## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF RHODE ISLAND

| | | |
|---|---|---|
| **RELENTLESS INC.;** | : | |
| **HUNTRESS INC.;** | : | |
| **SEAFREEZE FLEET LLC** | : | |
| | : | |
| *Plaintiffs,* | : | |
| | : | |
| v. | : | |
| | : | |
| | : | |
| **U.S. DEPARTMENT OF COMMERCE;** | : | |
| **WILBUR L. ROSS, JR., in his official** | : | |
| **capacity as Secretary of Commerce;** | : | Civil Action No. _____ |
| **NATIONAL OCEANIC AND** | : | |
| **ATMOSPHERIC ADMINISTRATION;** | : | |
| **NEIL JACOBS, in his official capacity as** | : | |
| **Acting Administrator of NOAA;** | : | |
| **NATIONAL MARINE FISHERIES** | : | |
| **SERVICE, a/k/a NOAA FISHERIES;** | : | |
| **CHRIS OLIVER, in his official capacity** | : | |
| **as Assistant Administrator for** | : | |
| **NOAA Fisheries** | : | |
| | : | |
| *Defendant*s. | : | |

Plaintiffs Relentless Inc. ("Relentless"), Huntress Inc. ("Huntress"), and Seafreeze Fleet LLC ("Seafreeze") submit this Complaint for Permanent Injunctive and Declaratory Relief to prohibit the Department of Commerce, by and through the National Oceanic and Atmospheric Administration and the National Marine Fisheries Service, from enforcing an unlawful and unconstitutional industry-funded at-sea monitor mandate on the nation's Atlantic herring fishermen promulgated through the New England Fishery Management Council's Industry-Funded Monitoring Omnibus Amendment ("IFM Amendment"), *available at* http://bit.ly/IFMOmnibus, and the February 7, 2020 Final Rule ("Final Rule"), *see* 85 Fed. Reg. 7,414 (to be codified at 50 C.F.R. pt. 648), implementing the IFM Amendment, and alleges as follows:

## INTRODUCTION

1.      Plaintiffs Relentless, Huntress, and Seafreeze bring this action because Defendants, a coterie of regulatory overseers, have exceeded the bounds that the Constitution and applicable statutes afford them and have imposed unwarranted, unlawful, and ruinous at-sea monitors ("ASMs") upon Plaintiffs' fishing fleet.  Defendants have done this despite the clear language in the Magnuson-Stevens Act, from which they purport to draw authority, which nowhere mentions "at-sea monitors" and fails to allow any Defendant to require any vessel to pay for such monitors. This unconstitutional power grab not only threatens the viability and livelihood of Plaintiffs but also the many others who draw their livelihood from the sea.

## JURISDICTION AND VENUE

2.      This is an action arising under the Magnuson-Stevens Fishery Conservation and Management Act, as amended by the Sustainable Fisheries Act, 16 U.S.C. § 1801 *et seq.* ("MSA"); the Administrative Procedure Act ("APA"), 5 U.S.C. § 701 *et seq.*; and the Regulatory Flexibility Act, 5 U.S.C. § 601 *et seq.* ("RFA").

3.      This Court has jurisdiction pursuant to the MSA. 16 U.S.C. §§ 1855(f), 1861(d). Review under the MSA is conducted in accordance with the APA, 5 U.S.C. § 701 *et seq.*

4.      This Court has jurisdiction pursuant to 28 U.S.C. § 1331 and the APA, 5 U.S.C. § 701 *et seq.* The challenged rule is final and reviewable agency action. 5 U.S.C. § 704.

5.      This Court has jurisdiction pursuant to 28 U.S.C. § 1331 and the RFA. 5 U.S.C. § 611.

6.      Venue is proper pursuant to 28 U.S.C. § 1391(e).

7.      Plaintiffs' petition for review is timely filed pursuant to the MSA and RFA. 16 U.S.C. § 1855(f); 5 U.S.C. § 611.

8.      This Court may issue a declaratory judgment pursuant to 28 U.S.C. §§ 2201-2202 and grant permanent injunctive relief pursuant to the APA, 5 U.S.C. § 706; and the MSA, 16 U.S.C.

§§ 1855(f), 1861(d).

## PARTIES

9.     Plaintiff RELENTLESS INC. is a corporation organized and operating under the laws of the State of Rhode Island and Providence Plantations. Relentless Inc. was founded over 30 years ago and is headquartered in North Kingstown, Rhode Island. Relentless Inc. owns and operates F/V *Relentless* (collectively, "Relentless"), a high-capacity freezer trawler that alternatively but sometimes simultaneously harvests Atlantic herring (*Culpea harengus*), Loligo and Illex squids (*Doryteuthis (Amerigo) pealeii* and *Illex illecebrosus*, respectively), Butterfish (*Peprilus triacanthus*), and Atlantic mackerel (*Scomber scombrus*).  F/V *Relentless* uses a unique at-sea freezing technique that allows the vessel to stay at sea longer than other vessels in the Atlantic herring fishery and provides the vessel flexibility in what catch it harvests during fishing trips. For Atlantic herring, F/V *Relentless* uses small-mesh bottom trawl gear and holds a Category A permit. Plaintiff Relentless will be subject to Defendants' industry-funded at-sea monitoring mandate, and it will be adversely affected when the IFM Amendment and the Final Rule take effect. Due to F/V *Relentless*'s unique at-sea freezing technique, Relentless will also be subject to disparate treatment relative to the rest of the Atlantic herring fleet under the IFM Amendment and the Final Rule.

