# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF RHODE ISLAND

|  |  |  |
|---|---|---|
| **RELENTLESS INC., et al.,** | : | |
| | : | |
| *Plaintiffs*, | : | |
| | : | |
| v. | : | Case No. 1: 20-cv-00108-WES-PAS |
| | : | |
| | : | |
| **U.S. DEPARTMENT OF COMMERCE,** | : | |
| **et al.,** | : | |
| | : | |
| *Defendant*s. | : | |

## PLAINTIFFS' MEMORANDUM IN SUPPORT OF
## MOTION FOR SUMMARY JUDGMENT

# TABLE OF CONTENTS

TABLE OF CONTENTS.................................................................................................ii

TABLE OF AUTHORITIES...........................................................................................iii

INTRODUCTION ............................................................................................................1

FACTS.............................................................................................................................2

    I.    THE ATLANTIC HERRING FISHERY AND ITS MANAGEMENT ................................2

        A.    The Atlantic Herring Fishery .................................................................2

        B.    Atlantic Herring Fishery Management....................................................3

        C.    Atlantic Herring Fishery Gear Types and Fishing Areas .......................4

    II.    PLAINTIFFS' VESSELS, BUSINESS, AND UNIQUE ISSUES ..................................8

    III.    THE PROPOSED IFM AMENDMENT AND FINAL RULE PROCESS....................10

        A.    Development of the IFM Amendment and Final Rule...........................10

        B.    Comments by Plaintiffs and Other Industry Stakeholders Regarding the IFM Amendment and Final Rule ...........................................................................12

        C.    The IFM Amendment and Final Rule ...................................................15

ARGUMENT...................................................................................................................19

    I.    STANDARD OF REVIEW ....................................................................................19

    II.    PLAINTIFFS ARE ENTITLED TO SUMMARY JUDGMENT BECAUSE INDUSTRY FUNDING IS UNLAWFUL AND IS NOT AUTHORIZED BY CONGRESS.......................................................20

        A.    The Structure and Purpose of the Magnuson-Stevens Act and Associated Regulatory Framework Do Not Support Industry-Funded Monitoring ............................................20

        B.    Administrative Power Derives from Statute and Summary Judgment Should Issue as Congress Did Not Authorize Industry-Funded at-Sea Monitors ...................................25

        C.    The Government's Admissions and Previous Litigated Position Demonstrate Industry Funded at-Sea Monitoring Is Unlawful ...........................................................................33

    III.    PLAINTIFFS ARE ENTITLED TO SUMMARY JUDGMENT BECAUSE INDUSTRY FUNDING IMPERMISSIBLY FORCES PLAINTIFFS INTO A MARKET THEY DO NOT WISH TO JOIN ....................34

    IV.    PLAINTIFFS ARE ENTITLED TO SUMMARY JUDGMENT BECAUSE THE FINAL RULE VIOLATES THE REGULATORY FLEXIBILITY ACT ...........................................................36

    CONCLUSION ...................................................................................................38

# TABLE OF AUTHORITIES

## Cases

*Anglers Conservation Network, et al., v. Pritzker*, 139 F. Supp. 3d 102 (D.D.C. 2015)..........................33, 34

*Associated Fisheries of Miane, Inc. v. Daley*, 127 F.3d 104 (1st Cir. 1997) ..............................................38

*Atlantic Fish Spotters Ass'n v. Evans*, 321 F.3d 220 (1st Cir. 2003) .......................................................28, 29

*Campanale & Sons, Inc. v. Evans*, 311 F.3d 109 (1st Cir. 2002)..............................................20, 27, 28

*Chevron U.S.A., Inc. v. Nat'l Res. Def. Council, Inc.*, 467 U.S. 837 (1984)..............................................25

*Connecticut v. Daley*, 53 F. Supp. 2d 147 (D. Conn. 1999)...............................................................................19

*Ebert v. Poston*, 266 U.S. 548 (1925)........................................................................................................................26

*FDA v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120 (2000) ..........................................................26

*Goethel v. Pritzker*, Civ. No. 15-cv-497, 2016 WL 4076831 (D.N.H. Jul. 26, 2016)..........................25, 26

*Goethel v. U.S. Dept. of Commerce*, 854 F.3d 106 (1st Cir. 2017) .............................................20, 21, 25

*Hadaja, Inc. v. Evans*, 263 F. Supp. 2d 346 (D.R.I. 2003) ........................................................................19, 30

*Hall v. Evans*, 165 F. Supp. 2d 114 (D.R.I. 2001) ................................................................................19, 31, 36

*Herman v. Hector I. Nieves Transp., Inc.*, 244 F.3d 32 (1st Cir. 2001).......................................................28

*Iselin v. United States*, 270 U.S. 245 (1926)...........................................................................................................27

*Kisor v. Willkie*, 139 S.Ct. 2400 (2019)......................................................................................................................25

*La. Pub. Serv. Comm'n v. Fed. Commc'ns Comm'n*, 476 U.S. 355 (1986) ...............................................26

*Little Bay Lobster Co. v. Evans*, 2002 WL 1005105 (D.N.H. May 16, 2002) ...............................................38

*Lovgren v. Locke*, 701 F.3d 5 (1st Cir. 2012)..................................................................................................25, 28

*Loving v. United States*, 517 U.S. 748 (1996) ......................................................................................................27

*Massachusetts ex rel. Div. of Marine Fisheries v. Daley*, 170 F.3d 23 (1st Cir. 1999)....................................31

*Motor Vehicle Mfrs. Ass'n, Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29 (1983) ................................19

*National Federation of Independent Business v. Sebelius*, 567 U.S. 519 (2012)..........................................34, 35

*NLRB v. SW General, Inc.*, 137 S.Ct. 929 (2017) ................................................................................................29

*Passamaquoddy Tribe v. State of Me.*, 75 F.3d 784 (1st Cir. 1996) ...........................................................34

*Penobscot Air Services, Ltd. v. Federal Aviation Admin.*, 164 F.3d 713 (1st Cir. 1999)..............................19

*Sabri v. U.S.*, 541 U.S. 600 (2004)...............................................................................................................................33

*U.S. v. Cusick*, Cr. No. 11cr10066-LTS, 2012 WL 442005 (D. Mass. Feb. 9. 2012).........................34, 35

*Western Sea Fishing Company, Inc. v. Locke*, 722 F. Supp. 2d 126 (D. Mass. 2010)....................................31

## Constitutional Provisions

U.S. Const. art. I, § 1 ................................................................................................................................ 20, 27

U.S. Const. art. I, § 7 ........................................................................................................................................20

U.S. Const. art. I, § 8 ........................................................................................................................................20

## Statutes

16 U.S.C. § 1801 *et seq*...........................................................................................................................................23

16 U.S.C. § 1801(b)(1)..............................................................................................................................................24

16 U.S.C. § 1801(b)(4)..............................................................................................................................................24

16 U.S.C. § 1801(b)(5)..............................................................................................................................................26

16 U.S.C. § 1802(11)..................................................................................................................................................24

16 U.S.C. § 1811(a).....................................................................................................................................................24

16 U.S.C. § 1827..........................................................................................................................................................28

16 U.S.C. § 1851(a).....................................................................................................................................................24

16 U.S.C. § 1851(a)(1)........................................................................................................................................24, 36

16 U.S.C. § 1851(a)(2)................................................................24, 37
16 U.S.C. § 1851(a)(6)................................................................25, 38
16 U.S.C. § 1851(a)(7)................................................................25, 38
16 U.S.C. § 1851(a)(8)................................................................25, 39
16 U.S.C. § 1852(a)(1)......................................................................25
16 U.S.C. § 1852(a)(1)(A)..................................................................25
16 U.S.C. § 1852(a)(1)(B)..................................................................26
16 U.S.C. § 1853.............................................................................26
16 U.S.C. § 1853(a).........................................................................26
16 U.S.C. § 1853(b).........................................................................26
16 U.S.C. § 1853(b)(8).....................................................................31
16 U.S.C. § 1853(c).........................................................................26
16 U.S.C. § 1854(d).........................................................................27
16 U.S.C. § 1854(d)(2)(B)..................................................................27
16 U.S.C. § 1855(d).........................................................................26
16 U.S.C. § 1855(f)(1)..................................................................21, 44
16 U.S.C. § 1862(a).....................................................................27, 40
16 U.S.C. § 1881a(a)(1)....................................................................27
16 U.S.C. § 1881a(a)(2)....................................................................27
5 U.S.C. § 601 *et seq.*....................................................................43
5 U.S.C. § 603(a)...........................................................................44
5 U.S.C. § 604.............................................................................44
5 U.S.C. § 604(b)..........................................................................44
5 U.S.C. § 611(a)..........................................................................44
5 U.S.C. § 701 *et seq.*....................................................................21
5 U.S.C. § 706(2)(D).......................................................................44
5 U.S.C. §601(3)...........................................................................44

## Rules and Regulations

50 C.F.R. § 200.2..........................................................................37
50 C.F.R. § 648.200(f).......................................................................6
50 C.F.R. § 648.204..........................................................................7
50 C.F.R. § 648.4(a)(10).....................................................................7
81 Fed. Reg. 75,731 (Nov. 1, 2016) (to be codified at 50 C.F.R. pt. 648) ...............4
83 Fed. Reg. 47,326 (Sept. 19, 2018)......................................................11
83 Fed. Reg. 55,665 (proposed Nov. 7, 2018) (to be codified at 50 C.F.R.pt. 648)..........11
84 Fed. Reg. 2,760 at 2,765 (Feb. 8, 2019) (to be codified at 50 C.F.R. pt. 648)...........3
85 Fed. Reg. 26,874 (May 6, 2020) (to be codified at 50 C.F.R. pt. 648)..................4
85 Fed. Reg. 7,414 (Feb. 7, 2020) (to be codified at 50 C.F.R. pt. 648)..............passim
Industry-Funded Monitoring An Omnibus Amendment to the Fishery Management Plans
 of the New England Fishery Management Council (Dec. 2018)...........................passim
NEFMC, Final Atl. Herring Fishery Mgmt. Plan (Mar. 8, 1999)...........................3, 4

## Other Authorities

ASMFC, *Atlantic Herring*......................................................................3
GARFO, *Industry-Funded Monitoring Amendment: Atlantic Herring Fishery* ...............17
MAFMC, *Omnibus Industry Funded Monitoring Amendment* ...............................11

NEFMC, *Atlantic Herring* .................................................................................................3

NOAA Fisheries, *Annual Commercial Landing Statistics* ...............................................2

NOAA Fisheries, *Atlantic Herring* ...............................................................2, 7, 30, 31

NOAA Fisheries, *Atlantic Herring Regulated and Closed Areas* ............................ 2, 6, 7

