# Exhibit 1

# Industry-Funded Monitoring

An Omnibus Amendment to
the Fishery Management Plans of the
New England Fishery Management Council

**December 2018**





The concept of "cost sharing" has come up throughout the discussions of industry-funded monitoring. Conceptually, cost sharing implies that industry and the government both contribute to the cost of the monitoring program. However, legal constraints prevent NMFS from receiving industry funds to pay for government costs in an industry-funded monitoring program. Therefore, it is necessary to specify appropriate cost responsibilities for NMFS and industry to avoid NMFS and industry sharing costs.

Department of Commerce General Counsel has advised NMFS that monitoring cost responsibilities can be allocated between industry and the government by delineating the sampling and administrative portions of the costs of monitoring. Industry would be responsible for costs directly attributable to the sampling portion of a monitoring program, and NMFS would be responsible for costs directly attributable to the administrative portion of the monitoring program (See Omnibus Alternative 2 under "Standardized Cost Responsibilities"). This division of cost responsibilities should remain the same and should differentiate between inherently governmental responsibilities and industry costs.

It is illegal for industry to pay inherently government costs (e.g., administrative costs), but either group can pay for sampling costs. Actual payment of different cost responsibilities for monitoring programs can work in two ways: (1) NMFS can pay for its cost responsibilities, such as support and administrative costs, and also pay for the industry's cost responsibilities, such as sampling costs (e.g., the Northeast Fisheries Observer Program); or (2) NMFS can pay for its cost responsibilities, such as support and administrative costs, and industry can pay for its cost responsibilities, such as sampling costs (e.g., industry-funded Atlantic scallop observer program). Additionally, NMFS can help to offset industry's monitoring cost responsibilities by reimbursing vessel owners through cooperative agreements with third parties when funding is available.

[Back to list of questions.]

**Why cannot NMFS directly collect fees for monitoring programs?**

The Miscellaneous Receipts Act requires Federal employees to deposit any money received on behalf of the government into the general Treasury, unless otherwise directed by law. This means that if NMFS accepted funds from the industry, NMFS would be required to direct those funds to the Treasury and would not be able to reserve them to pay for monitoring in the Greater Atlantic Region without a change in law to allow that to happen. For example, the Alaska Region has special authorization in the Magnuson-Stevens Act to collect fees from the industry and to put those fees into a fund to be used to defray the costs of monitoring in that region (Magnuson-Stevens Act § 313). The Greater Atlantic Region does not have such authority, except for cost recovery for Limited Access Privilege Programs (LAPPs). Currently, cost recovery is applicable only to the Atlantic sea scallop limited access general category individual fishing quota (IFQ) and the golden tilefish IFQ programs (both are forms of LAPPs). These fisheries, along with the surfclam and ocean quahog fisheries, are the only programs in the Greater Atlantic Region that are subject to the cost recovery requirement.

Under the LAPP cost recovery authority (Magnuson-Stevens Act § 303A(e)) and the authority to establish fees (Magnuson-Stevens Act § 304(d)), the Magnuson-Stevens Act requires NMFS to collect a fee to recover the actual costs directly related to the management, data collection, and enforcement of any LAPP and community development quota program that allocates a percentage of the total allowable catch of a fishery to such program.  NMFS must collect a fee not to exceed 3% of the ex-vessel value of fish harvested under these programs.  The fees are deposited into a unique fund that NMFS uses to directly pay for the management, data collection, and enforcement of the program.  The relevant costs to recover are the incremental costs, meaning those costs that would not have been incurred but for the LAPP.   If the Council decides at some future point to develop LAPPs in other fisheries, cost recovery programs could be implemented in those fisheries.  Development of LAPPs and cost recovery programs are complex and often take several years.

[Back to list of questions.]

**Why has it been difficult for NMFS to give cost estimates for various types of monitoring programs?**

Monitoring program costs include a variety of administrative and sampling costs that vary substantially within and between years.  This variability affects the estimates of both NMFS and industry costs for monitoring programs, which means that the estimate of the total or per sea day cost for the same monitoring program can vary depending on the time period of interest.  A discussion of the difficulties with generating a cost estimates for monitoring is included in the 2015 Program Review of the Northeast Fisheries Science Center Fisheries Sampling Branch, available at http://www.nefsc.noaa.gov/fsb/index.html#fsb-review.

Some of the reasons why estimates of NMFS administrative costs can vary include:

- The costs associated with training vary substantially within and between years because of the high monitor turnover rate.
- The costs associated with data editing varies greatly depending on the experience of the cohort of monitors for a given time period.  Data editing costs may be lower for a given period if the cohort of monitors is highly experienced.  Conversely, data editing costs may be higher for a period with a large cohort with less experienced monitors.

