# Exhibit 2

## DEPARTMENT OF COMMERCE

**National Oceanic and Atmospheric Administration**

**50 CFR Part 648**

[Docket No. 200115–0017]

RIN 0648–BG91

**Magnuson-Stevens Fishery Conservation and Management Act Provisions; Fisheries of the Northeastern United States; Industry-Funded Monitoring**

**AGENCY:** National Marine Fisheries Service (NMFS), National Oceanic and Atmospheric Administration (NOAA), Commerce.

**ACTION:** Final rule.

**SUMMARY:** This action implements the New England Fishery Management Council's Industry-Funded Monitoring Omnibus Amendment. This amendment allows the New England Council flexibility to increase monitoring in certain fishery management plans to assess the amount and type of catch and reduce uncertainty around catch estimates. This amendment establishes a process to standardize future industry-funded monitoring programs in New England fishery management plans and establishes industry-funded monitoring in the Atlantic herring fishery. This action helps ensure consistency in industry-funded monitoring programs across fisheries and increases monitoring in the Atlantic herring fishery.

**DATES:** Effective March 9, 2020, except for §§ 648.11(m) and 648.14(r) which are effective April 1, 2020.

**ADDRESSES:** Copies of the Industry-Funded Monitoring Omnibus Amendment, including the Environmental Assessment, the Regulatory Impact Review, and the Initial Regulatory Flexibility Analysis (EA/RIR/IRFA) prepared in support of this action are available from Thomas A. Nies, Executive Director, New England Fishery Management Council, 50 Water Street, Mill 2, Newburyport, MA 01950. The supporting documents are also accessible via the internet at: *http://www.nefmc.org.*

Written comments regarding the burden-hour estimates or other aspects of the collection-of-information requirements contained in this rule may be submitted to the Greater Atlantic Regional Fisheries Office and by email to *OIRA_Submission@omb.eop.gov* or fax to (202) 395–5806.

**FOR FURTHER INFORMATION CONTACT:** Carrie Nordeen, Fishery Policy Analyst, phone: (978) 282–9272 or email: *Carrie.Nordeen@noaa.gov.*

**SUPPLEMENTARY INFORMATION:**

### Background

The New England Fishery Management Council developed an amendment to allow industry-funded monitoring in its fishery management plans (FMPs), except those managed jointly with the Mid-Atlantic Fishery Management Council, and establish industry-funded monitoring in the Atlantic herring fishery. The amendment standardizes the development and administration of future industry-funded monitoring programs in New England Council FMPs and increases monitoring in the herring fishery to help provide increased accuracy in catch estimates.

The New England Industry-Funded Monitoring Omnibus Amendment provides a mechanism to allow the Council flexibility to increase monitoring in its FMPs to assess the amount and type of catch and reduce uncertainty around catch estimates. Industry-funded monitoring would be in addition to monitoring requirements associated with the Standardized Bycatch Reporting Methodology (SBRM), the Endangered Species Act (ESA), and the Marine Mammal Protection Act (MMPA). This amendment remedies NMFS disapprovals of previous Council proposals for industry-funded monitoring that either required NMFS to spend money that was not yet appropriated or split monitoring costs between the fishing industry and NMFS in ways that were inconsistent with Federal law.

To remedy the disapproved measures, the amendment uses a monitoring coverage target, as opposed to a mandatory coverage level, to allow NMFS to approve new monitoring programs without committing to support coverage levels above appropriated funding or before funding is determined to be available. Using a coverage target instead of mandatory coverage level means the realized coverage in a given year would be determined by the amount of Federal funding available to cover NMFS cost responsibilities in a given year. Industry-funded monitoring coverage targets are specified in individual FMPs and realized coverage for a fishery in a given year would be anywhere from no additional coverage above SBRM up to the specified coverage target. Additionally, the amendment defines cost responsibilities for industry-funded monitoring programs between the fishing industry and NMFS in a manner that is consistent with legal requirements. Monitoring cost responsibilities may be divided between the industry and the government, provided government cost responsibilities are paid by the government and the government's costs are differentiated from the industry's cost responsibilities. This amendment specifies that industry-funded monitoring costs are delineated between NMFS administrative costs and industry sampling costs.

The Industry-Funded Monitoring Amendment was adopted by the Council on April 20, 2017. The Council refined its recommendations for industry-funded monitoring in the herring fishery on April 19, 2018. We published a notice of availability (NOA) for the amendment in the **Federal Register** on September 19, 2018 (83 FR47326), with a comment period ending November 19, 2018. We published a proposed rule for the amendment in the **Federal Register** on November 7, 2018 (83 FR 55665), with a comment period ending December 24, 2018. After considering public comment, we approved the Industry-Funded Monitoring Amendment, on behalf of the Secretary of Commerce, on December 18, 2018. We informed the Council of the amendment's approval in a letter dated December 18, 2018. This final rule implements the Industry-Funded Monitoring Amendment as approved.

### Approved Omnibus Measures

This amendment standardizes the development and administration of future industry-funded monitoring programs in New England Council FMPs, including the Atlantic Herring FMP, the Atlantic Salmon FMP, the Atlantic Sea Scallop FMP, the Deep-Sea Red Crab FMP, the Northeast Multispecies FMP, and the Northeast Skate FMP. In the future, if the Council develops an industry-funded monitoring programs, the Council would develop those programs consistent with the specifications and requirements for industry-funded programs established in this amendment. The existing industry-funded monitoring programs in the Northeast Multispecies and Atlantic Sea Scallop FMPs would not be affected by this amendment. While cost responsibilities and monitoring service provider requirements established in this amendment are consistent with the existing programs, the industry-funded monitoring programs in the Multispecies and Scallop FMPS would not be included in the proposed process to prioritize industry-funded monitoring programs for available Federal funding.

The Council may incorporate these existing industry-funded monitoring programs into the prioritization process in a future action. Additionally, future industry-funded monitoring programs in the Multispecies and Scallop FMPs would either expand the existing programs or develop new programs consistent with the omnibus measures.

This amendment provides for industry-funded monitoring coverage targets in Council FMPs, noting that annual funding available to cover NMFS cost responsibilities would likely vary and dictate realized coverage levels. The realized coverage in a given year would be determined by the amount of Federal funding available to cover NMFS cost responsibilities in a given year.

The standards for future industry-funded monitoring programs in New England fisheries apply to several types of monitoring, including observing, at-sea monitoring, electronic monitoring, portside sampling, and dockside monitoring. This rule establishes the following principles to guide the Council's consideration when developing future industry-funded monitoring programs:
- A clear need or reason for the data collection;
- Objective design criteria;
- Cost of data collection should not diminish net benefits to the nation nor threaten continued existence of the fishery;
- Seek less data intensive methods to collect data necessary to assure conservation and sustainability when assessing and managing fisheries with minimal profit margins;
- Prioritize the use of modern technology to the extent practicable; and
- Incentives for reliable self-reporting.

All of this amendment's omnibus measures are administrative, specifying a process to develop and administer future industry-funded monitoring and monitoring set-aside programs and do not directly affect fishing effort or amounts of fish harvested. However, the omnibus measures may have indirect effects on Council FMPs. Standardizing the process for developing and administering future industry-funded monitoring programs may help reduce the administrative burden associated with implementing new programs and may lead to greater consistency in the information collected through industry-funded monitoring programs. Improved catch information resulting from greater consistency in how information is collected may lead to better management of biological resources. The prioritization process is expected to help ensure that available Federal funding is used to support industry-funded monitoring programs consistent with Council monitoring priorities. While industry-funded monitoring programs are expected to have an economic impact on the fishing industry, standard cost responsibilities may help the industry better understand and plan for their industry-funded monitoring cost responsibilities. Standard cost responsibilities may also aid the industry in negotiating coverage costs with service providers, which may ultimately reduce the dollar amount associated with industry cost responsibilities. Monitoring set-aside programs may also help minimize the economic burden on the fishing industry associated with paying for monitoring coverage.

*1. Standard Process To Implement and Revise Industry-Funded Monitoring Programs*

This amendment specifies that future industry-funded monitoring programs are implemented through an amendment to the relevant FMP. Because industry-funded monitoring programs have the potential to economically impact the fishing industry, the Council determined that implementing new industry-funded monitoring programs through an amendment would help ensure additional public notice and comment during the development of new programs. The details of any new industry-funded monitoring program implemented via amendment may include, but are not limited to:
- Level and type of coverage target;
- Rationale for level and type of coverage;
- Minimum level of coverage necessary to meet coverage goals;
- Consideration of waivers if coverage targets cannot be met;
- Process for vessel notification and selection;
- Cost collection and administration;
- Standards for monitoring service providers; and
- Any other measures necessary to implement the industry-funded monitoring program.

This amendment also specifies that future industry-funded monitoring programs, implemented through an amendment, may be revised through framework adjustments to the relevant FMP. Additional National Environmental Policy Act (NEPA) analysis would be required for any action implementing and/or modifying industry-funded monitoring programs, regardless if the vehicle is an amendment or framework adjustment.

*2. Standard Cost Responsibilities*

Cost responsibilities for industry-funded monitoring must be divided by cost category, rather than a dollar amount or percentage of total cost, between the fishing industry and NMFS. NMFS is obligated to pay any cost for which the benefit of the expenditure accrues to the government. This means that NMFS would be responsible for administrative costs to support industry-funded programs, but not the costs associated with sampling activities. Costs associated with sampling activities would be paid by the fishing industry. NMFS may offset industry cost responsibilities if Federal funding is available, but NMFS cannot be obligated to pay sampling costs in industry-funded sampling programs. Cost responsibilities dictated by legal requirements cannot be modified through this amendment. Instead, this amendment codifies NMFS cost responsibilities for industry-funded monitoring in New England FMPs to ensure consistency and compliance with legal requirements.

NMFS is responsible for paying costs associated with setting standards for, monitoring the performance of, and administering industry-funded monitoring programs. These program elements would include:
- The labor and facilities costs associated with training and debriefing of monitors;
- NMFS-issued gear (*e.g.*, electronic reporting aids used by human monitors to record trip information);
- Certification of monitoring providers and individual observers or monitors;
- Performance monitoring to maintain certificates;
- Developing and executing vessel selection;
- Data processing (including electronic monitoring video audit, but excluding service provider electronic video review); and
- Costs associated with liaison activities between service providers, NMFS, Coast Guard, Council, sector managers, and other partners.

NMFS costs to administer industry-funded monitoring for all monitoring types would be paid with Federal funds. The industry is responsible for funding all other monitoring program costs, including but not limited to:
- Costs to the service provider for deployments and sampling (*e.g.,* travel and salary for observer deployments and debriefing);
- Equipment, as specified by NMFS, to the extent not provided by NMFS (*e.g.,* electronic monitoring system);

• Costs to the service provider for observer or monitor time and travel to a scheduled deployment that doesn't sail and was not canceled by the vessel prior to the sail time;

• Costs to the service provider for installation and maintenance of electronic monitoring systems;

• Provider overhead and project management costs (*e.g.*, provider office space, administrative and management staff, recruitment costs, salary and per diem for trainees); and

• Other costs of the service provider to meet performance standards laid out by an FMP.

The cost responsibilities described above are consistent with the existing scallop and multispecies industry-funded monitoring programs, although cost responsibilities are not explicitly defined in those FMPs. This amendment codifies NMFS cost responsibilities for industry-funded monitoring for all New England FMPs, but it does not alter other current requirements for existing industry-funded monitoring programs.

### 3. Standard Requirements for Monitoring Service Providers and Observers/Monitors

The SBRM Omnibus Amendment (80 FR 37182; June 30, 2015) adopted general industry-funded observer service provider and observer requirements (at 50 CFR 648.11(h) and (i), respectively) should a Council develop and implement a requirement or option for an industry-funded observer program to support SBRM in any New England or Mid-Atlantic Council FMP. However, the SBRM Amendment did not address requirements for other types of industry-funded monitoring programs or coverage in addition to SBRM.

This amendment modifies and expands existing observer and service provider requirements and allows those requirements to apply to coverage supplemental to SBRM, ESA, and MMPA coverage. Specifically, this rule modifies and expands existing observer service provider requirements at §648.11(h) to apply to service providers for observers, at-sea monitors, portside samplers, and dockside monitors. Similarly, this rule modifies and expands existing observer requirements at §648.11(i) to apply to observers, at-sea monitors, portside samplers, and dockside monitors, described collectively as observers/monitors. These observer/monitor requirements serve as the default requirements for any future industry-funded monitoring programs in New England FMPs. The Council may add new requirements or revise existing requirements for FMP-specific industry-funded monitoring programs as part of the amendment developing those programs or the framework adjustment revising those programs.

### 4. Prioritization Process

This amendment establishes a Council-led process to prioritize industry-funded monitoring programs for available Federal funding across New England FMPs. This prioritization process allows the Council to align industry-funded monitoring programs with its monitoring priorities by recommending priorities for available NMFS funding to pay NMFS cost responsibilities associated with industry-funded monitoring. Revising the prioritization process would be done in a framework adjustment. The existing scallop and multispecies industry-funded monitoring programs will not be included in the prioritization process, unless the Council takes action in the future to include those programs in the prioritization process or develops new industry-funded monitoring programs within those FMPs consistent with this amendment.

Available Federal funding refers to any funds in excess of those allocated to meet SBRM or other existing monitoring requirements that may be used to cover NMFS costs associated with supporting industry-funded monitoring programs. Funding for SBRM, ESA, and MMPA observer coverage is not affected by this prioritization process. Any industry-funded monitoring programs will be prioritized separately from and, in addition to, any SBRM coverage or other statutory coverage requirements. The realized industry-funded monitoring coverage in a given year will be determined by the amount of Federal funding available to cover NMFS cost responsibilities in a given year.

When there is no Federal funding available to cover NMFS cost responsibilities above SBRM coverage in a given year, then no industry-funded monitoring programs would operate that year. If available funding in a given year is sufficient to support all industry-funded monitoring programs, the prioritization process would fully operationalize the industry-funded monitoring coverage targets specified in each FMP. If there is some available funding, but not enough to support all industry-funded monitoring programs, the Council will determine how to prioritize industry-funded monitoring coverage targets for available funding across FMPs.

As part of the Council-led prioritization process, this amendment establishes an equal weighting approach to prioritize industry-funded monitoring programs for available funding. An example of an equal weighting approach would be funding all industry-funded monitoring programs at 70 percent, if only 70 percent of the Federal funding needed to administer all the programs was available. Additionally, this rule specifies that the Council will adjust the equal weighting approach on an as-needed basis. This means that the equal weighting approach will be adjusted whenever a new industry-funded monitoring program consistent with this amendment is approved or whenever an existing industry-funded monitoring program consistent with this amendment is adjusted or terminated. The Council will revise the weighting approach for the Council-led prioritization process in a framework adjustment or by considering a new weighting approach at a public meeting, where public comment is accepted, and asking NMFS to publish a notice or rulemaking modifying the weighting approach, consistent with the Administrative Procedure Act (APA).

The SBRM coverage year begins in April and extends through March. SBRM coverage levels in a given year are determined by the variability of discard rates from the previous year and the availability of SBRM funding. During the spring, NMFS determines SBRM coverage for the upcoming year. Once NMFS finalizes SBRM coverage levels for the upcoming year, NMFS will then evaluate what Federal funding is available to cover its costs for meeting the industry-funded monitoring coverage targets for the upcoming year. NMFS will provide the Council, at the earliest practicable opportunity: (1) The estimated industry-funded monitoring coverage levels, incorporating the prioritization process and weighting approach, and based on available funding, for each FMP-specific monitoring program; and (2) the rationale for the industry-funded monitoring coverage levels, including the reason for any deviation from the Council's recommendations. NMFS will inform the Council of the estimated industry-funded coverage levels during a Council meeting. At that time, the Council may recommend revisions and additional considerations by the Regional Administrator and Science and Research Director. If NMFS costs associated with industry-funded coverage targets are fully funded in a given year, NMFS will also determine, in consultation with the Council, the allocation, if any, of any remaining available funding to offset industry costs. The earlier in the year that

_0000017733

industry-funded monitoring coverage targets are set for the following year, the more time the affected fishing industry would have to plan for industry-funded monitoring the following year. FMP-specific industry-funded monitoring programs would determine if industry-funded coverage targets were administered consistent with the FMP's fishing year or the SBRM year.

### 5. Monitoring Set-Aside Programs

This amendment standardizes the process to develop future monitoring set-aside programs and allows monitoring set-aside programs to be developed in a framework adjustment to the relevant FMP. A monitoring set-aside program would use a portion of the annual catch limit (ACL) from a fishery to help offset industry cost responsibilities associated with industry-funded monitoring coverage targets. There are many possible ways to structure a monitoring set-aside program, and the details of each program would be developed on an FMP-by-FMP basis. Monitoring set-aside programs are an option to help ease industry cost responsibilities associated with industry-funded monitoring, but they likely would only help offset a portion of the industry's cost responsibilities.

The details of monitoring set-aside programs may include, but are not limited to:
• The basis for the monitoring set-aside;
• The amount of the set-aside (e.g., percentage of ACL, days-at-sea (DAS));
• How the set-aside is allocated to vessels required to pay for monitoring (e.g., increased possession limit, differential DAS counting, additional trips against a percent of the ACL);
• The process for vessel notification;
• How funds are collected and administered to cover the industry's costs of monitoring coverage; and
• Any other measures necessary to develop and implement a monitoring set-aside.

### Approved Atlantic Herring Measures

This amendment establishes an industry-funded monitoring program in the Atlantic herring fishery that is expected to provide increased accuracy in catch estimates. Increased monitoring in the herring fishery will address the following goals: (1) Accurate estimates of catch (retained and discarded); (2) accurate catch estimates for incidental species with catch caps (haddock and river herring/shad); and (3) affordable monitoring for the herring fishery.

This amendment establishes a 50-percent industry-funded monitoring coverage target on vessels issued an All Areas (Category A) or Areas 2/3 (Category B) Limited Access Herring Permits fishing on a declared herring trip. The Council considered other coverage targets, including 100 percent, 75 percent, and 25 percent, but determined that the 50-percent coverage target best balanced the benefits and costs of additional monitoring. When tracking catch against catch caps in the herring fishery, analyses in the EA supporting this amendment suggest that a 50-percent coverage target would reduce the uncertainty around catch estimates, and likely result in a coefficient of variation (CV) less than 30 percent for the majority of catch caps. Additionally, the industry's cost responsibilities associated with a 50-percent coverage target are substantially less than those associated with higher coverage targets. Vessels participating in the herring fishery also participate in the Atlantic mackerel fishery. Currently, the mackerel fishery does not have an industry-funded monitoring program. If the Mid-Atlantic Council develops industry-funded monitoring in the mackerel fishery and the coverage targets do not match for the herring and mackerel fisheries, then the higher coverage target would apply on all trips declared into the fishery with the higher coverage target.

Herring coverage targets would be calculated for the SBRM year, April through March, by combining SBRM and industry-funding monitoring coverage. NMFS will determine how to calculate the coverage target, in consultation with Council staff. For example, if there is an estimated 10-percent SBRM coverage in a given year (based on allocated sea days and anticipated effort), then 40-percent industry-funded monitoring coverage will be needed to achieve the 50-percent coverage target. Because the coverage target is calculated by combining SBRM and industry-funded monitoring coverage, a vessel will not have SBRM coverage and industry-funded coverage on the same trip. Any vessel selected for SBRM coverage on a particular trip will not have the option of industry-funded monitoring on that trip. Per the prioritization process in the proposed omnibus measures, the realized coverage level in a given year will be determined by the amount of funding available to cover NMFS cost responsibilities in a given year. The realized coverage for the herring fishery in a given year will fall somewhere between no additional coverage in addition to SBRM and the specified coverage target. Combined coverage

targets are intended to help reduce the cost of industry-funded coverage, but the level of SBRM coverage in the herring fishery varies by gear type and has the potential to vary year to year. The variability of SBRM coverage has the potential to make it difficult for the herring industry to plan for industry-funded monitoring year to year.

In addition to the standard monitoring and service provider requirements in the omnibus measures, this amendment specifies that requirements for industry-funded observers and at-sea monitors in the herring fishery include a high volume fishery (HVF) certification. Currently, NMFS's Northeast Fisheries Observer Program (NEFOP) observers must possess a HVF certification in order to observe the herring fishery. NMFS developed the HVF certification to more effectively train observers in high volume catch sampling and documentation. NEFOP determined that data quality on herring trips was sub-optimal when collected by observers without specialized training, potentially resulting in data loss. In addition, the high variety of deck configurations, fish handling practices, and fast-paced operations proved more demanding for observers. Having additional training to identify these practices improved decision-making while at sea, which, ultimately, improved data accuracy and maximized data collection.

