# Exhibit 4

# Seafreeze Ltd.

100 DAVISVILLE PIER
NORTH KINGSTOWN, RI 02852
TEL: 401-295-2585



June 30, 2015

Dear Herring/Observer Committee Members,

Please find below a detailed explanation of how our vessels fish, and how the proposed industry-funded observer options affect our operations in a disproportionate manner.

Our trips tend to be "multispecies" trips. We declare into squid, herring and mackerel every trip from the end of November/beginning of December through April, because we work on all those species simultaneously during that season. Our trips are typically longer than the average "herring/mackerel" trip, and we are often looking for multiple species at once. Not all small percentages of species in a trip indicate "bycatch" or catch of a non-targeted species. A lot of the time, it indicates that we went looking for a certain species, made a tow, didn't find enough to work on, and went looking for something else.

We need the flexibility to maintain our style of fishing. Additionally, because we are freezing on board, our daily catching/processing capacity is limited, and our overhead costs higher than a fresh boat. Our high overhead, combined with the length of our trips and a per day observer cost, means that we would pay a higher amount per trip for considerably fewer pounds of product than a fresh boat. We should not get punished for a style of fishing we have maintained for 30 years just because we fish "differently" from other vessels.

## 2014 F/V Relentless Herring/Mackerel Trips

12/30/13-1/11/14; 13 Days
Herring - 17.56%
Loligo - 81.52%
Illex - .92%

1/15/14-1/24/14; 10 Days
Bluefish - .03%
Butterfish - .36%
Loligo - 97.67%
Illex - 1.45%

_00000017801

1/29/14-2/9/14; 12 Days
Butterfish - 90.76%
Loligo -9.24%

2/17/14-2/27/14; 11 Days
Butterfish- 72.55%
Mackerel - 27.32%
Loligo - .13%

3/4/14-3/12/14; 9 Days
Butterfish- 8.72%
Mackerel - 23.03%
Loligo - 67.97%
Illex - .25%

3/17/14-3/20/14; 4 Days
Butterfish - 77.11%
Loligo - 22.89%

3/23/14- 3/27/14; 5 Days
Herring - 95.5%
Mackerel - 4.5%
Total: 287,503

4/2/14-4/14/14; 13 Days
Bluefish -.13%
Butterfish - 29.2%
Herring - 46.5%
Mackerel -6.6%
Scup- .06%
Loligo - 17.51%

11/22/14-12/8/14; 15 Days (came into dock in middle of trip, probably for weather or mechanical issues, but did not offload)
Butterfish - 3.66%
Herring - 83.72%
Mackerel - .05%
Loligo - 8.7%
Illex- 3.87%

12/12/14-12/18/14; 7 Days
Herring - 99.98%
Mackerel - .02%

12/21/14-12/24/14; 4 Days (Shortened trip because of Christmas)
Herring - 99.47%
Mackerel- 5.1%
Loligo -.02%

Total: 252,678

12/27/14-1/3/15; 8 Days
Butterfish - 1.2%
Mackerel - .26%
Herring - 98.1%
Loligo - .44%

## 2014 F/V Persistence Herring/ Mackerel Trips

12/26/13-1/11/14; 17 Days
Butterfish - 56%
Mackerel -.02%
Loligo - 42.9%
Illex - 1.12%

1/27/14-2/6/14; 11 Days
Butterfish - 99.21%
Mackerel - .78%
Loligo - .01%

2/8/14-2/13/14; 7 Days
Butterfish -100%

2/16/14-2/28/14; 13 Days
Butterfish - 67.16%
Mackerel - 32.61%
Loligo - .23%

3/3/14-3/13/14; 11 Days
Butterfish - 69.58%
Herring - .8%
Mackerel- 29.19%
Loligo - .4%

3/15/14-3/20/14; 6 Days
Butterfish - 23%
Loligo - 77%

3/22/14-3/27/14; 6 Days
Butterfish - 2%
Herring - 94%
Mackerel - 3.75%
Loligo - .14%
Total: 232,556

