# Exhibit 6



**December 24, 2018**

**100 Davisville Pier**
**North Kingstown, R.I. 02852 U.S.A.**
**Tel: (401)295-2585**

**Comments on NOAA-NMFS-2018-0109**

1. **Omnibus Alternatives**

    **a.** As the Proposed Rule notes, the Omnibus amendment was a joint amendment initiated by both the New England And Mid Atlantic Fishery Management Councils. The entire development of the Omnibus portion of the amendment was joint between both Councils. We, as well as others in the industry, were led to believe that identical action on this portion of the amendment needed to be taken by both Councils in order to go forward. We were surprised that, without that possibility being made clear to the public, the Omnibus section was announced as part of this Proposed Rule.

    As a joint amendment, both Councils would be required to take the same course of action. The significant overlap of permits of species managed by both the New England and Mid Atlantic on the same vessels which operate in the Greater Atlantic Region make this issue of utmost importance. We are unaware of any other regions whose vessels experience this significant an overlap between Councils, managed species and associated permits. In the GARFO region, 3,673 vessels hold both MAFMC and NEFMC commercial permits, compared to 111 vessel who only hold a MAFMC commercial permit and 1, 585 vessels which hold only a NEFMC commercial permit..[1] By moving forward with New England Omnibus alternatives alone, we foresee that, although the Mid Atlantic Council chose not to move forward with the joint amendment, Mid Atlantic fisheries may be forced into industry funded monitoring by default, should vessels be engaged in multiple New England/Mid Atlantic fisheries on the same trip. This, in fact, is the very reason why an undue and disproportionate burden is placed on Seafreeze vessels alone as part of the Herring Alternatives. No analysis nor even discussion took place during development of the amendment regarding the potential crossovers should one Council choose to move forward with the Omnibus portion of the Amendment and one Council decline to move forward. Considering that one of the central points of discussion and action in the Mid Atlantic Council's April 2017 meeting was the question of Mid Atlantic managed fisheries being able to sustain the costs of industry funded monitoring, we believe that the Omnibus portion of the Proposed Rule should be disapproved.

    Amendment documents state that "there are no direct impacts on….fishery-related businesses and human communities associated with the preferred Omnibus Alternatives because they are administrative, specifying a process to develop and administer future industry-

---

[1] See https://s3.amazonaws.com/nefmc.org/10_NEFMC-FDDI-update-2018-12.pdf, slide 11.

_0000017710

funded monitoring " .[2] We disagree.  As clearly delineated, the future foreseeable impact of an IFM Omnibus amendment is future IFM programs, which is in fact the intent of the action. We understand that specific impacts cannot be quantified at this time; however, from a business perspective a "greasing of the skids" of IFM programs initiates uncertainty for the future and business plans moving forward. We also disagree with the EA assertions that standardized IFM requirements have any type of positive impacts on the fishing industry. While we understand that even in the absence of action, the Council has the ability to initiate IFM programs in the fisheries that it manages, the Omnibus Alternatives chosen indicate a clear path of intent. No IFM program has positive benefits on the fishing industry. In fact, the impacts of every Herring IFM Alternative in the amendment other than No Action are "Negative" for fishery-related businesses and communities.[3] This will be the same for any future IFM program.

  **b.** We disagree with NMFS that there is any substantive difference between "cost-sharing agreements" with NMFS for monitoring and direct payment of such monitoring.[4] Both require the fishing industry to pay for data collection used for monitoring and management, which is inherently a government function, except where legislatively exempted by the Magnuson Stevens Act in the case of limited access privilege programs.[5] Only in this specific legislative exemption is the fishing industry responsible for "data collection", or "costs related to …management [and] data collection" which is the express purpose of the Omnibus Amendment. According to the amendment's purpose and need, it was developed "for the collection of information"[6] for management.  There is no difference between "data collection" per the Magnuson Act and "collection of information" per the Omnibus Amendment. For fishery management plans that do not specifically fall under the limited access privilege program exemption, The Magnuson Stevens Act specifically provides for "Information Collection" programs which can be initiated at the request of a Fishery Management Council, upon Secretarial approval, for "monitoring a fishery management plan" which may by regulation "implement an information collection or observer program requiring submission of such additional information for the fishery."[7] Congress would not have had to create these specific legislative exemptions and provisions if the agency were given blanket authority to extract costs for data collection, monitoring and management from the fishing industry across all fishery management plans.

