# Exhibit 8

Federal Register / Vol. 83, No. 216 / Wednesday, November 7, 2018 / Proposed Rules **55665**

| Rule No. | Rule title | State effective date | EPA effective date | Final rule citation date | Comments |
|---|---|---|---|---|---|
| * | * | * | * | * | * | * |
| (32) XXXII ........... | Wyoming State Implementation Plan 5-Year Progress Report for Regional Haze, Appendix B: Alternative to BART for NO$_X$ and PM for PacifiCorp Naughton Unit 3. | November 28, 2017. | December 7, 2018. | [Federal Register citation], November 7, 2018. | Only includes Appendix B: Alternative to BART for NO$_X$ and PM for PacifiCorp Naughton Unit 3. |

■ 3. Section 52.2636 is amended by revising paragraph (a)(1)(vii) and amending paragraph(c)(1) by revising Table 1 to § 52.2636 to read as follows:

**§ 52.2636  Implementation plan for regional haze.**

(a) * * *

(1) * * *

(vii) PacifiCorp Naughton Power Plant Units 1 and 2 (PM and NO$_X$); and

\* \* \* \* \*

(c) * * *

(1) * * *

TABLE 1 TO § 52.2636

[Emission limits for BART units for which EPA approved the State's BART and Reasonable Progress determinations]

| Source name/BART unit | PM emission limits—lb/MMBtu | NO$_X$ emission limits—lb/MMBtu (30-day rolling average) |
|---|---|---|
| FMC Westvaco Trona Plant/Unit NS–1A | 0.05 | 0.35 |
| FMC Westvaco Trona Plant/Unit NS–1B | 0.05 | 0.35 |
| TATA Chemicals Partners (General Chemical) Green River Trona Plant/Boiler C | 0.09 | 0.28 |
| TATA Chemicals Partners (General Chemical) Green River Trona Plant/Boiler D | 0.09 | 0.28 |
| Basin Electric Power Cooperative Laramie River Station/Unit 1 | 0.03 | N/A |
| Basin Electric Power Cooperative Laramie River Station/Unit 2 | 0.03 | N/A |
| Basin Electric Power Cooperative Laramie River Station/Unit 3 | 0.03 | N/A |
| PacifiCorp Dave Johnston Power Plant/Unit 3 | 0.015 | 0.15 |
| PacifiCorp Dave Johnston Power Plant/Unit 4 | 0.015 | 0.15 |
| PacifiCorp Jim Bridger Power Plant/Unit 1 [1] | 0.03 | 0.26/0.07 |
| PacifiCorp Jim Bridger Power Plant/Unit 2 [1] | 0.03 | 0.26/0.07 |
| PacifiCorp Jim Bridger Power Plant/Unit 3 [1] | 0.03 | 0.26/0.07 |
| PacifiCorp Jim Bridger Power Plant/Unit 4 [1] | 0.03 | 0.26/0.07 |
| PacifiCorp Naughton Power Plant/Unit 1 | 0.04 | 0.26 |
| PacifiCorp Naughton Power Plant/Unit 2 | 0.04 | 0.26 |
| PacifiCorp Wyodak Power Plant/Unit 1 | 0.015 | N/A |

[1] The owners and operators of PacifiCorp Jim Bridger Units 1, 2, 3, and 4 shall comply with the NO$_X$ emission limit for BART of 0.26 lb/MMBtu and PM emission limit for BART of 0.03 lb/MMBtu and other requirements of this section by March 4, 2019. The owners and operators of PacifiCorp Jim Bridger Units 1, 2, 3 and 4 shall comply with the NO$_X$ emission limit for reasonable progress of 0.07 lb/MMBtu by: December 31, 2022, for Unit 1, December 31, 2021, for Unit 2, December 31, 2015, for Unit 3, and December 31, 2016, for Unit 4.

\* \* \* \* \*

[FR Doc. 2018–24372 Filed 11–6–18; 8:45 am]

**BILLING CODE 6560–50–P**

---

**DEPARTMENT OF COMMERCE**

**National Oceanic and Atmospheric Administration**

**50 CFR Part 648**

**[Docket No. 170831847–8853–01]**

**RIN 0648–BG91**

**Magnuson-Stevens Fishery Conservation and Management Act Provisions; Fisheries of the Northeastern United States; Industry-Funded Monitoring**

**AGENCY:** National Marine Fisheries Service (NMFS), National Oceanic and Atmospheric Administration (NOAA), Commerce.

**ACTION:** Proposed rule, request for comments.

**SUMMARY:** This action proposes regulations to implement the New England Fishery Management Council's Industry-Funded Monitoring Omnibus Amendment. The New England Council is considering ways to increase monitoring in certain fisheries to assess the amount and type of catch and reduce uncertainty around catch estimates. This amendment would implement a process to standardize future industry-funded monitoring programs in New England Council fishery management plans and industry-funded monitoring in the Atlantic herring fishery. This action would ensure consistency in industry-funded monitoring programs across fisheries

and increase monitoring in the Atlantic herring fishery.

**DATES:** Public comments must be received by December 24, 2018.

**ADDRESSES:** You may submit comments, identified by NOAA–NMFS–2018–0109, by either of the following methods:

• *Electronic Submission:* Submit all electronic public comments via the Federal eRulemaking Portal.

1. Go to *www.regulations.gov/ #!docketDetail;D=NOAA-NMFS-2018-0109;*

2. Click the "Comment Now!" icon and complete the required fields; and

3. Enter or attach your comments.

• *Mail:* Submit written comments to Michael Pentony, Regional Administrator, National Marine Fisheries Service, 55 Great Republic Drive, Gloucester, MA 01930. Mark the outside of the envelope, "Comments on

_0000016969

the Proposed Rule for the Industry-Funded Monitoring Amendment.''

*Instructions:* Comments sent by any other method, to any other address or individual, or received after the end of the comment period, may not be considered by us. All comments received are a part of the public record and will generally be posted for public viewing on *www.regulations.gov* without change. All personal identifying information (*e.g.,* name, address, etc.), confidential business information, or otherwise sensitive information submitted voluntarily by the sender will be publicly accessible. We will accept anonymous comments (enter ''N/A'' in the required fields if you wish to remain anonymous).

Copies of the Industry-Funded Monitoring Omnibus Amendment, including the Environmental Assessment, the Regulatory Impact Review, and the Initial Regulatory Flexibility Analysis (EA/RIR/IRFA) prepared in support of this action are available from Thomas A. Nies, Executive Director, New England Fishery Management Council, 50 Water Street, Mill 2, Newburyport, MA 01950. The supporting documents are also accessible via the internet at: *http://www.nefmc.org.*

Written comments regarding the burden-hour estimates or other aspects of the collection-of-information requirements contained in this proposed rule may be submitted to the Greater Atlantic Regional Fisheries Office and by email to *OIRA_Submission@omb.eop.gov* or fax to (202) 395–5806.

**FOR FURTHER INFORMATION CONTACT:**
Carrie Nordeen, Fishery Policy Analyst, phone: (978) 282–9272 or email: *Carrie.Nordeen@noaa.gov.*

**SUPPLEMENTARY INFORMATION:**

**Background**

In 2013, the Mid-Atlantic and New England Fishery Management Councils initiated a joint omnibus amendment to allow industry-funded monitoring in all of the fishery management plans (FMP) that the Councils manage. The joint amendment would provide a mechanism to support industry-funded monitoring and remedy issues that prevented NMFS from approving some of the Councils' previous industry-funded monitoring proposals. The industry-funded monitoring would be in addition to monitoring requirements associated with the Standardized Bycatch Reporting Methodology (SBRM), the Endangered Species Act (ESA), and the Marine Mammal Protection Act (MMPA). The Councils were interested in increasing monitoring

in certain FMPs to assess the amount and type of catch and to reduce uncertainty around catch estimates. Previous Council proposals for industry-funded monitoring either required NMFS to spend money that was not yet appropriated or split monitoring costs between the fishing industry and NMFS in ways that were inconsistent with Federal law.

In their development of the joint amendment, the Councils needed to remedy disapproved monitoring measures in Amendment 5 to the Atlantic Herring FMP (Amendment 5) (79 FR 8786, February 13, 2014) and Amendment 14 to the Atlantic Mackerel, Squid, and Butterfish FMP (Amendment 14) (79 FR 10029, February 24, 2014). Those measures recommended 100-percent observer coverage for the herring and mackerel fisheries and that NMFS would fund the increased monitoring along with a contribution by the fishing industry. Because NMFS's spending is limited by its Congressional appropriations, NMFS could not approve the Councils' recommendation because it could not guarantee that it would have sufficient funds to pay for the required increase in monitoring. Amendments 5 and 14 also recommended that the fishing industry contribution for industry-funded monitoring would be no more than $325 per day. Similarly, Framework 48 to the Northeast Multispecies FMP (78 FR 53363, August 29, 2013) recommended limiting the types of costs that industry would be responsible for paying in an industry-funded program, such that the industry would only have to pay for observer salaries. NMFS disapproved these proposals because they proposed to share industry monitoring costs with the government in ways that were inconsistent with Federal law.

To remedy the disapproved measures, the joint amendment would use a monitoring coverage target, as opposed to a mandatory coverage level, to allow NMFS to approve new monitoring programs without committing to support coverage levels above appropriated funding or before funding is determined to be available. Using a coverage target instead of mandatory coverage level means the realized coverage in a given year would be determined by the amount of Federal funding available to cover NMFS cost responsibilities in a given year. Industry-funded monitoring coverage targets would be specified in individual FMPs and realized coverage for a fishery in a given year would be anywhere from no additional coverage above SBRM up to the specified coverage target. Additionally, the joint amendment

would define cost responsibilities for industry-funded monitoring programs between the fishing industry and NMFS in a manner that is consistent with legal requirements. Monitoring cost responsibilities may be divided between the industry and the government, provided government cost responsibilities are paid by the government and the government's costs are differentiated from the industry's cost responsibilities. Currently, that cost delineation is between administrative and sampling costs. The joint omnibus amendment would use that delineation to define cost responsibilities for future industry-funded monitoring programs.

The omnibus alternatives in the joint amendment, meaning those alternatives that would apply to all Council FMPs, considered measures to standardize the development and administration of future industry-funded monitoring programs. The joint amendment also included industry-funded monitoring coverage targets for the herring and mackerel fisheries. Information from industry-funded monitoring would primarily be used to help track catch (retained and discarded) against catch limits. The industry-funded monitoring types considered in the joint amendment for the herring and mackerel fisheries included observers, at-sea monitors, electronic monitoring, and portside sampling. To help the Councils evaluate the utility of electronic monitoring to verify catch retention and track discarded catch, NMFS conducted a voluntary electronic monitoring study in 2016 and 2017 with midwater trawl vessels that participate in the herring and mackerel fisheries.

At its April 2017 meeting, the Mid-Atlantic Council decided to postpone action on the joint amendment until the midwater trawl electronic monitoring study was completed. The Mid-Atlantic Council's decision was based, in part, on its desire to have more information on the use of electronic monitoring to track catch against catch limits and the monitoring costs associated with electronic monitoring that would be borne by the mackerel industry. The Mid-Atlantic Council is expected to re-consider whether it wants to continue developing industry-funded monitoring measures for its FMPs at its October 2018 meeting. The New England Council selected preferred omnibus and herring coverage target alternatives at its April 2017 meeting, and recommended NMFS consider the amendment for approval and implementation. Therefore, the joint amendment initiated by both Councils to allow for industry-funded monitoring has become the New England Industry-Funded

Monitoring Omnibus Amendment and the proposed measures would only apply to FMPs that the New England Council manages.

The midwater electronic monitoring study concluded in January 2018. NMFS, New England Council, and Mid-Atlantic Council staff reviewed the study's final report in March 2018 and concluded that electronic monitoring was suitable for detecting discarding events aboard midwater trawl vessels. The study also evaluated costs associated with using EM in the herring fishery, especially the sampling costs that would be paid by the fishing industry. Based on the study, NMFS estimated the industry's costs for EM at approximately $296 per coverage day, not including the initial costs of purchasing and installing equipment. The EA for the amendment estimated the industry's annual costs for portside sampling at $96,000 for the midwater trawl fleet and $8,700 per vessel. Therefore, NMFS estimated the industry's costs for using electronic monitoring and portside sampling would be approximately $515 per coverage day.

A Notice of Availability (NOA) for the New England Industry-Funded Omnibus Amendment was published in the **Federal Register** on September 19, 2018 (83 FR47326). The comment period for the NOA ends on November 19, 2018. Comments submitted on the NOA and/or this proposed rule prior to November 19, 2018, will be considered in our decision to approve, partially approve, or disapprove the Industry-Funded Monitoring Omnibus Amendment. We will consider comments received by the end of the comment period for this proposed rule December 24, 2018 in our decision to implement measures proposed by the Council.

**Proposed Omnibus Measures**

This amendment would standardize the development and administration of future industry-funded monitoring programs for New England Council FMPs only. However, only the Atlantic Herring FMP would be subject to an industry-funded monitoring program resulting from this amendment. In the future, if the New England Council develops an industry-funded monitoring program, the New England Council would develop those programs consistent with the specifications and requirements for industry-funded programs established in this amendment. The existing industry-funded monitoring programs in the Northeast Multispecies and Atlantic Sea Scallop FMPs would not be affected by

this amendment. While proposed cost responsibilities and monitoring service provider requirements are consistent with the existing programs, the industry-funded monitoring programs in the Multispecies and Scallop FMPS would not be included in the proposed process to prioritize industry-funded monitoring programs for available Federal funding. The New England Council may incorporate these existing industry-funded monitoring programs into the prioritization process in a future action. Additionally, future industry-funded monitoring programs in the Multispecies and Scallop FMPs would either expand the existing programs or develop new programs consistent with the proposed omnibus measures.

As described previously, NMFS cannot approve and implement monitoring requirements for which it does not have available Federal funding to cover NMFS cost responsibilities. For that reason, this amendment proposes establishing industry-funded monitoring coverage targets in New England FMP with the understanding that annual funding available to cover NMFS cost responsibilities would likely vary and dictate realized coverage levels. The realized coverage in a given year would be determined by the amount of Federal funding available to cover NMFS cost responsibilities in a given year.

The standardized structure for future industry-funded monitoring programs in New England fisheries would apply to several types of monitoring, including observing, at-sea monitoring, electronic monitoring, portside sampling, and dockside monitoring. This rule proposes the following principles to guide the selection and implementation of future industry-funded monitoring programs. The Council's development of an industry-funded monitoring program must consider or include the following:

• A clear need or reason for the data collection;
• Objective design criteria;
• Cost of data collection should not diminish net benefits to the nation nor threaten continued existence of the fishery;
• Seek less data intensive methods to collect data necessary to assure conservation and sustainability when assessing and managing fisheries with minimal profit margins;
• Prioritize the use of modern technology to the extent practicable; and
• Incentives for reliable self-reporting.

All proposed omnibus measures are administrative, specifying a process to develop and administer future industry-funded monitoring and monitoring set-

aside programs, and do not directly affect fishing effort or amounts of fish harvested. However, the proposed omnibus measures may have indirect effects on New England FMPs. Standardizing the process for developing and administering future industry-funded monitoring programs may help reduce the administrative burden associated with implementing new programs and may lead to greater consistency in the information collected through industry-funded monitoring programs. Improved catch information resulting from greater consistency in how information is collected may lead to better management of biological resources. The prioritization process may help ensure that available Federal funding is used to support industry-funded monitoring programs consistent with Council monitoring priorities. While industry-funded monitoring programs are expected to have an economic impact on the fishing industry, standard cost responsibilities may help the industry better understand and plan for their industry-funded monitoring cost responsibilities. Standard cost responsibilities may also aid the industry in negotiating coverage costs with service providers, which may ultimately reduce the dollar amount associated with industry cost responsibilities. Lastly, monitoring set-aside programs may help minimize the economic burden on the fishing industry associated with paying for monitoring coverage.

*1. Standard Process To Implement and Revise Industry-Funded Monitoring Programs*

This amendment would specify that future industry-funded monitoring programs would be implemented through an amendment to the relevant FMP. Because industry-funded monitoring programs have the potential to economically impact the fishing industry, the Council determined that implementing new industry-funded monitoring programs through an amendment would help ensure additional public notice and comment during the development of new programs. The details of any new industry-funded monitoring program implemented via amendment may include, but are not limited to:

• Level and type of coverage target;
• Rationale for level and type of coverage;
• Minimum level of coverage necessary to meet coverage goals;
• Consideration of waivers if coverage targets cannot be met;
• Process for vessel notification and selection;

- Cost collection and administration;
- Standards for monitoring service providers; and
- Any other measures necessary to implement the industry-funded monitoring program.

