# Exhibit 13

*15. Observer Policy Committee (April 18-20, 2017) M)*



# CORRESPONDENCE



**Seafreeze Ltd.**

100 Davisville Pier
North Kingstown, R.I. 02852 U.S.A.
Tel: (401)295-2585



March 30, 2017

RECEIVED
MAR 30 2017
NEW ENGLAND FISHERY
MANAGEMENT COUNCIL

Dear Herring Committee members,

Please find below information we submitted in our written comments for the IFM amendment. We believe they warrant serious consideration at the Committee's meeting on April 5.

---

Two of the major goals and objectives identified by the NEFMC for increasing monitoring in the herring fishery are "accurate catch estimates for incidental species for which catch caps apply", and "affordable monitoring for the herring fishery". The catch cap species being discussed with relation to small mesh bottom trawl vessels, which include our vessels, are river herring and shad. According to analysis of small mesh bottom trawl observer data (all fisheries), approximately 5%-22% coverage is needed to obtain a 30% CV for river herring and shad catch in that gear type.[1] These coverage levels are already being covered by SBRM[2] and the associated CV is already below 30%. In fact the small mesh bottom trawl herring fishery RH/S catch cap CV was 28.4% in 2014, and 24.5% in 2015.[3] Additionally, due to the fact that the small mesh bottom trawl fleet includes vessels with permits other than A and B permits, which are targeted by this amendment, the herring alternatives presented would never achieve a 0% CV, even at 100% coverage rates (which is why even 100% observer coverage on small mesh bottom trawl would only have a "Low Positive" on tracking catch caps)[4]. Even staff documents developed during this amendment process have indicated that even Alternative 2.2, <u>up to 100% ASM coverage on small mesh bottom trawl, will have "Negligible" effect on catch tracked against catch caps.[5] But it will not have a negligible economic effect, on small mesh bottom trawl vessels in general but particularly Seafreeze vessels.</u>

---

[1] Industry Funded Monitoring Omnibus Amendment Discussion Document, Mackerel Alternatives, Mid Atlantic Fishery Management Council, April 12-14, 2016. See https://static1.squarespace.com/static/511cdc7fe4b00307a2628ac6/t/56fec92c04426225f77234f4/1459538223368/Tab02_MSB-RHS-Committees.pdf, page 28.

[2] According to the Herring PDT Meeting Summary Dec 10, 2015, revised Jan 15, 2016, in 2014 observers covered 26.2% of all small mesh bottom trawl trips targeting herring, and preliminary estimates indicated 31% coverage on trips from January-June 2015. See http://s3.amazonaws.com/nefmc.org/3.151210-Herring-PDT-mtg-summary-REVISED.pdf.

[3] Industry Funded Monitoring Amendment Document, Mid Atlantic Fishery Management Council, May 2016. See https://static1.squarespace.com/static/511cdc7fe4b00307a2628ac6/t/57504cae746fb9ccc234ba75/1464880308912/Tab09_IFM-Amendment.pdf, page 88.

[4] See http://s3.amazonaws.com/nefmc.org/3D_Staff-Presentation-on-Herring-Alternatives.pdf, slide 35.

[5] Ibid.

Coverage target considerations, according to the development of this amendment, should ensure that "Benefits of increased monitoring should equal or outweigh the costs of monitoring".[6] However, the amendment does not consider the daily catch capacity of vessels in its analysis or alternatives. Small mesh bottom trawl vessels, including Seafreeze vessels, are limited in daily harvesting capacity compared to other herring fishery gear types. Therefore, the daily financial burden on smaller capacity vessels is higher than on large capacity vessels. We have repeatedly raised this issue with the Councils.[7] The "Negligible" benefits of potential additional catch cap tracking do not outweigh the costs of monitoring for our lesser-daily-capacity small mesh bottom trawl vessels.

