# Exhibit 14



Pursuing Freedom and Opportunity through Justice and Accountability

November 19, 2018

**VIA REGULATIONS.GOV**

U.S. Department of Commerce
National Oceanic and Atmospheric Administration
National Marine Fisheries Service
ATTN: Michael Pentony, Regional Administrator
55 Great Republic Drive
Gloucester, MA 01930

       **Re:**    **Industry-Funded Monitoring (IFM) Omnibus Amendment**
               **83 Fed. Reg. 47,326 (Sept. 19, 2018)**
               **Docket No. NOAA-NMFS-2018-0109 (RIN 0648-BG91)**

Dear Administrator Pentony:

      I write on behalf of Cause of Action Institute ("CoA Institute"), a 501(c)(3) nonpartisan government-oversight organization that uses investigative, legal, and communications tools to educate the public about how government accountability, transparency, and the rule of law protect individual liberty and economic opportunity.[1]  CoA Institute has represented clients in challenging past efforts to compel the regulated industry to pay for discretionary supplemental at-sea monitoring services.[2]

      I appreciate the opportunity to submit the following comments on the National Marine Fisheries Service's ("NMFS") proposed rule adopting the New England Industry-Funded Monitoring ("IFM") Omnibus Amendment.[3]  The Omnibus Amendment, which is sponsored by the New England Fishery Management Council ("NEFMC"),[4] would introduce provisions into all NEFMC-administered fishery management plans to allow for standardized implementation of industry-funded monitoring via plan-specific amendments and framework adjustments.  The Omnibus Amendment also contains measures applicable only to the Atlantic herring fishery, which would create a new IFM program for the herring fleet.  Importantly, these requirements would further extend to many other vessels across the Greater Atlantic region that declare herring when targeting other fish species.

      In April 2017, prior to the final selection of preferred alternatives, CoA Institute advised the NEFMC that that the Omnibus Amendment raised serious legal questions concerning the authority of the federal government—by and through the NEFMC and NMFS—to compel regulated parties, *i.e.*, fishermen, to pay for supplemental at-sea monitoring outside of a formal fee system or limited access privilege program.[5]  To date, CoA Institute's objections have been ignored.  Neither the New England Council nor NMFS has made any effort in the final draft of the proposed Omnibus

---

[1] *About Us*, COA INST., https://causeofaction.org/about/ (last visited Nov. 19, 2018).
[2] *See generally Free the Fishermen*, COA INST., https://coainst.org/2Dp200f (last visited Nov. 19, 2018).
[3] Dep't of Commerce, Nat'l Ocean & Atmospheric Admin., Industry-Funded Monitoring Request for Comments, 83 Fed. Reg. 47,326 (Sept. 19, 2018).
[4] NEW ENG. FISHERY MGMT. COUNCIL, INDUSTRY-FUNDED MONITORING OMNIBUS AMEND. (Aug. 2018) [hereinafter OMNIBUS AMEND.], *available at* http://bit.ly/2DGJils.
[5] Letter from CoA Inst. to New Eng. Fishery Mgmt. Council (Apr. 12, 2017), *available at* http://coainst.org/2pDsCnQ.

_0000017655

Nat'l Marine Fisheries Serv.
Nov. 19, 2018
Page 2

Amendment to address the concerns raised on the record by CoA Institute and other stakeholders. This failure, whether mere oversight or intentional avoidance, tends to demonstrate the prejudicial view of NMFS and the NEFMC towards fishermen.  It also reveals the government's unfortunate determination to impose unlawful and devastating costs on an already beleaguered heritage industry.

        As set forth in detail below, there is *no statutory authorization* under the Magnuson-Stevens Act ("MSA"), 16 U.S.C. § 1801 *et seq.*, for industry-funding requirements in most of the Atlantic fisheries. As such, the Omnibus Amendment—and any future attempts to implement industry-funded monitoring under the Omnibus Amendment's framework—will almost certainly face legal challenge. CoA Institute respectfully requests that NMFS disapprove the Omnibus Amendment and work with the NEFMC to develop alternative means of achieving the Council's desired goals of increased data collection and expanded policing of annual catch totals.  For example, NMFS and the NEFMC could work to reallocate existing funds for such supplemental monitoring or petition Congress to appropriate funding specific to expanded at-sea monitoring.

