# Exhibit 15



Pursuing Freedom and Opportunity through Justice and Accountability

December 24, 2018

**VIA REGULATIONS.GOV**

U.S. Department of Commerce
National Oceanic and Atmospheric Administration
National Marine Fisheries Service
ATTN: Michael Pentony, Regional Administrator
55 Great Republic Drive
Gloucester, MA 01930

      Re:    Industry-Funded Monitoring (IFM) Omnibus Amendment
             83 Fed. Reg. 55,665 (Nov. 7, 2018)
             Docket No. NOAA-NMFS-2018-0109 (RIN 0648-BG91)

Dear Administrator Pentony:

      I write on behalf of Cause of Action Institute ("CoA Institute"), a 501(c)(3) nonpartisan government-oversight organization that uses investigative, legal, and communications tools to educate the public about how government accountability, transparency, and the rule of law protect individual liberty and economic opportunity.[1] CoA Institute has represented clients in challenging past efforts to compel the regulated industry to pay for discretionary supplemental at-sea monitoring services.[2]

      This comment concerns the National Marine Fisheries Service's ("NMFS") proposed rule for regulations implementing the New England Industry-Funded Monitoring ("IFM") Omnibus Amendment.[3] Earlier this fall, NMFS published a separate notice of availability concerning the Omnibus Amendment.[4] The agency has yet to finalize its action with respect to this earlier rulemaking, which would either approve or disapprove, in whole or in part, the Omnibus Amendment.[5]

      In April 2017, prior to its final selection of preferred alternatives, CoA Institute advised the New England Fishery Management Council ("NEFMC") of serious legal questions concerning the authority of the federal government to compel regulated parties, *i.e.*, fishermen, to pay for supplemental at-sea monitoring outside of a formal fee system or limited access privilege program.[6] More recently, CoA Institute reiterated its concerns in a regulatory comment[7] on NMFS's notice of availability and in public statements before the NEFMC and Mid-Atlantic Fishery Management Council.[8] To date, these objections have been ignored.

---

[1] *About Us*, COA INST., https://causeofaction.org/about/ (last visited Dec. 24, 2018).
[2] *See generally Free the Fishermen*, COA INST., https://coainst.org/2Dp200f (last visited Dec. 24, 2018).
[3] Dep't of Commerce, Nat'l Ocean & Atmospheric Admin., Industry-Funded Monitoring Request for Comments, 83 Fed. Reg. 55,665 (Nov. 7, 2018).
[4] Dep't of Commerce, Nat'l Ocean & Atmospheric Admin., Industry-Funded Monitoring Request for Comments, 83 Fed. Reg. 47,326 (Sept. 19, 2018).
[5] NEW ENG. FISHERY MGMT. COUNCIL, INDUSTRY-FUNDED MONITORING OMNIBUS AMEND. (Aug. 2018) [hereinafter OMNIBUS AMEND.], *available at* http://bit.ly/2DGJils.
[6] Letter from CoA Inst. to New Eng. Fishery Mgmt. Council (Apr. 12, 2017), *available at* http://coainst.org/2pDsCnQ.
[7] Comment of CoA Inst. on 83 Fed. Reg. 47,326 (Nov. 19, 2018), *available at* https://coainst.org/2zWMBkW.
[8] *See, e.g.*, Pub. Statement of Ryan P. Mulvey, CoA Inst. (Dec. 13, 2018), *available at* https://coainst.org/2EkB7e5.

