# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF RHODE ISLAND

| | | |
|---|---|---|
| RELENTLESS, INC., et al., | : | |
| | : | |
| Plaintiffs, | : | |
| | : | |
| v. | : | |
| | : | |
| U.S. DEPARTMENT OF COMMERCE, et al., | : | Civil Action No. 1:20-cv-00108-WES-PAS |
| | : | |
| | : | |
| Defendants. | : | |

## MEMORANDUM OF LAW IN SUPPORT OF DEFENDANTS' CROSS-MOTION FOR SUMMARY JUDGMENT AND IN OPPOSITION TO PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT

# TABLE OF CONTENTS

PAGE

I.     INTRODUCTION .................................................................................................. 1

II.    STATUTORY BACKGROUND............................................................................ 1

   A.    The Magnuson-Stevens Fishery Conservation and Management Act ............................ 1

   B.    The Regulatory Flexibility Act ................................................................... 3

III.   STATEMENT OF FACTS ................................................................................... 3

   A.    Approved Omnibus Measures ................................................................... 3

   B.    Approved Atlantic Herring IFM Measures ..................................................... 5

   C.    Procedural Background ........................................................................... 8

IV.    STANDARD OF REVIEW .................................................................................. 9

V.     ARGUMENT.................................................................................................... 11

   A.    The MSA Authorizes The IFM Coverage Requirement................................... 11

      1.  The MSA authorizes the IFM requirement...................................................... 12

      2.  NMFS reasonably interpreted the MSA to allow for imposition of monitoring requirements and their attendant compliance costs. .......................................... 17

      3.  The *Goethel* case is notable for its complete rejection of many of the arguments made in this case............................................................................................... 23

      4.  The Omnibus Amendment and its implementing regulations were approved pursuant to the procedures established by the MSA........................................... 24

   B.    The IFM Requirement Complies With The National Standards. ....................... 27

      1.    National Standard 1 ............................................................................. 28

      2.    National Standard 2 ............................................................................. 30

      3.    National Standard 6 ............................................................................. 34

      4.    National Standard 7 ............................................................................. 35

      5.    National Standard 8 ............................................................................. 37

C.  The IFM Requirement Neither Forces Plaintiffs Into A Market Nor Violates The Commerce Clause. ........................................................................................................ 39

D.  Defendants' Positions In Prior, Unrelated Litigation Are Not Preclusive. ........................ 41

E.  Defendants Complied With The Regulatory Flexibility Act. ........................................... 42

V.  CONCLUSION ................................................................................................................. 45

# TABLE OF AUTHORITIES

<u>CASE</u>                                                                                    <u>PAGE(s)</u>

*Ace Lobster Co. v. Evans,*
    165 F. Supp. 2d 148 (D.R.I. 2001) ...................................................................... passim

*Anglers Conservation Network v. Pritzker*
    139 F. Supp. 3d 102 (D.D.C. 2015) ............................................................................ 41

*Associated Fisheries of Maine v. Daley,*
    127 F.3d 104 (1st Cir. 1997) ......................................................................... passim

*Atieh v. Riordan,*
    727 F.3d 73 (1st Cir. 2013) ....................................................................................... 10

*Atlantic Fish Spotters Ass'n v. Evans,*
    321 F.3d 220 (1st Cir. 2003) ..................................................................................... 16

*Auer v. Robbins,*
    519 U.S. 452 (1997) .................................................................................................. 24

*Balt. Gas & Elec. v. Nat. Res. Def. Council,*
    462 U.S. 87 (1983) .................................................................................................... 10

*C&W Fish Co. v. Fox,*
    931 F.2d 1556 (D.C. Cir. 1991) ......................................................................... 2, 10

*Califano v. Sanders,*
    430 U.S. 99 (1977) ..................................................................................................... 9

*Campanale & Sons, Inc. v. Evans,*
    311 F.3d 109 (1st Cir. 2002) ..................................................................................... 13

*Chevron U.S.A. v. Nat. Res. Def. Council,*
    467 U.S. 837 (1984) .................................................................................................. 11

*Citizens to Pres. Overton Park v. Volpe,*
    401 U.S. 402 (1971) .............................................................................................. 9, 11

*Coastal Conservation Ass'n v. U.S. Dep't of Commerce,*
    2016 WL 54911 (E.D. La. Jan. 5, 2016) .................................................................. 12

*Conservation Law Found. v. Pritzker,*
    37 F. Supp. 3d 234 (D.D.C. 2014) ............................................................................. 4

*Conn. Light & Power v. Nuclear Regul. Comm'n*
    673 F.2d 525 (D.C. Cir. 1982) ........................................................................... 26, 27

*Ethyl Corp. v. EPA,*
    541 F.2d 1 (D.C. Cir. 1976) ...................................................................................... 10

*Flaherty v. Bryson,*
    850 F. Supp. 2d 38 (D.D.C. 2012) ............................................................................ 31

*Goethel v. Pritzker*,
    2016 WL 4076831 (D.N.H. July 29, 2016)................................................... 19, 23, 24

*Goethel v. U.S. Dep't of Commerce*,
    854 F.3d 106 (1st Cir.) *cert. denied*, 138 S. Ct. 221 (2017)................................ 24

*Graham Cnty. Soil & Water Conservation Dist. v. U.S. ex rel. Wilson*,
    559 U.S. 280 (2010) ........................................................................................ 16

*Hosp. of Univ. of Pa. v. Sebelius*,
    634 F. Supp. 2d 9 (D.D.C. 2009) ................................................................... 11

*J.H. Miles & Co. v. Brown*,
    910 F. Supp. 1138 (E.D. Va. 1995)................................................................ 34

*Kisor v. Wilkie*,
    139 S. Ct. 2400 (2019) ................................................................................... 24

*Krichbaum v. U.S. Forest Serv.*,
    17 F. Supp. 2d 549 (W.D. Va. 1998) .............................................................. 43

*Little Bay Lobster v. Evans*,
    352 F.3d 462 (1st Cir. 2003) ............................................................. 27, 28, 42

*Lovgren v. Locke*,
    701 F.3d 5 (1st Cir. 2012) ........................................................................ 10, 27

*Marsh v. Or. Nat. Res. Council*,
    490 U.S. 360 (1989) ....................................................................................... 10

*Massachusetts ex rel. Div. of Marine Fisheries v. Daley*,
    170 F.3d 23 (1st Cir. 1999) ............................................................................ 32

*Massachusetts v. Pritzker*,
    10 F. Supp. 3d 208 (D. Mass. 2014) .............................................................. 31

*Michigan v. EPA*,
    135 S. Ct. 2699 (2015) ................................................................................... 23

*Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins.*,
    463 U.S. 29 (1983) ........................................................................................... 9

*National Labor Relations Board v. SW General, Inc.*,
    137 S. Ct. 929 (2017) ..................................................................................... 16

*Nat. Res. Def. Council v. Daley*,
    209 F.3d 747 (D.C. Cir. 2000) ......................................................................... 2

*Nat. Res. Def. Council v. NMFS*,
    71 F. Supp. 3d 35 (D.D.C. 2014) ................................................................... 27

*Nat'l Coal. for Marine Conservation v. Evans*,
    231 F. Supp. 2d 119 (D.D.C. 2002) ............................................................... 39

*Nat'l Fed'n of Indep. Bus. v. Sebelius*,
    567 U.S. 519 (2012) ................................................................................. 14, 40

*Nat'l Fisheries Inst. v. Mosbacher*,
   732 F. Supp. 210 (D.D.C. 1990) ...................................................................... 20

*Nat'l Wildlife Fed'n v. Souza*,
   2009 WL 3667070 (S.D. Fla. Oct. 23, 2009) ................................................. 43

*N.C. Fisheries Ass'n v. Gutierrez*,
   518 F. Supp. 2d 62 (D.D.C. 2007) ....................................................... 28, 39, 45

*Nw. Envtl. Def. Ctr. v. Brennen*,
   958 F.2d 930 (9th Cir. 1992) ........................................................................... 32

*N. Wind, Inc. v. Daley*,
   200 F.3d 13 (1st Cir. 1999) ................................................................................ 9

*Oceana v. Locke*,
   831 F. Supp. 2d 95 (D.D.C. 2011) ................................................................... 13

*Oceana v. Pritzker*,
   26 F. Supp. 3d 33 (D.D.C. 2014) ..................................................................... 13

*Pac. Coast Fed'n of Fishermen's Ass'ns v. Blank*,
   693 F.3d 1084 (9th Cir. 2012) ......................................................................... 21

*Reposa v. U.S. by & through Evans*,
   2006 WL 8456847 (D.R.I. June 13, 2006) ........................................................ 9

*S. Offshore Fishing Ass'n v. Daley*,
   995 F. Supp. 1411 (M.D. Fla. 1998) ............................................................... 34

*Steadman v. SEC*,
   450 U.S. 91 (1981) ............................................................................................. 9

*United States v. Rodgers*,
   461 U.S. 677 (1983) ......................................................................................... 22

*Western Sea Fishing Co. v. Locke*,
   722 F. Supp. 2d 126 (D. Mass. 2010) ........................................................ 28, 29

*Willie R. Etheridge Seafood Co. v. Pritzker*,
   2016 WL 1126014 (E.D.N.C. Mar. 21, 2016) ................................................. 37

STATUTES

5 U.S.C. § 601 .................................................................................................. 3, 42

5 U.S.C. § 603 ....................................................................................................... 42

5 U.S.C. § 603(a) ............................................................................................... 42, 45

5 U.S.C. § 603(b) ................................................................................................... 42

5 U.S.C. § 603(c) ...................................................................................................... 3

5 U.S.C. § 604 .......................................................................................................... 3

5 U.S.C. § 604(a) ............................................................................................... 42, 45

5 U.S.C. § 605(b) ................................................................................................... 42

5 U.S.C. § 706 ........................................................................................................ 11

5 U.S.C. § 706(2)(A) .............................................................................................. 11

16 U.S.C. § 1801(a)(6) ............................................................................................. 1

16 U.S.C. § 1801(b)(1) ............................................................................................. 1

16 U.S.C. § 1801(b)(3) ............................................................................................. 1

16 U.S.C. § 1802(26)(A) ........................................................................................ 21

16 U.S.C. § 1802(31) ........................................................................................ 12, 13

16 U.S.C. § 1802(33) .............................................................................................. 28

16 U.S.C. § 1802(34) .............................................................................................. 28

16 U.S.C. § 1811(a) .................................................................................................. 1

16 U.S.C. § 1851(a) ................................................................................................ 10

16 U.S.C. § 1851(a)(1) ................................................................................... 2, 28, 29

16 U.S.C. § 1851(a)(2) ...................................................................................... 2, 30

16 U.S.C. § 1851(a)(3) .............................................................................................. 2

16 U.S.C. § 1851(a)(4) .............................................................................................. 2

16 U.S.C. § 1851(a)(5) .............................................................................................. 2

16 U.S.C. § 1851(a)(6) ...................................................................................... 2, 34

16 U.S.C. § 1851(a)(7) ..................................................................................... passim

16 U.S.C. § 1851(a)(8) ..................................................................................... passim

16 U.S.C. § 1851(a)(9) .............................................................................................. 2

16 U.S.C. § 1851(a)(10) ............................................................................................ 2

16 U.S.C. § 1851(b) ................................................................................................ 28

16 U.S.C. § 1852(a)(1)(A) ........................................................................................ 2

16 U.S.C. § 1852(b) .................................................................................................. 2

16 U.S.C. § 1852(h)(1) ........................................................................................... 1, 2

16 U.S.C. § 1853(a) ............................................................................................... 2, 21

16 U.S.C. § 1853(a)(1) ................................................................................................ 18

16 U.S.C. § 1853(a)(1)(A) ..................................................................................... 12, 23

16 U.S.C. § 1853(a)(5) ................................................................................................ 12

16 U.S.C. § 1853(a)(9) ................................................................................................15

16 U.S.C. § 1853(a)(15) ..............................................................................................29

16 U.S.C. § 1853(b) ..................................................................................................... 2

16 U.S.C. § 1853(b)(4) ................................................................................................ 14

16 U.S.C. § 1853(b)(8) ...................................................................................... passim

16 U.S.C. § 1853(b)(14) .................................................................................... passim

16 U.S.C. § 1853(c) ............................................................................................... 2, 25

16 U.S.C. § 1854(a) ..................................................................................................... 2

16 U.S.C. § 1854(a)(1)(A) ...........................................................................................25

16 U.S.C. § 1854(a)(1)(B) ....................................................................................... 3, 25

16 U.S.C. § 1854(a)(3) .................................................................................................25

16 U.S.C. § 1854(a)(5) .................................................................................................26

16 U.S.C. § 1854(b) ..................................................................................................... 2

16 U.S.C. § 1854(b)(1) .......................................................................................... 2, 25

16 U.S.C. § 1854(d) .................................................................................................... 21

16 U.S.C. § 1855(e) ......................................................................................................3

16 U.S.C. § 1855(f)(1) ..............................................................................................2, 3

16 U.S.C. § 1855(f)(2) ..................................................................................................2

16 U.S.C. § 1858(g)(1) ............................................................................................... 20

16 U.S.C. § 1858(g)(1)(D) .................................................................................... 15, 16

16 U.S.C. § 1862 ......................................................................................................... 18

