## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF RHODE ISLAND

| | | |
|---|---|---|
| **RELENTLESS INC., et al.** | : | |
| | : | |
| *Plaintiffs*, | : | |
| | : | |
| v. | : | Case No. 1: 20-cv-00108-WES-PAS |
| | : | |
| | : | |
| **U.S. DEPARTMENT OF COMMERCE,** | : | |
| **et al.** | : | |
| | : | |
| *Defendant*s. | : | |

## PLAINTIFFS' OBJECTION TO DEFENDANTS' CROSS-MOTION FOR SUMMARY JUDGMENT

Plaintiffs hereby object to the Cross-Motion for Summary Judgment filed by all Defendants and respectfully request that this Honorable Court deny Defendants' Cross-Motion for Summary Judgment, ECF No. 38. Plaintiffs rely in support of this request on their memorandum of law filed herewith.

Dated: January 29, 2021

Respectfully submitted,

/s/ John J. Vecchione
John J. Vecchione (admitted *pro hac vice*)
Kara Rollins (admitted *pro hac vice*)
New Civil Liberties Alliance
1225 19th Street NW, Ste. 450
Washington, DC 20036
Phone: (202) 869-5210
john.vecchione@ncla.legal
kara.rollins@ncla.legal

Kevin J. Holley, Esq. #4639
Holley Law LLC
33 College Hill Road, Ste. 25C
Warwick, RI 02886
Phone: (401) 521-2622
kevin@holleylawllc.com

*Counsel for Plaintiffs*

## REQUEST FOR ORAL ARGUMENT

Pursuant to LR Cv 7(c), Plaintiffs request oral argument and estimate that approximately 40 minutes will be required to address Defendants' cross-motion for summary judgment.

## CERTIFICATE OF SERVICE

I hereby certify that on January 29, 2021, I electronically filed the foregoing Plaintiffs' Objection to Defendants' Cross-Motion for Summary Judgment using the CM/ECF system, which will send electronic notification of such filing to all counsel of record.

/s/ John J. Vecchione

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF RHODE ISLAND

| | | |
|---|---|---|
| **RELENTLESS INC., et al.** | : | |
| | : | |
| *Plaintiffs*, | : | |
| | : | |
| v. | : | Case No. 1: 20-cv-00108-WES-PAS |
| | : | |
| | : | |
| **U.S. DEPARTMENT OF COMMERCE, et al.** | : | |
| | : | |
| | : | |
| *Defendant*s. | : | |

## PLAINTIFFS' MEMORANDUM IN RESPONSE TO DEFENDANTS' CROSS-MOTION FOR SUMMARY JUDGMENT (ECF NO. 38) AND REPLY TO OPPOSITION TO PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT (ECF NO. 39)

# TABLE OF CONTENTS

TABLE OF CONTENTS.................................................................................................i
TABLE OF AUTHORITIES...........................................................................................ii
INTRODUCTION .........................................................................................................1
ARGUMENT.................................................................................................................2

I.  THE DEFENDANTS DID NOT COUNTER PLAINTIFFS' FACTUAL ASSERTIONS BY CITATIONS TO THE RECORD TO OPPOSE KEY FACTS ........................................................2

II.  THE DEFENDANTS ASSERT THAT THE MERE POWER TO REGULATE THE FISHERIES CREATES AN ADMINISTRATIVE POWER TO FORCE INDUSTRY PARTICIPANTS TO PAY FOR AT-SEA MONITORS UNMENTIONED IN THE ANIMATING STATUTE .................................................4

  A.  The Same Result Cannot Obtain When the Statute Provides for Industry-Funded At-Sea Monitors or Observers in a Fishery and When It Doesn't.....................................................5
  B.  Unchallenged Actions of the Agency Prove Nothing.......................................................10
  C.  The Standard of Review Is Under the APA and the RFA and *Chevron* Does Not Aid the Defendants...............................................................................................................12
  D.  Defendants Have Not Complied with the National Standards .......................................18
    1.  The IFM Amendment and Final Rule Are Inconsistent with National Standard One 19
    2.  The IFM Amendment and Final Rule Are Inconsistent with National Standard Two 20
    3.  The IFM Amendment and Final Rule Are Inconsistent with National Standard Six 21
    4.  The IFM Amendment and Final Rule Are Inconsistent with National Standard Seven 21
    5.  The IFM Amendment and Final Rule Are Inconsistent with National Standard Eight 22
  E.  The Final Rule Is Arbitrary and Capricious as to Plaintiffs and the RFA was not Followed...............................................................................................................22
  F.  *Goethel* Is Neither Dispositive nor Persuasive in this Case ............................................23
  G.  A Regulated Party Cannot Be Forced into a Market Created Without Congressional Authorization and the Government's Previous Positions Are Instructive ....................................23
CONCLUSION.............................................................................................................24

# TABLE OF AUTHORITIES

## Cases

*Anglers Conservation Network, Inc. et al., v. Pritzker*, 139 F. Supp. 3d 102 (D.D.C. 2015)..........................24

*Atlantic Fish Spotters v. Evans*, 321 F.3d 220 (1st Cir. 2003) ........................................................23

*Campanale & Sons, Inc. v. Evans*, 311 F.3d 109 (1st Cir. 2002)....................................................23

*Chevron U.S.A. Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837 (1984)...........................12, 13

*Ethyl Corp. v. EPA*, 51 F.3d 1053 (D.C. Cir. 1995) ..............................................................14, 15

*Fed. Trade Comm'n v. AbbVie Inc*, 976 F.3d 327 (3d Cir. 2020)....................................................12

*Fed. Trade Comm'n v. AMG Capital Management, LLC*, 910 F.3d 417 (9th Cir. 2018)..............................11

*Fed. Trade Comm'n v. Credit Bureau Center, LLC*, 937 F.3d 764 (7th Cir. 2019).................................11

*Goethel v. Pritzker*, 1016 WL 4076831 (D.N.H. July 29, 2016) ....................................................23

*Gulf Fisheries Association v. National Marine Fisheries Service*, 968 F.3d 454 (5th Cir. 2020) ......7, 13, 14, 15

*Hadaja, Inc. v. Evans*, 263 F. Supp. 2d 346 (D.R.I. 2003) ..........................................................18

*Herman v. Hector I. Nieves Trasnp., Inc.*, 244 F.3d 32 (1st Cir. 2001)...............................................8

*Kisor v. Wilkie*, 139 S.Ct. 2400 (2019)..................................................................13, 23

*La. Pub. Serv. Comm'n v. Fed. Commc'n*, 476 U.S. 355 (1986) ......................................................7

*Lovgren v. Locke*, 701 F.3d 5 (1st Cir. 2012)....................................................................15

*Michigan v. EPA*, 135 S.Ct. 2699 (2015) ...................................................................12, 13

*Nat'l Cable Television Assoc., Inc. v. United States*, 415 U.S. 336 (1974) .......................................17

*NFIB v. Sebelius*, 567 U.S. 519 (2012) ........................................................................23

*NLRB v. SW General, Inc.*, 137 S.Ct. 929 (2017) ..................................................................8

*Russello v. United States*, 464 U.S. 16 (1983)....................................................................7

*Texas v. United States*, 809 F.3d 134 (5th Cir. 2015) ..............................................................7