10.     Plaintiff HUNTRESS INC. is a corporation organized and operating under the laws of the State of Rhode Island and Providence Plantations. Huntress Inc. was founded over 30 years ago and is headquartered in North Kingstown, Rhode Island. Huntress Inc. owns and operates F/V *Persistence* (collectively, "Huntress"), a high-capacity freezer trawler that alternatively but sometimes simultaneously harvests Atlantic herring (*Culpea harengus*), Loligo and Illex squids (*Doryteuthis (Amerigo) pealeii* and *Illex illecebrosus*, respectively), Butterfish (*Peprilus triacanthus*), and Atlantic mackerel (*Scomber scombrus*). F/V *Persistence* uses a unique at-sea freezing technique that allows the vessel to stay at sea longer than other vessels in the Atlantic herring fishery and provides

the vessel flexibility in what catch it harvests during fishing trips. For Atlantic herring, F/V *Persistence* uses small-mesh bottom trawl gear and holds a Category A permit. Plaintiff Huntress will be subject to Defendants' industry-funded at-sea monitoring mandate, and it will be adversely affected when the IFM Omnibus Amendment and the February 7, 2020 Final Rule take effect. Due to F/V *Persistence*'s unique at-sea freezing technique, Huntress will also be subject to disparate treatment relative to the rest of the Atlantic herring fleet under the IFM Amendment and the Final Rule.

11.     Plaintiff SEAFREEZE FLEET LLC ("Seafreeze") is a Limited Liability Company organized and operating under the laws of the Commonwealth of Massachusetts. Seafreeze is headquartered in Ipswich, Massachusetts. Seafreeze owns plaintiffs Relentless and Huntress (collectively, "Plaintiffs"). Seafreeze's vessels will be subject to Defendants' industry-funded at-sea monitoring mandate, and it will be adversely affected when the IFM Amendment and the Final Rule take effect. Due to Seafreeze fishing vessels' unique at-sea freezing technique, Seafreeze will also be subject to disparate treatment relative to the rest of the Atlantic herring fleet under the IFM Amendment and the Final Rule.

12.     Defendant UNITED STATES DEPARTMENT OF COMMERCE ("Dept. of Commerce" or the "Department") is an agency of the United States of America. Under the MSA, the Department has primary management responsibility for domestic marine fisheries in federal waters, which it has delegated.

13.     Defendant WILBUR L. ROSS, JR. is the Secretary of the United States Department of Commerce. He is sued in his official capacity.

14.     Defendant NATIONAL OCEANIC AND ATMOSPHERIC ADMINISTRATION ("NOAA") is a scientific agency within the Dept. of Commerce. It has the delegated responsibility to manage

domestic marine fisheries in federal waters, which it has sub-delegated to the National Marine Fisheries Service. NOAA promulgated the final rule at issue.

15.     Defendant DR. NEIL JACOBS is the Assistant Secretary of Commerce for Environmental Observation and Prediction and Acting Administrator of NOAA. He is sued in his official capacity.

16.     Defendant NATIONAL MARINE FISHERIES SERVICE ("NMFS" or "NOAA Fisheries") is a line office within NOAA. It has the sub-delegated responsibility to manage domestic marine fisheries in federal waters.

17.     Defendant CHRIS OLIVER is the Assistant Administrator for NOAA Fisheries. He is sued in his official capacity.

**STATUTORY AND REGULATORY BACKGROUND**

**The Magnuson-Stevens Act and the Fishery Conservation and Management Framework**

18.     Recognizing the economic importance of commercial and recreational fishing, the MSA was adopted to protect, manage, and grow the United States' fishery resources. To achieve these goals, the MSA delineates scientific and conservation-based statutory obligations to sustainably manage fishery resources for the benefit of the fishing industry and the environment. 16 U.S.C. § 1801 *et seq.*

19.     The MSA grants the Dept. of Commerce the ability to exercise "sovereign rights" to conserve and manage fisheries resources "for the purposes of exploring, exploiting, conserving, and managing all fish" in the Exclusive Economic Zone ("EEZ"). 16 U.S.C. §§ 1801(b)(1), 1811(a). Generally, the EEZ extends from the seaward boundary of each of the coastal States to 200 nautical miles offshore. 16 U.S.C. § 1802(11).

20.     The MSA provides for the development and implementation of fishery management plans ("FMPs") for fisheries. 16 U.S.C. § 1801(b)(4). FMPs are implemented with the goal of continually achieving and maintaining optimum yield within such fishery. *Id.* All FMPs, and their implementing regulations, must be prepared and executed in accordance with ten fishery conservation and management "National Standards." *Id.*; 16 U.S.C. § 1851(a). At least, five of the standards are implicated by the IFM Amendment and the Final Rule:

a.      National Standard One requires that "[c]onservation and management measures shall prevent overfishing while achieving, on a continuing basis, the optimum yield from each fishery for the United States fishing industry." 16 U.S.C. § 1851(a)(1).

b.      National Standard Two requires that "[c]onservation and management measures shall be based upon the best scientific information available." 16 U.S.C.

§ 1851(a)(2).

c.      National Standard Six requires that "[c]onservation and management measures shall take into account and allow for variations among, and contingencies in, fisheries, fishery resources, and catches." 16 U.S.C. § 1851(a)(6).

d.      National Standard Seven requires that "[c]onservation and management measures shall, where practicable, minimize costs and avoid unnecessary duplication." 16 U.S.C. § 1851(a)(7).

e.      National Standard Eight requires that "[c]onservation and management measures shall, consistent with the conservation requirements…, take into account the importance of fishery resources to fishing communities by utilizing economic and social data that [are based upon the best scientific information available], in order to (A) provide

for the sustained participation of such communities, and (B) to the extent practicable, minimize adverse economic impacts on such communities." 16 U.S.C. § 1851(a)(8).