NOAA Fisheries, *Bycatch* ............................................................................................30

NOAA Fisheries, *Fishing Gear: Bottom Trawls* ....................................................... 5, 6

NOAA Fisheries, *Fishing Gear: Midwater Trawls* .................................................... 4, 5

NOAA Fisheries, *Fishing Gear: Purse Seines* ................................................................5

NOAA Fisheries, *Industry-Funded Monitoring Coverage in the Atlantic Herring Fishery will Begin in April 2021* ..........................................................................................................18

NOAA Fisheries, *Industry-funded Monitoring in the Atlantic Herring Fishery* ...............17

The Declaration of Independence para. 12 (U.S. 1776) .....................................................1

## INTRODUCTION

Just as in the bill of particulars against George III listed in our founding document, so too the Defendants have, without Congressional authorization, "erected" a "new office[] and sent hither swarms of officers to harass" Plaintiffs "and eat out their substance." *See* The Declaration of Independence para. 12 (U.S. 1776). Plaintiffs Relentless Inc. ("Relentless"), Huntress Inc. ("Huntress"), and Seafreeze Fleet LLC ("Seafreeze") hereby submit this Memorandum in Support of their motion for summary judgment. The Department of Commerce ("the Department"), by and through the National Oceanic and Atmospheric Administration ("NOAA") and the National Marine Fisheries Service ("NMFS"), and the individual defendants in their official capacities (collectively "Defendants") have implemented an unlawful and unconstitutional industry-funded at-sea monitor mandate on the nation's Atlantic herring fishermen, and summary judgment should be granted to enjoin them from implementing it. Specifically, the New England Fishery Management Council's Industry-Funded Monitoring Omnibus Amendment and the February 7, 2020 Final Rule which implements the IFM Amendment, is unlawful, and summary judgment should be granted to enjoin the enforcement of the IFM Amendment by the Final Rule. *See* AR17000-637, NMFS and NEFMC, Industry-Funded Monitoring An Omnibus Amendment to the Fishery Management Plans of the New England Fishery Management Council (Dec. 2018) ("IFM Amendment") (cover page and excerpts attached as Exhibit 1); *see also* AR 17731-59, NOAA, Industry-Funded Monitoring, 85 Fed. Reg. 7,414 (Feb. 7, 2020) (to be codified at 50 C.F.R. pt. 648) ("Final Rule") (attached as Exhibit 2).

The administrative record and undisputed evidence show Plaintiffs are entitled to summary judgment on all counts.

1

## FACTS[1]

I.  **THE ATLANTIC HERRING FISHERY AND ITS MANAGEMENT**

A.  **The Atlantic Herring Fishery**

Atlantic herring, or *Culpea harengus*, are small schooling fish from the family *Clupeidae*. Atlantic herring are found across the North Atlantic, but in the western North Atlantic they are distributed from Labrador, Canada to Cape Hatteras, North Carolina. *See* NOAA Fisheries, *Atlantic Herring* (last visited Dec. 2, 2020) *available at* https://www.fisheries.noaa.gov/species/atlantic-herring.[2] In federally managed waters, the Atlantic herring population is concentrated from New England to New Jersey. *See* NOAA Fisheries, *Atlantic Herring Regulated and Closed Areas* (last visited Dec. 2, 2020) *available at* https://www.fisheries.noaa.gov/new-england-mid-atlantic/sustainable-fisheries/atlantic-herring-regulated-and-closed-areas.  Atlantic herring is a biologically important species as it is vital to the marine food chain, but it is also economically important in its own right.  The commercial herring fishery has operated in New England for hundreds of years and since 2010, the fishery has consistently landed over $20 million in Atlantic herring each year. *See* NOAA Fisheries, *Annual Commercial Landing Statistics* (last visited Dec. 2, 2020) *available at*  https://foss.nmfs.noaa.gov/apexfoss/f?p=215:200::::::: (select dataset "Commercial" for years 2019-2010 in region type "New England" for species "Herring, Atlantic" and run report).

Defendant NOAA has indicated that Atlantic herring are not overfished, nor are they subject to overfishing. *See supra Atlantic Herring.* The 2018 stock assessment also indicated that Atlantic herring stock levels are well above their target levels. *Id.* Despite this, the 2018 herring stock assessment has led to a nearly 70 percent reduction in herring quotas for 2019. *See* NOAA, Adjustment to Atlantic

---

[1] Pursuant to the Stipulation and Order Setting Briefing Schedule, *see* Doc. 36, Plaintiffs have not included a Statement of Undisputed and Disputed Fact under Local Rule Civ. 56.

[2] The parties have agreed by correspondence that cites to the Defendants' website can be relied upon by the Court.

Herring Specifications and Sub-Annual Catch Limits for 2019, 84 Fed. Reg. 2,760 at 2,765 (Feb. 8, 2019) (to be codified at 50 C.F.R. pt. 648).

### B. Atlantic Herring Fishery Management

In state coastal waters, the States and the Atlantic States Marine Fisheries Commission ("ASMFC") manage and regulate Atlantic herring under Amendment 3 to the Interstate Fishery Management Plan. *See* ASMFC, *Atlantic Herring* (last visited Dec. 2, 2020) *available at* http://www.asmfc.org/species/atlantic-herring. In federal waters, the New England Fishery Management Council ("NEFMC") manages Atlantic herring under the Atlantic Herring Fishery Management Plan ("FMP"). *See* NEFMC, Final Atl. Herring Fishery Mgmt. Plan (Mar. 8, 1999) *available at* https://s3.amazonaws.com/nefmc.org/herring_FMP.PDF. The Atlantic herring population is distributed across the jurisdictional boundaries of the NEFMC and Mid-Atlantic Fishery Management Council ("MAFMC"), which consulted on the Atlantic Herring FMP. *See id.* Since its March 1999 adoption, the Atlantic Herring FMP has been subject to eight amendments and six framework                                                                                    adjustments. *See generally* NEFMC, *Atlantic Herring* (last visited Dec. 2, 2020) *available at* https://www.nefmc.org/management-plans/herring (an additional amendment and two framework adjustments are under development).

The Atlantic Herring FMP sets out, in its original form and through amendments and framework adjustments, numerous primary management measures including:

        a.      Adopting a total catch limit, or annual catch limit ("ACL"), which is distributed across time and areas;[3]

---

[3] The ACL is the maximum amount of fish that can be sustainably harvested each year.

      b.      Controlling and limiting catch as the ACL is neared, as well as closing off areas when the ACL is reached;

      c.      Closing spawning areas and designating essential Atlantic herring habitat;

      d.      Mandatory permitting of certain Atlantic herring vessels, operators, dealers, and processors, as well as vessel, gear, and possession restrictions;

      e.      Requiring certain data reporting; and,

      f.      Defining overfishing of Atlantic herring.

*See generally supra* Final Atl. Herring Fishery Mgmt. Plan.

The NEFMC revises quota and management specifications every three years. The most recent quota and management specifications were finalized and approved in 2016, and specifications for the 2019-2021 period are under development. *See* NOAA, Specification of Management Measures for Atlantic Herring for the 2016-2018 Fishing Years, 81 Fed. Reg. 75,731 (Nov. 1, 2016) (to be codified at 50 C.F.R. pt. 648); *see also* NOAA, Framework Adjustment 6 and the 2019-2021 Atlantic Herring Fishery Specifications, 85 Fed. Reg. 26,874 (May 6, 2020) (to be codified at 50 C.F.R. pt. 648).

## C. Atlantic Herring Fishery Gear Types and Fishing Areas

There are three primary gear types used to catch and harvest Atlantic herring: midwater trawl, purse seine, and bottom trawl. While there are many variations in gear type, the three types of gear generally operate as described below.

Midwater trawlers generally harvest by deploying and towing nets that have a large opening at one end and that narrow at the back end. This allows the trawlers to capture the herring as they school in the water column. Midwater trawlers may also do "pair trawling," which is done by pulling a single net between two fishing vessels. *See* NOAA Fisheries, *Fishing Gear: Midwater Trawls* (last visited Dec. 4, 2020) *available at* https://www.fisheries.noaa.gov/national/bycatch/fishing-gear-midwater-trawls.

4



Figure 1: Midwater Trawls. *See id.*

Purse seiners generally deploy a wall of netting, a seine, around an area or schooling herring. The seine has floats along the top line and a lead line that threads through rings along the bottom of the seine. When catch is identified, the lead line is pulled causing the net to purse at the bottom, so the herring remain in the net as it is pulled to the surface. *See* NOAA Fisheries, *Fishing Gear: Purse Seines* (last visited Dec. 4, 2020) *available at* https://www.fisheries.noaa.gov/national/bycatch/fishing-gear-purse-seines.



Figure 2: Purse Seines. *See id.*

Bottom trawlers generally harvest herring by using nets fitted with weights and special gear that allow the net to stay open as it is trawled along the ocean floor. The nets are fitted with mesh that confine the fish as they are pulled to the surface. *See* NOAA Fisheries, *Fishing Gear: Bottom Trawls* (last

visited Dec. 4, 2020) *available at* https://www.fisheries.noaa.gov/national/bycatch/fishing-gear-bottom-trawls.



Figure 3: Bottom Trawls. *See id.*

Midwater trawl and purse seine are responsible for most of the Atlantic herring landings. *See* Final Rule at AR17738 (noting differences in revenue between gear types).

Under the Atlantic Herring FMP, there are four regulated Atlantic herring fishing management areas: Areas 1 (subdivided into Areas 1A and 1B), 2, and 3. *See supra Atlantic Herring Regulated and Closed Areas* (last visited Dec. 4, 2020). The NEFMC allocates a stock-wide annual catch limit across these four management areas ("sub-ACLs"). *See* 50 C.F.R. § 648.200(f).

Area 1 includes state and federal inshore (Area 1A) and offshore (Area 1B) waters in the Gulf of Maine that are adjacent to the states of Maine, New Hampshire, and Massachusetts. *See supra Atlantic Herring Regulated and Closed Areas*. Area 2 includes state and federal waters in the South Coastal Area that are adjacent to the states of Massachusetts, Rhode Island, Connecticut, New York, New Jersey, Delaware, Maryland, Virginia, and North Carolina. *See id.*  Area 3 includes all federal waters in the Georges Bank. *See id.*



<u>Figure 4</u>: Atlantic Herring Management Areas. *See id.*

Permits for Atlantic herring vessels are divided by permit type—limited and open access—and permit category—A, B, C, D, E, and F—which place restrictions where vessels can fish and how much herring they can possess. 50 C.F.R. § 648.4(a)(10)(iv)-(v); 50 C.F.R. § 648.204; *see also supra Atlantic Herring* (under "Commercial Fishing" tab). Only Categories A and B are impacted by the IFM Amendment and the Final Rule. *See* Final Rule at AR17734. Category A permits are "All Areas Limited Access" permits. Vessels holding Category A permits can possess an unlimited amount of herring in all areas. Plaintiffs' vessels, F/Vs *Relentless* and *Persistence* each hold Category A permits. Declaration of Meghan Lapp ¶ 4 (Dec. 3, 2020) ("Lapp Decl.") (attached as Exhibit 3). Category B permits are "Areas 2/3 Limited Access" permits. Vessels holding Category B permits can possess an unlimited amount of herring in Areas 2 and 3, but they are excluded from Areas 1A and 1B. Subject to ACL closures and limitations, the Atlantic herring fishery year runs from January 1 through December 31. *See supra Atlantic Herring* (under "Management" tab).