In addition, the breakdown of industry costs for sampling for a single sea day can vary depending on:

- How close the monitor's home port is to the port of deployment (an observer will be reimbursed travel costs which include mileage and an hourly wage for time traveling if traveling greater than 50 miles from their assigned home port);

_0000017038

[Back to list of questions.]

### 1.1.4 QUESTIONS AND ANSWERS ABOUT INDUSTRY COSTS

**The expected industry contribution for monitoring in the Greater Atlantic Region seems a lot higher than other regions. Do Alaska fishermen only pay $325 per sea day for observer coverage?**

There are a number of factors that influence industry costs for monitoring programs. A 2012 MRAG Americas report titled "Comparison of At-Sea Catch Monitoring Programs with Full Observer Coverage to the Directed Atlantic Herring Fishery – New England" compared the industry costs for Northeast Fishery Observer Program monitoring in the Atlantic herring fisheries to the industry contribution for several other fisheries that require 100% industry-funded monitoring coverage, including the Hawaii longline swordfish fishery, the Alaska pollock midwater trawl fishery, the West Coast at-sea whiting (hake) midwater trawl fishery, and the West Coast non-whiting trawl Individual Fishing Quota fishery. The report estimated industry contributions for these programs in the range of $360-420 per sea day. However, the report noted that the short trip duration (1-5 days) and complicated deployment logistics for the herring fleet result in higher per sea day costs for monitoring. In contrast, some of the other fisheries reviewed in the report have much longer trip duration (21-90 days) and have vessels that operate out of a limited number of ports, which simplifies deployment logistics.

[Back to list of questions.]

**The scallop fishery has an observer set-aside to help defray industry costs for monitoring. Can other FMPs use this approach? What are some of the challenges of using a monitoring set-aside to pay for industry costs?**

There are aspects of the scallop fishery, including the health and value of the stock, the management regime, and the predictability of landings, which allow the observer set-aside model to work well.

First, the health of the scallop resource means that a certain amount of the quota can be set aside to compensate the vessel for the cost of the observer. If a fishery resource is in poor shape, it may not be possible to allocate enough of the quota to a set-aside to effectively offset industry costs for monitoring. In addition, the high value of scallops allocated to vessels that carry observers helps compensate the vessel for the cost of the observer. Other fisheries with a lower price per pound (e.g., herring fishery) may need to set aside a much larger portion of the resource to compensate industry for monitoring cost.

Second, the management regime of the scallop fishery supports the set-aside model. The scallop fishery uses trip or days-at-sea limits for many of its permits, and vessels receive extra pounds or days-at-sea on each observed trip that provides additional funds to pay for

There would also be additional costs associated with the preferred Herring Alternatives. The Federal government would incur additional costs to administer an industry-funded monitoring program for the herring fishery. There would also be small non-pecuniary costs to herring vessels resulting from compliance with existing notification and reporting requirements (described in Section 2.2).

The economic benefits of the preferred Herring Alternatives are described in Section 4.2.7. It is difficult to quantify these benefits, but indirect positive impacts on herring vessels may result from increased monitoring helping to reduce uncertainty around retained and discarded catch estimates leading to additional harvesting opportunities. If increased monitoring reduces the uncertainty in the catch of haddock and river herring and shad tracked against catch caps, herring vessels may be less likely to be constrained by catch caps and more likely to be able to fully harvest herring sub-ACLs.

### 6.10.1.5 Determination of Significance

Based on the analyses provided in this document, the preferred alternatives are not expected to constitute a "significant regulatory action." This action is not expected to have an impact of $100M or more on the economy, or adversely affect in a material way the economy, a sector of the economy, productivity, jobs, the environment, public health or safety, or State, local, or tribal governments or communities. This action is not expected to raise novel legal and policy issues or interfere with an action taken or planned by another agency. Lastly, this action does not materially alter the budgetary impact of entitlements, grants, user fees, or loan programs, or the rights and obligations of recipients.

## 6.10.2 REGULATORY FLEXIBILITY ACT - INITIAL REGULATORY FLEXIBILITY ANALYSIS

### 6.10.2.1 Introduction

The purpose of the Regulatory Flexibility Act (RFA) is to reduce the impacts of burdensome regulations and recordkeeping requirements on small businesses. To achieve this goal, the RFA requires Federal agencies to describe and analyze the effects of proposed regulations, and possible alternatives, on small business entities. To this end, this section contains an Initial Regulatory Flexibility Analysis (IRFA), which includes an assessment of the effects that the Proposed Action and other alternatives are expected to have on small entities.

The preferred Omnibus Alternatives are administrative, specifying a process to develop and administer future industry-funded monitoring and monitoring set-aside programs, and do not directly affect fishing effort or amount of fish harvested. Because the Omnibus Alternatives have no direct economic impacts, they will not be discussed in this section.

The preferred Herring Alternatives affect levels of monitoring, rather than fishing behavior or harvest specifications, but they are expected to have economic impacts on fishery-related businesses and human communities.