Additionally, this amendment requires the Council to examine the results of any increased coverage in the herring fishery two years after implementation of this amendment, and consider if adjustments to the coverage targets are warranted. Depending on the results and desired actions, subsequent action to adjust the coverage targets could be accomplished via a framework adjustment or an amendment to the Herring FMP, as appropriate. Measures implemented in this amendment would remain in place unless revised by the Council.

### 1. Industry-Funded At-Sea Monitoring Coverage on Vessels Issued Category A or B Herring Permits

This rule specifies that vessels issued Category A or B herring permits will carry an industry-funded at-sea monitor on declared herring trips that are selected for coverage by NMFS, unless NMFS issues the vessel a waiver for coverage on that trip. Vessels will be selected for coverage by NMFS to meet the 50-percent coverage target. Prior to any trip declared into the herring fishery, representatives for vessels with Category A or B permits are required to notify NMFS for monitoring coverage. If an SBRM observer is not selected to

cover that trip, NMFS will notify the vessel representative whether an at-sea monitor must be procured through a monitoring service provider. Because the 50-percent coverage target is calculated by combining SBRM and industry-funded monitoring coverage, a vessel will not carry an SBRM observer on the same trip that carries an at-sea monitor. If NMFS informs the vessel representative that they need at-sea monitoring coverage, they will be required to obtain and pay for an at-sea monitor to carry on that trip. The vessel would be prohibited from fishing for, taking, possessing, or landing any herring without carrying an at-sea monitor on that trip. If NMFS informs the vessel representative that the vessel is not selected for at-sea monitoring coverage, NMFS will issue the vessel an at-sea monitoring coverage waiver for that trip.

This rule establishes three additional reasons for issuing vessels waivers for industry-funded monitoring requirements on a trip-by-trip basis. First, if an at-sea monitor is not available to cover a specific herring trip (either due to logistics or a lack of available Federal funding to cover NMFS cost responsibilities), NMFS will issue the vessel an at-sea monitoring coverage waiver for that trip. Second, if a vessel using midwater trawl gear intends to operate as a wing vessel on a trip, meaning that it would pair trawl with another midwater trawl vessel but would not pump or carry any fish onboard, then that vessel may request a waiver for industry-funded monitoring requirements on that trip. Vessels would notify NMFS in advance of the wing vessel trip, and NMFS would issue a waiver for industry-funded monitoring requirements for that trip. Wing vessels would be prohibited from carrying fish onboard during these trips. If a wing vessel did carry fish, the vessel would be out of compliance with industry-funded monitoring requirements on that trip. Third, if a vessel intended to land less than 50 mt of herring on a trip, then the vessel may request a waiver for industry-funded monitoring requirements on that trip. Vessels would notify NMFS in advance of the trip on which they intend to land less than 50 mt of herring, and NMFS will issue a waiver for industry-funded monitoring requirements for that trip. Vessels would be prohibited from landing 50 mt or more of herring on these trips. If the vessel landed 50 mt or more of herring, the vessel would be out of compliance with industry-funded monitoring requirements on that trip.

At-sea monitors will collect the following information on herring trips:

• Fishing gear information (*i.e.,* size of nets, mesh sizes, and gear configurations);

• Tow-specific information (*i.e.,* depth, water temperature, wave height, and location and time when fishing begins and ends);

• Species, weight, and disposition of all retained and discarded catch on observed hauls;

• Species, weight, and disposition of all retained catch on unobserved hauls;

• Actual catch weights whenever possible, or alternatively, weight estimates derived by sub-sampling;

• Length data, along with whole specimens and photos to verify species identification, on retained and discarded catch;

• Information on and biological samples from interactions with protected species, such as sea turtles, marine mammals, and sea birds; and

• Vessel trip costs (*i.e.,* operational costs for trips including food, fuel, oil, and ice).

The primary biological data that at-sea monitors will collect are length data on retained and discarded catch. However, to verify species identification, at-sea monitors may also collect whole specimens or photos. In the future, the Council may recommend that at-sea monitors collect additional biological information upon request. Revising what information an at-sea monitor collects could be done in a framework adjustment. Alternatively, the Council may recommend that at-sea monitors collect additional biological information by considering the issue at a public meeting, where public comment is accepted, and asking NMFS to publish a notice or rulemaking modifying the duties for at-sea monitors, consistent with the Administrative Procedure Act.

In contrast to observers, at-sea monitors would not collect whole specimens, photos, or biological samples (other than length data) from catch, unless it was for purposes of species identification, or sighting data on protected species. The Council recommended a limited data collection compared to observers to allow for possible cost savings for either the industry or NMFS associated with a limited data collection.

Currently, vessels issued Category A or B herring permits are required to comply with all slippage restrictions, slippage reporting requirements, and slippage consequence measures when carrying an observer for SBRM coverage (§ 648.11(m)(4)). Because the purpose of slippage restrictions is to help ensure catch is made available for sampling, this rule ensures that existing slippage requirements also apply when vessels

are carrying an industry-funded at-sea monitor. Specifically, when vessels issued Category A or B herring permits are carrying either an SBRM observer or industry-funded at-sea monitor, vessels are required to bring catch aboard the vessel and make it available for sampling prior to discarding. If vessels slipped catch for any reason, they would be required to report that slippage event on the daily vessel monitoring catch report and complete a slipped catch affidavit. If vessels slip catch due to excess catch of spiny dogfish, mechanical failure, or safety, then vessels are required to move 15 nautical miles (27.78 km) following that slippage event and remain 15 nautical miles (27.78 km) away from that slippage event before making another haul and for the duration of that fishing trip. If vessels slip catch for any other reason, they are required to terminate that fishing trip and immediately return to port.

Industry-funded monitoring would have direct economic impacts on vessels issued Category A and B permits participating in the herring fishery. The EA estimates the industry's cost responsibility associated with carrying an at-sea monitor at $710 per day. The EA uses returns-to-owner (RTO) to estimate the potential reduction in annual RTO associated with paying for monitoring coverage. RTO was calculated by subtracting annual operating costs from annual gross revenue and was used instead of net revenues to more accurately reflect fishing income. While the actual cost of industry-funded monitoring on a particular vessel would vary with effort level and the amount of SBRM coverage, analyses in the EA suggest that the cost of the proposed at-sea monitoring coverage may reduce the annual RTO for vessels with Category A or B herring permits up to approximately 20 percent. Waiving at-sea monitoring coverage requirements for wing vessel trips or trips that land less than 50 mt of herring would help reduce the cost of at-sea monitoring coverage on those trips, but those waivers are not an option for vessels that choose to land more than 50 mt of herring on a trip.

### 2. Industry-Funded Observer Coverage on Midwater Trawl Vessels Fishing in Groundfish Closed Areas

Midwater trawl vessels fishing in the Groundfish Closed Areas are required to carry an observer under the requirements at § 648.202(b). When Amendment 5 to the Herring FMP (79 FR 8786; February 13, 2014) established that requirement, the Groundfish Closed Areas included Closed Area I, Closed

Area II, Nantucket Lightship Closed Area, Cashes Ledge Closure Area, and the Western Gulf of Maine Closure Area. Currently, the only mechanism for midwater trawl vessels to carry an observer is if an observer is assigned through the SBRM. As described previously, SBRM coverage for midwater trawl vessels has recently been variable (approximately 4 to 40 percent from 2012 through 2018). This rule maintains the requirement to carry an observer for midwater trawl vessels fishing in a Groundfish Closed Area, but allows midwater trawl vessels to purchase observer coverage in order to access Groundfish Closed Areas.

Prior to any trip declared into a Groundfish Closed Area, representatives for midwater trawl vessels are required to provide notice to NMFS for monitoring coverage. If neither an SBRM observer nor industry-funded monitoring is selected to cover that trip, NMFS will notify the vessel representative that an observer may be procured through a monitoring service provider. The vessel is prohibited from fishing in the Groundfish Closed Area without carrying an observer. Observers will collect the following information on midwater trawl trips:

• Fishing gear information (*i.e.,* size of nets, mesh sizes, and gear configurations);
• Tow-specific information (*i.e.,* depth, water temperature, wave height, and location and time when fishing begins and ends);
• Species, weight, and disposition of all retained and discarded catch on observed hauls;
• Species, weight, and disposition of all retained catch on unobserved hauls;
• Actual catch weights whenever possible, or alternatively, weight estimates derived by sub-sampling;
• Whole specimens, photos, length information, and biological samples (*i.e.,* scales, otoliths, and/or vertebrae);
• Information on interactions with protected species, such as sea turtles, marine mammals, and sea birds; and
• Vessel trip costs (*i.e.,* operational costs for trip including food, fuel, oil, and ice).

The measure allowing midwater trawl vessels to purchase observer coverage to access Groundfish Closed Areas also has economic impacts on vessels participating in the herring fishery. The EA estimates the industry's cost responsibility associated with carrying an observer at $818 per day. While the actual cost of industry-funded monitoring on a particular vessel would vary with effort level and the amount of SBRM coverage, analyses in the EA suggest that the cost of observer coverage may reduce the annual RTO for midwater trawl vessels up to 5 percent. That 5 percent reduction in RTO would be in addition to any reduction in RTO due to other types of industry-funded monitoring coverage. Coverage waivers for Groundfish Closed Area trips are not an option to reduce the cost of observer coverage because coverage waivers do not apply on midwater trawl vessels fishing in the Groundfish Closed Areas.

If the Groundfish Closed Areas are modified, eliminated, or added in the future, existing observer coverage requirements for midwater trawl vessels apply to the modified areas, except for areas that are eliminated as Groundfish Closed Areas. Anticipating changes to the Groundfish Closed Areas in the Omnibus Essential Fish Habitat Amendment 2 (Habitat Amendment) (83 FR 15240; April 9, 2018), the Industry-Funded Monitoring Amendment Development Team/Fishery Management Action Team (PDT/FMAT) recommended the Council clarify its intent regarding the requirement that midwater trawl vessels fishing in Groundfish Closed Areas must carry an observer. In a March 17, 2017, memorandum, the PDT/FMAT noted that the Habitat Amendment proposed changes to Groundfish Closed Areas, such as eliminating areas, boundary changes, and seasonality. That same memorandum proposed the Council clarify that this amendment maintains the 100-percent observer coverage requirement on midwater trawl vessels fishing in Groundfish Closed Areas, as modified by the Habitat Amendment. The Council accepted the FM PDT/FMAT's proposed clarification when it took final action on this amendment in April 2017.

In January 2018, NMFS partially approved the Habitat Amendment, including changes to Closed Area I, Nantucket Lightship Closed Area, and the Western Gulf of Maine Closure Area. Consistent with Council intent regarding observer coverage, the final rule for the Habitat Amendment maintained the 100-percent observer requirement for midwater trawl vessels fishing in Closed Area I North (February 1–April 15), Closed Area II, Cashes Ledge Closure Area, and the Western Gulf of Maine Closure Area. Because the Habitat Amendment removed the Nantucket Lightship Closed Area and the southern portion of Closed Area 1 from the list of Groundfish Closed Areas, the 100-percent observer coverage requirement no longer applies to midwater trawl vessels fishing in the area previously known as the Nantucket Lightship Closed Area and the southern portion of what was formerly Closed Area 1. A recent Court Order (*Conservation Law Found.* v. *Ross, No. CV 18–1087 (JEB), 2019 WL 5549814 (D.D.C. Oct. 28, 2019)* enjoined NMFS from allowing gillnet fishing in the Nantucket Lightship Closed Area and Closed Area I. This decision does not apply to fishing gears other than gillnet gear, and the rule implementing this order (84 FR 68799; December 17, 2019) is specific to gillnet gear and does not prohibit midwater trawl vessels from fishing in these areas.

Recognizing that it recommended multiple industry-funded monitoring types, including at-sea monitoring coverage and observer coverage in Groundfish Closed Areas for the herring fishery, the Council also recommended prioritizing coverage aboard Category A and B vessels because those vessels harvest the majority of the herring. Consistent with that recommendation, if available Federal funding is insufficient to cover NMFS cost responsibilities associated with administering multiple monitoring programs for the herring fishery, this rule prioritizes industry-funded monitoring coverage on Category A and B vessels before observer coverage on midwater trawl vessels fishing in Groundfish Closed Areas.

## Atlantic Herring Exempted Fishing Permit

On April 19, 2018, the Council considered whether electronic monitoring in conjunction with portside sampling, would be an adequate substitute for at-sea monitoring coverage aboard midwater trawl vessels. Because midwater trawl vessels discard only a small percentage of catch at sea, electronic monitoring and portside sampling have the potential to be a cost effective way to address monitoring goals for the herring fishery. The purpose of electronic monitoring would be to confirm catch retention and verify compliance with slippage restrictions, while the purpose of portside sampling would be to collect species composition data along with age and length information. After reviewing the midwater trawl electronic monitoring study, the Council approved electronic monitoring and portside sampling as a monitoring option for midwater trawl vessels, but did not recommend requiring electronic monitoring and portside sampling as part of this action. Instead, the Council recommended NMFS use an exempted fishing permit (EFP) to further evaluate how to best permanently administer an electronic monitoring and portside sampling program.

The EFP would exempt midwater vessels from the requirement for industry-funded at-sea monitoring coverage and allow midwater trawl vessels to use electronic monitoring and portside sampling coverage to comply with the Council-recommended 50-percent coverage target. The recent midwater trawl electronic monitoring study provides a good foundation for an electronic monitoring program. However, using an EFP would provide NMFS with further information about how to most effectively and efficiently administer the electronic monitoring and portside sampling program, while allowing NMFS the flexibility to respond quickly to emerging issues, helping to make the monitoring program more robust. An EFP would also enable NMFS to evaluate other monitoring issues in the herring fishery that are of interest to the Council and herring industry, such as evaluating the utility of electronic monitoring and portside sampling when midwater trawl vessels fish in Groundfish Closed Areas or for other gear types (*e.g.*, purse seine or bottom trawl) used in the herring fishery.

The supporting documentation for the EFP was developed concurrently with rulemakings for this amendment and midwater trawl vessels issued EFPs are allowed to use electronic monitoring and portside sampling coverage to comply with the Council-recommended 50-percent coverage target. The Council recommended reconsidering herring industry-funded monitoring requirements two years after implementation. The Council would consider establishing electronic monitoring and portside sampling program requirements into regulation via a framework adjustment at that time.

### Status of Industry-Funded Monitoring in 2020

Throughout the development of this amendment, we cautioned the Council that any additional coverage would be contingent upon us having sufficient funding to administer industry-funded monitoring. For 2020, we have sufficient Federal funding to pay NMFS cost responsibilities associated with fully implementing industry-funded monitoring in the herring fishery. We estimate industry-funded monitoring cost responsibilities for the herring fishery to total approximately $100,000 in 2020. Therefore, beginning April 1,

2020, vessels issued Category A or B herring permits will be required to pay for at-sea monitoring coverage on trips we select for industry-funded monitoring coverage. Alternatively, herring vessels will have the option of requesting an EFP to use electronic monitoring and portside sampling instead of at-sea monitoring coverage to satisfy industry-funded monitoring requirements in 2020. We cannot yet determine if we will have funding to administer industry-funded monitoring in the herring fishery in 2021. We will evaluate available Federal funding relative to the cost of administering industry-funded monitoring in the herring fishery during the upcoming year.

### Compliance With the National Environmental Policy Act

In light of recent catch reductions in the herring fishery, we evaluated whether the EA supporting the Industry-Funded Monitoring Amendment remained valid to support this amendment. In making a determination on the need for additional analysis under NEPA, we considered and were guided by the Council on Environmental Quality (CEQ) NEPA regulations and applicable case law. The CEQ's regulations state that ''[a]gencies shall prepare supplements to either draft or final environmental impact statements if: (i) the agency makes substantial changes in the proposed action that are relevant to environmental concerns; or (ii) there are significant new circumstances or information relevant to environmental concerns and bearing on the proposed action or its impacts'' (40 Code of Federal Regulations (CFR) § 1502.09(c)). In addition, we considered the CEQ's significance criteria at 40 CFR 1508.27 to determine if any new circumstances or information are significant, which could require a new EA.

The EA describes the economic impacts of herring measures on fishery-related businesses and human communities and explained they result from paying for monitoring coverage. The economic impact of industry-funded monitoring coverage on the herring fishery is difficult to estimate because it varies with sampling costs, fishing effort, SBRM coverage, price of herring, and participation in other fisheries. The EA estimates industry's cost for at-sea monitoring

coverage at $710 per day and observer coverage at $818 per day, but cautioned those estimates would largely depend on negotiated costs between vessels and monitoring service providers. Less than half of the 50 vessels issued Category A or B herring permits are active in the herring fishery.

The impact of management measures on fishing-related businesses and communities is typically based on an analysis of revenue. But in an effort to better understand income from fishing trips, a survey of herring and mackerel vessels collected more detailed cost information for 2014, including payments to crew, repairs, maintenance, upgrades, and permitting costs. This additional information was used to calculate the vessel RTO for 2014 by subtracting fixed and operational costs from gross revenue, thereby providing a general framework for understanding the interaction between revenue and monitoring requirement costs.

Analysis in the EA estimates that at-sea monitoring coverage associated with the 50-percent coverage target has the potential to reduce annual RTO for vessels with Category A or B herring permits up to 20 percent and up to an additional 5 percent for midwater trawl access to Groundfish Closed Areas. Electronic monitoring and portside sampling may be a more cost effective way for herring vessels to satisfy industry-funded monitoring requirements. At the conclusion of our electronic monitoring project aboard midwater trawl vessels, we estimated industry's cost for electronic monitoring and portside sampling at $515 per day. Analysis in the EA estimates a reduction in annual RTO of up to 10 percent for electronic monitoring and portside sampling coverage.

At the Council's request, we reduced the herring ACL for 2018 (49,900 mt) on August 22, 2018, and reduced the herring ACL for 2019 (15,065 mt) on February 8, 2019, from the ACL that was in place during 2014 (104,088 mt).

To assess how a reduction in herring ACL may affect revenue, we compared herring revenue generated by Category A and B herring vessels from 2014 to 2018 (see Table 1). Even though the 2018 ACL was reduced by 52 percent (54,188 mt) from the 2014 ACL, the impact on 2018 revenue was not proportional to the reduction in ACL and differed by gear type.

_0000017737

TABLE 1—CHANGE IN CATEGORY A AND B HERRING REVENUE FROM 2014 TO 2018

| Gear type | 2014 herring revenue | 2018 herring revenue | Change in herring revenue |
|---|---|---|---|
| Midwater Trawl | $13,439,000 | $7,886,000 | −$5,553,000 |
| Purse Seine | 11,000,000 | 13,088,000 | +2,088,000 |
| Bottom Trawl | 1,508,000 | 1,017,000 | −491,000 |

Source: NMFS.

The change in herring revenue between 2014 and 2018 may have been affected by several factors, such as the availability of herring relative to the demand and vessel participation in other fisheries. The price of herring increased almost 70 percent between 2014 and 2018 from approximately $310 per mt to $525 per mt. While the price of herring is not likely to increase every year, we expect that a herring price increase would mitigate the negative economic impact of lowering the ACL. Total revenue from all fisheries for small-mesh bottom trawl vessels increased by approximately $25,000,000 between 2014 and 2018 suggesting vessels are expanding their participation in other fisheries. We expect that increases in total revenue from other fisheries would also mitigate the

negative economic impacts of reductions to the herring ACL and associated revenue.

At its September 2019 meeting, the Council recommended further reducing the herring ACL for 2020 and 2021 (11,621 mt). These catch levels are consistent with Council's new harvest policy for herring developed in Amendment 8 to the Herring FMP and recommendations from the Council's Scientific and Statistical Committee. If the 2020 herring stock assessment determines recruitment and biomass are higher than expected, the Council may request an increase to the 2021 ACL.