11/3/14-11/17/14; 15 Days

Butterfish - 4.5%
Whiting - .2%
Mackerel - 25.64%
Loligo - 63.16%
Illex - 6.1%

11/21/14-12/8/14; 18 Days
Butterfish - 37.25%
Herring - 55.25%
Mackerel - .04%
Loligo - 5.88%
Illex - 1.55%

12/11/14-12/18/14; 8 Days
Herring - 100%

12/20/14-12/24/14; 5 Days (Shortened trip because of Christmas)
Butterfish - 88.92%
Loligo - 11.08%

Because we are freezing on board, we also process discards and bycatch differently than other vessels. All catch is taken aboard and hand sorted on a conveyer belt as the product is being packaged for freezing. All discards/unwanted bycatch are hand sorted and placed in discard baskets next to the conveyor belt. Therefore, observers are not taking "samples" of the catch and extrapolating for an overall discard rate. They are taking accurate measurements of all discards, and able to do a full accounting of all species, including river herring/shad. All other product is hand packaged at the conveyor belt, and observers have the opportunity to view every 25 lb box of product.

Therefore, we believe that vessels freezing on board should be placed in a separate category from other vessels. In addition to our vessels, other vessels in the Mid Atlantic have freezing capabilities and occasionally operate as freezer vessels. We would request that a separate category be created for vessels operating in this manner.

Furthermore, we tend to have high observer coverage on our vessels. Prior to every trip, we are required to call and notify for a squid observer, a herring observer, and a mackerel observer. Our currently high levels of coverage show that there are extremely low bycatch rates for our vessels and our style of fishing. There is no reason we should have to pay high observer costs to prove what we have already been proving.

**Observer Coverage for This Past Herring/Mackerel Season, Nov. 2014-April 2015, F/V Relentless**
Trip 655 11/21/14-11/25/14; Observer (forced to come in in middle of trip for weather/mechanical problems, but did not offload; counts as one trip for dealer report; counts as two trips for NEFOP purposes)
Trip 656 11/28/14-12/8/14; Observer
Trip 657 12/12/14-12/18/14; No Observer
Trip 658 12/21/14-12/24/14; Observer
Trip 659 12/27/14- 1/3/15; No Observer
Trip 660 (660 A) 1/10/15-1/13/15; Observer (For trip 660, weather problems, had to come to dock, but did not offload; counts as one trip for dealer report; counts as multiple trips for NEFOP purposes)
Trip (660 B) 1/19/15-1/24/15; Observer
Trip (660 C) 1/28/15-2/8/15; No Observer
Trip 661 2/16/15-2/24/15; No Observer
Trip 662 3/6/15-3/17/15; No Observer
Trip 663 3/21/15-3/30/15; No Observer
Trip 664 4/4/15-4/15/15; Observer

This is 50% observer coverage. Based on NEFOP observer data, (excluding the last trip, for which I was unable to get the data), we had an average of 3.5% discards per trip, all species, throughout this high observer coverage. These discards include species such as skates, dogfish, sculpins, etc. The average river herring/shad discards were 0.13% per trip.

_00000017806

■ b. In paragraph (n)(4), revise the first sentence following the heading and paragraph (n)(4)(v) and add paragraph (n)(4)(xiii) to read as set forth below:

§ 17.84   Special rules—vertebrates.