  Additionally, for those exemptions created by Congress, there is a specified cap on costs that can be required of the fishing industry, to ensure industry economic viability. According to Section 304(d)(2)(B), the fees which industry can be required to pay cannot exceed 3% of ex-vessel revenue. This is critically important, as even in full cost recovery, the requirements for data collection for monitoring and management cannot be allowed to become so burdensome

---

[2] Draft EA for IFM Amendment, p. vii; at https://s3.amazonaws.com/nefmc.org/Draft-EA-for-IFM-Amendment-August-2018.pdf.
[3] See page 308-309
[4] See https://s3.amazonaws.com/nefmc.org/Draft-EA-for-IFM-Amendment-August-2018.pdf, p. 37-38.
[5] MSA Section 303A (9)(e). "program of fees paid by limited access privilege holders that will cover the costs of…data collection… See also Section 304(d)(2)(A) "the Secretary is authorized and shall collect a fee to recover the actual **costs related to the management, data collection**, and enforcement of any- (i) limited access privilege program"
[6] See Draft EA, p. 46.
[7] MSA Section 402(a).

on the fishing industry that it becomes financially infeasible to continue to participate in the fishery itself. In fact, the Draft EA itself states that "Vessels that…derive less revenue from herring…may be *more likely* to exit the fishery if the cost of monitoring is perceived as too expensive."[8] The fact that this is already identified and documented as a possibility resulting from the action is troubling, as is the fact that according to the alternatives in the action, there is no limit to the agency's discretion on requiring financial burdens on the fishing industry. Throughout the development of the Omnibus and Herring IFM Amendment, we have consistently argued that there is no provision in the document that would account for the event that industry would not be able to pay the costs. Clearly, if Congress places a limit on financial burdens that can be placed on industry under limited access privilege program provisions, the agency does not have blanket approval to require the fishing industry to pay for data collection and monitoring costs without limit. During the development of the Omnibus and Herring IFM Amendment, it was made very clear that if NMFS does not have the funding to cover its portion of the IFM costs, the IFM program would not be available for that time. However, there are no similar restrictions that would apply if the fishing industry were unable to pay its portion of an IFM program, or even to cap costs at a financially reasonable level. We do not believe that Congress would intend to eliminate participants from a fishery due to their inability to cover data collection and monitoring costs that elsewhere, for other fishery management plans, are explicitly capped.

This is especially concerning given the details of this amendment and its development. *Full* cost recovery that exists in North Pacific limited access privilege programs are in the estimated range of $360-$420 per sea day, according to the Draft EA,[9] as compared with the estimates in this action of *shared* industry costs of $818 per sea day for observers and $710 per sea day for at sea monitors.[10] And even of this estimated cost, NMFS states, "Monitoring program costs include a variety of administrative and sampling costs that vary substantially within and between years."[11] Not only are costs not capped to ensure economic viability of the fishing industry, but estimated costs may increase due to factors such as high monitor turnover and the experience rates of the monitors themselves.[12] This leaves the door open for monitoring costs to skyrocket, or to become so burdensome as to render vessels unprofitable, with no recourse for the fishing industry. This situation has already occurred with the New England groundfish fishery, as noted in our previous comments to the Council.[13]

This amendment also raises other questionable legal issues. Being required to enter into a contractual agreement with a monitoring provider is similar to being required to enter into a contractual agreement with a healthcare provider, which the Supreme Court has ruled is a form of taxation. However, only Congress has the authority to tax, which is why cost recovery for monitoring and data collection has been mandated by Congress in only specific circumstances. An agency does not have the authority to extend that tax indefinitely, further than what

---

[8] See EA at https://s3.amazonaws.com/nefmc.org/Draft-EA-for-IFM-Amendment-August-2018.pdf, p. 343, 345.
[9] Ibid, p. 44.
[10] Ibid, p. 243.
[11] Ibid, p. 39.
[12] Ibid.
[13] See Seafreeze Comments on Industry Funded Monitoring Omnibus Amendment Public Hearing Document September 2016, submitted November 4, 2016, p. 6. Also attached.