This amendment would also specify that future industry-funded monitoring programs, implemented through an amendment, may be revised through framework adjustments to the relevant FMP. Additional National Environmental Policy Act (NEPA) analysis would be required for any action implementing and/or modifying industry-funded monitoring programs, regardless if the vehicle is an amendment or framework adjustment.

### 2. Standard Cost Responsibilities

Cost responsibilities for industry-funded monitoring must be divided by cost category, rather than a dollar amount or percentage of total cost, between the fishing industry and NMFS. NMFS is obligated to pay any cost for which the benefit of the expenditure accrues to the government. This means that NMFS would be responsible for administrative costs to support industry-funded programs, but not the costs associated with sampling activities. Costs associated with sampling activities would be paid by the fishing industry. NMFS may help offset industry cost responsibilities through reimbursement if Federal funding is available, but NMFS cannot be obligated to pay sampling costs in industry-funded sampling programs. Cost responsibilities dictated by legal requirements cannot be modified through this amendment. Instead, this amendment would codify NMFS cost responsibilities for industry-funded monitoring in New England FMPs to ensure consistency and compliance with legal requirements.

NMFS would be responsible for paying costs associated with setting standards for, monitoring the performance of, and administering, industry-funded monitoring programs. These program elements would include:

- The labor and facilities costs associated with training and debriefing of monitors;
- NMFS-issued gear (*e.g.,* electronic reporting aids used by human monitors to record trip information);
- Certification of monitoring providers and individual observers or monitors;
- Performance monitoring to maintain certificates;
- Developing and executing vessel selection;
- Data processing (including electronic monitoring video audit, but

excluding service provider electronic video review); and
- Costs associated with liaison activities between service providers, NMFS, Coast Guard, Council, sector managers, and other partners.

NMFS's costs to administer industry-funded monitoring for all monitoring types would be paid with Federal funds. The industry would be responsible for funding all other costs of the monitoring program, those costs would include, but are not limited to:

- Costs to the service provider for deployments and sampling (*e.g.,* travel and salary for observer deployments and debriefing);
- Equipment, as specified by NMFS, to the extent not provided by NMFS (*e.g.,* electronic monitoring system);
- Costs to the service provider for observer or monitor time and travel to a scheduled deployment that doesn't sail and was not canceled by the vessel prior to the sail time;
- Costs to the service provider for installation and maintenance of electronic monitoring systems;
- Provider overhead and project management costs (*e.g.,* provider office space, administrative and management staff, recruitment costs, salary and per diem for trainees); and
- Other costs of the service provider to meet performance standards laid out by a FMP.

The cost responsibilities described above are consistent with the existing scallop and multispecies industry-funded monitoring programs, although cost responsibilities are not explicitly defined in those FMPs. This amendment would codify NMFS cost responsibilities for industry-funded monitoring for all New England FMPs, but it would not alter current requirements for existing industry-funded monitoring programs.

### 3. Standard Requirements for Monitoring Service Providers and Observers/Monitors

The SBRM Omnibus Amendment adopted general industry-funded observer service provider and observer requirements (at 50 CFR 648.11(h) and (i), respectively) should a Council develop and implement a requirement or option for an industry-funded observer program to support SBRM in any New England or Mid-Atlantic Council FMP. However, the SBRM Amendment did not address requirements for other types of industry-funded monitoring programs or coverage in addition to SBRM.

This action would modify existing observer and service provider requirements to apply more broadly to

monitoring by observers, at-sea monitors, portside samplers, and dockside monitors. Additionally, this amendment would apply those requirements to supplementing coverage required by SBRM, ESA, and MMPA. This rule proposes to expand and modify existing observer service provider requirements at § 648.11(h) to apply to service providers for observers, at-sea monitors, portside samplers, and dockside monitors. Similarly, this rule proposes to expand and modify existing observer requirements at § 648.11(i) to apply to observers, at-sea monitors, portside samplers, and dockside monitors, described collectively as observers/monitors. These observer/ monitor requirements would serve as the default requirements for any future industry-funded monitoring programs in New England Council FMPs. The Council may specify new requirements or revise existing requirements for FMP-specific industry-funded monitoring programs, as part of the amendment developing those programs or the framework adjustment revising those programs.

### 4. Prioritization Process

This amendment would establish a Council-led process to prioritize industry-funded monitoring programs for available Federal funding across New England Council FMPs. This prioritization process would allow the Council discretion to align Council monitoring priorities with available funding to pay NMFS cost responsibilities associated with industry-funded monitoring. Revising the prioritization process would be done in a framework adjustment. The existing scallop and multispecies industry-funded monitoring programs would not be included in the proposed prioritization process, unless the New England Council takes action in the future to include those programs in the prioritization process or develops new industry-funded monitoring programs within those FMPs consistent with this amendment.

Available Federal funding refers to any funds in excess of those allocated to meet SBRM or other existing monitoring requirements that may be used to cover the government's costs associated with supporting industry-funded monitoring programs. Funding for SBRM, ESA, and MMPA observer coverage would not be affected by this prioritization process. Any industry-funded monitoring programs would be prioritized separately from and in addition to any SBRM coverage or other statutory coverage requirements. The realized industry-funded monitoring coverage in

a given year would be determined by the amount of Federal funding available to cover NMFS cost responsibilities in a given year.

When there is no Federal funding available to cover NMFS cost responsibilities above SBRM coverage in a given year, then no industry-funded monitoring programs would operate that year. If available funding in a given year is sufficient to support all industry-funded monitoring programs, the prioritization process would fully operationalize the industry-funded monitoring coverage targets specified in each FMP. If there is some available funding, but not enough to support all industry-funded monitoring programs, the Council would determine how to prioritize industry-funded monitoring coverage targets for available funding across FMPs.

As part of the Council-led prioritization process, this amendment would establish an equal weighting approach to prioritize industry-funded monitoring programs for available funding. An example of an equal weighting approach would be funding all industry-funded monitoring programs at 70 percent, if only 70 percent of the Federal funding needed to administer all the programs was available. Additionally, this rule proposes that the Council would adjust the equal weighting approach on an as-needed basis. This means that the equal weighting approach would be adjusted whenever a new industry-funded monitoring program is approved or whenever an existing industry-funded monitoring program is adjusted or terminated. The Council would review the weighting approach for the Council-led prioritization process in a framework adjustment or by considering a new weighting approach at a public meeting, where public comment is accepted, and asking NMFS to publish a notice or rulemaking modifying the weighting approach, consistent with the Administrative Procedure Act (APA).

The SBRM coverage year begins in April and extends through March. SBRM coverage levels in a given year are determined by the variability of discard rates from the previous year and the availability of SBRM funding. During the spring, NMFS determines SBRM coverage for the upcoming year. Once NMFS finalizes SBRM coverage levels for the upcoming year, NMFS would then evaluate what Federal funding was available to cover its costs for meeting the industry-funded monitoring coverage targets for the next year. For example, once NMFS determines SBRM coverage for 2018, it would then evaluate what amount of

government coverage costs could be covered by available Federal funding to meet industry-funded monitoring coverage targets for 2019. NMFS would provide the Council, at the earliest practicable opportunity: (1) The estimated industry-funded monitoring coverage levels, incorporating the prioritization process and weighting approach and based on available funding, for each FMP-specific monitoring program; and (2) the rationale for the industry-funded monitoring coverage levels, including the reason for any deviation from the Council's recommendations. NMFS would inform the Council of the estimated industry-funded coverage levels during a Council meeting. At that time, the Council may recommend revisions and additional considerations by the Regional Administrator and Science and Research Director. If NMFS costs associated with industry-funded coverage targets are fully funded in a given year, NMFS would also determine, in consultation with the Council, the allocation, if any, of any remaining available funding to offset industry costs. The earlier in the year that industry-funded monitoring coverage targets are set for the following year, the more time the affected fishing industry would have to plan for industry-funded monitoring the following year. FMP-specific industry-funded monitoring programs would determine if industry-funded coverage targets were administered consistent with the FMP's fishing year or the SBRM year.

*5. Monitoring Set-Aside Programs*

This amendment would standardize the process to develop future monitoring set-aside programs and would allow monitoring set-aside programs to be developed in a framework adjustment to the relevant FMP. A monitoring set-aside program would use a portion of the annual catch limit (ACL) from a fishery to help offset industry cost responsibilities associated with industry-funded monitoring coverage targets. There are many possible ways to structure a monitoring set-aside program, and the details of each program would be developed on an FMP-by-FMP basis. Monitoring set-aside programs are an option to help ease industry cost responsibilities associated with industry-funded monitoring, but they likely would only help offset a portion of the industry's cost responsibilities.

The details of monitoring set-aside programs may include, but are not limited to:

• The basis for the monitoring set-aside;

• The amount of the set-aside (*e.g.,* percentage of ACL, days-at-sea (DAS));

• How the set-aside is allocated to vessels required to pay for monitoring (*e.g.,* increased possession limit, differential DAS counting, additional trips against a percent of the ACL);

• The process for vessel notification;

• How funds are collected and administered to cover the industry's costs of monitoring coverage; and

• Any other measures necessary to develop and implement a monitoring set-aside.

**Proposed Atlantic Herring Measures**

This amendment would establish an industry-funded monitoring program in the Atlantic herring fishery that is expected to provide increased accuracy in catch estimates. Increased monitoring in the herring fishery would address the following goals: (1) Accurate estimates of catch (retained and discarded); (2) accurate catch estimates for incidental species with catch caps (haddock and river herring/shad); and (3) affordable monitoring for the herring fishery.

This amendment would establish a 50-percent industry-funded monitoring coverage target on vessels issued an All Areas (Category A) or Areas 2/3 (Category B) Limited Access Herring Permits fishing on a declared herring trip. The Council considered other coverage targets, including 100-percent, 75-percent, and 25-percent, but the 50-percent coverage target balanced the benefits and costs of additional monitoring. When tracking catch against catch caps in the herring fishery, analyses in the EA supporting this amendment suggest that a 50-percent coverage target would greatly reduce the uncertainty around catch estimates, and likely result in a coefficient of variation less than 30 percent almost all of the time. Additionally, the industry's cost responsibilities associated with a 50-percent coverage target are substantially less than those associated with higher coverage targets. Vessels participating in the herring fishery also participate in the Atlantic mackerel fishery. Currently, the mackerel fishery does not have an industry-funded monitoring program. If the Mid-Atlantic Council develops industry-funded monitoring in the mackerel fishery and the industry-funded coverage targets do not match for the herring and mackerel fisheries, then the higher coverage target would apply on all trips declared into the fishery with the higher coverage target.

Herring coverage targets would be calculated for the herring fishing year, January through December, by

combining SBRM and industry-funding monitoring coverage. NMFS would determine how to calculate the combined coverage target, in consultation with Council staff. For example, if there is 10-percent SBRM coverage in a given year, then 40-percent industry-funded monitoring coverage would be needed to achieve the 50-percent coverage target. Because the coverage target is calculated by combining SBRM and industry-funded monitoring coverage, a vessel would not have SBRM coverage and industry-funded coverage on the same trip. Any vessel selected for SBRM coverage on a particular trip would not have the option of industry-funded monitoring on that trip. Per the prioritization process in the proposed omnibus measures, the realized coverage level in a given year would be determined by the amount of funding available to cover NMFS cost responsibilities in a given year. The realized coverage for the herring fishery in a given year would fall somewhere between no additional coverage in addition to SBRM and the specified coverage target. Combined coverage targets are intended to help reduce the cost of industry-funded coverage, but the level of SBRM coverage in the herring fishery varies by gear type and has the potential to vary year to year. The variability of SBRM coverage has the potential to make it difficult for the herring industry to plan for industry-funded monitoring year to year.

In addition to the proposed standard monitoring and service provider requirements in the proposed omnibus measures, this amendment would specify that requirements for industry-funded observers and at-sea monitors in the herring fishery include a high volume fishery (HVF) certification. Currently, NMFS's Northeast Fisheries Observer Program (NEFOP) observers must possess a HVF certification in order to observe the herring fishery. NMFS developed the HVF certification to more effectively train observers in high volume catch sampling and documentation. NEFOP determined that data quality on herring trips was sub-optimal when collected by observers without specialized training, potentially resulting in data loss. In addition, the high variety of deck configurations, fish handling practices and fast-paced operations proved more demanding for observers. Having additional training to identify these practices improved decision-making while at sea, which, ultimately, improved data accuracy and maximized data collection.

Additionally, this amendment would require the Council to examine the results of any increased coverage in the herring fishery two years after implementation of this amendment, and consider if adjustments to the coverage targets are warranted. Depending on the results and desired actions, subsequent action to adjust the coverage targets could be accomplished via a framework adjustment or an amendment to the Herring FMP, as appropriate. Measures implemented in this amendment would remain in place unless revised by the Council.

*1. Industry-Funded At-Sea Monitoring Coverage on Vessels Issued Category A or B Herring Permits*

This rule proposes that vessels issued Category A or B herring permits would carry an industry-funded at-sea monitor on declared herring trips that are selected for coverage by NMFS, unless NMFS issues the vessel a waiver for coverage on that trip. Vessels would be selected for coverage by NMFS to meet the 50-percent coverage target. Prior to any trip declared into the herring fishery, representatives for vessels with Category A or B permits would be required to notify NMFS for monitoring coverage. If an SBRM observer was not selected to cover that trip, NMFS would notify the vessel representative whether an at-sea monitor must be procured through a monitoring service provider. Because the 50-percent coverage target is calculated by combining SBRM and industry-funded monitoring coverage, a vessel would not carry an SBRM observer on the same trip that would carry an at-sea monitor. If NMFS informs the vessel representative that they need at-sea monitoring coverage, they would then be required to obtain and pay for an at-sea monitor to carry on that trip. The vessel would be prohibited from fishing for, taking, possessing, or landing any herring without carrying an at-sea monitor on that trip. If NMFS informs the vessel representative that the vessel is not selected for at-sea monitoring coverage, NMFS would issue the vessel an at-sea monitoring coverage waiver for that trip.

This rule proposes three reasons for issuing vessels waivers from industry-funded monitoring requirements on a trip-by-trip basis. First, if an at-sea monitor was not available to cover a specific herring trip (either due to logistics or a lack of available Federal funding to cover NMFS cost responsibilities), NMFS would issue the vessel an at-sea monitoring coverage waiver for that trip. Second, if a vessel using midwater trawl gear intended to operate as a wing vessel on a trip, meaning that it would pair trawl with another midwater trawl vessel but

would not pump or carry any fish onboard, then that vessel may request a waiver for industry-funded monitoring requirements on that trip. Vessels would notify NMFS in advance of the wing vessel trip, and NMFS would issue a waiver for industry-funded monitoring requirements on that trip. Wing vessels would be prohibited from carrying fish onboard during these trips. If a wing vessel did carry fish, the vessel would be out of compliance with industry-funded monitoring requirements on that trip. Third, if a vessel intended to land less than 50 metric tons (mt) of herring on a trip, then the vessel may request a waiver for industry-funded monitoring requirements on that trip. Vessels would notify NMFS in advance of the trip on which they intend to land less than 50 mt of herring, and NMFS would issue a waiver for industry-funded monitoring requirements on that trip. Vessels would be prohibited from landing 50 mt or more of herring on these trips. If the vessel landed 50 mt or more of herring, the vessel would be out of compliance with industry-funded monitoring requirements on that trip.

At-sea monitors would collect the following information on herring trips:
• Fishing gear information (*i.e.,* size of nets, mesh sizes, and gear configurations);
• Tow-specific information (*i.e.,* depth, water temperature, wave height, and location and time when fishing begins and ends);
• Species, weight, and disposition of all retained and discarded catch on observed hauls;
• Species, weight, and disposition of all retained catch on unobserved hauls;
• Actual catch weights whenever possible, or alternatively, weight estimates derived by sub-sampling;
• Length data, along with whole specimens and photos to verify species identification, on retained and discarded catch;
• Information on and biological samples from interactions with protected species, such as sea turtles, marine mammals, and sea birds; and
• Vessel trip costs (*i.e.,* operational costs for trips including food, fuel, oil, and ice).