None of the additional monitoring alternatives in the document provide for "affordable monitoring for the herring fishery", especially Seafreeze vessels. Our vessels do not operate solely in the herring/mackerel fisheries; we have multiple permits. We do not always know what species will be available when we leave the dock, so we complete the regulatory call in/declaration process for all appropriate fisheries. We do not fish like other "herring" vessels. If the availability of one species changes, or is not what we had anticipated, we then have the flexibility to cover our operating costs by switching over to a different species. Because our vessels freeze at sea and have limited daily capacity, our trips are also of extended duration, so any daily at sea monitoring costs would impact us disproportionately to all other herring vessels.

To demonstrate this dynamic, several trips are highlighted below. Pre-trip declaration combined with length of trip is what will determine coverage and cost, not herring landed.

For example, on this 10 day trip below, our primary pre-trip declaration was herring, but the trip consists of no herring and is primarily loligo squid. A per day monitoring cost would be very expensive on a trip of that length. And all of the cost would be borne by squid revenue. This is not unusual. The following 5 day trip was also a declared "herring" trip, but landed no herring. These types of "herring" trips, if they were to incur an at sea monitoring cost would have to be paid for not by herring revenue, but other revenue:

1/15/14-1/24/14; 10 Days

Catch: Loligo - 97.67%

---

[6] Ibid, slide 38.
[7] See for example, our letter to the Councils at https://static1.squarespace.com/static/511cdc7fe4b00307a2628ac6/t/551edc4ae4b0576112dc4bf3/1428085834669/Tab+06_Industry+Funded+Observer+Amendment.pdf and http://s3.amazonaws.com/nefmc.org/5.-Council-Letter-Observer-Concerns.Seafreeze.pdf.

12/20/14-12/24/14; 5 Days (Shortened trip because of Christmas)

Catch: Butterfish - 88.92%, Loligo - 11.08%

Conversely, we have trips where we expect to find other species but do not, therefore relying on the flexibility to catch herring as a way to cover our costs. For example, these two trips, during which the primary pre-trip declaration was squid, herring was the primary species landed:

12/11/14-12/18/14; 8 Days

Herring - 100%

12/27/14-1/3/15; 8 Days

Herring - 98.1%

Sub Option 5 would exempt trips landing less than 25 mt from industry funded monitoring requirements, and has been suggested at meetings of a way to address this issue. However, that option will still not account for the fact <u>that the decision whether or not to catch more significant amounts herring will still need to be made prior to leaving the dock</u>. As the information above demonstrates, our primary declaration/intent is not always what determines what species our vessels land, which is why we ensure that we appropriately declare into all possible fisheries in order to maintain flexibility of operations. <u>If that flexibility were taken away, not only would our entire style of fishing would be nullified, but could result in the above trips losing rather than making money</u>. A 25 mt landing will not cover the cost of an 8 day trip.

Pages 301-302 of the EA (attached) illustrate this dynamic. Out of declared herring days in 2014 that did not land herring, <u>111 are attributed to small mesh bottom trawl</u>, as compared to only 6 single midwater trawl and 4 paired midwater trawl. That would be 111 days of industry funded monitoring on small mesh bottom trawl vessels that would have to be covered by income from other fisheries. <u>Small mesh bottom trawl costs for declared herring trips not landing herring range from $90,586 compared to $3,212 at paired midwater trawl and $5,217 at single midwater trawl for the same monitoring option</u>. This is a function of the type of fishing style described above. Industry funded monitoring costs in this amendment are significantly heavier on small mesh bottom trawl vessels than other vessel types. This is <u>combined with the fact that even on declared herring trips landing herring, small mesh bottom trawl</u>

(i.e. "squid" vessels), have a 7% RTO compared to typical "herring and mackerel" vessels, which have a 15% RTO (page 299 of the EA ,attached). This is also a function of what has been previously mentioned due to daily capacity. Even at 25% ASM coverage, the cheapest cost estimate for small mesh bottom trawl, there is still a $19,657 annual cost burden for trips that do not even land herring. This amendment is about the erosion of profitability for our vessels.