I.    **The Magnuson-Stevens Act does not authorize the industry-funded monitoring programs envisioned by the Omnibus Amendment.**

        The stated purpose of the Omnibus Amendment is straightforward: the NEFMC is "interested in increasing monitoring . . . to assess the amount and type of catch, to more precisely monitor annual catch limits, and/or provide other information for management."[6]  But the NEFMC's ability to fund that increased monitoring is limited.[7]  The Council's proposed solution is to design a standardized mechanism that would permit the government to order fishermen to cover a substantial portion of monitoring costs.[8]  Yet the Council fails to point to any specific provision in the MSA that grants it authority to implement such a plan.  The proposed rule adopting the Omnibus Amendment instead ambiguously points to the entirety of the MSA as the source of requisite authority.[9]

        a.    **The NEFMC must have explicit statutory authorization to force the regulated industry to fund discretionary supplemental at-sea monitoring programs.**

        Federal agencies do not enjoy unbridled power in choosing which programs to pursue; they cannot impose new fees or taxes, nor can they simply demand that citizens pay for programs that the government ought to be financing in the first place.  In this sense, the basic presumption in the

---

[6] *See, e.g.,* OMNIBUS AMEND. at 28, 31.

[7] *See id.* at 31 ("NMFS has limited funding for monitoring, so the Council is considering requiring industry to contribute to the cost of the monitoring."); *see also* Greater Atl. Reg'l Fisheries Office, Nat'l Marine Fisheries Serv., Press Release: Industry-Funded Monitoring Omnibus Amendment, Public Hearings and Comment Period (Sept. 20, 2016) ("The amount of available Federal funding to support additional monitoring is limited[.]"), *available at* http://bit.ly/2nHNpl1.

[8] *See, e.g.,* OMNIBUS AMEND. at 51 ("Under Omnibus Alternative 2, there would be a standardized structure for new industry-funded monitoring programs in New England fisheries, including at-sea monitoring, portside monitoring, and electronic monitoring. . . . This industry-funded monitoring program structure would include . . . (1) [s]tandard cost responsibilities associated with industry-funded monitoring for NMFS and the fishing industry; (2) a process for FMP-specific industry-funded monitoring to be implemented via amendment and revised framework adjustment; (3) standard administrative requirements for industry-funded monitoring service providers; (4) [a] process to prioritize available Federal resources for industry-funded monitoring across FMPs; and (5) a process for FMP-specific monitoring set-aside programs to be implemented via a future framework adjustment action.).

[9] 83 Fed. Reg. at 47,327 ("Authority: 16 U.S.C. 1801 *et seq.*").

Nat'l Marine Fisheries Serv.
Nov. 19, 2018
Page 3

Omnibus Amendment—that the NEFMC can require the industry by fiat to fund a non-essential supplemental monitoring program—is gravely mistaken and runs afoul of a fundamental principle of administrative law: "[A]n agency literally has no power to act . . . unless and until Congress confers power upon it."[10]  The NEFMC acknowledges as much, but fails to give the principle due credit:

> Congress must decide how to finance any program, project, or activity . . . it establishes. Typically, programs are funded by appropriating funds from the U.S. Treasury.  In addition to designating the funds necessary for a program, a congressional appropriation sets a maximum authorized program level.  The maximum authorized program level functions as a cap on funding for a program.  A Federal agency cannot spend money on a program beyond the maximum authorized program level without authorization from Congress.  A Federal agency also cannot get around the maximum authorized program level by adding to its appropriations from sources outside the government without permission from Congress.[11]

The MSA does not authorize the NEFMC to redesign fishery management plans to introduce the sort of industry-funding requirement envisioned by the Omnibus Amendment.  At most, the MSA authorizes the *placement* of observers and monitors.[12]  Regional councils, however, are not at liberty to design particular or novel *funding* mechanisms for monitoring programs they choose to create.