Nat'l Marine Fisheries Serv.
Dec. 24, 2018
Page 2

### Discussion

CoA Institute offers the following comments on the proposed implementing regulations:

1. **The Magnuson-Stevens Act does not authorize the industry-funded monitoring programs envisioned by the Omnibus Amendment.**

By reference, CoA Institute incorporates and reiterates the concerns raised in its November 19, 2018 comment on the Omnibus Amendment. There is no statutory authorization under the Magnuson-Stevens Act ("MSA"), 16 U.S.C. § 1801 *et seq.*, for industry-funding requirements in most of the Atlantic fisheries. At most, the MSA authorizes the placement of observers and monitors.[9] But the NEFMC cannot design novel funding mechanisms for monitoring programs. The plain meaning of the MSA is clear and unambiguous.[10] IFM is authorized in a few specific regions and circumstances: (1) foreign fishing,[11] (2) limited access privilege programs,[12] and (3) the North Pacific fisheries research plan.[13] Congress's decision to permit NMFS and the regional councils to require IFM or observing in *only* these three situations clearly manifests Congress's intent not to authorize mandatory industry funding in other scenarios.[14] To read the MSA otherwise would render provisions discussing industry funding mere surplusage;[15] it would offend other important cannons of statutory construction;[16] and it would contradict the well-established legislative history of the MSA.

2. **The Omnibus Amendment violates the MSA's National Standards.**

As described in detail in CoA Institute's previous comment, the introduction of IFM across the Greater Atlantic region would impose a tremendous economic burden on the fishing industry that could lead to the elimination of small-scale fishing. This result would violate National Standards 7 and 8.[17] Congress never intended to grant the regional fishery management councils the authority to regulate a substantial portion of the fleet out of existence.[18] As the Supreme Court has held, "Congress . . . does not alter the fundamental details of a regulatory scheme [such as the one intended by the

---

[9] 16 U.S.C. § 1853(b)(8); 50 C.F.R. § 648.2.
[10] *See generally Palmieri v. Nynex Long Distance Co.*, 437 F.3d 111, 115 (1st Cir. 2006); *Bonilla v. Muebles J.J. Alvarez, Inc.*, 194 F.3d 275, 277 n.2 (1st Cir. 1999).
[11] 16 U.S.C. § 1821(h)(4).
[12] *Id.* § 1853a(e). The Greater Atlantic Region contains two fisheries that permit cost recovery through a fee system: the Atlantic sea scallop individual fishing quota and golden tilefish individual fishing quota limited access privilege programs.
[13] 16 U.S.C. § 1862(a).
[14] *Cf. Anglers Conservation Network v. Pritzker*, 139 F. Supp. 3d 102, 116 n.9 (D.D.C. 2015) ("'[C]ost sharing' programs with industry participants in other fisheries in order to provide higher observer coverage levels . . . were expressly authorized by statute *for particular fisheries only*.") (emphasis added) (citing 16 U.S.C. § 1862).
[15] *Nat'l Credit Union Admin v. First Nat'l Bank & Tr. Co.*, 522 U.S. 479, 501 (1998).
[16] *See Duncan v. Walker*, 533 U.S. 167, 173 (2001); *see also EchoStar Satellite L.L.C. v. Fed. Commc'ns Comm'n*, 704 F.3d 992, 999 (D.C. Cir. 2013); *Ry. Labor Execs.' Ass'n v. Natl' Mediation Bd.*, 29 F.3d 655 (D.C. Cir. 1994)
[17] *See* 16 U.S.C. § 1851(a)(7)–(8). One should not lightly conclude that Congress intend to grant authority for the Council and NMFS to take actions that would put fishermen out of business. *See Arctic Sole Seafoods v. Gutierrez*, 622 F. Supp. 2d 1050, 1061 (W.D. Wash. 2008) (rejecting agency interpretation because it "leads to absurd results—the inevitable elimination of the fishery); *W. Sea Fishing Co. v. Locke*, 722 F. Supp. 2d 126, 140 (D. Mass. 2010) ("[The MSA] creates a duty to allow for harvesting at optimum yield in the present, while . . . [also] protecting fishery output for the future[.]").
[18] The NEFMC could certainly repeal or revoke any of its fishery management plans, but it must do so explicitly and by three-quarters majority approval of its voting members. 16 U.S.C. § 1854(h).