16 U.S.C. § 1862(a)(2) ................................................................................................ 17

16 U.S.C. § 1862(b)(2) ................................................................................................ 17

16 U.S.C. § 1862(b)(2)(F) ........................................................................................... 17

16 U.S.C. § 1862(b)(2)(G) ........................................................................................... 17

16 U.S.C. § 1881a(a)(1) .............................................................................................. 22

16 U.S.C. § 1881a(a)(2) .............................................................................................. 22

16 U.S.C. § 5101 ......................................................................................................... 13

16 U.S.C. § 5103(b)(1) ..................................................................................................13

31 U.S.C. § 1341 ........................................................................................................... 41

31 U.S.C. § 3302 ...................................................................................................... 22, 41

31 U.S.C. § 3302(b) ....................................................................................................... 22

46 U.S.C. § 4502 ........................................................................................................... 15

## REGULATIONS

46 C.F.R. pt. 28(B) ....................................................................................................... 15

50 C.F.R. § 600.305 ...................................................................................................... 28

50 C.F.R. § 600.310(b)(2)(ii) .........................................................................................30

50 C.F.R. § 600.310(e)(2)(i)(G) ......................................................................................30

50 C.F.R. § 600.310(e)(3) .............................................................................................. 28

50 C.F.R. § 600.310(e)(3)(ii) .................................................................................... 28, 29

50 C.F.R. § 600.310(j)(1)(iii) ..........................................................................................30

50 C.F.R. § 600.315(b)(1) .............................................................................................. 31

50 C.F.R. § 600.340 ...................................................................................................... 35

50 C.F.R. § 600.345 ...................................................................................................... 38

50 C.F.R. § 635.7 ...........................................................................................................14

50 C.F.R. § 648.2 ........................................................................................................... 13

50 C.F.R. § 648.202(b)(1) ................................................................................................ 7

50 C.F.R. § 648.9 ...........................................................................................................14

50 C.F.R. § 648.10 .........................................................................................................14

50 C.F.R. § 648.11(g) ............................................................................................... 14, 19

50 C.F.R. § 648.11(h) ...................................................................................................... 4

50 C.F.R. § 648.11(i) ....................................................................................................... 4

50 C.F.R. § 660.16 ................................................................................................... 14, 19

50 C.F.R. § 679.51 .........................................................................................................14

54 Fed. Reg. 50,386 (Dec. 6, 1989) ............................................................................... 18

55 Fed. Reg. 4,839 (Feb. 12, 1990) ................................................................................18

83 Fed. Reg. 47,236 (Sept. 18, 2018) .............................................................................8

83 Fed. Reg. 55,665 (Nov. 7, 2018)...................................................................................8, 26

85 Fed. Reg. 7,414 (Feb. 7, 2020) ......................................................................................4, 8

OTHER AUTHORITIES

H.R. Rep. No. 101-393 (Dec. 15, 1989) ..................................................................................19

H.R. Rep. No. 114-605 (June 7, 2016) ....................................................................................20

S. Rep. No. 101-414 (Aug. 2, 1990) ........................................................................................19

S. Rep. No. 114-66 (June 16, 2015).........................................................................................20

S. Rep. No. 114-239 (Apr. 21, 2016) .......................................................................................20

S. Rep. No. 115-139 (July 27, 2017) .......................................................................................20

S. Rep. No. 115-275 (June 14, 2018).......................................................................................20

S. Rep. No. 116-127 (Sept. 26, 2019)......................................................................................20


Pub. L. No. 94-265.....................................................................................................................1

Pub. L. No. 96-354......................................................................................................................3

Pub. L. No. 101-627.................................................................................................................18

Pub. L. No. 104-297....................................................................................................................1

Pub. L. No. 109-479....................................................................................................................1

## ADMINISTRATIVE RECORD CITATIONS

Documents in the administrative record are assigned numbered pages, using consecutive Bates numbers. In order to save space, citations to specific administrative record pages utilize only the direct Bates-numbered page with the prefix "AR." Key administrative record documents can be found using the following Bates numbers and acronyms:

| Document | Bates Number | Acronym |
|---|---|---|
| Environmental Assessment | AR17000 to -17637 | EA |
| Final Rule, Magnuson-Stevens Fishery Conservation and Management Act Provisions; Fisheries of the Northeastern United States; Industry-Funded Monitoring, 85 Fed. Reg. 7414 (Feb. 7, 2020) | AR17731 to -17759 | Final Rule |

**GLOSSARY**

| | |
|---|---|
| ACL | annual catch limits (for the fishery or specified subcomponent) |
| ADA | Anti-Deficiency Act |
| APA | Administrative Procedure Act |
| ASM | at-sea monitor |
| CV | coefficient of variation |
| EA | Environmental Assessment |
| EFP | exempted fishing permit |
| FMP | fishery management plan |
| FRFA | final regulatory flexibility analysis |
| FY | fishing year |
| IFM | industry-funded monitoring |
| IFQ | individual fishing quota |
| IRFA | initial regulatory flexibility analysis |
| LAPP | limited access privilege program |
| MRS | Miscellaneous Receipts Statute |
| MSA | Magnuson-Stevens Fishery Conservation and Management Act |
| MSY | maximum sustainable yield |
| mt | metric ton |
| NOA | notice of availability |
| NEFMC or Council | New England Fishery Management Council |
| NMFS | National Marine Fisheries Service |
| OY | optimum yield |
| RFA | Regulatory Flexibility Act |
| RTO | returns to owner |
| SBRM | Standardized Bycatch Reporting Methodology |
| VMS | vessel monitoring system |

# I.     INTRODUCTION

In late 2018, the New England Fishery Management Council finalized an amendment establishing standards for developing and administering future industry-funded monitoring in its fishery management plans, and implementing industry-funded monitoring in the Atlantic herring fishery (the Omnibus Amendment). The Secretary of Commerce approved the Omnibus Amendment, and the National Marine Fisheries Service (NMFS) developed regulations to implement it. Contrary to Plaintiffs' arguments, the MSA authorizes industry-funded monitoring, NMFS acted within its statutory authority and in a manner consistent with the Constitution, and the Omnibus Amendment and implementing regulations comply with federal law. The Court should deny Plaintiffs' motion, and grant Defendants' cross-motion.

# II.    STATUTORY BACKGROUND

## A.     The Magnuson-Stevens Fishery Conservation and Management Act (MSA)

The MSA establishes federal jurisdiction over fishery resources within the United States' exclusive economic zone. 16 U.S.C. §§ 1801(a)(6), 1811(a).[1] Key purposes of the statute are "to take immediate action to conserve and manage the fishery resources found off the coasts of the United States. . ." and "to promote domestic commercial and recreational fishing under sound conservation and management principles. . . ." *Id*. § 1801(b)(1), (3).

To assist in fishery management, the MSA created eight regional Fishery Management Councils, each of which prepares and submits fishery management plans (FMPs) and plan amendments for each fishery under its authority that requires conservation and management. 16

---

[1]  Congress first enacted the statute in 1976 as the Fishery Conservation and Management Act, Pub. L. No. 94-265, renamed it as the Magnuson Fishery Conservation and Management Act then the Magnuson-Stevens Act, made revisions in 1996 through the Sustainable Fisheries Act, Pub. L. No. 104-297, and amended it in 2007 with the Magnuson-Stevens Fishery Conservation and Management Reauthorization Act, Pub. L. No. 109-479.

U.S.C. § 1852(h)(1); *see Nat. Res. Def. Council v. Daley*, 209 F.3d 747, 749 (D.C. Cir. 2000); *C&W Fish Co. v. Fox*, 931 F.2d 1556, 1557-58 (D.C. Cir. 1991). Council voting members include federal, state, and territorial fishery management officials (including the NMFS Regional Administrator from the relevant geographic area) and individuals nominated by state governors and appointed by the Secretary who are knowledgeable about the conservation and management, or the commercial or recreational harvest, of fishery resources within the councils' geographic areas. 16 U.S.C. § 1852(b). The New England Fishery Management Council (Council or NEFMC) is responsible for developing and recommending FMPs for fisheries in the Atlantic Ocean seaward of Maine, New Hampshire, Massachusetts, Rhode Island, and Connecticut, including the Atlantic herring fishery. *See id.* § 1852(a)(1)(A), (h)(1). All FMPs must be consistent with ten National Standards and other MSA provisions. *Id*. § 1851(a)(1)-(10).

FMPs must include certain mandatory provisions, *id.* § 1853(a), and may include additional discretionary provisions to conserve and manage fisheries. *Id.* § 1853(b). NMFS approves, partially approves, or disapproves FMPs and amendments developed and submitted by the councils based on consistency with law, and implements approved FMPs and amendments through regulations. *See id.* § 1854(a), (b). Along with an FMP or amendment, the relevant council submits proposed regulations that the council deems "necessary or appropriate" to implement the FMP or amendment. *Id.* § 1853(c). Both the FMP or amendment and proposed regulations are subject to public review and comment. *Id.* § 1854(a)(1), (b)(1). The MSA provides for judicial review of "[r]egulations promulgated by the Secretary" and "actions that are taken by the Secretary under regulations which implement a fishery management plan, including but not limited to actions that establish the date of closure of a fishery to commercial or recreational fishing." *Id.* § 1855(f)(1)-(2). A petition for review must be filed "within 30 days after the date on which the regulations are

promulgated or the action is published in the Federal Register, as applicable." *Id.* § 1855(f)(1).

**B.    The Regulatory Flexibility Act**

Congress enacted the Regulatory Flexibility Act (RFA), 5 U.S.C. § 601 et seq., to encourage administrative agencies to consider the potential impact of nascent federal regulations on small businesses. *See* Pub. L. No. 96-354, § 2(b), 94 Stat. 1164, 1165 (1980) (statement of purpose). Under the RFA, an agency that publishes a notice of proposed rulemaking must prepare an initial regulatory flexibility analysis (IRFA) describing the effect of the proposed rule on small businesses and discussing alternatives that might minimize adverse economic consequences. *See* 5 U.S.C. § 603(c). When promulgating a final rule, the agency must prepare a final regulatory flexibility analysis (FRFA) and make copies available to members of the public and publish directions for obtaining such copies. *See id.* § 604. Rulemaking to implement an FMP (or a plan amendment) must be consistent with the RFA. *See* 16 U.S.C. §§ 1854(a)(1)(B), 1855(e).

**III.    STATEMENT OF FACTS**

In 2018, the Council finalized its Omnibus Amendment to establish standards for the development of future industry-funded monitoring (IFM) in its FMPs,[2] and to establish IFM in the Atlantic herring fishery. AR17771. The Atlantic herring fishery measures are intended to assess the amount and type of catch, monitor annual catch limits more precisely, and/or provide other information for management, with the purpose of providing increased accuracy in catch estimates. AR17027. The details of the omnibus measures and the Atlantic herring IFM measures are below.

**A.    Approved Omnibus Measures**

The Omnibus Amendment standardizes the development and administration of future IFM

---

[2]   The amendment applies to the Council's FMPs except for those managed jointly with the Mid-Atlantic Fishery Management Council. AR17731.

programs in New England Council FMPs. If the Council develops a future IFM program for a specific FMP, it would develop that program consistent with the procedures and any specifications or requirements established using the omnibus measures. AR17731 (85 Fed. Reg. 7,414 (Feb. 7, 2020)). All of the amendment's omnibus measures are administrative: they specify a development and administration process for future IFM programs that does not directly affect fishing effort or amounts of fish harvested, but may have indirect effects on FMPs. AR17732. Standardizing the process for developing and administering future IFM programs may reduce the administrative burden associated with implementing new programs and may lead to greater consistency in the information collected. *Id*. Improved catch information resulting from greater consistency in how information is collected may lead to better management of biological resources. *Id*.

There are five core elements to the approved omnibus measures. ***First***, the omnibus measures establish a process for FMP-specific IFM to be implemented through an FMP amendment and revised through a framework adjustment.[3] AR17732. This requirement ensures additional public notice and comment during the development of new programs. *Id*. Additional analysis would be required for any action implementing and/or modifying IFM programs, whether it is an amendment or framework adjustment. *Id*. ***Second***, the omnibus measures identify standard IFM cost responsibilities for NMFS and the fishing industry, dividing those responsibilities by cost category. *Id*. NMFS is responsible for its administrative costs to support industry-funded programs, and industry is responsible for its costs associated with the sampling activities. *Id*. ***Third***, the omnibus measures establish standard administrative requirements for monitoring service providers and industry-funded observers/monitors as set forth in 50 C.F.R. § 648.11(h) and

---

[3]   A framework adjustment allows a council and NMFS to update an FMP through expedited changes that modify FMPs in more modest ways than an FMP amendment. *See Conservation Law Found. v. Pritzker*, 37 F. Supp. 3d 234, 239 (D.D.C. 2014).