*Univ. of Tex. Sw. Med. Ctr. v. Nassar*, 570 U.S. 338 (2013) .......................................................13

*Util. Air Regulatory Grp. v. EPA*, 573 U.S. 302 (2014) .............................................................13

*Western Sea Fishing Co. v. Locke*, 722 F. Supp. 2d 126 (D. Mass. 2010) ..................................18

**Statutes**

16 U.S.C. § 1802(16) ...........................................................................................................................7

16 U.S.C. § 1851(a) ...........................................................................................................................18

16 U.S.C. § 1851(a)(1) ......................................................................................................................19

16 U.S.C. § 1851(a)(2) ......................................................................................................................20

16 U.S.C. § 1851(a)(6) ......................................................................................................................21

16 U.S.C. § 1851(a)(7) ......................................................................................................................21

16 U.S.C. § 1851(a)(8) ......................................................................................................................22

16 U.S.C. § 1853(b) .............................................................................................................................4

16 U.S.C. § 1853a .........................................................................................................................5, 8

16 U.S.C. § 1854(b) .............................................................................................................................8

16 U.S.C. § 1854(d)(2)(B) ...................................................................................................................5

16 U.S.C. § 1858(g)(1)(D) ...................................................................................................................4

16 U.S.C. § 1862(a) .................................................................................................................5, 6, 8, 15

16 U.S.C. § 1862(b) .............................................................................................................................6

16 U.S.C. § 1862(b)(1)(B) ...................................................................................................................6

16 U.S.C. § 1881b(a) .........................................................................................................................10

31 U.S.C. § 3302 ..................................................................................................................................9

**Rules and Regulations**

85 Fed. Reg. 7,414 (Feb. 7, 2020) ......................................................................................................1

**Other Authorities**

*Black's Law Dictionary* (5th ed. 1979) ...........................................................................................9

H.R. Rep. 101-393 (Dec. 15, 1989) ............................................................................................16

Jason R. Crance & Mike Mastry, *Fourth Amendment Privacy Rights at Sea and Governmental Use of Vessel Monitoring Systems: There's Something Fishy About This*, 22 J. Envtl. L. & Litig. 231 (2007) ..........................................................................................................................................11

Philip Hamburger, Chevron *Bias*, 84 Geo. Wash. L. Rev. 1187 (2016) ...................................18

S. Rep. No 101-414 (Aug. 2, 1990)..............................................................................................16

## INTRODUCTION

The Defendants in this action ("Defendants" or the "Government") have responded to Plaintiffs' Motion for Summary Judgment, Doc. 37, by avoiding clear factual material in the record, and claiming specific powers to require the industry to pay for on-board, at-sea monitors emerging from the mere grant of power to regulate fisheries. Defendants point to no specific language in any statute granting them the power to require the industry to pay such fees to third parties who provide information for the government's purposes, even though Defendants admit there is specific authority for this in at least one other fishery. The Defendants point to no facts in the record to counter the established record fact that Plaintiffs' vessels have been singled out to carry more observers, more often on their fishing trips than other vessels in the herring fleet. Nothing in the regulation prohibits the same result for at-sea monitors. *See* AR17805. No facts are adduced that the particular challenges of Plaintiffs' unique method of fishing and freezing their catch at sea were addressed by the Defendants in issuing the New England Fishery Management Council's Industry-Funded Monitoring Omnibus Amendment ("IFM Amendment"), *available at* http://bit.ly/IFMOmnibus, and the February 7, 2020 Final Rule ("Final Rule"), *see* 85 Fed. Reg. 7,414 (to be codified at 50 C.F.R. pt. 648) (AR17731-17759).

In opposition, the Defendants both oppose Plaintiffs' motion for summary judgment, Doc. 37, and cross move for summary judgment. They argue that some amalgam of *Chevron* deference and statutory silence allows them to force the industry to pay for at-sea monitors that serve a clearly governmental rather than business purpose. They also assert that they have complied with the Administrative Procedure Act ("APA") and the Regulatory Flexibility Act ("RFA") simply by noting they disagree with Plaintiffs concerning some of their comments, not addressing others, and are under no obligation to allow Plaintiffs' style of fishing even when it conflicts with no statutory goal. They take these positions, in essence, simply because it is easier for them to do so. They state that creating

1

a new office (herring industry paid at-sea monitors) and making Plaintiffs pay for that office is lawful and does not require clear statutory authorization. Defendants further assert that they have adhered to the National Standards set forth in the Magnuson-Stevens Fishery Conservation and Management Act ("MSA"). All of this is unsupported by the record or the law.

The administrative record and undisputed evidence show Plaintiffs are entitled to summary judgment on all counts and that the Summary Judgment motion of the Government must be denied.

## ARGUMENT

### I. THE DEFENDANTS DID NOT COUNTER PLAINTIFFS' FACTUAL ASSERTIONS BY CITATIONS TO THE RECORD TO OPPOSE KEY FACTS

The Defendants appear to agree with the Plaintiffs on the trawler types and areas regulated by the Final Rule, as well as its effects and nature. *Compare* Pls.' Mem. in Supp. of Mot. for Summ. J. at 2-15, ECF No. 37-1 ("Pls.' Mem.") *with* Mem. of Law in Supp. of Defs.' Cross-Mot. for Summ. J. and in Opp. to Pls.' Mot. for Summ. J. at 1-5, ECF Nos. 38-1, 39 (collectively, "Defs.' Mem."). There does not appear to be a dispute on the fact of regulation and the requirement that the Plaintiffs pay for the at-sea monitors assigned to their vessels. *Id.* Defendants do not take issue with the fact that the Atlantic herring stocks are neither endangered nor overfished. Pls.' Mem. at 2. They do not dispute that Plaintiffs' fishing style does not allow them to take advantage of any exception to the burdensome intrusion caused by Defendants' challenged actions. They also do not dispute that Plaintiffs have had at-sea observers assigned to their vessels more often than other boats, nor that nothing in the regulations will prevent this arbitrary and capricious outcome for the newly created at-sea monitors in the future. The sole pushback by Defendants on this is that the evidence in the administrative record establishing these facts was "self-selected" by Plaintiffs. Defs.' Mem. at 33. But in the entire administrative record, they point to no counter fact, as is required in opposing summary judgment, or indeed in supporting their own summary judgment motion.