21.     The MSA establishes eight Regional Fishery Management Councils ("Councils"). 16 U.S.C. § 1852(a)(1). The Councils share fishery conservation, management, and regulatory responsibilities with the Dept. of Commerce and NOAA. Two of the eight Councils are relevant to the action challenged here: the New England Fishery Management Council ("NEFMC") and the Mid-Atlantic Fishery Management Council ("MAFMC"). 16 U.S.C. § 1852(a)(1).

   a.  The NEFMC consists of the States of Maine, New Hampshire, Massachusetts, Rhode Island, and Connecticut and has jurisdiction over fisheries and waters seaward of the coastal waters of those states. 16 U.S.C. § 1852(a)(1)(A). The NEFMC has 18 voting members, including 12 appointed by the Secretary of Commerce (the "Secretary"). *Id.*

   b.  The MAFMC consists of the States of New York, New Jersey, Delaware, Pennsylvania, Maryland, Virginia, and North Carolina and has jurisdiction over fisheries and waters seaward of the coastal waters of those states. 16 U.S.C. § 1852(a)(1)(B). The MAFMC has 21 voting members, including 13 that are appointed by the Secretary. *Id.*

   c.  Councils, including the NEFMC and MAFMC, are comprised of voting and non-voting members. 16 U.S.C. § 1852(b), (c).

22.     The Councils prepare, monitor, and revise FMPs. 16 U.S.C. § 1801(b)(5). The Councils, in conjunction with the Secretary, may also propose regulations implementing or modifying an FMP or plan amendment. 18 U.S.C. § 1853(c); *cf.* 18 U.S.C. § 1855(d).

23.     The Councils also provide a forum through which the fishing industry, as well as other interested parties, can take an active role in advising, establishing, and administering FMPs. 16 U.S.C. § 1801(b)(5).

24.    The MSA prescribes the required and discretionary provisions of FMPs. 18 U.S.C. § 1853.

     a.    Among other requirements, FMPs must include conservation and management measures; fishery descriptions; certain yield assessments; essential fish habitat identification; fishery impact statements; criteria for identifying overfishing within the fishery; standardized reporting methodology for bycatch analysis; and a mechanism for setting annual catch limits. 18 U.S.C. § 1853(a).

     b.    Among other provisions, FMPs may include fishery permits; designation of limited or closed off fishing zones; limitations on catch and sale of fish; prohibitions and requirements related to gear types; requirements for carrying observers on board to collect conservation and management data; reservation of portions of allowable catch for use in scientific research. 18 U.S.C. § 1853(b).

25.    The MSA does not contemplate or even use the term "at-sea monitor."

26.    The MSA permits information collections that are beneficial for developing, implementing, or revising FMPs. 18 U.S.C. § 1881a(a)(1). If a Council determines such information collection is necessary, it may request that the Secretary implements the collection. *Id.* If the Secretary determines that the collection is justified, then the Secretary has the duty to promulgate regulations implementing the collection program. *Id.* If determined necessary, the Secretary may also initiate an information collection. 18 U.S.C. § 1881a(a)(2).

27.    The MSA explicitly authorizes the collection of fees in certain circumstances for specific purposes:

     a.    The MSA authorizes the Secretary to collect fees to cover actual costs directly related to the management, of, data collection for, and enforcement of limited access privilege programs and certain community development quota programs. 16 U.S.C.

8

§ 1854(d). Such fees are capped at 3 percent of the ex-vessel value of fish harvested under those programs. 16 U.S.C. § 1854(d)(2)(B).

b.      The MSA explicitly permits the North Pacific Fishery Council ("NPFC") to establish a system of fees to pay for the cost of implementing fisheries research plans, including mandated observers, for certain fisheries under its jurisdiction. 16 U.S.C.

§ 1862(a). There is no such provision for the NEFMC- or MAFMC-managed fisheries.

c.      The MSA also explicitly permits the Secretary to charge fees, under certain circumstances, to foreign fishing vessels that harvest fish in United States' jurisdictional waters to pay for observers. 16 U.S.C. § 1827.

### The Regulatory Flexibility Act

28.      The RFA requires administrative agencies to consider the effect of their actions on small entities, including small businesses. The purpose of the RFA is to enhance agency sensitivity to the economic impact of rulemaking on small entities to ensure that alternative proposals receive serious consideration at the agency level.

29.      The RFA provides that, whenever an agency is required by the APA to publish a general notice of proposed rulemaking, it must prepare and make available for public comment an Initial Regulatory Flexibility Analysis ("IFRA"), 5 U.S.C. § 603(a), and subsequently prepare and make public a Final Regulatory Flexibility Analysis ("FRFA"). 5 U.S.C. § 604. An agency must also publish the FRFA or a summary of the FRFA in the *Federal Register*. 5 U.S.C. § 604(b).

30.      When an agency takes a final action that is subject to the RFA, including the promulgation of final rules, but does not comply with the RFA, "a small entity that is adversely affected or aggrieved by final agency action is entitled to judicial review." 5 U.S.C. § 611(a).

31.     Under NMFS regulations, the "small business size standard" for commercial fishing businesses, and their affiliates, "is $11 million in annual gross receipts." 50 C.F.R. § 200.2; 5 U.S.C. § 601(3).

## FACTUAL ALLEGATIONS

### The Atlantic Herring Fishery and Atlantic Herring FMP

32.     Atlantic herring, or *Culpea harengus*, are small schooling fish from the family *Clupeidae*.

33.     Atlantic herring are found across the North Atlantic, but in the western North Atlantic they are distributed from Labrador, Canada to Cape Hatteras, North Carolina. In federally managed waters, the Atlantic herring population is concentrated from New England to New Jersey.

34.     Atlantic herring is a biologically important species as it plays a base role in the food web of the marine ecosystem.

35.     Atlantic herring is also an economically important species. The commercial herring fishery has operated in New England for hundreds of years. And since 2010, the fishery has consistently landed over $20 million in Atlantic herring each year.

36.     According to the 2018 stock assessment, Atlantic herring are not overfished, nor are they subject to overfishing. *See* NOAA Fisheries, *Atlantic Herring* (last visited Mar. 2, 2020) *available at* https://www.fisheries.noaa.gov/species/atlantic-herring. The 2018 stock assessment also indicated that Atlantic herring stock levels are well above their target levels. *Id.* Despite this, the 2018 herring stock assessment has led to a nearly 70 percent reduction in herring quotas for 2019. *See* NOAA, Adjustment to Atlantic Herring Specifications and Sub-Annual Catch Limits for 2019, 84 Fed. Reg. 2,760 at 2,765 (Feb. 8, 2019) (to be codified at 50 C.F.R. pt. 648).