## II.    PLAINTIFFS' VESSELS, BUSINESS, AND UNIQUE ISSUES

Plaintiffs Relentless and Huntress are small businesses whose primary industry is commercial fishing. Their annual gross receipts are less than or equal to $11 million. Lapp Decl. ¶ 5. They are subject to the IFM Amendment and the Final Rule.

Both Relentless and Huntress are corporations organized under Rhode Island law and operating out of North Kingstown, Rhode Island. Relentless owns the pseudonymous F/V *Relentless* and Huntress owns the F/V *Persistence*. Both vessels are high-capacity freezer trawlers that alternatively, but sometimes simultaneously, harvest Atlantic herring, Loligo and Illex squids (*Doryteuthis (Amerigo) pealeii* and *Illex illecebrosus*, respectively), Butterfish (*Peprilus triacanthus*), and Atlantic mackerel (*Scomber scombrus*). *See* AR17801-14, -801, Comment from Meghan Lapp, Fisheries Liaison, Seafreeze Ltd., to Herring/Observer Committee Members (June 30, 2015) ("June 30, 2015 Comment Letter") (attached as Exhibit 4). Both ships use a unique at-sea freezing technique that allows the vessels to stay at sea longer than other vessels in the Atlantic herring fishery and provides each vessel flexibility in what catch it harvests during fishing trips. *Id.* Both ships use small-mesh bottom trawl gear and hold a Category A permit for Atlantic herring. Lapp Decl. ¶ 4. Both vessels hold several permits and operate across the jurisdictional boundaries of the NEFMC and the MAFMC. Plaintiffs typically declare into herring, squid, and mackerel fisheries on the trips they take from late November through April because they harvest all those species alternatively but sometimes simultaneously during the season.[4] *See* June 30, 2015 Comment Letter at AR17801. That is, they may take each species, some, or all species during any given trip. This flexible style of fishing allows Plaintiffs to cover operating costs by switching over to a different species based on what they can catch.

---

[4] "Declaring" means informing regulatory authorities of what species a vessel intends to pursue on any given trip.



Figure 5: From left, F/Vs *Persistence* and *Relentless* afloat.

Prior to every trip, Plaintiffs are required to call and notify observers of their gear type for each trip. For herring/mackerel trips, Plaintiffs have noticed a higher-than-average observer rate than NMFS has claimed is average for the herring fishery. *Compare* June 30, 2015 Comment Letter at AR17805. For example, from November 2014 to April 2015 the F/V *Relentless* had 50% herring/mackerel observer coverage. *Id.* Plaintiff, through its affiliate Seafreeze, informed the Defendants of this fact with no adequate response. Under Plaintiffs' style of fishing, it is possible to have a declared herring/mackerel trip, that is selected for observer coverage, that only harvests squid and butterfish. *Id.* at AR17801 (noting a 10-day Herring/Mackerel trip that did not land any herring). Under the IFM Amendment and Final Rule, Plaintiffs may be forced to carry a herring at-sea monitor on a declared herring trip that does not end up harvesting herring. Plaintiffs would then be forced to pay for the at-sea monitor from other-species revenue, not Atlantic-herring revenue. AR17699-709, -03, Comment from Meghan Lapp, Fisheries Liaison, Seafreeze Ltd., to NEFMC and MAFMC (Nov. 4, 2016) (submitted in response to NEFMC and MAFMC's published Notice of Public Hearings and request for comments (NOAA, Public Hearings, 81 Fed. Reg. 64,426 (Sept. 20, 2016))) ("Nov. 4, 2016 Comment Letter") (attached as Exhibit 5). While other vessels in the herring fishery conduct multi-

species trips—herring and mackerel, managed by MAFMC under its own FMP, school together and are regularly harvested together—the record reveals no other vessels besides *Relentless* and *Persistence* in the Atlantic herring fleet that declare into and/or harvest squid and butterfish on the same trip as declared Atlantic herring trips.

Plaintiffs process their catch and freeze at sea. *See* June 30, 2015 Comment Letter at AR17804. Under Plaintiffs' process, all catch is brought aboard, hand sorted on a conveyor belt, hand packaged, and then frozen. *Id.* Any discards or unwanted bycatch are also hand sorted and retained in discard baskets. *Id.* In comparison to other vessels in the Atlantic herring fishery, F/Vs *Relentless* and *Persistence* have more limited catching and processing capacity, longer trips, and higher overhead costs. For example, Plaintiffs are limited up to about 125,000 pounds of catch per day due to limited freezing capacity, compared to other vessels in the herring fleet which can harvest in excess of 500,000 pounds of catch per day. *See* AR17710-15, -14, Comment from Meghan Lapp, Fisheries Liaison, Seafreeze Ltd., regarding Comments on NOAA-NMFS-2018-0109 (Dec. 24, 2018) ("Dec. 24, 2018 Comment Letter") (attached as Exhibit 6). Plaintiffs' trips typically last 7-14 days at sea, compared to 2-3 days for other vessels in the herring fleet. *Id.* F/Vs *Relentless* and *Persistence* require twice as many crew members to operate, compared to other vessels in the herring fleet. *Id.* Because at-sea monitors are paid per day, the costs to these Plaintiffs are higher per trip than they are for the rest of the fishing fleet. *Id.* This regulatory inequity threatens Plaintiffs' use of the flexible style of fishing they have developed. Due to costs associated with the IFM Amendment and the Final Rule, it could result in fishing trips losing rather than making money.

### III.    THE PROPOSED IFM AMENDMENT AND FINAL RULE PROCESS

#### A.    Development of the IFM Amendment and Final Rule

The IFM Amendment and Final Rule allow industry-funded monitoring in NEFMC FMPs, except for those under joint-management with MAFMC, *e.g.,* mackerel. *See* Final Rule at AR17731.

On or about April 20, 2017, the NEFMC finalized its preferred alternatives and adopted the IFM Amendment. Final Rule at AR17731. A year later, on April 19, 2018, NEFMC "refined" its industry-funded monitoring recommendations. *Id.*   On September 19, 2018, the NEFMC published a Notice of Availability for the IFM Amendment in the *Federal Register. See* AR17639-40, NOAA, Industry-Funded Monitoring, 83 Fed. Reg. 47,326 (Sept. 19, 2018) (attached as Exhibit 7). The Notice of Availability permitted interested parties to submit comments regarding adoption of the IFM Amendment for a 60-day period ending on November 18, 2018. *Id.*  In early October 2018, while the IFM Amendment comment period was still open, the MAFMC postponed action on the IFM Amendment for the mackerel fishery. *See* MAFMC, *Omnibus Industry Funded Monitoring Amendment* (last visited Dec. 4, 2020) *available at* http://www.mafmc.org/actions/omnibus-observer-funding.

On November 7, 2018, while the IFM Amendment comment period was still open, the proposed rule implementing the IFM Amendment was published in the *Federal Register. See* AR16969-91, NOAA, Industry-Funded Monitoring Proposed Rule, 83 Fed. Reg. 55,665 (proposed Nov. 7, 2018) (to be codified at 50 C.F.R.pt. 648) ("Proposed Rule") (attached as Exhibit 8).  The Proposed Rule permitted interested parties to submit comments regarding the implementing rule for a 47-day period ending on December 24, 2018. *Id.* at AR16969.  On December 18, 2018, while the comment period for the Proposed Rule implementing the IFM Amendment was still open, the Secretary of Commerce notified the NEFMC in an unpublished letter that the Secretary approved the IFM Amendment. *See* Final Rule at AR17731; *see also* AR17760-62, Letter from Michael Pentony, Greater Atlantic Region Sustainable Fisheries Office ("GARFO") Regional Adm'r, to Dr. John Quinn, NEFMC Chairman (Dec. 18, 2018) ("Pentony Letter") (attached as Exhibit 9). On February 7, 2020, NMFS and NOAA adopted the Final Rule implementing the IFM Amendment, which was substantially the same as the Proposed Rule. *See* Final Rule at AR17739.

Plaintiffs, through their sister company, Seafreeze Ltd., as well as other industry stakeholders, submitted comments during the Proposed Rule's comment period. *See* Dec. 24, 2018 Comment Letter, AR17710-15.

## B. Comments by Plaintiffs and Other Industry Stakeholders Regarding the IFM Amendment and Final Rule

Since announcing the development of the IFM Amendment, it has been contentious and controversial. AR16992-98, -94, Memorandum from Michael Pentony, GARFO Reg'l Administrator to Chris Oliver, Asst. Adm'r for Fisheries (Sept. 11, 2018) ("Oliver Mem.") (attached as Exhibit 10). Many of the comments were by fishermen who stated the proposed regulations were unaffordable, particularly considering other restrictions on herring and mackerel catches. *Id.* at AR16994; *and see, e.g.,* AR13473-13544, -13491-94, -98, Industry-Funded Monitoring (IFM) Omnibus Amendment Public Hearing Summaries October – November 2016 ("Pub. Hearing Summaries"); AR16725-968, -728, -735, Public Comments to NOAA-NMFS-2016-0139-0002 ("NOAA-NMFS-2016-0139-0002 Comments"). The lack of consistency in assigning at-sea monitors was also criticized. *See* Pub. Hearing Summaries at AR13507, -15; NOAA-NMFS-2016-0139-0002 Comments at AR16730, -733, -738, -740. Including by Plaintiffs here. *See* AR16749. The current observer rate was what Congress funded; this new requirement came about because the *regulators* wanted more monitoring. *See* Pub. Hearing Summaries at AR13509. Industry stakeholders, including Plaintiffs through their sister company, Seafreeze Ltd., have expressed concerns over the regulatory burdens placed on them by the proposed IFM Amendment and its alternatives. Plaintiffs and other industry stakeholders highlighted and explained serious concerns and issues with the IFM Amendment and Final Rule during the Amendment's development and the respective comment periods. Plaintiffs commented throughout the process.