While the economic impact of industry-funded monitoring coverage on the herring fishery is affected by revenue, the level of fishing effort and SBRM coverage would also affect the economic impact of industry-funded

monitoring. Analyses in the EA estimate the coverage days to achieve the 50-percent coverage target in the herring fishery in 2014. In an effort to estimate the maximum number of coverage days, that particular analysis did not account for SBRM coverage or coverage waivers for trips landing less than 50 mt of herring. To assess how changes in the herring fishery may affect industry-funded monitoring coverage, we re-estimated the coverage days to achieve the 50-percent coverage target for 2020. Our updated analysis adjusts for recent vessel activity, low herring ACL, recent SBRM coverage, and coverage waivers for trips landing less than 50 mt of herring. The change in estimated average coverage days to achieve the 50-percent coverage target from 2014 to 2020 is shown in Table 2.

TABLE 2—ESTIMATED REDUCTION IN INDUSTRY-FUNDED MONITORING COVERAGE DAYS TO ACHIEVE A 50-PERCENT COVERAGE TARGET FROM 2014 TO 2020

| Gear type | 2014 | 2020 | Change in days |
|---|---|---|---|
| Midwater Trawl | Up to 728 days (14 vessels) | Up to 54 days (9–11 vessels) | −674 |
| Purse Seine | Up to 196 days (7 vessels) | Up to 67 days (5 vessels) | −129 |
| Bottom Trawl | Up to 108 days (9 vessels) | Up to 29 days (2 vessels) | −79 |

Source: NMFS.

The reduction in expected industry-funded monitoring coverage days and vessels participating in the herring fishery from 2014 to 2020 is largely driven by changes in fishing behavior, likely linked to the availability of herring (distribution and seasonality) and a low herring ACL in 2020. Because the RTO analysis was, in part, based on economic data collected with a special cost survey that could not be repeated in a timely way for this action, it is not possible to update that analysis for 2020. However, fewer sea days required to achieve the 50-percent coverage target will result in lower industry costs in 2020 than what the EA estimated for 2014. Fewer coverage days and fewer active vessels in 2020 (and likely 2021) is expected to mitigate the negative economic impacts of reductions to the herring ACL and associated revenue.

We also expect midwater trawl fishing effort in Groundfish Closed Areas to be lower in 2020 than was estimated for 2014. Without considering SBRM coverage, the EA estimates midwater trawl vessels may purchase observer coverage for up to approximately 250 coverage days to access Groundfish Closed Areas in 2014. After adjusting for recent vessel activity and a low herring ACL and assuming recent SBRM coverage, we estimate that midwater trawl vessels may purchase coverage for up to 30 coverage days to access Groundfish Closed Areas in 2020 (and likely 2021). Even though purchasing observer coverage to access Groundfish Closed Areas is optional, few coverage days and fewer active vessels in 2020 is expected to mitigate the negative economic impacts of reductions to the herring ACL and associated revenue.

As recommended by the Council, we intend to offer an EFP in 2020 and 2021 to allow vessels to use electronic monitoring and portside sampling in lieu of at-sea monitoring coverage to achieve the 50-percent coverage target. Depending on vessel interest and sampling logistics, that same EFP may also allow midwater trawl vessels to access Groundfish Closed Areas or evaluate electronic monitoring for other gear types (e.g., purse seine or bottom trawl) used in the herring fishery. Analyses in the EA and updated estimates at the conclusion of our electronic monitoring project aboard midwater trawl vessels, suggest that electronic monitoring and portside sampling is likely less expensive and more cost effective than either at-sea monitoring or observer coverage. Excluding the initial cost associated with purchasing and installing

electronic monitoring equipment, video review and storage are likely the most substantial ongoing industry costs associated with using electronic monitoring. A portion of our Federal funding to administer industry-funded monitoring in the herring fishery is designated to help offset industry's video review and storage costs. Federal funding helping offset industry's electronic monitoring sampling costs is expected to minimize the economic impact of industry-funded monitoring coverage on the herring fishery. Participating in the EFP is expected to mitigate the negative economic impacts of reductions to the herring ACL and associated revenue.

High herring prices and low coverage days to achieve the 50-percent coverage target are likely short-term influences on the economic impact of industry-funded monitoring coverage on the herring fishery associated with a low herring ACL. If herring recruitment and biomass return to average levels, the long-term economic impact of industry-funded monitoring coverage on the herring fishery is likely consistent with estimated impacts analyzed and described in the EA.

Additionally, the EA analyzes a range of coverage targets for at-sea monitoring and electronic monitoring and portside sampling aboard Category A and B vessels, including 100 percent, 75 percent, 50 percent, and 25 percent. The EA estimates the reduction in annual RTO associated with these coverage target alternatives ranged from 42 percent to less than 1 percent. Despite reductions in expected revenue for 2020 and 2021, we expect the reduction of annual RTO associated with implementing a 50-percent coverage target for at-sea monitoring aboard Category A and B vessels to be within this analyzed range.

After considering the action, new information, and new circumstances, we determined that the action and its impacts fall within the scope of the existing EA. It is not necessary to develop a new NEPA analysis because (1) the action is identical to the proposed action analyzed in the EA and (2) no new information or circumstances relevant to environmental concerns or impacts of the action are significantly different from when the EA's finding of no significant impact was signed on December 17, 2018. Thus, the FONSI for existing EA for the New England Industry-Funded Monitoring Omnibus Amendment remains valid to support implementing this amendment.

## Changes From the Proposed Rule

This rule includes minor changes from the proposed rule to clarify requirements. First, it revises the definition for *slippage in the Atlantic herring fishery* to make it consistent with the definition for *slips* and *slipping catch in the Atlantic herring fishery* and clarifies that slippage applies when a NMFS-certified observer or monitor is aboard the vessel.

Second, this rule aligns the herring coverage target with the SBRM year (April–March) instead of the fishing year (January–December) and adjusts the date by which the herring industry selects a monitoring type for the following year (October instead of July). This change ensures the coverage target will be more predictable for the entire year rather than changing with the SBRM year. NMFS will determine how to calculate the coverage target in consultation with Council staff.

Third, this rule removes "on a declared herring trip" from the criteria described at § 648.11(m)(2)(i) and revises the list of required information at § 648.11(m)(2)(i) to clarify when and how the owner, operator, or manager of a herring vessel must notify NMFS of a herring trip. The existing notification requirement describes that vessels issued certain herring permits or acting as herring carriers must notify NMFS of trips on which a vessel may harvest, possess, or land herring. Because pre-trip notifications are required at least 48 hours in advance of a trip and trip declarations are required just prior to a vessel leaving port on a trip, the existing criteria absent the reference to "on a declared herring trip" is a more logical descriptor of when a vessel is required to notify NMFS of a herring trip. The list of required information is revised to support NMFS selecting vessels for industry-funded monitoring coverage.

Fourth, this rule corrects references to § 648.11 to reflect provisions implemented in this rule.

## Comments and Responses

We received 20 comment letters on the NOA and proposed rule: 5 from participants in the herring fishery (Seafreeze, Lund's Fisheries, Providian, O'Hara Corporation); 3 from fishing industry organizations (CHOIR Coalition, New England Purse Seiner's Alliance (NEPSA), and Cape Cod Commercial Fishermen's Alliance (CCCFA); 3 from environmental advocacy groups (Conservation Law Foundation (CLF) and Cause of Action Institute (COA)); and 9 from members of the public.

*Comment 1:* COA and Seafreeze commented that the Magnuson-Stevens Fishery Conservation and Management Act (Magnuson-Stevens Act) does not authorize an industry-funded monitoring program as envisioned by the Industry-Funded Monitoring Amendment. They cautioned that the amendment intends to standardize the development of industry-funded monitoring programs, yet it fails to identify any specific provision in the Magnuson-Stevens Act granting it such authority. COA also commented that the Council does not have explicit statutory authorization to require the industry to fund discretionary supplemental at-sea monitoring programs. COA and Seafreeze explained that the Magnuson-Stevens Act only explicitly authorizes industry-funded monitoring for foreign fishing, limited access privilege programs (LAPPs), and the North Pacific fisheries research plan. They cautioned that because the Magnuson-Steven Act caps industry fees related to LAPPs at 3 percent of ex-vessel revenue, the agency does not have the ability to require the fishing industry to pay data collection and monitoring costs without limit.

*Response:* We disagree. The Magnuson-Stevens Act expressly authorizes onboard human monitors to be carried on fishing vessels "for the purpose of collecting data necessary for the conservation and management of the fishery." 16 U.S.C. 1853(b)(8). The requirement to carry observers, along with many other requirements under the Magnuson-Stevens Act, includes compliance costs on industry participants. For example, NMFS regulations require fishing vessels to install vessel monitoring systems for monitoring vessel positions and fishing, report catch electronically, fish with certain gear types or mesh sizes, or ensure a vessel is safe before an observer may be carried on a vessel. Vessels pay costs to third-parties for services or goods in order to comply with these regulatory requirements that are authorized by the Magnuson-Stevens Act. There are also opportunity costs imposed by restrictions on vessel sizes, fish sizes, fishing areas, or fishing seasons. These industry costs are not "fees." A fee is a form of "funding" where the industry is assessed a payment by the agency, authorized by statute, to be deposited in the U.S. Treasury and disbursed for administrative costs otherwise borne by the agency. This amendment does not address administrative costs that are charged in LAPPs and are subject to the 3 percent cap.

The need for monitoring and the data it provides is discussed in the amendment. Section 1.1 of the amendment explains that the Council is

establishing the framework for industry-funded monitoring programs because of its interest in increasing monitoring and/or other types of data collection in some FMPs to assess the amount and type of catch, to more accurately monitor annual catch limits, and/or provide other information for management. The Council's goals for industry-funded monitoring in the herring fishery are described in Section 2.2 of the amendment and include: (1) Accurate estimates of catch (retained and discarded); (2) accurate catch estimates for incidental species for which catch caps apply; and (3) affordable monitoring for the herring fishery. The Council's rationale for increased monitoring through industry-funded monitoring programs is consistent with the Magnuson-Stevens Act provision "for the purpose of collecting data appropriate for the conservation and management of the fishery."

*Comment 2:* COA and Seafreeze claim that the amendment is inconsistent with Federal appropriations laws and the U.S. Constitution. They commented that Congress decides how to finance any program it establishes, stating that a Federal agency cannot spend money on a program without authorization from Congress and cannot add to its appropriations from sources outside the government without permission from Congress. COA and Seafreeze caution that the type of industry-funded program set forth in the amendment imposes a "tax" on regulated parties. COA raised additional concerns that the industry funded program may violate the Anti-Deficiency Act and Miscellaneous Receipts Statute. Further, COA stated the amendment violates the Fourth Amendment to, and the Commerce Clause in, the U.S. Constitution. Last, Seafreeze expressed concern that the amendment violates the Fifth Amendment to the Constitution because data collected using industry funds could be used in enforcement actions.

*Response:* The Magnuson-Stevens Act expressly authorizes measures, including monitoring, "for the purpose of collecting data necessary for the conservation and management of the fishery." It also acknowledges such measures may result in costs to the fishing industry as evident by its requirement to, where practicable, minimize costs and adverse economic impacts on communities. The inherent cost of a requirement, like industry-funding monitoring, is not the same as a "tax." A hallmark of a tax is that the government receives some revenue. The government receives no revenue from

industry-funded monitoring. Similar to arrangements between vessels and vessel monitoring system service providers, the payment for industry cost responsibilities associated with industry-funded monitoring would be made by the vessel to the monitoring service provider. Because the agency would not receive any payment from the vessel related to industry-funded monitoring, this amendment is consistent with the Anti-Deficiency Act and Miscellaneous Receipts Statue. Industry-funded monitoring in the herring fishery does not does not violate the Commerce Clause of the Constitution, which authorizes Congress to regulate commerce, because NMFS is regulating existing economic activity, which is permissible under the Commerce Clause. Industry-funded monitoring does not violate the Fourth Amendment protection against unreasonable searches and seizures because it is neither a search nor unreasonable if it was considered to be a search. At-sea monitors are not authorized officers conducting vessel searches for purposes of ensuring compliance with fisheries requirements. Further, the fishing industry is pervasively regulated, and monitoring is reasonable as authorized under the Magnuson-Stevens Act to receive critical fisheries data. Last, the amendment does not violate the Fifth Amendment to the Constitution because the monitoring requirement does not compel evidence that is testimonial in nature. An at-sea monitor simply records the results of the vessel's actions. An individual's participation in the fishery is voluntary, and an individual may choose to land less than the 50 mt of herring per trip threshold for requiring industry-funded monitoring. Further, monitoring is a regulatory reporting requirement, to which the Fifth Amendment privilege does not apply. Last, the information provided is not for purposes of discovering criminal violations. The herring fishery is a regulated industry under the Magnuson-Stevens Act, which provides for civil penalties for fisheries catch violations, not criminal sanctions. Any potentially incriminating evidence would be merely a byproduct of the requirement for industry-funded monitoring.

*Comment 3:* Seafreeze commented that because the amendment was initiated jointly by the New England and Mid-Atlantic Councils, it was led to believe that identical omnibus measures would need to be selected by both Councils. Seafreeze expressed concern that the potential of only one Council

adopting the amendment was not considered during the development of the amendment and, therefore, recommended the omnibus measures be disapproved.

*Response:* When the New England Council took final action on the Industry-Funded Monitoring Amendment in April 2017, it considered whether to make its recommendations contingent upon a similar action by the Mid-Atlantic Council, but decided against it. Instead, the Council overwhelmingly approved the omnibus measures for its FMPs, with the exception of FMPs managed jointly with the Mid-Atlantic Council (*i.e.,* Monkfish and Spiny Dogfish FMPs) and the herring measures in the amendment and recommended the amendment be submitted to the agency for review and approval. The Mid-Atlantic Council considered industry-funded monitoring for its FMPs at its April 2017 and October 2018 meetings, but decided not to pursue it. Mid-Atlantic fishermen had an opportunity to participate and submit their concerns to the Mid-Atlantic Council during those meetings. Mid-Atlantic representatives to the New England Council also had an opportunity to present the Mid-Atlantic Council's concerns to the New England Council during the amendment's development. Further, while the omnibus measures, especially the prioritization process, were designed to be appropriate for both Councils, they were never intended to obligate a Council to establish provisions for industry-funded monitoring. Therefore, as explained in the proposed rule (83 FR 55665; November 7, 2018), the joint amendment initiated by both Councils to allow for industry-funded monitoring became the New England Industry-Funded Monitoring Amendment and, as such, omnibus measures only apply to New England Council FMPs. The omnibus measures do not impose any substantive burden on any Mid-Atlantic fishery. Rather, the amendment sets up the framework under which future potential monitoring programs for New England fisheries would be established. If the Mid-Atlantic Council reconsiders industry-funded monitoring it a future action, it may consider whether to adopt similar omnibus measures at that time.

*Comment 4:* COA commented that our publication of **Federal Register** notices for the Industry-Funded Monitoring Amendment caused confusion. It questioned why we published an NOA in September 2018 seeking public comment on the approval or disapproval of the amendment followed

by a proposed rule with implementing regulations in November 2018 prior to finalizing our decision on the amendment. COA suggested that by publishing the notices for the approval/disapproval of the amendment and implementing regulations concurrently, that we had already made a decision on the amendment and would view public comments with prejudice. Additionally, the O'Hara Corporation was concerned that we approved the amendment in December 2018, prior to the closing of the public comment period on the proposed rule. O'Hara Corporation was disappointed in our process for notice and comment and wondered how public comments received after the amendment approval were considered.

*Response:* It is our practice to publish an NOA and proposed rule concurrently. The NOA for the Industry-Funded Monitoring Amendment was published on September 19, 2018, with a comment period ending November 19, 2018. The proposed rule for the amendment was published on November 7, 2018, with a comment period ending December 24, 2018. The comment periods for the NOA and proposed rule overlapped for 13 days. Both the NOA and proposed rule explained that any public comments we received on the amendment or the proposed rule during the NOA comment period would be considered in our decision to approve/disapprove the amendment.

We received seven comment letters during the NOA comment period. Those commenters expressed diverse views on the Industry-Funded Monitoring Amendment and recommended we approve, disapprove, and re-consider the amendment. We carefully reviewed and considered all of those comments prior to approving the amendment on December 18, 2018. NMFS must approve/disapprove an amendment within 30 days of the end of the comment period on the amendment. The decision date for the Industry-Funded Monitoring Amendment was December 19, 2018. Therefore, it would not have been possible to consider all public comments received through December 24, 2018, in the decision to approve/disapprove the Industry-Funded Monitoring Amendment.

The proposed rule explained that we would consider any public comment received after the NOA comment period but during the proposed rule comment period in our decision to implement proposed measures. We reviewed and considered all additional comments received during the proposed rule comment period prior to publishing this final rule. Commenters did not provide

any new or additional information during the public comment period on the proposed rule that would have prevented us from approving the Industry-Funded Monitoring Amendment.

*Comment 5:* Seafreeze disagreed with the conclusions in the EA regarding impacts of the omnibus measures on fishery-related business and human communities. Specifically, it questioned assertions that omnibus measures would have no direct impacts, that costs are too speculative to analyze, and that standardized industry-funded monitoring requirements would have a positive impact. Seafreeze also commented that the impact of any future industry-funded monitoring program on fishery-related business and communities would be negative.

*Response:* The EA explains that omnibus measures are tools for the Council to use when developing future industry-funded monitoring programs. The omnibus measures have no direct biological impacts because they do not directly affect the level of fishing, fishing operations, amount of fish harvested, or area fished. Additionally, the omnibus measures do not have any direct economic impacts on fishery-related business or human communities because they do not require the development of industry-funded monitoring programs nor do they directly impose any costs. Categorizing and characterizing industry cost responsibilities in this action could provide the industry with information to better understand and plan for their industry-funded monitoring cost responsibilities as well negotiate better contracts with industry-funded monitoring service providers, which may ultimately reduce the dollar amount associated with industry cost responsibilities. Improved catch information that results from the opportunity to align funding with the most critical industry-funded monitoring programs may lead to better management of biological resources, which may eventually lead to higher harvest levels.

In the future, if the Council developed an industry-funded monitoring program for a particular FMP, the EA acknowledges there would be direct negative economic impacts to fishing vessels provided vessels were required to pay for increased monitoring. Future industry-funded monitoring programs would be developed to achieve specific goals. Without knowing the goals or the details of the measures to achieve those goals, attempting to quantify in this amendment the impact or the specific benefits of a future industry-funded

monitoring program is too speculative. The economic impacts to fishing vessels and benefits resulting from a future industry-funded monitoring program would be evaluated in the amendment to establish that industry-funded monitoring program and cannot considered in this amendment.

*Comment 6:* COA commented that the introduction of industry-funded monitoring across the Greater Atlantic Region would impose a tremendous economic burden on the fishing industry that could lead to the elimination of small-scale fishing. As an example, COA referenced a 2016 letter by the Long Island Commercial Fishing Association in which the Association states the $800 per day cost of monitoring would force more than half of its fleet out of business.

*Response:* Generalizing economic impacts associated with industry-funded monitoring programs is often inaccurate. Members of the Long Island Commercial Fishing Association participate in a variety of fisheries, including vessels using small-mesh bottom trawl gear in the herring fishery. The $800 cost per covered day is the estimated cost for observer coverage in the herring fishery. The Industry-Funded Monitoring Amendment does not require observer coverage on small-mesh bottom trawl vessels in the herring fishery, instead it establishes a 50-percent coverage for at-sea monitoring coverage on declared herring trips at an estimated cost of $710 per day of coverage. Additionally, the Industry-Funded Monitoring Amendment does not require industry-funded monitoring coverage on trips intending to land less than 50 mt of herring. For those trips, the vessel owner/operator would request a waiver for industry-funded monitoring coverage and would not be responsible for industry-funded monitoring costs on that trip. The amendment estimated that waiving coverage on trips that land less than 50 mt of herring would result in industry-funded monitoring coverage on only 19 percent of trips by small-mesh bottom trawl vessels. More recently, when we only considered small-mesh bottom trawl vessels with Category A or B permits that had been active in the herring fishery in the last two years, we found that industry-funded monitoring requirements would likely only apply to only two small-mesh bottom trawl vessels. For these reasons, we disagree that the implementation of industry-funded monitoring in the herring fishery would lead to the elimination of small-scale fishing in the Greater Atlantic Region.

*Comment 7:* Seafreeze expressed concern that vessels participating in New England and Mid-Atlantic fisheries on the same trip may be subject to industry-funded monitoring requirements, even though the Mid-Atlantic Council did not adopt the this amendment. COA commented the EA fails to address the possibility of overlapping requirements for industry-funded monitoring in multiple fisheries.