* * * * *
    (n) * * *
    (3) * * *
* * * * *

  *Legally present*—A Person is legally present when (1) on their own property, (2) not trespassing and has the landowner's permission to bring their stock animal or dog on the property, or (3) abiding by regulations governing legal presence on public lands.
* * * * *
  *Stock animal*—A horse, mule, donkey, llama, or goat used to transport people or their possessions.
  *Unacceptable impact*—Impact to ungulate population or herd where a State or Tribe has determined that wolves are one of the major causes of the population or herd not meeting established State or Tribal management goals.
  *Ungulate population or herd*—An assemblage of wild ungulates living in a given area.
* * * * *
  (4) *Allowable forms of take of gray wolves.* The following activities, only in the specific circumstances described under this paragraph (n)(4), are allowed: Opportunistic harassment; intentional harassment; take on private land; take on public land except land administered by National Parks; take in response to impacts on wild ungulate populations; take in defense of human life; take to protect human safety; take by designated agents to remove problem wolves; incidental take; take under permits; take per authorizations for employees of designated agents; take for research purposes; and take to protect stock animals and dogs. * * *
* * * * *
  (v) *Take in response to wild ungulate impacts.* If wolf predation is having an unacceptable impact on wild ungulate populations (deer, elk, moose, bighorn sheep, mountain goats, antelope, or bison) as determined by the respective State or Tribe, a State or Tribe may lethally remove the wolves in question.
  (A) In order for this provision to apply, the State or Tribes must prepare a science-based document that:
  (1) Describes the basis of ungulate population or herd management objectives, what data indicate that the ungulate population or herd is below management objectives, what data indicate that wolves are a major cause of the unacceptable impact to the ungulate population or herd, why wolf removal is a warranted solution to help restore the ungulate population or herd to State or Tribal management objectives, the level and duration of wolf removal being proposed, and how ungulate population or herd response to wolf removal will be measured and control actions adjusted for effectiveness;
  (2) Demonstrates that attempts were and are being made to address other identified major causes of ungulate herd or population declines or the State or Tribe commits to implement possible remedies or conservation measures in addition to wolf removal; and
  (3) Provides an opportunity for peer review and public comment on their proposal prior to submitting it to the Service for written concurrence. The State or Tribe must:
  (i) Conduct the peer review process in conformance with the Office of Management and Budget's Final Information Quality Bulletin for Peer Review (70 FR 2664, January 14, 2005) and include in their proposal an explanation of how the bulletin's standards were considered and satisfied; and
  (ii) Obtain at least five independent peer reviews from individuals with relevant expertise other than staff employed by a State, Tribal, or Federal agency directly or indirectly involved with predator control or ungulate management in Idaho, Montana, or Wyoming.
  (B) Before we authorize lethal removal, we must determine that an unacceptable impact to wild ungulate populations or herds has occurred. We also must determine that the proposed lethal removal is science-based, will not contribute to reducing the wolf population in the State below 20 breeding pairs and 200 wolves, and will not impede wolf recovery.
* * * * *
  (xiii) *Take to protect stock animals and dogs.* Any person legally present on private or public land, except land administered by the National Park Service, may immediately take a wolf that is in the act of attacking the individual's stock animal or dog, provided that there is no evidence of intentional baiting, feeding, or deliberate attractants of wolves. The person must be able to provide evidence of stock animals or dogs recently (less than 24 hours) wounded, harassed, molested, or killed by wolves, and we or our designated agents must be able to confirm that the stock animals or dogs were wounded, harassed, molested, or killed by wolves. To preserve evidence that the take of a wolf was conducted according to this rule, the person must not disturb the carcass and the area surrounding it. The take of any wolf without such evidence of a direct and immediate threat may be referred to the appropriate authorities for prosecution.
* * * * *

  Dated: December 27, 2007.
**Kenneth Stansell,**
*Acting Director,*
*U.S. Fish and Wildlife Service.*
[FR Doc. 08–334 Filed 1–24–08; 8:45 am]
BILLING CODE 4310–55–P

---

## DEPARTMENT OF COMMERCE

### National Oceanic and Atmospheric Administration

### 50 CFR Part 648

[Docket No. 070627217–7523–02]

RIN 0648–AV70

### Magnuson-Stevens Fishery Conservation and Management Act Provisions; Fisheries of the Northeastern United States; Northeast Region Standardized Bycatch Reporting Methodology Omnibus Amendment