Congress has specified. Another question is how information and data collected through industry funds could be used in enforcement actions against that industry member, by essentially compelling him to be a witness against himself, violating the 5th Amendment of the U.S. Constitution. For example, during the exit interviews of the electronic monitoring pilot study (EM) developed as a part of this amendment to determine if EM could be an option for monitoring/data collection requirements, the participants commented on "the criminal case that was built around EM video data" collected during the course of the study.[14] While the pilot study was funded by the agency and no individual was required to pay for the monitoring in this case, the fact that data collected as part of the monitoring was used in a criminal action raises questions as to whether data paid for by fishing industry members as a requirement of industry funded monitoring could be thus used.

We therefore support Omnibus Alternative 1: No Action.

2. **Herring Alternatives**

   a. Following on from the points above regarding economic impacts which have no boundaries, the herring portion of the amendment relies solely on cost analysis and potential reductions to vessel return to owner (RTO) which are expected to result from the various industry funding alternatives using harvest levels and vessel income/expenditures from 2014. In 2014, the herring quota was 104, 088 mt, and industry harvested 95,037 mt- 91.3% of the total quota.[15] However, in 2018, a herring stock assessment was completed that will result in reductions to the quota by approximately 70%. In 2019, the quota levels are expected to be between 21,266 and 30,668 mt, and in 2020 quota levels are expected to be between 12,672 and 16,131 mt.[16] This significant reduction in quota will result in major economic impacts to the herring fishery. No economic impacts analysis was conducted as part of the amendment to demonstrate impacts to the commercial herring fishery at harvest levels drastically below those of 2014. In fact, the projected reduction in herring revenue from 2017 to 2019 is 80-87%.[17] Again, we raised these types of issues during amendment development but were never given satisfactory answers. The fixed costs of vessel operation (acknowledged in the RTO analysis)[18] do not change with vessel income, so economic impacts to herring vessels under 2019-2021 quotas will be much different than projected by the amendment analysis. Overall reduction in herring income will also result in lower RTO.

   b. The two Seafreeze freezer vessels are disproportionately impacted by the herring portion of the amendment. For further details see our attached letter to the Council dated November 4, 2016. During the development of the amendment the "public perception problem" that initiated the action, as well as development of alternatives, all focused on midwater trawl vessels. We repeatedly commented that our freezer vessels, which are small mesh bottom trawl, do not have the same daily capacity or fishing behavior as the midwater trawl fleet. The Council adopted a 50 mt exemption from IFM requirements for other small daily capacity small mesh

---

[14] See https://s3.amazonaws.com/nefmc.org/2_Herring-and-Mackerel-Fishery-Electronic-Monitoring-Project_Final-Report.pdf, p. 83.
[15] See https://www.greateratlantic.fisheries.noaa.gov/aps/monitoring/atlanticherring.html.
[16] See Herring Presentation at December 2018 New England Council Meeting at https://s3.amazonaws.com/nefmc.org/181205-Herring-Presentation-for-NEFMC-Meeting-post.pdf,
[17] Ibid.
[18] See EA at https://s3.amazonaws.com/nefmc.org/Draft-EA-for-IFM-Amendment-August-2018.pdf. , p. 249.