The primary biological data that at-sea monitors would collect are length data on retained and discarded catch. However, to verify species identification, at-sea monitors may also collect whole specimens or photos. In the future, the Council may recommend that at-sea monitors collect additional biological information upon request. Revising what information an at-sea monitor collects could be done in a framework adjustment. Alternatively,

_0000016974

the Council may recommend that at-sea monitors collect additional biological information by considering the issue at a public meeting, where public comment is accepted, and asking NMFS to publish a notice or rulemaking modifying the duties for at-sea monitors, consistent with the APA.

In contrast to observers, at-sea monitors would not collect whole specimens, photos, or biological samples (other than length data) from catch, unless it was for purposes of species identification, or sighting data on protected species. The Council recommended a limited data collection compared to observers to allow for possible cost savings for either the industry or NMFS associated with a limited data collection.

Currently, vessels issued Category A or B herring permits are required to comply with all slippage restrictions, slippage reporting requirements, and slippage consequence measures when carrying an observer for SBRM coverage (§ 648.11(m)(4)). Because the purpose of slippage restrictions is to help ensure catch is made available for sampling, this rule proposes that existing slippage requirements would also apply when vessels are carrying an industry-funded at-sea monitor. Specifically, when vessels issued Category A or B herring permits are carrying either an SBRM observer or industry-funded at-sea monitor, vessels would be required to bring catch aboard the vessel and make it available for sampling prior to discarding. If vessels slipped catch for any reason, they would be required to report that slippage event on the daily vessel monitoring catch report and complete a slipped catch affidavit. If vessels slip catch due to excess catch of spiny dogfish, mechanical failure, or safety, then vessels would be required to move 15 nautical miles (27.78 km) following that slippage event and remain 15 nautical miles (27.78 km) away from that slippage event before making another haul and for the duration of that fishing trip. If vessels slip catch for any other reason, they would be required to terminate that fishing trip and immediately return to port.

Industry-funded monitoring would have direct economic impacts on vessels issued Category A and B permits participating in the herring fishery. The EA estimated the industry's cost responsibility associated with carrying an at-sea monitor at $710 per day. The EA uses returns-to-owner (RTO) to estimate the potential reduction in annual RTO associated with paying for monitoring coverage. RTO was calculated by subtracting annual

operating costs from annual gross revenue and was used instead of net revenues to more accurately reflect fishing income. While the actual cost of industry-funded monitoring on a particular vessel would vary with effort level and the amount of SBRM coverage, analyses in the EA suggest that the cost of the proposed at-sea monitoring coverage may reduce the annual RTO for vessels with Category A or B herring permits up to approximately 20 percent. Waiving at-sea monitoring coverage requirements for wing vessel trips or trips that land less than 50 mt of herring would help reduce the cost of at-sea monitoring coverage on those trips, but those waivers are not an option for all vessels.

*2. Industry-Funded Observer Coverage on Midwater Trawl Vessels Fishing in Groundfish Closed Areas*

Midwater trawl vessels fishing in the Groundfish Closed Areas are required to carry an observer by measures at § 648.202(b). When Amendment 5 established that requirement, the Groundfish Closed Areas included Closed Area I, Closed Area II, Nantucket Lightship Closed Area, Cashes Ledge Closure Area, and the Western Gulf of Maine Closure Area. Currently, the only mechanism for midwater trawl vessels to carry an observer is if an observer is assigned through the SBRM. As described previously, SBRM coverage for midwater trawl vessels has recently been variable (approximately 4 percent to 40 percent from 2015 through 2017). This rule would maintain the requirement to carry an observer for midwater trawl vessels fishing in a Groundfish Closed Area, but it proposes that midwater trawl vessels would be able to purchase observer coverage in order to access Groundfish Closed Areas.

Prior to any trip declared into a Groundfish Closed Area, representatives for midwater trawl vessels would be required to provide notice to NMFS for monitoring coverage. If an SBRM observer was not selected to cover that trip, NMFS would notify the vessel representative that an observer may be procured through a monitoring service provider. The vessel would be prohibited from fishing in the Groundfish Closed Areas without carrying an observer. Observers would collect the following information on midwater trawl trips:

• Fishing gear information (*i.e.*, size of nets, mesh sizes, and gear configurations);
• Tow-specific information (*i.e.*, depth, water temperature, wave height,

and location and time when fishing begins and ends);
• Species, weight, and disposition of all retained and discarded catch on observed hauls;
• Species, weight, and disposition of all retained catch on unobserved hauls;
• Actual catch weights whenever possible, or alternatively, weight estimates derived by sub-sampling;
• Whole specimens, photos, length information, and biological samples (*i.e.*, scales, otoliths and/or vertebrae);
• Information on interactions with protected species, such as sea turtles, marine mammals, and sea birds; and
• Vessel trip costs (*i.e.*, operational costs for trip including food, fuel, oil, and ice).

The proposed measure to allow midwater trawl vessels to purchase observer coverage to access Groundfish Closed Areas would also have economic impacts on vessels participating in the herring fishery. The EA estimated the industry's cost responsibility associated with carrying an observer at $818 per day. While the actual cost of industry-funded monitoring on a particular vessel would vary with effort level and the amount of SBRM coverage, analyses in the EA suggest that the cost of observer coverage may reduce the annual RTO for midwater trawl vessels up to 5 percent. That 5 percent reduction in RTO would be in additional to any reduction in RTO due to other types of industry-funded monitoring coverage. Coverage waivers are not an option to reduce the cost of observer coverage because coverage waivers do not apply on midwater trawl vessels fishing in the Groundfish Closed Areas.

If the Groundfish Closed Areas are modified, eliminated, or added in the future, existing observer coverage requirements for midwater trawl vessels would apply to the modified areas. Anticipating changes to the Groundfish Closed Areas in the Omnibus Essential Fish Habitat Amendment 2 (Habitat Amendment), the Industry-Funded Monitoring Amendment Development Team/Fishery Management Action Team (PDT/FMAT) recommended the Council clarify its intent regarding the requirement that midwater trawl vessels fishing in Groundfish Closed Areas must carry an observer. In a March 17, 2017, memorandum, the PDT/FMAT noted that the Habitat Amendment proposed changes to Groundfish Closed Areas, such as eliminating areas, boundary changes, and seasonality. That same memorandum proposed the Council clarify that this amendment maintains the 100-percent observer coverage requirement on midwater trawl

_0000016975

vessels fishing in Groundfish Closed Areas, as modified by the Habitat Amendment. The Council accepted the FM PDT/FMAT's proposed clarification when it took final action on this amendment in April 2017.

In January 2018, NMFS partially approved the Habitat Amendment, including changes to Closed Area I, Nantucket Lightship Closed Area, and the Western Gulf of Maine Closure Area. Consistent with Council intent regarding observer coverage, the final rule for the Habitat Amendment (83 FR 15240, April 9, 2018) maintained the 100-percent observer requirement for midwater trawl vessels fishing in Closed Area I North (February 1–April 15), Closed Area II, Cashes Ledge Closure Area, and the Western Gulf of Maine Closure Area. Because the Habitat Amendment removed the Nantucket Lightship Closed Area from the list of Groundfish Closed Areas, the 100-percent observer coverage requirement no longer applies to midwater trawl vessels fishing in the area previously known as the Nantucket Lightship Closed Area.

Recognizing that it recommended multiple industry-funded monitoring types, including at-sea monitoring coverage and observer coverage in Groundfish Closed Areas, for the herring fishery, the Council also recommended prioritizing coverage aboard Category A and B vessels because those vessels harvest the majority of the herring. Consistent with that recommendation, if available Federal funding is insufficient to cover NMFS cost responsibilities associated with administering multiple monitoring programs for the herring fishery, this rule proposes prioritizing industry-funded monitoring coverage on Category A and B vessels before supporting observer coverage on midwater trawl vessels fishing in Groundfish Closed Areas.

### Atlantic Herring Exempted Fishing Permit

On April 19, 2018, the New England Council considered whether electronic monitoring in conjunction with portside sampling, would be an adequate substitute for at-sea monitoring coverage aboard midwater trawl vessels. Because midwater trawl vessels discard only a small percentage of catch at sea, electronic monitoring and portside sampling have the potential to be a cost effective way to address monitoring goals for the herring fishery. The purpose of electronic monitoring would be to confirm catch retention and verify compliance with slippage restrictions, while the purpose of portside sampling would be to collect species composition

data along with age and length information. After reviewing the midwater trawl electronic monitoring study, the Council approved electronic monitoring and portside sampling as a monitoring option for midwater trawl vessels, but did not recommend requiring electronic monitoring and portside sampling as part of this action. Instead, the Council recommended NMFS use an exempted fishing permit (EFP) to further evaluate how to best permanently administer an electronic monitoring and portside sampling program.

The EFP would exempt midwater vessels from the proposed requirement for industry-funded at-sea monitoring coverage and would allow midwater trawl vessels to use electronic monitoring and portside sampling coverage to comply with the Council-recommended 50-percent industry-funded monitoring coverage target. The recent midwater trawl electronic monitoring study provides a good foundation for an electronic monitoring program. However, using an EFP would provide NMFS with further information about how to most effectively and efficiently administer the electronic monitoring and portside sampling program, while allowing NMFS the flexibility to respond quickly to emerging issues, helping to make the monitoring program more robust. An EFP would also enable NMFS to evaluate other monitoring issues in the herring fishery that are of interest to the Council and herring industry. Lastly, NMFS could use an EFP to evaluate the utility of electronic monitoring and portside sampling when midwater trawl vessels switch to purse seining and/or fish in Groundfish Closed Areas.

The EFP would be developed concurrently with rulemaking for this amendment. If the proposed herring measures are approved, then midwater trawl vessels issued EFPs would be allowed to use electronic monitoring and portside sampling coverage to comply with the Council-recommended 50-percent industry-funded monitoring coverage target. The Council recommended reconsidering herring industry-funded monitoring requirements two years after implementation. The Council would consider establishing electronic monitoring and portside sampling program requirements into regulation via a framework adjustment at that time.

### Proposed Corrections and Clarification

NMFS proposes the following corrections and updates under the authority of section 305(d) to the Magnuson-Stevens Fishery

Conservation and Management Act (Magnuson-Stevens Act), which provides that the Secretary of Commerce may promulgate regulations necessary to carry out a FMP or the Magnuson-Stevens Act.

First, this rule proposes correcting the typographic error in § 648.7(b)(2)(i). This correction would correct "opn 9access" to "open access" and is necessary to clarify the intent of the regulation.

Second, this rule proposes updating outdated requirements for vessels operating under the midwater trawl and purse seine exempted fisheries. Regulations at § 648.80(d)(5) and (e)(5) require vessels to notify NMFS 72 hours in advance of a fishing trip to coordinate observer deployment. Amendment 5 replaced the 72-hour notification requirement with a 48-hour notification requirement to allow herring vessels more flexibility in their trip planning and scheduling. The 72-hour notification requirements for herring vessels in § 648.80 were overlooked in Amendment 5, so this rule proposes updating the 72-hour notification requirements with 48-hour notification requirements for midwater trawl and purse seine vessels to ensure consistent requirements across the herring fishery. Regulations at § 648.80(d)(5) also require midwater trawl vessels to inform NMFS if the vessels intends to fish in Groundfish Closed Area I. This requirement initially facilitated placing observers on midwater vessels fishing in Groundfish Closed Area I, but is no longer necessary. Therefore, this rule proposes removing the reference to Groundfish Closed Area I from the notification requirements so that requirements are consistent with proposed notification requirements at § 648.11(m)(2).

Third, this rule proposes allowing us to use both observer and monitor data to track catch against the haddock catch caps. Regulations at § 648.86(a)(3)(ii) state that the Regional Administrator shall use haddock catches observed by observers to estimate of total haddock catch in a given haddock stock area. However, the Council has spent the last several years considering additional monitoring types to increase monitoring in the herring fishery, particularly to track catch against haddock and river herring/shad catch caps. In a February 2016 letter, the Council requested that we use observer and portside sampling data to monitor fishery catch caps. Additionally, in this amendment, the Council recommended that vessels issued Category A and B herring permits carry at-sea monitors to meet a 50-percent industry-funded monitoring

coverage target. In § 648.2, this rule proposes defining observers or monitors to include NMFS-certified observers, at-sea monitors, portside samplers, and dockside monitors. For these reasons, this rule also proposes updating § 648.86(a)(3)(ii) to allow the Regional Administrator to use observer and monitor data to track catch against haddock catch caps.

**Classification**

Pursuant to section 304(a)(1)(A) of the Magnuson-Stevens Act, the NMFS Assistant Administrator has made a preliminary determination that this proposed rule is consistent the Magnuson-Stevens Act and other applicable law. In making the final determination, we will consider the data, views, and comments received during the public comment period.

This proposed rule has been preliminarily determined to be not significant for purposes of Executive Orders (E.O.) 12866.

NMFS prepared an Initial Regulatory Flexibility Analysis (IRFA) for this proposed rule, as required by section 603 of the Regulatory Flexibility Act (RFA), 5 U.S.C. 603. The IRFA describes the economic impact that this proposed rule would have on small entities, including small businesses, and also determines ways to minimize these impacts. The proposed omnibus measures are administrative, specifying a process to develop and administer future industry-funded monitoring and monitoring set-aside programs, and do not directly affect fishing effort or amount of fish harvested. Because the proposed omnibus measures have no direct economic impacts, they will not be discussed in this section. The proposed Atlantic herring measures affect levels of monitoring, rather than harvest specifications, but they are expected to have economic impacts on fishery-related businesses and human communities due to the costs associated with the industry-funded monitoring measures for the herring fishery.

A description of the action, why it is being considered, and the legal basis for this action are contained at the beginning of this section in the preamble and in the **SUMMARY** section. The IRFA includes this section of the preamble to this rule and analyses contained in the Industry-Funded Monitoring Omnibus Amendment and its accompanying EA/RIR/IRFA. A copy of the full analysis is available from the Council (see **ADDRESSES**). A summary of the IRFA follows.

*Description of the Reason Why Action by the Agency Is Being Considered and Statement of the Objective of, and Legal Basis for, This Proposed Rule*

This action proposes management measures for New England Fishery Management Council FMPs. A complete description of the reasons why this action is being considered, and the objectives of and legal basis for this action, are contained in the preamble to this proposed rule and are not repeated here.

*Description and Estimate of the Number of Small Entities To Which the Proposed Rule Would Apply*

Effective July 1, 2016, NMFS established a small business size standard of $11 million in annual gross receipts for all businesses primarily engaged in the commercial fishing industry for RFA compliance purposes only (80 FR 81194, December 29, 2015). The directly regulated entities are businesses that own at least one limited access Atlantic herring vessel. As of 2016, there are 66 businesses that own at least one limited access herring vessel. Four businesses are large entities (gross receipts greater than $11 million). The remaining 62 businesses are small entities. Gross receipts and gross receipts from herring fishing for the small entities are characterized in Table 1.

TABLE 1—GROSS REVENUES AND REVENUES FROM HERRING FOR THE DIRECTLY REGULATED SMALL ENTITIES

|  | Gross receipts from herring permitted firms | Gross receipts from herring fishing |
|---|---|---|
| Mean ................................ | $1,847,392 | $422,210 |
| Median ............................. | $1,076,172 | $0 |
| 25th Percentile ................. | $656,965 | $0 |
| 75th Percentile ................. | $2,684,753 | $95,218 |
| Permitted Small Entities .. | 62 | 62 |

*Source: NMFS.*

Many of the businesses that hold limited access herring permits are not actively fishing for herring. Of those businesses actively fishing for herring, there are 32 directly regulated entities with herring landings. Two firms are large entities (gross receipts over $11 million). The remaining 30 businesses are small entities. Table 2 characterizes gross receipts and gross receipts from the herring fishery for the active firms.

TABLE 2—GROSS REVENUES AND REVENUES FROM HERRING FOR THE ACTIVE DIRECTLY REGULATED SMALL ENTITIES

|  | Gross receipts from active herring permitted firms | Gross receipts from herring fishing |
|---|---|---|
| Mean ................................ | $2,070,541 | $872,567 |
| Median ............................. | $1,030,411 | $95,558 |
| 25th Percentile ................. | $554,628 | $6,570 |
| 75th Percentile ................. | $2,955,883 | $1,696,758 |
| Active Small Entities ....... | 30 | 30 |

*Source: NMFS.*

For the 30 small entities, herring represents an average of 36 percent of gross receipts. For 12 of the small entities, herring represents the single largest source of gross receipts. For eight of the small entities, longfin squid is the largest source of gross receipts and Atlantic sea scallops is the largest source of gross receipts for five of the small entities. The largest source of gross receipts for the remaining five small entities are mixed across different fisheries. Eight of the 30 small entities derived zero revenues from herring.