The herring and mackerel alternatives in the IFM amendment were primarily initiated to address low observer coverage in the midwater trawl herring fishery due to changes with SBRM. It was not to make an entire style of fishing economically or operationally nonviable. It is also not equitable that revenue from other fisheries be siphoned to pay for herring/mackerel monitoring. If our vessels are required to pay for a per day monitoring cost, we could be required to raise the prices on all our products to cover that expenditure. Compounding that, we compete on and against a world market with all of our products, including herring. All of our products are food grade, which means that we have developed and rely on markets that solicit international competition. We are also competing price-wise with companies and vessels from nations where the fishing industry is subsidized by their national government. If forced to raise our prices to pay for an IFM cost, Seafreeze, as well as the United States, will be put at a competitive disadvantage internationally. If we do not increase our prices and the cost were to be paid for by the vessels and crew, the per day monitoring cost may outweigh daily crew compensation, and crews would be forced to pay for "benefits (vacation and sick leave)"[8] afforded to observers that crew themselves do not receive, all while receiving a smaller paycheck. This is inequitable.

Regardless, the industry funded monitoring amendment saddles Seafreeze vessels in particular with more economic harm than any other "herring" vessels due to the nature of our operations. This is unacceptable. Therefore, the only alternatives that we can support would be Alternative 1, No Action, or Alternatives 2.4-2.6, which would keep our vessels at SBRM coverage.

Thank you for your consideration.

Sincerely,

Meghan Lapp
Fisheries Laision, Seafreeze Ltd.

---

[8] See http://s3.amazonaws.com/nefmc.org/150701-Discussion-Document-Appendix.pdf, page 11.

TABLE 95. SUMMARY OF TOTAL TRIP COSTS FOR HERRING AND MACKEREL VESSELS IN 2014

| Cost Category | Description | Average Percent of 2014 Gross Revenue for Herring and Mackerel Vessels | Average Percent of 2014 Gross Revenue for Squid Vessels |
|---|---|---|---|
| Variable Costs | Annual fuel, oil, food, water, ice, carrier vessel, communication, fishing supplies, crew supplies, and catch handling costs | 25% | 35% |
| Crew Share | Total annual payments to crew | 28% | 26% |
| Repair, Maintenance, Upgrades, Haulout (RMUH) | Annual cost of repairs to engines, deck equipment, machinery, hull, fishing gear, electronics, processing equipment, refrigeration, safety equipment, upgrades and haulout. Because these costs vary considerably from year to year and are typically spread out over several years, only a portion of these costs were applied to 2014 revenue | 13% | 11% |
| Fixed Costs | Annual mooring, dockage, permits and licenses, insurance, quota and DAS lease, crew benefits, vessel monitoring, workshop and storage, office, vehicle, travel, association, professional, interest, taxes, and non-crew labor costs<br>Note: depreciation expense of the vessel is not included in fixed costs. | 19% | 21% |
| Return to Owner | Gross revenue less variable, crew share, RMUH, and fixed costs | 15% | 7% |

The NEFMC is considering four types of industry-funded monitoring for the herring fishery, including NEFOP-level observers, at-sea monitors, EM, and portside sampling coverage. NEFOP-level and at-sea monitoring coverage would function independently, but EM and portside are intended to be used together.

Selecting Herring Alternative 2.5 rather than Herring Alternative 2.1 reduces total industry monitoring costs from $811,000 to $75,000 – a 91% reduction. However, Herring Alternative 2.5 only provides increased monitoring in the Groundfish Closed Areas.

Initial industry cost assumptions for Herring Alternative 2.4 estimated $325 per sea day for electronic monitoring (cameras on every midwater trawl vessel, video collected for the duration of the trip, 100% vide review) and $5.12 per mt for portside sampling (administration and sampling cost) on close to 100% of trips. Revised industry cost assumptions for Herring Alternative 2.4 estimated $187 per sea day for electronic monitoring (cameras on every midwater trawl vessel, video collected around haulback, 50% video review) and $3.84 per mt for portside sampling (only sampling costs) on close to 50% of trips. Using the revised cost assumptions rather than the initial cost assumption for Herring Alternative 2.4 reduces total industry monitoring costs by 51% ($457,595 to $222,958) in Year 2 for paired midwater trawl vessels and reduces costs by 54% ($134,165 to $61,067) in Year 2 for single midwater trawl vessels.