The plain meaning of the MSA is clear and unambiguous.[13]  The statute only authorizes IFM in a few specific regions and circumstances: (1) foreign fishing,[14] (2) limited access privilege programs,[15] and (3) the North Pacific fisheries research plan.[16]  Congress's decision to permit NMFS and the councils to require industry-funded monitoring or observing in *only* these three situations clearly manifests Congress's intent not to allow mandatory industry funding in other scenarios.[17]  To read the MSA otherwise would render provisions discussing industry funding mere surplusage;[18] it would offend other important cannons of statutory construction;[19] and it would contradict the well-established legislative history of the MSA.

Indeed, with respect to the legislative history of the MSA, there is no evidence of congressional recognition for any sort of pre-existing, implied authority to impose monitoring costs on the regulated

---

[10] *La. Pub. Serv. Comm'n v. Fed. Commc'ns Comm'n*, 476 U.S. 355, 374 (1986); *see Util. Air Regulatory Grp. v. Envtl. Prot. Agency*, 134 S. Ct. 2427, 2466 (2014) ("An agency confronting resource constraints may change its own conduct, but it cannot change the law.").

[11] OMNIBUS AMEND. at 32.

[12] 16 U.S.C. § 1853(b)(8); 50 C.F.R. § 648.2.

[13] *See generally Palmieri v. Nynex Long Distance Co.*, 437 F.3d 111, 115 (1st Cir. 2006); *Bonilla v. Muebles J.J. Alvarez, Inc.*, 194 F.3d 275, 277 n.2 (1st Cir. 1999).

[14] 16 U.S.C. § 1821(h)(4).

[15] *Id.* § 1853a(e).  The Greater Atlantic Region contains two fisheries that permit cost recovery through a fee system: the Atlantic sea scallop individual fishing quota and golden tilefish individual fishing quota limited access privilege programs.

[16] *Id.* § 1862(a).

[17] *Cf. Anglers Conservation Network v. Pritzker*, 139 F. Supp. 3d 102, 116 n.9 (D.D.C. 2015) ("'[C]ost sharing' programs with industry participants in other fisheries in order to provide higher observer coverage levels . . . were expressly authorized by statute *for particular fisheries only*.") (emphasis added) (citing 16 U.S.C. § 1862).

[18] *Nat'l Credit Union Admin v. First Nat'l Bank & Tr. Co.*, 522 U.S. 479, 501 (1998).

[19] *See Duncan v. Walker*, 533 U.S. 167, 173 (2001); *see also EchoStar Satellite L.L.C. v. Fed. Commc'ns Comm'n*, 704 F.3d 992, 999 (D.C. Cir. 2013); *Ry. Labor Execs.' Ass'n v. Natl' Mediation Bd.*, 29 F.3d 655 (D.C. Cir. 1994)

Nat'l Marine Fisheries Serv.
Nov. 19, 2018
Page 4

industry. Congress has, in fact, *repeatedly declined* the opportunity to permit IFM nationwide. Each time that Congress has reauthorized the MSA, it has considered and rejected bills that would have created blanket authority for mandatory IFM programs.[20] The IFM regime that the NEFMC now seeks to impose on the herring fishery—and the future IFM programs it envisions for the remaining New England fisheries—runs afoul of this legislative history.