Nat'l Marine Fisheries Serv.
Dec. 24, 2018
Page 3

MSA] in vague terms or ancillary provisions,"[19] nor does it "delegate a decision of such economic and political significance [as the introduction of IFM] in so cryptic a fashion."[20]  IFM represents a shift of tremendous economic and political significance.

With respect to the omnibus measures, the NEFMC attempts to mask the inevitable negative economic consequences of the Omnibus Amendment by suggesting that its measures "do not require the development of IFM programs nor do they directly impose any costs."[21]  Although technically true, this claim is misleading.  As the Council itself recognized, once future fishery-specific IFM programs are approved under the Omnibus Amendment's "streamlined" procedures, the expected economic impact on fishery-related business and communities will be uniformly negative: "[T]here would be *direct negative economic impacts to fishing vessels*[.]"[22]

As for the herring fishery, monitoring costs will likely exceed $710 per sea day for an at-sea monitor and $818 per sea day for a NEFOP-level observer.[23]  Such costs are probably higher than the daily landings revenue of the typical small-scale vessel, particularly given the latest reduction in quota. Indeed, NMFS's proposed rule recognizes that the herring measures alone could result in an "approximately 20 percent" reduction in annual return-to-owner for Category A and B permit holders.[24]  The Council—and NMFS—cannot ignore the devastating economic effects of industry funding in the herring fishery, just as it cannot ignore the costs associated with the omnibus alternatives that it has deemed too "speculative" to analyze.[25]

3. **The Environmental Assessment for the Omnibus Amendment is fatally flawed given recent developments and expected future action in the herring fishery.**

Two other commenters have impliedly suggested yet another problem for the Omnibus Amendment, namely, the fatal flaws in the accompanying Environmental Assessment ("EA"), which fails to account for recent developments in the herring fishery, as well as expected future management measures.[26]  There are at least two such issues that NMFS should consider.

*First*, as CoA Institute previously explained, the Omnibus EA fails, at a general level, to account for possible overlapping requirements for IFM in multiple fisheries.  It is reasonable to assume that some vessels, which declare into multiple fisheries for any given trip, could be continually subject to monitoring requirements.  The NEFMC made only meager efforts to consider how its preferred

---

[19] *Whitman v. Am. Trucking Ass'ns, Inc.*, 531 U.S. 457, 468 (2001).
[20] *Food & Drug Admin. v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 160 (2000); *see Gonzales v. Oregon*, 546 U.S. 243, 267 (2006) (rejecting argument that Congress would permit "broad and unusual authority through an implicit delegation").
[21] OMNIBUS AMEND. at 180.
[22] *See, e.g.*, *id.* (emphasis added); *see also id.* at 9, 304.
[23] *Id.* at 243 (Table 73).
[24] 83 Fed. Reg. at 55,671.
[25] OMNIBUS AMEND. at 183 ("[P]otential downstream effects (e.g., subsequent management measures to address bycatch issues) of this action are considered too remote and speculative to be appropriate for consideration[.]").
[26] *See* Comment of Lund's Fisheries Inc. on Omnibus Amend. (Nov. 19, 2018), Docket No. NOAA-NMFS-2018-0109-0009, *available at* http://bit.ly/2LtTgId; *see also* Comment of F/V Ocean Spray P'ship. on Omnibus Amend. (Dec. 18, 2019), Docket No. NOAA-NMFS-2018-0109-0012, *available at* http://bit.ly/2Cuz71B.