(i), respectively. AR17733. These requirements serve as the default requirements for any future IFM programs in New England FMPs. *Id*. **Fourth**, the omnibus measures establish a Council-led process for prioritizing IFM programs for available federal funding across New England FMPs. *Id*. Prioritization allows the Council to recommend its IFM program priorities for available NMFS funding to pay NMFS's IFM cost responsibilities. *Id*. For example, if there are some available appropriations for funding NMFS's cost responsibilities, but not enough to support all IFM programs, the Council will determine its IFM coverage priorities for available funding across FMPs. *Id*. **Fifth**, the omnibus measures standardize the process for developing future monitoring set-aside programs, and allow monitoring set-aside programs to be developed in a framework adjustment to the relevant FMP. AR17734. A monitoring set-aside program uses a portion of a fishery's annual catch limit (ACL) to help offset industry cost responsibilities associated with IFM coverage targets. *Id*.

### B.    Approved Atlantic Herring IFM Measures

Atlantic herring are found in the Atlantic Ocean between North Carolina and the Canadian Maritime Provinces. AR17103. Atlantic herring serve as a forage species for a number of other fish, marine mammals, and seabirds. AR17070, AR17161, AR17511. There is a directed fishery for Atlantic herring, composed primarily of vessels using midwater trawl gear, purse seines, and small-mesh bottom trawl gear. AR17104. Vessels using midwater trawl gear typically harvest the majority of herring catch. *Id*. The Atlantic herring fishery is managed through the Atlantic Herring FMP, which was developed by the Council and implemented in 2000. *Id*. Additional management measures have been implemented through FMP amendments and framework adjustments, including this amendment. AR17293-95 (listing amendments and framework adjustments for Atlantic Herring FMP).

The Omnibus Amendment establishes an Atlantic herring IFM program that is expected to provide increased accuracy in catch estimates. AR17734. Improved accuracy of catch estimates contributes toward achieving the following goals: (1) accurate estimates of catch (both retained and discarded), (2) accurate catch estimates for incidental catch species with catch caps (such as haddock and river herring/shad), and (3) affordable monitoring for the herring fishery. *Id.*; *see* AR17214 (increased information to help track catch against catch caps may help allow the herring fishery to fully harvest ACLs); AR17215 (coverage targets have the potential to improve herring catch estimates and management). The primary biological data that at-sea monitors in the Atlantic herring fishery will collect are length data on retained and discarded catch, and whole specimens or photos to verify species identification; monitors also will collect information on catch composition and fishing effort. AR17735. The herring measures establish a 50% monitoring coverage target for vessels with Category A or Category B limited access herring permits.[4] AR17734. The 50% coverage target includes a combination of Standardized Bycatch Reporting Methodology (SBRM) coverage,[5] which is funded by NMFS, and IFM coverage.[6] *Id.* Vessel owners would pay their costs for any additional monitoring coverage above SBRM coverage requirements to achieve the 50% coverage target, which is calculated by combining SBRM and IFM coverage, thus a vessel will not have SBRM and IFM coverage on the same trip. *Id.* Any additional coverage above SBRM is contingent on NMFS having appropriated funds to pay for its administrative costs for IFM coverage. AR17737. The Council considered other coverage targets,

---

[4]  A Category A permit is an All Areas permit that allows vessels with such permits to fish in all four areas. *See* AR17135, AR17152. A Category B permit is an Areas 2/3 Limited Access permit that allows vessels to fish in areas 2 and 3. *Id.*

[5]  The SBRM amendment was implemented in 2007 and revised in 2015; it specifies methods and processes to monitor bycatch in the Greater Atlantic fisheries. AR17293.

[6]  For example, if there is an estimated 10% SBRM coverage in a given year, then 40% IFM coverage will be needed to achieve the 50% coverage target. AR17734.

including 100%, 75%, and 25%, but determined that the 50% coverage target best balanced the benefits associated with reducing uncertainty against the costs of additional monitoring. AR17734.

Coverage requirements may be waived on a trip-by-trip basis if monitoring coverage is unavailable, if vessels intend to land less than 50 metric tons (mt) of herring, or if wing vessels carry no fish on pair trawling trips.[7] AR17735. These waivers would help reduce the cost of IFM coverage on those trips, but are not an option for vessels that choose to land more than 50 mt of herring per trip. *Id*. In addition, the Council recommended NMFS issue an exempted fishing permit (EFP) to midwater trawl vessels that choose to use electronic monitoring together with portside sampling. AR17736-37. The EFP exempts midwater trawl vessels from at-sea monitoring coverage, and allows use of electronic monitoring and portside sampling to comply with the 50% IFM coverage target. AR17737. Midwater trawl vessels typically discard only a small percentage of catch at sea, thus electronic monitoring and portside sampling potentially are a cost-effective way to address monitoring goals for this large part of the herring fishery. AR17736, AR17738.[8]

NMFS acknowledged that the IFM coverage requirement will have direct economic impacts on vessels issued Category A and B permits participating in the herring fishery. AR17735. The Environmental Assessment (EA) states that industry's estimated cost responsibility associated with carrying an at-sea monitor (ASM) is $710 per day. *Id*. According to the EA, the potential reduction in annual returns to owner for vessels with Category A or B herring permits associated with paying for monitoring coverage is up to approximately 20%, although the actual cost of IFM

---

[7]  A wing vessel trip refers to the pairing of a trawl vessel with another midwater trawl vessel that would not pump or carry any fish onboard. AR17735.

[8]  The herring measures also maintain the requirement that midwater trawl vessels that access Groundfish Closed Areas must carry an observer as required by 50 C.F.R. § 648.202(b)(1). AR17735-36; AR17072, AR17093. Previously, the only mechanism for midwater trawl vessels to carry an observer in order to access the Groundfish Closed Areas was if the vessel was randomly selected to carry an SBRM observer. AR17736. The herring measures, however, allow midwater trawl vessels to purchase observer coverage to access those areas. *Id*.

on a particular vessel would vary with effort level and the amount of SBRM coverage. AR17190, AR17290, AR17306; *see* AR17735. Finally, the Council will review IFM's effectiveness in the herring fishery two years after implementation and consider if adjustments to the coverage target are warranted. AR17734.

### C.    Procedural Background

The Council adopted the Omnibus Amendment on April 20, 2017. AR17731. A notice of availability (NOA) for the amendment was published in the Federal Register on September 18, 2018, 83 Fed. Reg. 47,236, with a comment period that ended on November 19, 2018. AR17731. On December 18, 2018, NMFS approved the amendment on behalf of the Secretary of Commerce and informed the Council of its approval by letter. AR17731; AR17760-62.

NMFS's proposed rule to implement the amendment was published in the Federal Register on November 7, 2018, with a comment period that ended on December 24, 2018. 83 Fed. Reg. 55,665 (Nov. 7, 2018); *see* AR17731. The proposed rule stated that NMFS would consider any public comment received after the close of the NOA comment period but during the proposed rule's comment period in NMFS's decisionmaking regarding the proposed measures. 83 Fed. Reg. at 55,667. While some expressed concerns over the economic impact of the IFM coverage requirement on participants in the herring industry, NMFS considered the nature and extent of the costs relative to the benefits of additional monitoring. AR17742. The final rule was published in the Federal Register on February 7, 2020. AR17731 (85 Fed. Reg. 7,414). The regulations associated with the omnibus measures became effective on March 9, 2020, and the regulations associated with IFM in the Atlantic herring fishery became effective on April 1, 2020.[9]

---

[9]   Implementation of the industry-funded monitoring requirement in the Atlantic herring fishery has been delayed. *See* https://www.fisheries.noaa.gov/species/atlantic-herring#industry-fundedmonitoring (last visited Jan. 13, 2021).

Plaintiffs Relentless and Huntress are the owners of two commercial fishing vessels, the F/V Relentless and F/V Persistence, which hold Category A permits to participate in the Atlantic herring fishery. Their vessels use small-mesh bottom trawl gear and have high-capacity freezing capability, giving them flexibility to conduct multi-day fishing trips for species including herring, squid, butterfish, and mackerel. Plaintiffs participated in the years-long process leading to the Omnibus Amendment through Seafreeze Ltd., "a sister company," that submitted letters to the Council and comments to NMFS. ECF 37-1 (Pl. Br.) at 12-15 & Ex. 3 (Decl. of M. Lapp ¶¶ 1-2).

## IV.    STANDARD OF REVIEW

Courts resolve MSA claims under the deferential Administrative Procedure Act (APA) standard of review. *N. Wind, Inc. v. Daley*, 200 F.3d 13, 17 (1st Cir. 1999). Because the APA standard affords great deference to agency decisionmaking and because the Secretary's action is presumed valid, judicial review is narrow, even at the summary judgment stage. *Associated Fisheries of Maine v. Daley*, 127 F.3d 104, 109 (1st Cir. 1997). The court's role "is only to determine whether the Secretary's decision to promulgate the fishery regulation was consonant with his statutory powers, reasoned, and supported by substantial evidence in the record." *Id.* (citations omitted). Substantial evidence means such relevant evidence as "a reasonable mind might accept as adequate to support a conclusion." *Steadman v. SEC*, 450 U.S. 91, 99 (1981); *Reposa v. U.S. by & through Evans*, CA 04-494 S, 2006 WL 8456847, at *4 (D.R.I. June 13, 2006). Under this standard, the Court must determine whether "the decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment." *Citizens to Pres. Overton Park v. Volpe*, 401 U.S. 402, 416 (1971), *abrogated on other grounds*, *Califano v. Sanders*, 430 U.S. 99 (1977); *see Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins.*, 463 U.S. 29, 42-43 (1983). "An agency decision fails to pass this test if the administrative record

reveals that 'the agency relied on improper factors, failed to consider pertinent aspects of the problem, offered a rationale contradicting the evidence before it, or reached a conclusion so implausible that it cannot be attributed to a difference of opinion or the application of agency expertise.'" *Atieh v. Riordan,* 727 F.3d 73, 76 (1st Cir. 2013) (quoting *Associated Fisheries,* 127 F.3d at 109). Administrative actions are presumed valid; thus, the APA only requires the Court to decide whether the agency "articulated a rational connection between the facts found and the choice made." *Balt. Gas & Elec. v. Nat. Res. Def. Council*, 462 U.S. 87, 105 (1983) (citation omitted).

Further, when a party challenges an FMP, plan amendment, or regulation as inconsistent with one or more of the ten National Standards set forth in 16 U.S.C. § 1851(a), a court is to determine whether "the administrative judgment, right or wrong, derives from the record, possesses a rational basis, and evinces no mistake of law." *Lovgren v. Locke*, 701 F.3d 5, 32 (1st Cir. 2012) (quoting *Associated Fisheries*, 127 F.3d at 111); *see also C&W Fish,* 931 F.2d at 1562 (the court's task is "not to review *de novo* whether the amendment complies with these standards but to determine whether the Secretary's conclusion that the standards have been satisfied is rational and supported by the record.") (citation omitted). Where, as here, an agency's technical expertise is involved, the reviewing court should be particularly zealous in guarding the agency's discretion. *Marsh v. Or. Nat. Res. Council*, 490 U.S. 360, 376-77 (1989); *see Balt. Gas*, 462 U.S. at 103 ("[w]hen examining . . . [a] scientific determination . . . a reviewing court must generally be at its most deferential"). The court "must look at the decision not as the chemist, biologist or statistician that [it is] qualified neither by training nor experience to be, but as a reviewing court exercising [its] narrowly defined duty of holding agencies to certain minimal standards of rationality." *Ethyl Corp. v. EPA*, 541 F.2d 1, 36 (D.C. Cir. 1976) (en banc).

Because actions reviewed under the APA's standard of review are governed by the administrative record, *see* 5 U.S.C. § 706, there are no facts in dispute for the Court to resolve. *Hosp. of Univ. of Pa. v. Sebelius*, 634 F. Supp. 2d 9, 12-13 (D.D.C. 2009). Judicial review of Plaintiffs' claims is limited to the administrative record, and the Court should determine agency compliance with the law solely on the record on which the decision at issue was made. 5 U.S.C. § 706; *Overton Park*, 401 U.S. at 419. Summary judgment "thus serves as the mechanism for deciding, as a matter of law, whether the agency action is supported by the administrative record and otherwise consistent with the APA standard of review." *Sebelius*, 634 F. Supp. 2d at 13 (citations omitted). Although this case is brought before the Court on the parties' cross-motions for summary judgment, agency action is entitled to a presumption of regularity. *Overton Park*, 401 U.S. at 415. Plaintiffs must prove the particular manner in which the actions taken by Defendants are "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). If Plaintiffs fail to meet this burden, their motion for summary judgment must be denied, and judgment entered for Defendants.

## V.   ARGUMENT

### A.   The MSA Authorizes The IFM Coverage Requirement.

This case involves NMFS's construction of the MSA, thus the two-part analysis established by the Supreme Court in *Chevron U.S.A. v. Nat. Res. Def. Council*, 467 U.S. 837 (1984), applies. Under the first step of the *Chevron* analysis, a court must give effect to congressional intent where Congress has "directly spoken to the precise question at issue." *Id*. at 842-43. However, "if the statute is silent or ambiguous with respect to the specific issue, the question for the court [under step two] is whether the agency's answer is based on a permissible construction of the statute." *Id*. at 843; *Ace Lobster Co. v. Evans*, 165 F. Supp. 2d 148, 166 n.16 (D.R.I. 2001) (reviewing court must defer to agency's statutory interpretation as long as it is reasonable). Here, Congress has

spoken directly to the precise question at issue. The MSA explicitly authorizes FMPs to include observer requirements, 16 U.S.C. § 1853(b)(8), and to implement measures that are deemed "necessary and appropriate" to conserve and manage the fishery, *id.* § 1853(a)(1)(A), (b)(14). If, however, the Court determines that Congress has not spoken directly on the issue, it should find NMFS's interpretation of the MSA to allow the IFM requirement is reasonable nonetheless.