Nor do the Defendants counter the fact that Plaintiffs' fishing method need not (though it may) take more than 50,000 pounds of herring per day but its vessels stay out more days than others in the herring fleet and so are unlikely to be able to take advantage of the no at-sea monitor exception for those vessels taking less than 50,000 pounds of herring per day under the Final Rule. Pls.' Mem. at 9-10. Defendants cannot counter the fact that other vessels could, without at-sea monitors, take more herring, over the same period of time, because they go back and forth from the harbor more frequently rather than staying at sea and freezing their catch as Plaintiffs do. *Id.* at 10.  No fact is adduced to counter Plaintiffs' clear evidence that their vessels typically stay at sea 3 to 5 times as long as the rest of the fleet, and so are injured disproportionately more and without reason by "per trip" rather than "per day" exemptions from the Final Rule. *Id.* Defendants do not even address this argument, never mind counter with a material fact in the record.[1] No fact counters the clear administrative record that Plaintiffs' vessels do not produce more waste or by-catch than other methods of fishing. *Id.* Defendants do not factually dispute that Plaintiffs will be paying for this cost foisted upon them, often, with non-herring catch, because of the nature of their fishing operations which allows them to flexibly harvest herring, mackerel, and squid. *Id.* at 9. Nor is there any counter to the fact that the IFM Amendment and Final Rule can result in Plaintiffs actually losing money on the fishing trips with at-sea monitors on them when they do not even end up fishing for herring or that they will pay more per trip than other members of the fleet because the at-sea monitors are paid per diem and Plaintiffs' vessels are out longer. *Id.* at 10. Indeed, there is no refutation of the fact that small-mesh bottom trawlers like F/Vs *Relentless* and *Persistence* had the most days, 111, with no herring caught but where, in the future under the Final Rule, monitoring costs could be paid. *See* AR15946-15953, -15949, Comment from Meghan Lapp, Fisheries Liaison, Seafreeze Ltd., to Herring

---

[1] The obtuse suggestion that Plaintiffs could simply "choose" to fish another way ignores that the vessels (a sunk cost) are built and outfitted for this and have been for more than 30 years. It is not just a question of staying out for 2 days or 11 or not catching squid or butterfish.

Committee Members (Mar. 30, 2017) ("Mar. 30, 2017 Comment Letter"). There is no dispute that Plaintiffs will be forced to bear almost $40,000 in costs for at-sea monitors on trips that do not land herring. *See* AR17815. There is also no dispute that the Final Rule will reduce returns to owners who cannot use exemptions, like Plaintiffs here, by 20%. *See* Final Rule at AR17735, 17742.

The main response to this lack of factual material in the record to cross Plaintiffs' facts or independently support the Government's summary judgment answer is that Plaintiffs can always stop fishing. This callous answer flies in the face of the national standards and the standard of review under the APA and RFA. This answer to the failure to respond to Plaintiffs' well-taken comments rather than address them by other than arbitrary and capricious dictates—like the failure to address the concerns of an admittedly small business—both violates the APA and the RFA and counsels for the grant of summary judgment for Plaintiffs and its denial for Defendants.

## II. THE DEFENDANTS ASSERT THAT THE MERE POWER TO REGULATE THE FISHERIES CREATES AN ADMINISTRATIVE POWER TO FORCE INDUSTRY PARTICIPANTS TO PAY FOR AT-SEA MONITORS UNMENTIONED IN THE ANIMATING STATUTE

At bottom, Defendants claim that the mere ability to regulate the fisheries, or the fact that industry-paid at-sea observers (rather than "monitors") are allowed in some fisheries, allows them in all. This conclusion cannot be supported. Defendants complain that Plaintiffs did not read Section 1853(b)(8) with Section 1858(g)(1)(D) of the MSA. *See* Defs.' Mem. at 16. The facts and the statute here wholly oppose the preposterous reading suggested by Defendants. Section 1853(b) merely allows that the Secretary may require that observers can be ordered on board a vessel which holds a federal fishing permit, a proposition that is undisputed in this litigation. *See* 16 U.S.C. § 1853(b).

Congress appropriates money for these observers, and by separate statute, in at least one fishery, has directed that the Secretary may allow industry funding. And Section 1858(g)(1)(D) of the MSA merely allows the Secretary to ensure at-sea observers are paid by industry vessels *in those fisheries where Congress has provided for industry funding of observers. See* 16 U.S.C. § 1858(g)(1)(D). The MSA does

not require industry funding because Congress expressly authorizes appropriated funds in the budgets for the agencies and nowhere authorizes any Defendant to augment those resources by other schemes or contrivances. While Defendants state that there is no evidence they simply wanted more observers than Congress authorized, they do not counter Plaintiffs' statement of facts on this issue. Defs.' Mem. at 12 (citing Pub. Hearing Summaries at AR13509). Defendants' further attempt to ignore the explicit statutory language by claiming that because the MSA allows "necessary and appropriate" measures for "the conservation and management of fisheries" this is enough to authorize industry-funded at-sea monitors.[2] This reading of the MSA cannot be, as it completely upends the statutory language, canons of construction, logic of the statute, and makes whole swaths of Congress's statutory scheme superfluous.

A. **The Same Result Cannot Obtain When the Statute Provides for Industry-Funded At-Sea Monitors or Observers in a Fishery and When It Doesn't**

A curious fact of the Defendants' Memorandum is that it notes that the Secretary of Commerce and NOAA went ahead and made industry-funded observers a reality in the North Pacific. *See* Defs.' Mem. at 18. Congress allowed Defendants to make the industry pay these or analogous costs by either fees or industry funding in certain circumstances. *See* Pls.' Mem. at 23; *and see* 16 U.S.C. § 1853a (authorizing Limited Access Privilege Programs ("LAPPs")); 16 U.S.C. § 1854(d)(2)(B) (capping fees at 3% of ex-vessel value of fish harvested); 16 U.S.C. § 1862(a) (allowing industry funding of observers in the North Pacific Fishery Management Council). But Congress has taken no similar action for the other fisheries, nor has it authorized other such observers or at-sea monitors to be paid in any manner whatsoever by the regulated industry. The fact that, by statute, Congress has directed

---

[2] While the Defendants argue that by regulation they can expand and convert the statutory "observers" into the at-sea "monitors" required in the Final Rule, they do not dispute that "observers" is the statutory language used by Congress. Nor do they dispute that by the Final Rule at issue here they have unilaterally determined different duties for such "monitors" from those of statutorily authorized "observers." *See* Defs.' Mem. at 13 n. 11.

similar fee-shifting plans in other fisheries does not help the Government but injures its position here. Congress saw a practice that was legally problematic but might make sense in the high-dollar fishery of the Northern Pacific, so it statutorily authorized something similar, but with many protections for the industry. *See* 16 U.S.C. § 1862(a) and (b) (authorizing fee-shifting provisions for observers in the Northern Pacific Fisheries under certain conditions) *and see* Pls.' Mem at 16. Congress has not authorized the same for the New England herring fishery (but has authorized a discretionary fee plan through LAPPs), and that fact undermines the arguments the Government makes here.

It is useful to look at the statute pertaining to the Northern Pacific Fishery, particularly that statute's granularity and particularity, as opposed to the vast powers without any statutory support the Defendants claim here. Section 1862(a) states:

> The North Pacific Council may prepare, in consultation with the Secretary, a fisheries research plan for any fishery under the Council's jurisdiction except a salmon fishery which—
> (1) requires that observers be stationed on fishing vessels engaged in the catching, taking, or harvesting of fish and on United States fish processors fishing for or processing species under the jurisdiction of the Council, including the Northern Pacific halibut fishery, for the purpose of collecting data necessary for the conservation, management, and scientific understanding of any fisheries under the Council's jurisdiction; and
> (2) establishes a system, or system, of fees, which may vary by fishery, management area, or observer coverage level, to pay for the cost of implementing the plan.