37.     In state coastal waters, the states and the Atlantic States Marine Fisheries Commission ("ASMFC") manage and regulate Atlantic herring under Amendment 3 to the Interstate Fishery

Management Plan. *See* ASMFC, *Atlantic Herring* (last visited Mar. 2, 2020) *available at* http://www.asmfc.org/species/atlantic-herring.

38.     In federal waters, the NEFMC manages Atlantic herring under the Atlantic Herring FMP. *See* NEFMC, Final Atl. Herring Fishery Mgmt. Plan (Mar. 8, 1999) *available at* http://bit.ly/NEFMCAHFMP. The Atlantic herring population is distributed across the jurisdictional boundaries of the NEFMC and MAFMC, which consulted on the Atlantic Herring FMP.

39.     Since its March 1999 adoption, the Atlantic Herring FMP has been subject to seven amendments and four framework adjustments. *See generally* NEFMC, *Atlantic Herring* (last visited Mar. 2, 2020) *available* at https://www.nefmc.org/management-plans/herring. There are currently an additional two amendments and three framework adjustments to the Atlantic Herring FMP under development. *See id.*

40.     The Atlantic Herring FMP sets out, in its original form and through amendments and framework adjustments, numerous primary management measures to help develop a sustainable herring fishery. *See id.* (listing the Atlantic Herring FMP including approved and in-development amendments and framework adjustments). Such conservation and management measures include, but are not limited to:

    a.      Adopting a total catch limit, or annual catch limit ("ACL"), which is distributed across time and areas;[1]

    b.      Controlling and limiting catch as the ACL is neared, as well as closing off areas when the ACL is reached;

    c.      Closing spawning areas and designating essential Atlantic herring habitat;

---

[1] The ACL is the maximum amount of fish that can be sustainably harvested each year.

      d.      Mandatory permitting of certain Atlantic herring vessels, operators, dealers, and processors, as well as vessel, gear, and possession restrictions;

      e.      Requiring certain data reporting; and,

      f.      Defining overfishing of Atlantic herring.

41.     The NEFMC revises quota and management specifications every three years. The most recent quota and management specifications were finalized and approved in 2016, and specifications for the 2019-2021 period are under development. *See* NOAA, Specification of Management Measures for Atlantic Herring for the 2016-2018 Fishing Years, 81 Fed. Reg. 75,731 (Nov. 1, 2016) (to be codified at 50 C.F.R. pt. 648); *see also* NOAA, Framework Adjustment 6 and the 2019-2021 Atlantic Herring Fishery Specifications, 85 Fed. Reg. 4,932 (proposed Jan. 28, 2020) (to be codified at 50 C.F.R. pt. 648).

42.     There are three primary gear types used to catch and harvest Atlantic herring: midwater trawl, purse seine, and bottom trawl. While there are many variations in gear type, the three types of gear generally operate as follows:

      a.      Midwater trawlers generally harvest by deploying and towing nets that have a large opening at one end and that narrow at the back end. This allows the trawlers to capture the herring as they school in the water column. Midwater trawlers may also do "pair trawling," which is done by pulling a single net between two fishing vessels.



<u>Figure 1</u>: Midwater Trawls, *available at* http://bit.ly/MidwaterTrawls

b.       Purse seiners generally deploy a wall of netting, a seine, around an area or schooling herring. The seine has floats along the top line and a lead line that threads through rings along the bottom of the seine. When catch is identified, the lead line is pulled causing the net to purse at the bottom, so the herring remain in the net as it is pulled to the surface.



<u>Figure 2</u>: Purse Seines, *available at* http://bit.ly/PurseSeines

c.       Bottom trawlers generally harvest herring by using nets fitted with weights and special gear that allow the net to stay open as it is trawled along the ocean floor. The nets are fitted with mesh that confine the fish as they are pulled to the surface.



<u>Figure 3</u>: Bottom Trawls *available at* http://bit.ly/BottomTrawls

43.     Midwater trawl and purse seine are responsible for most of the Atlantic herring landings.

44.     Under the Atlantic Herring FMP, there are four regulated Atlantic herring fishing management areas: Areas 1 (subdivided into Areas 1A and 1B), 2, and 3. The NEFMC allocates a stock-wide ACL across these four management areas ("sub-ACLs"). *See* 50 C.F.R. § 648.200(f).

a.     Area 1 includes state and federal inshore (Area 1A) and offshore (Area 1B) waters in the Gulf of Maine that are adjacent to the states of Maine, New Hampshire, and Massachusetts.

b.     Area 2 includes state and federal waters in the South Coastal Area that are adjacent to the states of Massachusetts, Rhode Island, Connecticut, New York, New Jersey, Delaware, Maryland, Virginia, and North Carolina.

c.     Area 3 includes all federal waters in the Georges Bank.



Figure 4: Atlantic Herring Management Areas *available at* http://bit.ly/AHMAMap

45.     Permits for Atlantic herring vessels are divided by permit type—limited and open access—and permit category—A, B, C, D, E, and F—which place restrictions where vessels can fish and how much herring they can possess.  50 C.F.R. § 648.4(a)(10)(iv)-(v); 50 C.F.R. § 648.204;

*see also* NOAA Fisheries, *Atlantic Herring* (last visited Mar. 2, 2020) *available at* https://www.fisheries.noaa.gov/species/atlantic-herring. Only Categories A and B are impacted by the IFM Amendment and the Final Rule.

      a.      Category A permits are "All Areas Limited Access" permits. Vessels holding Category A permits can possess an unlimited amount of herring in all areas. Plaintiffs' vessels, F/Vs *Relentless* and *Persistence* each hold Category A permits.

      b.      Category B permits are "Areas 2/3 Limited Access" permits. Vessels holding Category B permits can possess an unlimited amount of herring in Areas 2 and 3, but they are excluded from Areas 1A and 1B.