On June 30, 2015, Meghan Lapp detailed exactly how Plaintiffs vessels operated and how because of the longer trips, flexible fishing schedule, and low bycatch rates F/Vs *Relentless* and

*Persistence* would be disproportionately affected by the proposed IFM Amendment. *See generally* June 30, 2015 Comment Letter, AR17801-14. Among other issues, the June 30, 2015 Comment Letter also raised concerns over the high cost of at-sea monitoring coverage for these vessels and requested that the Committee create a separate category under any IFM Amendment that would account for the unique issues that arise from operating freezer vessels. *Id.* at AR17801, -04.

On November 4, 2016, Ms. Lapp submitted a comment which clearly noted the deficiency of failing to account for the daily catch harvesting capacity of small mesh bottom trawl vessels. *See generally* Nov. 4, 2016 Comment Letter, AR17699-709. The Nov. 4, 2016 Comment Letter indicated disagreement with the funding mechanism for additional monitoring, *i.e.,* industry-funding, because the monitoring is inherently a public function, and it said that "[p]ublic funds should be used for public purposes." AR1770. The letter also indicated that costs to Seafreeze's vessels would be disproportionate relative to the rest of the herring fleet because of its style of fishing. *See* AR1770-03. This comment also deals with two completely unaddressed problems with the Final Rule: (1) Plaintiffs will be paying for herring monitoring with other marine harvests; (2) They also would lose the flexibility of harvesting different species they carry permits for. As Ms. Lapp stated in her Nov. 4, 2016 Comment Letter:

> The herring and mackerel alternatives in the IFM amendment were primarily initiated to address low observer coverage in the midwater trawl herring fishery due to changes with [standardized bycatch reporting]. It was not to make an entire style of fishing economically or operationally nonviable. It is also not equitable that revenue from other fisheries be siphoned to pay for herring/mackerel monitoring. … Regardless, the industry funded monitoring amendment saddles Seafreeze vessels in particular with more economic harm than any other "herring" vessels due to the nature of our operations.

AR17703 (emphasis in original).

Ms. Lapp also submitted an undated letter raising concerns with the IFM Amendment to the Herring Committee. *See* AR3773-74, Comment from Meghan Lapp, Fisheries Liaison, Seafreeze Ltd., to Council Members (undated) ("Undated Comment Letter") (attached as Exhibit 11). The Undated

13

Comment Letter indicated Seafreeze's opposition to 100 percent observer coverage and electronic monitoring. *Id.* at AR3773. It also inquired about the availability of independent economic analysis of the amounts herring vessels typically catch and about requesting a separation or exemption between vessels that are herring-focused versus vessels that are mixed species-focused like F/Vs *Relentless* and *Persistence*. *Id.* at AR3773-4.

By letter dated February 3, 2017, Ms. Lapp clearly laid out the unique harm industry-funded monitoring would cause to Plaintiffs and requested that the NEFMC reconsider the economic impacts of its decision to select 50 percent at-sea monitor coverage. *See* AR17815-19, Comment from Meghan Lapp, Fisheries Liaison, Seafreeze Ltd., to Herring Committee Members (Feb. 3, 2017) ("Feb. 3, 2017 Comment Letter") (attached as Exhibit 12). The Feb. 3, 2017 Comment Letter again raised Seafreeze's concerns over the disproportionate costs borne by its vessels, including the fact that under the IFM Amendment, it would be forced to pay $39,313 a year for herring at-sea monitors on trips that do not land herring. *See id.* at AR17815.

For Plaintiffs and their sister company Seafreeze Ltd., Ms. Lapp wrote again on March 30, 2017 and noted that it was small-mesh bottom trawlers like F/Vs *Relentless* and *Persistence* that had the most days, 111, with no herring caught but where monitoring costs were paid. *See* AR15946-53, -49, Comment from Meghan Lapp, Fisheries Liaison, Seafreeze Ltd., to Herring Committee Members (Mar. 30, 2017) ("Mar. 30, 2017 Comment Letter") (attached as Exhibit 13). The single midwater trawlers and paired midwater trawlers had 6 and 4 such days respectively. *Id.* As the Mar. 30 Comment Letter notes, the IFM Amendment Draft determined that there were disproportionate monitoring costs associated with small-mesh bottom trawls compared to other styles of trawling. *See* AR15949, -952-53.

Ms. Lapp wrote again on December 24, 2018 to point out that the Magnuson-Stevens Fishery Conservation and Management Act, as amended by the Sustainable Fisheries Act, 16 U.S.C. § 1801 *et*

*seq.* ("MSA"), did not allow the cost-sharing proposals made in the Final Rule. *See* Dec. 24, 2018 Comment Letter at AR17711. For the fisheries where cost sharing is allowed, the MSA capped costs at 3% of ex-vessel revenue. *See id.* The Dec. 24, 2018 Comment Letter also notes that Defendants could not get around statutory prohibitions on charging industry fees by forcing Plaintiffs into a market they did not wish to enter. *See id.* at 17712.

Others also commented. For example, on November 19, 2018, Cause of Action Institute[5] ("COA") pointed out the lack of authority in the MSA for an industry-funded monitoring program and noted why the law did not allow this course of action in this fishery—because it violated National Standards by imposing too great a cost on fishermen. AR17655-62, Comment from Ryan P. Mulvey, Counsel, Cause of Action Institute, regarding Comments on NOAA-NMFS-2018-0109 (Nov. 19, 2018) (attached as Exhibit 14); see *also* Oliver Mem. at AR16994. COA again wrote on December 24, 2018 pointing out the very problem Plaintiffs here face of having longer trips than those boats that take short trips and return to port more quickly. AR17663-77, Comment from Ryan P. Mulvey, Counsel, Cause of Action Institute, regarding Comments on NOAA-NMFS-2018-0109 (Dec. 24, 2018) (attached as Exhibit 15).

**C. The IFM Amendment and Final Rule**

Despite the comments of the Plaintiffs and others, the Defendants forged ahead and implemented the Final Rule. It contained the unconstitutional and unlawful provisions. Indeed, it was designed and implemented specifically to get around legal prohibitions on this type of activity. *See* Oliver Mem., at AR16992 (noting Congress only authorized current funding levels for observers and Commerce had denied previous industry-funded proposals as spending money not yet

---

[5] COA represents Plaintiffs in the D.C. action, *Loper Bright Enterprises v. Department of Commerce*, C.A. No. 20-466 (D.D.C.), which was the subject of this Court's Order denying transfer of this case. Doc. 15.

appropriated or inconsistent with federal law). The Final Rule was promulgated despite clear evidence that industry-funded observer programs were only currently implemented in "high volume or high value species fisheries" and only allowed under the MSA in such places as Alaska. AR42, A.I.S., Inc. Recommendation for Observer Funding Omnibus Amendment (Dec. 27, 2013). The $700-800 per day cost of at-sea monitors proposed in the Final Rule is twice as high as the cost in the high-value Alaskan fishery, which is where the MSA authorizes industry funded at-sea monitors. *See* IFM Amendment at AR17043.

The industry stakeholders, including Plaintiffs, through Seafreeze, expressed concerns over the regulatory burdens placed on them by the proposed IFM Amendment and its alternatives. *See* June 30, 2015 Comment Letter; *see also* Nov. 4, 2016 Comment Letter; Undated Comment Letter. In the June 30, 2015 Comment Letter, Seafreeze explained how F/V *Relentless* and F/V *Persistence* declare into multiple fisheries on a typical trip, that flexibility is necessary to maintain their style of fishing and provided data in support of these assertions. *See* AR17801. Among other issues, the letter also repeated concerns over the high cost of at-sea monitoring coverage for these vessels and requested that the Committee create a separate category. *Id.* at AR17801-04.

Among other issues in the Nov. 4, 2016 Comment Letter, Seafreeze reiterated the positions it took in its June 30, 2015 Comment Letter and provided additional specific commentary regarding why it could only support "Omnibus Alternative 1, No Action." *See* AR17699-700.

On February 7, 2020, NMFS and NOAA adopted the Final Rule implementing the IFM Amendment, which was substantially the same as the Proposed Rule. *See* Final Rule at AR17739. The Defendants' response to concerns raised by stakeholders was a near wholesale rejection of the comments submitted. *See id.* at AR17739-44. Plaintiffs' comments and concerns, including a requested exclusion for small-mesh bottom trawlers that process and freeze at sea, were rejected by the Final Rule. *Id.* The entire response to Seafreeze's concerns that its type of fishing needed a different

16

category or response was rejected in Comment 9. *See id.* at AR17743. Defendants simply disagreed. *Id.* They did not dispute that Seafreeze would be paying for herring monitoring with revenue from other fishing stocks, nor did they address the problem that Seafreeze vessels would bear a disproportionate amount of the monitors and that no provision had been made to make sure such observers were apportioned fairly. Similarly, in Comment 10 the fact that herring catches would be far less in 2020 and 2021 than the 2014 data was determined to be accurate but the Defendants simply waived away the concerns. *See id.*

The IFM Amendment and the Final Rule establish a 50 percent monitoring coverage target for at-sea monitoring. *See* Final Rule at AR17739, -42; *see also* GARFO, *Industry-Funded Monitoring Amendment: Atlantic Herring Fishery* at 4 (last visited Dec. 4, 2020) *available at* https://s3.amazonaws.com/nefmc.org/14_200130-IFM-Amendment-Presentation.pdf ("IFM Amendment Presentation"). This target is achieved by combining Standardized Bycatch Reporting Methodology ("SBRM") of the Northeast Fisheries Observer Program ("NEFOP") plus IFM coverage. *See* Final Rule at 7,417; 7,418. The Atlantic herring vessel owners pay for the IFM sampling cost—approximately $710 per day—and NOAA Fisheries purportedly pays for IFM administrative costs. *See* Final Rule at 7,415. SBRM NEFOP is funded by NOAA Fisheries. *See* NOAA Fisheries, *Industry-funded Monitoring in the Atlantic Herring Fishery* (last updated June 16, 2020) *available at* https://www.fisheries.noaa.gov/infographic/industry-funded-monitoring-atlantic-herring-fishery.

The IFM Amendment forces many Atlantic herring vessel owners, including Plaintiffs, to enter forced negotiations with private at-sea monitor providers that are approved and trained by NOAA. *See* IFM Amendment Presentation at 7. The information and data that at-sea monitors collect is directed by NOAA Fisheries and the NEFMC. *See* Final Rule at AR17735.

As small-mesh bottom trawls, F/Vs *Relentless* and *Persistence* are not eligible for the at-sea monitoring alternative—electronic monitoring with portside sampling—thus, they can only comply

with the IFM mandate by carrying and bearing the cost of an at-sea monitor. *See id.* at AR17736. Because they cannot receive the alternatives, they will also bear more than their fair share of at-sea monitors.