*Response:* Similar to other measures in FMPs (*e.g.*, possession limits, gear restrictions, or reporting requirements), vessels are subject to the most restrictive requirements when participating in multiple fisheries on a single trip. With the understanding that vessels participate in multiple fisheries, the EA explicitly considers revenue and operational costs associated with participation in the herring, Atlantic mackerel, and squid fisheries. Because herring and mackerel are often harvested together on the same trip, the amendment specifies that the higher coverage target applies on trips declared into both fisheries. If the Council considers industry-funded monitoring in other fisheries in the future, the impacts of those programs relative to existing industry-funded monitoring programs will be considered at that time.

*Comment 8:* Several commenters expressed opinions on the relative costs and benefits of industry-funded monitoring. CLF, CCCFA, and CHOIR generally support the industry-funded monitoring requirements for the herring fishery, but are concerned that anything less than 100-percent coverage, especially when combined with coverage waivers, may undermine the effectiveness of additional monitoring. In contrast, Lund's cautioned that the 50-percent coverage target for the herring fishery is higher than necessary and wastes scarce agency and industry resources by monitoring a fishery with a low bycatch rate. COA commented that the amendment is inconsistent with National Standards 7 and 8 because it fails to explain why increased monitoring is necessary, in light of the financial burden it will place on the fishing industry, or how the amendment would minimize adverse economic impacts and provide for the sustained participation of communities.

*Response:* This amendment establishes industry-funded monitoring in the herring fishery to help increase the accuracy of catch estimates, especially for species with incidental catch caps (*i.e.*, haddock and river herring/shad). Our decision to approve this amendment included weighing the benefits of the measures relative to the costs, especially the industry's cost associated with additional monitoring. We concluded that the Council's measures minimize costs to the extent practicable and take into account the importance of fishery resources to fishing communities to provide for their sustained participation in the fishery and minimize the adverse economic impacts of these measures on those communities.

The 50-percent coverage target for vessels with Category A or B herring permits has the potential to reduce uncertainty around catch estimates in the herring fishery, thereby improving catch estimation for stock assessments and management. SBRM coverage on vessels participating in the herring fishery is variable. Recent coverage has ranged from 2 percent to 40 percent during 2012 to 2018. Analysis in the EA suggests a 50-percent coverage target would reduce the uncertainty around estimates of catch tracked against catch caps, likely resulting in a CV of less than 30 percent for the majority of catch caps. If increased monitoring reduces the uncertainty in the catch of haddock and river herring and shad tracked against catch caps, herring vessels may be more constrained by catch caps, thereby increasing accountability, or they may be less constrained by catch caps and better able to fully harvest herring sub-ACLs. Recent CVs associated with catch caps constraining the herring fishery have been as high as 86 percent. Improving our ability to track catch against catch limits is expected to support the herring fishery achieve optimum yield, minimize bycatch and incidental catch to the extent practicable, and support the sustained participation of fishing communities. Coverage waivers would only be issued under specific circumstances, when monitors are unavailable or trips have minimal to no catch, and are not expected to reduce the benefits of additional monitoring. This amendment does not require additional monitoring aboard herring vessels in Groundfish Closed Areas. Rather it maintains an existing requirement for 100-percent observer coverage on herring midwater trawl vessels fishing inside of Groundfish Closed Areas, but provides flexibility for vessels by allowing the purchase of observer coverage to access Groundfish Closed Areas.

While the economic impact of industry-funding monitoring on participants in the herring fishery may be substantial, we considered the nature and extent of these costs relative to the benefits of additional monitoring, such as reducing uncertainty around catch estimates to improve management, and measures to mitigate costs.

Recognizing the potential economic impact of industry-funded monitoring on the herring industry, the Council recommended several measures to minimize the impact of paying for additional coverage. Setting the coverage target at 50 percent, instead of 75 or 100 percent, balances the benefit of additional monitoring with the costs associated with additional monitoring. Allowing SBRM coverage to contribute toward the 50-percent coverage target for at-sea monitoring is expected to reduce costs for the industry. Waiving industry-funded monitoring requirements on certain trips, including trips that land less than 50 mt of herring and pair trawl trips carrying no fish, would minimize the cost of additional monitoring. Trips that land less than 50 mt are common for small-mesh bottom trawl, single midwater trawl, and purse seine vessels. As such, the 50-mt exemption has the potential to result in a less than 5 percent reduction in annual RTO associated with at-sea monitoring coverage for those vessels. Electronic monitoring and portside sampling may be a more cost effective way for midwater trawl vessels to meet the 50-percent coverage target requirement than at-sea monitoring coverage. Analysis in the EA estimates that electronic monitoring and portside sampling coverage has the potential to reduce annual RTO up to 10 percent instead of the 20 percent reduction associated with at-sea monitoring coverage.

The amendment also includes measures to ensure the Council considers the cost of additional monitoring relative to its effectiveness and provides the flexibility to adjust measures if industry-funded monitoring requirements for the herring fishery become too onerous. Herring measures require the Council to review the industry-funded monitoring requirements two years after implementation. Omnibus measures allow the Council to modify the weighting approach to recommend to us how to prioritize Federal funding across industry-funded monitoring programs. If the Council wants to recommend that we not prioritize Federal funding to administer industry-funded monitoring in herring fishery, essentially recommending no additional monitoring for the herring fishery, it would consider the new weighting approach at a public meeting and request us to publish a rulemaking modifying the weighting approach. Additionally, if we find that coverage waivers undermine the benefits of

additional monitoring, the Council could restrict waivers when it reviews the industry-funded monitoring requirements two years after implementation.

*Comment 9:* Seafreeze and COA commented that industry-funding monitoring in the herring fishery disproportionately affects Seafreeze vessels and any other vessels that make multi-day trips processing catch at sea in violation of National Standard 6's requirement to take into account and allow for variations among fisheries, fishery resources, and catch. Seafreeze explained that despite a relatively low daily production capacity (57 mt), its vessels would not qualify for a coverage waiver, like other small-mesh bottom trawl vessels, because its vessels make longer than average trips processing and freezing catch from multiple fisheries. Seafreeze also commented that, according to the EA, the 50-percent coverage target would cost it $80,000 per year ($40,000 per vessel) on trips that do not land herring.

*Response:* We disagree. In an effort to minimize the economic impact of industry-funded monitoring, the Council explicitly considered measures to address Seafreeze's concern about disproportional impacts on its vessels, including considering alternatives for coverage waivers for trips when landings would be less than 20-percent herring or less than 50 mt of herring per day. Ultimately, the Council determined that the potential for a relatively high herring catches per trip aboard those vessels warranted additional monitoring and chose the 50 mt per trip threshold. The EA estimates the effort and monitoring costs associated with declared herring trips that ultimately did not land herring. In 2014, there were 111 sea days for small-mesh bottom trawl vessels that had no herring landings. The cost of at-sea monitoring coverage on 50 percent of those trips was estimated at just under $40,000. That $40,000 is the total cost for monitoring all small-mesh bottom trawl vessels for the year. Therefore, it is highly unlikely that Seafreeze would be paying $80,000 per year for at-sea monitoring on trips that did not land herring. As described previously, the Council has the flexibility to recommend we not prioritize Federal funding for industry-funded monitoring in the herring fishery and/or adjust measures if industry-funded monitoring requirements for the herring fishery become too onerous or do not allow for variations among, and contingencies in, fisheries, fishery resources, and catches.

*Comment 10:* Several commenters (CLF, CCCFA, Lund's) support the option to allow midwater trawl vessels to purchase observers to access Groundfish Closed Areas. However, CLF and CCCFA object to midwater trawl vessels having any additional access to Groundfish Closed Areas, including access to areas maintained as Groundfish Closed Areas in the recent Omnibus Habitat Amendment.

*Response:* We acknowledge the commenters support for the measure allowing midwater trawl vessels to purchase an observer to access Groundfish Closed Areas. This amendment does not relax any restrictions for Groundfish Closed Areas implemented in the recent Omnibus Habitat Amendment.

*Comment 11:* Several commenters were concerned with recent catch limit reductions in the herring fishery and how that affects the economic impact of industry-funded monitoring. The specifics of their comments are as follows:

• COA, Providian, and Seafreeze noted that economic impacts for the herring fishery were analyzed based on revenue and operating costs from 2014 and do not reflect the recent reductions in ACLs;

• Providian acknowledges that lower ACLs means fewer fishing trips and recommends continued SBRM coverage in the herring fishery;

• Lund's recommends SBRM coverage, in conjunction with the existing state-administered portside sampling program, as the best investment to understand catch in herring fishery; and

• Lund's, Providian, and O'Hara request the amendment be delayed, at least until after 2021, in hopes that future increases in herring harvest and revenue would be able to support industry-funded monitoring.

*Response:* As discussed in the preamble, we acknowledge that herring effort, catch, and resulting revenue will likely be lower in 2020 and 2021 than in prior years, such that the cost of industry-funded monitoring relative to herring catch and revenue may be high in the short-term. However, the magnitude of that impact on individual vessels and businesses is likely variable and would be mitigated by several factors, which are discussed in the preamble section addressing our NEPA considerations.

*Comment 12:* Four members of the public supported this amendment and believe increased monitoring is necessary for sustainable FMPs. For two of those individuals, their support is conditional on the economic impact of the amendment, specifically that the amendment does not overburden an already struggling New England fishing industry.

*Response:* We appreciate the commenters' support for this amendment and note the amendment includes several measures to minimize the economic impact on the herring industry of paying for additional coverage.

*Comment 13:* Several commenters provided input on the EFP to further evaluate how to best permanently administer an electronic monitoring and portside sampling program. The specifics of their comments are as follows:

• NEPSA, CLF, CCCFA, and CHOIR supported us using an EFP to initially administer electronic monitoring and portside sampling in the herring fishery and urged us to quickly transition to electronic monitoring in the herring fishery because electronic monitoring provides a more cost effective and accurate means to monitor the herring fishery than human monitors;

• CHOIR and NEPSA urged us to allow purse seine vessels to participate in the EFP and explained that lessons learned from the midwater trawl electronic monitoring study would apply to purse seine vessels as both gear types capture fish in nets and bring those nets alongside the vessels to pump fish aboard;

• NEPSA asserted that electronic monitoring is easier for vessel operators than at-sea monitoring coverage because it does not involve the logistics of carrying a human monitor and noted that allowing purse seine vessels to participate in the EFP would increase the number of participants and help decrease the per-vessel cost of using electronic monitoring;

• Lund's commented that it supports us using an EFP to further evaluate an electronic monitoring and portside sampling program, but at this time prefers human monitors to electronic monitoring;

• CLF and CHOIR advocated that net sensors be incorporated into the EFP to help quantify the amount of slipped catch and CHOIR hoped that electronic monitoring can be developed to identify the contents and estimate the amount of slipped catch; and

• CLF requested the EFP include documenting all discards, verifying compliance with slippage requirements and consequence measures, 100-percent video review, documenting interactions with protected species, and complementary coverage by SBRM observers.

*Response:* We acknowledge commenters' support for the EFP and will consider these recommendations as

the terms and conditions of the EFP are finalized.

*Comment 14:* One member of the public supported developing future industry-funded monitoring programs via amendment to allow for public input and standardizing industry-funded monitoring programs to help ensure fairness across fisheries.

*Response:* We acknowledge the commenter's support for omnibus measures in the amendment.

*Comment 15:* One individual commented that additional monitoring, especially industry-funded monitoring for herring, is unnecessary because herring are numerous and not at risk of extinction. The individual is not convinced the Council considered its own criteria for the development of an industry-funded monitoring program, such as a clear need for the data collection, cost of collection, less data intensive methods, prioritizing modern technology, and incentive for reliable self-reporting. Instead, the commenter recommended tracking catch by using fishing industry reporting to NMFS of the weight of fish sold.

*Response:* We disagree. The Council identified and supported the need for additional monitoring as reducing uncertainty around catch estimates in the herring fishery, thereby improving catch estimation for stock assessments and management, as noted in the response to Comment 8. The Council considered less data intensive methods, prioritizing modern technology, and incentives for self-reporting by allowing vessels to use either at-sea monitoring or electronic monitoring and portside sampling coverage to satisfy industry-funded monitoring requirements. In contrast to observers, at-sea monitors would not collect whole specimens, photos, or biological samples (other than length data) from catch, unless it was for purposes of species identification, or sighting data on protected species. The Council recommended a limited data collection for at-sea monitors compared to observers to allow for possible cost savings for either the industry or NMFS associated with a limited data collection. Because midwater trawl vessels discard only a small percentage of catch at sea, electronic monitoring and portside sampling have the potential to be a cost effective way to

address monitoring goals for the herring fishery. Analysis in the EA estimates that electronic monitoring and portside sampling coverage has the potential to reduce annual RTO up to 10 percent instead of the 20 percent reduction associated with at-sea monitoring coverage.

We currently track catch in the herring fishery using the weight of fish purchased by dealers, but those data are not robust enough to track catch against catch caps and would not help reduce the uncertainty associated with catch tracked against catch caps.

*Comment 16:* Three members of the public provided comments on forest management, keeping marine mammals in captivity, and NEPA requirements for terrestrial businesses.

*Response:* Because those comments are outside the scope of this amendment, we are not providing responses to those comments in this final rule.

## Classification

The Administrator, Greater Atlantic Region, NMFS determined that this amendment is necessary for the conservation and management of New England Council FMPs and that it is consistent with the Magnuson-Stevens Act and other applicable law.

This final rule has been determined to be not significant for purposes of Executive Order (E.O.) 12866.

This final rule is not an E.O. 13771 regulatory action because this action is not significant under E.O. 12866.

NMFS prepared a final regulatory flexibility analysis (FRFA) in support of this action. The FRFA incorporates the initial RFA, a summary of the significant issues raised by the public comments in response to the initial RFA, NMFS responses to those comments, and a summary of the analyses completed in support of this action. A description of why this action was considered, the objectives of, and the legal basis for this rule is contained in in the preamble to the proposed and this final rule, and is not repeated here. All of the documents that constitute the FRFA and a copy of the EA/RIR/IRFA are available upon request (see **ADDRESSES**) or via the internet at: *http://www.nefmc.org.*

The omnibus measures are administrative, specifying a process to

develop and administer future industry-funded monitoring and monitoring set-aside programs, and do not directly affect fishing effort or amount of fish harvested. Because the omnibus measures have no direct economic impacts, they will not be discussed in this section. The herring measures affect levels of monitoring, rather than harvest specifications, but they are expected to have economic impacts on fishery-related businesses and human communities due to the costs associated with the industry-funded monitoring measures for the herring fishery.

*A Statement of the Significant Issues Raised by the Public in Response to the IRFA, a Statement of the Agency's Assessment of Such Issues, and a Statement of Any Changes Made in the Final Rule as a Result of Such Comments*

We received 18 comment letters on the NOA and proposed rule. Those comments, and our responses, are contained in the Comments and Responses section of this final rule and are not repeated here. Comments 1, 2, 5, 6, 8, 9, 11, and 12 discussed the economic impacts of the measures, but did not directly comment on the IRFA. All changes from the proposed rule, as well as the rationale for those changes, are described in the Changes from the Proposed Rule section of this final rule and are not repeated here.

*Description and Estimate of the Number of Small Entities To Which the Rule Would Apply*

Effective July 1, 2016, NMFS established a small business size standard of $11 million in annual gross receipts for all businesses primarily engaged in the commercial fishing industry for RFA compliance purposes only (80 FR 81194, December 29, 2015). The directly regulated entities are businesses that own at least one limited access Atlantic herring vessel. As of 2016, there are 66 businesses that own at least one limited access herring vessel. Four businesses are large entities (gross receipts greater than $11 million). The remaining 62 businesses are small entities. Gross receipts and gross receipts from herring fishing for the small entities are characterized in Table 3.

TABLE 3—GROSS REVENUES AND REVENUES FROM HERRING FOR THE DIRECTLY REGULATED SMALL ENTITIES

|  | Gross receipts from all fishing by herring permitted small entities | Gross receipts from herring fishing by herring permitted small entities |
|---|---|---|
| Mean | $1,847,392 | $422,210 |
| Median | 1,076,172 | 0 |
| 25th Percentile | 656,965 | 0 |
| 75th Percentile | 2,684,753 | 95,218 |
| Permitted Small Entities | 62 | 62 |

*Source:* NMFS.

Many of the businesses that hold limited access herring permits are not actively fishing for herring. Of those businesses actively fishing for herring, there are 32 directly regulated entities with herring landings. Two businesses are large entities (gross receipts over $11 million). The remaining 30 businesses are small entities. Table 4 characterizes gross receipts and gross receipts from the herring fishery for the active small entities.

TABLE 4—GROSS REVENUES AND REVENUES FROM HERRING FOR THE ACTIVE DIRECTLY REGULATED SMALL ENTITIES

|  | Gross receipts from all fishing by active herring permitted small entities | Gross receipts from active herring permitted fishing by small entities |
|---|---|---|
| Mean | $2,070,541 | $872,567 |
| Median | 1,030,411 | 95,558 |
| 25th Percentile | 554,628 | 6,570 |
| 75th Percentile | 2,955,883 | 1,696,758 |
| Active Small Entities | 30 | 30 |

*Source:* NMFS.

For the 30 small entities, herring represents an average of 36 percent of gross receipts. For 12 of the small entities, herring represents the single largest source of gross receipts. For eight of the small entities, longfin squid is the largest source of gross receipts and Atlantic sea scallops is the largest source of gross receipts for five of the small entities. The largest source of gross receipts for the remaining five small entities are mixed across different fisheries. Eight of the 30 small entities derived zero revenues from herring.

*Description of Projected Reporting, Recordkeeping, and Other Compliance Requirements*

This final rule contains collection-of-information requirements subject to review and approval by the Office of Management and Budget (OMB) under the Paperwork Reduction Act (PRA). The new requirements, which are described in detail in the preamble, have been submitted to OMB for approval as a revised collection under control number 0648–0674. The action does not duplicate, overlap, or conflict with any other Federal rules.

The Industry-Funded Monitoring Amendment would replace the current phone-based observer pre-trip notification system with a new web-based pre-trip notification system. There would be no additional reporting burden associated with this measure because the new notification system would increase convenience and will require approximately the same time burden (5 minutes).

This amendment would implement a 50-percent industry-funded monitoring coverage target on vessels issued Category A or B herring permits. The herring industry would be required to pay for industry cost responsibilities associated with at-sea monitoring. There are an estimated 42 vessels with Category A or B permits in the herring fishery. After considering SBRM coverage, we estimate that each vessel would incur monitoring costs for an additional 19 days at sea per year, at an estimated maximum cost of $710 per sea day. The annual cost estimate for carrying an at-sea monitor for Category A and B vessels would be $566,580, with an average cost per vessel of $13,490.

In addition to the 50-percent industry-funded monitoring coverage target, midwater trawl vessels would have the option to purchase observer coverage to allow them to fish in Groundfish Closed Areas. This option would be available to the estimated 12 vessels that fish with midwater trawl gear. Because this option would be available on all trips not otherwise selected for SBRM or industry-funded coverage, it is estimated that each vessel may use this option for up to 21 days per year, at an estimated maximum cost of $818 per sea day. Therefore, the annual cost associated with industry-funded observer coverage for midwater trawl vessels fishing in Groundfish Closed Areas is estimated to be $206,136, with an average annual cost per vessel of $17,178.

To access Groundfish Closed Areas, owners/operators of the 12 affected midwater trawl vessels would request an observer by calling one of the approved monitoring service providers. The average midwater trawl vessel is estimated to take 7 of these trips per year, and each call would take an estimated 5 minutes at a rate of $0.10 per minute. Thus, the total annual burden estimate to the industry for calls to obtain industry-funded observer coverage would be 7 hours and $42 (Per vessel: 1 hr and $3.50). For each of the 7 estimated trips that the vessel calls in to request an industry-funded observer to access Groundfish Closed Areas, the vessel has the option to cancel that trip. The call to cancel the trip would take an estimated 1 minute at a rate of $0.10 per minute. The total annual burden

_0000017745

estimated to the industry for cancelling these trips would be 1 hour and $8 (Per vessel: 1 hr and $1).