**AGENCY:** National Marine Fisheries Service (NMFS), National Oceanic and Atmospheric Administration (NOAA), Commerce.

**ACTION:** Final rule.

---

**SUMMARY:** NMFS is implementing approved management measures contained in the Standardized Bycatch Reporting Methodology (SBRM) Omnibus Amendment (SBRM Amendment) to the Fishery Management Plans (FMPs) of the Northeast Region, developed by the Mid-Atlantic and New England Fishery Management Councils (Councils). The SBRM Amendment establishes an SBRM for all 13 Northeast Region FMPs, as required under the Magnuson-Stevens Fishery Conservation and Management Act (Magnuson-Stevens Act). The measures include: Bycatch reporting and monitoring mechanisms; analytical techniques and allocation of at-sea fisheries observers; an SBRM performance standard; a review and reporting process; framework adjustment and annual specifications provisions; a prioritization process; and provisions for industry-funded observers and observer set-aside programs.

**DATES:** This final rule is effective February 27, 2008.

_00000017808

and the fishing vessel, rather than between the observer service provider and NMFS. The commenters refer to experience with a similar model utilized in Alaska under the North Pacific Groundfish Observer Program. The commenters cautioned that, in their opinion, such a contractual relationship may reduce the reliability of the data collected by the at-sea observers due to the potential for bias and conflict of interest. The commenters also cited concerns over quality control of the data due to the lack of direct oversight by the agency. To remedy the potential problems they identified, the commenters suggested that NMFS evaluate the performance of approved observer service providers on an annual basis, increase Federal funding for observers contracted by and paid for by NMFS, and/or utilize an independent non-profit organization (either an existing organization such as the Atlantic States Marine Fisheries Commission or an organization created specifically for this purpose) to provide an "arms-length" relationship between the fishing industry, NMFS, and observer service providers.

*Response:* NMFS acknowledges that a perceived conflict of interest could be a potential issue for some types of industry-funded observer programs. Rigorous data quality assurance and control standards, observer training and certification programs, and frequent reviews and oversight of the observer data collection programs are all means to address these concerns. NMFS acknowledges that some of the issues raised by the commenter regarding the North Pacific Groundfish Observer Program have been previously identified as potential concerns with that model, but notes that there are significant differences between the North Pacific program and the single industry-funded program that is currently in place in the Northeast Region. These differences include the observer set-aside that is an important component of the Northeast sea scallop observer program and serves to mitigate the conflict of interest concerns by providing a mechanism to offset the added cost to sea scallop fishing vessels of carrying an observer. Also, to minimize the likelihood that an observer would develop ties to a vessel owner/operator and/or feel pressure by a vessel owner/operator to misreport, the regulations prohibit observer service providers from consecutively deploying the same observer on the same vessel and from deploying an observer on the same vessel more than twice per month.

While NMFS shares some of the concerns identified by the commenters relative to the need to ensure that there is no real or perceived conflict of interest between the at-sea observers and the fishing vessels, and to ensure reliable, high quality data are collected and reported, none of these concerns are immediately applicable to this rulemaking. The regulatory changes implemented in this final rule merely establish the procedures that potential observer service providers must follow to be considered for approval, and the standards that they must meet on a continuing basis to maintain their certification to serve in the Northeast Region. However, excepting the sea scallop observer program that was formally implemented under a separate rulemaking (72 FR 32549, June 13, 2007), no other fisheries in the Northeast Region are operating under an industry-funded observer requirement that would utilize these regulations. This action makes no changes to the regulations or procedures established under Amendment 13 to the Sea Scallop FMP, other than to generalize the observer certification procedures to apply more broadly than for the sea scallop fishery alone. The intent of this action was to create a more efficient process for the Councils to develop future industry-funded programs, should the need arise in any fishery. Actual implementation of an industry-funded observer program that would enable fishing vessels to select from a list of approved observer service providers would require the appropriate Council to initiate, develop, and have approved such a program for each particular fishery.