_0000017713

bottom trawl vessels, which is appropriate due to the undue economic burden that would result if those vessels were required to comply with herring IFM. However, our vessels are now unduly burdened for three reasons:

1. Midwater trawl vessels for which this amendment was designed, can harvest in excess of 500,000 lbs of herring a day, because they do not process at sea and simply pump herring into a refrigerated seawater tank upon harvest and return to port. Our vessels, because they are freezing at sea, are limited to approximately 125,000 lbs a day production, essentially the same as the vessels with the 50 mt exemption. Not only are we limited in daily production, but we incur much greater daily operating costs than midwater vessels due to larger crew size and fuel needed to hand pack and freeze our product. This is why the annual "RTO" related to "squid" (i.e., small mesh bottom trawl- which includes our vessels) vessels in the analysis is averaged at 7% as compared to the RTO of "herring and mackerel vessels" at 15%. As payment for industry funded monitoring is a daily cost, and our vessels have lower daily harvest capabilities and higher daily overheads than the midwater vessels for which this amendment was designed, we would incur disproportionate financial burdens as the result of any action. Seafreeze vessels are the only such A or B herring permit holders who will be thus affected. Because the 50 mt exemption is a per trip exemption, and not a daily harvest level exemption, it still does not help our vessels. It will only address the needs of small daily capacity vessels with short trips landing fresh product.

2. Seafreeze freezer vessels require much longer fishing trips than fresh herring vessels, i.e., midwater vessels or other small mesh bottom trawl vessels, due to our unique operations. Seafreeze fishing trips are typically 7-14 days long, as opposed to typical 1-3 day long trips for fresh herring vessels. Therefore, the cost of a daily monitoring fee would be much higher per trip for Seafreeze than any other herring fishery participants.

3. Out of all affected permit holders, Seafreeze vessels are the <u>only</u> vessels which participate in the other fisheries in addition to herring/mackerel fishery on the same trip. This is by design and this flexibility to fish multiple species on the same trip has been the key to our success as a company over the past 30 years. We are the only vessels which operate in this manner, due to our unique setup. As such, we declare into all fisheries in which we may potentially fish prior to leaving on a trip. We may or may not harvest each one of those species-including herring- on a given trip, depending on the unique characteristics of each given trip, but require the need to reserve the right to do so to ensure profitability.[19] As we have continually pointed out during the development of the IFM amendment, the cost of herring monitoring is not a function of herring harvest, it is a function of VMS trip/species declaration. As part of the amendment development, we requested an analysis on the monitoring costs associated with declared "herring" trips that did not land herring, to demonstrate these impacts to our freezer vessels. Although our freezer vessels were not the only small mesh bottom trawl vessels analyzed (but are the only small mesh bottom trawl vessels which fish in this "multispecies" manner), the average cost for "herring" monitoring on trips that did not land herring in 2014 for small mesh

---

[19] For a more detailed explanation, broken down by actual trips, actual species composition, and actual length of trip, please refer to pages 4-6 of our Comments on Industry Funded Monitoring Omnibus Amendment Public Hearing Document September 2016, submitted November 4, 2016, attached. This detailed information, although confidential business information, was provided publicly to the Council to prove our points made here. However, it went unrecognized.

5

bottom trawl vessels associated with the Council's preferred alternative of 50% ASM coverage is $39,313 per vessel.[20] This means that the actual costs to our vessels would have been higher than this average. By comparison, the same costs associated with single midwater and paired midwater trawls were $2,264 and $1,394, respectively.[21] Therefore, the disproportionate economic impacts to our vessels have been documented by the agency itself, as NMFS is the lead role in developing the amendment. Seafreeze vessels should not be forced to pay approximately $80,000 a year or more for herring monitoring on trips that do not land herring. Furthermore, our entire unique business plan on which our company and vessels were founded and has been in operation since 1986, should not be made unviable due to an action designed to address issues arising from other segments of the fishery.

The Herring Alternatives put forward by the IFM Amendment do not prevent or take into account these disproportionate economic impacts to Seafreeze vessels. As such, they violate National Standard 6 of the Magnuson Stevens Act, which states, "Conservation and management measures shall take into account and allow for variations among, and contingencies in, fisheries, fishery resources, and catches."[22] Therefore we can only support Herring Alternative 1: No Action.

Thank you for the opportunity to comment.

Sincerely,

Meghan Lapp
Fisheries Liaison, Seafreeze Ltd.

---

[20] See EA at https://s3.amazonaws.com/nefmc.org/Draft-EA-for-IFM-Amendment-August-2018.pdf, p. 250.
[21] Ibid.
[22] MSA, Section 301(a)(6).

_0000017715