*Description of Projected Reporting, Recordkeeping, and Other Compliance Requirements*

This proposed rule contains collection-of-information requirements subject to review and approval by the Office of Management and Budget (OMB) under the Paperwork Reduction Act (PRA). The new requirements, which are described in detail in the preamble, have been submitted to OMB for approval as a new collection. The proposed action does not duplicate, overlap, or conflict with any other Federal rules.

The Industry-Funded Monitoring Amendment would replace the current phone-based observer pre-trip notification system with a new web-based pre-trip notification system. There would be no additional reporting burden associated with this measure because the new notification system would increase convenience and will require approximately the same time burden (5 minutes).

This amendment would implement a 50-percent industry-funded monitoring coverage target on vessels issued Category A or B herring permits. The herring industry would be required to pay for industry cost responsibilities associated with at-sea monitoring. There are an estimated 42 vessels with Category A or B permits in the herring fishery. After considering SBRM coverage, NMFS estimates that each vessel would incur monitoring costs for

an additional 19 days at sea per year, at an estimated maximum cost of $710 per sea day. The annual cost estimate for carrying an at-sea monitor for Category A and B vessels would be $566,580, with an average cost per vessel of $13,490.

In addition to the 50-percent industry-funded monitoring coverage target, midwater trawl vessels would have the option to purchase observer coverage to allow them to fish in Groundfish Closed Areas. This option would be available to the estimated 12 vessels that fish with midwater trawl gear. Since this option would be available on all trips not otherwise selected for SBRM or industry-funded at-sea monitoring coverage, it is estimated that each vessel may use this option for up to 21 days per year, at an estimated maximum cost of $818 per sea day. Therefore, the annual cost associated with industry-funded observer coverage for midwater trawl vessels fishing in Groundfish Closed Areas is estimated to be $206,136, with an average annual cost per vessel of $17,178.

To access Groundfish Closed Areas, owners/operators of the 12 affected midwater trawl vessels would request an observer by calling one of the approved monitoring service providers. The average midwater trawl vessel is estimated to take 7 of these trips per year, and each call would take an estimated 5 minutes at a rate of $0.10 per minute. Thus, the total annual burden estimate to the industry for calls to obtain industry-funded observer coverage would be 7 hours and $42 (Per vessel: 1 hr and $3.50). For each of the 7 estimated trips that the vessel calls in to request an industry-funded observer to access Groundfish Closed Areas, the vessel has the option to cancel that trip. The call to cancel the trip would take an estimated 1 minute at a rate of $0.10 per minute. The total annual burden estimated to the industry for cancelling these trips would be 1 hour and $8 (Per vessel: 1 hr and $1).

NMFS expects that some monitoring service providers would apply for approval under the service provider requirements at § 648.11(h), specifically that four out of six providers may apply for approval, and would be subject to these requirements. These providers would submit reports and information required of service providers as part of their application for approval. Service providers must comply with the following requirements, submitted via email, phone, web-portal, fax, or postal service: Submit applications for approval as a monitoring service provider; formally request industry-funded at-sea monitor training by the NEFOP; submit industry-funded at-sea monitor deployment and availability reports; submit biological samples, safety refusal reports, and other reports; give notification of industry-funded at-sea monitor availability within 24 hours of the vessel owner's notification of a prospective trip; provide vessels with notification of industry-funded observer availability in advance of each trip; maintain an updated contact list of all industry-funded observers/ observers that includes the monitor's/ observer's identification number, name, mailing and email address, phone numbers, homeports or fisheries/trip types assigned, and whether or not the monitor/observer is "in service" (*i.e.,* available to provide coverage services). Monitoring service providers would have to provide raw at-sea monitoring data to NMFS and make at-sea monitors available to NMFS for debriefing upon request. The regulations would also require monitoring service providers to submit any outreach materials, such as informational pamphlets, payment notification, and descriptions of monitor duties, as well as all contracts between the service provider and entities requiring monitoring services for review to NMFS. Monitoring service providers also have the option to respond to application denials, and submit a rebuttal in response to a pending removal from the list of approved monitoring service providers. NMFS expects that all of these reporting requirements combined are expected to take 1,192 hours of response time per year for a total annual cost of $12,483 for all affected monitoring service providers ($3,121 per provider). The following table provides the detailed time and cost information for each response item.

TABLE 3—BURDEN ESTIMATE FOR PROPOSED MEASURES

| Monitoring service provider requirements | Number of entities | Total number of items | Response time per response (minutes) | Total time burden (hours) | Cost per response ($) | Total annual public cost ($) |
|---|---|---|---|---|---|---|
| Monitor deployment report by email | 4 | 444 | 10 | 74 | 0.00 | 0.00 |
| Monitor availability report by email | 4 | 216 | 20 | 72 | 0.00 | 0.00 |
| Safety refusals by email | 4 | 40 | 30 | 20 | 0.00 | 0.00 |
| Raw monitor data by express mail | 4 | 444 | 5 | 37 | 23.75 | 10,545 |
| Monitor debriefing | 4 | 124 | 120 | 248 | 12.00 | 1,488 |
| Other reports | 4 | 68 | 30 | 34 | 0.00 | 0.00 |
| Biological samples | 4 | 516 | 60 | 516 | 0.50 | 258 |
| New application to be a service provider | 4 | 4 | 600 | 40 | 0.49 | 2 |
| Applicant response to denial | 1 | 1 | 600 | 10 | 0.49 | 1 |
| Request to service provider to procure a monitor by web-portal | 90 | 360 | 10 | 60 | 0.00 | 0.00 |
| Notification of unavailability of monitors | 90 | 360 | 5 | 30 | 0.00 | 0.00 |
| Request to service provider to procure an observer for Groundfish Closed Areas by phone | 21 | 84 | 10 | 14 | 1.00 | 84.00 |
| Notification of unavailability of observers for Groundfish Closed Areas | 21 | 84 | 5 | 7 | 0.50 | 42.00 |
| Request for monitor training | 4 | 12 | 30 | 6 | 1.80 | 21.60 |
| Rebuttal of pending removal from list of approved service providers | 1 | 1 | 480 | 8 | 0.49 | 1 |
| Monitor contact list updates | 4 | 48 | 5 | 4 | 0.00 | 0.00 |
| Monitor availability updates | 4 | 48 | 5 | 4 | 0.00 | 0.00 |
| Service provider material submissions | 4 | 8 | 30 | 4 | 2.50 | 20.00 |
| Service provider contracts | 4 | 8 | 30 | 4 | 2.50 | 20.00 |
| Total | ............... | ............... | ..................... | 1,192 | ............... | 12,483 |

Public comment is sought regarding the following: Whether this proposed collection of information is necessary for the proper performance of agency functions, including whether the information shall have practical utility; the accuracy of the burden estimate; ways to enhance the quality, utility, and clarity of the information to be collected; and ways to minimize the burden of the collection of information, including through the use of automated collection techniques or other forms of information technology. Send comments on these or any other aspects of the collection of information to the Regional Administrator (see **ADDRESSES**) and email to *OIRA_Submission@ omb.eop.gov* or fax to 202–395–7285.

Notwithstanding any other provision of the law, no person is required to respond to, and no person shall be subject to penalty for failure to comply with, a collection of information subject to the requirements of the PRA, unless that collection of information displays a currently valid OMB Control Number.

*Federal Rules Which May Duplicate, Overlap, or Conflict With the Proposed Rule*

This action does not duplicate, overlap, or conflict with any other Federal rules.

*Description of Significant Alternatives to the Proposed Action Which Accomplish the Stated Objectives of Applicable Statues and Which Minimize Any Significant Economic Impact on Small Entities*

None of the non-preferred herring alternatives would be expected to accomplish the stated objectives for monitoring in the herring fishery as well as the proposed action. The following are objectives for increased monitoring in the herring fishery: (1) Accurate estimates of catch (retained and discarded), (2) accurate catch estimates for incidental species with catch caps (haddock and river herring/shad), and (3) affordable monitoring for the herring fishery. Herring alternatives considered different combinations of monitoring types (observers, at-sea monitors, electronic monitoring, portside sampling) and coverage targets (100 percent, 75 percent, 50 percent, 25 percent) on herring fleets (vessels with Category A or B permits, midwater trawl vessels). Non-preferred herring alternatives with coverage targets of 100 percent or 75 percent would have higher costs than the proposed action. Non-preferred herring alternatives for the midwater trawl fleet or those with 25-percent coverage targets may not have

improved monitoring in the herring fishery as well as the proposed action.

List of Subjects in 50 CFR Part 648

Fisheries, Fishing, Recordkeeping and reporting requirements.

Dated: October 30, 2018.

**Samuel D. Rauch, III,**

*Deputy Assistant Administrator for Regulatory Programs, National Marine Fisheries Service.*

For the reasons set out in the preamble, 50 CFR part 648 is proposed to be amended as follows:

PART 648—FISHERIES OF THE NORTHEASTERN UNITED STATES

■ 1. The authority citation for part 648 continues to read as follows:

**Authority:** 16 U.S.C. 1801 *et seq.*

■ 2. In § 648.2, add the definition for ''Observer or monitor'' and revise the definitions for ''Electronic monitoring'' and ''Slippage in the Atlantic herring fishery'' and ''Slip(s) or slipping catch in the Atlantic herring fishery'' in alphabetical order to read as follows:

§ 648.2  Definitions.

\*    \*    \*    \*    \*

*Electronic monitoring* means a network of equipment that uses a software operating system connected to one or more technology components, including, but not limited to, cameras and recording devices to collect data on catch and vessel operations.

\*    \*    \*    \*    \*

*Observer or monitor* means any person certified by NMFS to collect operational fishing data, biological data, or economic data through direct observation and interaction with operators of commercial fishing vessels as part of NMFS' Northeast Fisheries Observer Program. Observers or monitors include NMFS-certified fisheries observers, at-sea monitors, portside samplers, and dockside monitors.

\*    \*    \*    \*    \*

*Slippage in the Atlantic herring fishery* means catch that is discarded prior to it being brought aboard a vessel issued an Atlantic herring permit and/ or prior to making it available for sampling and inspection by a NMFS-certified observer or monitor. Slippage also means any catch that is discarded during a trip prior to it being sampled portside by a portside sampler on a trip selected for portside sampling coverage by NMFS. Slippage includes releasing catch from a codend or seine prior to the completion of pumping the catch aboard and the release of catch from a codend or seine while the codend or seine is in

the water. Fish that cannot be pumped and remain in the codend or seine at the end of pumping operations are not considered slippage. Discards that occur after the catch is brought on board and made available for sampling and inspection by a NMFS-certified observer or monitor are also not considered slippage.

*Slip(s) or slipping catch in the Atlantic herring fishery* means discarded catch from a vessel issued an Atlantic herring permit that is carrying a NMFS-certified observer or monitor prior to the catch being brought on board or prior to the catch being made available for sampling and inspection by a NMFS-approved observer or monitor after the catch is on board. Slip(s) or slipping catch also means any catch that is discarded during a trip prior to it being sampled portside by a portside sampler on a trip selected for portside sampling coverage by NMFS. Slip(s) or slipping catch includes releasing fish from a codend or seine prior to the completion of pumping the fish on board and the release of fish from a codend or seine while the codend or seine is in the water. Slippage or slipped catch refers to fish that are slipped. Slippage or slipped catch does not include operational discards, discards that occur after the catch is brought on board and made available for sampling and inspection by a NMFS-certified observer or monitor, or fish that inadvertently fall out of or off fishing gear as gear is being brought on board the vessel.

\*    \*    \*    \*    \*

■ 3. In § 648.7, revise paragraph (b)(2)(i) to read as follows:

§ 648.7  Record keeping and reporting requirements.

\*    \*    \*    \*    \*

(b) \*  \*  \*

(2) \*  \*  \*

(i) *Atlantic herring owners or operators issued an All Areas open access permit.* The owner or operator of a vessel issued an All Areas open access permit to fish for herring must report catch (retained and discarded) of herring via an IVR system for each week herring was caught, unless exempted by the Regional Administrator. IVR reports are not required for weeks when no herring was caught. The report shall include at least the following information, and any other information required by the Regional Administrator: Vessel identification; week in which herring are caught; management areas fished; and pounds retained and pounds discarded of herring caught in each management area. The IVR reporting week begins on Sunday at 0001 hour

(hr) (12:01 a.m.) local time and ends Saturday at 2400 hr (12 midnight). Weekly Atlantic herring catch reports must be submitted via the IVR system by midnight each Tuesday, eastern time, for the previous week. Reports are required even if herring caught during the week has not yet been landed. This report does not exempt the owner or operator from other applicable reporting requirements of this section.

\*   \*   \*   \*   \*

■ 4. Revise § 648.11 and the section heading to read as follows:

### § 648.11   Monitoring coverage.

(a) The Regional Administrator may request any vessel holding a permit for Atlantic sea scallops, NE multispecies, monkfish, skates, Atlantic mackerel, squid, butterfish, scup, black sea bass, bluefish, spiny dogfish, Atlantic herring, tilefish, Atlantic surfclam, ocean quahog, or Atlantic deep-sea red crab; or a moratorium permit for summer flounder; to carry a NMFS-certified fisheries observer. A vessel holding a permit for Atlantic sea scallops is subject to the additional requirements specified in paragraph (k) of this section. A vessel holding an All Areas or Areas 2/3 Limited Access Herring Permit is subject to the additional requirements specified in paragraph (m) of this section. Also, any vessel or vessel owner/operator that fishes for, catches or lands hagfish, or intends to fish for, catch, or land hagfish in or from the exclusive economic zone must carry a NMFS-certified fisheries observer when requested by the Regional Administrator in accordance with the requirements of this section.

(b) If requested by the Regional Administrator or their designees, including NMFS-certified observers, monitors, and NMFS staff, to be sampled by an observer or monitor, it is the responsibility of the vessel owner or vessel operator to arrange for and facilitate observer or monitor placement. Owners or operators of vessels selected for observer or monitor coverage must notify the appropriate monitoring service provider before commencing any fishing trip that may result in the harvest of resources of the respective fishery. Notification procedures will be specified in selection letters to vessel owners or permit holder letters.

(c) The Regional Administrator may waive the requirement to be sampled by an observer or monitor if the facilities on a vessel for housing the observer or monitor, or for carrying out observer or monitor functions, are so inadequate or unsafe that the health or safety of the observer or monitor, or the safe operation of the vessel, would be jeopardized.

(d) An owner or operator of a vessel on which a NMFS-certified observer or monitor is embarked must:

(1) Provide accommodations and food that are equivalent to those provided to the crew.

(2) Allow the observer or monitor access to and use of the vessel's communications equipment and personnel upon request for the transmission and receipt of messages related to the observer's or monitor's duties.

(3) Provide true vessel locations, by latitude and longitude or loran coordinates, as requested by the observer or monitor, and allow the observer or monitor access to and use of the vessel's navigation equipment and personnel upon request to determine the vessel's position.

(4) Notify the observer or monitor in a timely fashion of when fishing operations are to begin and end.

(5) Allow for the embarking and debarking of the observer or monitor, as specified by the Regional Administrator, ensuring that transfers of observers or monitors at sea are accomplished in a safe manner, via small boat or raft, during daylight hours as weather and sea conditions allow, and with the agreement of the observers or monitors involved.

(6) Allow the observer or monitor free and unobstructed access to the vessel's bridge, working decks, holding bins, weight scales, holds, and any other space used to hold, process, weigh, or store fish.

(7) Allow the observer or monitor to inspect and copy any the vessel's log, communications log, and records associated with the catch and distribution of fish for that trip.

(e) The owner or operator of a vessel issued a summer flounder moratorium permit, a scup moratorium permit, a black sea bass moratorium permit, a bluefish permit, a spiny dogfish permit, an Atlantic herring permit, an Atlantic deep-sea red crab permit, a skate permit, or a tilefish permit, if requested by the observer or monitor, also must:

(1) Notify the observer or monitor of any sea turtles, marine mammals, summer flounder, scup, black sea bass, bluefish, spiny dogfish, Atlantic herring, Atlantic deep-sea red crab, tilefish, skates (including discards) or other specimens taken by the vessel.

(2) Provide the observer or monitor with sea turtles, marine mammals, summer flounder, scup, black sea bass, bluefish, spiny dogfish, Atlantic herring, Atlantic deep-sea red crab, skates, tilefish, or other specimens taken by the vessel.