Many of the vessels that would be impacted by industry-funded monitoring costs in the herring fishery would also be impacted by industry-funded monitoring costs in the mackerel fishery. For example, all the vessels impacted by Herring Alternative 2.1 would also be impacted by Mackerel Alternative 2.1.

A trip must be a declared herring trip in order to land 1 lb or more of herring. The economic analysis focused on trips that landed 1 lb or more of herring because those are the trips that would be subject to industry-funded monitoring. However, industry participants also requested consideration of the economic impacts associated with declared herring trips that did not land any herring.

In 2014, there were 121 sea days for 22 trips that had no herring landings. If 100% NEFOP-level observer coverage was required on those trips, then $98,978 would have been spent monitoring those trips. If 100% at-sea monitoring coverage was required on those trips, then $85,910 would have been spent monitoring those trips. The breakdowns of these costs by gear type as well as other coverage levels and monitoring types are provided in Table 96.

TABLE 96. MONITORING COSTS ASSOCIATED WITH DECLARED HERRING TRIPS THAT DID NOT LAND HERRING IN 2014.

|  | Small Mesh Bottom Trawl | Single Midwater Trawl | Paired Midwater Trawl | Total |
|---|---|---|---|---|
| **Permit Category** | A | A | A |  |
| **Total Number of Days** | 111 | 6 | 4 | 121 |
| **Total NEFOP Cost – 100% Coverage** | $90,586 | $5,217 | $3,212 | $99,015 |
| **Total ASM Cost –** | $78,626 | $4,528 | $2,788 | $85,943 |

Industry-Funded Monitoring Omnibus Amendment

| | | | | |
|---|---|---|---|---|
| **100% Coverage** | | | | |
| **Total ASM Cost – 75% Coverage** | $58,970 | $3,396 | $2,091 | $64,457 |
| **Total ASM Cost – 50% Coverage** | $39,313 | $2,264 | $1,394 | $42,971 |
| **Total ASM Cost – 25% Coverage** | $19,657 | $1,132 | $697 | $21,486 |
| **Total EM Cost, Year 2 – $325 per day** | | $2,073 | $1,276 | $3,349 |
| **Total EM Cost, Year 2 – $187 per day** | | $1,193 | $734 | $1,927 |

The tables and box plots on the following pages provide summarized economic data for each of the herring coverage target alternatives. The economic impact on vessels associated with paying for monitoring coverage is described as a percentage of RTO for each herring coverage target alternative in the following figures. The tables provide the mean and median number of sea days per vessel that would result from each of the alternatives, as well as the mean and median RTO that would ultimately be reduced by the industry-funded monitoring costs. Additionally, fleet level effort, revenue, and monitoring cost information for each herring coverage target alternative are also provided. Additional economic analysis is available in Appendix 8.

### 4.2.5.1 Impacts of Herring Alternatives 1 and 2 on Fishery-Related Businesses

Herring Alternative 1 would not specify a coverage target for an industry-funded monitoring program in the Herring FMP. Monitoring for herring vessels would be allocated according to SBRM. If there was Federal funding available after SBRM coverage requirements were met, additional monitoring for the herring fishery would be evaluated on a case-by-case basis. Under Herring Alternative 1, additional costs to vessels participating in the herring fishery associated with monitoring coverage, if there were any, would be evaluated on a case-by-case basis.

In recent years, observer coverage for the herring fishery has largely been allocated as part of the SBRM. The SBRM is the combination of sampling design, data collection procedures, and analyses used to estimate bycatch in multiple fisheries. The SBRM provides a structured approach for evaluating the effectiveness of the allocation of fisheries observer effort across multiple fisheries to monitor a large number of species. Although management measures are typically developed and implemented on an FMP-by-FMP basis, from the perspective of developing a bycatch reporting system, there is overlap among the FMPs and the fisheries that occur in New England and the Mid-Atlantic that could result in redundant and wasteful requirements if each FMP is addressed independently.

Currently, the herring resource is not overfished, and overfishing is not occurring. Additionally, in recent years, the fleet has had the ability to fully harvest the stock-wide ACL and the sub-ACLs. Selection of Herring Alternative 1 will not likely affect the setting of

_0000015953