The case of the groundfish monitoring program is instructive. CoA Institute represented David Goethel, a New Hampshire-based fisherman, and the members of Northeast Fishery Sector XIII in a lawsuit challenging the legality of the Northeast multispecies sector at-sea monitoring program.[21] Due to procedural technicalities, our clients were unable to obtain a decision on the merits that addressed the statutory authority concerns addressed in the foregoing paragraphs. Congress subsequently appropriated funds to continue covering industry costs, which had been expected to exceed $700 per sea day and put nearly 60% of the fleet out of business.[22] But the U.S. Court of Appeals for the First Circuit still commented on the underlying ambiguity of the government's position, particularly in light of a NEFMC-commissioned study that predicted the unsustainable burden of IFM:

> [G]iven [the government's] own study which indicated that the groundfish sector could face serious difficulties as a result of the industry funding requirement, . . . this may be a situation where further clarification from Congress would be helpful for the regulated fisheries and the agency itself as it balances the competing goals of conservation and the economic vitality of the fishery.[23]

The Omnibus Amendment, as discussed below, presents the herring fishery—and, ultimately, other fisheries under the purview of the NEFMC and other adjoining councils—with the same sort of threat to economic viability. And the NEFMC and NMFS have yet again failed to point to any specific provision of the MSA that authorizes them to require the regulated industry to shoulder the cost of discretionary at-sea monitoring programs that the government cannot itself fund. The Omnibus Amendment must be rejected on these grounds.

   b. **The Omnibus Amendment's IFM scheme would violate the National Standards and other important legal principles.**

Notwithstanding the NEFMC's lack of legal authority, the introduction of IFM across the Greater Atlantic region also would impose a tremendous economic burden on the fishing industry that could lead to the elimination of small-scale fishing. This result would violate National Standards 7 and 8.[24] Congress never intended to grant the regional fishery management councils the authority

---

[20] H.R. 5018, 109th Cong. § 9(b) (2006); H.R. 39, 104th Cong. § 9(b)(4) (1995); H.R. 1554, 101st Cong. § 2(a)(3) (1989).
[21] *See generally Oversight Hearing on "Exploring the Successes and Challenges of the Magnuson-Stevens Act": Hearing Before the U.S. H.R. Comm. on Nat. Resources, Subcomm. on Water, Power, & Oceans*, 115th Cong. (July 19, 2017) (statement for the record of Ryan P. Mulvey, Counsel, Cause of Action Inst.), *available at* https://coainst.org/2FqgO10.
[22] *See* Eric Bolinder, *Congress Throws Fishermen a Lifeline*, COA INST. (Mar. 27, 2018), https://coainst.org/2zg1wqb.
[23] *Goethel v. Dep't of Commerce*, 854 F.3d 106, 116 (1st. Cir. 2017), *cert. denied*, 138 S. Ct. 221 (2017).
[24] *See* 16 U.S.C. § 1851(a)(7)–(8). One should not lightly conclude that Congress intend to grant authority for the Council and NMFS to take actions that would put fishermen out of business. *See Arctic Sole Seafoods v. Gutierrez*, 622 F. Supp. 2d 1050, 1061 (W.D. Wash. 2008) (rejecting agency interpretation because it "leads to absurd results—the inevitable

Nat'l Marine Fisheries Serv.
Nov. 19, 2018
Page 5

to regulate a substantial portion of the fleet out of existence.[25]  As the Supreme Court has held, "Congress . . . does not alter the fundamental details of a regulatory scheme [such as the one intended by the MSA] in vague terms or ancillary provisions,"[26] nor does it "delegate a decision of such economic and political significance [as the introduction of industry-funded monitoring] in so cryptic a fashion."[27]  IFM represents a shift of tremendous economic and political significance.

In the absence of authorization for the sort of IFM programs set forth in the Omnibus Amendment, the NEFMC and NMFS can only be described as preparing to impose a "tax" to extract money from regulated parties to fund desired regulatory programs.  This cannot stand: "only Congress has the power to levy taxes."[28]  The Omnibus Amendment, as applied in the herring fishery and other future fishery management plan amendments, also may violate numerous statutes governing agency finance, such as the Anti-Deficiency Act[29] and Miscellaneous Receipts Statute.[30]  For example, the Government Accountability Office has rejected the proposition that an agency can avoid the Miscellaneous Receipts Statute "by authorizing a contractor to charge fees to outside parties and keep the payments in order to offset costs that would otherwise be borne by agency appropriations."[31]  Yet this sort of rearrangement of financial obligations and receipts is exactly what would occur under the IFM programs envisioned under the Omnibus Amendment.  Instead of charging a "fee" to fishermen as a form of cost recovery, the NEFMC instead would order fishermen to pay monitoring service providers directly as a condition of retaining and using a permit.  Finally, IFM programs would impermissibly compel fishermen into commercial transactions in violation of the Commerce Clause[32] and violate other parts of the Constitution, including the Fourth Amendment.[33]

## II.    The expected economic impact of the Omnibus Amendment, including measures specific to the Atlantic herring fishery, and stakeholder feedback expose other important deficiencies.