Nat'l Marine Fisheries Serv.
Dec. 24, 2018
Page 4

herring alternatives would impact the mackerel fleet and other vessels that incidentally declare herring yet would still be subject to IFM requirements.[27]

*Second*, and more importantly, the Omnibus EA fails to address the interplay between IFM and recent in-season adjustments in the herring fishery. This past summer, NMFS and the NEFMC reduced the annual catch limit for herring by over 50%.[28] The Council and NMFS now seek again to lower the annual quota for calendar year 2019,[29] with an eye to further reductions in 2020 and 2021. Although there is some uncertainty as to the precise level of reduction, all the possible specification adjustments will be economically devastating. According to a report provided to the NEFMC at its December 2018 meeting, these alternatives will reduce herring revenue by between 80–87%.[30] That, in turn, will result in a 20–22% reduction in total revenue for all vessels declaring into the fishery.[31] Such a loss in profitability on top of the costs associated with IFM will cripple the fleet. The EA for the Omnibus Amendment must be amended to consider the foregoing numbers.[32]

**4. NMFS's *Federal Register* actions have caused confusion and suggest prejudice.**

Stakeholders in the Greater Atlantic region already have raised concerns over the NEFMC's decision to move forward with the Omnibus Amendment, despite the lack of final action on the part of the Mid-Atlantic Council. NMFS's unexpected publication of the September 19, 2018 "notice of availability" only added to this surprise and confusion. It is unclear why the agency published a rule in September, seeking comment on the approval or disapproval of the Omnibus Amendment, and then subsequently published a proposed rule for implementing regulations in November before any action on the Omnibus Amendment was finalized. To the extent rulemakings for the approval of the Omnibus Amendment and the introduction of implementing regulations are being done concurrently, it would seem to suggest that NMFS has already determined its course of action and will view public comments with prejudice.

**5. There are other inequities in the Omnibus Amendment's herring measures**

Beyond the foregoing deficiencies, there also appears to be some inequity in the design of the herring measures. For example, vessels that intend to land less than fifty (50) metric tons (mt) of herring *on any given trip* are provided a waiver from IFM requirements. Yet there are vessels in the fishery that have unique fishing behavior and daily capacity, including those that process at sea and return to port after extended multi-day trips. Because the 50 mt exemption is provided *per trip*, rather than *per day*, the IFM program will favor small capacity vessels that make short, daily trips and land fresh fish. Other vessels, which do not otherwise harvest at a higher daily rate, will be disproportionately impacted and likely subject to a higher monitoring coverage rate. The inequity of

---

[27] *See, e.g.*, OMNIBUS AMEND. at 250–51.
[28] Dep't of Commerce, Nat'l Ocean & Atmospheric Admin., Adjustment to 2018 Atlantic Herring Management Area Sub-Annual Catch Limits, 83 Fed. Reg. 42,450 (Aug. 22, 2018).
[29] Dep't of Commerce, Nat'l Ocean & Atmospheric Admin., Adjustment to Atlantic Herring Specifications and Sub-Annual Catch Limits for 2019, 83 Fed. Reg. 61,593 (Nov. 30, 2018).
[30] Presentation: In-Season Adjustment to Atlantic Herring Specifications for 2019, N. Eng. Fishery Mgmt. Council (Dec. 5, 2018), *available at* http://bit.ly/2V3w4Vk.
[31] *Id*.
[32] The EA should also more closely consider the impact of Atlantic herring Amendment 8, which is still in development but would create new cost burdens for fishermen, including the creation of new buffer zones.

Nat'l Marine Fisheries Serv.
Dec. 24, 2018
Page 5

this outcome is only heightened by the fact that these same vessels may declare into herring only incidentally, or without any real intention of primarily targeting herring. They will nevertheless be required to carry a herring monitor for one- or two-week trips at a time. The Omnibus EA does not adequately address these unique cost factors, and that raises questions about compliance with National Standard 6, which requires fishery management plans to attend to variations in fishing habits.[33]

I. Conclusion

Thank you for your consideration of these comments. CoA Institute respectfully requests that NMFS disapprove the Omnibus Amendment and decline final action on the proposed implementing regulations. If you have any questions, please do not hesitate to contact me at ryan.mulvey@causeofaction.org or (202) 499-4232.

Sincerely,

RYAN P. MULVEY
COUNSEL
CAUSE OF ACTION INSTITUTE

---

[33] 16 U.S.C. § 1851(a)(6).