### 1.    The MSA authorizes the IFM requirement.

The MSA expressly authorizes at-sea monitors (i.e., observers) to be carried onboard fishing vessels "for the purpose of collecting data necessary for the conservation and management of the fishery." 16 U.S.C. § 1853(b)(8). The MSA also requires that FMPs contain measures "necessary and appropriate" for the conservation and management of a fishery, and authorizes FMPs to "prescribe such other measures, requirements, or conditions and restrictions as are determined to be necessary and appropriate for the conservation and management of the fishery." *Id.* § 1853(a)(1)(A), (b)(14). Courts have interpreted the meaning of the words "necessary and appropriate" as they are used in the MSA. *See Coastal Conservation Ass'n v. U.S. Dep't of Commerce*, Civil Action No. 15-1300, 2016 WL 54911, at *4 (E.D. La. Jan. 5, 2016) (finding that "necessary and appropriate" in 16 U.S.C. § 1853(a)(1)(A) is "empowering language"). Further, the Council has a responsibility to "specify the pertinent data which shall be submitted to the Secretary. . . , including, but not limited to, information regarding the type and quantity of fishing gear used, catch by species in numbers of fish or weight thereof. . . ." 16 U.S.C. § 1853(a)(5).

Plaintiffs incorrectly contend that the MSA allows for "observers" but not "at-sea monitors." Pl. Br. 23, 29. The MSA broadly defines "observer" as "any person required or authorized to be carried on a vessel for conservation and management purposes by regulations or permits under this chapter." 16 U.S.C. § 1802(31). "At-sea monitors" are authorized to be carried

on vessels "for conservation and management purposes" and thus fall within this definition. The statute does not confine the duties of an observer (or monitor) to gathering any limited set of information. *See id*. Further, regulations implementing the MSA define the terms "observer" and "monitor" identically:

> Observer or monitor means any person certified by NMFS to collect operational fishing data, biological data, or economic data through direct observation and interaction with operators of commercial fishing vessels as part of NMFS' Northeast Fisheries Observer Program. Observers or monitors include NMFS-certified fisheries observers, at-sea monitors, portside samplers, and dockside monitors.

50 C.F.R. § 648.2 (emphasis added).[10] The broad categories of potential data that may be collected is consistent with how the MSA defines the term "observer." *Id*; *see also* 16 U.S.C. § 1802(31). Thus, there is no merit to Plaintiffs' assertion that "at-sea monitors" are a "new office" that is unauthorized as a matter of law, simply because the at-sea monitors in the Atlantic herring fishery will collect a slightly different data set than other observers. Pl. Br. 18, 29.[11] Nor does Plaintiffs' reliance on *Campanale & Sons, Inc. v. Evans*, 311 F.3d 109 (1st Cir. 2002), save their case. *Campanale* concerned whether the agency complied with a "consultation" requirement in the Atlantic Coastal Fisheries Cooperative Management Act, 16 U.S.C. §§ 5101, 5103(b)(1). But neither that statute nor its "consultation" requirement are at issue here and Plaintiffs' lengthy

---

[10]   Amendment 16 to the Northeast Multispecies FMP also implemented at-sea monitor regulations to achieve FMP goals and objectives, and defined their roles consistent with the MSA observer definition. *See Oceana v. Pritzker*, 26 F. Supp. 3d 33, 40 (D.D.C. 2014) (considering Amendment 16 to the Northeast Groundfish FMP); *Oceana v. Locke*, 831 F. Supp. 2d 95, 112 (D.D.C. 2011).

[11]   Both the EA and the Final Rule explained that the Council had recommended that at-sea monitors collect limited biological data as compared to observers such as those assigned to vessels through the SBRM program to allow for possible cost savings associated with limited data collection. AR17735; AR17083. During the Council's decisionmaking process, it changed its recommendation from initially collecting data only on discarded catch to collecting information on both retained and discarded catch so as to increase the utility of information collected by ASMs. AR17083. Observers collect whole specimens; the primary biological data that at-sea monitors will collect are length, and they also may collect whole specimens or photos. AR17735. At-sea monitors will collect additional information regarding fishing gear; tow-specific information; species, weight, and disposition of retained and discarded catch; and vessel trip costs. *Id*.

discussion of the standard of review in APA cases as articulated in *Campanale* provides no unique insight for resolving Plaintiffs' claims.

Plaintiffs' quarrel, instead, is with whether the MSA allows sampling costs to be imposed on the industry, rather than borne by the government. The requirement that industry pay for its sampling costs is neither novel nor a violation of law. Observers are used in other fisheries, including in fisheries managed by the NEFMC, and widely accepted from scientific and management perspectives as an important tool for fisheries monitoring. *See* 50 C.F.R. § 648.11(g) (listing fisheries under NEFMC jurisdiction that may require industry-funded monitoring);[12] *see also id*. §§ 635.7, 679.51, 660.16 (requiring observers in Atlantic highly migratory species, Alaska Groundfish and Halibut, and West Coast groundfish fisheries). The MSA authorizes various measures—in addition to observers—to monitor fisheries and, inherently, such measures result in costs to the regulated industry. For example, in many fisheries, fishing vessels are required to install vessel monitoring system (VMS) units on board for purposes of monitoring the vessels' position. *See*, *e.g*., 50 C.F.R. §§ 648.9-648.10 (VMS requirements); 16 U.S.C. § 1853(b)(4) (authorizing FMPs to require, among other things, "devices which may be required to facilitate enforcement"). Requirements to install and use VMS can impose compliance costs. The MSA recognizes that fact and requires, where practicable, minimization of costs and adverse economic impacts on communities. *See* 16 U.S.C. § 1851(a)(7)-(8) (National Standards 7 and 8). The MSA does not need to authorize <u>imposition</u> of the costs of regulatory requirements such as VMS or observers—the statute just needs to authorize the requirements themselves. *See Nat'l Fed'n of Indep. Bus. v. Sebelius*, 567 U.S. 519, 652 (2012) (Scalia, J., Kennedy, J., Thomas, J., Alito, J., dissenting) ("Government regulation typically imposes costs on the regulated industry."); *see also*

---

[12]   As Plaintiffs acknowledge, the New England groundfish fishery has had an IFM requirement in place since 2012, which was the topic of extensive litigation. *See* Section V.A.3, *infra*.

46 U.S.C. § 4502 (directing Coast Guard to prescribe regulations for safety standards for vessels); 46 C.F.R. pt. 28(B) (onboard safety requirements for commercial vessels). To conclude otherwise would mean that Congress intended the government to subsidize the costs of all conservation measures, such as at-sea or electronic monitors, VMS, equipment necessary for vessels or dealers to submit reports to NMFS electronically, and appropriately configured fishing vessels and gear, which are necessary for harvesting fish from a public resource. The Omnibus Amendment does not impose the government's costs on the industry, or tax the industry. *Cf.* Pl. Br. 29, 35. Rather, it requires industry to comply with ASM coverage requirements. These requirements have compliance costs, and the Omnibus Amendment identifies the industry's costs versus the government's costs, in part to ensure compliance with other Federal laws. *See* Section V.A.2, *infra*.

Section 1858(g) also demonstrates NMFS's statutory authority to require ASM coverage that imposes compliance costs on the industry with its statement that the Secretary may impose a permit sanction for an owner's or operator's failure to pay a contractor for observer services. *See* 16 U.S.C. § 1858(g)(1)(D). This section of the MSA is worded broadly and is not limited to any specific fishery or region. *See* Section V.A.2, *infra*. This enforcement provision presupposes that industry may be obligated to enter into contracts and pay for observer services, as do National Standards 7 and 8, which require NMFS to consider the costs and economic impact of regulation on the industry. 16 U.S.C. § 1851(a)(7)-(8); *see id*. § 1853(a)(9) (requiring assessment of economic impacts of conservation and management measures). The provision allowing imposition of permit sanctions on this basis would be needed only if the MSA authorizes industry payments for observer services contracted for by vessel owners and operators. The explicit reference to payments for observer services demonstrates that the MSA authorizes observer coverage requirements that impose compliance costs on the industry. Plaintiffs' contention that the MSA gives NMFS

15

authority to require observers, but not the authority to require industry to pay for their costs, Pl. Br. 26, lacks merit when Sections 1853(b)(8) and 1858(g)(1)(D) are read together. *See Graham Cnty. Soil & Water Conservation Dist. v. U.S. ex rel. Wilson*, 559 U.S. 280, 289 (2010) (a statute must be read as a whole). Indeed, Plaintiffs' brief fails to even mention Section 1858(g)(1)(D).

Congress included broad language in Section 1853(b) that allows FMPs to include a wide variety of discretionary provisions. *See supra*. FMPs may require vessels to carry observers "for the purpose of collecting data necessary for the conservation and management of the fishery." 16 U.S.C. § 1853(b)(8). FMPs also may "prescribe such other measures, requirements, or conditions and restrictions as are determined to be necessary and appropriate for the conservation and management of the fishery." *Id*. § 1853(b)(14). Plaintiffs' narrow reading of these MSA provisions is inconsistent with their text, and their reliance on *Atlantic Fish Spotters Ass'n v. Evans*, 321 F.3d 220 (1st Cir. 2003), is misplaced. Pl. Br. 22-23, 29. In *Atlantic Fish Spotters*, the agency interpreted an annual appropriations bill as granting the authority to impose a permitting requirement beyond the fiscal year. 321 F.3d at 223-24. In that case, the First Circuit articulated the general rules for statutory interpretation, but that is where its relevance and helpfulness ends, as the factual circumstances in that case are not present in this case. *Id*. Here, the authority for the Omnibus Amendment and the Final Rule derive directly from the plain language of the MSA, not an annual appropriations bill. Nor does *National Labor Relations Board v. SW General, Inc*., 137 S. Ct. 929, 939-40 (2017) support Plaintiffs' position. Pl. Br. 29. In that case, the Supreme Court held that the plain language of the statute at issue there did not support the agency's interpretation and, further, the absence of language in one section of the statute did not give rise to the sensible inference that the term left out must have meant to be excluded. As explained above, no such "sensible inference" can be drawn here in light of the totality of the statutory text.

When the text of the MSA is carefully construed and the entire statutory scheme is viewed in context, it is clear that the statute allows NMFS to require monitors and thus cause industry to incur the costs of utilizing monitors. This Court must give effect to Congress's intent and reject Plaintiffs' contention that NMFS lacks authority under the MSA to cause vessels to incur the cost associated with monitoring in the Atlantic herring fishery.

> **2.    NMFS reasonably interpreted the MSA to allow for imposition of monitoring requirements and their attendant compliance costs.**

Should the Court determine that Congress has not spoken directly to the issue of NMFS's authority to require the industry to pay for IFM, NMFS's interpretation of the MSA is nonetheless reasonable under *Chevron* step two. Plaintiffs assert that the MSA's explicit references to the government's collection of fees in other sections of the statute for other fisheries and programs means that NMFS's interpretation that the statute allows the IFM requirement is impermissible. Pl. Br. 23-24. This position has no merit, as a careful review of the amendment requiring observers in the North Pacific and other provisions of the MSA shows that NMFS reasonably determined it is authorized to require monitoring coverage that comes with compliance costs for the industry.

As a threshold matter, the imposition of a fee is wholly different from requiring the industry to pay its cost of complying with conservation and management provisions. Fees are authorized by certain provisions of the MSA for specific costs and purposes; they require members of the industry to pay the government's administrative costs, and the payments are made directly to the government. *E.g.*, 16 U.S.C. § 1862(a)(2), (b)(2). Such fees may be required of industry participants even when they do not actually use the service. *See id*. § 1862(b)(2)(F). Unlike ASM sampling costs, fees are not paid to third parties for services rendered. *See id*. § 1862(b)(2)(G).

Observer programs where U.S. vessels paid for their costs of carrying observers on their vessels were implemented before Congress added observer provisions (now, 16 U.S.C. §§

1853(b)(8) and 1862) to the Magnuson Act (now, MSA) in late 1990. *See* n. 1, *supra* (providing brief legislative overview). The Secretary issued regulations requiring observers in two groundfish fisheries in the North Pacific, finding that it was "necessary and appropriate for the conservation and management of the fishery," citing what is now 16 U.S.C. §§ 1853(a)(1), 1853(b)(14). *See* 54 Fed. Reg. 50,386, 50,391 (Dec. 6, 1989). That observer program, approved by the North Pacific Council in 1989, provides that: "[a]ny vessel operator or manager of a shoreside processing facility who is required to accommodate an observer is responsible for obtaining a NMFS-certified observer . . . [and] will pay the cost of the observer directly to the contractor." 55 Fed. Reg. 4,839-02, 4,840 (Feb. 12, 1990); *see also* N. Pac. Fishery Mgmt. Council, Envtl. Assessment, Restructuring the Program for Observer Procurement & Deployment in the N. Pac. (March 2011), at 3, *available at* https://repository.library.noaa.gov/view/noaa/4291 (last visited Jan. 13, 2021) (later description of the observer program).