*Id.* The statute then provides for the standards that must be used to provide for this industry standing. *See* 16 U.S.C. §§ 1862(b)(1)(A)-(D), 1862(b)(2)(A)-(J). Those standards include "be fair and equitable to all vessels and processors." 16 U.S.C. § 1862(b)(1)(B). Obviously, in this case, foisting a disproportionate share of the regulatory costs on two vessels out of Rhode Island, to no gain to conservation of herring or other species in this fishery, is not "fair and equitable." But these requirements do not even apply to this fishery—which provides more support for the proposition that "fee shifting" does not apply to this fishery either.

The Defendants' entire response never explains the answer to Plaintiffs' query in their moving memoranda, how could Congress, in detail, provide all of these requirements in one fishery for industry-funded monitors, and all of the restrictions on industry funding in LAPPs, and yet, miraculously, all the other fisheries are subject to industry funding of at-sea monitors without any of these protections or procedures at the Defendants' own determination. Obviously, Congress did not do so, or else why would it have spent all the time creating these other statutes? There is no reason. The Fifth Circuit recently struck down just such a claim of unfettered power by the Secretary of Commerce and NOAA. *See Gulf Fisheries Association v. National Marine Fisheries Service*, 968 F.3d 454, 455 (5th Cir. 2020) (prohibiting NOAA and the Secretary from regulating "aquaculture" when not explicitly authorized by statute).

What the Court said in *Gulf Fisheries* applies to the powers asserted here:

> The [MSA] neither says nor suggests that the agency may regulate aquaculture. The agency interprets this silence as an invitation, but our precedent says the opposite: Congress does not delegate authority merely by not withholding it. *See Texas v. United States*, 809 F.3d 134, 186 (5th Cir. 2015), *aff'd by equally divided Court*, —— U.S. ——, 136 S. Ct. 2271, 195 L. Ed. 2d 638 (2016). Undaunted, the agency seeks authority in the Act's definition of "fishing"—the "catching, taking, or *harvesting* of fish." 16 U.S.C. § 1802(16) (emphasis added). "Harvesting," we are told, implies gathering crops, and in aquaculture the fish are the crop. That is a slippery basis for empowering an agency to create an entire industry the statute does not even mention. We will not bite. If anyone is to expand the forty-year-old Magnuson-Stevens Act to reach aquaculture for the first time, it must be Congress.

*Id.* The "necessary and appropriate" language was not so expansive to allow anything Defendants desired to do within the regulated fishery. That case is also instructive in that the Fifth Circuit noted that Congress knew how to regulate aquaculture if it wanted to, and silence was indicative that it did not do so. *Id.* at 466 (citing *Russello v. United States*, 464 U.S. 16, 23 (1983) ("[W]here Congress includes particular language in one section of a statute but omits it in another, it is presumed that Congress acts intentionally and purposely." (cleaned up))); *see also La. Pub. Serv. Comm'n v. Fed. Commc'n*, 476 U.S. 355, 374 (1986) ("an agency may not confer power upon itself.").

So it is here, if the Defendants want the type of powers they have been granted by Section 1862(a) in the Northern Pacific Fishery, they can only receive them from Congress, and not by its silence. The Defendants do not factually dispute that the reason they have avoided LAPPs or other statutorily authorized methods for charging industry is to avoid Congress's statutory scheme that provides protections when these actions are going to be taken. *See* AR17037. Defendants also wanted to exceed the levels of funding Congress had provided for observers. *See* AR16992. Neither of these evasions should be given judicial support. To do so would strip Congress of its statutory authorization and appropriations power and hand much of it over to executive branch agencies. Congress knows how to give the agencies the powers the Defendants here claim, and it has done so explicitly in the Northern Pacific Fishery and through LAPPS in New England and for foreign vessels. Pls.' Mem at 23 (and statutes cited therein). It did not magically give Defendants that power in every other fishery without ever mentioning it elsewhere in the statute. Defendants nowhere explain this conundrum raised in Plaintiffs' opening brief and further ignore the argument that the result cannot be the same when Congress both explicitly authorizes an extraordinary power and when it does not. They also do not explain how their novel interpretation of Defendants' power to charge industry for these at-sea monitors can make not just a phrase superfluous, but at least two entire sections of the MSA, Sections 1862(a) and Section 1854(b). *Cf. Herman v. Hector I. Nieves Transp., Inc.*, 244 F.3d 32, 36 (1st Cir. 2001) ("statute should be construed so as not to render any of its phrases superfluous."); *and see NLRB v. SW General, Inc.,* 137 S.Ct. 929, 941 (2017) ("… the Board's interpretation makes the first requirement superfluous, a result we typically try to avoid.").

Defendants attempt to explain away the use of LAPPs as "discretionary" and therefore not precluding their action here. Defs.' Mem. at 21 (citing 16 U.S.C. § 1853a (defining LAPPs)). But this explanation undermines Defendants' position, it does not strengthen it. Congress explicitly gave Defendants the power to charge a cost-recovery program but put in limits on amounts of such charges

8

and provided the procedure to obtain the right to charge them. It is undisputed that for herring fishers like Plaintiffs, who cannot take advantage of any exemptions, the reduction in return to owner is a staggering 20%. Pls.' Mem. at 18. Once again, what valid concept of statutory construction allows an unbounded power to force Plaintiffs into a market they do not choose and requires them to pay those federal officers fees when everywhere else fee shifting is allowed the costs and protections are tightly controlled by statute? It is true that LAPPs are discretionary but the alternative—to go ahead and collect such costs by creating a third party, trained and approved by the Government, who does the work and then making the industry pay for it—is not provided as a "discretionary" alternative. The alternative is for the Defendants not to create new offices and have industry pay for them claiming power Congress has not authorized. When an agency disagrees with Congress on the level at which its activities should be funded or what powers it has, the agency loses. The Courts should not create new powers and abilities for such an agency.

The Defendants also misread Plaintiffs' argument about the statutory structure Congress has set up to prohibit Defendants, and indeed, most agencies to exceed the activity level Congress has directed through appropriated funds. Defendants note that Plaintiffs have not alleged a count in the Complaint that Defendants have violated the Miscellaneous Receipts Statute ("MRS"), 31 U.S.C. § 3302, which prohibits an agency from keeping money meant for the government and requiring it be deposited in the treasury. The citation to that statute was merely to note one of the myriad ways Congress has prevented the administrative state from expanding its powers beyond the bounds Congress, with Presidential signature, has allowed. Defendants cannot dispute that the entire Final Rule regarding industry-funded monitoring was designed to avoid not only the LAPPs provisions but also the MRS. *See* Pls.' Mem. at 15-16 (citing the Oliver Mem., at AR16992). The entire scheme[3]

---

[3] The Government takes issue with the word "scheme." Defs.' Mem. at 22. That word is defined as "[a] design or plan formed to accomplish some purpose; a system" or alternatively, "Plan reasonably calculated to deceive persons of ordinary prudence or comprehension." )*Black's*

amounts to struggling for reasons to abrogate Congressional intent. The MSA is a clear expression of that intent, and the Court can examine the MSA to determine whether the Final Rule is allowed by the text and plain meaning of the statute.