46.      Subject to ACL closures and limitations, the Atlantic herring fishery year runs from January 1 through December 31.

### Plaintiffs' Vessels: F/V *Relentless* and F/V *Persistence*

47.      Plaintiffs Relentless and Huntress are small businesses whose primary industry is commercial fishing. Their annual gross receipts are less than or equal to $11 million. They are subject to the IFM Amendment and the Final Rule.

48.      F/Vs *Relentless* and *Persistence* are high-capacity freezer trawlers that alternatively and sometimes simultaneously harvest Atlantic herring, as well as other managed species including Loligo and Illex squids (*Doryteuthis (Amerigo) pealeii* and *Illex illecebrosus*, respectively), Butterfish (*Peprilus triacanthus*), and Atlantic mackerel (*Scomber scombrus*).

49.      F/Vs *Relentless* and *Persistence* hold several permits and operate across the jurisdictional boundaries of the NEFMC and the MAFMC. When harvesting Atlantic herring, F/Vs *Relentless* and *Persistence* use small mesh bottom trawl gear and operate under Category A permits.

50.      Plaintiffs typically declare into herring, squid, and mackerel fisheries on the trips they take from late November through April because they harvest all those species alternatively but

sometimes simultaneously during the season.  That is, they may take each species, some or all species during a trip. This flexible style of fishing allows Plaintiffs to cover operating costs by switching over to a different species based on what they can catch.

51.     "Declaring" means informing regulatory authorities of what species a vessel intends to pursue on any given trip.



<u>Figure 5</u>: From left, F/Vs *Persistence* and *Relentless* afloat.

52.     Prior to every trip, Plaintiffs are required to call and notify for observers for their gear type for each trip.

53.     For herring/mackerel trips, Plaintiffs have noticed a higher-than-average observer rate than NMFS has claimed is average for the herring fishery.  For example, from November 2014 to April 2015 the F/V *Relentless* had 50 percent herring/mackerel observer coverage.

54.     Under Plaintiffs' style of fishing it is possible to have a declared herring/mackerel trip, that is selected for observer coverage, that only harvests squid and butterfish.

55.     Similarly, under the IFM Amendment and Final Rule, Plaintiffs may be forced to carry a herring at-sea monitor on a declared herring trip, that does not end up harvesting herring. Under

the IFM Amendment and Final Rule, Plaintiffs will be forced to pay for the at-sea monitor from other-species revenue, not Atlantic-herring revenue.

56.     While other vessels in the herring fishery conduct multi-species trips—herring and mackerel, managed by MAFMC under its own FMP, school together and are regularly harvested together—on information and belief, F/Vs *Relentless* and *Persistence* are the only vessels in the Atlantic herring fleet who declare into and/or harvest squid and butterfish on the same trip as declared Atlantic herring trips.

57.     Plaintiffs process their catch and freeze at sea.  Under Plaintiffs' process, all catch is brought aboard, hand sorted on a conveyor belt, hand packaged, and then frozen. Any discards or unwanted bycatch are also hand sorted and retained in discard baskets.

58.     In comparison to other vessels in the Atlantic herring fishery, F/Vs *Relentless* and *Persistence* have more limited catching and processing capacity, longer trips, and higher overhead costs. For example,

        a.     Plaintiffs are limited up to about 125,000 pounds of catch per day due to limited freezing capacity, compared to other vessels in the herring fleet which can harvest in excess of 500,000 pounds of catch per day.

        b.     Plaintiffs' trips typically last 7-14 days at sea, compared to 2-3 days for other vessels in the herring fleet.

        c.     F/Vs *Relentless* and *Persistence* require twice as many crew members to operate, compared to other vessels in the herring fleet.

59.     If Plaintiffs are unable to use the flexible style of fishing they have developed—due to costs associated with the IFM Amendment and the Final Rule—it could result in fishing trips losing rather than making money.

### The New England Council's Industry-Funded Monitoring Omnibus Amendment

60.     The IFM Amendment and Final Rule are the culmination of almost seven years of design and development by the NEFMC, MAFMC, and NMFS. *See* NEFMC, *Observer Policy Committee (Industry-Funded Monitoring)* (last visited Mar. 2, 2020) *available at* https://www.nefmc.org/committees/observer-policy-committee. The IFM Amendment and Final Rule allows industry-funded monitoring in NEFMC FMPs, except for those under joint-management with MAFMC, *e.g.,* mackerel. *See* Final Rule at 7,414 (Exhibit 1).

61.     Since announcing the development of the IFM Amendment, its reception has been contentious. Industry stakeholders, including Plaintiffs through their sister company, Seafreeze Ltd., have expressed concerns over the regulatory burdens placed on them by the proposed IFM Amendment and its alternatives. *See* Comment from Meghan Lapp, Fisheries Liaison, Seafreeze Ltd., to Herring/Observer Committee Members (June 30, 2015) ("June 30, 2015 Comment Letter") (Exhibit 2); *see also* Comment from Meghan Lapp, Fisheries Liaison, Seafreeze Ltd., to NEFMC and MAFMC (Nov. 4, 2016) (submitted in response to NEFMC and MAFMC's published Notice of Public Hearings and request for comments (NOAA, Public Hearings, 81 Fed. Reg. 64,426 (Sept. 20, 2016))) ("Nov. 4, 2016 Comment Letter") (Exhibit 3).

     a.     In the June 30, 2015 Comment Letter, Seafreeze explained how F/V *Relentless* and F/V *Persistence* declare into multiple fisheries on a typical trip, that flexibility is necessary to maintain their style of fishing and provided data in support of these assertions. *See* Exhibit 2 at 1. Among other issues, the letter also raised concerns over the high cost of at-sea monitoring coverage for these vessels and requested that the Committee create a separate category under any IFM Amendment that would account for the unique issues that arise from operating freezer vessels. *Id.* at 1, 4.

b.     Among other issues in the Nov. 4, 2016 Comment Letter, Seafreeze reiterated

the positions it took in its June 30, 2015 Comment Letter and provided additional specific

commentary regarding why it could only support "Omnibus Alternative 1, No Action."