The IFM Amendment and the Final Rule project that, for vessels like F/Vs *Relentless* and *Persistence* that cannot use electronic monitoring, implementing the IFM Amendment will reduce returns-to-owner ("RTO") by almost 20 percent. *See id.* at AR17735, -42. The Final Rule also develops a standard process to implement and revise industry-funded monitoring programs in the Atlantic herring and other FMPs under NEFMC's jurisdiction. *Id.* at AR17732. Starting April 1, 2020, vessels issued Category A or B permits, including F/Vs *Relentless* and *Persistence* are required to pay for at-sea monitoring on trips NEFMC selects for IFM coverage. *See id.* at AR17737. Also, rather than obtaining an exemption for harvesting less than 50 mt per day, the Final Rule allows such exemptions *per trip*. *Id.* at AR17735.

The Final Rule is clear that the at-sea monitors are not observers and have different functions from that office. *See id.* At-sea monitors do such things as collect fishing gear information, and tow-specific information, which is when fishing begins and ends, water temperature, species, weight, and disposition of retained and discards. It states "in contrast to observers, at-sea monitors would not collect whole specimens, photos or biological samples…" *Id.*

On December 3, 2020, NOAA announced that industry-funded monitoring coverage in the Atlantic Herring Fishery will begin in April 2021. *See* NOAA Fisheries, *Industry-Funded Monitoring Coverage in the Atlantic Herring Fishery will Begin in April 2021* (last updated Dec. 3, 2020, 4:11 pm) *available at* https://content.govdelivery.com/accounts/USNOAAFISHERIES/bulletins/2af8457. Implementation of the mandate was delayed due to the COVID-19 pandemic. *Id.*

18

# ARGUMENT

## I.    STANDARD OF REVIEW

Agency actions under the MSA are reviewed pursuant to the Administrative Procedure Act ("APA"). *See* 16 U.S.C. § 1855(f)(1), 5 U.S.C. § 701 *et seq*. Under the APA, an "agency decision shall be set aside only if the actions of the agency are found to be 'arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.'" *Hadaja, Inc. v. Evans*, 263 F. Supp. 2d 346, 351 (D.R.I. 2003) (quoting 5 U.S.C. § 706(2)(A)). A regulation is arbitrary or capricious when,

> the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise.

*Hall v. Evans*, 165 F. Supp. 2d 114, 137-28 (D.R.I. 2001) (citing *Connecticut v. Daley*, 53 F. Supp. 2d 147, 157 (D. Conn. 1999)).

Under the APA's "'arbitrary and capricious' standard, the court must determine whether the agency examined the pertinent evidence, considered the relevant factors, and articulated a satisfactory explanation for its action, including a rational connection between the facts found and the choice made." *Hadaja, Inc.*, 263 F. Supp. 2d at 351 (citing *Penobscot Air Services, Ltd. v. Federal Aviation Admin.*, 164 F.3d 713, 719 (1st Cir. 1999)). While the APA's review standard is deferential, "the agency must examine the relevant data and articulate a satisfactory explanation for its action including a 'rational connection between the facts found and the choice made.'" *Motor Vehicle Mfrs. Ass'n, Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983) (quoting *Burlington Truck Lines, Inc. v. United States*, 371 U.S. 156, 168 (1962). "Thus, the agency must 'explain its result ... and respond to relevant and significant public comments.'" *Hadaja, Inc.*, 263 F. Supp. 2d at 351 (quoting *Penobscot*, 164 F.3d at 719, n. 3 (citations omitted)).

## II.   PLAINTIFFS ARE ENTITLED TO SUMMARY JUDGMENT BECAUSE INDUSTRY FUNDING IS UNLAWFUL AND IS NOT AUTHORIZED BY CONGRESS

Allowing the Final Rule to stand would make untenable any effort to hold an agency only to the powers granted to it by Congress.  NOAA and the other defendants apparently assert that they can require a regulated party to pay for at-sea monitoring of the fish stocks that belong to the government when: 1) Congress has explicitly authorized it by statute; *and* 2) when Congress has *not* authorized it by statute.  What Congress says in the statute is, should the Final Rule stand, irrelevant to whether an Agency can act, even when the action taken may weaken or destroy the regulated party. This position, were it to prevail, would allow the Defendants to evade or arrogate to themselves the Congressional powers to lay and collect taxes, appropriate, and spend.  U.S. Const. art. I, §§ 1, 7, 8. Their power to do so was not granted by statute, and the Supreme Court and this Circuit have been very clear that the plain language of the statute governs, not the will of the agency.

### A. The Structure and Purpose of the Magnuson-Stevens Act and Associated Regulatory Framework Do Not Support Industry-Funded Monitoring

Recognizing the economic importance of commercial and recreational fishing, the MSA was adopted to protect, manage, and grow the United States of America's fishery resources. To achieve these goals, the MSA delineates scientific and conservation-based statutory obligations to sustainably manage fishery resources for the benefit of the fishing industry and the environment. 16 U.S.C. § 1801 *et seq.*  The MSA grants the Dept. of Commerce the ability to exercise "sovereign rights" to conserve and manage fisheries resources "for the purposes of exploring, exploiting, conserving, and managing all fish" in the Exclusive Economic Zone ("EEZ"). 16 U.S.C. §§ 1801(b)(1), 1811(a). Generally, the EEZ extends from the seaward boundary of each of the coastal States to 200 nautical miles offshore. 16 U.S.C. § 1802(11); *Goethel v. U.S. Dept. of Commerce*, 854 F.3d 106, 108 (1st Cir. 2017); *Campanale & Sons, Inc. v. Evans*, 311 F.3d 109, 110 (1st Cir. 2002).  The MSA provides for the development and implementation of fishery management plans ("FMPs") for fisheries. 16 U.S.C. § 1801(b)(4). FMPs

are implemented with the goal of continually achieving and maintaining optimum yield within each fishery. *Id.; see Goethel*, 854 F.3d at 109; *Campanale & Sons, Inc.*, 311 F.3d at 110-111. All FMPs, and their implementing regulations, must be prepared and executed in accordance with ten fishery conservation and management "National Standards." 16 U.S.C. § 1851(a). We are concerned with five of these standards that are implicated by the IFM Amendment and the Final Rule:

1.      National Standard One requires that "[c]onservation and management measures shall prevent overfishing while achieving, on a continuing basis, the optimum yield from each fishery for the United States fishing industry." 16 U.S.C. § 1851(a)(1).

2.      National Standard Two requires that "[c]onservation and management measures shall be based upon the best scientific information available." 16 U.S.C. § 1851(a)(2).

3.      National Standard Six requires that "[c]onservation and management measures shall take into account and allow for variations among, and contingencies in, fisheries, fishery resources, and catches." 16 U.S.C. § 1851(a)(6).

4.      National Standard Seven requires that "[c]onservation and management measures shall, where practicable, minimize costs and avoid unnecessary duplication." 16 U.S.C. § 1851(a)(7).

5.      National Standard Eight requires that "[c]onservation and management measures shall, consistent with the conservation requirements …, take into account the importance of fishery resources to fishing communities by utilizing economic and social data that [are based upon the best scientific information available], in order to (A) provide for the sustained participation of such communities, and (B) to the extent practicable, minimize adverse economic impacts on such communities." 16 U.S.C. § 1851(a)(8).

21

The MSA establishes eight Regional Fishery Management Councils ("Councils"). 16 U.S.C. § 1852(a)(1). The Councils share fishery conservation, management, and regulatory responsibilities with the Dept. of Commerce and NOAA. Two of the eight Councils are relevant to the action challenged here: NEFMC and MAFMC. *See id.*

The NEFMC consists of the States of Maine, New Hampshire, Massachusetts, Rhode Island, and Connecticut and has jurisdiction over fisheries and waters seaward of the coastal waters of those states. 16 U.S.C. § 1852(a)(1)(A). The NEFMC has 18 voting members, including 12 appointed by the Secretary of Commerce (the "Secretary"). *Id.* The MAFMC consists of the States of New York, New Jersey, Delaware, Pennsylvania, Maryland, Virginia, and North Carolina and has jurisdiction over fisheries and waters seaward of the coastal waters of those states. 16 U.S.C. § 1852(a)(1)(B). The MAFMC has 21 voting members, including 13 that are appointed by the Secretary. *Id.* Councils, including the NEFMC and MAFMC, are comprised of voting and non-voting members. 16 U.S.C. § 1852(b), (c). The Councils prepare, monitor, and revise FMPs. 16 U.S.C. § 1801(b)(5). The Councils, in conjunction with the Secretary, may also propose regulations implementing or modifying an FMP or plan amendment. 16 U.S.C. § 1853(c); *cf.* 16 U.S.C. § 1855(d).

The Councils also provide a forum through which the fishing industry, as well as other interested parties, can take an active role in advising, establishing, and administering FMPs. 16 U.S.C. § 1801(b)(5). The MSA prescribes the required and discretionary provisions of FMPs. 16 U.S.C. § 1853.

Among other requirements, FMPs must include conservation and management measures; fishery descriptions; certain yield assessments; essential fish habitat identification; fishery impact statements; criteria for identifying overfishing within the fishery; standardized reporting methodology for bycatch analysis; and a mechanism for setting annual catch limits. 16 U.S.C. § 1853(a). Among other provisions, FMPs may include fishery permits; designation of limited or closed-off fishing zones;

limitations on catch and sale of fish; prohibitions and requirements related to gear types; requirements for carrying observers on board to collect conservation and management data; reservation of portions of allowable catch for use in scientific research. 16 U.S.C. § 1853(b).

The MSA authorizes information collection but does not contemplate or even use the term "at-sea monitor." Instead the MSA permits information collections that are beneficial for developing, implementing, or revising FMPs. 16 U.S.C. § 1881a(a)(1). If a Council determines such information collection is necessary, it may request that the Secretary implements the collection. *Id.* If the Secretary determines that the collection is justified, then the Secretary has the duty to promulgate regulations implementing the collection program. *Id.* If determined necessary, the Secretary may also initiate an information collection. 16 U.S.C. § 1881a(a)(2). There is no general grant to the Secretary or any other Defendant of the right or ability to collect fees from regulated parties for data collection.

The MSA explicitly authorizes the collection of fees in certain circumstances for specific purposes. It does not generally allow industry funding of agency wishes. The statute does authorize the Secretary to collect fees to cover actual costs directly related to the management, of, data collection for, and enforcement of limited access privilege programs ("LAPPs") and certain community development quota programs. 16 U.S.C. § 1854(d). Such fees are capped at 3 percent of the ex-vessel value of fish harvested under those programs. 16 U.S.C. § 1854(d)(2)(B). One Council and only one can implement fees for observers. The MSA explicitly permits the North Pacific Fishery Council ("NPFC") to establish a system of fees to pay for the cost of implementing fisheries research plans, including mandated observers, for certain fisheries under its jurisdiction. 16 U.S.C. § 1862(a). There is no such provision for the NEFMC- or MAFMC-managed fisheries. That absence is telling and dispositive of the unlawful power asserted here by Defendants through the Final Rule. The MSA also explicitly permits the Secretary to charge fees, under certain circumstances, to foreign fishing vessels that harvest fish in the United States of America's jurisdictional waters to pay for observers. 16 U.S.C.