We expect that some monitoring service providers would apply for approval under the service provider requirements at § 648.11(h), specifically that four out of six providers may apply for approval, and would be subject to these requirements. These providers would submit reports and information required of service providers as part of their application for approval. Service providers must comply with the following requirements, submitted via email, phone, web-portal, fax, or postal service: Submit applications for approval as a monitoring service provider; formally request industry-funded at-sea monitor training by the NEFOP; submit industry-funded at-sea monitor deployment and availability reports; submit biological samples, safety refusal reports, and other reports; give notification of industry-funded at-sea monitor availability within 24 hours of the vessel owner's notification of a prospective trip; provide vessels with notification of industry-funded observer availability in advance of each trip; and maintain an updated contact list of all industry-funded at-sea monitors/observers that includes the monitor's/observer's identification number, name, mailing and email address, phone numbers, homeports or fisheries/trip types assigned, and whether or not the monitor/observer is ''in service'' (i.e., available to provide coverage services). Monitoring service providers would have to provide raw at-sea monitoring data to NMFS and make at-sea monitors available to NMFS for debriefing upon request. The regulations would also require monitoring service providers to submit any outreach materials, such as informational pamphlets, payment notification, and descriptions of monitor duties, as well as all contracts between the service provider and entities requiring monitoring services for review to NMFS. Monitoring service providers also have the option to respond to application denials, and submit a rebuttal in response to a pending removal from the list of approved monitoring service providers. NMFS expects that all of these reporting requirements combined are expected to take 1,192 hours of response time per year for a total annual cost of $12,483 for all affected monitoring service providers ($3,121 per provider). The following table provides the detailed time and cost information for each response item.

TABLE 5—BURDEN ESTIMATE FOR MEASURES

| Monitoring service provider requirements | Number of respondents | Total number of annual responses | Response time per response (minutes) | Total annual burden (hours) | Cost per response | Total annual cost |
|---|---|---|---|---|---|---|
| Monitor deployment report ........................ | 4 | 444 | 10 | 74 | $0.00 | $0 |
| Monitor availability report ......................... | 4 | 216 | 20 | 72 | 0.00 | 0 |
| Safety refusals ......................................... | 4 | 40 | 30 | 20 | 0.00 | 0 |
| Raw monitor data ..................................... | 4 | 444 | 5 | 37 | 23.75 | 10,545 |
| Monitor debriefing .................................... | 4 | 124 | 120 | 248 | 12.00 | 1,488 |
| Other reports ............................................ | 4 | 68 | 30 | 34 | 0.00 | 0 |
| Biological samples ................................... | 4 | 516 | 60 | 516 | 0.50 | 258 |
| New application to be a service provider | 4 | 4 | 600 | 40 | 0.55 | 2 |
| Applicant response to denial ................... | 1 | 1 | 600 | 10 | 0.55 | 1 |
| Request for monitor training .................... | 4 | 12 | 30 | 6 | 1.80 | 22 |
| Rebuttal of pending removal from list of approved service providers ................. | 1 | 1 | 480 | 8 | 0.55 | 1 |
| Request to service provider to procure a monitor ................................................. | 90 | 360 | 10 | 60 | 0.00 | 0 |
| Notification of unavailability of monitors .. | 90 | 360 | 5 | 30 | 0.00 | 0 |
| Call to service provider to procure an observer for Groundfish Closed Areas by phone ................................................. | 21 | 84 | 10 | 14 | 1.00 | 84 |
| Notification of unavailability of observers for Groundfish Closed Areas ............... | 21 | 84 | 5 | 7 | 0.50 | 42 |
| Monitor contact list updates .................... | 4 | 48 | 5 | 4 | 0.00 | 0 |
| Monitor availability updates ..................... | 4 | 48 | 5 | 4 | 0.00 | 0 |
| Service provider material submissions .... | 4 | 8 | 30 | 4 | 2.50 | 20 |
| Service provider contracts ....................... | 4 | 8 | 30 | 4 | 2.50 | 20 |
| Total ................................................. | .................... | .................... | .................... | 1,192 | .................... | 12,483 |

Public comment is sought regarding the following: Whether this proposed collection of information is necessary for the proper performance of agency functions, including whether the information shall have practical utility; the accuracy of the burden estimate; ways to enhance the quality, utility, and clarity of the information to be collected; and ways to minimize the burden of the collection of information, including through the use of automated collection techniques or other forms of information technology. Send comments on these or any other aspects of the collection of information to the Regional Administrator (see **ADDRESSES**) and email to *OIRA_Submission@ omb.eop.gov* or fax to 202–395–7285.

Notwithstanding any other provision of the law, no person is required to respond to, and no person shall be subject to penalty for failure to comply with, a collection of information subject to the requirements of the PRA, unless that collection of information displays a currently valid OMB Control Number.

*Federal Rules Which May Duplicate, Overlap, or Conflict With the Proposed Rule*

This action does not duplicate, overlap, or conflict with any other Federal rules.

*Description of the Steps the Agency Has Taken To Minimize the Significant Economic Impact on Small Entities Consistent With the Stated Objectives of Applicable Statutes*

Recognizing the potential economic impact of industry-funded monitoring

on the herring industry, this amendment contains several measures to minimize the impact of paying for additional coverage. Setting the coverage target at 50 percent, instead of 75 or 100 percent, balances the benefit of additional monitoring with the costs associated with additional monitoring. Allowing SBRM coverage to contribute toward the 50-percent coverage target for at-sea monitoring is expected to reduce costs for the industry. Waiving industry-funded monitoring requirements on certain trips, including trips that land less than 50 mt of herring and pair trawl trips carrying no fish, would minimize the cost of additional monitoring. Trips that land less than 50 mt are common for small-mesh bottom trawl, single midwater trawl vessel, and purse seine vessels. As such, the 50-mt exemption has the potential to result in a less than 5 percent reduction in annual RTO associated with at-sea monitoring coverage for those vessels. Electronic monitoring and portside sampling may be a more cost effective way for midwater trawl vessels to meet the 50-percent coverage target requirement than at-sea monitoring coverage. Analysis in the EA estimates that electronic monitoring and portside sampling coverage has the potential to reduce annual RTO up to 10 percent instead of the 20 percent reduction associated with at-sea monitoring coverage. Herring measures require the Council to review the industry-funded monitoring requirements two years after implementation. Omnibus measures allow the Council to modify the weighting approach to recommend to us how to prioritize Federal funding across industry-funded monitoring programs. If the Council wants to recommend that we not prioritize Federal funding to administer industry-funded monitoring in the herring fishery, essentially recommending no additional monitoring for the herring fishery, it would consider the new weighting approach at a public meeting and request us to publish a rulemaking modifying the weighting approach. These measures ensure the Council considers the cost of additional monitoring relative to its effectiveness and provides the flexibility to adjust measures if industry-funded monitoring requirements for the herring fishery become too onerous. Section 212 of the Small Business Regulatory Enforcement Fairness Act of 1996 states that, for each rule or group of related rules for which an agency is required to prepare a FRFA, the agency shall publish one or more guides to assist small entities in complying with the rule, and shall

designate such publications as ''small entity compliance guides.'' The agency shall explain the actions a small entity is required to take to comply with a rule or group of rules. As part of this rulemaking process, a letter to permit holders that also serves as small entity compliance guide was prepared. Copies of this final rule are available from the Greater Atlantic Regional Fisheries Office (GARFO), and the compliance guide (*i.e.*, fishery bulletin) will be sent to all holders of permits for the herring fishery. The guide and this final rule will be posted on the GARFO website.

## List of Subjects in 50 CFR Part 648

Fisheries, Fishing, Recordkeeping and reporting requirements.

Dated: January 15, 2020.

**Samuel D. Rauch III,**
*Deputy Assistant Administrator for Regulatory Programs, National Marine Fisheries Service.*

For the reasons set out in the preamble, 50 CFR part 648 is amended as follows:

## PART 648—FISHERIES OF THE NORTHEASTERN UNITED STATES

■ 1. The authority citation for part 648 continues to read as follows:

**Authority:** 16 U.S.C. 1801 *et seq.*

■ 2. In § 648.2, revise the definitions for ''Electronic monitoring,'' ''Observer/sea sampler,'' ''Slippage in the Atlantic herring fishery,'' and ''Slip(s) or slipping catch in the Atlantic herring fishery'' to read as follows:

### § 648.2   Definitions.
\*    \*    \*    \*    \*

*Electronic monitoring* means a network of equipment that uses a software operating system connected to one or more technology components, including, but not limited to, cameras and recording devices to collect data on catch and vessel operations. With respect to the NE multispecies fishery, electronic monitoring means any equipment that is used to monitor area fished and the amount and identity of species kept and discarded in lieu of at-sea monitors as part of an approved Sector at-sea monitoring program.
\*    \*    \*    \*    \*

*Observer or monitor* means any person certified by NMFS to collect operational fishing data, biological data, or economic data through direct observation and interaction with operators of commercial fishing vessels as part of NMFS' Northeast Fisheries Observer Program. Observers or monitors include NMFS-certified fisheries observers, at-sea monitors,

portside samplers, and dockside monitors.
\*    \*    \*    \*    \*

*Slippage in the Atlantic herring fishery* means discarded catch from a vessel issued an Atlantic herring permit that is carrying a NMFS-certified observer or monitor prior to the catch being brought on board or prior to the catch being made available for sampling and inspection by a NMFS-certified observer or monitor after the catch is on board. Slippage also means any catch that is discarded during a trip prior to it being sampled portside by a portside sampler on a trip selected for portside sampling coverage by NMFS. Slippage includes releasing catch from a codend or seine prior to the completion of pumping the catch aboard and the release of catch from a codend or seine while the codend or seine is in the water. Fish that cannot be pumped and remain in the codend or seine at the end of pumping operations are not considered slippage. Discards that occur after the catch is brought on board and made available for sampling and inspection by a NMFS-certified observer or monitor are also not considered slippage.

*Slip(s) or slipping catch in the Atlantic herring fishery* means discarded catch from a vessel issued an Atlantic herring permit that is carrying a NMFS-certified observer or monitor prior to the catch being brought on board or prior to the catch being made available for sampling and inspection by a NMFS-certified observer or monitor after the catch is on board. Slip(s) or slipping catch also means any catch that is discarded during a trip prior to it being sampled portside by a portside sampler on a trip selected for portside sampling coverage by NMFS. Slip(s) or slipping catch includes releasing fish from a codend or seine prior to the completion of pumping the fish on board and the release of fish from a codend or seine while the codend or seine is in the water. Slippage or slipped catch refers to fish that are slipped. Slippage or slipped catch does not include operational discards, discards that occur after the catch is brought on board and made available for sampling and inspection by a NMFS-certified observer or monitor, or fish that inadvertently fall out of or off fishing gear as gear is being brought on board the vessel.
\*    \*    \*    \*    \*

■ 3. In § 648.7, revise paragraph (b)(2)(i) to read as follows:

**§ 648.7   Record keeping and reporting requirements.**

\*    \*    \*    \*    \*

(b) \* \* \*

(2) \* \* \*

(i) *Atlantic herring owners or operators issued an All Areas open access permit.* The owner or operator of a vessel issued an All Areas open access permit to fish for herring must report catch (retained and discarded) of herring via an IVR system for each week herring was caught, unless exempted by the Regional Administrator. IVR reports are not required for weeks when no herring was caught. The report shall include at least the following information, and any other information required by the Regional Administrator: Vessel identification; week in which herring are caught; management areas fished; and pounds retained and pounds discarded of herring caught in each management area. The IVR reporting week begins on Sunday at 0001 hour (hr) (12:01 a.m.) local time and ends Saturday at 2400 hr (12 midnight). Weekly Atlantic herring catch reports must be submitted via the IVR system by midnight each Tuesday, eastern time, for the previous week. Reports are required even if herring caught during the week has not yet been landed. This report does not exempt the owner or operator from other applicable reporting requirements of this section.

\*    \*    \*    \*    \*

■ 4. Revise § 648.11 to read as follows:

**§ 648.11   Monitoring coverage.**

(a) *Coverage.* The Regional Administrator may request any vessel holding a permit for Atlantic sea scallops, NE multispecies, monkfish, skates, Atlantic mackerel, squid, butterfish, scup, black sea bass, bluefish, spiny dogfish, Atlantic herring, tilefish, Atlantic surfclam, ocean quahog, or Atlantic deep-sea red crab; or a moratorium permit for summer flounder; to carry a NMFS-certified fisheries observer. A vessel holding a permit for Atlantic sea scallops is subject to the additional requirements specified in paragraph (k) of this section. A vessel holding an All Areas or Areas ⅔ Limited Access Herring Permit is subject to the additional requirements specified in paragraph (m) of this section. Also, any vessel or vessel owner/operator that fishes for, catches or lands hagfish, or intends to fish for, catch, or land hagfish in or from the exclusive economic zone must carry a NMFS-certified fisheries observer when requested by the Regional Administrator in accordance with the requirements of this section.

(b) *Facilitating coverage.* If requested by the Regional Administrator or their designees, including NMFS-certified observers, monitors, and NMFS staff, to be sampled by an observer or monitor, it is the responsibility of the vessel owner or vessel operator to arrange for and facilitate observer or monitor placement. Owners or operators of vessels selected for observer or monitor coverage must notify the appropriate monitoring service provider before commencing any fishing trip that may result in the harvest of resources of the respective fishery. Notification procedures will be specified in selection letters to vessel owners or permit holder letters.

(c) *Safety waivers.* The Regional Administrator may waive the requirement to be sampled by an observer or monitor if the facilities on a vessel for housing the observer or monitor, or for carrying out observer or monitor functions, are so inadequate or unsafe that the health or safety of the observer or monitor, or the safe operation of the vessel, would be jeopardized.

(d) *Vessel requirements associated with coverage.* An owner or operator of a vessel on which a NMFS-certified observer or monitor is embarked must:

(1) Provide accommodations and food that are equivalent to those provided to the crew.

(2) Allow the observer or monitor access to and use of the vessel's communications equipment and personnel upon request for the transmission and receipt of messages related to the observer's or monitor's duties.

(3) Provide true vessel locations, by latitude and longitude or loran coordinates, as requested by the observer or monitor, and allow the observer or monitor access to and use of the vessel's navigation equipment and personnel upon request to determine the vessel's position.

(4) Notify the observer or monitor in a timely fashion of when fishing operations are to begin and end.

(5) Allow for the embarking and debarking of the observer or monitor, as specified by the Regional Administrator, ensuring that transfers of observers or monitors at sea are accomplished in a safe manner, via small boat or raft, during daylight hours as weather and sea conditions allow, and with the agreement of the observers or monitors involved.

(6) Allow the observer or monitor free and unobstructed access to the vessel's bridge, working decks, holding bins, weight scales, holds, and any other

space used to hold, process, weigh, or store fish.

(7) Allow the observer or monitor to inspect and copy any the vessel's log, communications log, and records associated with the catch and distribution of fish for that trip.

(e) *Vessel requirements associated with protected species.* The owner or operator of a vessel issued a summer flounder moratorium permit, a scup moratorium permit, a black sea bass moratorium permit, a bluefish permit, a spiny dogfish permit, an Atlantic herring permit, an Atlantic deep-sea red crab permit, a skate permit, or a tilefish permit, if requested by the observer or monitor, also must:

(1) Notify the observer or monitor of any sea turtles, marine mammals, summer flounder, scup, black sea bass, bluefish, spiny dogfish, Atlantic herring, Atlantic deep-sea red crab, tilefish, skates (including discards) or other specimens taken by the vessel.

(2) Provide the observer or monitor with sea turtles, marine mammals, summer flounder, scup, black sea bass, bluefish, spiny dogfish, Atlantic herring, Atlantic deep-sea red crab, skates, tilefish, or other specimens taken by the vessel.

(f) *Coverage funded from outside sources.* NMFS may accept observer or monitor coverage funded by outside sources if:

(1) All coverage conducted by such observers or monitors is determined by NMFS to be in compliance with NMFS' observer or monitor guidelines and procedures.

(2) The owner or operator of the vessel complies with all other provisions of this part.

(3) The observer or monitor is approved by the Regional Administrator.

(g) *Industry-funded monitoring programs.* Fishery management plans (FMPs) managed by the New England Fishery Management Council (New England Council), including Atlantic Herring, Atlantic Salmon, Atlantic Sea Scallops, Deep-Sea Red Crab, Northeast Multispecies, and Northeast Skate Complex, may include industry-funded monitoring programs (IFM) to supplement existing monitoring required by the Standard Bycatch Reporting Methodology (SBRM), Endangered Species Act, and the Marine Mammal Protection Act. IFM programs may use observers, monitors, including at-sea monitors and portside samplers, and electronic monitoring to meet specified IFM coverage targets. The ability to meet IFM coverage targets may be constrained by the availability of

**7432**    **Federal Register** / Vol. 85, No. 26 / Friday, February 7, 2020 / Rules and Regulations

Federal funding to pay NMFS cost responsibilities associated with IFM.

(1) *Guiding principles for new IFM programs.* The Council's development of an IFM program must consider or include the following:

(i) A clear need or reason for the data collection;

(ii) Objective design criteria;

(iii) Cost of data collection should not diminish net benefits to the nation nor threaten continued existence of the fishery;

(iv) Seek less data intensive methods to collect data necessary to assure conservation and sustainability when assessing and managing fisheries with minimal profit margins;

(v) Prioritize the use of modern technology to the extent practicable; and

(vi) Incentives for reliable self-reporting.

(2) *Process to implement and revise new IFM programs.* New IFM programs shall be developed via an amendment to a specific FMP. IFM programs implemented in an FMP may be revised via a framework adjustment. The details of an IFM program may include, but are not limited to:

(i) Level and type of coverage target;

(ii) Rationale for level and type of coverage;

(iii) Minimum level of coverage necessary to meet coverage goals;

(iv) Consideration of waivers if coverage targets cannot be met;

(v) Process for vessel notification and selection;

(vi) Cost collection and administration;

(vii) Standards for monitoring service providers; and

(viii) Any other measures necessary to implement the industry-funded monitoring program.

(3) *NMFS cost responsibilities.* IFM programs have two types of costs, NMFS and industry costs. Cost responsibilities are delineated by the type of cost. NMFS cost responsibilities include the following:

(i) The labor and facilities associated with training and debriefing of monitors;

(ii) NMFS-issued gear (*e.g.,* electronic reporting aids used by human monitors to record trip information);

(iii) Certification of monitoring service providers and individual observers or monitors; performance monitoring to maintain certificates;

(iv) Developing and executing vessel selection;

(v) Data processing (including electronic monitoring video audit, but excluding service provider electronic video review); and

(vi) Costs associated with liaison activities between service providers, and NMFS, Coast Guard, New England Council, sector managers, and other partners.

(vii) The industry is responsible for all other costs associated with IFM programs.

(4) *Prioritization process to cover NMFS IFM cost responsibilities.* (i) Available Federal funding refers to any funds in excess of those allocated to meet SBRM requirements or the existing IFM programs in the Atlantic Sea Scallop and Northeast Multispecies FMPs that may be used to cover NMFS cost responsibilities associated with IFM coverage targets. If there is no available Federal funding in a given year to cover NMFS IFM cost responsibilities, then there shall be no IFM coverage during that year. If there is some available Federal funding in a given year, but not enough to cover all of NMFS cost responsibilities associated with IFM coverage targets, then the New England Council will prioritize available Federal funding across IFM programs during that year. Existing IFM programs for Atlantic sea scallops and Northeast multispecies fisheries shall not be included in this prioritization process.

(ii) Programs with IFM coverage targets shall be prioritized using an equal weighting approach, such that any available Federal funding shall be divided equally among programs.

(iii) After NMFS determines the amount of available Federal funding for the next fishing year, NMFS shall provide the New England Council with the estimated IFM coverage levels for the next fishing year. The estimated IFM coverage levels would be based on the equal weighting approach and would include the rationale for any deviations from the equal weighting approach. The New England Council may recommend revisions and additional considerations to the Regional Administrator and Science and Research Director.

(A) If available Federal funding exceeds that needed to pay all of NMFS cost responsibilities for administering IFM programs, the New England Council may request NMFS to use available funding to help offset industry cost responsibilities through reimbursement.

(B) [Reserved]

(iv) Revisions to the prioritization process may be made via a framework adjustment to all New England FMPs.

(v) Revisions to the weighting approach for the New England Council-led prioritization process may be made via a framework adjustment to all New England FMPs or by the New England Council considering a new weighting approach at a public meeting, where public comment is accepted, and requesting NMFS to publish a notice or rulemaking revising the weighting approach. NMFS shall implement revisions to the weighting approach in a manner consistent with the Administrative Procedure Act.