The development of future Council fishery management actions to implement any additional industry-funded observer programs provides the appropriate opportunity to ensure that the programs fully address the data quality concerns and limitations noted by the commenters. NMFS is committed to ensuring that data collected and provided by at-sea fisheries observers are of the highest-possible quality and meet all applicable standards for reliability, precision, and accuracy. Any proposal by a Council to implement a future industry-funded observer program, such as is currently in place for the sea scallop fishery, would be reviewed to ensure it fully explains and justifies how the data to be obtained through the program meet all appropriate quality standards.

*Comment 2:* One member of the public endorsed the comments of the observers' professional association, voicing his concern over industry-funded observer programs as exist in Alaska under the North Pacific Groundfish Observer Program. The commenter added, however, that his concerns do not refer to the sea scallop observer program that is linked to an observer set-aside program to offset the costs to the vessels of carrying an observer. The commenter is most concerned with the perceptions of conflict of interest that can arise under situations where the observer service provider is contractually linked, and dependent on, the fishing vessels rather than NMFS.

*Response:* The response above to comment 1 addresses the majority of the points raised by the commenter. As noted by the commenter, observer set-aside programs, such as the Northeast sea scallop program, mitigate many of these concerns by providing a mechanism to offset the added cost to the vessel of carrying an observer. While there is no requirement to do so, NMFS fully anticipates that any program developed by a Council to implement an industry-funded observer program would be directly associated with an observer set-aside program that offsets the additional costs to the vessels. No such program is currently proposed or under development by either Council, but the SBRM Amendment provides a mechanism for the Councils to develop and propose a set-aside program that uses quota, days-at-sea, increased trip limits, or other means to compensate fishing vessels that carry observers.

*Comment 3:* The comments submitted by a public interest environmental organization were very similar to those of the observers' professional association. The commenters oppose changing the NEFOP to a model based on the North Pacific Groundfish Observer Program, in which the industry finances the observer program through independent contracts with observer service providers. The commenters raised concerns regarding the appearance of a conflict of interest between the fishing vessels and the observer service providers, a threat of bias in the data collection, creating an economic incentive to avoid observation, less transparency of observer data, and a lack of control on harassment of an interference with observers. The comment letter also expressed concern that the SBRM would discourage monitoring for marine mammals and other non-bycatch related monitoring.

*Response:* Although the commenters in this case appear to have misunderstood the intent of the SBRM Amendment, NMFS takes their concerns seriously. The response above to comment 1 addresses the majority of the concerns raised by the commenters, but NMFS points out that the commenters

_00000017810

claim that the SBRM Amendment effects a "conversion" of the NEFOP from one controlled by NMFS to an industry-funded program. This is not the case. The SBRM Amendment provides a mechanism for the Councils to develop and propose industry-funded observer programs that would serve to supplement the existing NMFS-funded observer program, but this action neither implements nor requires such a program. Currently, the Councils are free to develop and propose such a system (as was done in Amendment 13 to the Sea Scallop FMP); the SBRM Amendment allows the Councils to use the framework adjustment process to propose a similar program instead of requiring a full FMP amendment. NMFS fully anticipates that any such program would include an observer set-aside mechanism, such as exists for the sea scallop fishery. As noted above and by other commenters, such a mechanism mitigates many of the concerns raised by the commenters.

NMFS disagrees with the commenter that such a system, should one be proposed by a Council and implemented by NMFS, would result in industry "control" of the observer program. The regulations at 50 CFR 648.11(h) and (i) provide extensive and detailed procedures that must be followed by all observer service providers in order to obtain and maintain NMFS certification as valid service providers. These regulations specifically address the issues of potential conflicts of interest (§ 648.11(h)(6)), harassment of or interference with observers (§ 648.11(h)(5)(vii)(F)), and data transparency (§ 648.11(h)(5)(vii)(A)). Regarding the concerns raised about the availability of the "raw" observer data, the regulations at § 648.11(h)(5)(vii)(A) require that, in addition to providing summary data within 12 hours of landing, that the observer service providers "provide the raw (unedited) data collected by the observer to NMFS within 72 hours of the trip landing." Regarding the commenters' opinion that the plan creates an economic incentive to evade observation, this claim does not take into account that observer set-aside programs in many ways may actually create an incentive to be observed, as a set-aside program would grant a vessel extra quota, trips, DAS, or increased possession limits in exchange for carrying an observer.