(f) NMFS may accept observer or monitor coverage funded by outside sources if:

(1) All coverage conducted by such observers or monitors is determined by NMFS to be in compliance with NMFS' observer or monitor guidelines and procedures.

(2) The owner or operator of the vessel complies with all other provisions of this part.

(3) The observer or monitor is approved by the Regional Administrator.

(g) *Industry-Funded Monitoring Programs.* Fishery management plans (FMPs) managed by the New England Fishery Management Council (New England Council), including Atlantic Herring, Atlantic Salmon, Atlantic Sea Scallops, Deep-Sea Red Crab, Northeast Multispecies, and Northeast Skate Complex, may include industry-funded monitoring programs (IFM) to supplement existing monitoring required by the Standard Bycatch Reporting Methodology (SBRM), Endangered Species Act, and the Marine Mammal Protection Act. IFM programs may use observers, monitors, including at-sea monitors and portside samplers, and electronic monitoring to meet specified IFM coverage targets. The ability to meet IFM coverage targets may be constrained by the availability of Federal funding to pay NMFS cost responsibilities associated with IFM.

(1) *Guiding Principles for New IFM Programs.* The Council's development of an IFM program must consider or include the following:

(i) A clear need or reason for the data collection;

(ii) Objective design criteria;

(iii) Cost of data collection should not diminish net benefits to the nation nor threaten continued existence of the fishery;

(iv) Seek less data intensive methods to collect data necessary to assure conservation and sustainability when assessing and managing fisheries with minimal profit margins;

(v) Prioritize the use of modern technology to the extent practicable; and

(vi) Incentives for reliable self-reporting.

(2) *Process To Implement and Revise New IFM Programs.* New IFM programs shall be developed via an amendment to a specific FMP. IFM programs implemented in an FMP may be revised via a framework adjustment. The details of an IFM program may include, but are not limited to:

(i) Level and type of coverage target,

(ii) Rationale for level and type of coverage,

(iii) Minimum level of coverage necessary to meet coverage goals,

(iv) Consideration of waivers if coverage targets cannot be met,

(v) Process for vessel notification and selection,

(vi) Cost collection and administration,

(vii) Standards for monitoring service providers, and

(viii) Any other measures necessary to implement the industry-funded monitoring program.

(3) *NMFS Cost Responsibilities.* IFM programs have two types of costs, NMFS and industry costs. Cost responsibilities are delineated by the type of cost. NMFS cost responsibilities include the following:

(i) The labor and facilities associated with training and debriefing of monitors;

(ii) NMFS-issued gear (*e.g.,* electronic reporting aids used by human monitors to record trip information);

(iii) Certification of monitoring service providers and individual observers or monitors; performance monitoring to maintain certificates;

(iv) Developing and executing vessel selection;

(v) Data processing (including electronic monitoring video audit, but excluding service provider electronic video review); and

(vi) Costs associated with liaison activities between service providers, and NMFS, Coast Guard, New England Council, sector managers, and other partners.

(vii) The industry is responsible for all other costs associated with IFM programs.

(4) *Prioritization Process to Cover NMFS IFM Cost Responsibilities.* (i) Available Federal funding refers to any funds in excess of those allocated to meet SBRM requirements or the existing IFM programs in the Atlantic Sea Scallop and Northeast Multispecies FMPs that may be used to cover NMFS cost responsibilities associated with IFM coverage targets. If there is no available Federal funding in a given year to cover NMFS IFM cost responsibilities, then there shall be no IFM coverage during that year. If there is some available Federal funding in a given year, but not enough to cover all of NMFS cost responsibilities associated with IFM coverage targets, then the New England Council will prioritize available Federal funding across IFM programs during that year. Existing IFM programs for Atlantic sea scallops and Northeast multispecies fisheries shall

not be included in this prioritization process.

(ii) Programs with IFM coverage targets shall be prioritized using an equal weighting approach, such that any available Federal funding shall be divided equally among programs.

(iii) After NMFS determines the amount of available Federal funding for the next fishing year, NMFS shall provide the New England Council with the estimated IFM coverage levels for the next fishing year. The estimated IFM coverage levels would be based on the equal weighting approach and would include the rationale for any deviations from the equal weighting approach. The New England Council may recommend revisions and additional considerations to the Regional Administrator and Science and Research Director.

(A) If available Federal funding exceeds that needed to pay all of NMFS cost responsibilities for administering IFM programs, the New England Council may request NMFS to use available funding to help offset industry cost responsibilities through reimbursement.

(B) [Reserved]

(iv) Revisions to the prioritization process may be made via a framework adjustment to all New England FMPs.

(v) Revisions to the weighting approach for the New England Council-led prioritization process may be made via a framework adjustment to all New England FMPs or by the New England Council considering a new weighting approach at a public meeting, where public comment is accepted, and requesting NMFS to publish a notice or rulemaking revising the weighting approach. NMFS shall implement revisions to the weighting approach in a manner consistent with the Administrative Procedure Act.

(5) *IFM Program Monitoring Service Provider Requirements.* IFM monitoring service provider requirements shall be consistent with requirements in paragraphs (h) of this section and observer or monitor requirements shall be consistent with requirements in paragraph (i) of this section.

(6) *Monitoring Set-Aside.* The New England Council may develop a monitoring set-aside program for individual FMPs that would devote a portion of the annual catch limit for a fishery to help offset the industry cost responsibilities for monitoring coverage, including observers, at-sea monitors, portside samplers, and electronic monitoring.

(i) The details of a monitoring set-aside program may include, but are not limited to:

(A) The basis for the monitoring set-aside;

(B) The amount of the set-aside (*e.g.,* quota, days at sea);

(C) How the set-aside is allocated to vessels required to pay for monitoring (*e.g.,* an increased trip limit, differential days at sea counting, additional trips, an allocation of the quota);

(D) The process for vessel notification;

(E) How funds are collected and administered to cover the industry's costs of monitoring; and

(F) Any other measures necessary to develop and implement a monitoring set-aside.

(ii) The New England Council may develop new monitoring set-asides and revise those monitoring set-asides via a framework adjustment to the relevant FMP.

(h) *Monitoring service provider approval and responsibilities*—(1) General. An entity seeking to provide monitoring services, including services for IFM Programs described in paragraph (g) of this section, must apply for and obtain approval from NMFS following submission of a complete application. Monitoring services include providing NMFS-certified observers, monitors (at-sea monitors and portside samplers), and/or electronic monitoring. A list of approved monitoring service providers shall be distributed to vessel owners and shall be posted on the NMFS Fisheries Sampling Branch (FSB) website at: *https://www.nefsc.noaa.gov/femad/fsb/.*

(2) [Reserved]

(3) *Contents of application.* An application to become an approved monitoring service provider shall contain the following:

(i) Identification of the management, organizational structure, and ownership structure of the applicant's business, including identification by name and general function of all controlling management interests in the company, including but not limited to owners, board members, officers, authorized agents, and staff. If the applicant is a corporation, the articles of incorporation must be provided. If the applicant is a partnership, the partnership agreement must be provided.

(ii) The permanent mailing address, phone and fax numbers where the owner(s) can be contacted for official correspondence, and the current physical location, business mailing address, business telephone and fax numbers, and business email address for each office.

(iii) A statement, signed under penalty of perjury, from each owner or owners, board members, and officers, if a corporation, that they are free from a

conflict of interest as described under paragraph (h)(6) of this section.

(iv) A statement, signed under penalty of perjury, from each owner or owners, board members, and officers, if a corporation, describing any criminal conviction(s), Federal contract(s) they have had and the performance rating they received on the contracts, and previous decertification action(s) while working as an observer or monitor or monitoring service provider.

(v) A description of any prior experience the applicant may have in placing individuals in remote field and/ or marine work environments. This includes, but is not limited to, recruiting, hiring, deployment, and personnel administration.

(vi) A description of the applicant's ability to carry out the responsibilities and duties of a monitoring service provider as set out under paragraph (h)(5) of this section, and the arrangements to be used.

(vii) Evidence of holding adequate insurance to cover injury, liability, and accidental death for observers or monitors, whether contracted or employed by the service provider, during their period of employment (including during training). Workers' Compensation and Maritime Employer's Liability insurance must be provided to cover the observer or monitor, vessel owner, and observer provider. The minimum coverage required is $5 million. Monitoring service providers shall provide copies of the insurance policies to observers or monitors to display to the vessel owner, operator, or vessel manager, when requested.

(viii) Proof that its observers or monitors, whether contracted or employed by the service provider, are compensated with salaries that meet or exceed the U.S. Department of Labor (DOL) guidelines for observers. Observers shall be compensated as Fair Labor Standards Act (FLSA) non-exempt employees. Monitoring service providers shall provide any other benefits and personnel services in accordance with the terms of each observer's or monitor's contract or employment status.

(ix) The names of its fully equipped, NMFS/FSB certified, observers or monitors on staff or a list of its training candidates (with resumes) and a request for an appropriate NMFS/FSB Training class. All training classes have a minimum class size of eight individuals, which may be split among multiple vendors requesting training. Requests for training classes with fewer than eight individuals will be delayed until further requests make up the full training class size.

(x) An Emergency Action Plan (EAP) describing its response to an ''at sea'' emergency with an observer or monitor, including, but not limited to, personal injury, death, harassment, or intimidation. An EAP that details a monitoring service provider's responses to emergencies involving observers, monitors, or monitoring service provider personnel. The EAP shall include communications protocol and appropriate contact information in an emergency.

(4) *Application evaluation.* (i) NMFS shall review and evaluate each application submitted under paragraph (h)(3) of this section. Issuance of approval as a monitoring service provider shall be based on completeness of the application, and a determination by NMFS of the applicant's ability to perform the duties and responsibilities of a monitoring service provider, as demonstrated in the application information. A decision to approve or deny an application shall be made by NMFS within 15 business days of receipt of the application by NMFS.

(ii) If NMFS approves the application, the monitoring service provider's name will be added to the list of approved monitoring service providers found on the NMFS/FSB website specified in paragraph (h)(1) of this section, and in any outreach information to the industry. Approved monitoring service providers shall be notified in writing and provided with any information pertinent to its participation in the observer or monitor programs.

(iii) An application shall be denied if NMFS determines that the information provided in the application is not complete or the evaluation criteria are not met. NMFS shall notify the applicant in writing of any deficiencies in the application or information submitted in support of the application. An applicant who receives a denial of his or her application may present additional information to rectify the deficiencies specified in the written denial, provided such information is submitted to NMFS within 30 days of the applicant's receipt of the denial notification from NMFS. In the absence of additional information, and after 30 days from an applicant's receipt of a denial, a monitoring service provider is required to resubmit an application containing all of the information required under the application process specified in paragraph (h)(3) of this section to be re-considered for being added to the list of approved monitoring service providers.

(5) *Responsibilities of monitoring service providers.* (i) A monitoring service must provide observers or monitors certified by NMFS/FSB pursuant to paragraph (i) of this section for deployment in a fishery when contacted and contracted by the owner, operator, or vessel manager of a fishing vessel, unless the monitoring service provider refuses to deploy an observer or monitor on a requesting vessel for any of the reasons specified at paragraph (h)(5)(viii) of this section.

(ii) A monitoring service provider must provide to each of its observers or monitors:

(A) All necessary transportation, lodging costs and support for arrangements and logistics of travel for observers and monitors to and from the initial location of assignment, to all subsequent vessel assignments, to any debriefing locations, and for appearances in Court for monitoring-related trials as necessary;

(B) Lodging, per diem, and any other services necessary for observers or monitors assigned to a fishing vessel or to attend an appropriate NMFS/FSB training class;

(C) The required observer or monitor equipment, in accordance with equipment requirements listed on the NMFS/FSB website specified in paragraph (h)(1) of this section, prior to any deployment and/or prior to NMFS observer or monitor certification training; and

(D) Individually assigned communication equipment, in working order, such as a mobile phone, for all necessary communication. A monitoring service provider may alternatively compensate observers or monitors for the use of the observer's or monitor's personal mobile phone, or other device, for communications made in support of, or necessary for, the observer's or monitor's duties.

(iii) *Observer and monitor deployment logistics.* Each approved monitoring service provider must assign an available certified observer or monitor to a vessel upon request. Each approved monitoring service provider must be accessible 24 hours per day, 7 days per week, to enable an owner, operator, or manager of a vessel to secure monitoring coverage when requested. The telephone or other notification system must be monitored a minimum of four times daily to ensure rapid response to industry requests. Monitoring service providers approved under paragraph (h) of this section are required to report observer or monitor deployments to NMFS for the purpose of determining whether the predetermined coverage levels are being achieved in the appropriate fishery.

(iv) *Observer deployment limitations.* (A) A candidate observer's first several

deployments and the resulting data shall be immediately edited and approved after each trip by NMFS/FSB prior to any further deployments by that observer. If data quality is considered acceptable, the observer would be certified. For further information, see *https://www.nefsc.noaa.gov/fsb/ training/*.

(B) For the purpose of coverage to meet SBRM requirements, unless alternative arrangements are approved by NMFS, a monitoring service provider must not deploy any NMFS-certified observer on the same vessel for more than two consecutive multi-day trips, and not more than twice in any given month for multi-day deployments.

(C) For the purpose of coverage to meet IFM requirements, a monitoring service provider may deploy any NMFS-certified observer or monitor on the same vessel for more than two consecutive multi-day trips and more than twice in any given month for multi-day deployments.

(v) *Communications with observers and monitors.* A monitoring service provider must have an employee responsible for observer or monitor activities on call 24 hours a day to handle emergencies involving observers or monitors or problems concerning observer or monitor logistics, whenever observers or monitors are at sea, stationed portside, in transit, or in port awaiting vessel assignment.

(vi) *Observer and monitor training requirements.* A request for a NMFS/FSB Observer or Monitor Training class must be submitted to NMFS/FSB 45 calendar days in advance of the requested training. The following information must be submitted to NMFS/FSB at least 15 business days prior to the beginning of the proposed training: A list of observer or monitor candidates; candidate resumes, cover letters and academic transcripts; and a statement signed by the candidate, under penalty of perjury, that discloses the candidate's criminal convictions, if any. A medical report certified by a physician for each candidate is required 7 business days prior to the first day of training. CPR/First Aid certificates and a final list of training candidates with candidate contact information (email, phone, number, mailing address and emergency contact information) are due 7 business days prior to the first day of training. NMFS may reject a candidate for training if the candidate does not meet the minimum qualification requirements as outlined by NMFS/FSB minimum eligibility standards for observers or monitors as described on the NMFS/FSB website.

(vii) *Reports and Requirements*—(A) Deployment reports. The monitoring service provider must report to NMFS/FSB when, where, to whom, and to what vessel an observer or monitor has been deployed, as soon as practicable, and according to requirements outlined on the NMFS/FSB website. The deployment report must be available and accessible to NMFS electronically 24 hours a day, 7 days a week. The monitoring service provider must ensure that the observer or monitor reports to NMFS the required electronic data, as described in the NMFS/FSB training. Electronic data submission protocols will be outlined in training and may include accessing government websites via personal computers/devices or submitting data through government issued electronics. The monitoring service provider shall provide the raw (unedited) data collected by the observer or monitor to NMFS at the specified time per program. For further information, see *https://www.nefsc.noaa.gov/fsb/scallop/*.

(B) *Safety refusals.* The monitoring service provider must report to NMFS any trip or landing that has been refused due to safety issues (*e.g.,* failure to hold a valid USCG Commercial Fishing Vessel Safety Examination Decal or to meet the safety requirements of the observer's or monitor's safety checklist) within 12 hours of the refusal.

(C) *Biological samples.* The monitoring service provider must ensure that biological samples, including whole marine mammals, sea turtles, sea birds, and fin clips or other DNA samples, are stored/handled properly and transported to NMFS within 5 days of landing. If transport to NMFS/FSB Observer Training Facility is not immediately available then whole animals requiring freezing shall be received by the nearest NMFS freezer facility within 24 hours of vessel landing.

(D) *Debriefing.* The monitoring service provider must ensure that the observer or monitor remains available to NMFS, either in-person or via phone, at NMFS' discretion, including NMFS Office for Law Enforcement, for debriefing for at least 2 weeks following any monitored trip. If requested by NMFS, an observer or monitor that is at sea during the 2-week period must contact NMFS upon his or her return. Monitoring service providers must pay for travel and land hours for any requested debriefings.