In line with the National Standards, the Omnibus Amendment and future industry-funded monitoring programs must "minimize costs,"[34] "provide for the sustained participation of [fishing] communities,"[35] and "minimize adverse economic impacts."[36]  The Omnibus Amendment fails to

---

elimination of the fishery); *W. Sea Fishing Co. v. Locke*, 722 F. Supp. 2d 126, 140 (D. Mass. 2010) ("[The MSA] creates a duty to allow for harvesting at optimum yield in the present, while . . . [also] protecting fishery output for the future[.]").
[25] The NEFMC could certainly repeal or revoke any of its fishery management plans, but it must do so explicitly and by three-quarters majority approval of its voting members.  16 U.S.C. § 1854(h).
[26] *Whitman v. Am. Trucking Ass'ns, Inc.*, 531 U.S. 457, 468 (2001).
[27] *Food & Drug Admin. v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 160 (2000); *see Gonzales v. Oregon*, 546 U.S. 243, 267 (2006) (rejecting argument that Congress would permit "broad and unusual authority through an implicit delegation").
[28] *Thomas v. Network Solutions*, 2 F. Supp. 2d 22, 29 (D.D.C. 1998); *see* U.S. Const., art. I., § 8, cl. 1; *Nat'l Cable Television Ass'n, Inc. v. United States*, 415 U.S. 336, 340 (1974) ("Taxation is a legislative function, and Congress . . . is the sole organ for levying taxes[.]").
[29] *See* 31 U.S.C. § 1341(a)(1)(A)–(B); *see also Envtl. Def. Ctr. v. Babbitt*, 73 F.3d 867, 872 (9th Cir. 1995).
[30] *See* 31 U.S.C. § 3302(b); *see also Scheduled Airlines Traffic Offices, Inc. v. Dep't of Def.*, 87 F.3d 1356, 1361 (D.C. Cir. 1996).
[31] GOV'T ACCOUNTABILITY OFFICE, 2 PRINCIPLES OF FED. APPROPRIATIONS L. at 6-177 (3d ed. 2006).
[32] *See, e.g., Nat'l Fed'n of Indep. Bus. v. Sebelius*, 132 S. Ct. 2566, 2587 (2012) (The government cannot "compel[] individuals to become active in commerce by purchasing a product.").
[33] *See City of Los Angeles, Calif. v. Patel*, 135 S. Ct. 2443, 2452 (2015).
[34] 16 U.S.C. § 1851(a)(7).
[35] *Id.* § 1851(a)(8).
[36] *Id.*

Nat'l Marine Fisheries Serv.
Nov. 19, 2018
Page 6

meet these standards, both generally and with respect to the herring alternatives, because it will have a severe and adverse impact on the fishing industry.

With respect to the omnibus measures, the NEFMC attempts to mask the inevitable negative economic consequences of its amendment by suggesting that its measures "do not require the development of IFM programs nor do they directly impose any costs."[37] Although technically true, this claim is misleading. As the NEFMC itself recognizes, once future fishery-specific IFM programs are approved under the Omnibus Amendment's "streamlined" procedures, the expected economic impact on fishery-related business and communities will be uniformly negative: "[T]here would be *direct negative economic impacts to fishing vessels*[.]"[38]