Congress was aware of the North Pacific Observer Program and its industry funding provisions when it enacted the Fishery Conservation Amendments of 1990 that added Sections 1853(b)(8) (observer provision) and 1862 (North Pacific Fisheries Research Plan) to the statute. *See* Pub. L. No. 101-627 §§ 109, 118, 104 Stat. 4436 (respectively, observer provision and North Pacific Fisheries Research Plan).[13] Section 1853(b)(8) confirmed the authority already implicit in the Magnuson Act, as it was being administered by NMFS at the time, to require observers on domestic fishing vessels at the vessel's expense of using the observer services. *See* Comm. on

---

[13]   Congress received testimony that the cost of observers should be considered the appropriate cost of profiting from a public resource. *See* Hr'g 101-37, before the H. Subcomm. on Fisheries & Wildlife Conservation & the Env't at 149 (Aug. 8, 1989) (Stmt. of A. Thomson, Exec. Dir. of the Alaska Crab Coalition) ("[I]t is not the responsibility of the tax paying public to provide a subsidy to the factory trawlers in the form of federal funding for observers."). Others contended that federal funding should be available for the observer program, supplemented by funds collected from industry through a user fee. *Id.* at 183 (Stmt. of E. Evans, Alaska Factory Trawler Ass'n).

Merch. Marine & Fisheries, H.R. Rep. No. 101-393 at 28 (Dec. 15, 1989) ("[T]his subsection allows the Councils to require that observers be carried on board domestic fishing [vessels] for data collection purposes. The Committee notes that the Councils already have—*and have used*—such authority; the amendment makes the authority explicit.") (emphasis added); Comm. on Commerce, Sci., & Transp., S. Rep. No. 101-414 at 8, 20 (Aug. 2, 1990) (provision "clarif[ies] the existing authority"). Thus, the legislative history for the observer provision at Section 1853(b)(8) confirms that the MSA authorized fishery observer programs prior to the statutory amendment, like the program extant in the North Pacific. Other fisheries currently have observer programs where vessels pay for their direct costs. *E.g.*, 50 C.F.R. § 660.16 (West Coast groundfish fishery); *id.* § 648.11(g) (fisheries under NEFMC jurisdiction). That costs (in the form of fees collected by the government, as opposed to industry paying its own costs such as those at issue in this case) are addressed in Section 1862 but not expressly in Section 1853 does not support a sensible inference that the MSA forbids an FMP that requires industry to bear the cost of certain regulations. *Goethel v. Pritzker*, Civ. No. 15-cv-497-JL, 2016 WL 4076831, at *6 (D.N.H. July 29, 2016). Nor does it support Plaintiffs' contention that the fee-based provisions in Section 1862 exclude the NEFMC from implementing an IFM requirement such as the one at issue in the Omnibus Amendment. Pl. Br. 23, 28-29. To the contrary, the MSA authorizes them both.

As this history shows, NMFS has consistently interpreted the MSA to authorize programs that require industry to absorb their costs of observers hired through third-party contractors, like the observers at issue in this case. In the course of criticizing a decision from another district court in New Hampshire in which that court stated that industry-funded monitoring in the New England groundfish fishery was legally permissible, *see* Section V.A.3, *infra*, Plaintiffs argue that Congress authorized funding for those at-sea monitors after the First Circuit "flagged the funding issue for

Congress[.]" Pl. Br. 26 n.7. In fact, Congress has amended the MSA several times during this period; it has not overridden the agency's authority and has explicitly acknowledged such authority in 16 U.S.C. § 1858(g)(1). *See* Section V.A.1, *supra*. In addition, Congressional committees have been aware that industry is bearing the direct costs of monitoring in the Northeast groundfish fishery, including before the First Circuit decision cited by the Plaintiffs. *See*, *e.g.*, S. Rep. No. 114-66 at 31-32 (June 16, 2015) (committee directing NMFS to work with the regional fishery councils to put in place more cost-affordable monitoring plans); S. Rep. No. 114-239 at 31-32 (Apr. 21, 2016) (directing NMFS to work with councils to identify cost-effective monitoring programs); H.R. Rep. No. 114-605 at 17 (June 7, 2016) (same); S. Rep. No. 115-139 at 34 (July 27, 2017) (recognizing Northeast groundfish fishery's struggles associated with monitoring costs); S. Rep. No. 115-275 at 36 (June 14, 2018) (same); S. Rep. No. 116-127 at 42 (Sept. 26, 2019) (same). Similarly, courts have rejected "cramped" interpretations of the MSA and held that the statute vests broad authority in the Secretary to promulgate such regulations as are necessary to carry out the conservation and management measures of an approved FMP. *Nat'l Fisheries Inst. v. Mosbacher*, 732 F. Supp. 210, 216 (D.D.C. 1990) ("Merely because Congress chose to also specify certain actions as unlawful *per se* in [one part of the MSA] does not mean that it intended those prohibitions to be the boundaries of the Secretary's broad rulemaking authority.").

Plaintiffs state that the MSA authorizes collection of fees in certain circumstances for specific purposes, such as when they are associated with limited access privilege programs (LAPPs). Pl. Br. 23-24. This argument fundamentally mischaracterizes the nature of the IFM requirement as requiring NMFS to collect a "fee" from any vessel participating in the Atlantic herring fishery that is subject to the IFM requirement. To the contrary, if a SBRM observer is not selected to cover a vessel's trip, and NMFS notifies a vessel representative that it must procure an

at-sea monitor, the vessel is required to obtain a monitor from a provider of its choosing and pay to carry a monitor on that trip. AR17735. Payment for a monitor is remitted <u>directly to the service provider</u>; it is not a fee paid to NMFS.

Moreover, the MSA does not require a LAPP in order to require IFM in the Atlantic herring fishery. Pl. Br. 23-24. Under a LAPP, a person receives a Federal permit for exclusive use "to harvest a certain portion of the total catch allowed for a particular species." *Pac. Coast Fed'n of Fishermen's Ass'ns v. Blank*, 693 F.3d 1084, 1088 (9th Cir. 2012) (citation omitted); *see also* 16 U.S.C. § 1802(26)(A) (defining LAPP). When a council elects to implement a LAPP, it must establish a cost-recovery program. 16 U.S.C. § 1854(d). But LAPPs themselves are not statutorily required: they are discretionary; designed to address a wide variety of fishery-specific issues such as overfishing, overcapacity, or economic inefficiencies; and subject to a broad range of statutory considerations. *See generally id.* § 1853a. The Council did not select a LAPP to address the issues that the herring measures were intended to address, nor was the Council required to.

Plaintiffs also imply that "information collection" is authorized only under Section 1881a, and that Defendants cannot "collect fees" for "data collection." Pl. Br. 23. The Omnibus Amendment and Final Rule provide ample justification for the need for IFM, however, including accurate monitoring of annual catch limits and/or other information for management. *E.g.*, AR17010; AR17739-40. Further, Plaintiffs' argument rests on the faulty premise that Section 1881a operates to the exclusion of other statutorily-authorized methods for information collection, when its plain language shows it simply provides an option for doing so. That is, "[i]f a Council determines that <u>additional</u> information would be beneficial for developing, implementing, or revising a [FMP] or for determining whether a fishery is in need of management, the Council <u>may</u> request that the Secretary implement an information collection program for the fishery which

would provide the types of information specified by the Council." 16 U.S.C. § 1881a(a)(1) (emphasis added). Secretarial action is similarly optional: "[i]f the Secretary determines that <u>additional</u> information is necessary for developing, implementing, revising, or monitoring a fishery management plan, or for determining whether a fishery is in need of management, the Secretary <u>may</u>, by regulation, implement an information collection or observer program requiring submission of such additional information for the fishery." *Id*. § 1881a(a)(2) (emphasis added). "Additional information" in both subparagraphs reinforces that Section 1881a is not the only authority for information collection. Use of the word "may" in a statute generally connotes a degree of discretion. *United States v. Rodgers*, 461 U.S. 677, 706 (1983). Thus, while Section 1881a "may" provide an optional statutory mechanism for collecting information to develop, implement, or revise an FMP, it is not the exclusive method for doing so, and does not prohibit a council from developing FMPs or amendments that include an IFM requirement.

Finally, Plaintiffs characterize the IFM requirement as a "scheme" and suggest that it was unlawful to construct the Omnibus Amendment and Final Rule in a way that complied with the Miscellaneous Receipts Statute (MRS), 31 U.S.C. § 3302.[14] Pl. Br. 24. By way of background, the MRS states that "an official or agent of the Government receiving money for the Government from any source shall deposit the money in the Treasury as soon as practicable without deduction for any charge or claim." 31 U.S.C. § 3302(b). The MRS prevents an agency from augmenting its appropriations by either directly accepting funds from another entity or causing another entity to bear a cost that should otherwise be borne by the agency. Here, payments to monitoring providers are not for services provided to the government, they are not remitted to NMFS, nor does NMFS

---

[14]  The Complaint does not include a claim for violation of the MRS, so Plaintiffs' argument is not relevant to their assertion that the IFM requirement is not authorized by Congress.

exercise control over the contractual relationship. On these facts, payments to monitoring providers are not "for the use" of NMFS or any other federal agency. Nor is there any factual basis for Plaintiffs' assertion that the at-sea monitors are "federal contractors." Pl. Br. 34. The IFM requirement, therefore, does not violate the MRS. Plaintiffs' characterization of Defendants' effort to comply with the law as some sort of a legal violation in and of itself is a legally dubious argument that this Court should reject.

NMFS's interpretation of the MSA is reasonable for the reasons noted above. The MSA authorizes NMFS to implement measures that it deems "necessary and appropriate" to conserve and manage the fishery, 16 U.S.C. § 1853(a)(1)(A), (b)(14), in addition to authorizing the use of observers, *id*. § 1853(b)(8). The Supreme Court has recognized that the words "appropriate and necessary" are "the classic broad and all-encompassing term . . ." *Michigan v. EPA*, 135 S. Ct. 2699, 2707 (2015) (citation omitted).[15] The statute's broad grant of discretion, coupled with the explicit authorization to use observers, supports the conclusion that NMFS is authorized to require vessels to incur the compliance costs of an observer requirement (as well as any other conservation and management measure).

### 3. The *Goethel* case is notable for its complete rejection of many of the arguments made in this case.

This case is not the first to assert a legal challenge to an industry-funding requirement established by the Council. Fishermen participating in the Northeast multispecies fishery raised most of the same issues as Plaintiffs raise in this case. *Goethel*, 2016 WL 4076831, at *3-10. The district court granted summary judgment for NMFS, holding that the statute of limitations barred the plaintiffs' claims and that, even if timely filed, NMFS was entitled to summary judgment

---

[15]    In *Michigan*, it was non-controversial that industry would bear the costs of complying with EPA's regulation, even though the pertinent statutory provision was silent on the issue of cost.

nonetheless. *Id*. In a methodical and well-reasoned opinion, the district court rejected all of the plaintiffs' claims, finding that the MSA authorized industry funding; industry funding was not a tax; industry funding did not violate the Anti-Deficiency Act, the MRS, or the Commerce Clause of the United States Constitution; NMFS had complied with the National Environmental Policy Act and RFA; and NMFS did not violate various other provisions of the Constitution. *Id*. The First Circuit affirmed the district court's statute of limitations holding and, thus, did not reach the remaining questions. *Goethel v. U.S. Dep't of Commerce*, 854 F.3d 106 (1st Cir.), *cert. denied*, 138 S. Ct. 221 (2017).

For Plaintiffs to say that the *Goethel* court's reasoning should be disregarded because it "confused" the terms "observers" and "at-sea monitors," Pl. Br. 26, lacks any statutory basis and is plainly inconsistent with NMFS's reasonable interpretation of the term "observers." *See* Section V.A.1, *supra*. Furthermore, Plaintiffs' suggestion that the *Goethel* court's opinion should be rejected because of the Supreme Court's holding in *Kisor v. Wilkie*, 139 S. Ct. 2400 (2019), is best described as a stretch. Pl. Br. 25-26. The *Kisor* decision concerned deference to an agency's interpretation of an ambiguous <u>regulation</u> pursuant to *Auer v. Robbins*, 519 U.S. 452 (1997). Here, the question before the Court is one of <u>statutory</u> interpretation. *Kisor*, therefore, has no relevance to the issues before this Court. Thus, while the *Goethel* decision is an unpublished decision from a sister district court that is not binding on this Court, its wholesale rejection of the plaintiffs' claims in that case is noteworthy and persuasive, as it reflects the district court's inability to find a scintilla of merit to many of the same arguments that are asserted here.

### 4.    The Omnibus Amendment and its implementing regulations were approved pursuant to the procedures established by the MSA.

Plaintiffs' reliance on *Campanale* to suggest that there were procedural irregularities in the review process for the Omnibus Amendment and the Final Rule is misplaced. Pl. Br. 28. Section

1854(a) of the MSA prescribes the review process for FMPs and FMP amendments (collectively referred to below as "FMPs"). Contrary to Plaintiffs' suggestion, Pl. Br. 28, those steps were followed and there were no procedural irregularities for the Omnibus Amendment or its Final Rule.