### B.    Unchallenged Actions of the Agency Prove Nothing

One of the other arguments that Defendants raise is that they are empowered to require certain location devices on commercial vessels that the industry must put on their vessels and pay for. *See* Defs.' Mem. at 14-15. They cite no case that equates equipment requirements with actual people—especially those who live on the vessel throughout the duration of a fishing trip—who provide a government function and a government service. The presence of these people is far more intrusive than Vessel Monitoring System ("VMS") devices and is treated differently by statute. Under the MSA, as we have seen, the statute, in applicable fisheries or under applicable circumstances, carves out a special regime for paying for actual people who are assigned to a company or individual's vessel, or Congress appropriates funds for such observers. The costs that the industry must absorb are the berthing space and facilities that must be made available to these third-party officials. *See generally* 16 U.S.C. § 1881b(a) (authorizing the Secretary to promulgate regulations determining whether a vessel is required to carry an observer based on the adequacy and safety of the facilities for quartering an observer). Those analogous costs, unchallenged here, are comparable to the VMS devices and such referred to by Defendants. People on board vessels performing a government function are not so analogous. They are akin to hiring and paying the salary of the highway patrolman who pulls you over. Such a novel imposition must be identified and spelled out by Congress.

Also, in the case of VMS, there are challenges that are in the process of being litigated. As in many cases when actions were brought, the Government settled by paying some fishers' costs or the

---

*Law Dictionary* (5th ed. 1979. As the record clearly demonstrates this plan was devised to avoid all the statutory prohibitions against this kind of action, the second definition is more apt.

challenge to this intrusion has not been fully litigated. *See generally,* Jason R. Crance & Mike Mastry, Fourth Amendment Privacy Rights at Sea and Governmental Use of Vessel Monitoring Systems: There's Something Fishy About This, 22 J. Envtl. L. & Litig. 231 (2007).

In addition, unlike the costs imposed by the very nature of valid regulation, here it is undisputed that the purpose of this regulation was to avoid the various strictures Congress has implemented to prevent agencies from burdening industry with the cost of government functions more properly paid for by the Government. In fact, the Defendants here contumaciously proceeded with implementing the Final Rule regardless of legal or practical obstacles and despite the comments of the Plaintiffs and others. The fact that the rule was essentially finalized before all comments were in, which Defendant does not deny, highlights the kabuki theatre nature of its purported adherence to the APA. The Final Rule was, by Defendants' own admission, designed and implemented specifically to get around legal prohibitions on this type of activity. *See* AR16992 (noting Congress only authorized current funding levels for observers and Commerce had denied previously proposed industry-funded proposals as requiring spending money not yet appropriated or inconsistent with federal law). It was promulgated despite clear evidence that industry-funded observer programs were only currently implemented in "high volume or high value species fisheries" and only allowed under the MSA in such places as Alaska. *See* AR42. The $700 to $800 per day cost of at-sea monitors proposed in the Final Rule is twice as high as the cost in the North Pacific Fishery, where fee-shifting provisions for observers are actually authorized by the MSA.[4] Defendants *factually* dispute none of this; they simply argue that they were attempting to obtain the desired result while avoiding some statutory prohibitions.

---

[4] A similar attempt by the Federal Trade Commission ("FTC") to avoid the statutory scheme created by Congress to seize funds of regulated industries and proceed by injunction and so avoid industry protections in the statutory scheme is currently before the Supreme Court. *See Fed. Trade Comm'n v. AMG Capital Management, LLC,* 910 F.3d 417 (9th Cir. 2018), *cert. granted,* 141 S.Ct. 194 (July 9, 2020). Two Circuits have explicitly found unlawful an attempt by FTC to avoid the statutory scheme provided by Congress by claiming the same power under the right to obtain an injunction. *See Fed. Trade Comm'n v. Credit Bureau Center, LLC,* 937 F.3d 764, 784 (7th Cir. 2019),

The Defendants cannot cite statutes and regulations that are unchallenged in this suit, for instance the regulation concerning requiring on-board VMS for certain regulated vessels, or the statute allowing government funded observers on vessels, and argue that therefore this challenged regulation found nowhere in those statutes cannot be properly challenged, but that is the gist of much of their argument.

### C. The Standard of Review Is Under the APA and the RFA and *Chevron* Does Not Aid the Defendants

Defendants do not dispute the standard of review under the APA and the RFA as described in Plaintiffs' moving brief, although they do urge the standard is more deferential than those statutes actually are. But the Defendants' real argument is that this regulation is entitled to *Chevron* deference. The Defendants note the broad authority to regulate fisheries they are granted, and they claim it subsumes every power Congress has, including that of assigning fees to industries for regulatory costs. For the proposition that Defendants have broad authority to regulate where "appropriate and necessary" they cite *Michigan v. EPA*, 135 S.Ct. 2699, 2707 (2015). *See* Defs.' Mem. at 21. This is strange for several reasons. That case is inapposite on this issue because, as Defendants admit, the issue of statutory support for industry funding of that regulation was not at issue. *See* Defs.' Mem. at 23 n. 15. However, there as here, the agency claimed an ability to ignore costs when regulating power plants that was directly contradicted by part of the statute. The Court struck it down stating:

> We review this interpretation under the standard set out in *Chevron U.S.A. Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837, 104 S.Ct. 2778, 81 L. Ed. 2d 694 (1984). *Chevron* directs courts to accept an agency's reasonable resolution of an ambiguity in a statute that the agency administers. *Id.*, at 842–843, 104 S.Ct. 2778. Even under this deferential standard, however, "agencies must operate within the bounds of reasonable interpretation." *Utility Air Regulatory Group v. EPA*, 573 U.S. ——, ——,

*cert. vacated*, —— S.Ct. —— (Nov. 9, 2020) ( comparing statutory protections under cease and desist orders with powers claimed under Section 13(b) of FTC Act); *Fed. Trade Comm'n v. AbbVie Inc*, 976 F.3d 327, 375-79 (3d Cir. 2020) (finding no power to seize assets under section 13(b) because of structure of FTC allowing such seizures in different sections of the Act). This is a similar effort to avoid strictures Congress, for good reason, placed on agency power.

134 S.Ct. 2427, 2442, 189 L. Ed. 2d 372 (2014) (internal quotation marks omitted). EPA strayed far beyond those bounds when it read § 7412(n)(1) to mean that it could ignore cost when deciding whether to regulate power plants.

*Id.*

In this case, the Court should not get past *Chevron* step one—whether there is an ambiguity in the statute—because there is no ambiguity when the traditional tools of construction are used. Once again *Gulf Fisheries* is instructive. There, as here, faced with a novel agency claim that it was granted the power to regulate aquaculture, and could charge fees without statutory support, the Court said:

> At step one, we ask "whether Congress has directly spoken to the precise question at issue." *Chevron*, 467 U.S. at 842, 104 S.Ct. 2778. We answer that question by "exhaust[ing] all the 'traditional tools' of construction," including "text, structure, history, and purpose." *Kisor v. Wilkie*, —— U.S. ——, 139 S.Ct. 2400, 2415, 204 L. Ed. 2d 841 (2019) (quoting *Chevron*, 467 U.S. at 843 n. 9, 104 S.Ct. 2778).