*See* Exhibit 3. The letter indicated disagreement with the funding mechanism for additional

monitoring, *i.e.,* industry-funding, because the monitoring is inherently a public function,

and it said that "[p]ublic funds should be used for public purposes." *Id.* at 2. The letter

also indicated that costs to Seafreeze's vessels would be disproportionate relative to the

rest of the herring fleet because of its style of fishing. *Id.* at 2-5.

62.     Seafreeze submitted subsequent comments raising concerns with the IFM

Amendment to the Herring Committee. *See* Comment from Meghan Lapp, Fisheries Liaison,

Seafreeze Ltd., to Council Members (undated) ("Undated Comment Letter") (Exhibit 4); *see also*

Comment from Meghan Lapp, Fisheries Liaison, Seafreeze Ltd., to Herring Committee Members

(Feb. 3, 2017) ("Feb. 3, 2017 Comment Letter") (Exhibit 5); *see also* Comment from Meghan Lapp,

Fisheries Liaison, Seafreeze Ltd., to Herring Committee Members (Mar. 30, 2017) ("Mar. 30, 2017

Comment Letter") (Exhibit 6).

a.     The Undated Comment Letter indicated Seafreeze's opposition to 100 percent

observer coverage and electronic monitoring. *See* Exhibit 4. It also inquired about the

availability of independent economic analysis of the amount of herring vessels typically

catch and about requesting a separation or exemption between vessels that are herring-

focused versus vessels that are mixed species-focused like F/Vs *Relentless* and *Persistence*. *Id.*

b.     The Feb. 3, 2017 Comment Letter requested that the NEFMC reconsider the

economic impacts of its decision to select 50 percent at-sea monitor coverage. *See* Exhibit

5.  The letter again raised Seafreeze's concerns over the disproportionate costs borne by

its vessels, including the fact that under the IFM Amendment, it would be forced to pay $39,313 a year for herring at-sea monitors on trips that do not land herring. *Id.*

      c.      The Mar. 30, 2017 Comment Letter resubmitted prior written comments. *See* Exhibit 6.

63.      On or about April 20, 2017, the NEFMC finalized its preferred alternatives and adopted the IFM Amendment. *See* Final Rule at 7,414.

64.      A year later, on April 19, 2018, the NEFMC "refined" its industry-funded monitoring recommendations. *Id.*

65.      On September 19, 2018, the NEFMC published a Notice of Availability for the IFM Amendment in the *Federal Register. See* NOAA, Industry-Funded Monitoring, 83 Fed. Reg. 47,326 (Sept. 19, 2018) (Exhibit 7). The Notice of Availability permitted interested parties to submit comments regarding adoption of the IFM Amendment for a 60-day period ending on November 18, 2018. *Id.*

66.      In early-October 2018, while the IFM Amendment comment period was still open, the MAFMC postponed action on the IFM Amendment for the mackerel fishery. *See* MAFMC, *Omnibus Industry Funded Monitoring Amendment* (last visited Mar. 2, 2020) *available at* http://www.mafmc.org/actions/omnibus-observer-funding.

67.      On November 7, 2018, while the IFM Amendment comment period was still open, the proposed rule implementing the IFM Amendment was published in the *Federal Register*. NOAA, Industry-Funded Monitoring Proposed Rule, 83 Fed. Reg. 55,665 (Nov. 7, 2018) ("Proposed Rule") (Exhibit 8). The Proposed Rule permitted interested parties to submit comments regarding the implementing rule for a 47-day period ending on December 24, 2018. *Id.*

68.      Plaintiffs, through their sister company, Seafreeze Ltd., as well as other members of the Atlantic herring fleet, submitted comments during the Proposed Rule's comment period. The

comments in response to the Proposed Rule were generally negative. *See, e.g.,* Comment from Meghan Lapp, Fisheries Liaison, Seafreeze Ltd., regarding Comments on NOAA-NMFS-2018-0109 (Dec. 24, 2018) ("Dec. 24, 2018 Comment Letter") (Exhibit 9).

      a.     The Dec. 24, 2018 Comment Letter raised several issues with the Proposed Rule implementing the IFM Amendment. *See* Exhibit 9. First, the comment letter raised issue with NEFMC moving forward with the IFM Amendment without MAFMC, which could force Mid-Atlantic fisheries into industry-funding monitoring by default. *Id.* at 1. The letter also reiterated the fact that the IFM Amendment disproportionately impacts Seafreeze vessels. *Id.* Seafreeze also again raised the fact that at-sea monitoring for the purpose of data collection "is an inherently governmental function" and that such industry-funded monitoring is not permitted under the MSA. *Id.* at 2-3. The Dec. 24, 2018 Comment Letter also challenged that forcing vessels to contract with at-sea monitoring providers is an impermissible tax that has not been approved by Congress. *Id.* at 3. The Comment Letter also reiterated that Seafreeze's unique style of harvesting, processing, and freezing at sea should be taken into consideration in the Final Rule. *Id.* at 4-6.

69.     On December 18, 2018, while the comment period for the Proposed Rule implementing the IFM Amendment was still open, the Secretary notified the NEFMC in an unpublished letter that the Secretary approved the IFM Amendment. *See* Final Rule at 7,414; *see also* Letter from Michael Pentony, Greater Atlantic Region Sustainable Fisheries Office ("GARFO") Regional Administrator, to Dr. John Quinn, NEFMC Chairman (Dec. 18, 2018) (Exhibit 10).

70.     At the January 30, 2020, NEFMC meeting, a representative from GARFO presented information about the forthcoming Final Rule. *See* GARFO, *Industry-Funded Monitoring Amendment:*

*Atlantic Herring Fishery* (last visited Mar. 2, 2020) *available at* http://bit.ly/IFMAmendmentPresentation ("IFM Amendment Presentation") (Exhibit 11).