§ 1827.  That is the sum total of statutory authorizations.  There are no other provisions identifying

at-sea monitors nor allowing industry fees to pay for them.  In fact, there is a prohibition on charging

the regulated entities for collecting data except for the LAPPs and NPFC.

Incredibly, the Defendants admit, without blush or shame, that the at-sea monitor contracting

scheme is designed for one reason only, to not have to comply with Congressional authorization or

to provide the resources taken from the regulated entity and deposit them in the U.S. Treasury.  When

questioned why it did not simply directly request fees from the regulated entities and why this program

was designed this way instead, NOAA stated:

> The Miscellaneous Receipts Act requires Federal employees to deposit any money
> received on behalf of the government into the general Treasury, unless otherwise
> directed by law. This means that if NMFS accepted funds from the industry, NMFS
> would be required to direct those funds to the Treasury and would not be able to
> reserve them to pay for monitoring in the Greater Atlantic Region without a change
> in law to allow that to happen. For example, the Alaska Region has special
> authorization in the Magnuson-Stevens Act to collect fees from the industry and to
> put those fees into a fund to be used to defray the costs of monitoring in that region
> (Magnuson-Stevens Act § 313). The Greater Atlantic Region does not have such
> authority, except for cost recovery for Limited Access Privilege Programs (LAPPs).
> Currently, cost recovery is applicable only to the Atlantic sea scallop limited access
> general category individual fishing quota (IFQ) and the golden tilefish IFQ programs
> (both are forms of LAPPs). These fisheries, along with the surfclam and ocean quahog
> fisheries, are the only programs in the Greater Atlantic Region that are subject to the
> cost recovery requirement.

IFM Amendment at AR17037.

The Defendants knew how to implement LAPPs and knew they were available but

chose not to actually follow a law that would allow them for herring, which currently does not

have a LAPP in New England.  They stated:

> Under the LAPP cost recovery authority (Magnuson-Stevens Act § 303A(e)) and the
> authority to establish fees (Magnuson-Stevens Act § 304(d)), the Magnuson-Stevens
> Act requires NMFS to collect a fee to recover the actual costs directly related to the
> management, data collection, and enforcement of any LAPP and community
> development quota program that allocates a percentage of the total allowable catch of
> a fishery to such program. NMFS must collect a fee not to exceed 3% of the ex-vessel
> value of fish harvested under these programs. The fees are deposited into a unique
> fund that NMFS uses to directly pay for the management, data collection, and

enforcement of the program. The relevant costs to recover are the incremental costs, meaning those costs that would not have been incurred but for the LAPP. If the Council decides at some future point to develop LAPPs in other fisheries, cost recovery programs could be implemented in those fisheries. Development of LAPPs and cost recovery programs are complex and often take several years.

*Id.* at 17038; *see generally* Oliver Mem., AR16992-98. Moreover, Congress provided an extra step for approving LAPPs in New England. *Lovgren v. Locke,* 701 F.3d 5, 17 (1st Cir. 2012) (describing the referendum of permit holders required and citing 16 U.S.C. § 1853(a)(c)(6)(D)(1)).[6] That this Congressionally authorized mechanism exists is another reason why this Court must not countenance foisting these costs upon industry through a Rube-Goldberg scheme to avoid Congressional powers and explicit statutory strictures. .

### B. Administrative Power Derives from Statute and Summary Judgment Should Issue as Congress Did Not Authorize Industry-Funded at-Sea Monitors

The First Circuit is a maritime Circuit encompassing not only the storied fisheries of New England but even the rich waters of Puerto Rico. The Defendants will likely rely on *Goethel v. Pritzker,* Civ. No. 15-cv-497, 2016 WL 4076831 (D.N.H. Jul. 26, 2016), an unreported case out of New Hampshire, in defense of its adoption of the IFM Amendment and promulgation of the Final Rule. *See id., aff'd on statute of limitations ground, Goethel,* 854 F.3d at 108.

In that case the lower court dismissed a challenge to an at-sea monitor requirement in the groundfish fishery on statute of limitations grounds. *See id.* at *.4. However, that court went on—in *dicta*—to dismiss the statutory construction arguments made there by plaintiffs. *See id.* at *4-10.. Notably, that court relied heavily on *Chevron U.S.A., Inc. v. Nat'l Res. Def. Council, Inc.,* 467 U.S. 837, 843 (1984) (citations omitted). *See Goethel* at *4.. *Chevron*'s view of agency deference has since been curtailed, at least through implication, by *Kisor v. Willkie,* 139 S.Ct. 2400 (2019). *See id.* at 2416 ("Under

---

[6] The Greater Atlantic Region, which encompasses NEFMC and the MAFMC, contains two fisheries that permit industry funding through a fee system: the Atlantic sea scallop individual fishing quota and the golden tilefishing quota LAPPs. As noted, the MSA allows such fees for LAPPs.

*Auer*, as under *Chevron*, the agency's reading must fall 'within the bounds of reasonable interpretation.' … And let there be no mistake: That is a requirement an agency can fail." (internal citation omitted)). Secondly, the *Goethel* Court confused "observers" which are allowed by statute under 16 U.S.C. § 1853(b)(8), with this new office, at-sea monitors, which are nowhere described in the MSA. In this case, the Final Rule explicitly notes that at-sea monitors have different duties than "observers." *Compare Goethel*, 2016 WL 4076831 at *4. (noting that the statute allows "at-sea monitors"); *with* Final Rule at AR17735 (noting the types of data and information observers collect is different than the type of data and information at-sea monitors collect). That court chose not to publish the opinion and, other than the statute of limitations decision, it is entirely *dicta* and non-binding on this Court.[7]

The *Goethel dicta* also traduces the bedrock foundation of administrative law that there is no power in an agency to act "unless and until Congress confers power upon it." *La. Pub. Serv. Comm'n v. Fed. Commc'ns Comm'n*, 476 U.S. 355, 374 (1986). "An agency may not confer power upon itself." *Id.* To do that allows an agency to override Congress and as the Supreme Court has said that is something they are "both unwilling and unable to do." *Id.* at 374-75. Nothing in the MSA confers this power on any Defendant. "[A]n administrative agency's power to regulate … must always be grounded in a valid grant of authority from Congress." *FDA v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 161 (2000). The MSA explicitly allows "observers" to be placed on vessels "for the purpose of collecting data." 16 U.S.C. § 1853(b)(8). It does not generally allow the government to charge fishermen for the cost of their own monitors and, when it does, it says so. This court should not supply the lack.

*Casus omissus*, or the omitted-case canon, instructs the courts to be careful not to supply what amounts to "judicial legislation." *Ebert v. Poston*, 266 U.S. 548, 554 (1925); *Iselin v. United States*, 270

---

[7] It should be noted that Judge Stahl's opinion from the First Circuit flagged the funding issue for Congress and subsequently Congress funded those at-sea monitors. *See Goethel*, 854 F.3d at 116.

U.S. 245, 251 (1926) ("To supply omissions transcends the judicial function."). This is in keeping with the fact that neither the President nor an agency has any inherent power to make law. *See Loving v. United States*, 517 U.S. 748, 758 (1996) ("the lawmaking function belongs to Congress … and may not be conveyed to another branch or entity.") (citing U.S. Const art. I, § 1). Were the Court to add to what Congress has actually authorized the Defendants, it would be making such a conveyance.

Far more germane to this Court's analysis is *Campanale & Sons, Inc.*, 311 F.3d at 109. In that case Rhode Island lobstermen brought a declaratory judgment action against the Secretary of Commerce that a lobster trap-per-boat limit the Department implemented violated the APA, the MSA and the Regulatory Flexibility Act ("RFA"). *Id.* at 115. The lower court granted summary judgment for the government and the lobstermen appealed. The First Circuit set out the standard of review of the agency action under the APA. "Under the APA's standard of review, this Court can set aside agency action if we determine such action to be 'arbitrary capricious, an abuse of discretion.' or 'without observance of procedure required by law,' or otherwise contrary to law. *Id.* at 116. If the issue is whether the agency followed the requisite legal procedure the review is "limited but exacting." *Id.* The Court also laid out the rules this Court must follow on statutory interpretation stating: "Our general rules of statutory interpretation dictate a narrow course for us on review: unless the statutory language is ambiguous, we generally are limited by its plain meaning." *Id.* (citations omitted).

The issue in that case was what the word "consultation" meant. The court found it had as its plain meaning "the act of asking the advice or opinion of someone." *Id.* at 117. (citations omitted). The Defendants argued that because they had taken comments from some of the "consultants" they had fulfilled their duty. But the First Circuit stated "Consultation, within the parameters of the Atlantic Coastal Act, must mean something more than general participation in the public comment

process on environmental impact statements, otherwise the consultation requirement would be rendered nugatory." *Id.* at 118.[8]

The Defendants want to read out of the MSA the exceptions to industry funding explicitly put there by Congress for LAPPs, foreign vessels, and the Northern Pacific. This, the First Circuit states, is prohibited. It reversed the district court because the record did not demonstrate consultation. *Id.* at 121. There is another factor in *Campanale & Sons, Inc.* that pertains here. One of the faults of the Secretary of Commerce there was that he affirmed the final rule there at issue (on lobster traps) *before consultation. Id.* at 117 (Secretary had made his decision before any correspondence deemed "consultation" occurred). Here, the Secretary of Commerce approved the IFM Amendment Final before the comment period was over, making a mockery of the comment requirement and failing the procedural test laid out in *Campanale & Sons, Inc. See* Final Rule at AR17731; *see also* Pentony Letter at AR17760. Such rules are to be approved only "after a statutorily designated period of public comment" *Lovgren*, 701 F.3d at 13.