(5) *IFM program monitoring service provider requirements.* IFM monitoring service provider requirements shall be consistent with requirements in paragraph (h) of this section and observer or monitor requirements shall be consistent with requirements in paragraph (i) of this section.

(6) *Monitoring set-aside.* The New England Council may develop a monitoring set-aside program for individual FMPs that would devote a portion of the annual catch limit for a fishery to help offset the industry cost responsibilities for monitoring coverage, including observers, at-sea monitors, portside samplers, and electronic monitoring.

(i) The details of a monitoring set-aside program may include, but are not limited to:

(A) The basis for the monitoring set-aside;

(B) The amount of the set-aside (*e.g.,* quota, days at sea);

(C) How the set-aside is allocated to vessels required to pay for monitoring (*e.g.,* an increased trip limit, differential days at sea counting, additional trips, an allocation of the quota);

(D) The process for vessel notification;

(E) How funds are collected and administered to cover the industry's costs of monitoring; and

(F) Any other measures necessary to develop and implement a monitoring set-aside.

(ii) The New England Council may develop new monitoring set-asides and revise those monitoring set-asides via a framework adjustment to the relevant FMP.

(h) *Monitoring service provider approval and responsibilities*—(1) *General.* An entity seeking to provide monitoring services, including services for IFM Programs described in paragraph (g) of this section, must apply for and obtain approval from NMFS following submission of a complete application. Monitoring services include providing NMFS-certified observers, monitors (at-sea monitors and portside samplers), and/or electronic monitoring. A list of approved monitoring service providers shall be distributed to vessel owners and shall be posted on the NMFS Fisheries Sampling Branch (FSB) website at: *https://www.nefsc.noaa.gov/femad/fsb/.*

(2) [Reserved]

(3) *Contents of application.* An application to become an approved monitoring service provider shall contain the following:

(i) Identification of the management, organizational structure, and ownership structure of the applicant's business, including identification by name and general function of all controlling management interests in the company, including but not limited to owners, board members, officers, authorized agents, and staff. If the applicant is a corporation, the articles of incorporation must be provided. If the applicant is a partnership, the partnership agreement must be provided.

(ii) The permanent mailing address, phone and fax numbers where the owner(s) can be contacted for official correspondence, and the current physical location, business mailing address, business telephone and fax numbers, and business email address for each office.

(iii) A statement, signed under penalty of perjury, from each owner or owners, board members, and officers, if a corporation, that they are free from a conflict of interest as described under paragraph (h)(6) of this section.

(iv) A statement, signed under penalty of perjury, from each owner or owners, board members, and officers, if a corporation, describing any criminal conviction(s), Federal contract(s) they have had and the performance rating they received on the contracts, and previous decertification action(s) while working as an observer or monitor or monitoring service provider.

(v) A description of any prior experience the applicant may have in placing individuals in remote field and/or marine work environments. This includes, but is not limited to, recruiting, hiring, deployment, and personnel administration.

(vi) A description of the applicant's ability to carry out the responsibilities and duties of a monitoring service provider as set out under paragraph (h)(5) of this section, and the arrangements to be used.

(vii) Evidence of holding adequate insurance to cover injury, liability, and accidental death for observers or monitors, whether contracted or employed by the service provider, during their period of employment (including during training). Workers' Compensation and Maritime Employer's Liability insurance must be provided to cover the observer or monitor, vessel owner, and observer provider. The minimum coverage required is $5 million. Monitoring service providers shall provide copies of the insurance policies to observers or monitors to

display to the vessel owner, operator, or vessel manager, when requested.

(viii) Proof that its observers or monitors, whether contracted or employed by the service provider, are compensated with salaries that meet or exceed the U.S. Department of Labor (DOL) guidelines for observers. Observers shall be compensated as Fair Labor Standards Act (FLSA) non-exempt employees. Monitoring service providers shall provide any other benefits and personnel services in accordance with the terms of each observer's or monitor's contract or employment status.

(ix) The names of its fully equipped, NMFS/FSB certified, observers or monitors on staff or a list of its training candidates (with resumes) and a request for an appropriate NMFS/FSB Training class. All training classes have a minimum class size of eight individuals, which may be split among multiple vendors requesting training. Requests for training classes with fewer than eight individuals will be delayed until further requests make up the full training class size.

(x) An Emergency Action Plan (EAP) describing its response to an "at sea" emergency with an observer or monitor, including, but not limited to, personal injury, death, harassment, or intimidation. An EAP that details a monitoring service provider's responses to emergencies involving observers, monitors, or monitoring service provider personnel. The EAP shall include communications protocol and appropriate contact information in an emergency.

(4) *Application evaluation.* (i) NMFS shall review and evaluate each application submitted under paragraph (h)(3) of this section. Issuance of approval as a monitoring service provider shall be based on completeness of the application, and a determination by NMFS of the applicant's ability to perform the duties and responsibilities of a monitoring service provider, as demonstrated in the application information. A decision to approve or deny an application shall be made by NMFS within 15 business days of receipt of the application by NMFS.

(ii) If NMFS approves the application, the monitoring service provider's name will be added to the list of approved monitoring service providers found on the NMFS/FSB website specified in paragraph (h)(1) of this section, and in any outreach information to the industry. Approved monitoring service providers shall be notified in writing and provided with any information pertinent to its participation in the observer or monitor programs.

(iii) An application shall be denied if NMFS determines that the information provided in the application is not complete or the evaluation criteria are not met. NMFS shall notify the applicant in writing of any deficiencies in the application or information submitted in support of the application. An applicant who receives a denial of his or her application may present additional information to rectify the deficiencies specified in the written denial, provided such information is submitted to NMFS within 30 days of the applicant's receipt of the denial notification from NMFS. In the absence of additional information, and after 30 days from an applicant's receipt of a denial, a monitoring service provider is required to resubmit an application containing all of the information required under the application process specified in paragraph (h)(3) of this section to be re-considered for being added to the list of approved monitoring service providers.

(5) *Responsibilities of monitoring service providers*—(i) *Certified observers or monitors.* A monitoring service provider must provide observers or monitors certified by NMFS/FSB pursuant to paragraph (i) of this section for deployment in a fishery when contacted and contracted by the owner, operator, or vessel manager of a fishing vessel, unless the monitoring service provider refuses to deploy an observer or monitor on a requesting vessel for any of the reasons specified at paragraph (h)(5)(viii) of this section.

(ii) *Support for observers or monitors.* A monitoring service provider must provide to each of its observers or monitors:

(A) All necessary transportation, lodging costs and support for arrangements and logistics of travel for observers and monitors to and from the initial location of deployment, to all subsequent vessel assignments, to any debriefing locations, and for appearances in Court for monitoring-related trials as necessary;

(B) Lodging, per diem, and any other services necessary for observers or monitors assigned to a fishing vessel or to attend an appropriate NMFS/FSB training class;

(C) The required observer or monitor equipment, in accordance with equipment requirements listed on the NMFS/FSB website specified in paragraph (h)(1) of this section, prior to any deployment and/or prior to NMFS observer or monitor certification training; and

(D) Individually assigned communication equipment, in working order, such as a mobile phone, for all

necessary communication. A monitoring service provider may alternatively compensate observers or monitors for the use of the observer's or monitor's personal mobile phone, or other device, for communications made in support of, or necessary for, the observer's or monitor's duties.

(iii) *Observer and monitor deployment logistics.* Each approved monitoring service provider must assign an available certified observer or monitor to a vessel upon request. Each approved monitoring service provider must be accessible 24 hours per day, 7 days per week, to enable an owner, operator, or manager of a vessel to secure monitoring coverage when requested. The telephone or other notification system must be monitored a minimum of four times daily to ensure rapid response to industry requests. Monitoring service providers approved under this paragraph (h) are required to report observer or monitor deployments to NMFS for the purpose of determining whether the predetermined coverage levels are being achieved in the appropriate fishery.

(iv) *Observer deployment limitations.* (A) A candidate observer's first several deployments and the resulting data shall be immediately edited and approved after each trip by NMFS/FSB prior to any further deployments by that observer. If data quality is considered acceptable, the observer would be certified. For further information, see *https://www.nefsc.noaa.gov/fsb/ training/.*

(B) For the purpose of coverage to meet SBRM requirements, unless alternative arrangements are approved by NMFS, a monitoring service provider must not deploy any NMFS-certified observer on the same vessel for more than two consecutive multi-day trips, and not more than twice in any given month for multi-day deployments.

(C) For the purpose of coverage to meet IFM requirements, a monitoring service provider may deploy any NMFS-certified observer or monitor on the same vessel for more than two consecutive multi-day trips and more than twice in any given month for multi-day deployments.

(v) *Communications with observers and monitors.* A monitoring service provider must have an employee responsible for observer or monitor activities on call 24 hours a day to handle emergencies involving observers or monitors or problems concerning observer or monitor logistics, whenever observers or monitors are at sea, stationed portside, in transit, or in port awaiting vessel assignment.

(vi) *Observer and monitor training requirements.* A request for a NMFS/ FSB Observer or Monitor Training class must be submitted to NMFS/FSB 45 calendar days in advance of the requested training. The following information must be submitted to NMFS/FSB at least 15 business days prior to the beginning of the proposed training: A list of observer or monitor candidates; candidate resumes, cover letters and academic transcripts; and a statement signed by the candidate, under penalty of perjury, that discloses the candidate's criminal convictions, if any. A medical report certified by a physician for each candidate is required 7 business days prior to the first day of training. CPR/First Aid certificates and a final list of training candidates with candidate contact information (email, phone, number, mailing address and emergency contact information) are due 7 business days prior to the first day of training. NMFS may reject a candidate for training if the candidate does not meet the minimum qualification requirements as outlined by NMFS/FSB minimum eligibility standards for observers or monitors as described on the NMFS/FSB website.

(vii) *Reports and Requirements*—(A) *Deployment reports.* The monitoring service provider must report to NMFS/ FSB when, where, to whom, and to what vessel an observer or monitor has been deployed, as soon as practicable, and according to requirements outlined on the NMFS/FSB website. The deployment report must be available and accessible to NMFS electronically 24 hours a day, 7 days a week. The monitoring service provider must ensure that the observer or monitor reports to NMFS the required electronic data, as described in the NMFS/FSB training. Electronic data submission protocols will be outlined in training and may include accessing government websites via personal computers/ devices or submitting data through government issued electronics. The monitoring service provider shall provide the raw (unedited) data collected by the observer or monitor to NMFS at the specified time per program. For further information, see *https://www.nefsc.noaa.gov/fsb/ scallop/.*

(B) *Safety refusals.* The monitoring service provider must report to NMFS any trip or landing that has been refused due to safety issues (*e.g.,* failure to hold a valid USCG Commercial Fishing Vessel Safety Examination Decal or to meet the safety requirements of the observer's or monitor's safety checklist) within 12 hours of the refusal.

(C) *Biological samples.* The monitoring service provider must ensure that biological samples, including whole marine mammals, sea turtles, sea birds, and fin clips or other DNA samples, are stored/handled properly and transported to NMFS within 5 days of landing. If transport to NMFS/FSB Observer Training Facility is not immediately available then whole animals requiring freezing shall be received by the nearest NMFS freezer facility within 24 hours of vessel landing.

(D) *Debriefing.* The monitoring service provider must ensure that the observer or monitor remains available to NMFS, either in-person or via phone, at NMFS' discretion, including NMFS Office for Law Enforcement, for debriefing for at least 2 weeks following any monitored trip. If requested by NMFS, an observer or monitor that is at sea during the 2-week period must contact NMFS upon his or her return. Monitoring service providers must pay for travel and land hours for any requested debriefings.

(E) *Availability report.* The monitoring service provider must report to NMFS any occurrence of inability to respond to an industry request for observer or monitor coverage due to the lack of available observers or monitors as soon as practicable if the provider is unable to respond to an industry request for monitoring coverage. Availability report must be available and accessible to NMFS electronically 24 hours a day, 7 days a week.

(F) *Incident reports.* The monitoring service provider must report possible observer or monitor harassment, discrimination, concerns about vessel safety or marine casualty, or observer or monitor illness or injury; and any information, allegations, or reports regarding observer or monitor conflict of interest or breach of the standards of behavior, to NMFS/FSB within 12 hours of the event or within 12 hours of learning of the event.

(G) *Status report.* The monitoring service provider must provide NMFS/ FSB with an updated list of contact information for all observers or monitors that includes the identification number, name, mailing address, email address, phone numbers, homeports or fisheries/ trip types assigned, and must include whether or not the observer or monitor is ''in service,'' indicating when the observer or monitor has requested leave and/or is not currently working for an industry-funded program. Any Federally contracted NMFS-certified observer not actively deployed on a vessel for 30 days will be placed on Leave of Absence (LOA) status (or as specified by NMFS/FSB according to

most recent Information Technology Security Guidelines at *https:// www.nefsc.noaa.gov/fsb/memos/*. Those Federally contracted NMFS-certified observers on LOA for 90 days or more will need to conduct an exit interview with NMFS/FSB and return any NMFS/FSB issued gear and Common Access Card (CAC), unless alternative arrangements are approved by NMFS/FSB. NMFS/FSB requires 2-week advance notification when a Federally contracted NMFS-certified observer is leaving the program so that an exit interview may be arranged and gear returned.

(H) *Vessel contract.* The monitoring service provider must submit to NMFS/FSB, if requested, a copy of each type of signed and valid contract (including all attachments, appendices, addendums, and exhibits incorporated into the contract) between the monitoring service provider and those entities requiring monitoring services.

(I) *Observer and monitor contract.* The monitoring service provider must submit to NMFS/FSB, if requested, a copy of each type of signed and valid contract (including all attachments, appendices, addendums, and exhibits incorporated into the contract) between the monitoring service provider and specific observers or monitors.

(J) *Additional information.* The monitoring service provider must submit to NMFS/FSB, if requested, copies of any information developed and/or used by the monitoring service provider and distributed to vessels, observers, or monitors, such as informational pamphlets, payment notification, daily rate of monitoring services, description of observer or monitor duties, etc.

(viii) *Refusal to deploy an observer or monitor.* (A) A monitoring service provider may refuse to deploy an observer or monitor on a requesting fishing vessel if the monitoring service provider does not have an available observer or monitor within the required time and must report all refusals to NMFS/FSB.

(B) A monitoring service provider may refuse to deploy an observer or monitor on a requesting fishing vessel if the monitoring service provider has determined that the requesting vessel is inadequate or unsafe pursuant to the reasons described at § 600.746.

(C) The monitoring service provider may refuse to deploy an observer or monitor on a fishing vessel that is otherwise eligible to carry an observer or monitor for any other reason, including failure to pay for previous monitoring deployments, provided the monitoring service provider has

received prior written confirmation from NMFS authorizing such refusal.

(6) *Limitations on conflict of interest.* A monitoring service provider:

(i) Must not have a direct or indirect interest in a fishery managed under Federal regulations, including, but not limited to, a fishing vessel, fish dealer, and/or fishery advocacy group (other than providing monitoring services);

(ii) Must assign observers or monitors without regard to any preference by representatives of vessels other than when an observer or monitor will be deployed for the trip that was selected for coverage; and

(iii) Must not solicit or accept, directly or indirectly, any gratuity, gift, favor, entertainment, loan, or anything of monetary value from anyone who conducts fishing or fishing related activities that are regulated by NMFS, or who has interests that may be substantially affected by the performance or nonperformance of the official duties of monitoring service providers.

(7) *Removal of monitoring service provider from the list of approved service providers.* A monitoring service provider that fails to meet the requirements, conditions, and responsibilities specified in paragraphs (h)(5) and (6) of this section shall be notified by NMFS, in writing, that it is subject to removal from the list of approved monitoring service providers. Such notification shall specify the reasons for the pending removal. A monitoring service provider that has received notification that it is subject to removal from the list of approved monitoring service providers may submit written information to rebut the reasons for removal from the list. Such rebuttal must be submitted within 30 days of notification received by the monitoring service provider that the monitoring service provider is subject to removal and must be accompanied by written evidence rebutting the basis for removal. NMFS shall review information rebutting the pending removal and shall notify the monitoring service provider within 15 days of receipt of the rebuttal whether or not the removal is warranted. If no response to a pending removal is received by NMFS, the monitoring service provider shall be automatically removed from the list of approved monitoring service providers. The decision to remove the monitoring service provider from the list, either after reviewing a rebuttal, or if no rebuttal is submitted, shall be the final decision of NMFS and the Department of Commerce. Removal from the list of approved monitoring service providers does not necessarily prevent such

monitoring service provider from obtaining an approval in the future if a new application is submitted that demonstrates that the reasons for removal are remedied. Certified observers and monitors under contract with observer monitoring service provider that has been removed from the list of approved service providers must complete their assigned duties for any fishing trips on which the observers or monitors are deployed at the time the monitoring service provider is removed from the list of approved monitoring service providers. A monitoring service provider removed from the list of approved monitoring service providers is responsible for providing NMFS with the information required in paragraph (h)(5)(vii) of this section following completion of the trip. NMFS may consider, but is not limited to, the following in determining if a monitoring service provider may remain on the list of approved monitoring service providers:

(i) Failure to meet the requirements, conditions, and responsibilities of monitoring service providers specified in paragraphs (h)(5) and (6) of this section;

(ii) Evidence of conflict of interest as defined under paragraph (h)(6) of this section;

(iii) Evidence of criminal convictions related to:

(A) Embezzlement, theft, forgery, bribery, falsification or destruction of records, making false statements, or receiving stolen property; or

(B) The commission of any other crimes of dishonesty, as defined by state law or Federal law, that would seriously and directly affect the fitness of an applicant in providing monitoring services under this section; and

(iv) Unsatisfactory performance ratings on any Federal contracts held by the applicant; and

(v) Evidence of any history of decertification as either an observer, monitor, or monitoring service provider.

(i) *Observer or monitor certification—* (1) *Requirements.* To be certified, employees or sub-contractors operating as observers or monitors for monitoring service providers approved under paragraph (h) of this section. In addition, observers must meet NMFS National Minimum Eligibility Standards for observers specified at the National Observer Program website: *https:// www.nmfs.noaa.gov/op/pds/categories/ scienceandtechnology.html.* For further information, see *https:// www.st.nmfs.noaa.gov/observer-home/*.

(2) *Observer or monitor training.* In order to be deployed on any fishing vessel, a candidate observer or monitor

must have passed an appropriate NMFS/FSB Observer Training course and must adhere to all NMFS/FSB program standards and policies (refer to website for program standards, *https://www.nefsc.noaa.gov/fsb/training/*). If a candidate fails training, the candidate and monitoring service provider shall be notified immediately by NMFS/FSB. Observer training may include an observer training trip, as part of the observer's training, aboard a fishing vessel with a trainer. Refer to the NMFS/FSB website for the required number of program specific observer and monitor training certification trips for full certification following training, *https://www.nefsc.noaa.gov/fsb/training/*.

(3) *Observer requirements.* All observers must:

(i) Have a valid NMFS/FSB fisheries observer certification pursuant to paragraph (i)(1) of this section;

(ii) Be physically and mentally capable of carrying out the responsibilities of an observer on board fishing vessels, pursuant to standards established by NMFS. Such standards are available from NMFS/FSB website specified in paragraph (h)(1) of this section and shall be provided to each approved monitoring service provider;

(iii) Have successfully completed all NMFS-required training and briefings for observers before deployment, pursuant to paragraph (i)(2) of this section;

(iv) Hold a current Red Cross (or equivalence) CPR/First Aid certification;

(v) Accurately record their sampling data, write complete reports, and report accurately any observations relevant to conservation of marine resources or their environment; and

(vi) Report unsafe sampling conditions, pursuant to paragraph (m)(6) of this section.

(4) *Monitor requirements.* All monitors must:

(i) Hold a high school diploma or legal equivalent;

(ii) Have a valid NMFS/FSB certification pursuant to paragraph (i)(1) of this section;

(iii) Be physically and mentally capable of carrying out the responsibilities of a monitor on board fishing vessels, pursuant to standards established by NMFS. Such standards are available from NMFS/FSB website specified in paragraph (h)(1) of this section and shall be provided to each approved monitoring service provider;

(iv) Have successfully completed all NMFS-required training and briefings for monitors before deployment, pursuant to paragraph (i)(2) of this section;

(v) Hold a current Red Cross (or equivalence) CPR/First Aid certification if the monitor is to be employed as an at-sea monitor;

(vi) Accurately record their sampling data, write complete reports, and report accurately any observations relevant to conservation of marine resources or their environment; and

(vii) Report unsafe sampling conditions, pursuant to paragraph (m)(6) of this section.