The commenters are also incorrect that the plan "discourages" marine mammal monitoring. NMFS acknowledges in the SBRM Amendment the importance of its mandate under other applicable laws, such as the MMPA and the Migratory Bird Act, but the focus of the SBRM is on those living marine resources defined as fish and bycatch under the Magnuson-Stevens Act. Only the Magnuson-Stevens Act requires an SBRM to be established, and the Magnuson-Stevens Act specifically excludes certain types of organisms, specifically marine mammals and birds, from the definitions.

The commenters are mistaken to conclude that the "SBRM is based on a flawed model." The actual SBRM established as a result of this action is wholly severable from the provision that authorizes the Councils to develop and propose an industry-funded observer program through a framework adjustment rather than an amendment to an FMP. The SBRM does not implement, require, or rely upon any industry-funded observer programs that may be developed and proposed by a Council in the future.

*Comment 4:* An organization representing a coalition of fishing interests involved in the Atlantic herring fishery submitted comments critical of the field sampling protocols and procedures used by at-sea observers to monitor bycatch occurring in fisheries that pump their catch directly from the codend into the vessel hold. The commenters asserted that the current observer protocols for the herring fishery contain loopholes that were not addressed in the SBRM Amendment, due to the potential for unobserved catch to be released from the net without being brought on board the vessel for the observer to monitor. The commenters expressed concern regarding the lack of mandated observer coverage on at-sea processing vessels, which transfer catch from the codend of catcher vessels to the hold of the processor vessel and about how pair trawls are treated if an observer is aboard only one of the paired vessels. The commenters also expressed concern that the filtering procedures described in the SBRM Amendment would result in exclusion of certain fishing modes (such as mid-water trawls) from observer coverage due to low levels of coverage in the past ("the SBRM ensures that [the mid-water trawl] mode will be unobserved in perpetuity").

*Response:* All fishing vessels permitted by NMFS to operate in the Northeast Region under one or more of the FMPs subject to the SBRM Amendment are currently obligated to carry a NMFS-certified observer on any trip for which they are requested by the Regional Administrator to do so (at § 648(a), (b), (c), and (d)). This requirement does not change, and is, in fact, reinforced in section 1.7 of the amendment. This requirement, by definition, applies to herring at-sea processors. The commenters incorrectly claim that the SBRM excludes some fishing modes from observer coverage; in fact, according to the results of the importance filter adopted in the amendment, the coverage allocated to the New England mid-water trawl fishing mode, cited by the commenters as "unobserved in perpetuity," would be 316 days, nearly twice the coverage level in 2004 and would represent 11.5 percent of trips taken in 2004. The commenters appear to misunderstand the function of the importance filters, which is to eliminate certain species (those for which the total discards in a fishing mode is a negligible proportion of either the total discards of that species across all fishing modes, or for which the total discards of that species is a negligible proportion of total fishing-related mortality of that species) from the calculation of the observer coverage allocation within a fishing mode (the allocation being no less than the highest coverage level of all species remaining after the importance filter is applied). Under no circumstances do the importance filters eliminate any fishing modes from the observer allocation process. This can be seen in Appendix C of the amendment in a table illustrating the results of applying the SBRM to the 2004 dataset. There is some level of observer coverage assigned to each of the 39 fishing modes addressed in the SBRM Amendment. In addition, the commenters asserted that the SBRM Amendment did not address the field sampling protocols to be used in collecting data by at-sea fisheries observers. This is incorrect. Section 1.7 of the SBRM Amendment stipulates that "The NEFOP shall serve as the primary mechanism to obtain data on discards in all Northeast Region commercial fisheries managed under one or more of the subject FMPs," and that "all data obtained by the NEFOP under this SBRM shall be collected according to the techniques and protocols established and detailed in the Fisheries Observer Program Manual (NEFOP 2006a) and the Biological Sampling Manual (NEFOP 2006b)." This section of the SBRM Amendment goes on to identify the minimum data fields to be collected by Northeast Region observers. The Fisheries Observer Program Manual and the Biological Sampling Manual provide general as well as specific instructions for at-sea observers operating on mid-water trawl, purse seine, and pair trawl vessels; these instructions and sampling priorities explicitly account, to the extent