(E) *Availability report.* The monitoring service provider must report to NMFS any occurrence of inability to respond to an industry request for observer or monitor coverage due to the lack of available observers or monitors as soon as practicable if the provider is unable to respond to an industry request for monitoring coverage. Availability report must be available and accessible to NMFS electronically 24 hours a day, 7 days a week.

(F) *Incident reports.* The monitoring service provider must report possible observer or monitor harassment, discrimination, concerns about vessel safety or marine casualty, or observer or monitor illness or injury; and any information, allegations, or reports regarding observer or monitor conflict of interest or breach of the standards of behavior, to NMFS/FSB within 12 hours of the event or within 12 hours of learning of the event.

(G) *Status report.* The monitoring service provider must provide NMFS/FSB with an updated list of contact information for all observers or monitors that includes the identification number, name, mailing address, email address, phone numbers, homeports or fisheries/trip types assigned, and must include whether or not the observer or monitor is "in service," indicating when the observer or monitor has requested leave and/or is not currently working for an industry-funded program. Any Federally contracted NMFS-certified observer not actively deployed on a vessel for 30 days will be placed on Leave of Absence (LOA) status (or as specified by NMFS/FSB according to most recent Information Technology Security Guidelines at *https://www.nefsc.noaa.gov/fsb/memos/.* Those Federally contracted NMFS-certified observers on LOA for 90 days or more will need to conduct an exit interview with NMFS/FSB and return any NMFS/FSB issued gear and Common Access Card (CAC), unless alternative arrangements are approved by NMFS/FSB. NMFS/FSB requires 2-week advance notification when a Federally contracted NMFS-certified observer is leaving the program so that an exit interview may be arranged and gear returned.

(H) *Vessel contract.* The monitoring service provider must submit to NMFS/FSB, if requested, a copy of each type of signed and valid contract (including all attachments, appendices, addendums, and exhibits incorporated into the contract) between the monitoring service provider and those entities requiring monitoring services.

(I) *Observer and monitor contract.* The monitoring service provider must submit to NMFS/FSB, if requested, a copy of each type of signed and valid contract (including all attachments, appendices, addendums, and exhibits incorporated into the contract) between

the monitoring service provider and specific observers or monitors.

(J) *Additional information.* The monitoring service provider must submit to NMFS/FSB, if requested, copies of any information developed and/or used by the monitoring service provider and distributed to vessels, observers, or monitors, such as informational pamphlets, payment notification, daily rate of monitoring services, description of observer or monitor duties, etc.

(viii) *Refusal to deploy an observer or monitor.* (A) A monitoring service provider may refuse to deploy an observer or monitor on a requesting fishing vessel if the monitoring service provider does not have an available observer or monitor within the required time and must report all refusals to NMFS/FSB.

(B) A monitoring service provider may refuse to deploy an observer or monitor on a requesting fishing vessel if the monitoring service provider has determined that the requesting vessel is inadequate or unsafe pursuant to the reasons described at § 600.746.

(C) The monitoring service provider may refuse to deploy an observer or monitor on a fishing vessel that is otherwise eligible to carry an observer or monitor for any other reason, including failure to pay for previous monitoring deployments, provided the monitoring service provider has received prior written confirmation from NMFS authorizing such refusal.

(6) *Limitations on conflict of interest.* A monitoring service provider:

(i) Must not have a direct or indirect interest in a fishery managed under Federal regulations, including, but not limited to, a fishing vessel, fish dealer, and/or fishery advocacy group (other than providing monitoring services);

(ii) Must assign observers or monitors without regard to any preference by representatives of vessels other than when an observer or monitor will be deployed for the trip that was selected for coverage; and

(iii) Must not solicit or accept, directly or indirectly, any gratuity, gift, favor, entertainment, loan, or anything of monetary value from anyone who conducts fishing or fishing related activities that are regulated by NMFS, or who has interests that may be substantially affected by the performance or nonperformance of the official duties of monitoring service providers.

(7) *Removal of monitoring service provider from the list of approved service providers.* A monitoring service provider that fails to meet the requirements, conditions, and

responsibilities specified in paragraphs (h)(5) and (6) of this section shall be notified by NMFS, in writing, that it is subject to removal from the list of approved monitoring service providers. Such notification shall specify the reasons for the pending removal. A monitoring service provider that has received notification that it is subject to removal from the list of approved monitoring service providers may submit written information to rebut the reasons for removal from the list. Such rebuttal must be submitted within 30 days of notification received by the monitoring service provider that the monitoring service provider is subject to removal and must be accompanied by written evidence rebutting the basis for removal. NMFS shall review information rebutting the pending removal and shall notify the monitoring service provider within 15 days of receipt of the rebuttal whether or not the removal is warranted. If no response to a pending removal is received by NMFS, the monitoring service provider shall be automatically removed from the list of approved monitoring service providers. The decision to remove the monitoring service provider from the list, either after reviewing a rebuttal, or if no rebuttal is submitted, shall be the final decision of NMFS and the Department of Commerce. Removal from the list of approved monitoring service providers does not necessarily prevent such monitoring service provider from obtaining an approval in the future if a new application is submitted that demonstrates that the reasons for removal are remedied. Certified observers and monitors under contract with observer monitoring service provider that has been removed from the list of approved service providers must complete their assigned duties for any fishing trips on which the observers or monitors are deployed at the time the monitoring service provider is removed from the list of approved monitoring service providers. A monitoring service provider removed from the list of approved monitoring service providers is responsible for providing NMFS with the information required in paragraph (h)(5)(vii) of this section following completion of the trip. NMFS may consider, but is not limited to, the following in determining if a monitoring service provider may remain on the list of approved monitoring service providers:

(i) Failure to meet the requirements, conditions, and responsibilities of monitoring service providers specified in paragraphs (h)(5) and (h)(6) of this section;

(ii) Evidence of conflict of interest as defined under paragraph (h)(6) of this section;

(iii) Evidence of criminal convictions related to:

(A) Embezzlement, theft, forgery, bribery, falsification or destruction of records, making false statements, or receiving stolen property; or

(B) The commission of any other crimes of dishonesty, as defined by state law or Federal law, that would seriously and directly affect the fitness of an applicant in providing monitoring services under this section;

(iv) Unsatisfactory performance ratings on any Federal contracts held by the applicant; and

(v) Evidence of any history of decertification as either an observer, monitor, or monitoring service provider.

(i) *Observer or monitor certification.* (1) To be certified, employees or sub-contractors operating as observers or monitors for monitoring service providers approved under paragraph (h) of this section. In addition, observers must meet NMFS National Minimum Eligibility Standards for observers specified at the National Observer Program website: *https://www.nmfs.noaa.gov/op/pds/categories/scienceandtechnology.html.* For further information, see *https://www.st.nmfs.noaa.gov/observer-home/.*

(2) *Observer or monitor training.* In order to be deployed on any fishing vessel, a candidate observer or monitor must have passed an appropriate NMFS/FSB Observer Training course and must adhere to all NMFS/FSB program standards and policies (refer to website for program standards, *https://www.nefsc.noaa.gov/fsb/training/*). If a candidate fails training, the candidate and monitoring service provider shall be notified immediately by NMFS/FSB. Observer training may include an observer training trip, as part of the observer's training, aboard a fishing vessel with a trainer. Refer to the NMFS/FSB website for the required number of program specific observer and monitor training certification trips for full certification following training, *https://www.nefsc.noaa.gov/fsb/training/.*

(3) *Observer requirements.* All observers must:

(i) Have a valid NMFS/FSB fisheries observer certification pursuant to paragraph (i)(1) of this section;

(ii) Be physically and mentally capable of carrying out the responsibilities of an observer on board fishing vessels, pursuant to standards established by NMFS. Such standards are available from NMFS/FSB website specified in paragraph (h)(1) of this

_0000016984

section and shall be provided to each approved monitoring service provider;

(iii) Have successfully completed all NMFS-required training and briefings for observers before deployment, pursuant to paragraph (i)(2) of this section;

(iv) Hold a current Red Cross (or equivalence) CPR/First Aid certification;

(v) Accurately record their sampling data, write complete reports, and report accurately any observations relevant to conservation of marine resources or their environment; and

(vi) Report unsafe sampling conditions, pursuant to paragraph (m)(6) of this section.

(4) *Monitor requirements.* All monitors must:

(i) Hold a high school diploma or legal equivalent;

(ii) Have a valid NMFS/FSB certification pursuant to paragraph (i)(1) of this section;

(iii) Be physically and mentally capable of carrying out the responsibilities of a monitor on board fishing vessels, pursuant to standards established by NMFS. Such standards are available from NMFS/FSB website specified in paragraph (h)(1) of this section and shall be provided to each approved monitoring service provider;

(iv) Have successfully completed all NMFS-required training and briefings for monitors before deployment, pursuant to paragraph (i)(2) of this section;

(v) Hold a current Red Cross (or equivalence) CPR/First Aid certification if the monitor is to be employed as an at-sea monitor;

(vi) Accurately record their sampling data, write complete reports, and report accurately any observations relevant to conservation of marine resources or their environment; and

(vii) Report unsafe sampling conditions, pursuant to paragraph (m)(6) of this section.

(5) Probation and decertification. NMFS may review observer and monitor certifications and issue observer and monitor certification probation and/or decertification as described in NMFS policy found on the NMFS/FSB website specified in paragraph (h)(1) of this section.

(6) *Issuance of decertification.* Upon determination that decertification is warranted under paragraph (i)(5) of this section, NMFS shall issue a written decision to decertify the observer or monitor to the observer or monitor and approved monitoring service provider via certified mail at the observer's or monitor's most current address provided to NMFS. The decision shall identify whether a certification is

revoked and shall identify the specific reasons for the action taken. Decertification is effective immediately as of the date of issuance, unless the decertification official notes a compelling reason for maintaining certification for a specified period and under specified conditions. Decertification is the final decision of NMFS and the Department of Commerce and may not be appealed.

(j) In the event that a vessel is requested by the Regional Administrator to carry a NMFS-certified fisheries observer pursuant to paragraph (a) of this section and is also selected to carry an at-sea monitor as part of an approved sector at-sea monitoring program specified in § 648.87(b)(1)(v) for the same trip, only the NMFS-certified fisheries observer is required to go on that particular trip.

(k) *Atlantic sea scallop observer program*—(1) *General.* Unless otherwise specified, owners, operators, and/or managers of vessels issued a Federal scallop permit under § 648.4(a)(2), and specified in paragraph (a) of this section, must comply with this section and are jointly and severally responsible for their vessel's compliance with this section. To facilitate the deployment of at-sea observers, all sea scallop vessels issued limited access and LAGC IFQ permits are required to comply with the additional notification requirements specified in paragraph (k)(2) of this section. When NMFS notifies the vessel owner, operator, and/or manager of any requirement to carry an observer on a specified trip in either an Access Area or Open Area as specified in paragraph (k)(3) of this section, the vessel may not fish for, take, retain, possess, or land any scallops without carrying an observer. Vessels may only embark on a scallop trip in open areas or Access Areas without an observer if the vessel owner, operator, and/or manager has been notified that the vessel has received a waiver of the observer requirement for that trip pursuant to paragraphs (k)(3) and (k)(4)(ii) of this section.

(2) *Vessel notification procedures*—(i) *Limited access vessels.* Limited access vessel owners, operators, or managers shall notify NMFS/FSB by telephone not more than 10 days prior to the beginning of any scallop trip of the time, port of departure, open area or specific Sea Scallop Access Area to be fished, and whether fishing as a scallop dredge, scallop trawl, or general category vessel.

(ii) *LAGC IFQ vessels.* LAGC IFQ vessel owners, operators, or managers must notify the NMFS/FSB by telephone by 0001 hr of the Thursday preceding the week (Sunday through

Saturday) that they intend to start any open area or access area scallop trip and must include the port of departure, open area or specific Sea Scallop Access Area to be fished, and whether fishing as a scallop dredge, scallop trawl vessel. If selected, up to two trips that start during the specified week (Sunday through Saturday) can be selected to be covered by an observer. NMFS/FSB must be notified by the owner, operator, or vessel manager of any trip plan changes at least 48 hr prior to vessel departure.

(3) *Selection of scallop trips for observer coverage.* Based on predetermined coverage levels for various permit categories and areas of the scallop fishery that are provided by NMFS in writing to all observer service providers approved pursuant to paragraph (h) of this section, NMFS shall notify the vessel owner, operator, or vessel manager whether the vessel must carry an observer, or if a waiver has been granted, for the specified scallop trip, within 24 hr of the vessel owner's, operator's, or vessel manager's notification of the prospective scallop trip, as specified in paragraph (k)(2) of this section. Any request to carry an observer may be waived by NMFS. All waivers for observer coverage shall be issued to the vessel by VMS so as to have on-board verification of the waiver. A vessel may not fish in an area with an observer waiver confirmation number that does not match the scallop trip plan that was called in to NMFS. Confirmation numbers for trip notification calls are only valid for 48 hr from the intended sail date.

(4) *Procurement of observer services by scallop vessels.* (i) An owner of a scallop vessel required to carry an observer under paragraph (k)(3) of this section must arrange for carrying an observer certified through the observer training class operated by the NMFS/FSB from an observer service provider approved by NMFS under paragraph (h) of this section. The owner, operator, or vessel manager of a vessel selected to carry an observer must contact the observer service provider and must provide at least 48-hr notice in advance of the fishing trip for the provider to arrange for observer deployment for the specified trip. The observer service provider will notify the vessel owner, operator, or manager within 18 hr whether they have an available observer. A list of approved observer service providers shall be posted on the NMFS/FSB website at *https:// www.nefsc.noaa.gov/femad/fsb/.* The observer service provider may take up to 48 hr to arrange for observer

deployment for the specified scallop trip.

(ii) An owner, operator, or vessel manager of a vessel that cannot procure a certified observer within 48 hr of the advance notification to the provider due to the unavailability of an observer may request a waiver from NMFS/FSB from the requirement for observer coverage for that trip, but only if the owner, operator, or vessel manager has contacted all of the available observer service providers to secure observer coverage and no observer is available. NMFS/FSB shall issue such a waiver within 24 hr, if the conditions of this paragraph (g)(4)(ii) are met. A vessel may not begin the trip without being issued a waiver.

(5) Owners of scallop vessels shall be responsible for paying the cost of the observer for all scallop trips on which an observer is carried onboard the vessel, regardless of whether the vessel lands or sells sea scallops on that trip, and regardless of the availability of set-aside for an increased possession limit or reduced DAS accrual rate. The owners of vessels that carry an observer may be compensated with a reduced DAS accrual rate for open area scallop trips or additional scallop catch per day in Sea Scallop Access Areas or additional catch per open area or access area trip for LAGC IFQ trips in order to help defray the cost of the observer, under the program specified in §§ 648.53 and 648.60.

(i) Observer service providers shall establish the daily rate for observer coverage on a scallop vessel on an Access Area trip or open area DAS or IFQ scallop trip consistent with paragraphs (k)(5)(i)(A) and (B), respectively, of this section.

(A) *Access Area trips.* (1) For purposes of determining the daily rate for an observed scallop trip on a limited access vessel in a Sea Scallop Access Area when that specific Access Area's observer set-aside specified in § 648.60(d)(1) has not been fully utilized, a service provider may charge a vessel owner for no more than the time an observer boards a vessel until the vessel disembarks (dock to dock), where "day" is defined as a 24-hr period, or any portion of a 24-hr period, regardless of the calendar day. For example, if a vessel with an observer departs on July 1 at 10 p.m. and lands on July 3 at 1 a.m., the time at sea equals 27 hr, which would equate to 2 full "days."

(2) For purposes of determining the daily rate in a specific Sea Scallop Access Area for an observed scallop trip on a limited access vessel taken after NMFS has announced the industry-funded observer set-aside in that specific Access Area has been fully utilized, a service provider may charge a vessel owner for no more than the time an observer boards a vessel until the vessel disembarks (dock to dock), where "day" is defined as a 24-hr period, and portions of the other days would be pro-rated at an hourly charge (taking the daily rate divided by 24). For example, if a vessel with an observer departs on July 1 at 10 p.m. and lands on July 3 at 1 a.m., the time spent at sea equals 27 hr, which would equate to 1 day and 3 hr.

(3) For purposes of determining the daily rate in a specific Sea Scallop Access Area for observed scallop trips on an LAGC vessel, regardless of the status of the industry-funded observer set-aside, a service provider may charge a vessel owner for no more than the time an observer boards a vessel until the vessel disembarks (dock to dock), where "day" is defined as a 24-hr period, and portions of the other days would be pro-rated at an hourly charge (taking the daily rate divided by 24). For example, if a vessel with an observer departs on July 1 at 10 p.m. and lands on July 3 at 1 a.m., the time spent at sea equals 27 hr, which would equate to 1 day and 3 hr.