As for the herring fishery, monitoring costs will likely exceed $710 per sea day for an at-sea monitor and $818 per sea day for a NEFOP-level observer.[39] Such costs are probably higher than the daily landings revenue of the typical small-scale vessel, particularly given the latest reduction in quota. This is certainly the case in the Northeast multispecies fishery. Under the groundfish sector at-sea monitoring program, up to 60% of the fleet was expected to "see negative returns to owner when full" monitoring costs were "factored in."[40] Although devastating economic impacts have been somewhat mitigated by congressional action,[41] a recent report from the Northeast Fisheries Science Center confirms the continued decline of the groundfish fishery, which will only accelerate once monitoring costs fully shift to sector fishermen.[42] The NEFMC cannot ignore the devastating economic effects of industry funding in the herring fishery, just as it cannot ignore the costs associated with the omnibus alternatives that it has deemed too "speculative" to analyze.[43]

In a previous draft of the Omnibus Amendment, the NEFMC suggested that monitoring costs could rise even further due to overlapping requirements for IFM in multiple fisheries. Specifically, the Council indicated that "[m]any of the vessels that would be impacted by [IFM] costs in the herring fishery would also be impacted by [IFM] costs in the mackerel fishery."[44] When the Mid-Atlantic Council decided to withdraw from the Omnibus Amendment, and thus concurrently tabled its proposed IFM regime for the mackerel fishery, it did so in large part because of its concern for overlapping IFM requirements: "The Council had originally considered IFM due to observer coverage concerns in the mackerel fishery, but *most mackerel catches will be subject to additional monitoring through a recent New England Council IFM action for the Atlantic herring fishery*."[45] Damningly, the NEFMC has not

---

[37] OMNIBUS AMEND. at 180.
[38] *See, e.g., id.* (emphasis added); *see also id.* at 9, 304.
[39] *Id.* at 243 (Table 73).
[40] NEW ENG. FISHERY MGMT. COUNCIL, DRAFT REPORT: PRELIMINARY EVALUATION OF THE IMPACT OF GROUNDFISH-SECTOR FUNDED AT SEA MONITORING ON GROUNDFISH FISHERY PROFITS at 10 (June 19, 2015), *available at* http://bit.ly/28QUXwT. These costs were predicted to be heaviest for small vessels. *Id.* at 13 (Table 12). NMFS recognized these prospects, describing them as a "restructuring of the fleet." *Id.* at 10.
[41] *See supra* note 22.
[42] *See generally* NAT'L OCEANIC & ATMOSPHERIC ADMIN., 2015 FINAL REPORT ON THE PERFORMANCE OF THE NORTHEAST MULTISPECIES (GROUNDFISH) FISHERY (MAY 2007 – APRIL 2016), Ref. Doc. 18-13 (Nov. 2018).
[43] OMNIBUS AMEND. at 183 ("[P]otential downstream effects (e.g., subsequent management measures to address bycatch issues) of this action are considered too remote and speculative to be appropriate for consideration[.]").
[44] NEW ENG. FISHERY MGMT. COUNCIL & MID-ATL. FISHERY MGMT. COUNCIL, INDUSTRY-FUNDED MONITORING OMNIBUS AMEND. at 301 (Sept. 2016), *available at* http://bit.ly/2mQxrtn.
[45] Mid-Atl. Fishery Mgmt. Council, October 2018 Council Meeting Summary at 1–2 (Oct. 2018) (emphasis added), *available at* http://bit.ly/2PYRMdA.

Nat'l Marine Fisheries Serv.
Nov. 19, 2018
Page 7

undertaken any detailed analysis exploring the potential economic impact of IFM in a future scenario where multiple fisheries require such monitoring. It is reasonable to assume that some vessels, which declare into multiple fisheries for any given trip, could be continually subject to monitoring requirements. Further, the Council has made only meager efforts to consider how its preferred herring alternatives will impact the mackerel fleet and other vessels that incidentally declare herring yet may still be subject to IFM requirements.[46]