Section 1853(c) requires the Council to submit proposed regulations that implement an FMP to the Secretary "simultaneously with the plan or amendment under [Section 1854]." 16 U.S.C. § 1853(c). When a council transmits an FMP, the Secretary is required to "immediately commence a review of the plan or amendment to determine whether it is consistent" with the MSA, the National Standards, and any other applicable law. *Id*. § 1854(a)(1)(A). The Secretary also must immediately publish a notice of availability (NOA) for the FMP in the Federal Register and provide a 60-day NOA comment period. *Id*. § 1854(a)(1)(B). The Secretary then shall approve, disapprove, or partially approve the FMP within 30 days of the end of the comment period by written notice to the council. *Id*. § 1854(a)(3).

Here, the NOA for the Omnibus Amendment was published on September 19, 2018, the 60-day NOA comment period ended on November 19, 2018, and NMFS approved the amendment and notified the Council on December 18, 2018. AR17731, AR17741; AR17760-62. NMFS sent the notice of approval directly to the Council as required by the MSA. 16 U.S.C. § 1854(a)(3). While Plaintiffs note that it was an "unpublished letter," Pl. Br. 11, there is no statutory requirement to publish the letter in the Federal Register or anywhere else.

With regard to rulemaking, the MSA states that a council shall submit proposed regulations that it deems "necessary or appropriate" to implement an FMP. 16 U.S.C. § 1853(c). Upon receipt of proposed regulations prepared under Section 1853(c), the Secretary shall "immediately initiate an evaluation of the proposed regulations to determine whether they are consistent with the [FMP or amendment]," the MSA, or other applicable law. *Id*. § 1854(b)(1). The MSA defines

"immediately" as requiring Secretarial action within 5 days. *Id*. § 1854(a)(5). In light of these legal requirements, it is NMFS's practice to publish an NOA for an FMP concurrently with a proposed rule. AR17741. Accordingly, the proposed rule for the Omnibus Amendment was published on November 7, 2018, with a comment period ending December 24, 2018. *Id*. As a result, the comment periods for the Omnibus Amendment and proposed rule overlapped for 13 days. *Id*. As NMFS stated in its response to comments, both the NOA and the proposed rule explained that any public comments received on the Omnibus Amendment or proposed rule during the NOA comment period would be considered in the agency's decision to approve or disapprove the amendment. *Id*. Plaintiffs appear to suggest that proposed regulations implementing an amendment should be published in the Federal Register only after secretarial approval of the underlying FMP amendment. Pl. Br. 28. There is no MSA provision to support this proposition. The proposed rule explained that the amendment had not yet been finalized and that its comment period remained open. 83 Fed. Reg. at 55,665, 55,667. Further, the NOA and the proposed rule had separate public comment periods of 60-days and 45-days respectively. The public had the opportunity to meaningfully and usefully participate in the process, in full compliance with the law. *E.g*., *Conn. Light & Power v. Nuclear Regul. Comm'n*, 673 F.2d 525, 528, 530 (D.C. Cir. 1982).

NMFS received seven comment letters during the NOA comment period and carefully considered all comments before the Omnibus Amendment was approved on December 18. AR17731; AR17773. NMFS reviewed and considered all additional comments received during the proposed rule comment period prior to preparing the final rule, but no new or additional information was provided that would have prevented NMFS from approving the amendment. *Id*. Indeed, Plaintiffs fail to identify a single comment that NMFS did not consider, or for which the agency failed to make a response. To the contrary, NMFS reviewed and considered all comments

received during both comment periods, and interested members of the public had ample opportunity to communicate information, concerns, and criticisms to the agency during the process. *See Conn. Light & Power*, 673 F.2d at 530. Plaintiffs cannot identify any prejudice resulting from the comment periods, nor lack of an opportunity to comment on the amendment or regulations. There was no procedural infirmity and, in the absence of any pertinent legal authority to support Plaintiffs' argument, the Court should reject it.

      **B.**      **The IFM Requirement Complies With The National Standards.**

Plaintiffs' contention that the IFM requirement is inconsistent with National Standards 1, 2, 6, 7, and 8, Pl. Br. 29-33, has no merit. Courts "will uphold a regulation against a claim of inconsistency with a 'national standard' under § 1851 if the Secretary had a 'rational basis' for it[,]" that is, as long as the Secretary acted reasonably in promulgating the regulation. *Lovgren*, 701 F.3d at 32 (citation omitted); *Associated Fisheries*, 127 F.3d at 111 ("courts reviewing this type of administrative decision must leave room for a certain amount of play in the joints"). "What matters is that the administrative judgment, right or wrong, derives from the record, possesses a rational basis, and evinces no mistake of law." *Associated Fisheries*, 127 F.3d at 111. Although the National Standards constitute statutory requirements upon which legal action can be based, they "do not require any particular outcome with respect to allocations; rather, they provide a framework for the Council's analysis" through "broadly worded statements of Congressional objectives for all fishery conservation and management measures." *Nat. Res. Def. Council v. NMFS*, 71 F. Supp. 3d 35, 42 (D.D.C. 2014) (citation omitted). Courts apply a rule of reason to challenges alleging failure to comply with the National Standards, and will not invalidate a regulation or a plan amendment simply because the challenger's preferred alternative was not selected or the Secretary could have conducted a more thorough analysis. *Little Bay Lobster v.*

*Evans*, 352 F.3d 462, 470 (1st Cir. 2003); *N.C. Fisheries Ass'n v. Gutierrez*, 518 F. Supp. 2d 62, 92 (D.D.C. 2007). NMFS established advisory guidelines on the National Standards, *see* 50 C.F.R. § 600.305 *et seq.*, "which shall not have the force and effect of law." 16 U.S.C. § 1851(b).

### 1.    National Standard 1

National Standard 1 provides that "[c]onservation and management measures shall prevent overfishing while achieving, on a continuing basis, the optimum yield from each fishery for the United States fishing industry." 16 U.S.C. § 1851(a)(1). "Overfishing" means a rate or level of fishing mortality that jeopardizes the capacity of a fishery to produce the maximum sustainable yield (MSY) on a continuing basis. *Id*. § 1802(34). Optimum yield (OY) is a long-term average amount of desired yield, prescribed on the basis of MSY as reduced by other factors, that is intended to provide the greatest overall benefit to the Nation. *See id*. § 1802(33); 50 C.F.R. § 600.310(e)(3). Under NMFS guidelines, "[a]n FMP must contain conservation and management measures, including ACLs and [accountability measures], to achieve OY on a continuing basis, and provisions for information collection that are designed to determine the degree to which OY is achieved. These measures should allow for practical and effective implementation and enforcement of the management regime." 50 C.F.R. § 600.310(e)(3)(ii).

Plaintiffs improperly rely on *Western Sea Fishing Co. v. Locke*, 722 F. Supp. 2d 126 (D. Mass. 2010) for the proposition that the IFM requirement "burdens other fisheries because. . . Plaintiffs will be paying for the at-sea monitors with fish revenues earned aside from Atlantic herring" and thus does not comply with National Standard 1. Pl. Br. 30-31. In *Western Sea Fishing*, NMFS banned permit splitting to avoid future problems associated with excess fleet capacity. 722 F. Supp. 2d at 139-40. The plaintiffs argued the ban was inconsistent with National Standard 1, and the court agreed, holding that the ban was not rationally related to achieving optimum yield

where there was no evidence of overfishing. *Id*. at 140-41. The IFM requirement, however, is not a substantive limitation on fishing effort like the one at issue in *Western Sea Fishing*. To the contrary, it is part of an effort to collect information and monitor the fishery, which is exactly what NMFS guidelines require. *See* 50 C.F.R. § 600.310(e)(3)(ii). Accordingly, in its discussion of National Standard 1, the EA explained that the increased monitoring in the Atlantic herring fishery put in place by the IFM requirement will increase the accuracy of catch estimates, including for species with incidental catch caps (such as haddock, river herring/shad). AR17312. Uncertainty may otherwise lead to effort restrictions in the herring fishery. *Id*. Conversely, additional monitoring may illustrate higher than expected catch of haddock and river herring/shad, resulting in catch caps that are fully harvested earlier than expected and reduced opportunities to harvest herring. *Id*.[16] While Plaintiffs suggest that they will be forced to pay sampling costs "with fish revenues earned aside from Atlantic herring," Pl. Br. 31, there is no requirement for a council to parse through costs attributable to harvesting each species or stock in all potential manner of fishing. To be consistent with National Standard 1, the Omnibus Amendment and Final Rule need only prevent overfishing, while achieving optimum yield. NMFS explained in the Final Rule how the information gathered through the IFM requirement will help achieve those goals.

Contrary to Plaintiffs' argument, Pl. Br. 30, the not-overfished status of the Atlantic herring fishery is not a prerequisite to whether the IFM requirement is consistent with National Standard 1. AR17210, AR17251. National Standard 1 and the annual catch limit provision, are directed at preventing <u>and</u> ending overfishing. *See* 16 U.S.C. §§ 1851(a)(1), 1853(a)(15). An approach that

---

[16]    In the Final Rule, Defendants explained that recent coefficients of variation (CVs) that measure variability in catch estimates associated with the herring fishery have been as high as 86%, thus increased monitoring would reduce the uncertainty around estimates of catch tracked against catch caps for other species, likely resulting in a lower CV of less than 30%. AR17742. Thus, the Omnibus Amendment expressly considered the protection of other species or fisheries when implementing the IFM requirement, as required by *Western Sea Fishing*. 722 F. Supp. 2d at 140.

requires overfishing as a prerequisite before measures can be taken to prevent it is inconsistent with the MSA's overarching conservation objective. *See* 50 C.F.R. § 600.310(e)(2)(i)(G) (defining "approaching an overfished condition" in guidelines for National Standard 1); *id*. § 600.310(j)(1)(iii) (requiring Secretary to notify a council when a stock or stock complex is "approaching an overfished condition").

Plaintiffs also argue that the IFM requirement is inconsistent with National Standard 1 because it imposes a burden on them and their vessels, and they "will not be able to use the exemptions because of their [vessels'] style of fishing." Pl. Br. 30. This argument overlooks two facts. First, Plaintiffs' "style of fishing" (and participation in the herring or other fisheries) is voluntary. Plaintiffs state repeatedly that they cannot take advantage of waiver of coverage requirements for vessels that intend to land less than 50 mt of herring. *Id*. at 30, 32; *see* AR17735. But participation in any fishery, and the manner in which Plaintiffs choose to do so, is voluntary. AR17740. If a vessel determines the costs of compliance are too high, it may choose to land less than the 50 mt of herring per trip threshold for requiring IFM, or not participate at all. *See id.* Second, National Standard 1 does not demand elimination of vessel costs; it requires only "balancing the various interests that comprise the greatest overall benefits to the Nation." 50 C.F.R. § 600.310(b)(2)(ii). That some vessels might face increased costs or requirements that may affect their fishing is one of the considerations when balancing overall benefits to the Nation, which were considered in this amendment. AR17311-12. For these reasons, the IFM requirement is consistent with National Standard 1, and the Court should defer to NMFS's rational decisionmaking.

### 2.    National Standard 2

National Standard 2 provides that conservation and management measures in an FMP and its implementing regulations must be "based upon the best scientific information available." 16

U.S.C. § 1851(a)(2); *see* 50 C.F.R. § 600.315(b)(1) (defining "scientific information" as including scientific, economic, and social information). National Standard 2 "is a practical standard requiring only that fishery regulations be diligently researched and based on sound science." *Massachusetts v. Pritzker*, 10 F. Supp. 3d 208, 217 (D. Mass. 2014) (quoting *Flaherty v. Bryson*, 850 F. Supp. 2d 38, 61 (D.D.C. 2012)). Observers are widely accepted from scientific and management perspectives as an important tool for fisheries monitoring. The scientific basis for the IFM requirement is articulated throughout the EA and the Final Rule. *See, e.g.*, AR17210 (explaining how monitoring will provide information to track harvest against catch caps); AR17221 (same); AR17316 (same); AR17742-43 (same). While Plaintiffs baldly assert that there is "no comparison between the Atlantic herring stocks' health if only government-funded. . . observers are used," Pl. Br. 31, this statement ignores the fulsome discussion in the Final Rule of the fact that existing SBRM coverage is variable. AR17742. During the years 2012 to 2018, coverage ranged from 2 percent to 40 percent. *Id*. Analysis in the EA suggests that a 50% coverage target would reduce the uncertainty around estimates of catch tracked against catch caps, resulting in a CV of less than 30% for the majority of catch caps. *Id*. Plaintiffs' assertion that "the delta" between pre-existing coverage levels and IFM coverage "is not apparent in the record," Pl. Br. 31, is plainly baseless.

Nor have Plaintiffs shown that the Omnibus Amendment and Final Rule failed to take economic information into account. The EA's analysis of economic impacts was based on trip cost data collected by NMFS and showed the economic impact of the alternatives on vessel net revenues. AR17312. When industry participants expressed concern that an analysis of net revenues underestimated vessel costs, staff from the Mid-Atlantic Fishery Management Council coordinated a survey of herring and mackerel vessels to collect more detailed cost information. *Id*. The survey was included with the EA and the data collected was used to update the impact analysis. *Id*.