*Id.* at 460.[5]

The *Gulf Fisheries* Court went on to note that all the tools of statutory construction, per Supreme Court direction, must be used to determine ambiguity:

> Our interpretation "must account for both the specific context in which language is used and the broader context of the statute as a whole." *Util. Air Regulatory Grp. v. EPA*, 573 U.S. 302, 321, 134 S.Ct. 2427, 189 L. Ed. 2d 372 (2014) (citation omitted) (cleaned up). We will not defer to "an agency interpretation that is inconsistent with the design and structure of the statute as a whole." *Id.* (quoting *Univ. of Tex. Sw. Med. Ctr. v. Nassar*, 570 U.S. 338, 353, 133 S.Ct. 2517, 186 L. Ed. 2d 503 (2013)) (cleaned up). If that holistic reading of the statute settles the matter, *Chevron* ends: we "must give effect to the unambiguously expressed intent of Congress." *Chevron*, 467 U.S. at 843, 104 S.Ct. 2778.

*Id.* Only after this task is complete and ambiguity is found does the Court reach step two where it determines whether the agency's interpretation is permissible. *Id.* Courts ought not find ambiguity in

---

[5] The Fifth Circuit in this case, like Plaintiffs in their moving brief, cite *Kisor v. Wilkie* which is, as Defendants' note, an *Auer* deference case. However, both the Fifth Circuit and Plaintiffs here only cited the portions of *Kisor* where the Supreme Court stated the factors applied to both forms of deference, *Chevron* and *Auer*.

Congress's silence on whether it granted an agency power or not and require Congressional negation of that power in order to find no ambiguity. *Id.* at 461. But that is exactly what Defendants are urging on this Court now—a requirement of citing statutory negation.

An Environmental Protection Agency ("EPA") case like *Michigan*, striking down agency action even when the agency claimed *Chevron* deference, is *Ethyl Corp. v. EPA*, 51 F.3d 1053 (D.C. Cir. 1995). In that case, Congress had provided the administrator of the EPA broad power to grant or withhold a waiver from a gasoline additive if it was demonstrated it did not affect emission standards negatively. Instead, the administrator denied a waiver based on "public health." *Id.* at 1058. But the statute only allowed a denial based on emission standards and not "public health." *Id.* The D.C. Circuit rejected the proposition made here that *Chevron* deference is created by Congress's silence on an issue. *Id.* at 170. Congress must implicitly or explicitly assign the power. *Id.* Here it did neither. In fact, the D.C. Circuit's holding in *Ethyl Corp.* also notes that silence does not get an agency to *Chevron* step two stating:

> To suggest, as the [agency] effectively does, that *Chevron* step two is implicated any time a statute does not expressly *negate* the existence of a claimed administrative power …, is both flatly unfaithful to the principles of administrative law … and refuted by precedent. … Were courts to *presume* a delegation of power absent an express *withholding* of such power, agencies would enjoy virtually limitless hegemony, a result plainly out of keeping with *Chevron* and quite likely with the Constitution as well. … We refuse, once again, to presume a delegation of power merely because Congress has not expressly withheld such power. The level of specificity in section 211(f)(4) concerning the emission criterion effectively closes any gap the Agency seeks to find and fill with additional criteria "in the public interest." Congress was explicit in its direction: the Agency is to consider the effects of a fuel additive's emission products on the "failure of any emission control device or system … to achieve compliance … with the emission standards." … In this case, EPA has failed to give effect to the unambiguously expressed intent of Congress.

*Id.* (internal citations omitted).

But *Ethyl Corp.* is even more apposite to this case than that one because the Court looked at another part of the animating statute that *did* provide the EPA the power to take account of a gasoline additive's effect on public health. This is analogous to the other parts of the MSA which give the

14

applicable agencies the power to make industry pay for at-sea observers. The Court there stated, "Another telling indication that the Administrator has misconstrued the meaning of section 211(f)(4), is the plain language of a nearby provision, section 211(c)(1), which explicitly instructs the Administrator to consider a fuel additive's effects on public health." *Id.* at 171.

Critically, the Fifth and D.C. Circuits are not in conflict with this Circuit's holdings regarding *Chevron* such as *Lovgren v. Locke*, 701 F.3d 5 (1st Cir. 2012), cited by both parties here. The fact patterns and statutory provisions in those cases are merely closer to the fact pattern here. In *Lovgren*, this Circuit applied *Chevron* deference to the determination of whether a program was or was not a LAPP. There was no question there requiring the Court to address the agencies' assertion of a novel power as there is here. And in that case the statutory language and structure favored the agencies and here they do not. Here there is no ambiguity. Congress simply did not give the Defendants the power to require Plaintiffs to enter a market and purchase on-board at-sea monitors who are trained by and report to the Government. It knew how to, as the entire statute reveals, but it did not do so. The Government does not cite a case where a power was granted explicitly in one part of a statute, but Courts determined it was implicitly granted elsewhere. As both *Gulf Fisheries* and *Ethyl Corp.* reveal, the opposite is the proper rule of statutory interpretation under *Chevron* or otherwise. When Congress explicitly grants a power under one section of a statute, it does not implicitly do so elsewhere. And the legislative history also shows that this is so.

The legislative history, to the extent relevant, does not support forcing Plaintiffs to pay for at-sea monitors, as here the statute is clear that Defendants do not have the asserted power in the New England Fishery. As noted, that Congress statutorily allowed a similar program in the Northern Pacific Fishery subverts rather than supports Defendants' position here. In the 1990 MSA amendments, as all parties agree, Congress only explicitly allowed fee-shifting provisions of the nature of that attempted here in that fishery. *See* 16 U.S.C. § 1862(a). It also, and separately, added the

general observer provision of Section 1853(b)(8). Contrary to Defs.' Mem. at 18-19, the only thing Congress clarified Defendants' authority to do was to place the observers on vessels. *It did not "clarify" or "approve" the fee requirements*. Nothing in 1853(b)(8) or its history does this. Defendants' attempt to say that fee-shifting/charging provisions were "clarified" or "authorized" by Congress is completely unsupported by Section 1853(b)(8). In fact, the Senate comments, which are not law but which the Court may wish to consult, state that section 1853(b)(8) "would clarify the existing authority in the [MSA] for fishery management plans to require that observers be carried on board domestic fishing vessels for conservation and management purposes." S. Rep. No 101-414 at 20 (Aug. 2, 1990). Nothing in that statement provides support for making those vessels pay for the observers. Once again, this suit does not challenge NOAA's and Commerce's being able to put observers on Plaintiffs' vessels in the proper case. The statute provides for it, and it is not challenged here. But the Defendants cannot bootstrap that Congressional authorization, and the provision of appropriated funds to pay for it, into requiring Plaintiffs to pay for their monitors or observers. This leads the Court into error, as far as statutory analysis is concerned.

As for 16 U.S.C. § 1862(a), to the extent the Court wishes to consult legislative history, when Congress added the fee-shifting provision to the Northern Pacific Council, Section 118 of Public Law 101-627 in the Committee notes says: "This section adds a new provision to the [MSA] which is *specific* to the North Pacific Management Council. Nothing in this section should be construed as affecting the rights and responsibilities of other Regional fishery Management Councils or as affecting fisheries other than those within the jurisdiction of the North Pacific Fishery Management Council." H.R. Rep. 101-393 at 31(Dec. 15, 1989) (emphasis added).