71.    On February 7, 2020, NMFS and NOAA adopted the Final Rule implementing the IFM Amendment, which was substantially the same as the Proposed Rule. *See* Final Rule at 7,422.

72.    The Defendants' response to concerns raised by stakeholders was a near wholesale rejection of the comments submitted. *See id.* at 7,422-7,427. All of Plaintiffs' comments and concerns, including a requested exclusion for small-mesh bottom trawlers that process and freeze at sea, were rejected by the Final Rule. *Id.*

73.    The IFM Amendment and the Final Rule establish a 50 percent monitoring coverage target for at-sea monitoring. *See* Final Rule at 7,422; 7,425; *see also* IFM Amendment Presentation at 4. This target is achieved by combining Standardized Bycatch Reporting Methodology ("SBRM") of the Northeast Fisheries Observer Program ("NEFOP") plus IFM coverage. *See* Final Rule at 7,417; 7,418. The Atlantic herring vessel owners pay for the IFM sampling cost— approximately $710 per day—and NOAA Fisheries pays for IFM administrative costs. *See* Final Rule at 7,415. SBRM NEFOP is funded by NOAA Fisheries. *See* NOAA Fisheries, *Industry-funded Monitoring in the Atlantic Herring Fishery* (last updated Feb. 28, 2020) *available at* http://bit.ly/IFMmonitoring.

74.    The IFM Amendment forces many Atlantic herring vessel owners, including Plaintiffs, to enter forced negotiations with private at-sea monitor providers that are approved and trained by NOAA. *See* IFM Amendment Presentation at 7. The information and data at-sea monitors collect is directed by NOAA Fisheries and the NEFMC. *See* Final Rule at 7,418.

75.    As small-mesh bottom trawls, F/Vs *Relentless* and *Persistence* are not eligible for the at-sea monitoring alternative—electronic monitoring with portside sampling—thus, they can only comply with the IFM mandate by carrying and bearing the cost of an at-sea monitor. *See id.* at

7,419. Even if the alternative were available, Plaintiffs would not receive any relief as it is their view that electronic monitoring violates the Fourth and Fifth Amendments of the U.S. Constitution. *See id.* at 7,423.

76.     The IFM Amendment and the Final Rule project that, for vessels like F/Vs *Relentless* and *Persistence* that cannot use electronic monitoring, implementing the IFM Amendment will reduce returns-to-owner ("RTO") by almost 20 percent. *See id.* at 7,418; 7,425.

77.     The Final Rule also develops a standard process to implement and revise industry-funded monitoring programs in the Atlantic herring and other FMPs under NEFMC's jurisdiction. *See* Final Rule at 7,415.

78.     Starting April 1, 2020, vessels issued Category A or B permits, including F/Vs *Relentless* and *Persistence* are required to pay for at-sea monitoring on trips NEFMC selects for IFM coverage. *Id.* at 7,420.

### CLAIMS FOR RELIEF

### COUNT ONE
### INDUSTRY FUNDING IS UNLAWFUL

79.     Plaintiffs reallege and incorporate by reference the allegations contained in paragraphs 1-78, as if fully set forth herein.

80.     Under the MSA, and in accordance with the APA, this Court is authorized to hold unlawful and set aside agency action, findings, and conclusions that it finds to be arbitrary, capricious, an abuse of discretion, or not otherwise in accordance with law, 5 U.S.C. § 706(2)(A); contrary to constitutional right, power, privilege, or immunity, 5 U.S.C. § 706(2)(B); in excess of statutory jurisdiction, authority, or limitations, or short of statutory right; or without observance of procedure required by law, 5 U.S.C. § 706(2)(C). *See* 16 U.S.C. § 1855(f)(1).

81.     On February 7, 2020, Defendants promulgated the Final Rule implementing the IFM Amendment. Under the MSA and APA, that act is a final agency action subject to judicial review. 16 U.S.C. § 1855(f)(1); 5 U.S.C. § 704.

82.     The IFM Amendment and the Final Rule violate the MSA and other applicable laws.

83.     Mandating Plaintiffs to pay for the Atlantic herring at-sea monitoring program is arbitrary, capricious, an abuse of discretion, or not otherwise in accordance with law; contrary to constitutional right, power, privilege, or immunity; and in excess of statutory jurisdiction, authority, or limitations.

84.     By requiring Plaintiffs to pay for the Atlantic herring at-sea monitors, Defendants committed the following violations:

        a.     *Ultra vires* action in excess of any statutory authority granted by Congress; and

        b.     Infringing on Congress's exclusive legislative Powers vested by Article I, § 1 of the Constitution of the United States.

85.     Defendants lack the authority to require industry-funded at-sea monitoring in the Atlantic herring fishery. Thus, the IFM Amendment and the Final Rule are void and unenforceable to the extent they impose such a requirement.

### COUNT TWO
### THE INDUSTRY-FUNDED AT-SEA MONITORING PROGRAM IS NOT AUTHORIZED BY THE MSA OR ANY OTHER LAW, AND IT WOULD EXCEED CONGRESS' POWER IF IT WERE

86.     Plaintiffs reallege and incorporate by reference the allegations contained in paragraphs 1-78, as if fully set forth herein.

87.     Administrative agencies have only those powers and related regulatory abilities as delegated to them by statute. There is no other source of regulatory authority in an agency except statute. Agencies that exceed their delegated powers are acting unconstitutionally.

88.     The MSA explicitly authorizes the collection of fees in certain circumstances.

89.     The MSA authorizes the Secretary to collect fees to cover actual costs directly related to the management, of, data collection for, and enforcement of limited access privilege programs and certain community development quota programs. 16 U.S.C. § 1854(d). Such fees are capped at 3 percent of the ex-vessel value of fish harvested under those programs. 16 U.S.C. § 1854(d)(2)(B).

90.     The MSA explicitly permits the North Pacific Fishery Council ("NPFC") to establish a system of fees to pay for the cost of implementing fisheries research plans, including mandated observers, for certain fisheries under its jurisdiction. 16 U.S.C. § 1862(a).