Also important to this Court's statutory analysis and examination of the Final Rule and whether it comports with statute is *Atlantic Fish Spotters Ass'n v. Evans*, 321 F.3d 220 (1st Cir. 2003). That too was a summary judgment motion where the Court's duty is to resolve all genuine factual disputes in favor of the opposing party and draw all reasonable inferences in favor of that party. *Id.* at 223. Statutory interpretation "begins—and sometimes ends—with the relevant statutory text … When the words of a statute neither create ambiguity nor lead to an entirely unreasonable interpretation, an inquiring court need not consult other aids to statutory instruction." *Id.* at 223-24. In that case the Court was determining whether the words of a yearly appropriation bill, prohibiting

---

[8] The Circuit approvingly cited *Herman v. Hector I. Nieves Transp., Inc.*, 244 F.3d 32, 36 (1st Cir. 2001), for the "primary canon of statutory construction is that a statute should be construed so as not to render any of its phrases superfluous."

spotting tuna from the air, created a permanent law against the practice. The Court determined that it did not do so, and NOAA could not condition permits on that appropriation thereafter. *Id.* at 229. NOAA could not rely on that statute after the funding year wore out to prohibit spotting tuna from the air. Here, NOAA and the other Defendants cannot use the statutory allowance for "observers" to create a whole new office, at-sea monitors. Nor can they use the three exceptions allowing industry funding to create a general agency prerogative to such funding. It is noteworthy here that Congress explicitly appropriates money for observers. Defendants cannot expand their reach by looking for other sources not authorized by appropriation or law to fund their regulatory desires.

The Supreme Court's interpretation of federal statutes also provides powerful support for the proposition that courts must not countenance the statutory legerdemain attempted here. Interpretation of statutes should not make any part of them superfluous. *NLRB v. SW General, Inc.*, 137 S.Ct. 929, 941 (2017) ("the Board's interpretation makes the first requirement superfluous, a result we typically try to avoid."). In that case the Court interpreted the Federal Vacancies Reform Act ("FVRA"). The Court started with the text of the statute. *Id.* at 938. It found that FVRA made no sense unless it applied to "anyone performing acting service under the FVRA" because any other reading would make much of the statute superfluous. Here, the sections of the MSA allowing "observers" to be paid by industry funding in one fishery, and explicitly allowing the money not to go back into the Treasury make no sense at all if the MSA willy-nilly allows Defendants to get around every protection for beleaguered fishermen in the MSA by simply requiring the agency to newly make offices to swarm over Plaintiffs' boats eating out their substance.

This Court's decision in *Hadaja, Inc.* is also instructive. In that case plaintiff sued the Secretary of Commerce for his Tilefish Fishery Management Plan ("TFMP"). The Complaint included, as here, an allegation that the National Standards had not been followed. This Court found that National Standard Two was not complied with because, in one case, the finding was based on political

compromise not science and, in another, that there was no evidence at all that trawling was hurting the tilefish. *Id.* at 353, 356. Here the record is devoid of adequate support for five standards.

National Standard One requires that "[c]onservation and management measures shall prevent overfishing while achieving, on a continuing basis, the optimum yield from each fishery for the United States fishing industry." 16 U.S.C. § 1851(a)(1). Here it is undisputed that 1) Plaintiffs' vessels have a very low percentage of bycatch[9], *see* June 30, 2015 Comment Letter at AR17805 ("Our currently high levels of coverage show that there are extremely low bycatch rates for our vessels and our style of fishing."); 2) that Plaintiffs take less Atlantic herring a day than other types of trawlers, *see* Dec. 24, 2018 Comment Letter at AR17714 ; and yet 3) they are threatened with higher at-sea monitoring costs as they will not be able to use the exemptions because of their style of fishing. One of the unexplained arbitrary and capricious aspects of the Final Rule is that, if a vessel takes less than 50 mt of Atlantic herring per *trip*, it can obtain a waiver to the at-sea monitor requirement. Such a vessel could go out every day, obtain 49 mt of Atlantic herring, unload it, and go out the next day and so on for 8 days and never be burdened with an at-sea monitor. But either F/V *Relentless* or *Persistence* could take less than 20 mt a day of herring and be burdened by an at-sea monitor with no exemption allowable because they are out for 8 days and so their entire *trip* is not eligible for exemption. It is also undisputed that Atlantic herring are not overfished. *See supra Atlantic Herring.* Placing at-sea monitors on Seafreeze vessels does not aim to prevent overfishing while obtaining optimum yield, because the Final Rule's arbitrary exemptions for those vessels taking *more* Atlantic herring per day and taking it back to the dock fresh get to avoid every burden while taking more Atlantic herring than F/Vs *Relentless* and *Persistence* over the same 8-day period. But because of the longer voyages, Plaintiffs have to assume the burden of at-sea monitors. This case is similar to *Western Sea Fishing Company, Inc. v. Locke*, 722 F.

---

[9] Bycatch are the fish taken that are not meant to be harvested. *See* NOAA Fisheries, *Bycatch* (last visited Dec. 4, 2020) *available at* https://www.fisheries.noaa.gov/topic/bycatch.

Supp. 2d 126, 140-141 (D. Mass. 2010), where the Court struck down a rule on herring that did nothing to comply with National Standard One.  This rule does nothing to establish optimum yield, and it burdens other fisheries because, as demonstrated unequivocally, Plaintiffs will be paying for the at-sea monitors with fish revenues earned aside from Atlantic herring.  In addition to failing to comply with National Standard One, this differential treatment is also arbitrary and capricious on its face.

National Standard Two requires that "[c]onservation and management measures shall be based upon the best scientific information available." 16 U.S.C. § 1851(a)(2).  There is no scientific basis in the record for requiring at-sea monitors for Atlantic herring.  It is not endangered nor is it overfished. *See supra Atlantic Herring.*  There is no basis to believe that the type of fishing that Plaintiffs engage in is more harmful to the Atlantic herring stock than any other kind of Atlantic herring fishing but, as demonstrated by the record, and not contradicted by the Defendants, Seafreeze's fleet gets assigned at-sea monitors more often than other members of the fleet without any scientific reason for that costly imbalance.  There is also no comparison between the Atlantic herring stocks' health if only government-funded and statutorily authorized observers are used as opposed to the additional at-sea monitors made possible by industry funding.  The delta between Atlantic herring stocks under only appropriated observers versus under industry-funded at-sea monitors is not apparent in the record. To burden industry, with no scientific evidence of clear increase in Atlantic herring stocks therefrom, violates National Standard Two (as well as National Standard Seven).  *See Massachusetts ex rel. Div. of Marine Fisheries v. Daley*, 170 F.3d 23, 32 (1st Cir. 1999) (where state-by-state quotas unsupported by the record MSA regulations could be overturned); *See Hall*, 165 F. Supp. 2d 114 (overturning final rule under MSA because differing treatment by gear type was arbitrary and capricious).

National Standard Six requires that "[c]onservation and management measures shall take into account and allow for variations among, and contingencies in, fisheries, fishery resources, and catches." 16 U.S.C. § 1851(a)(6).  The Final Rule takes no notice that Plaintiffs are multi-species fishers.

As noted in the comments, F/Vs *Relentless* and *Persistence* have on-board observers for squid, Atlantic herring and other species. They consistently have lower bycatch rates than other vessels, yet the Final Rule is requiring them, as is undisputed, to rely on non-Atlantic herring resources to pay for the at-sea monitors for Atlantic herring. This cross-subsidy completely upends the style of fishing Plaintiffs engage in *and* puts pressure on the other fishery resources that is not warranted. *See* Dec. 24, 2018 Comment Letter at AR17714-15.

National Standard Seven requires that "[c]onservation and management measures shall, where practicable, minimize costs and avoid unnecessary duplication." 16 U.S.C. § 1851(a)(7). This National Standard has been completely ignored. As noted, Plaintiffs are bearing a disproportionate amount of at-sea monitors for no good reason, and the discrepancy is unexplained by the Final Rule or any response to comments. Defendants have not limited the costs to Plaintiffs to even the three percent of ex-vessel revenue found in other parts of the statute. Plaintiffs are completely frozen out of any of the three exemptions, and the Defendants have refused any suggestion to lower the burden on them. A per-day herring exemption was dismissed out of hand without adequate reason or scientific basis. *See* Final Rule at AR017743. That this National Standard has not been complied with is also supported by the incredible fact that the industry contribution in the beleaguered New England Fishery is about twice the industry contribution per day found in Alaska—where fishing is more lucrative *and industry-funded at-sea observers are statutorily authorized*. IFM Amendment at AR17043 (industry-funded observers $360-420 per day).

National Standard Eight requires that "[c]onservation and management measures shall, consistent with the conservation requirements …, take into account the importance of fishery resources to fishing communities by utilizing economic and social data that [are based upon the best scientific information available], in order to (A) provide for the sustained participation of such communities, and (B) to the extent practicable, minimize adverse economic impacts on such

32

communities." 16 U.S.C. § 1851(a)(8).  This standard has been violated in the same way as National Standard Seven.  Plaintiffs are not more damaging than any other vessel to any fishing resource, yet the Final Rule burdens them the most because they fish different species than the other manner of fishing.

### C. The Government's Admissions and Previous Litigated Position Demonstrate Industry Funded at-Sea Monitoring Is Unlawful

Money is fungible.  *Sabri v. U.S.*, 541 U.S. 600, 606 (2004).  The Defendants claim the Final Rule does not implement a "fee."  *See* AR17739 ("These industry costs are not 'fees.'  A fee is a form of "funding" where the industry is assessed a payment by the agency, authorized by statute, to be deposited in the U.S. Treasury and disbursed for administrative costs otherwise borne by the agency.").  So, the record is clear these are not user fees, perhaps allowable under 31 U.S.C. § 9701 (b).  Not only does the MSA only allow industry funding in limited circumstances not relevant here, but the Government also has admitted in litigation that various laws prohibit much of what is attempted here.  *Anglers Conservation Network, et al., v. Pritzker*, 139 F. Supp. 3d 102 (D.D.C. 2015).  In that case, a group of environmental organizations sued the Defendants, including the Secretary of Commerce, under the MSA for failing to require one hundred percent monitoring for Mackerel, Squid, and Butterfish.  *Id.* at 104.  The plaintiffs wanted shad and river herring included in the rule and to require observer coverage levels of one hundred percent and funded through cost sharing with industry.  *Id.* at 115.  The government responded that that proposal would "have violated federal statutes outside of the MSA framework, in contravention of 16 U.S.C. § 1853(a)(a)(C)'s requirement that provisions of fishery management plans 'shall be consistent with … any other applicable law.'"  *Id.*  The Secretary of Commerce, NOAA and NMFS argued that this proposal "would violate" the Anti-Deficiency Act, 31 U.S.C. § 1341(a)(1), the Miscellaneous Receipts Statute 31 U.S.C. § 3302(b), and 18 U.S.C. § 209, which prohibits payment of federal employees' salaries from non-governmental sources.  *Id.* at 116.  The Court held the record "amply" supported this concern.  *Id.*  The Court noted that Plaintiffs

identified other cost sharing with industry for observers in other fisheries, but they lost their argument when three of the Defendants here, including the Secretary, pointed out "that those programs were expressly authorized by statute for particular fisheries only. *See* 16 U.S.C. § 1862(a); *see also Anglers Conservation Network*, 139 F. Supp. 3d at 116 n.9 ("authorizing, under MSA § 313, a system of fees for observers in North Pacific fisheries").