(5) *Probation and decertification.* NMFS may review observer and monitor certifications and issue observer and monitor certification probation and/or decertification as described in NMFS policy found on the NMFS/FSB website specified in paragraph (h)(1) of this section.

(6) *Issuance of decertification.* Upon determination that decertification is warranted under paragraph (i)(5) of this section, NMFS shall issue a written decision to decertify the observer or monitor to the observer or monitor and approved monitoring service providers via certified mail at the observer's or monitor's most current address provided to NMFS. The decision shall identify whether a certification is revoked and shall identify the specific reasons for the action taken. Decertification is effective immediately as of the date of issuance, unless the decertification official notes a compelling reason for maintaining certification for a specified period and under specified conditions. Decertification is the final decision of NMFS and the Department of Commerce and may not be appealed.

(j) *Coverage.* In the event that a vessel is requested by the Regional Administrator to carry a NMFS-certified fisheries observer pursuant to paragraph (a) of this section and is also selected to carry an at-sea monitor as part of an approved sector at-sea monitoring program specified in § 648.87(b)(1)(v) for the same trip, only the NMFS-certified fisheries observer is required to go on that particular trip.

(k) *Atlantic sea scallop observer program*—(1) *General.* Unless otherwise specified, owners, operators, and/or managers of vessels issued a Federal scallop permit under § 648.4(a)(2), and specified in paragraph (a) of this section, must comply with this section and are jointly and severally responsible for their vessel's compliance with this section. To facilitate the deployment of at-sea observers, all sea scallop vessels issued limited access and LAGC IFQ permits are required to comply with the additional notification requirements specified in paragraph (k)(2) of this section. When NMFS notifies the vessel

owner, operator, and/or manager of any requirement to carry an observer on a specified trip in either an Access Area or Open Area as specified in paragraph (k)(3) of this section, the vessel may not fish for, take, retain, possess, or land any scallops without carrying an observer. Vessels may only embark on a scallop trip in open areas or Access Areas without an observer if the vessel owner, operator, and/or manager has been notified that the vessel has received a waiver of the observer requirement for that trip pursuant to paragraphs (k)(3) and (k)(4)(ii) of this section.

(2) *Vessel notification procedures*—(i) *Limited access vessels.* Limited access vessel owners, operators, or managers shall notify NMFS/FSB by telephone not more than 10 days prior to the beginning of any scallop trip of the time, port of departure, open area or specific Sea Scallop Access Area to be fished, and whether fishing as a scallop dredge, scallop trawl, or general category vessel.

(ii) *LAGC IFQ vessels.* LAGC IFQ vessel owners, operators, or managers must notify the NMFS/FSB by telephone by 0001 hr of the Thursday preceding the week (Sunday through Saturday) that they intend to start any open area or access area scallop trip and must include the port of departure, open area or specific Sea Scallop Access Area to be fished, and whether fishing as a scallop dredge, scallop trawl vessel. If selected, up to two trips that start during the specified week (Sunday through Saturday) can be selected to be covered by an observer. NMFS/FSB must be notified by the owner, operator, or vessel manager of any trip plan changes at least 48 hr prior to vessel departure.

(3) *Selection of scallop trips for observer coverage.* Based on predetermined coverage levels for various permit categories and areas of the scallop fishery that are provided by NMFS in writing to all observer service providers approved pursuant to paragraph (h) of this section, NMFS shall notify the vessel owner, operator, or vessel manager whether the vessel must carry an observer, or if a waiver has been granted, for the specified scallop trip, within 24 hr of the vessel owner's, operator's, or vessel manager's notification of the prospective scallop trip, as specified in paragraph (k)(2) of this section. Any request to carry an observer may be waived by NMFS. All waivers for observer coverage shall be issued to the vessel by VMS so as to have on-board verification of the waiver. A vessel may not fish in an area with an observer waiver confirmation number that does not match the scallop

trip plan that was called in to NMFS. Confirmation numbers for trip notification calls are only valid for 48 hr from the intended sail date.

(4) *Procurement of observer services by scallop vessels.* (i) An owner of a scallop vessel required to carry an observer under paragraph (k)(3) of this section must arrange for carrying an observer certified through the observer training class operated by the NMFS/FSB from an observer service provider approved by NMFS under paragraph (h) of this section. The owner, operator, or vessel manager of a vessel selected to carry an observer must contact the observer service provider and must provide at least 48-hr notice in advance of the fishing trip for the provider to arrange for observer deployment for the specified trip. The observer service provider will notify the vessel owner, operator, or manager within 18 hr whether they have an available observer. A list of approved observer service providers shall be posted on the NMFS/FSB website at *https://www.nefsc.noaa.gov/femad/fsb/*. The observer service provider may take up to 48 hr to arrange for observer deployment for the specified scallop trip.

(ii) An owner, operator, or vessel manager of a vessel that cannot procure a certified observer within 48 hr of the advance notification to the provider due to the unavailability of an observer may request a waiver from NMFS/FSB from the requirement for observer coverage for that trip, but only if the owner, operator, or vessel manager has contacted all of the available observer service providers to secure observer coverage and no observer is available. NMFS/FSB shall issue such a waiver within 24 hr, if the conditions of this paragraph (g)(4)(ii) are met. A vessel may not begin the trip without being issued a waiver.

(5) *Cost of coverage.* Owners of scallop vessels shall be responsible for paying the cost of the observer for all scallop trips on which an observer is carried onboard the vessel, regardless of whether the vessel lands or sells sea scallops on that trip, and regardless of the availability of set-aside for an increased possession limit or reduced DAS accrual rate. The owners of vessels that carry an observer may be compensated with a reduced DAS accrual rate for open area scallop trips or additional scallop catch per day in Sea Scallop Access Areas or additional catch per open area or access area trip for LAGC IFQ trips in order to help defray the cost of the observer, under the program specified in §§ 648.53 and 648.60.

(i) Observer service providers shall establish the daily rate for observer coverage on a scallop vessel on an Access Area trip or open area DAS or IFQ scallop trip consistent with paragraphs (k)(5)(i)(A) and (B), respectively, of this section.

(A) *Access Area trips.* (*1*) For purposes of determining the daily rate for an observed scallop trip on a limited access vessel in a Sea Scallop Access Area when that specific Access Area's observer set-aside specified in § 648.60(d)(1) has not been fully utilized, a service provider may charge a vessel owner for no more than the time an observer boards a vessel until the vessel disembarks (dock to dock), where ''day'' is defined as a 24-hr period, or any portion of a 24-hr period, regardless of the calendar day. For example, if a vessel with an observer departs on July 1 at 10 p.m. and lands on July 3 at 1 a.m., the time at sea equals 27 hr, which would equate to 2 full ''days.''

(*2*) For purposes of determining the daily rate in a specific Sea Scallop Access Area for an observed scallop trip on a limited access vessel taken after NMFS has announced the industry-funded observer set-aside in that specific Access Area has been fully utilized, a service provider may charge a vessel owner for no more than the time an observer boards a vessel until the vessel disembarks (dock to dock), where ''day'' is defined as a 24-hr period, and portions of the other days would be pro-rated at an hourly charge (taking the daily rate divided by 24). For example, if a vessel with an observer departs on July 1 at 10 p.m. and lands on July 3 at 1 a.m., the time spent at sea equals 27 hr, which would equate to 1 day and 3 hr.

(*3*) For purposes of determining the daily rate in a specific Sea Scallop Access Area for observed scallop trips on an LAGC vessel, regardless of the status of the industry-funded observer set-aside, a service provider may charge a vessel owner for no more than the time an observer boards a vessel until the vessel disembarks (dock to dock), where ''day'' is defined as a 24-hr period, and portions of the other days would be pro-rated at an hourly charge (taking the daily rate divided by 24). For example, if a vessel with an observer departs on July 1 at 10 p.m. and lands on July 3 at 1 a.m., the time spent at sea equals 27 hr, which would equate to 1 day and 3 hr.

(B) *Open area scallop trips.* For purposes of determining the daily rate for an observed scallop trip for DAS or LAGC IFQ open area trips, regardless of the status of the industry-funded

observer set-aside, a service provider shall charge dock to dock where ''day'' is defined as a 24-hr period, and portions of the other days would be pro-rated at an hourly charge (taking the daily rate divided by 24). For example, if a vessel with an observer departs on the July 1st at 10 p.m. and lands on July 3rd at 1 a.m., the time at sea equals 27 hr, so the provider would charge 1 day and 3 hr.

(ii) NMFS shall determine any reduced DAS accrual rate and the amount of additional pounds of scallops per day fished in a Sea Scallop Access Area or on an open area LAGC IFQ trips for the applicable fishing year based on the economic conditions of the scallop fishery, as determined by best available information. Vessel owners and observer service providers shall be notified through the Small Entity Compliance Guide of any DAS accrual rate changes and any changes in additional pounds of scallops determined by the Regional Administrator to be necessary. NMFS shall notify vessel owners and observer providers of any adjustments.

(iii) Owners of scallop vessels shall pay observer service providers for observer services within 45 days of the end of a fishing trip on which an observer deployed.

(6) *Coverage and cost requirements.* When the available DAS or TAC set-aside for observer coverage is exhausted, vessels shall still be required to carry an observer as specified in this section, and shall be responsible for paying for the cost of the observer, but shall not be authorized to harvest additional pounds or fish at a reduced DAS accrual rate.

(l) *NE multispecies observer coverage*—(1) *Pre-trip notification.* Unless otherwise specified in this paragraph (l), or notified by the Regional Administrator, the owner, operator, or manager of a vessel (*i.e.,* vessel manager or sector manager) issued a limited access NE multispecies permit that is fishing under a NE multispecies DAS or on a sector trip, as defined in this part, must provide advanced notice to NMFS of the vessel name, permit number, and sector to which the vessel belongs, if applicable; contact name and telephone number for coordination of observer deployment; date, time, and port of departure; and the vessel's trip plan, including area to be fished, whether a monkfish DAS will be used, and gear type to be used at least 48 hr prior to departing port on any trip declared into the NE multispecies fishery pursuant to § 648.10 or § 648.85, as instructed by the Regional Administrator, for the purposes of selecting vessels for observer deployment. For trips lasting

48 hr or less in duration from the time the vessel leaves port to begin a fishing trip until the time the vessel returns to port upon the completion of the fishing trip, the vessel owner, operator, or manager may make a weekly notification rather than trip-by-trip calls. For weekly notifications, a vessel must notify NMFS by 0001 hr of the Friday preceding the week (Sunday through Saturday) that it intends to complete at least one NE multispecies DAS or sector trip during the following week and provide the date, time, port of departure, area to be fished, whether a monkfish DAS will be used, and gear type to be used for each trip during that week. Trip notification calls must be made no more than 10 days in advance of each fishing trip. The vessel owner, operator, or manager must notify NMFS of any trip plan changes at least 24 hr prior to vessel departure from port. A vessel may not begin the trip without being issued an observer notification or a waiver by NMFS.

(2) *Vessel selection for observer coverage.* NMFS shall notify the vessel owner, operator, or manager whether the vessel must carry an observer, or if a waiver has been granted, for the specified trip within 24 hr of the vessel owner's, operator's or manager's notification of the prospective trip, as specified in paragraph (l)(1) of this section. All trip notifications shall be issued a unique confirmation number. A vessel may not fish on a NE multispecies DAS or sector trip with an observer waiver confirmation number that does not match the trip plan that was called in to NMFS. Confirmation numbers for trip notification calls are valid for 48 hr from the intended sail date. If a trip is interrupted and returns to port due to bad weather or other circumstance beyond the operator's control, and goes back out within 48 hr, the same confirmation number and observer status remains. If the layover time is greater than 48 hr, a new trip notification must be made by the operator, owner, or manager of the vessel.

(3) *NE multispecies monitoring program goals and objectives.* Monitoring programs established for the NE multispecies are to be designed and evaluated consistent with the following goals and objectives:

(i) Improve documentation of catch:

(A) Determine total catch and effort, for each sector and common pool, of target or regulated species; and

(B) Achieve coverage level sufficient to minimize effects of potential monitoring bias to the extent possible while maintaining as much flexibility as possible to enhance fleet viability.

(ii) Reduce the cost of monitoring:

(A) Streamline data management and eliminate redundancy;

(B) Explore options for cost-sharing and deferment of cost to industry; and

(C) Recognize opportunity costs of insufficient monitoring.

(iii) Incentivize reducing discards:

(A) Determine discard rate by smallest possible strata while maintaining cost-effectiveness; and

(B) Collect information by gear type to accurately calculate discard rates.

(iv) Provide additional data streams for stock assessments:

(A) Reduce management and/or biological uncertainty; and

(B) Perform biological sampling if it may be used to enhance accuracy of mortality or recruitment calculations.

(v) Enhance safety of monitoring program.

(vi) Perform periodic review of monitoring program for effectiveness.

(m) *Atlantic herring monitoring coverage*—(1) *Monitoring requirements.* (i) In addition to the requirement for any vessel holding an Atlantic herring permit to carry a NMFS-certified observer described in paragraph (a) of this section, vessels issued an All Areas or Areas 2/3 Limited Access Herring Permit are subject to industry-funded monitoring (IFM) requirements on declared Atlantic herring trips, unless the vessel is carrying a NMFS-certified observer to fulfill Standard Bycatch Reporting Methodology requirements. An owner of a midwater trawl vessel, required to carry a NMFS-certified observer when fishing in Northeast Multispecies Closed Areas at § 648.202(b), may purchase an IFM high volume fisheries (HVF) observer to access Closed Areas on a trip-by-trip basis. General requirements for IFM programs in New England Council FMPs are specified in paragraph (g) of this section. Possible IFM monitoring for the Atlantic herring fishery includes NMFS-certified observers, at-sea monitors, and electronic monitoring and portside samplers, as defined in § 648.2.

(A) IFM HVF observers shall collect the following information:

(*1*) Fishing gear information (*e.g.*, size of nets, mesh sizes, and gear configurations);

(*2*) Tow-specific information (*e.g.*, depth, water temperature, wave height, and location and time when fishing begins and ends);

(*3*) Species, weight, and disposition of all retained and discarded catch (fish, sharks, crustaceans, invertebrates, and debris) on observed hauls;

(*4*) Species, weight, and disposition of all retained catch on unobserved hauls;

(*5*) Actual catch weights whenever possible, or alternatively, weight estimates derived by sub-sampling;

(*6*) Whole specimens, photos, length information, and biological samples (*e.g.*, scales, otoliths, and/or vertebrae from fish, invertebrates, and incidental takes);

(*7*) Information on interactions with protected species, such as sea turtles, marine mammals, and sea birds; and

(*8*) Vessel trip costs (*i.e.*, operational costs for trip including food, fuel, oil, and ice).

(B) IFM HVF at-sea monitors shall collect the following information:

(*1*) Fishing gear information (*e.g.*, size of nets, mesh sizes, and gear configurations);

(*2*) Tow-specific information (*e.g.*, depth, water temperature, wave height, and location and time when fishing begins and ends);

(*3*) Species, weight, and disposition of all retained and discarded catch (fish, sharks, crustaceans, invertebrates, and debris) on observed hauls;

(*4*) Species, weight, and disposition of all retained catch on unobserved hauls;

(*5*) Actual catch weights whenever possible, or alternatively, weight estimates derived by sub-sampling;

(*6*) Length data, along with whole specimens and photos to verify species identification, on retained and discarded catch;

(*7*) Information on and biological samples from interactions with protected species, such as sea turtles, marine mammals, and sea birds; and

(*8*) Vessel trip costs (*i.e.*, operational costs for trip including food, fuel, oil, and ice).

(*9*) The New England Council may recommend that at-sea monitors collect additional biological information upon request. Revisions to the duties of an at-sea monitor, such that additional biological information would be collected, may be done via a framework adjustment. At-sea monitor duties may also be revised to collect additional biological information by considering the issue at a public meeting, where public comment is accepted, and requesting NMFS to publish a notice or rulemaking revising the duties for at-sea monitors. NMFS shall implement revisions to at-sea monitor duties in accordance with the APA.

(C) IFM Portside samplers shall collect the following information:

(*1*) Species, weight, and disposition of all retained catch (fish, sharks, crustaceans, invertebrates, and debris) on sampled trips;

(*2*) Actual catch weights whenever possible, or alternatively, weight estimates derived by sub-sampling; and

(3) Whole specimens, photos, length information, and biological samples (*i.e.*, scales, otoliths, and/or vertebrae from fish, invertebrates, and incidental takes).

(ii) Vessels issued an All Areas or Areas 2/3 Limited Access Herring Permit are subject to IFM at-sea monitoring coverage. If the New England Council determines that electronic monitoring, used in conjunction with portside sampling, is an adequate substitute for at-sea monitoring on vessels fishing with midwater trawl gear, and it is approved by the Regional Administrator as specified in (m)(1)(iii), then owners of vessels issued an All Areas or Areas 2/3 Limited Access Herring Permit may choose either IFM at-sea monitoring coverage or IFM electronic monitoring and IFM portside sampling coverage, pursuant with requirements in paragraphs (h) and (i) of this section. Once owners of vessels issued an All Areas or Areas 2/3 Limited Access Herring Permit may choose an IFM monitoring type, vessel owners must select one IFM monitoring type per fishing year and notify NMFS of their selected IFM monitoring type via selection form six months in advance (October 31) of the beginning of the SBRM year. NMFS will provide vessels owners with selection forms no later than September 1 in advance of the beginning of the SBRM year.

(A) In a future framework adjustment, the New England Council may consider if electronic monitoring and portside sampling coverage is an adequate substitute for at-sea monitoring coverage for Atlantic herring vessels that fish with purse seine and/or bottom trawl gear.

(B) IFM coverage targets for the Atlantic herring fishery are calculated by NMFS, in consultation with New England Council staff.

(C) If IFM coverage targets do not match for the Atlantic herring and Atlantic mackerel fisheries, then the higher IFM coverage target would apply on trips declared into both fisheries.

(D) Vessels intending to land less than 50 mt of Atlantic herring are exempt from IFM requirements, provided that the vessel requests and is issued a waiver prior to departing on that trip, consistent with paragraphs (m)(2)(iii)(B) and (m)(3) of this section. Vessels issued a waiver must land less than 50 mt of Atlantic herring on that trip.

(E) A wing vessel (*i.e.*, midwater trawl vessel pair trawling with another midwater trawl vessel) is exempt from IFM requirements on a trip, provided the wing vessel does not possess or land any fish on that trip and requests and is issued a waiver prior to departing on that trip, consistent with paragraphs (m)(2)(iii)(C) and (m)(3) of this section.

(F) Two years after implementation of IFM in the Atlantic herring fishery, the New England Council will examine the results of any increased coverage in the Atlantic herring fishery and consider if adjustments to the IFM coverage targets are warranted.

(iii) Electronic monitoring and portside sampling coverage may be used in place of at-sea monitoring coverage in the Atlantic herring fishery, if the electronic monitoring technology is deemed sufficient by the New England Council. The Regional Administrator, in consultation with the New England Council, may approve the use of electronic monitoring and portside sampling for the Atlantic herring fishery in a manner consistent with the Administrative Procedure Act, with final measures published in the **Federal Register**. A vessel electing to use electronic monitoring and portside sampling in lieu of at-sea monitoring must develop a vessel monitoring plan to implement an electronic monitoring and portside sampling program that NMFS determines is sufficient for monitoring catch, discards and slippage events. The electronic monitoring and portside sampling program shall be reviewed and approved by NMFS as part of a vessel's monitoring plan on a yearly basis in a manner consistent with the Administrative Procedure Act.

(iv) Owners, operators, or managers of vessels issued an All Areas Limited Access Herring Permit or Areas 2/3 Limited Access Herring Permit are responsible for their vessel's compliance with IFM requirements. When NMFS notifies a vessel owner, operator, or manager of the requirement to have monitoring coverage on a specific declared Atlantic herring trip, that vessel may not fish for, take, retain, possess, or land any Atlantic herring without the required monitoring coverage. Vessels may only embark on a declared Atlantic herring trip without the required monitoring coverage if the vessel owner, operator, and/or manager has been notified that the vessel has received a waiver for the required monitoring coverage for that trip, pursuant to paragraphs (m)(2)(iii)(B) and (C) and (m)(3) of this section.