_00000017812



# Greater Atlantic Region Bulletin
NOAA Fisheries, Greater Atlantic Regional Fisheries Office, 55 Great Republic Drive, Gloucester, MA 01930

For Information Contact:
Sustainable Fisheries Division
(978) 281 – 9315

http://www.nero.noaa.gov/
Date Issued: 2/28/2014

## Atlantic Sea Scallop Fishery
Fishing Year 2014 Observer Set-Aside Compensation Rates
*Effective Date: March 1, 2014*

The Greater Atlantic Regional Fisheries Office (GARFO) and the Northeast Fisheries Science Center (NEFSC) of NOAA's National Marine Fisheries Service have worked together to calculate the initial observer set-aside compensation rate for fishing year (FY) 2014. We will revisit these rates in June once Framework 25 is implemented, if approved, to see if any mid-year adjustments are necessary.

### FY 2014 Initial Compensation Rates

The compensation rate for open areas for limited access vessels fishing under DAS is **0.07 DAS per DAS fished** (the vessel is charged 0.93 DAS for each DAS fished with an observer onboard). This rate is slightly lower than the open area rates from recent years (e.g., 0.08 DAS per DAS fished in FYs 2012 and 2013) due to higher anticipated open area effort in FY 2014, in addition to our attempt to equalize this compensation rate with that for access areas.

Although there are no FY 2014 allocated access area trips at the start of the fishing year, limited access scallop vessels may take FY 2013 compensation trips broken in the last 60 days of FY 2013 in the first 60 days of FY 2014 (i.e., through April 29, 2014). The compensation rate for these compensation trips is **150 lb** in addition to the vessel's possession limit for the trip for each day or part of a day an observer is onboard.

Although limited access general category (LAGC) individual fishing quota (IFQ) vessels will not be able to fish within the access areas at the start of FY 2014, they may possess an additional **150 lb per trip** in open areas when carrying an observer.



We selected these compensation rates because we expect that they provide sufficient compensation for the observer fee while also providing sufficient observer coverage based on anticipated coverage levels needed for the start of FY 2014.

For limited access vessels on access areas trips, the compensation rate provides an average buffer of approximately $1,010 per day over the $675 per day cost of the observer at the expected price of scallops. For limited access vessels on open area trips, the buffer is approximately $1,325. For LAGC vessels, the compensation rate provides an average buffer of approximately $1,010 per trip over the $675 per day cost of the observer at the expected price of scallops, assuming trips are one day in length.

*For small entity compliance guides, this bulletin complies with section 212 of the Small Business Regulatory Enforcement and Fairness Act of 1996. This notice is authorized by the Regional Administrator of the National Marine Fisheries Service, Greater Atlantic Region.*

_00000017813

We intend for these excess funds to account for variations in the fishery, such as lower scallop price and landings per day fished (also called landings per unit effort (LPUE)), without creating financial incentive to extend an observed trip.

PLEASE NOTE: These are initial rates because we may consider changing the compensation rate as we gather fishery information throughout FY 2014, such as scallop price, length of trips, LPUE, and overall rate of observer set-aside usage.