(B) *Open area scallop trips.* For purposes of determining the daily rate for an observed scallop trip for DAS or LAGC IFQ open area trips, regardless of the status of the industry-funded observer set-aside, a service provider shall charge dock to dock where "day" is defined as a 24-hr period, and portions of the other days would be pro-rated at an hourly charge (taking the daily rate divided by 24). For example, if a vessel with an observer departs on the July 1st at 10 p.m. and lands on July 3rd at 1 a.m., the time at sea equals 27 hr, so the provider would charge 1 day and 3 hr.

(ii) NMFS shall determine any reduced DAS accrual rate and the amount of additional pounds of scallops per day fished in a Sea Scallop Access Area or on an open area LAGC IFQ trips for the applicable fishing year based on the economic conditions of the scallop fishery, as determined by best available information. Vessel owners and observer service providers shall be notified through the Small Entity Compliance Guide of any DAS accrual rate changes and any changes in additional pounds of scallops determined by the Regional Administrator to be necessary. NMFS shall notify vessel owners and observer providers of any adjustments.

(iii) Owners of scallop vessels shall pay observer service providers for

observer services within 45 days of the end of a fishing trip on which an observer deployed.

(6) When the available DAS or TAC set-aside for observer coverage is exhausted, vessels shall still be required to carry an observer as specified in this section, and shall be responsible for paying for the cost of the observer, but shall not be authorized to harvest additional pounds or fish at a reduced DAS accrual rate.

(l) *NE multispecies observer coverage*—(1) *Pre-trip notification.* Unless otherwise specified in this paragraph (l), or notified by the Regional Administrator, the owner, operator, or manager of a vessel (*i.e.,* vessel manager or sector manager) issued a limited access NE multispecies permit that is fishing under a NE multispecies DAS or on a sector trip, as defined in this part, must provide advanced notice to NMFS of the vessel name, permit number, and sector to which the vessel belongs, if applicable; contact name and telephone number for coordination of observer deployment; date, time, and port of departure; and the vessel's trip plan, including area to be fished, whether a monkfish DAS will be used, and gear type to be used at least 48 hr prior to departing port on any trip declared into the NE multispecies fishery pursuant to § 648.10 or § 648.85, as instructed by the Regional Administrator, for the purposes of selecting vessels for observer deployment. For trips lasting 48 hr or less in duration from the time the vessel leaves port to begin a fishing trip until the time the vessel returns to port upon the completion of the fishing trip, the vessel owner, operator, or manager may make a weekly notification rather than trip-by-trip calls. For weekly notifications, a vessel must notify NMFS by 0001 hr of the Friday preceding the week (Sunday through Saturday) that it intends to complete at least one NE multispecies DAS or sector trip during the following week and provide the date, time, port of departure, area to be fished, whether a monkfish DAS will be used, and gear type to be used for each trip during that week. Trip notification calls must be made no more than 10 days in advance of each fishing trip. The vessel owner, operator, or manager must notify NMFS of any trip plan changes at least 24 hr prior to vessel departure from port. A vessel may not begin the trip without being issued an observer notification or a waiver by NMFS.

(2) *Vessel selection for observer coverage.* NMFS shall notify the vessel owner, operator, or manager whether the vessel must carry an observer, or if a waiver has been granted, for the

specified trip within 24 hr of the vessel owner's, operator's or manager's notification of the prospective trip, as specified in paragraph (l)(1) of this section. All trip notifications shall be issued a unique confirmation number. A vessel may not fish on a NE multispecies DAS or sector trip with an observer waiver confirmation number that does not match the trip plan that was called in to NMFS. Confirmation numbers for trip notification calls are valid for 48 hr from the intended sail date. If a trip is interrupted and returns to port due to bad weather or other circumstance beyond the operator's control, and goes back out within 48 hr, the same confirmation number and observer status remains. If the layover time is greater than 48 hr, a new trip notification must be made by the operator, owner, or manager of the vessel.

(3) *NE multispecies monitoring program goals and objectives.* Monitoring programs established for the NE multispecies are to be designed and evaluated consistent with the following goals and objectives:

(i) Improve documentation of catch:

(A) Determine total catch and effort, for each sector and common pool, of target or regulated species; and

(B) Achieve coverage level sufficient to minimize effects of potential monitoring bias to the extent possible while maintaining as much flexibility as possible to enhance fleet viability.

(ii) Reduce the cost of monitoring:

(A) Streamline data management and eliminate redundancy;

(B) Explore options for cost-sharing and deferment of cost to industry; and

(C) Recognize opportunity costs of insufficient monitoring.

(iii) Incentivize reducing discards:

(A) Determine discard rate by smallest possible strata while maintaining cost-effectiveness; and

(B) Collect information by gear type to accurately calculate discard rates.

(iv) Provide additional data streams for stock assessments:

(A) Reduce management and/or biological uncertainty; and

(B) Perform biological sampling if it may be used to enhance accuracy of mortality or recruitment calculations.

(v) Enhance safety of monitoring program.

(vi) Perform periodic review of monitoring program for effectiveness.

(m) *Atlantic herring monitoring coverage*—(1) *Monitoring requirements.* (i) In addition to the requirement for any vessel holding an Atlantic herring permit to carry a NMFS-certified observer described in paragraph (a) of this section, vessels issued an All Areas

or Areas 2/3 Limited Access Herring Permit are subject to industry-funded monitoring (IFM) requirements on declared Atlantic herring trips, unless the vessel is carrying a NMFS-certified observer to fulfill Standard Bycatch Reporting Methodology requirements. An owner of a midwater trawl vessel, required to carry a NMFS-certified observer when fishing in Northeast Multispecies Closed Areas at §648.202(b), may purchase an IFM high volume fisheries (HVF) observer to access Closed Areas on a trip-by-trip basis. General requirements for IFM programs in New England Council FMPs are specified in paragraph (g) of this section. Possible IFM monitoring for the Atlantic herring fishery includes NMFS-certified observers, at-sea monitors, and electronic monitoring and portside samplers, as defined in §648.2.

(A) IFM HVF observers shall collect the following information:

(1) Fishing gear information (*e.g.,* size of nets, mesh sizes, and gear configurations);

(2) Tow-specific information (*e.g.,* depth, water temperature, wave height, and location and time when fishing begins and ends);

(3) Species, weight, and disposition of all retained and discarded catch (fish, sharks, crustaceans, invertebrates, and debris) on observed hauls;

(4) Species, weight, and disposition of all retained catch on unobserved hauls;

(5) Actual catch weights whenever possible, or alternatively, weight estimates derived by sub-sampling;

(6) Whole specimens, photos, length information, and biological samples (*e.g.,* scales, otoliths, and/or vertebrae from fish, invertebrates, and incidental takes);

(7) Information on interactions with protected species, such as sea turtles, marine mammals, and sea birds; and

(8) Vessel trip costs (*i.e.,* operational costs for trip including food, fuel, oil, and ice).

(B) IFM HVF at-sea monitors shall collect the following information:

(1) Fishing gear information (*e.g.,* size of nets, mesh sizes, and gear configurations);

(2) Tow-specific information (*e.g.,* depth, water temperature, wave height, and location and time when fishing begins and ends);

(3) Species, weight, and disposition of all retained and discarded catch (fish, sharks, crustaceans, invertebrates, and debris) on observed hauls;

(4) Species, weight, and disposition of all retained catch on unobserved hauls;

(5) Actual catch weights whenever possible, or alternatively, weight estimates derived by sub-sampling;

(6) Length data, along with whole specimens and photos to verify species identification, on retained and discarded catch;

(7) Information on and biological samples from interactions with protected species, such as sea turtles, marine mammals, and sea birds; and

(8) Vessel trip costs (*i.e.,* operational costs for trip including food, fuel, oil, and ice).

(9) The New England Council may recommend that at-sea monitors collect additional biological information upon request. Revisions to the duties of an at-sea monitor, such that additional biological information would be collected, may be done via a framework adjustment. At-sea monitor duties may also be revised to collect additional biological information by considering the issue at a public meeting, where public comment is accepted, and requesting NMFS to publish a notice or rulemaking revising the duties for at-sea monitors. NMFS shall implement revisions to at-sea monitor duties in accordance with the APA.

(C) IFM Portside samplers shall collect the following information:

(1) Species, weight, and disposition of all retained catch (fish, sharks, crustaceans, invertebrates, and debris) on sampled trips;

(2) Actual catch weights whenever possible, or alternatively, weight estimates derived by sub-sampling; and

(3) Whole specimens, photos, length information, and biological samples (*i.e.,* scales, otoliths, and/or vertebrae from fish, invertebrates, and incidental takes).

(ii) Vessels issued an All Areas or Areas 2/3 Limited Access Herring Permit are subject to IFM at-sea monitoring coverage. If the New England Council determines that electronic monitoring, used in conjunction with portside sampling, is an adequate substitute for at-sea monitoring on vessels fishing with midwater trawl gear, and it is approved by the Regional Administrator as specified in (m)(1)(iii), then owners of vessels issued an All Areas or Areas 2/3 Limited Access Herring Permit may choose either IFM at-sea monitoring coverage or IFM electronic monitoring and IFM portside sampling coverage, pursuant with requirements in paragraphs (h) and (i) of this section. Once owners of vessels issued an All Areas or Areas 2/3 Limited Access Herring Permit may choose an IFM monitoring type, vessel owners must select one IFM monitoring type per fishing year and notify NMFS of their selected IFM monitoring type via selection form six months in advance of

the beginning of the fishing year. NMFS will provide vessels owners with selection forms no later than June 1 of each year.

(A) In a future framework adjustment, the New England Council may consider if electronic monitoring and portside sampling coverage is an adequate substitute for at-sea monitoring coverage for Atlantic herring vessels that fish with purse seine and/or bottom trawl gear.

(B) IFM coverage targets for the Atlantic herring fishery are calculated by NMFS, in consultation with New England Council staff.

(C) If IFM coverage targets do not match for the Atlantic herring and Atlantic mackerel fisheries, then the higher IFM coverage target would apply on trips declared into both fisheries.

(D) Vessels intending to land less than 50 mt of Atlantic herring are exempt from IFM requirements, provided that the vessel requests and is issued a waiver prior to departing on that trip, consistent with paragraphs (m)(2)(iii)(B) and (m)(3) of this section. Vessels issued a waiver must land less than 50 mt of Atlantic herring on that trip.

(E) A wing vessel (*i.e.*, midwater trawl vessel pair trawling with another midwater trawl vessel) is exempt from IFM requirements on a trip, provided the wing vessel does not possess or land any fish on that trip and requests and is issued a waiver prior to departing on that trip, consistent with paragraphs (m)(2)(iii)(C) and (m)(3) of this section.

(F) Two years after implementation of IFM in the Atlantic herring fishery, the New England Council will examine the results of any increased coverage in the Atlantic herring fishery and consider if adjustments to the IFM coverage targets are warranted.

(iii) Electronic monitoring and portside sampling coverage may be used in place of at-sea monitoring coverage in the Atlantic herring fishery, if the electronic monitoring technology is deemed sufficient by the New England Council. The Regional Administrator, in consultation with the New England Council, may approve the use of electronic monitoring and portside sampling for the Atlantic herring fishery in a manner consistent with the Administrative Procedure Act, with final measures published in the **Federal Register**. A vessel electing to use electronic monitoring and portside sampling in lieu of at-sea monitoring must develop a vessel monitoring plan to implement an electronic monitoring and portside sampling program that NMFS determines is sufficient for monitoring catch, discards and slippage events. The electronic monitoring and

portside sampling program shall be reviewed and approved by NMFS as part of a vessel's monitoring plan on a yearly basis in a manner consistent with the Administrative Procedure Act.

(iv) Owners, operators, or managers of vessels issued an All Areas Limited Access Herring Permit or Areas 2/3 Limited Access Herring Permit are responsible for their vessel's compliance with IFM requirements. When NMFS notifies a vessel owner, operator, or manager of the requirement to have monitoring coverage on a specific declared Atlantic herring trip, that vessel may not fish for, take, retain, possess, or land any Atlantic herring without the required monitoring coverage. Vessels may only embark on a declared Atlantic herring trip without the required monitoring coverage if the vessel owner, operator, and/or manager has been notified that the vessel has received a waiver for the required monitoring coverage for that trip, pursuant to paragraphs (m)(2)(iii)(B) and (C) and paragraph (m)(3) of this section.

(v) To provide the required IFM coverage aboard declared Atlantic herring trips, NMFS-certified observers and monitors must hold a high volume fisheries certification from NMFS/FSB. See details of high volume certification at *https://www.nefsc.noaa.gov/fsb/ training/*.

(2) *Pre-trip notification.* (i) At least 48 hr prior to the beginning of any trip on which a vessel may harvest, possess, or land Atlantic herring, the owner, operator, or manager of a vessel issued a Limited Access Herring Permit, or a vessel issued an Areas 2/3 Open Access Herring Permit on a declared herring trip, or a vessel issued an All Areas Open Access Herring Permit fishing with midwater trawl gear in Management Areas 1A, 1B, and/or 3, as defined in § 648.200(f)(1) and (3), or a vessel acting as a herring carrier must notify NMFS/FSB of the trip.

(ii) The notification to NMFS/FSB must include the following information: Vessel name or names in the cases of paired midwater trawlers, permit category, and permit number; contact name for coordination of monitoring coverage; telephone number for contact; the date, time, and port of departure; gear type; target species; trip length and port of landing; and intended area of fishing.

(iii) For vessels issued an All Areas Limited Access Herring Permit or Areas 2/3 Limited Access Herring Permit, the trip notification must also include the following requests, if appropriate:

(A) For IFM NMFS-certified observer coverage aboard vessels fishing with midwater trawl gear to access the

Northeast Multispecies Closed Areas, consistent with requirements at § 648.202(b), at any point during the trip;

(B) For a waiver of IFM requirements on a trip that shall land less than 50 mt of Atlantic herring; and

(C) For a waiver of IFM requirements on trip by a wing vessel as described in paragraph (m)(ii)(E) of this section.

(iv) Trip notification must be provided no more than 9 days in advance of each fishing trip. The vessel owner, operator, or manager must notify NMFS/FSB of any trip plan changes at least 12 hr prior to vessel departure from port.

(3) *Selection of trips for monitoring coverage.* NMFS shall notify the owner, operator, and/or manager of a vessel with an Atlantic herring permit whether a declared Atlantic herring trip requires coverage by a NMFS-funded observer or whether a trip requires IFM coverage. NMFS shall also notify the owner, operator, and/or manager of vessel if a waiver has been granted, either for the NMFS-funded observer or for IFM coverage, as specified in paragraph (m)(2) of this section. All waivers for monitoring coverage shall be issued to the vessel by VMS so that there is an on-board verification of the waiver. A waiver is invalid if the fishing behavior on that trip is inconsistent with the terms of the waiver.

(4) *Procurement of monitoring services by Atlantic herring vessels.* (i) An owner of an Atlantic herring vessel required to have monitoring under paragraph (m)(3) of this section must arrange for monitoring by an individual certified through training classes operated by the NMFS/FSB and from a monitoring service provider approved by NMFS under paragraph (h) of this section. The owner, operator, or vessel manager of a vessel selected for monitoring must contact a monitoring service provider prior to the beginning of the trip and the monitoring service provider will notify the vessel owner, operator, or manager whether monitoring is available. A list of approved monitoring service providers shall be posted on the NMFS/FSB website at *https://www.nefsc.noaa.gov/ femad/fsb/*.

(ii) An owner, operator, or vessel manager of a vessel that cannot procure monitoring due to the unavailability of monitoring may request a waiver from NMFS/FSB from the requirement for monitoring on that trip, but only if the owner, operator, or vessel manager has contacted all of the available monitoring service providers to secure monitoring and no monitoring is available. NMFS/FSB shall issue a waiver, if the

conditions of this paragraph (m)(4)(ii) are met. A vessel without monitoring coverage may not begin a declared Atlantic herring trip without having been issued a waiver.

(iii) Vessel owners shall pay service providers for monitoring services within 45 days of the end of a fishing trip that was monitored.

(5) When vessels issued limited access herring permits are working cooperatively in the Atlantic herring fishery, including pair trawling, purse seining, and transferring herring at-sea, each vessel must provide to observers or monitors, when requested, the estimated weight of each species brought on board and the estimated weight of each species released on each tow.