The NEFMC and NMFS have received overwhelmingly negative feedback in pursuing the Omnibus Amendment. Of the eighty-three submissions posted to the electronic docket during the last round of public comment in the *Federal Register* in 2016, only six stakeholders voiced various levels of support for IFM; the vast majority—93%—opposed it.[47] The reasons for this opposition are straightforward enough. Many small-scale fishermen cannot remain profitable if they must assume monitoring costs.[48] The Long Island Commercial Fishing Association, for example, expects that the Omnibus Amendment's approximately $800 per sea day cost will force more than half of the entire New York-based fleet out of business.[49] Stakeholders also are skeptical that increased monitoring has any connection to conservation or maintaining the sustainability of the fisheries, and they question the quality of the data collected. Most importantly, however, the public recognizes that the MSA does not authorize industry-funded monitoring simply because the Council or NMFS wishes it to do so,[50] and they acknowledge the potential constitutional problems.[51]

Apart from their lack of authority under the MSA to impose monitoring costs on vessels, the NEFMC and NMFS also have failed to provide an adequate explanation for why increased monitoring is even necessary in light of the extreme financial burden it will put on fishermen. As proposed, IFM could destroy multi-generational, small-business fishermen up and down the East Coast while benefitting industrial fishing firms. That result is unacceptable.

---

[46] *See, e.g.*, OMNIBUS AMEND. at 250–51.

[47] Dep't of Commerce, Nat'l Oceanic & Atmospheric Admin., 81 Fed. Reg. 64,426 (Sept. 20, 2016), Docket No. NOAA-NMFS-2016-0139-0001, *available at* http://bit.ly/2p5NO1s.

[48] *See* Comment of Meghan Lapp, Seafreeze Ltd., on Omnibus Amend. (Nov. 7, 2016), Docket No. NOAA-NMFS-2016-0139-0009, *available at* http://bit.ly/2nUf8Ph (discussing impact of herring and mackerel alternatives).

[49] *See* Comment of Long Island Commercial Fishing Ass'n on Omnibus Amend. (Nov. 8, 2016), Docket No. NOAA-NMFS-2016-0139-0084, *available at* http://bit.ly/2odOrsX ("The onus for NMFS required observer coverage should be on NMFS, not industry. It is cost prohibitive.").

[50] *See, e.g.*, Comment of David Goethel on Omnibus Amend. (Nov. 7, 2016), Docket No. NOAA-NMFS-2016-0139-0010, *available at* http://bit.ly/2o04Mye ("Monitoring is a function of government and should be funded at levels Congress deems appropriate through NOAA line items in the budget. . . . [The MSA] allows for the placement of observers on fishing boats but is silent on cost recovery except in specific fisheries in the North Pacific Region."); *see also* Comment of Gregg Morris on Omnibus Amend. (Nov. 8, 2016), Docket No. NOAA-NMFS-2016-0139-0080, *available at* http://bit.ly/2o09hJp (same).

[51] *E.g.*, Comment of N.C. Fisheries Ass'n on Omnibus Amend. (Nov. 7, 2016), Docket No. NOAA-NMFS-2016-0139-0082, *available at* http://bit.ly/2oXBtAa (raising due process concerns) ("There was no reasonable opportunity for [public hearings] down in the affected states of Maryland, Virginia, and North Carolina. Their involvement in the public hearings process was substantially truncate. [Those] whose stand to be severely impacted . . . have not been given a single public hearing reasonably close enough for them to be expected to attend."); *cf.* Brooke Constance White, *Stonington fishermen, first selectman: Camera proposal violates Fourth Amendment rights*, THE WESTERLY SUN (Apr. 7, 2017), http://bit.ly/2o00maB.

Nat'l Marine Fisheries Serv.
Nov. 19, 2018
Page 8

**III.     Conclusion**

Thank you for your consideration of the foregoing comments.  CoA Institute respectfully requests that NMFS disapprove the Omnibus Amendment.  NMFS should instead work with the NEFMC to pursue alternative means of achieving the Council's monitoring goals.  If you have any questions, please do not hesitate to contact me at ryan.mulvey@causeofaction.org or (202) 499-4232.

Sincerely,

RYAN P. MULVEY
COUNSEL
CAUSE OF ACTION INSTITUTE