Ultimately, analysis of the economic impact of the preferred herring alternatives on fishery-related businesses compared industry cost responsibilities to 2014 herring vessel returns-to-owner. AR17313. The EA analyzed the economic impacts of the IFM coverage on the herring fishery by estimating the industry-funded cost of carrying an at-sea monitor (per sea day), calculating the annual returns-to-owner (RTO) (expressed as a percentage of annual gross revenue), and then estimating the potential reduction in the annual RTO associated with paying the monitoring costs under the different coverage alternatives considered. AR17442-74. Based on this analysis, the EA estimated that the reduction in annual RTO associated with the coverage target alternative ranges from 45% to less than 1%. AR17261. For the selected 50% coverage target for IFM on Category A and B vessels the reduction in annual RTO was estimated to be up to approximately 20%, although the actual cost of IFM on a particular vessel would vary with effort level and the amount of SBRM coverage. AR17190, AR17290, AR17306, AR17326; AR17735. Clearly, the Omnibus Amendment and Final Rule were based on the best available information; indeed, Plaintiffs fail to identify any economic information that was not considered. *Massachusetts ex rel. Div. of Marine Fisheries v. Daley*, 170 F.3d 23, 30 (1st Cir. 1999) ("If no one proposed anything better, then what is available is the best."); *see also Nw. Envtl. Def. Ctr. v. Brennen*, 958 F.2d 930, 936 (9th Cir. 1992) (rejecting a "best scientific information available" claim because the challenger "has not pointed to any scientific evidence inconsistent with the Secretary's decision").

Instead of actually identifying any specific informational deficiencies, Plaintiffs claim that there is "no basis to believe that the type of fishing Plaintiffs engage in is more harmful to the Atlantic herring stock than any other kind of Atlantic herring fishing," but their vessels nonetheless are "assigned at-sea monitors more often than other members of the fleet without any scientific reason for that costly imbalance." Pl. Br. 31. As a threshold matter, Plaintiffs' contention that they

32

were assigned observers more often than other vessels in the Atlantic herring fishery is based on a self-selected six-month period from late 2014 to early 2015 with no evidence cited to support the notion that this would be predictive of actual assignments in the future. *E.g.*, AR17805 (letter from M. Lapp, Seafreeze Ltd., dated June 30, 2015); AR17705 (letter from Seafreeze Ltd. dated Nov. 4, 2016). Moreover, Plaintiffs fail to mention that the monitoring coverage from that six-month period predated the IFM requirement and thus was paid for with agency funds, at no cost to Plaintiffs or their vessels. AR17731. Plaintiffs seem to imply that, with implementation of the IFM requirement, the cost of procuring at-sea monitors will be transferred in full to them, but that argument fails for two reasons.

First, the 50% coverage target includes a combination of SBRM coverage, which is funded by NMFS, and IFM coverage. AR17734. Vessel owners would pay for any additional monitoring coverage above SBRM coverage requirements to achieve the 50% coverage target, which is calculated by combining SBRM and IFM coverage. *Id.* Thus, because Plaintiffs will very likely receive SBRM coverage in the future, they almost certainly would not be required to bear the entire cost for monitoring for achieving the 50% coverage target. Second, as explained in the EA, three types of gear are used in the Atlantic herring fishery: midwater trawl gear, purse seine gear, and small mesh bottom trawl gear. AR17011. The EA explained that, of the three gear types, vessels using small mesh bottom trawl gear will have the least negative economic impact associated with paying for monitoring coverage, while the negative economic impact on midwater trawl vessels will be higher. AR17306-07. Indeed, as explained in the EA, the discard rates of midwater trawl vessels is lower compared to vessels that use other gear types, thus their SBRM coverage has been lower. AR17097. Conversely, small mesh bottom trawl vessels, like Plaintiffs' vessels, typically have rates of SBRM coverage nearly two times higher than vessels using midwater trawl gear and

more than three times higher than vessels using purse seine gear. AR17193 (Table 62, observer coverage rates from 2015); *see also* AR17076 (Table 10). If those historical trends continue after the IFM requirement is implemented, Plaintiffs would not be required to pay for substantial portions of their required coverage, and their contention that they will have financially devastating rates of IFM coverage will be shown to have been speculative.

Judicial review of the Omnibus Amendment and Final Rule's consistency with National Standard 2 "is limited to determining whether the Secretary intelligently and knowingly decided on a rational policy, given the scientific and judgmental tools available to him." *S. Offshore Fishing Ass'n v. Daley*, 995 F. Supp. 1411, 1433 (M.D. Fla. 1998). That standard has easily been met here.

### 3.    National Standard 6

Pursuant to National Standard 6, conservation and management measures "shall take into account and allow for variations among, and contingencies in, fisheries, fishery resources, and catches." 16 U.S.C. § 1851(a)(6). As explained in *Ace Lobster*,

> National Standard 6, on its face, dictates flexibility on the part of fishery managers. It suggests that the Secretary and his designees must be prepared to address uncertainties or changes that might arise. As the implementing regulations state, the "regime chosen must be flexible enough to allow timely response to resource, industry and other national and regional needs."

*Ace Lobster*, 165 F. Supp. 2d at 181-82 (quoting *J.H. Miles & Co. v. Brown*, 910 F. Supp. 1138, 1155 (E.D. Va. 1995)). The Omnibus Amendment and Final Rule are consistent with National Standard 6 because the herring measures provide multiple options for participating vessels to comply with the IFM requirement in a flexible manner, including choosing electronic monitoring and portside sampling coverage; and allowing vessels the choice of catching less than 50 mt of herring so as to obtain a waiver on such trips. AR17735, 17736-37. In addition, the Council will review IFM's effectiveness in the herring fishery two years after implementation and consider if adjustments to the coverage target are warranted. AR17734. The omnibus measures allow the

Council to modify the weighting approach to recommend how to prioritize federal funding across IFM programs. AR17742. This process would allow the Council to recommend against prioritizing federal funding to administer IFM in the herring fishery (i.e., recommending no additional monitoring for the herring fishery) or, if NMFS finds that coverage waivers undermine the benefits of additional monitoring, the Council could restrict waivers when it reviews the IFM requirements two years after implementation. AR17742-43. These adaptive management measures represent the "sort of flexibility [that] National Standard 6 contemplates." *Ace Lobster*, 165 F. Supp. 2d at 182.

Plaintiffs state that the Final Rule "takes no notice that Plaintiffs are multi-species fishers" and that they will have to rely on "non-Atlantic herring resources to pay for the at-sea monitors for Atlantic herring." Pl. Br. 31-32. But Defendants specifically did address Plaintiffs' contention that the IFM requirement could disproportionally affect them and any other vessels that make multi-day trips processing catch at sea. AR17743. Further, National Standard 6 does not require making additional allowances for the way that Plaintiffs fish, or how they choose to fund their operations. "There is no requirement in [N]ational [S]tandard 6 or anywhere else in the statute that defendant finely attune its regulations to each and every fishing vessel in [a] fishery." *Ace Lobster*, 165 F. Supp. 2d at 182. The Court should reject Plaintiffs' claim that the Omnibus Amendment and Final Rule are inconsistent with National Standard 6.

### 4. National Standard 7

National Standard 7 states that "[c]onservation and management measures shall, where practicable, minimize costs and avoid unnecessary duplication." 16 U.S.C. § 1851(a)(7); *see also* 50 C.F.R. § 600.340. Achievement of the 50% IFM coverage target is calculated by combining SBRM and IFM coverage. AR17734; AR17315. Thus, herring fishery vessels will have either SBRM coverage or IFM coverage, but not both on a particular trip, and both types of coverage

will be used to achieve the 50% coverage target. The IFM requirement, therefore, expressly avoids any duplication and complies with National Standard 7. *Id.*

Further, analysis in the EA shows that the herring measures minimize the industry's monitoring costs, where practicable, while achieving the benefits of increasing monitoring coverage as demonstrated by the consideration of the value of additional monitoring against the costs to be borne by industry. AR17315. The 50% coverage target selected by the Council for vessels with Category A or B herring permits provides the benefits of collecting additional information on biological resources while minimizing industry cost responsibilities, particularly when compared to the higher coverage targets of 100% and 75% considered by the Council, which would have carried higher costs for such vessels. AR17315; AR17346. The EA analysis expressly includes a consideration of less costly alternatives, including no additional coverage (which would have no additional cost to the herring industry) and a 25% coverage target (which would have a lower cost to the herring industry than the 50% coverage target that ultimately was selected). AR17075, AR17082, AR17083. In fact, the Council considered higher coverage targets of 75% and 100%, but chose the 50% coverage target because it best balanced the benefits and costs of additional monitoring while establishing costs that "are substantially less than those associated with higher coverage targets." AR17734; *see* AR17257-58. The herring measures also allow an exemption for trips that land less than 50 mt of herring from the IFM requirement, which has the potential to greatly reduce IFM costs for vessels on such trips. AR17315. The herring measures also include provisions for the EFP, which would exempt midwater trawl vessels from the at-sea monitoring coverage requirement in lieu of electronic monitoring and portside sampling. AR17737.[17] Both measures may be a more cost-effective way for vessels to meet the 50% coverage

---

[17]    Plaintiffs use small mesh bottom trawl gear and, accordingly, likely could not use the EFP, although other vessels in the herring fishery could do so.

target requirement than at-sea monitoring coverage. AR17738, 17742. While the Omnibus Amendment carries costs for the industry, the simple fact that a regulation will impose costs does not mean that it violates National Standard 7. *Willie R. Etheridge Seafood Co. v. Pritzker*, No. 2:14-CV-73-BO, 2016 WL 1126014, at *8 (E.D.N.C. Mar. 21, 2016). Indeed, National Standard 7's language anticipates that conservation and management measures will carry at least some costs, which need to be minimized to the extent practicable when attempting to achieve the amendment's conservation and management objectives. These considerations show that the Omnibus Amendment measures minimize costs and avoid duplication, to the extent practicable, and satisfy National Standard 7.

Plaintiffs fail to identify any duplication in the Omnibus Amendment's measures, and their argument that they bear "a disproportionate amount of at-sea monitors" and are "frozen out of any of the three exemptions," Pl. Br. 32, has no factual basis. *See* Section V.B.1, *supra*. A decision not to adapt their fishing operations so as to take advantage of any of the coverage waivers is Plaintiffs' voluntary choice. Further, Plaintiffs' comparison between the herring measures and observer programs elsewhere in the United States is baseless, as the EA explained that the costs in other fisheries are lower because they do not have the same short trips and complicated deployment logistics as the Atlantic herring fleet. AR17043.

### 5.    National Standard 8

The Omnibus Amendment satisfies National Standard 8, which states:

[c]onservation and management measures shall, consistent with the conservation requirements of this [Act] (including the prevention of overfishing and rebuilding of overfished stocks), take into account the importance of fishery resources to fishing communities by utilizing economic and social data that meet the requirements of paragraph (2), in order to (A) provide for the sustained participation of such communities, and (B) to the extent practicable, minimize adverse economic impacts on such communities.

16 U.S.C. § 1851(a)(8). As set forth in the EA, the value of additional monitoring was weighed against the associated costs. AR17316. The EA included economic and social data that the Council had before choosing monitoring provisions that attempt to provide for the sustained participation by fishing communities, and minimize costs against monitoring's benefits to the extent practicable. *E.g.*, AR17052, AR17160-68, AR17210-12. NMFS explained that additional monitoring is expected to reduce uncertainty around catch estimates in the herring fishery to help improve the tracking of catch against catch limits and, ultimately, to help improve management. AR17316.

NMFS specifically acknowledged that IFM may have a substantial impact on participants in the herring fishery, but outlined in the Final Rule all of the measures that minimize adverse economic impacts, including the 50% coverage target, the exemption for trips that land less than 50 mt of herring, and the combined coverage target. AR17742. These measures are all consistent with National Standard 8 and its guidelines (50 C.F.R. § 600.345), which require that any analysis should assess the likely positive and negative social and economic impacts of the alternative management measures considered, over both the short and long term. By improving the ability to track catch against catch limits, the 50% coverage target is expected to support the herring fishery as it seeks to achieve optimum yield, minimize bycatch and incidental catch to the extent practicable, and support the sustained participation of fishing communities. AR17742. Tracking catch against catch limits has the potential to lead to the development of improved management measures, which in turn potentially will provide for sustained participation of fishing communities in the herring fishery. *Id.* Thus, these measures "take[s] into account the importance of fishery resources to fishing communities." 16 U.S.C. § 1851(a)(8). The Omnibus Amendment also includes measures to ensure that the Council considers the costs of additional monitoring relative to its effectiveness, and provides flexibility to adjust measures if IFM requirements become too

onerous. AR17742. The herring measures require the Council to review the IFM requirement two years after implementation, and the omnibus measures allow the Council to modify the weighting approach to recommend how to prioritize federal funding across IFM programs. *Id*.