To use legislative history, as the Defendants attempt here, and not note that it clearly made all fees collected from industry apply to one fishery on the opposite side of the country from New England, and that it explicitly stated that no other fishery's or council's powers or duties changed one

iota because of what was allowed in the North Pacific, is not proper use of such history.  If anything, the legislative history reveals that Congress looked at charging industry observer fees in one fishery and approved it and explicitly continued to prohibit it everywhere else.  Neither 16 U.S.C. § 1862(a) and its legislative history, nor Section 1853(b)(8) and its legislative history allow any support for any proposition regarding fees for observers.  These sections only lend support for the uncontested proposition that for commercial fishermen the agencies are empowered to require observers on their boats if they wish to use the fishery.

Even if the Court applies *Chevron* deference and finds ambiguity in the statute which both Defendants and Plaintiffs agree is not there, it ought to deny the Defendants' implementing of the Final Rule because it is not permissible.  A free-standing power to charge all regulated industries fees for government activities is nowhere described in the Constitution or any statute.  It would release the agencies of the federal government from one of the main constraints on their power, Congressional appropriations.  If this conduct is "permissible," no agency can be constrained by Article I taxing or spending authority, because without standards and without clear authorization they can require industry to pay for their desires by outsourcing the government function to third parties.[6]

Finally, it should be noted that here the "at-sea monitor" charges are not related in any way to a benefit received by the regulated industry.  The information gathered does not help the individual fisherman and is seen as an intrusive imposition.  It helps the government monitor its own property— fish stocks.  Such a scheme is on dangerous ground constitutionally.  *See Nat'l Cable Television Assoc., Inc. v. United States*, 415 U.S. 336, 342 (1974) (when a fee scheme was not premised on benefit granted regulated company, it approached being a tax and to avoid a non-delegation issue the Court would remand to allow a fee assessment along these constitutional lines).  In this case, without Congressional

---

[6] It is also not permissible for being arbitrary and capricious under the APA, failing to comply with the RFA or the National Standards as noted in the Moving Brief and herein.

authorization or direction on what the fee is to be based or how it is to be limited, Defendants have just acted.  There is virtually no explanation for the 50% level of industry support they cite.  All the Defendants say is its more than 25% and less than 100%, so that's better.  This is a cursory analysis and does not require agency expertise.  In addition, while the Court is bound by Circuit precedent, it should be noted that *Chevron* deference places the thumb on the scale for one litigant, the government, and that litigant happens to be the most powerful in the country.  Such deference is inconsistent with the Due Process Clause of the Fifth Amendment and judicial independence and should be abandoned. *See* Philip Hamburger, Chevron *Bias*, 84 Geo. Wash. L. Rev. 1187, 1195 (2016).  The Court should strike down the action because it intrudes on Congress's Article I powers, and if Congress wishes to provide the agencies with a fee-charging power for at-sea monitors, it should do so and provide the criteria for doing so, as it has done in some fisheries and in New England under the LAPP program.

### D.  Defendants Have Not Complied with the National Standards

Defendants claim that the MSA's National Standards do not have the force of law and completely ignore the cases cited by Plaintiffs in the moving brief that explicitly strike NOAA and Department of Commerce actions for failing to comply with those standards.  *See Western Sea Fishing Co. v. Locke*, 722 F. Supp. 2d 126, 140-141 (D. Mass. 2010) (striking herring rule that did nothing to comply with National Standard 1); *Hadaja, Inc. v. Evans*, 263 F. Supp. 2d 346 (D.R.I. 2003) (striking regulation for failing to comply with National Standard 2).  The National Standards were not authorized by Congress so that agencies can ignore them.  *See* 16 U.S.C. § 1851(a) ("Any fishery management plan, and *any regulation* promulgated to implement any such plan … shall be consistent with the following national standards for fishery conservation and management." (emphasis added)).  In this case, the National Standards were not followed and the IFM Amendment and Final Rule are inconsistent with the goals of National Standards One, Two, Six, Seven, and Eight.

**1. The IFM Amendment and Final Rule Are Inconsistent with National Standard One**

National Standard One states that "[c]onservation and management measures shall prevent overfishing while achieving, on a continuing basis, the optimum yield from each fishery for the United States fishing industry." 16 U.S.C. § 1851(a)(1).

It is now undisputed that herring is not overfished, and it is undisputed that Plaintiffs' method of fishing takes in less of the herring stock than other vessels that are given exemptions or exit strategies for the at-sea monitors. Pls.' Mem. at 9-10, 13-14. It is also undisputed that, compared to most of the fleet, Plaintiffs have a low level of by-catch. Pls.' Mem. at 12-13. It is also now undisputed (except for the Government claiming Plaintiffs' statistics are self-selected while pointing to no genuine material fact in the record) that Plaintiffs will bear, for no reason, a disproportionate share of the at-sea monitors' costs and will need to pay those costs by resources taken from non-herring harvesting. Pls.' Mem. at 13. None of these undisputed facts complies with National Standard One. As both sides agree, National Standard 1 is aimed at preventing overfishing while achieving optimal yield over time. In response, the Government agencies claim that they are trying to end "overfishing" and that the IFM Amendment and Final Rule will somehow contribute to this. They do not explain, nor does the record, how overburdening vessels that take less herring and produce less by-catch than similar trawler types can do that. The Government's callous—take it or leave it—assertion that Plaintiffs can just leave the fishing fleet or herring fishery also does nothing to support this standard, because ships that take more herring and produce more by-catch will be the winners in that scenario. It is undisputed Plaintiffs have engaged in their freeze system style of fishing for over 30 years. The Government in this action claims that it complies with its duties by ignoring the specific nature of Plaintiffs' long-established business model that does not affect the fishing stock more than other types of gear permitted in the same fishery, indeed affects it less as the undisputed facts show, and simply forcing the lower-impact vessels out of the fishery. This standard requires a connection of means to ends.

19

To drive out of the herring industry fishers that burden that fishery less by refusing to put them in their own category under the regulation or otherwise accommodate them violates this National Standard.

### 2. The IFM Amendment and Final Rule Are Inconsistent with National Standard Two

National Standard Two states that "[c]onservation and management measures shall be based upon the best scientific information available." 16 U.S.C. § 1851(a)(2).

Here Defendants claim that small-mesh bottom trawlers have more by-catch than mid-water trawlers, and that there is no evidence that Plaintiffs' vessels will bear a disproportionate cost of the at-sea monitors. It is undisputed that Plaintiffs currently bear disproportionate regulatory cost of observers because their vessels are assigned such observers more often (it is admitted that heretofore such observers' salaries are paid by the Government). Defs.' Mem. at 43 n. 20. The Government also says no other proposal was made except a per day herring catch that was proposed and rejected. But this assertion is not true. Plaintiffs proposed both a new category for freezer vessels, or a category for vessels that are mixed species-focused rather than herring focused. Pls.' Mem. at 13 (AR17801-04), 14(AR3773-4). Both of these options were rejected without explanation.[7] As has never been refuted by the Government, it is perfectly possible to take far larger amounts of herring, produce far more by-catch, and *never* get an at-sea monitor—as long as you take under the allotted amount of fish per trip rather than per day. This regulation is not a scientific exercise.

---

[7] Which is also contrary to the requirements of the APA and the RFA.

### 3. The IFM Amendment and Final Rule Are Inconsistent with National Standard Six

National Standard Six states that "[c]onservation and management measures shall take into account and allow for variations among, and contingencies in, fisheries, fishery resources, and catches." 16 U.S.C. § 1851(a)(6).