91.     The MSA also explicitly permits the Secretary to charge fees, under certain circumstances, to foreign fishing vessels that harvest fish in United States' jurisdictional waters to pay for observers. 16 U.S.C. § 1827.

92.     This same statutory allocation of power to collect or order fees is absent from the MSA for domestic fisheries managed by the New England Fishery Management Council, including the Atlantic herring fishery.

93.     Only Congress has the power to "lay and collect Taxes, Duties, Imposts and Excises" and all such must be uniform throughout the United States.   U.S. Constitution, Article I., § 8. Similarly, under law, Congress must appropriate funds, and agencies may not augment the budgets assigned them by Congress.   The prohibition on non-statutory augmentation of budgets appropriated by Congress is a vital part of the structure of the Constitution and its separation of powers, and it also enjoys statutory support.

94.     There is in fact no such thing in the MSA as an "at-sea monitor" with the powers and duties ascribed in the IFM Amendment and the Final Rule.

95.     Congress has expressed in statute and by appropriations that it commands that the Atlantic herring fishery be regulated by appropriated funds.

96. Through their promulgation of the IFM Amendment and the Final Rule, Defendants have therefore arrogated to themselves a power of Congress that has not been delegated to them by clear statutory language in violation of, *inter alia*, Article I of the Constitution of the United States. Defendants have asserted a right of agencies to self-fund "off the books" that is alien to the Constitution and American law.

97. Plaintiffs will suffer harm from this unconstitutional and statutorily unauthorized seizure of power by an executive agency, which power is beyond any power of the executive.

**COUNT THREE**
**THE DEFENDANTS HAVE UNCONSTITUTIONALLY AND IN VIOLATION OF THE MSA
FORCED PLAINTIFFS INTO A MARKET THEY DO NOT WISH TO ENTER**

98. Plaintiffs reallege and incorporate by reference the allegations contained in paragraphs 1-97, as if fully set forth herein.

99. Defendants have also, without statutory authority, forced Plaintiffs into the artificially created "market" of at-sea monitors. If Plaintiffs simply do nothing vis-à-vis this market, they will be fined or forbidden from fishing under their permits. This also violates Article I of the Constitution of the United States. By forcing the Plaintiffs into a market that they do not wish to enter, Defendants' actions exceed the power of Congress or the Federal Government under the Constitution.

100. Without authority of the MSA or other statute Defendants have A) invented an office "at-sea monitor" found nowhere in the statute; B) forced Plaintiffs to accept the presence of such officers on their vessels; C) forced Plaintiffs into the "market" for "at-sea monitors."

101. Plaintiffs will suffer harm from this unconstitutional and statutorily unauthorized seizure of power by an executive agency, which power is beyond any power of the executive.

## COUNT FOUR
### INDUSTRY FUNDING VIOLATES THE REGULATORY FLEXIBILITY ACT

102.    Plaintiffs reallege and incorporate by reference the allegations contained in paragraphs 1-78, as if fully set forth herein.

103.    Under the MSA, and in accordance with the APA, this Court is authorized to hold unlawful and set aside agency action, findings, and conclusions that are taken without observance of the procedure required by law. 16 U.S.C. § 1855(f)(1); *cf.* 5 U.S.C. § 706(2)(D).

104.    Plaintiffs Relentless and Huntress are small businesses whose primary industry is commercial fishing. Their annual gross receipts are less than or equal to $11 million. They are subject to the IFM Amendment and the Final Rule. *See* 50 C.F.R. § 200.2; 5 U.S.C. § 601(3).

105.    Defendants failed to prepare legally sufficient initial or final regulatory flexibility analyses in violation of the RFA.

106.    Defendants' RFA violation is without observance of procedure required by law and is final agency action that is arbitrary, capricious, and an abuse of discretion in violation of the MSA and the APA.

107.    Given Defendants' violation of the RFA, the IFM Amendment and the Final Rule are void and unenforceable.

### PRAYER FOR RELIEF

Wherefore, the Plaintiffs pray for the following relief against the defendants:

A.    Declaratory judgment that the IFM Amendment and the Final Rule violate the United States Constitution's Article I, because Congress did not authorize the Defendants to create at-sea monitors to the Defendants, or to create the at-sea monitoring program in the Atlantic herring fishery, or the forced industry financing thereof.

B.      Declaratory judgment that the IFM Amendment and the Final Rule violate the United States Constitution.

C.      Declaratory judgment holding unlawful and setting aside the IFM Amendment and the Final Rule under the MSA.

D.      Declaratory judgment holding unlawful and setting aside the IFM Amendment and the Final Rule under the APA.

E.      Declaratory judgment that the IFM Amendment and the Final Rule are void and unenforceable under the RFA.

F.      Declaratory judgment that the Defendants cannot force Plaintiffs into a market they do not wish to enter.

G.      Injunctive relief permanently enjoining Defendants from enforcing the IFM Amendment and the Final Rule, and from requiring Plaintiffs to fund or contract for at-sea monitors and prohibiting their presence on Plaintiffs' vessels.

H.      For an award for all reasonable attorneys' fees and costs incurred herein and that Plaintiffs may be entitled to under law; and,

I.      For such other relief as this Court deems just and proper.


[Remainder of page intentionally left blank.]

Dated: March 4, 2020

Respectfully submitted,

/s/ Kevin J. Holley
Kevin J. Holley, Esq. #4639
Holley Law LLC
33 College Hill Road, Ste. 25C
Warwick, RI 02886
Phone: (401) 521-2622
kevin@holleylawllc.com

John Vecchione
Senior Litigation Counsel
Kara Rollins
Litigation Counsel
*Pro hac vice forthcoming*

New Civil Liberties Alliance
1225 19th Street NW, Suite 450
Washington, DC 20036
Phone: (202) 869-5210
john.vecchione@ncla.legal
kara.rollins@ncla.legal

*Counsel for Plaintiffs*