While the Government may be immune to judicial estoppel, the arguments it made and won on in *Anglers Conservation Network* ought to be persuasive here. The First Circuit has noted, "[I]mplied repeals of federal statutes are disfavored." *Passamaquoddy Tribe v. State of Me.*, 75 F.3d 784, 790 (1st Cir. 1996) (quotes omitted). All the statutes cited in *Anglers* are still in force. The MSA itself is parsimonious in allowing this type of cost splitting. But there is a broader reason the requirement to deal with at-sea monitors violates the law. It violates the very structure of the Congressional grants of agency power. What level various government activities shall be funded at is quintessentially a legislative function. That is why the funding sources of the various agencies and their yearly levels are so contentious. Here, the record is clear that Defendants decided they did not like the level of observers Congress was willing to fund. They did not like the laws that prevented them from dunning the industry. So, they determined to dun the industry by equating at-sea monitors to equipment required to comply with a rule as a cost of business. But at-sea monitors are not equipment to enforce a rule. They are federal contractors doing a federal job. In fact, impeding them in their work is a crime. *U.S. v. Cusick*, Cr. No. 11cr10066-LTS, 2012 WL 442005 at *3 (D. Mass. Feb. 9. 2012) (at-sea monitor was a "representative of the Federal government").

## III.    PLAINTIFFS ARE ENTITLED TO SUMMARY JUDGMENT BECAUSE INDUSTRY FUNDING IMPERMISSIBLY FORCES PLAINTIFFS INTO A MARKET THEY DO NOT WISH TO JOIN

In *National Federation of Independent Business v. Sebelius*, 567 U.S. 519 (2012), the Supreme Court ruled that Congress lacked the power under the Commerce Clause to force individuals into a market they were not already in or "existing commercial activity." *Id.* at 552. The Court declined to allow

Congress, under the Commerce Clause to require "mandatory purchase[s] to solve almost any problem." *Id.*   The ability to regulate commerce is not the ability to compel it. *Id.* at 555.   The at-sea monitors here are "purchased" solely because an administrative agency has 1) created the office without statutory basis; and 2) required Plaintiffs to enter that market to "solve" the "problem" of Congress not appropriating the amount of money NOAA wants for monitoring.  The Final Rule would penalize Plaintiffs if they do not enter this market by barring them from the fisheries.  The Court further noted the Federal Government did not have this power under the "necessary and proper clause." *Id.* at 561.   *NFIB v. Sebelius* famously determined the penalty for failing to enter the market the Federal Government wanted you to enter was a "tax." *Id.* at 574.   The taxing power is greater than the power to regulate commerce. *Id.* at 573.

Here Congress did not give Commerce, NOAA or any other Defendant the power to tax. They cannot force Plaintiffs into a market Plaintiffs do not wish to join.  The Defendants admit that the at-sea monitor contracting is not a user fee.  The response in the comments was that it is simply incidental to Commerce's power to regulate the fisheries. Final Rule at AR17739.  The Defendants claim that at-sea monitors are simply like equipment needed to comply with valid regulations, like scales to weigh fish, for instance.  But they are nothing of the kind.  At-sea monitors are government agents. *Cusick*, 2012 WL 442005 at * 3 (at-sea monitor was a "representative of the Federal government (albeit indirectly in the form of an outsourced data collector) placed by legal mandate on board the vessel in order to monitor and to catalogue the fishing activity … as part of the federal government's regulation of the fishing industry.").  Under a criminal statute, at-sea monitors are the equivalent of federal employees.  The Final Rule requires Plaintiffs to enter a market for at-sea monitors that previously only the government entered because they paid for the at-sea monitors.  The Final Rule has the intended effect of moving the Defendants out of the at-sea monitors market and

putting the Plaintiffs in it.  This is admittedly being done to avoid the constitutional and statutory prohibitions on making industry pay directly for government representatives.

Money is fungible and this diversion of money, prohibited by Congress should not be allowed by analogizing at-sea monitors as "gear types" or other equipment required by regulation.  *See* Final Rule at AR17739.  The nature of the at-sea monitors as doing work for the federal government and not in any way advancing the goals of the regulated vessels demonstrates the impropriety of having such costs imposed on industry.  As already noted, the MSA unequivocally gives Defendants the right to put "observers" on Plaintiffs' vessels.  It nowhere gives Defendants the power to require payment for monitors who are not even "observers" under the MSA.  The Final Rule impinges on Congress's appropriation power, taxing power, and spending power.  It willfully avoids statutory bars on just what is accomplished here, and the Court ought to prohibit this charade.

## IV.    PLAINTIFFS ARE ENTITLED TO SUMMARY JUDGMENT BECAUSE THE FINAL RULE VIOLATES THE REGULATORY FLEXIBILITY ACT

The Regulatory Flexibility Act, 5 U.S.C. § 601 *et seq.*, ("RFA") requires administrative agencies to consider the effect of their actions on small entities, including small businesses and reduce their impact where possible.  *See Hall*, 165 F. Supp. 2d at 144.  After the comment period the Final Regulatory Flexibility Analysis ("FRFA") accompanies the publication of a final rule.  *Id.*  If it finds there is a significant impact, it must explore alternatives.  *Id.* [10] The purpose of the RFA is to enhance agency sensitivity to the economic impact of rulemaking on small entities to ensure that alternative proposals receive serious consideration at the agency level.  The RFA provides that, whenever an agency is required by the APA to publish a general notice of proposed rulemaking, it must prepare and make available for public comment an Initial Regulatory Flexibility Analysis ("IRFA"), 5 U.S.C. §

---

[10] As in *Hall*, Plaintiffs believe there is no dispute that Relentless and Huntress are "small entities" under the RFA.  *Id.* at 145.  The Lapp Dec. also demonstrates this should it be necessary.

603(a), and subsequently prepare and make public a FRFA., 5 U.S.C. § 604. An agency must also publish the FRFA or a summary of the FRFA in the *Federal Register*. 5 U.S.C. § 604(b). When an agency takes a final action that is subject to the RFA, including the promulgation of final rules, but does not comply with the RFA, "a small entity that is adversely affected or aggrieved by final agency action is entitled to judicial review." 5 U.S.C. § 611(a).

Under NMFS regulations, the "small business size standard" for commercial fishing businesses, and their affiliates, "is $11 million in annual gross receipts." 50 C.F.R. § 200.2; 5 U.S.C. §601(3). Plaintiffs Relentless and Huntress meet all these standards. Like the MSA, the RFA is reviewed under the APA, and this Court is authorized to hold unlawful and set aside agency action, findings, and conclusions that are taken without observance of the procedure required by law. 16 U.S.C. § 1855(f)(1); *cf.* 5 U.S.C. § 706(2)(D).

The RFA in this case found that of the 66 businesses affected by the Final Rule, 62 were small businesses. *See* Final Rule at AR17744. Of these, like plaintiffs here, 30 were actively fishing Atlantic herring. *Id.* at AR17745. NOAA estimates that "each vessel would incur monitoring costs for an additional 19 days at sea per year, at an estimated maximum cost of $710 per sea day. The annual cost estimate for carrying an at-sea monitor for category A or B vessels would be $566,580, with an average cost per vessel of $13,490." *Id.* at AR17745. Incredibly, Defendants categorize this massive increase, for minimal gain, as a "potential economic impact." *Id.* They say under a heading "Steps the Agency Has Taken to Minimize the Significant Economic Impact on Small Entities" that such steps include: 1) "setting the coverage target at 50 percent rather than 75 or 100 percent"; 2) allowing exemptions for 50 mt *per trip*; and 3) electronic monitoring and port-side sampling for mid-water trawlers. *Id.* at AR17747.

This Circuit has stated that the RFA "does not command an agency to take specific substantive measures, but, rather, only to give explicit consideration to less onerous options." *Associated Fisheries*

*of Miane, Inc. v. Daley*, 127 F.3d 104, 114 (1st Cir. 1997).  It must "describe those it considered and explain its rejection of any which, if adopted, would have been substantially less burdensome on the specified entities."  *Id.* (citations omitted).

The Agency never considered or included the recommendations to make exemptions available for at-sea processors which can take advantage of none of the measures it did consider.  It did not "adequately summarize and respond[]" to the comments it received on this issue from Plaintiffs and others.  *See Little Bay Lobster Co. v. Evans*, 2002 WL 1005105 * 30 (D.N.H. May 16, 2002) (agency should adequately summarize and respond to alternatives to comply with RFA).  Defendants did not address the impacts associated with the omnibus alternatives throughout the process including in the 2018 IFM Amendment.  *See* IFM Amendment at AR17339 (stating that "[b]ecause Omnibus Alternatives have no direct economic impacts, they will not be discussed in [the RFA/IFRA] section").  They also rejected without analysis the comments and data claiming a great drop in the elimination of fishermen in the region.  Final Rule at AR17741.

Finally, and glaringly, there is nothing in the Final Rule to ensure that at-sea monitors are allocated across the fleet fairly.  The fleet consists of many kinds of vessels.  There is no cap or prohibition on how often each vessel will host these at-sea monitors.  This is arbitrary and capricious in itself, but it also violates the RFA.  Each of the alternatives is not listed, including no-action, and compared by the Defendants in relation to small businesses.

## CONCLUSION

By aggrandizing to themselves powers of Congress not delegated to them by statute, and in some cases asserting powers such as forcing individuals into markets beyond the power of Congress itself, by failing to comply with the National Standards of the MSA, and by failing to comply with the RFA, the Defendant Agencies and individuals acting in their official capacities should be enjoined

from applying the Final Rule, and summary judgment should be granted in favor of Plaintiffs on all counts.

Dated: December 4, 2020                          Respectfully submitted,

                                                 /s/ John J. Vecchione
                                                 John J. Vecchione (admitted *pro hac vice*)
                                                 Kara Rollins (admitted *pro hac vice*)
                                                 New Civil Liberties Alliance
                                                 1225 19th Street NW, Ste. 450
                                                 Washington, DC 20036
                                                 Phone: (202) 869-5210
                                                 john.vecchione@ncla.legal
                                                 kara.rollins@ncla.legal

                                                 Kevin J. Holley, Esq. #4639
                                                 Holley Law LLC
                                                 33 College Hill Road, Ste. 25C
                                                 Warwick, RI 02886
                                                 Phone: (401) 521-2622
                                                 kevin@holleylawllc.com

                                                 *Counsel for Plaintiffs*

**CERTIFICATE OF SERVICE**

I hereby certify that on December 4, 2020, I electronically filed the foregoing Plaintiffs'
Memorandum in Support of Summary Judgment using the CM/ECF system, which will send
electronic notification of such filing to all counsel of record.


/s/ John J. Vecchione