(v) To provide the required IFM coverage aboard declared Atlantic herring trips, NMFS-certified observers and monitors must hold a high volume fisheries certification from NMFS/FSB. See details of high volume certification at *https://www.nefsc.noaa.gov/fsb/training/*.

(2) *Pre-trip notification.* (i) At least 48 hr prior to the beginning of any trip on which a vessel may harvest, possess, or land Atlantic herring, the owner, operator, or manager of a vessel issued a Limited Access Herring Permit, or a vessel issued an Areas 2/3 Open Access Herring Permit, or a vessel issued an All Areas Open Access Herring Permit fishing with midwater trawl gear in Management Areas 1A, 1B, and/or 3, as defined in § 648.200(f)(1) and (3), or a vessel acting as a herring carrier must notify NMFS/FSB of the trip.

(ii) The notification to NMFS/FSB must include the following information: Vessel name or permit number; email and telephone number for contact; the date, time, and port of departure; trip length; and gear type.

(iii) For vessels issued an All Areas Limited Access Herring Permit or Areas 2/3 Limited Access Herring Permit, the trip notification must also include the following requests, if appropriate:

(A) For IFM NMFS-certified observer coverage aboard vessels fishing with midwater trawl gear to access the Northeast Multispecies Closed Areas, consistent with requirements at § 648.202(b), at any point during the trip;

(B) For a waiver of IFM requirements on a trip that shall land less than 50 mt of Atlantic herring; and

(C) For a waiver of IFM requirements on trip by a wing vessel as described in paragraph (m)(ii)(E) of this section.

(iv) Trip notification must be provided no more than 10 days in advance of each fishing trip. The vessel owner, operator, or manager must notify NMFS/FSB of any trip plan changes at least 12 hr prior to vessel departure from port.

(3) *Selection of trips for monitoring coverage.* NMFS shall notify the owner, operator, and/or manager of a vessel with an Atlantic herring permit whether a declared Atlantic herring trip requires coverage by a NMFS-funded observer or whether a trip requires IFM coverage. NMFS shall also notify the owner, operator, and/or manager of vessel if a waiver has been granted, either for the NMFS-funded observer or for IFM coverage, as specified in paragraph (m)(2) of this section. All waivers for monitoring coverage shall be issued to the vessel by VMS so that there is an on-board verification of the waiver. A waiver is invalid if the fishing behavior on that trip is inconsistent with the terms of the waiver.

(4) *Procurement of monitoring services by Atlantic herring vessels.* (i) An owner of an Atlantic herring vessel required to have monitoring under paragraph (m)(3) of this section must

arrange for monitoring by an individual certified through training classes operated by the NMFS/FSB and from a monitoring service provider approved by NMFS under paragraph (h) of this section. The owner, operator, or vessel manager of a vessel selected for monitoring must contact a monitoring service provider prior to the beginning of the trip and the monitoring service provider will notify the vessel owner, operator, or manager whether monitoring is available. A list of approved monitoring service providers shall be posted on the NMFS/FSB website at *https://www.nefsc.noaa.gov/ femad/fsb/*.

(ii) An owner, operator, or vessel manager of a vessel that cannot procure monitoring due to the unavailability of monitoring may request a waiver from NMFS/FSB from the requirement for monitoring on that trip, but only if the owner, operator, or vessel manager has contacted all of the available monitoring service providers to secure monitoring and no monitoring is available. NMFS/FSB shall issue a waiver, if the conditions of this paragraph (m)(4)(ii) are met. A vessel without monitoring coverage may not begin a declared Atlantic herring trip without having been issued a waiver.

(iii) Vessel owners shall pay service providers for monitoring services within 45 days of the end of a fishing trip that was monitored.

(5) *Vessels working cooperatively.* When vessels issued limited access herring permits are working cooperatively in the Atlantic herring fishery, including pair trawling, purse seining, and transferring herring at-sea, each vessel must provide to observers or monitors, when requested, the estimated weight of each species brought on board and the estimated weight of each species released on each tow.

(6) *Sampling requirements for NMFS-certified observer and monitors.* In addition to the requirements at § 648.11(d)(1) through (7), an owner or operator of a vessel issued a limited access herring permit on which a NMFS-certified observer or monitor is embarked must provide observers or monitors:

(i) A safe sampling station adjacent to the fish deck, including: A safety harness, if footing is compromised and grating systems are high above the deck; a safe method to obtain samples; and a storage space for baskets and sampling gear.

(ii) Reasonable assistance to enable observers or monitors to carry out their duties, including but not limited to assistance with: Obtaining and sorting samples; measuring decks, codends, and holding bins; collecting bycatch when requested by the observers or monitors; and collecting and carrying baskets of fish when requested by the observers or monitors.

(iii) Advance notice when pumping will be starting; when sampling of the catch may begin; and when pumping is coming to an end.

(iv) Visual access to the net, the codend of the net, and the purse seine bunt and any of its contents after pumping has ended and before the pump is removed from the net. On trawl vessels, the codend including any remaining contents must be brought on board, unless bringing the codend on board is not possible. If bringing the codend on board is not possible, the vessel operator must ensure that the observer or monitor can see the codend and its contents as clearly as possible before releasing its contents.

(7) *Measures to address slippage.* (i) No vessel issued a limited access herring permit may slip catch, as defined at § 648.2, except in the following circumstances:

(A) The vessel operator has determined, and the preponderance of available evidence indicates that, there is a compelling safety reason; or

(B) A mechanical failure, including gear damage, precludes bringing some or all of the catch on board the vessel for inspection; or

(C) The vessel operator determines that pumping becomes impossible as a result of spiny dogfish clogging the pump intake. The vessel operator shall take reasonable measures, such as strapping and splitting the net, to remove all fish which can be pumped from the net prior to release.

(ii) Vessels may make test tows without pumping catch on board if the net is re-set without releasing its contents provided that all catch from test tows is available to the observer to sample when the next tow is brought on board for sampling.

(iii) If a vessel issued any limited access herring permit slips catch, the vessel operator must report the slippage event on the Atlantic herring daily VMS catch report and indicate the reason for slipping catch. Additionally, the vessel operator must complete and sign a Released Catch Affidavit detailing: The vessel name and permit number; the VTR serial number; where, when, and the reason for slipping catch; the estimated weight of each species brought on board or slipped on that tow. A completed affidavit must be submitted to NMFS within 48 hr of the end of the trip.

(iv) If a vessel issued an All Areas or Areas 2/3 Limited Access Herring permit slips catch for any of the reasons described in paragraph (m)(7)(i) of this section when an observer or monitor is aboard, the vessel operator must move at least 15 nm (27.78 km) from the location of the slippage event before deploying any gear again, and must stay at least 15 nm (27.78 km) away from the slippage event location for the remainder of the fishing trip.

(v) If a vessel issued an All Areas or Areas 2/3 Limited Access Herring permit slips catch for any reason on a trip selected by NMFS for portside sampling, pursuant to paragraph (m)(3) of this section, the vessel operator must move at least 15 nm (27.78 km) from the location of the slippage event before deploying any gear again, and must stay at least 15 nm (27.78 km) away from the slippage event location for the remainder of the fishing trip.

(vi) If catch is slipped by a vessel issued an All Areas or Areas 2/3 Limited Access Herring permit for any reason not described in paragraph (m)(7)(i) of this section when an observer or monitor is aboard, the vessel operator must immediately terminate the trip and return to port. No fishing activity may occur during the return to port.

(n) *Atlantic mackerel, squid, and butterfish observer coverage*—(1) *Pre-trip notification.* (i) A vessel issued a limited access Atlantic mackerel permit, as specified at § 648.4(a)(5)(iii), must, for the purposes of observer deployment, have a representative provide notice to NMFS of the vessel name, vessel permit number, contact name for coordination of observer deployment, telephone number or email address for contact; and the date, time, port of departure, gear type, and approximate trip duration, at least 48 hr, but no more than 10 days, prior to beginning any fishing trip, unless it complies with the possession restrictions in paragraph (n)(1)(iii) of this section.

(ii) A vessel that has a representative provide notification to NMFS as described in paragraph (n)(1)(i) of this section may only embark on a mackerel trip without an observer if a vessel representative has been notified by NMFS that the vessel has received a waiver of the observer requirement for that trip. NMFS shall notify a vessel representative whether the vessel must carry an observer, or if a waiver has been granted, for the specific mackerel trip, within 24 hr of the vessel representative's notification of the prospective mackerel trip, as specified in paragraph (n)(1)(i) of this section. Any request to carry an observer may be waived by NMFS. A vessel that fishes

_0000017757

with an observer waiver confirmation number that does not match the mackerel trip plan that was called in to NMFS is prohibited from fishing for, possessing, harvesting, or landing mackerel except as specified in paragraph (n)(1)(iii) of this section. Confirmation numbers for trip notification calls are only valid for 48 hr from the intended sail date.

(iii) A vessel issued a limited access mackerel permit, as specified in § 648.4(a)(5)(iii), that does not have a representative provide the trip notification required in paragraph (n)(1)(i) of this section is prohibited from fishing for, possessing, harvesting, or landing more than 20,000 lb (9.07 mt) of mackerel per trip at any time, and may only land mackerel once on any calendar day, which is defined as the 24-hr period beginning at 0001 hours and ending at 2400 hours.

(iv) If a vessel issued a limited access Atlantic mackerel permit, as specified in § 648.4(a)(5)(iii), intends to possess, harvest, or land more than 20,000 lb (9.07 mt) of mackerel per trip or per calendar day, and has a representative notify NMFS of an upcoming trip, is selected by NMFS to carry an observer, and then cancels that trip, the representative is required to provide notice to NMFS of the vessel name, vessel permit number, contact name for coordination of observer deployment, and telephone number or email address for contact, and the intended date, time, and port of departure for the cancelled trip prior to the planned departure time. In addition, if a trip selected for observer coverage is cancelled, then that vessel is required to carry an observer, provided an observer is available, on its next trip.

(2) *Sampling requirements for limited access Atlantic mackerel and longfin squid/butterfish moratorium permit holders.* In addition to the requirements in paragraphs (d)(1) through (7) of this section, an owner or operator of a vessel issued a limited access Atlantic mackerel or longfin squid/butterfish moratorium permit on which a NMFS-certified observer is embarked must provide observers:

(i) A safe sampling station adjacent to the fish deck, including: A safety harness, if footing is compromised and grating systems are high above the deck; a safe method to obtain samples; and a storage space for baskets and sampling gear.

(ii) Reasonable assistance to enable observers to carry out their duties, including but not limited to assistance with: Obtaining and sorting samples; measuring decks, codends, and holding bins; collecting bycatch when requested by the observers; and collecting and carrying baskets of fish when requested by the observers.

(iii) Advance notice when pumping will be starting; when sampling of the catch may begin; and when pumping is coming to an end.

(3) *Measures to address slippage.* (i) No vessel issued a limited access Atlantic mackerel permit or a longfin squid/butterfish moratorium permit may slip catch, as defined at § 648.2, except in the following circumstances:

(A) The vessel operator has determined, and the preponderance of available evidence indicates that, there is a compelling safety reason; or

(B) A mechanical failure, including gear damage, precludes bringing some or all of the catch on board the vessel for sampling and inspection; or

(C) The vessel operator determines that pumping becomes impossible as a result of spiny dogfish clogging the pump intake. The vessel operator shall take reasonable measures, such as strapping and splitting the net, to remove all fish that can be pumped from the net prior to release.

(ii) If a vessel issued any limited access Atlantic mackerel permit slips catch, the vessel operator must report the slippage event on the Atlantic mackerel and longfin squid daily VMS catch report and include the reason for slipping catch. Additionally, vessels issued a limited Atlantic mackerel permit or a longfin squid/butterfish moratorium permit, the vessel operator must complete and sign a Released Catch Affidavit detailing: The vessel name and permit number; the VTR serial number; where, when, and the reason for slipping catch; the estimated weight of each species brought on board or slipped on that tow. A completed affidavit must be submitted to NMFS within 48 hr of the end of the trip.

(iii) If a vessel issued a limited access Atlantic mackerel permit slips catch for any of the reasons described in paragraph (n)(3)(i) of this section, the vessel operator must move at least 15 nm (27.8 km) from the location of the slippage event before deploying any gear again, and must stay at least 15 nm (27.8 km) from the slippage event location for the remainder of the fishing trip.

(iv) If catch is slipped by a vessel issued a limited access Atlantic mackerel permit for any reason not described in paragraph (n)(3)(i) of this section, the vessel operator must immediately terminate the trip and return to port. No fishing activity may occur during the return to port.

■ 5. In § 648.14, revise paragraphs (e), (r)(1)(vi)(A), (r)(2)(v), and (r)(2)(viii)

through (xii) and add paragraphs (r)(2)(xiii) and (xiv) to read as follows:

## § 648.14  Prohibitions.

\*    \*    \*    \*    \*

(e) *Observer program.* It is unlawful for any person to do any of the following:

(1) Assault, resist, oppose, impede, harass, intimidate, or interfere with or bar by command, impediment, threat, or coercion any NMFS-certified observer or monitor conducting his or her duties; any authorized officer conducting any search, inspection, investigation, or seizure in connection with enforcement of this part; any official designee of the Regional Administrator conducting his or her duties, including those duties authorized in § 648.7(g).

(2) Refuse monitoring coverage by a NMFS-certified observer or monitor if selected for monitoring coverage by the Regional Administrator or the Regional Administrator's designee.

(3) Fail to provide information, notification, accommodations, access, or reasonable assistance to either a NMFS-certified observer or monitor conducting his or her duties as specified in § 648.11.

(4) Submit false or inaccurate data, statements, or reports.

\*    \*    \*    \*    \*

(r) \*    \*    \*

(1) \*    \*    \*

(vi) \*    \*    \*

(A) For the purposes of observer deployment, fail to notify NMFS at least 48 hr prior to departing on a declared herring trip with a vessel issued an All Areas Limited Access Herring Permit and/or an Area 2 and 3 Limited Access Herring Permit and fishing with midwater trawl or purse seine gear, or on a trip with a vessel issued a Limited Access Incidental Catch Herring Permit and/or an Open Access Herring Permit that is fishing with midwater trawl gear in Management Areas 1A, 1B, and/or 3, as defined in § 648.200(f)(1) and (3), pursuant to the requirements in § 648.80(d) and (e).

\*    \*    \*    \*    \*

(2) \*    \*    \*

(v) Fish with midwater trawl gear in any Northeast Multispecies Closed Area, as defined in § 648.81(a)(3) through (5) and (c)(3) and (4), without a NMFS-certified observer on board, if the vessel has been issued an Atlantic herring permit.

\*    \*    \*    \*    \*

(viii) Slip catch, as defined at § 648.2, unless for one of the reasons specified at § 648.11(m)(7)(i).

(ix) For vessels with All Areas or Areas 2/3 Limited Access Herring

Permits, fail to move 15 nm (27.78 km), as required by §§ 648.11(m)(7)(iv) and (v) and 648.202(b)(4)(iv).

(x) For vessels with All Areas or Areas 2/3 Limited Access Herring Permits, fail to immediately return to port, as required by §§ 648.11(m)(7)(vi) and 648.202(b)(4)(iv).

(xi) Fail to complete, sign, and submit a Released Catch Affidavit as required by §§ 648.11(m)(7)(iii) and 648.202(b)(4)(ii).

(xii) Fail to report or fail to accurately report a slippage event on the Atlantic herring daily VMS catch report, as required by §§ 648.11(m)(7)(iii) and 648.202(b)(4)(iii).

(xiii) For vessels with All Areas or Areas 2/3 Limited Access Herring Permits, fail to comply with industry-funded monitoring requirements at § 648.11(m).

(xiv) For a vessel with All Areas or Areas 2/3 Limited Access Herring Permit, fail to comply with its NMFS-approved vessel monitoring plan requirements, as described at § 648.11(m).

*    *    *    *    *

■ 6. In § 648.80, revise paragraphs (d)(5) and (e)(5) to read as follows:

**§ 648.80  NE Multispecies regulated mesh areas and restrictions on gear and methods of fishing.**

*    *    *    *    *

(d) * * *

(5) To fish for herring under this exemption, a vessel issued an All Areas Limited Access Herring Permit and/or an Areas 2 and 3 Limited Access Herring Permit on a declared herring trip, or a vessel issued a Limited Access Incidental Catch Herring Permit and/or an Open Access Herring Permit fishing with midwater trawl gear in Management Areas 1A, 1B, and/or 3, as defined in § 648.200(f)(1) and (3), must provide notice of the following information to NMFS at least 48 hr prior to beginning any trip into these areas for the purposes of observer deployment: Vessel name; contact name for coordination of observer deployment; telephone number for contact; the date, time, and port of departure; and

*    *    *    *    *

(e) * * *

(5) To fish for herring under this exemption, vessels that have an All Areas Limited Access Herring Permit and/or an Areas 2 and 3 Limited Access Herring Permit must provide notice to NMFS of the vessel name; contact name for coordination of observer deployment; telephone number for contact; and the date, time, and port of departure, at least 48 hr prior to beginning any trip into these areas for the purposes of observer deployment; and

*    *    *    *    *

■ 7. In § 648.86, revise paragraph (a)(3)(ii)(A)(*1*) to read as follows:

**§ 648.86  NE Multispecies possession restrictions.**

*    *    *    *    *

(a) * * *
(3) * * *
(ii) * * *
(A) * * *

(*1*) *Haddock incidental catch cap.* When the Regional Administrator has determined that the incidental catch allowance for a given haddock stock, as specified in § 648.90(a)(4)(iii)(D), has been caught, no vessel issued an Atlantic herring permit and fishing with midwater trawl gear in the applicable stock area, *i.e.,* the Herring GOM Haddock Accountability Measure (AM) Area or Herring GB Haddock AM Area, as defined in paragraphs (a)(3)(ii)(A)(*2*) and (*3*) of this section, may fish for, possess, or land herring in excess of 2,000 lb (907.2 kg) per trip in or from that area, unless all herring possessed and landed by the vessel were caught outside the applicable AM Area and the vessel's gear is stowed and not available for immediate use as defined in § 648.2 while transiting the AM Area. Upon this determination, the haddock possession limit is reduced to 0 lb (0 kg) for a vessel issued a Federal Atlantic herring permit and fishing with midwater trawl gear or for a vessel issued an All Areas Limited Access Herring Permit and/or an Areas 2 and 3 Limited Access Herring Permit fishing on a declared herring trip, regardless of area fished or gear used, in the applicable AM area, unless the vessel also possesses a NE multispecies permit and is operating on a declared (consistent with § 648.10(g)) NE multispecies trip. In making this determination, the Regional Administrator shall use haddock catches observed by NMFS-certified observers or monitors by herring vessel trips using midwater trawl gear in Management Areas 1A, 1B, and/or 3, as defined in § 648.200(f)(1) and (3), expanded to an estimate of total haddock catch for all such trips in a given haddock stock area.

*    *    *    *    *

**§§ 648.10, 648.14, 648.51, 648.59, 648.80, 648.86, and 648.202   [Amended]**

■ 8. In the table below, for each section indicated in the left column, remove the text indicated in the middle column from wherever it appears in the section, and add the text indicated in the right column:

| Section | Remove | Add |
|---|---|---|
| 648.10(f)(4)(i) introductory text | NMFS-approved | NMFS-certified. |
| 648.14(i)(1)(ix)(B) | NMFS-approved | NMFS-certified. |
| 648.14(i)(1)(ix)(C) | 648.11(g) | 648.11(k). |
| 648.14(k)(2)(iii) | 648.11(k) | 648.11(l). |
| 648.14(k)(2)(iv) | 648.11(k) | 648.11(l). |
| 648.51(c)(4) | 648.11(g) | 648.11(k). |
| 648.51(e)(3)(iii) | 648.11(g) | 648.11(k). |
| 648.59(b)(2) | 648.11(g) | 648.11(k). |
| 648.80(d)(3) | NMFS-approved sea sampler/observer | NMFS-certified observer. |
| 648.80(e)(2)(ii) | NMFS-approved sea sampler/observer | NMFS-certified observer. |
| 648.86(a)(3)(ii)(A)(*1*) | NMFS-approved | NMFS-certified. |
| 648.202(b)(4)(iv) | 648.11(m)(4)(iv) and (v) | 648.11(m)(7)(iv) and (vi). |

[FR Doc. 2020–00881 Filed 2–6–20; 8:45 am]

**BILLING CODE 3510–22–P**

_0000017759