(6) *Sampling requirements for NMFS-certified observer and monitors.* In addition to the requirements at § 648.11(d)(1) through (7), an owner or operator of a vessel issued a limited access herring permit on which a NMFS-certified observer or monitor is embarked must provide observers or monitors:

(i) A safe sampling station adjacent to the fish deck, including: A safety harness, if footing is compromised and grating systems are high above the deck; a safe method to obtain samples; and a storage space for baskets and sampling gear.

(ii) Reasonable assistance to enable observers or monitors to carry out their duties, including but not limited to assistance with: Obtaining and sorting samples; measuring decks, codends, and holding bins; collecting bycatch when requested by the observers or monitors; and collecting and carrying baskets of fish when requested by the observers or monitors.

(iii) Advance notice when pumping will be starting; when sampling of the catch may begin; and when pumping is coming to an end.

(iv) Visual access to the net, the codend of the net, and the purse seine bunt and any of its contents after pumping has ended and before the pump is removed from the net. On trawl vessels, the codend including any remaining contents must be brought on board, unless bringing the codend on board is not possible. If bringing the codend on board is not possible, the vessel operator must ensure that the observer or monitor can see the codend and its contents as clearly as possible before releasing its contents.

(7) *Measures to address slippage.* (i) No vessel issued a limited access herring permit may slip catch, as defined at § 648.2, except in the following circumstances:

(A) The vessel operator has determined, and the preponderance of available evidence indicates that, there is a compelling safety reason; or

(B) A mechanical failure, including gear damage, precludes bringing some or all of the catch on board the vessel for inspection; or

(C) The vessel operator determines that pumping becomes impossible as a result of spiny dogfish clogging the pump intake. The vessel operator shall take reasonable measures, such as strapping and splitting the net, to remove all fish which can be pumped from the net prior to release.

(ii) Vessels may make test tows without pumping catch on board if the net is re-set without releasing its contents provided that all catch from test tows is available to the observer to sample when the next tow is brought on board for sampling.

(iii) If a vessel issued any limited access herring permit slips catch, the vessel operator must report the slippage event on the Atlantic herring daily VMS catch report and indicate the reason for slipping catch. Additionally, the vessel operator must complete and sign a Released Catch Affidavit detailing: The vessel name and permit number; the VTR serial number; where, when, and the reason for slipping catch; the estimated weight of each species brought on board or slipped on that tow. A completed affidavit must be submitted to NMFS within 48 hr of the end of the trip.

(iv) If a vessel issued an All Areas or Areas 2/3 Limited Access Herring permit slips catch for any of the reasons described in paragraph (m)(4)(i) of this section when an observer or monitor is aboard, the vessel operator must move at least 15 nm (27.78 km) from the location of the slippage event before deploying any gear again, and must stay at least 15 nm (27.78 km) away from the slippage event location for the remainder of the fishing trip.

(v) If a vessel issued an All Areas or Areas 2/3 Limited Access Herring permit slips catch for any reason on a trip selected by NMFS for portside sampling, pursuant to paragraph (m)(3) of this section, the vessel operator must move at least 15 nm (27.78 km) from the location of the slippage event before deploying any gear again, and must stay at least 15 nm (27.78 km) away from the slippage event location for the remainder of the fishing trip.

(vi) If catch is slipped by a vessel issued an All Areas or Areas 2/3 Limited Access Herring permit for any reason not described in paragraph (m)(4)(i) of this section when an observer or monitor is aboard, the vessel operator must immediately terminate the trip and return to port. No fishing activity may occur during the return to port.

(n) *Atlantic mackerel, squid, and butterfish observer coverage*—(1) *Pre-trip notification.* (i) A vessel issued a limited access Atlantic mackerel permit, as specified in § 648.4(a)(5)(iii), must, for the purposes of observer deployment, have a representative provide notice to NMFS of the vessel name, vessel permit number, contact name for coordination of observer deployment, telephone number or email address for contact; and the date, time, port of departure, gear type, and approximate trip duration, at least 48 hr, but no more than 10 days, prior to beginning any fishing trip, unless it complies with the possession restrictions in paragraph (n)(1)(iii) of this section.

(ii) A vessel that has a representative provide notification to NMFS as described in paragraph (n)(1)(i) of this section may only embark on a mackerel trip without an observer if a vessel representative has been notified by NMFS that the vessel has received a waiver of the observer requirement for that trip. NMFS shall notify a vessel representative whether the vessel must carry an observer, or if a waiver has been granted, for the specific mackerel trip, within 24 hr of the vessel representative's notification of the prospective mackerel trip, as specified in paragraph (n)(1)(i) of this section. Any request to carry an observer may be waived by NMFS. A vessel that fishes with an observer waiver confirmation number that does not match the mackerel trip plan that was called in to NMFS is prohibited from fishing for, possessing, harvesting, or landing mackerel except as specified in paragraph (n)(1)(iii) of this section. Confirmation numbers for trip notification calls are only valid for 48 hr from the intended sail date.

(iii) *Trip limits:* A vessel issued a limited access mackerel permit, as specified in § 648.4(a)(5)(iii), that does not have a representative provide the trip notification required in paragraph (n)(1)(i) of this section is prohibited from fishing for, possessing, harvesting, or landing more than 20,000 lb (9.07 mt) of mackerel per trip at any time, and may only land mackerel once on any calendar day, which is defined as the 24-hr period beginning at 0001 hours and ending at 2400 hours.

(iv) If a vessel issued a limited access Atlantic mackerel permit, as specified in § 648.4(a)(5)(iii), intends to possess, harvest, or land more than 20,000 lb (9.07 mt) of mackerel per trip or per

calendar day, and has a representative notify NMFS of an upcoming trip, is selected by NMFS to carry an observer, and then cancels that trip, the representative is required to provide notice to NMFS of the vessel name, vessel permit number, contact name for coordination of observer deployment, and telephone number or email address for contact, and the intended date, time, and port of departure for the cancelled trip prior to the planned departure time. In addition, if a trip selected for observer coverage is cancelled, then that vessel is required to carry an observer, provided an observer is available, on its next trip.

(2) *Sampling requirements for limited access Atlantic mackerel and longfin squid/butterfish moratorium permit holders.* In addition to the requirements in paragraphs (d)(1) through (7) of this section, an owner or operator of a vessel issued a limited access Atlantic mackerel or longfin squid/butterfish moratorium permit on which a NMFS-certified observer is embarked must provide observers:

(i) A safe sampling station adjacent to the fish deck, including: A safety harness, if footing is compromised and grating systems are high above the deck; a safe method to obtain samples; and a storage space for baskets and sampling gear.

(ii) Reasonable assistance to enable observers to carry out their duties, including but not limited to assistance with: Obtaining and sorting samples; measuring decks, codends, and holding bins; collecting bycatch when requested by the observers; and collecting and carrying baskets of fish when requested by the observers.

(iii) Advance notice when pumping will be starting; when sampling of the catch may begin; and when pumping is coming to an end.

(3) *Measures to address slippage.* (i) No vessel issued a limited access Atlantic mackerel permit or a longfin squid/butterfish moratorium permit may slip catch, as defined at § 648.2, except in the following circumstances:

(A) The vessel operator has determined, and the preponderance of available evidence indicates that, there is a compelling safety reason; or

(B) A mechanical failure, including gear damage, precludes bringing some or all of the catch on board the vessel for sampling and inspection; or

(C) The vessel operator determines that pumping becomes impossible as a result of spiny dogfish clogging the pump intake. The vessel operator shall take reasonable measures, such as strapping and splitting the net, to

remove all fish that can be pumped from the net prior to release.

(ii) If a vessel issued any limited access Atlantic mackerel permit slips catch, the vessel operator must report the slippage event on the Atlantic mackerel and longfin squid daily VMS catch report and indicate the reason for slipping catch. Additionally, vessels issued a limited Atlantic mackerel permit or a longfin squid/butterfish moratorium permit, the vessel operator must complete and sign a Released Catch Affidavit detailing: The vessel name and permit number; the VTR serial number; where, when, and the reason for slipping catch; the estimated weight of each species brought on board or slipped on that tow. A completed affidavit must be submitted to NMFS within 48 hr of the end of the trip.

(iii) If a vessel issued a limited access Atlantic mackerel permit slips catch for any of the reasons described in paragraph (n)(3)(i) of this section, the vessel operator must move at least 15 nm (27.8 km) from the location of the slippage event before deploying any gear again, and must stay at least 15 nm (27.8 km) from the slippage event location for the remainder of the fishing trip.

(iv) If catch is slipped by a vessel issued a limited access Atlantic mackerel permit for any reason not described in paragraph (n)(3)(i) of this section, the vessel operator must immediately terminate the trip and return to port. No fishing activity may occur during the return to port.

■ 5. Amend § 648.14 by revising paragraphs (e), (r)(1)(vi)(A), (r)(2)(v), and (r)(2)(ix) through (xi) and adding paragraphs (r)(2)(xiii) and (xiv) to read as follows:

### § 648.14 Prohibitions.

\* \* \* \* \*

(e) *Observer program.* It is unlawful for any person to do any of the following:

(1) Assault, resist, oppose, impede, harass, intimidate, or interfere with or bar by command, impediment, threat, or coercion any NMFS-certified observer or monitor conducting his or her duties; any authorized officer conducting any search, inspection, investigation, or seizure in connection with enforcement of this part; any official designee of the Regional Administrator conducting his or her duties, including those duties authorized in § 648.7(g).

(2) Refuse monitoring coverage by a NMFS-certified observer or monitor if selected for monitoring coverage by the Regional Administrator or the Regional Administrator's designee.

(3) Fail to provide information, notification, accommodations, access, or reasonable assistance to either a NMFS-certified observer or monitor conducting his or her duties as specified in § 648.11.

(4) Submit false or inaccurate data, statements, or reports.

\* \* \* \* \*

(r) \* \* \*

(1) \* \* \*

(vi) \* \* \*

(A) For the purposes of observer deployment, fail to notify NMFS at least 48 hr prior to departing on a declared herring trip with a vessel issued an All Areas Limited Access Herring Permit and/or an Area 2 and 3 Limited Access Herring Permit and fishing with midwater trawl or purse seine gear, or on a trip with a vessel issued a Limited Access Incidental Catch Herring Permit and/or an Open Access Herring Permit that is fishing with midwater trawl gear in Management Areas 1A, 1B, and/or 3, as defined in § 648.200(f)(1) and (3), pursuant to the requirements in § 648.80(d) and (e).

\* \* \* \* \*

(2) \* \* \*

(v) Fish with midwater trawl gear in any Northeast Multispecies Closed Area, as defined in § 648.81(a)(3),(4), (5), and (c)(3) and (4), without a NMFS-certified observer on board, if the vessel has been issued an Atlantic herring permit.

\* \* \*

(ix) For vessels with All Areas or Areas 2/3 Limited Access Herring Permits, fail to move 15 nm (27.78 km), as required by §§ 648.11(m)(8)(iv) and (v) and § 648.202(b)(4)(iv).

(x) For vessels with All Areas or Areas 2/3 Limited Access Herring Permits, fail to immediately return to port, as required by § 648.11(m)(8)(vi) and § 648.202(b)(4)(iv).

(xi) Fail to complete, sign, and submit a Released Catch Affidavit as required by § 648.11(m)(8)(iii) and § 648.202(b)(4)(ii).

\* \* \*

(xiii) For vessels with All Areas or Areas 2/3 Limited Access Herring Permits, fail to comply with industry-funded monitoring requirements at § 648.11(m).

(xiv) For a vessel with All Areas or Areas 2/3 Limited Access Herring Permit, fail to comply with its NMFS-approved vessel monitoring plan requirements, as described at § 648.11(m).

\* \* \* \* \*

■ 6. In § 648.80 revise paragraph (d)(5) and (e)(5) to read as follows:

**§ 648.80  NE Multispecies regulated mesh areas and restrictions on gear and methods of fishing.**

\*      \*      \*      \*      \*

(d) \* \* \*

(5) To fish for herring under this exemption, a vessel issued an All Areas Limited Access Herring Permit and/or an Areas 2 and 3 Limited Access Herring Permit fishing on a declared herring trip, or a vessel issued a Limited Access Incidental Catch Herring Permit and/or an Open Access Herring Permit fishing with midwater trawl gear in Management Areas 1A, 1B, and/or 3, as defined in § 648.200(f)(1) and (3), must provide notice of the following information to NMFS at least 48 hr prior to beginning any trip into these areas for the purposes of observer deployment: Vessel name; contact name for coordination of observer deployment; telephone number for contact; the date, time, and port of departure; and

\*      \*      \*      \*      \*

(e) \* \* \*

(5) To fish for herring under this exemption, vessels that have an All Areas Limited Access Herring Permit and/or an Areas 2 and 3 Limited Access Herring Permit must provide notice to NMFS of the vessel name; contact name for coordination of observer deployment; telephone number for contact; and the date, time, and port of departure, at least 48 hr prior to beginning any trip into these areas for the purposes of observer deployment; and

\*      \*      \*      \*      \*

■ 7. In § 648.86 revise paragraph (a)(3)(ii)(A)(*1*) to read as follows:

**§ 648.86  NE Multispecies possession restrictions.**

\*      \*      \*      \*      \*

(a) \* \* \*
(3) \* \* \*
(ii) \* \* \*
(A) \* \* \*

(*1*) 648.86(a)(3)(ii) *Haddock incidental catch cap.* (A)(*1*) When the Regional Administrator has determined that the incidental catch allowance for a given haddock stock, as specified in § 648.90(a)(4)(iii)(D), has been caught, no vessel issued an Atlantic herring permit and fishing with midwater trawl gear in the applicable stock area, *i.e.,* the Herring GOM Haddock Accountability Measure (AM) Area or Herring GB Haddock AM Area, as defined in paragraphs (a)(3)(ii)(A)(*2*) and (*3*) of this section, may fish for, possess, or land herring in excess of 2,000 lb (907.2 kg) per trip in or from that area, unless all herring possessed and landed by the vessel were caught outside the applicable AM Area and the vessel's gear is stowed and not available for immediate use as defined in § 648.2 while transiting the AM Area. Upon this determination, the haddock possession limit is reduced to 0 lb (0 kg) for a vessel issued a Federal Atlantic herring permit and fishing with midwater trawl gear or for a vessel issued an All Areas Limited Access Herring Permit and/or an Areas 2 and 3 Limited Access Herring Permit fishing on a declared herring trip, regardless of area fished or gear used, in the applicable AM area, unless the vessel also possesses a NE multispecies permit and is operating on a declared (consistent with § 648.10(g)) NE multispecies trip. In making this determination, the Regional Administrator shall use haddock catches observed by NMFS-certified observers or monitors by herring vessel trips using midwater trawl gear in Management Areas 1A, 1B, and/or 3, as defined in § 648.200(f)(1) and (3), expanded to an estimate of total haddock catch for all such trips in a given haddock stock area.

\*      \*      \*      \*      \*

**§§ 648.10, 648.14, 648.51, 648.59, 648.80, and 648.86   [Amended]**

■ 8. In the table below, for each section indicated in the left column, remove the text indicated in the middle column from wherever it appears in the section, and add the text indicated in the right column:

| Section | Remove | Add |
|---|---|---|
| 648.10(f)(4) | NMFS-approved | NMFS-certified. |
| 648.14(i)(3)(ix) | NMFS-approved | NMFS-certified. |
| 648.14(i)(3)(ix)(C) | 648.11(g) | 648.11(k). |
| 648.14(k)(2)(iii) | 648.11(k) | 648.11(l). |
| 648.14(k)(2)(iv) | 648.11(k) | 648.11(l). |
| 648.51(c)(4) | 648.11(g) | 648.11(k). |
| 648.51(e)(3)(iii) | 648.11(g) | 648.11(k). |
| 648.59(b)(2) | 648.11(g) | 648.11(k). |
| 648.80(d)(3) | NMFS-approved sea sampler/observer | NMFS-certified observer. |
| 648.80(e)(2)(ii) | NMFS-approved sea sampler/observer | NMFS-certified observer. |
| 648.86(a)(3)(ii) | NMFS-approved | NMFS-certified. |
| 648.202(b)(4)(iv) | 648.11(m)(4)(iv) and (v) | 648.11(m)(4)(iv) and (vi). |

[FR Doc. 2018–24087 Filed 11–6–18; 8:45 am]

**BILLING CODE 3510–22–P**