The MSA's sometimes conflicting goals of conservation on the one hand and minimizing harm to fishing communities on the other require striking an appropriate balance. *N.C. Fisheries*, 518 F. Supp. 2d at 92. In striking that balance, the law does not require an official or numerical cost/benefit analysis. *Id*. Rather, NMFS has substantial discretion when determining whether an FMP's implementing regulations are consistent with National Standard 8. NMFS considers the analysis of various alternatives to ensure that an FMP's implemented measures take into account all of the factors required by National Standard 8. This includes a determination that the potential for sustained participation of fishing communities does not compromise achievement of the FMP's conservation goals, and the adverse economic impacts on those communities are minimized to the extent practicable consistent with achieving the conservation goals, as it did here. *Nat'l Coal. for Marine Conservation v. Evans*, 231 F. Supp. 2d 119, 133 (D.D.C. 2002).

### C. The IFM Requirement Neither Forces Plaintiffs Into A Market Nor Violates The Commerce Clause.

Plaintiffs' argument that the IFM requirement violates the Commerce Clause, contending that it "force[s] Plaintiffs into a market Plaintiffs do not wish to join," Pl. Br. 35, fares no better because it has no factual or legal support. First, Plaintiffs fundamentally mischaracterize the IFM requirement. As explained above, the IFM requirement does not require vessels to absorb payment for a governmental obligation, as Plaintiffs suggest. Rather, a vessel pays a third-party monitoring service provider for the ASM services it provides to the vessel pursuant to contractual arrangements between the vessel and the service provider. AR17740. Defendants do not receive any payment from the vessel related to industry-funded monitoring, nor do Defendants maintain

control over the contractual relationship between the vessel and the service provider, nor are Plaintiffs funding work done for the government. AR17740, AR17741 (categorizing cost responsibilities allows industry to negotiate better contracts); AR17481 (vessels negotiate and contract directly with providers).

Second, these facts show that this case is fundamentally different than *National Federation of Independent Businesses v. Sebelius*, 567 U.S. 519 (2012) (*NFIB*). There, the challenged provision required individuals who otherwise would choose not to purchase health insurance to do so or face a tax penalty. *Id*. at 539, 547-48. Thus, the statute "regulate[d] individuals precisely *because* they are doing nothing." *Id.* at 552. In contrast to the provision at issue in *NFIB*, the Omnibus Amendment and Final Rule do not compel Plaintiffs to engage in commerce: participation in the fishery is voluntary. AR17740. Plaintiffs are free to decide whether to participate in the Atlantic herring fishery or not. If Plaintiffs decide to continue participating in the Atlantic herring fishery, then that decision carries with it the obligation to carry an at-sea monitor on board their vessels when an IFM monitor is assigned on a declared herring trip on which they choose to attempt to catch 50 mt or more of herring. *See* Section III.B, *supra*. This coverage requirement may be waived on a trip by trip basis if monitoring coverage is unavailable, if vessels intend to land less than 50 mt of herring, or if wing vessels carry no fish on pair trawling trips. AR17735. Midwater trawl vessels are exempted from at-sea monitoring coverage pursuant to the EFP, which allows use of electronic monitoring and portside sampling to comply with the 50% IFM coverage target. AR17736-37. If, on the other hand, Plaintiffs decide not to participate in the Atlantic herring fishery, they remain free to participate in the other multiple fisheries in which they currently participate. In short, Atlantic herring is a public resource and fishing is a "pervasively regulated" industry. AR17740. Harvesting this public resource is a privilege, not a right, and the

IFM requirement is a condition of obtaining that privilege.

### D.    Defendants' Positions In Prior, Unrelated Litigation Are Not Preclusive.

In their effort to argue that the IFM requirement is unlawful, Plaintiffs also contend that NMFS "admitted in [other] litigation that various laws prohibit much of what is attempted here." Pl. Br. 33.[18] But with this argument, Plaintiffs mischaracterize *Anglers Conservation Network v. Pritzker*, which presented facts significantly different than this case. 139 F. Supp. 3d 102 (D.D.C. 2015). In *Anglers*, the challenged FMP amendment mandated 100% observer coverage on certain herring fishing vessel trips, a fixed partial payment of the observer costs (a maximum of $325 per day of coverage) to be paid by the industry, and no differentiation between the industry's and government's costs. *Id*. at 115-16. NMFS disapproved of that mandate because it may have obligated NMFS to bear a cost for which it had no appropriated funds (in violation of the Anti-Deficiency Act, 31 U.S.C. § 1341), and to potentially augment its budget by accepting fees directly from the fishing industry to fund observer monitoring costs (in violation of the MRS, 31 U.S.C. § 3302).[19] *Id*. No such facts are present here: the IFM coverage requirement does not require NMFS to administer a program for which it has no appropriated funds, nor does it implicate cost-sharing between NMFS and the industry (as each has its own cost responsibilities), nor will it require the direct acceptance of contributions from industry participants (i.e., direct payment from vessels to NMFS). Plaintiffs' effort to build a bridge between this case and *Anglers Conservation Network* so as to argue estoppel should be rejected. Similarly, Plaintiffs' statement that the IFM requirement

---

[18]    Plaintiffs seem to suggest that Defendants should be estopped from making any arguments inconsistent with those asserted in *Anglers Conservation Network*, but fail to even articulate the relevant legal standard. *See* Pl. Br. 33-34.

[19]    Plaintiffs have not asserted claims under either of these statutes, and so it is unclear how NMFS's positions in a case in which those statutes were, in fact, implicated could have preclusive effect here.

stems from Defendants' decision that "they did not like the level of observers Congress was willing to fund," Pl. Br. 34, is unsupported by any citation and has no basis in fact.

### E.    Defendants Complied With The Regulatory Flexibility Act.

Defendants fully complied with the procedural requirements imposed by the RFA, 5 U.S.C. § 601 et seq., in evaluating the Final Rule. The RFA requires an agency to conduct a "regulatory flexibility analysis" whenever it proposes a rule that will have "a significant economic impact on a substantial number of small entities." 5 U.S.C. §§ 603, 605(b). An agency must prepare an "initial regulatory flexibility analysis" (IRFA) when it publishes the proposed rule and a "final regulatory flexibility analysis" (FRFA) when it publishes the final rule. *Id.* §§ 603(a), 604(a). Sections 603 and 604 of the statute establish the explanations and considerations that IRFAs and FRFAs, respectively, "shall contain." *Id.* §§ 603(b), 604(a). Both forms of analysis generally "describe[ ] the effect of the proposed rule on small businesses and discuss[ ] alternatives that might minimize adverse economic consequences." *Associated Fisheries*, 127 F.3d at 111-12 (citation omitted). "The agency's obligation is simply to make a reasonable good faith effort to address comments and alternatives." *Little Bay Lobster*, 352 F.3d at 471. Completion of these analyses is a "procedural obligation." *Id.* at 470. The RFA does not prohibit regulations from having adverse economic effects on small entities or even require agencies to minimize those effects. *Id.*

NMFS prepared an IRFA and FRFA for the Final Rule that complied with the RFA. *See* AR17339-46 (IRFA, contained in EA); AR17744-47 (FRFA, contained in Final Rule). While Plaintiffs contend that NMFS failed to consider granting them broad-based exemptions from the IFM requirement, Pl. Br. 38, the administrative record proves otherwise. As stated in the Final Rule, "the Council explicitly considered measures to address Seafreeze's concern about disproportional impacts on its vessels [from the IFM requirement], including considering

42

alternatives for coverage waivers for trips when landings would be less than 20-percent herring or less than 50 mt of herring per day." AR17743. Indeed, the Council expressly considered "an option to exempt vessels that catch and freeze herring at sea from IFM requirements, provided the vessels possess less than 50 mt of herring per day during a trip[,]" an "exemption that would affect less than three vessels." AR15925. As explained in the Final Rule, the Council ultimately determined that the potential for relatively high herring catches per trip aboard those vessels warranted additional monitoring, and chose the 50 mt per trip threshold. AR17743.

In addition, Defendants expressly addressed Seafreeze's claim that the IFM requirement's 50% coverage target would cost it $80,000 per year on trips that do not land herring. *Id*. For example, in 2014, there were 111 sea days for small-mesh bottom trawl vessels that had no herring landings. *Id*.; *see also* AR17249.[20] The cost of ASM coverage on 50% of those trips was estimated at just under $40,000 for monitoring all small-mesh bottom trawl vessels for the year. *Id*. Therefore, as Defendants explained, it is highly unlikely that Plaintiffs' two vessels would be paying $80,000 per year to comply with the IFM requirement on trips for which they seek, but do not land, herring. *Id*. Plaintiffs' concerns were considered, but an outcome different than what Plaintiffs preferred ultimately was selected. That Plaintiffs desired a different outcome is irrelevant. *Krichbaum v. U.S. Forest Serv.*, 17 F. Supp. 2d 549, 556 (W.D. Va. 1998); *Nat'l Wildlife Fed'n v. Souza*, No. 08-14115-CIV, 2009 WL 3667070, at *7 (S.D. Fla. Oct. 23, 2009).

While Plaintiffs allege that Defendants "did not address the impacts associated with the omnibus alternatives throughout the process," Pl. Br. 38, they fail to specify the nature of these alleged impacts. Assuming that Plaintiffs mean to refer to a lack of attention to economic impacts, this assertion lacks any merit. That is, both the IRFA and the FRFA explain that the omnibus

---

[20]   The IFM requirement was not in place in 2014. *See* AR17131; AR17209. Rather, Defendants relied on data related to SBRM coverage in that year, which was funded by the government. AR17249**.**

measures are administrative and have no direct economic impacts, thus they did not need to be addressed further. AR17339; AR17744.

Plaintiffs contend that Defendants "rejected without analysis the comments and data [regarding] the elimination of fishermen in the region." Pl. Br. 38. But the Final Rule expressly addressed issues regarding the potential economic burden on small-scale fishing posed by IFM. AR17741. There, Defendants explained that "[g]eneralizing economic impacts associated with industry-funded monitoring is often inaccurate." *Id*. The IFM requirement applies to the entirety of the herring fishery, not just those vessels that engage in small-scale fishing. *Id*. Indeed, the Final Rule contains multiple provisions that mitigate the impact of the IFM requirement on vessels that engage in small-scale fishing, such as the 50% coverage target for ASM coverage on declared herring trips. *Id*. Further, IFM coverage is not required on trips intending to land less than 50 mt of herring, as vessels would request a waiver of the IFM requirement for such trips. *Id*. The EA indicated that only 19% of trips by small-mesh bottom trawl vessels land more than 50 mt of herring and the median potential reduction in RTO for small-mesh bottom trawl vessels is just 2.5%. *Id*.; *see also* AR15905; AR17261. Conversely, small mesh bottom trawl vessels and single midwater trawl vessels have the "greatest potential to benefit" from the 50 mt threshold because greater than 50% of their trips land under this amount. AR17253. Further, NMFS evaluated only small-mesh bottom trawl vessels with Category A or B permits that had been active in the herring fishery in the last two years, and found that the IFM requirement would likely apply to only two small-mesh bottom trawl vessels. AR17741. Thus, Defendants "made a reasonable, good-faith effort" to address the impacts of the IFM requirement on small-scale fishing. *Associated Fisheries*, 127 F.3d at 116. This is all that is required to comply with the RFA.

44

Finally, the IRFA and the FRFA track, subsection by subsection, what Congress by statute required an agency to provide in each. *See* 5 U.S.C. §§ 603(a), 604(a). This approach has been endorsed by the courts. *See N.C. Fisheries*, 518 F. Supp. 2d at 95-96. The analyses considered the economic impacts on small entities that could result from the herring measures, and described the steps NMFS took to minimize the economic impact on small entities as required by the RFA. AR17339-46; AR17744. The FRFA analysis addressed the potential impacts associated with other considered alternatives. AR17746-47. There is no serious dispute that Defendants put forth a "reasonable, good-faith effort to carry out the mandate of [the RFA,]" *Associated Fisheries*, 127 F.3d at 114, thus Plaintiffs' claim should be dismissed.

## V.    CONCLUSION

For these reasons, the Court should grant summary judgment for Defendants.

Dated: January 15, 2021                    Respectfully submitted,

                                           JEAN E. WILLIAMS,
                                           Deputy Assistant Attorney General
                                           SETH M. BARSKY, Chief
                                           MEREDITH L. FLAX, Assistant Chief

                                           /s/ Alison C. Finnegan
                                           Alison C. Finnegan, Senior Trial Attorney
                                           (Pennsylvania Bar No. 88519)
                                           U.S. Department of Justice
                                           Environment & Natural Resources Division
                                           Wildlife & Marine Resources Section
                                           Ben Franklin Station, P.O. Box 7611
                                           Washington, D.C. 20044-7611
                                           Tel: (202) 305-0500; Fax: (202) 305-0275
                                           alison.c.finnegan@usdoj.gov

                                           /s/ Kristine S. Tardiff
                                           Kristine S. Tardiff
                                           (New Hampshire Bar No. 10058)
                                           United States Department of Justice
                                           Environment & Natural Resources Division
                                           Natural Resources Section

53 Pleasant Street, 4th Floor
Concord, NH 03301
Tel: (603) 230-2583; Fax (603) 225-1577
kristine.tardiff@usdoj.gov

Attorneys for Defendants

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on January 15, 2021, I electronically filed the foregoing Cross-Motion for Summary Judgment and Memorandum of Law in Support thereof with the Clerk of Court using the CM/ECF system, which will send electronic notification of such filing to all counsel of record.

   /s/ Alison C. Finnegan   