The moving brief lays out the problems under this National Standard. But in response to the Government's assertion that it complied by taking into account variations and contingencies in "fishery, fishery resources and catches," it is noteworthy that the IFM Amendment and Final Rule are more burdensome on multi-species fishing vessels like Plaintiffs' than vessels that take only one or two species or return to port more often. There is zero justification for this given the nature of the New England fishery, and the Government points to none. While under the national standards Defendants may not have to account for individual fishing methods, they do under RFA and have not done so here.

### 4. The IFM Amendment and Final Rule Are Inconsistent with National Standard Seven

National Standard Seven states that "[c]onservation and management measures shall, where practicable, minimize costs and avoid unnecessary duplication." 16 U.S.C. § 1851(a)(7).

Defendants claim they have complied with this standard even though the IFM Amendment and Final Rule explicitly burden Plaintiffs for no good regulatory reason. Once again, the Government says a 30-year type of fishing that does no more harm to the fishery than any other type of fishing can bear a disproportionate amount of costs because the Government cannot be bothered to allow exemptions or adjust categories that apply to it. This is not complying with the duty under National Standard 7 to minimize costs.

**5.  The IFM Amendment and Final Rule Are Inconsistent with National Standard Eight**

National Standard Eight states that "[c]onservation and management measures shall … take into account the importance of fishery resources to fishing communities by utilizing economic and social data that meet the requirements of [National Standard Two], in order to (A) provide for the sustained participation of such communities, and (B) to the extent practicable, minimize adverse economic impacts on such communities." 16 U.S.C. § 1851(a)(8).

The Government's statement that it considered the effects of its IFM Amendment and Final Rule on local damage to fishing communities is belied by the fact that it is undisputed that Plaintiffs represent Rhode Island fishers who are the only ones engaging in freeze fishing with small-mesh gear and are overburdened by the monitoring costs that are assessed with no eye to the benefit to the regulated party or the impact of these fishers on the fishery.  If the Defendants had gone out of their way to create a regulation that disproportionately injured one type of low-impact fishing without concomitant regulatory benefit, they would have been hard pressed to find a more suitable regulation than the one they have come up with here.

**E.  The Final Rule Is Arbitrary and Capricious as to Plaintiffs and the RFA was not Followed**

The alternatives proposed by Plaintiffs were not addressed by the Government.  The proposal not to allow at-sea monitors at all as an alternative (actually in concert with the statute) was not considered.  Exempting vessels that stay out for nearly two weeks harvesting non-herring stocks was not considered.  Making an allocation of at-sea monitors that allows the burden to fall on the entire fleet equally or more equally was not considered.  As noted earlier a new category of fisher, either for freezer boats or non-herring focused fishers who take many different species and may harvest no herring at all was not considered although proposed.  Pls.' Mem. at 13 (AR17801-04); Pls.' Mem. at 14 (AR3773-4).  The benefit to the Government (there is no benefit to Plaintiffs) from these at-sea

monitors is disproportionately borne by Plaintiffs, and there has been zero analysis of why this must be so.

But in any case, the IFM Amendment and Final Rule remain arbitrary and capricious because there is no rationality in making one portion of the fleet pay more for this cost than other vessels that contribute more to by-catch or take more in herring stocks than Plaintiffs do—the harms the MSA was intended to curb.

### F. *Goethel* Is Neither Dispositive nor Persuasive in this Case

As predicted, Defendants have leaned hard on *Goethel v. Pritzker*, 1016 WL 4076831 (D.N.H. July 29, 2016), *aff'd sub nom.*, *Goethel v. U.S. Dep't of Commerce*, 854 F.3d 106 (1st Cir.), *cert denied*, 138 S.Ct. 221 (2017), which does not bind this Court, and in any case deals with a different regulation and its application to a different type of statute with different comments in the record. The *Goethel* case remains a statute of limitations case and any analysis on the merits is merely *dicta*. *See id.* at *4 (finding that the "window" to challenge had closed but proceeding to analyze the plaintiffs' claims on the merits anyway). There is no such defense here. The *Goethel* case did not "exhaust all the 'traditional tools' of construction" to determine if the MSA is ambiguous as *Kisor* subsequently made clear such deference requires. *See* 139 S.Ct. at 2415. In *Goethel*, an expansive power was granted to an agency without statutory or textual support. The Supreme Court had not decided and clarified certain deference standards in *Kisor*, and its admonitions appear not to have been followed. As Plaintiffs noted in their moving brief, the plain text analysis of *Campanale & Sons, Inc. v. Evans*, 311 F.3d 109 (1st Cir. 2002), and *Atlantic Fish Spotters v. Evans*, 321 F.3d 220 (1st Cir. 2003), are more apposite and binding on this court. *See* Pls.' Mem. at 28-29.

### G. A Regulated Party Cannot Be Forced into a Market Created Without Congressional Authorization and the Government's Previous Positions Are Instructive

Finally, the Government argues that this case differs from *NFIB v. Sebelius*, 567 U.S. 519 (2012), because Plaintiffs are regulated parties that are exercising the privilege of fishing. But no

statute allows Defendants to create a market and force regulated parties into it.  In *Sebelius*, the statute authorized it; here it does not.  So even if the Government's proposition were accurate, it is immaterial as nothing gives Defendants' such power.  Likewise, nothing gives Defendants the power to tax.

The Government also takes issue with citing its positions in *Anglers Conservation Network, Inc. et al., v. Pritzker*, 139 F. Supp. 3d 102 (D.D.C. 2015), and noting there is no formalized estoppel theory that prohibits it making the arguments it made there.  But it argued that Congress had prevented by active statutory limitations the relief sought by intervenors there, and it won.  Those arguments should be as persuasive with this Court that no such power was left to the Defendants whether they are estopped from saying otherwise here, or not.

## CONCLUSION

There is no support in fact or law for the Defendants' assertion of an unbounded power to charge industry for at-sea monitors, and Plaintiffs should be granted summary judgment on all counts and Defendants denied summary judgment on all counts.

Dated: January 29, 2021                          Respectfully submitted,


                                                 /s/ John J. Vecchione
                                                 John J. Vecchione (admitted *pro hac vice*)
                                                 Kara Rollins (admitted *pro hac vice*)
                                                 New Civil Liberties Alliance
                                                 1225 19th Street NW, Ste. 450
                                                 Washington, DC 20036
                                                 Phone: (202) 869-5210
                                                 john.vecchione@ncla.legal
                                                 kara.rollins@ncla.legal

                                                 Kevin J. Holley, Esq. #4639
                                                 Holley Law LLC
                                                 33 College Hill Road, Ste. 25C
                                                 Warwick, RI 02886
                                                 Phone: (401) 521-2622
                                                 kevin@holleylawllc.com

                                                 *Counsel for Plaintiffs*

## CERTIFICATE OF SERVICE

I hereby certify that on January 29, 2021, I electronically filed the foregoing Plaintiffs' Memorandum in Opposition to Defendants' Cross-Motion for Summary Judgment and Reply in Support of Plaintiff's Summary Judgment using the CM/ECF system, which will send electronic notification of such filing to all counsel of record.

/s/ John J. Vecchione