# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF RHODE ISLAND

RELENTLESS, INC., et al.,     :
                     :

           Plaintiffs,     :
                     :

           v.            :
                     :

U.S. DEPARTMENT OF COMMERCE,     :     Civil Action No. 1:20-cv-00108-WES-PAS
     et al.,             :
                     :

           Defendants.[1]     :

## REPLY MEMORANDUM OF LAW IN SUPPORT OF DEFENDANTS' CROSS-MOTION FOR SUMMARY JUDGMENT

---

[1]   Wynn Coggins, Acting Agency Head, and Paul Doremus, Acting Assistant Administrator for the National Marine Fisheries Service ("NMFS"), are substituted pursuant to Federal Rule of Civil Procedure 25(d).

# <u>TABLE OF CONTENTS</u>

<u>PAGE</u>

I.    INTRODUCTION ................................................................................................. 1

II.   ARGUMENT ....................................................................................................... 2

    A.  The Court Should Decide This Case Pursuant To The Scope And Standard Of Review Set Forth In The Administrative Procedure Act. ........................................................................ 2

    B.  The MSA Authorizes The Omnibus Amendment's IFM Requirement............................. 3

    C.  NMFS Reasonably Interpreted The MSA.......................................................................... 9

        1.  The legislative history supports the legality of the IFM requirement............................ 9

        2.  NMFS reasonably considered the coverage target and costs associated with the Omnibus Amendment's IFM requirement. ................................................................. 12

    D.  The IFM Requirement Is Consistent With The National Standards. ................................ 17

        1.  National Standard 1 .................................................................................................. 18

        2.  National Standard 2 .................................................................................................. 20

        3.  National Standard 6 .................................................................................................. 20

        4.  National Standard 7 .................................................................................................. 21

        5.  National Standard 8 .................................................................................................. 22

    E.  Defendants Complied With The Regulatory Flexibility Act. ............................................ 23

    F.  The IFM Requirement Does Not Force Plaintiffs Into A Market...................................... 24

III.  CONCLUSION ................................................................................................. 25

i

## TABLE OF AUTHORITIES

**CASES**                                                                                                    **PAGE**

*Ace Lobster v. Evans*,
   165 F. Supp. 2d 148 (D.R.I. 2001) ........................................................................ 21

*Anglers Conservation Network v. Pritzker*,
   139 F. Supp. 3d 102 (D.D.C. 2015) ..................................................................... 25

*Associated Fisheries of Me. v. Daley*,
   127 F.3d 104 (1st Cir. 1997) ....................................................................... 2, 23, 24

*Balt. Gas & Elec. v. Nat. Res. Def. Council*,
   462 U.S. 87 (1983) ................................................................................................ 3

*Coastal Conservation Ass'n v. U.S. Dep't of Com.*,
   2016 WL 54911 (E.D. La. Jan. 4, 2016) ........................................................... 4, 6

*Coastal Conservation Ass'n v. U.S. Dep't of Com.*,
   846 F.3d 99 (5th Cir. 2017)) .............................................................................. 8

*Ethyl Corp. v. EPA*,
   51 F.3d 1053 (D.C. Cir. 1995) ........................................................................... 6

*Flaherty v. Bryson*,
   850 F. Supp. 2d 38 (D.D.C. 2012) ..................................................... 16, 17, 20

*FTC v. AbbVie Inc.*,
   976 F.3d 327 (3d Cir. 2020) ............................................................................. 16

*FTC v. Credit Bureau Ctr.*,
   937 F.3d 764 (7th Cir. 2019) ............................................................................ 16

*Goethel v. Pritzker*,
   2016 WL 4076831 (D.N.H. July 29, 2016) ............................................... passim

*Graham Cnty. Soil & Water Conservation Dist. v. U.S. ex rel. Wilson*,
   559 U.S. 280 (2010) .......................................................................................... 8

*Groundfish Forum v. Ross*,
   375 F. Supp. 3d 72 (D.D.C. 2019) .................................................................... 6

*Gulf Fishermen's Ass'n v. Gutierrez*,
   484 F. Supp. 2d 1264 (M.D. Fla. 2007) ........................................................... 13

*Gulf Fishermen's Association v. NMFS*,
   968 F.3d 454 (5th Cir. 2020) .............................................................................. 4

*Hadaja, Inc. v. Evans*,
   263 F. Supp. 2d 346 (D.R.I. 2003) .................................................................. 18

*Lovgren v. Locke*,
   701 F.3d 5 (1st Cir. 2012) ............................................................................. 2, 17

*Marx v. Gen. Revenue Corp.*,
   568 U.S. 371 (2013) ........................................................................................... 8

*Massachusetts v. Pritzker*,
  10 F. Supp. 3d 208 (D. Mass. 2014) ...................................................... 20

*Michigan v. EPA*,
  576 U.S. 743 (2015) ..................................................................................... 6

*Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*,
  463 U.S. 29 (1983) ..................................................................................... 17

*N.C. Fisheries Ass'n v. Gutierrez*,
  518 F. Supp. 2d 62 (D.D.C. 2007) .......................................................... 23

*N. Wind, Inc. v. Daley*,
  200 F.3d 13 (1st Cir. 1999) ......................................................................... 2

*Nat. Res. Def. Council v. NMFS*,
  71 F. Supp. 3d 35 (D.D.C. 2014) ............................................................ 18

*Nat'l Fed'n of Indep. Bus. v. Sebelius*,
  567 U.S. 519 (2012) ............................................................................ 14, 24

*Oceana v. Locke*,
  831 F. Supp. 2d 95 (D.D.C. 2011) ............................................................ 5

*Phoenix-Griffin Group II, Ltd. v. Chao*,
  376 F. Supp. 2d 234 (D.R.I. 2005) ............................................................ 3

*Rivers End Outfitters, LLC v. U.S. Dep't of Com.*,
  Case No. 20-cv-2312 (E.D. La.) ............................................................. 13

*Roche v. Evans*,
  249 F. Supp. 2d 47 (D. Mass. 2003) ........................................................ 1

*Vt. Yankee Nuclear Power Corp. v. Nat. Res. Def. Council*,
  435 U.S. 519 (1978) ................................................................................... 19

*Western Sea Fishing Co. v. Locke*,
  722 F. Supp. 2d 126 (D. Mass. 2010) .................................................... 18

## STATUTES

5 U.S.C. § 603 .................................................................................................. 23

5 U.S.C. § 603(a) ............................................................................................ 23

5 U.S.C. § 603(b) ............................................................................................ 23

5 U.S.C. § 604 .................................................................................................. 23

5 U.S.C. § 604(a) ............................................................................................ 23

5 U.S.C. § 706(2)(A) ........................................................................................ 3

16 U.S.C. § 1801(a) ........................................................................................... 1

16 U.S.C. § 1802(26) ..................................................................................... 11

16 U.S.C. § 1851(a) ........................................................................................... 2

16 U.S.C. § 1851(a)(1) .................................................................................... 19

16 U.S.C. § 1851(a)(4) .................................................................................... 22

16 U.S.C. § 1851(a)(6) .................................................................................... 21

16 U.S.C. § 1851(a)(7) ................................................................................ 5, 21

16 U.S.C. § 1851(a)(8) ...................................................................................... 5

16 U.S.C. § 1851(b) ......................................................................................... 18

16 U.S.C. § 1853a .....................................................................................5, 7, 12

16 U.S.C. § 1853(a)(1)(A) ........................................................................ 3, 4, 7

16 U.S.C. § 1853(a)(5) .............................................................................. 3, 4, 7

16 U.S.C. § 1853(b)(4) .................................................................................... 13

16 U.S.C. § 1853(b)(8) .......................................................................... 3, 4, 7, 9

16 U.S.C. § 1853(b)(14) ................................................................................3, 7

16 U.S.C. § 1854(d)(2)(A) ........................................................................... 7, 12

16 U.S.C. § 1854(d)(2)(B) ................................................................................7

16 U.S.C. § 1858(g)(1)(D) ........................................................................ passim

16 U.S.C. § 1858(g)(1)(D)(i)-(iv) ....................................................................6

16 U.S.C. § 1861 .............................................................................................. 14

16 U.S.C. § 1862 ........................................................................................ passim

16 U.S.C. § 1862(a) ...................................................................................10, 11

16 U.S.C. § 1862(b)(2)(B) .............................................................................. 10

16 U.S.C. § 1862(b)(2)(E) .............................................................................. 10

16 U.S.C. § 1862(b)(2)(F) ............................................................................... 10


**REGULATIONS**

50 C.F.R. § 600.310(b)(2)(ii) ......................................................................... 19

50 C.F.R. § 600.340(c) ..................................................................................... 5


**OTHER AUTHORITIES**

Black's Law Dictionary (11th ed. 2019) .........................................................24

H.R. Rep. No. 101-393 (Dec. 15, 1989) .....................................................9, 10

S. Rep. No. 101-414 (Aug. 2, 1990) ...............................................................10

## I.    INTRODUCTION

In their Response to Defendants' Cross-Motion for Summary Judgment and Reply to Opposition to Plaintiffs Motion for Summary Judgment (ECF 40 & 41 ("Pl. Opp.")), Plaintiffs repeatedly misstate Defendants' arguments, the content of the administrative record, and the law and legal standard on which this case should be evaluated. Plaintiffs fail to address the points raised in Defendants' Memorandum in Support of Cross-Motion for Summary Judgment and in Opposition to Plaintiffs' Motion for Summary Judgment (ECF 38-1 & 39 ("Def. Br.")), or offer support for their flawed legal positions. Throughout their brief, Plaintiffs describe the Omnibus Amendment and Final Rule pejoratively as a deceptive "scheme," *e.g.*, Pl. Opp. 5, 9, 17, and then criticize Defendants for challenging their usage of the word. *Id.* at 9 n.3. The analysis and implementation of the Omnibus Amendment and Final Rule are the result of a years-long transparent public process, and there was neither a scheme nor any deception. Most importantly, however, Plaintiffs' arguments rest on the mistaken premise that because the industry-funded monitoring ("IFM") requirement set forth in the Omnibus Amendment and Final Rule does not afford special treatment for their purportedly unique style of fishing, it is unauthorized. The Magnuson-Stevens Fishery Conservation and Management Act ("MSA") obligates Defendants to implement conservation and management measures in fisheries that inure to the benefit of the Nation, *see generally* 16 U.S.C. § 1801(a), not for any individual participant or vessel. This is true even where the Secretary cannot accommodate all of the interests of some fishermen in order to benefit the fishery as a whole. *Roche v. Evans*, 249 F. Supp. 2d 47, 55-56 (D. Mass. 2003).

It is plain that Plaintiffs disagree, and are dissatisfied, with the Omnibus Amendment. But the question before the Court is whether the record supports the agency's decision to approve the omnibus measures and herring measures in the Omnibus Amendment, and the measures comply

with the MSA and other laws. The answer is clearly yes. Defendants considered the available information and viewpoints, and explained their decision. That information supports Defendants' conclusions. Plaintiffs' desire for a different outcome is not a proper basis for upending an action that has been carefully designed to take into account the interests of the entire fishery and provide the greatest benefit to the Nation. The Court should deny Plaintiffs' motion and grant Defendants' cross-motion.

## II.     ARGUMENT

### A.     The Court Should Decide This Case Pursuant To The Scope And Standard Of Review Set Forth In The Administrative Procedure Act.

Plaintiffs argue that they are entitled to prevail because "Defendants did not counter Plaintiffs' factual assertions by citations to the record to oppose key facts." Pl. Opp. 2. Plaintiffs fail to cite a single legal authority to support their novel approach, despite devoting pages to this argument, which entirely ignores the manner in which the courts resolve MSA claims under the deferential Administrative Procedure Act ("APA") standard of review. *Id*. at 2-4; *see N. Wind, Inc. v. Daley*, 200 F.3d 13, 17 (1st Cir. 1999). The First Circuit has explained that "[the summary judgment] rubric has a special twist in the administrative law context" such that the Court's role "is only to determine whether the Secretary's decision to promulgate the fishery regulation was consonant with his statutory powers, reasoned, and supported by substantial evidence in the record." *Associated Fisheries of Me. v. Daley*, 127 F.3d 104, 109 (1st Cir. 1997) (citations omitted). Similarly, when a party challenges a fishery management plan ("FMP"), plan amendment, or regulation as inconsistent with one or more of the ten National Standards set forth in 16 U.S.C. § 1851(a), a court is to determine whether "the administrative judgment, right or wrong, derives from the record, possesses a rational basis, and evinces no mistake of law." *Lovgren v. Locke*, 701 F.3d 5, 32 (1st Cir. 2012) (quoting *Associated Fisheries*, 127 F.3d at 111). However,

2

the Court does <u>not</u> assess whether Defendants have demonstrated a factual dispute that precludes entry of judgment at this stage of the case, *Phoenix-Griffin Group II, Ltd. v. Chao*, 376 F. Supp. 2d 234, 245 (D.R.I. 2005), so Plaintiffs' repeated contentions that Defendants failed to "counter" facts cited in their brief are misdirected and fail to address the pertinent legal standard.

Under the well-established APA standard of review, the Court should determine whether Defendants "articulated a rational connection between the facts found and the choice made," *Balt. Gas & Elec. v. Nat. Res. Def. Council*, 462 U.S. 87, 105 (1983) (citation omitted), and set aside the decision only if it is arbitrary, capricious, or otherwise contrary to law. 5 U.S.C. § 706(2)(A).

**B.    The MSA Authorizes The Omnibus Amendment's IFM Requirement.**

The MSA authorizes the IFM requirement. Congress has spoken directly to this issue by including multiple provisions in the MSA that demonstrate that it confers authority to require the industry to be responsible for the cost of utilizing human observers. Among these provisions are the broad authorization for developing and implementing conservation and management measures. Specifically, the MSA authorizes FMPs to include observer requirements as set forth in 16 U.S.C. § 1853(b)(8). The MSA also requires that FMPs contain measures "necessary and appropriate" for the conservation and management of the fishery, and authorizes FMPs to "prescribe such other measures, requirements, or conditions and restrictions as are determined to be necessary and appropriate for the conservation and management of the fishery." 16 U.S.C. §§ 1853(a)(1)(A), 1853(b)(14). Further, the Council has a responsibility to "specify the pertinent data which shall be submitted to the Secretary . . . including, but not limited to, information regarding the type and quantity of fishing gear used, catch by species in numbers of fish or weight thereof[.]" 16 U.S.C. § 1853(a)(5). Congress's intent is clear: by using the words "necessary and appropriate" throughout the MSA, it granted the agency broad authority to take actions for the conservation and

management of the fishery through "empowering language." *Coastal Conservation Ass'n v. U.S. Dep't of Com.*, Civ. Action No. 15-1300, 2016 WL 54911, at *4 (E.D. La. Jan. 4, 2016), *aff'd*, 846 F.3d 99 (5th Cir. 2017).

While Plaintiffs devote a substantial portion of their brief trying to draw parallels to the Fifth Circuit's holding in *Gulf Fishermen's Association v. NMFS*, 968 F.3d 454 (5th Cir. 2020), that case provides no guidance on the issues here. *See* Pl. Opp. 7, 13-15. In *Gulf Fishermen's Association*, the court considered the agency's claim that it was empowered to act because the MSA failed to "express Congress's unambiguous intent to foreclose the regulation of aquaculture." 968 F.3d at 461. Here, Defendants are arguing that the text of the MSA affirmatively authorizes the imposition of conservation and management measures; the requirement that vessels carry observers for the purpose of submitting important fishing information; measures that can have compliance costs that are appropriate for industry to bear when harvesting fish from a public resource; and enforcement of payment to service providers through the imposition of sanctions. *E.g.*, 16 U.S.C. §§ 1853(a)(1)(A), 1853(a)(5), 1853(b)(8), 1858(g)(1)(D). As Defendants explained in their opening brief, another district court within the First Circuit already has considered these precise issues and endorsed Defendants' position. Def. Br. 23-24 (citing *Goethel v. Pritzker*, Civ. No. 15-cv-497-JL, 2016 WL 4076831, at *3-10 (D.N.H. July 29, 2016), *aff'd*, 854 F.3d 106 (1st Cir.), *cert. denied*, 138 S. Ct. 221 (2017)).

Measures requiring the submission of fishing information via vessel monitoring system ("VMS") unit installation and use, sector, vessel, and dealer electronic reporting, and other measures requiring vessel and gear identification and configuration and vessel and crew restrictions, come with compliance costs. Def. Br. 14-15. The MSA recognizes these requirements and costs in numerous sections of the statute and requires, where practicable, minimization of costs

and adverse economic impacts on communities. *E.g.*, 16 U.S.C. § 1851(a)(7)-(8) (National Standards 7 and 8). Indeed, the guidelines associated with National Standard 7 discuss compliance costs, 50 C.F.R. § 600.340(c), and the agency's interpretation of the National Standards have been held to have persuasive authority. *Oceana v. Locke*, 831 F. Supp. 2d 95, 117 (D.D.C. 2011); *see also* Section II.D.4-5, *infra*. This explicit recognition of compliance costs, without any enumeration of the kind of costs that are included or excluded, shows a fatal flaw in Plaintiffs' argument that Congress did not grant NMFS the authority to require IFM.

Section 1858(g), which authorizes permit sanctions when an owner or operator fails to pay a contractor for observer services, also supports NMFS's position that industry may be obligated to enter into contracts and pay for observer services. *See* 16 U.S.C. § 1858(g)(1)(D). Plaintiffs attempt to dismiss this statutory provision with a single sentence, erroneously claiming that Section 1858(g)(1)(D) "merely allows the Secretary to ensure at-sea observers are paid by industry vessels *in those fisheries where Congress has provided for industry funding of observers.*" Pl. Opp. 4. Contrary to Plaintiffs' claim, Section 1858(g)(1)(D) does not refer to any specific fishery or region, nor to any of the sections of the MSA that Plaintiffs claim are the sole authority for assessing costs to the industry. *See*, *e.g.*, Pl. Opp. 6 (referencing Section 1862), 8 (referencing Section 1853a). Thus, there is no textual support for Plaintiffs' statement that Section 1858(g) applies only to specific regions and fisheries, or when using certain statutorily-available management measures. If the authority to require IFM was as narrow as Plaintiffs allege, surely Congress would have tailored it here with specific reference to the provisions on which Plaintiffs rely. But Congress did not, nor did it use the word "fee" in the text of Section 1858(g). Instead, the MSA states that if the owner or operator of a vessel fails to make "<u>any payment</u> required for observer services provided to <u>or contracted by an owner or operator</u>," NMFS can suspend, revoke, deny, or impose conditions

on, the vessel's permit. 16 U.S.C. § 1858(g)(1)(D)(i)-(iv) (emphasis added). In other words, a vessel must pay for the observer services it has contracted for as a condition of participating in the fishery. Reading the statute as a whole consistent with the "canons of construction" urged by Plaintiffs, Pl. Opp. 5, Section 1858(g)(1)(D)'s language is evidence that Congress allowed NMFS to approve FMPs and implementing regulations that require IFM.

Plaintiffs dispute that the MSA's "necessary and appropriate" clause serves as statutory authority for the IFM requirement. Pl. Opp. 7. But there is precedent for Defendants' position that the MSA's "necessary and appropriate" language confers a broad grant of authority. *See Coastal Conservation Ass'n*, 2016 WL 54911, at *4, *see also Groundfish Forum v. Ross*, 375 F. Supp. 3d 72, 83-84 (D.D.C. 2019) (the words "necessary and appropriate" are part of a "broad definition" of "conservation and management measures"). Instead of addressing relevant case law interpreting the MSA, Plaintiffs try to draw ill-fitting parallels to other cases, such as *Gulf Fishermen's Association*, which is plainly distinguishable based on its facts. *See supra*. Plaintiffs also argue incorrectly that *Michigan v. EPA*, 576 U.S. 743 (2015), is inapposite because the Court rejected EPA's reliance on "necessary and appropriate" language in the Clean Air Act as the basis for declining to consider costs. Pl. Opp. 12. Neither case vitiates the fundamental proposition that the term "necessary and appropriate" is broad authority. In fact, *Michigan v. EPA* recognizes "the capaciousness of this phrase." 576 U.S. at 752. Nor is *Ethyl Corp. v. EPA*, 51 F.3d 1053 (D.C. Cir. 1995) a good fit for Plaintiffs' arguments. There, the court found that the language of the Clean Air Act allowed EPA to consider only effects on emission standards, but not public health, when denying an application for a new fuel additive. *Id*. at 1058. The Clean Air Act's plain language did not support the agency's interpretation, nor was it a gap for the agency to fill pursuant to an explicit or implicit delegation of authority. *Id*. at 1060. That is where the difference lies with this case:

Congress indisputably granted NMFS the discretion to require observers to be carried onboard vessels, and to enforce payment to service providers for those services. 16 U.S.C. §§ 1853(a)(1)(A), 1853(b)(8), 1858(g)(1)(D). NMFS reasonably exercised the MSA's explicit and implicit delegations of authority to fill any gaps when implementing the IFM requirement.

Plaintiffs continue to argue without any basis that Congress never intended to authorize the IFM requirement because (according to them) it instead allowed industry to "pay these or analogous costs by either fees or industry funding in certain circumstances." Pl. Opp. 5 (citing Sections 1853a, 1854(d)(2)(B), and 1862).[2] As a factual matter, the Court should decline to follow Plaintiffs' approach. The statutory provisions that Plaintiffs cite do not refer to "industry funding in certain circumstances." Pl. Opp. 5. The sections they cite refer to "fees." There are critical differences between the fees that are allowed in the North Pacific Fishery as set out in Section 1862 and the cost-recovery programs that are components of limited access privilege programs ("LAPPs") as set forth in Section 1853a and 1854(d)(2)(A), as opposed to the costs of complying with the Omnibus Amendment's IFM requirement that is authorized by Sections 1853(a)(1)(A), 1853(a)(5), 1853(b)(8), 1853(b)(14), and 1858(g). *See* Section II.C.1, *infra*. Although Section 1853(b)(8) and Section 1862 were added to the statute at the same time, the statutory provisions providing the North Pacific Council with the authority to require all fishery participants to pay fees to the government for the administrative costs of monitoring do not explicitly or impliedly foreclose other Councils from requiring industry participants to carry observers on their vessels and pay service providers for the costs of that service. *See* 16 U.S.C. § 1862. For this same reason,

---

[2]   In their opening brief, Plaintiffs argued that Section 1881a was the only statutorily-authorized method for "data collection." ECF 37-1 ("Pl. Br.") at 23. Defendants previously explained that Section 1881a could not be read so as to operate to the exclusion of other methods for information collection allowed by the MSA. Def. Br. 21-22. Having failed to make any rejoinder to that argument, Plaintiffs appear to have conceded the lack of merit in their argument regarding Section 1881a.

the cost-recovery program referenced in the statutory provisions associated with LAPPs are an inapt analogy for the IFM requirement. *See* Section II.C.1, *infra*. As mentioned previously, Congress was not silent on the agency's authority to require observers and to enforce payments for those contracted services. The Court should reject Plaintiffs' argument that Congress's more detailed approach for requiring and collecting fees means that its less detailed authorization for IFM equates to Congress's silence. Congress's more detailed approach for fees addresses the requirements or restrictions of other laws, such as the Miscellaneous Receipts Statute and Anti-Deficiency Act.

Even if the Court were to equate this less-detailed authorization as silence on Defendants' authority to require industry to pay its compliance costs, it should decline to adopt Plaintiffs' conclusion nevertheless. In a challenge to a different FMP that established quotas and other management measures, the Fifth Circuit held that a statute's silence on a particular issue does not automatically mean Congress meant to exclude it "'unless it is fair to suppose that Congress considered the unnamed possibility and meant to say no to it.'" *Coastal Conservation Ass'n v. U.S. Dep't of Com.*, 846 F.3d 99, 106 (5th Cir. 2017) (quoting *Marx v. Gen. Revenue Corp.*, 568 U.S. 371, 381 (2013)). When one reads the statutory text together, as a whole, as the law requires, it is clear that no such assumption can be made here. *See Graham Cnty. Soil & Water Conservation Dist. v. U.S. ex rel. Wilson*, 559 U.S. 280, 289-90 (2010) (a statute must be read as a whole). Another court construing the exact same argument that Plaintiffs make here with respect to an IFM requirement in another fishery unambiguously rejected it. *See Goethel*, 2016 WL 4076831, at *5. In light of the MSA's expansive authorization to take action for the conservation and management of the fishery and the ample statutory support for the IFM requirement, the Court should reject Plaintiffs' arguments.

Congress expressly provided the Council broad authorization for developing and implementing conservation and management measures, including FMPs that have observer requirements. The MSA further includes provisions that make clear that industry may be required to bear the costs of those conservation and management measures, including specific reference to payment for observers. The Court plainly can find that Congress has spoken directly to this issue.

## C.    NMFS Reasonably Interpreted The MSA.

If the Court determines that Congress has not spoken directly on the issue of NMFS's authority, it should find NMFS's interpretation of the MSA to allow the Omnibus Amendment's IFM requirement is reasonable nonetheless.

### 1.    The legislative history supports the legality of the IFM requirement.

Plaintiffs first incorrectly assert that the MSA's legislative history is not relevant, but then argue that it does not support the legality of the IFM requirement in any event. Pl. Opp. 15-17. Relying on Section 1862, which added the North Pacific Fisheries Research Plan to the MSA in 1990, Plaintiffs argue that Congress granted only the North Pacific Council the authority to require fees for certain FMPs, and that the observer provision in Section 1853(b)(8) did nothing to clarify Defendants' authority to require industry to bear its costs. *Id*. at 15-16. But, as the court stated in *Goethel*, the fact that fees are addressed in Section 1862, but costs are not addressed specifically in Section 1853 "does not 'support[] a sensible inference' that the MSA forbids an FMP amendment under which industry must bear the cost of certain regulations." *See Goethel*, 2016 WL 4076831, at *6.[3] In enacting Section 1853(b)(8), Congress confirmed the authority already implicit in the MSA to require observers on domestic fishing vessels at the vessel's expense of using the observer services. *See* Comm. on Merchant Marine & Fisheries, H.R. Rep. No. 101-393

---

[3]   Plaintiffs acknowledge that Section 1862 established a system of fees, Pl. Opp. 6, but refuse to acknowledge or address the inherent difference between a fee and a cost. *See infra*.

at 28 (1989) ("[T]his subsection allows the Councils to require that observers be carried on board domestic fishing [vessels] for data collection purposes. The Committee notes that the Councils already have—and have used—such authority; the amendment makes the authority explicit.") (emphasis added). While Plaintiffs contend that this language relates only to the authority to carry observers, Pl. Opp. 15-16, the reality is that the authority also was being administered so as to require industry members to pay for their respective vessel's expenses, and the language of the committee report supports the idea that it would continue to be used in that manner. Plaintiffs' contention that Congress "explicitly continued to prohibit [this authority] everywhere else," Pl. Opp. 17, appears nowhere in the legislative history.

Indeed, Plaintiffs' blind insistence that Section 1862 operates to exclude NMFS from exercising its authority to require vessels to bear their costs of observer services stretches too far. It overlooks the difference between the fees permitted by that section for the purpose of establishing a fisheries research plan and the provisions authorizing the IFM requirement at issue in this case. Section 1862(a) allowed the Council to establish user fees (including administrative and other specified costs) to implement a fisheries research plan. The fees would be distributed fairly and equitably among all members of the fishery, even those who are not required to carry an observer, rather than placing the direct costs of carrying observers only on the vessels that carried them. *See also* 16 U.S.C. § 1862(b)(2)(B), (E), (F). This was a change from prior law, rather than placing the direct cost of carrying observers only on the vessels that carried them. S. Rep. No. 101-414, at 8, reprinted in 1990 U.S.C.C.A.N. 6276, 6283 (prior to the amendments, the North Pacific Council did not have "authority to implement an equitable funding mechanism"). Thus, while Plaintiffs selectively excerpt the phrase "fair and equitable" from Section 1862(b)(2)(B) to suggest their vessels would be given special consideration under a fee-based system such as the one used

in the North Pacific Fishery, the rest of the statutory provision does not support their interpretation.

The 1990 amendments provided the North Pacific Council an alternative to its existing observer program where industry paid for the costs of carrying observers on their vessels. In enacting Section 1862(a), Congress allowed fisheries in the North Pacific to employ a specific funding mechanism (a fee) for specific industrywide costs that would be paid to the government, and usage of the fees for those costs, while leaving NMFS discretion to require vessels to pay for costs that they incur for use of observer services in the North Pacific and other fisheries. While Plaintiffs assert that the legislative history of Section 1862 did not change the power of any other fishery or council, Pl. Opp. 16-17, that argument proves the point: the statute established a North Pacific Fishery research plan option with a fee-based system, while leaving intact other fisheries' authority to continue to require vessels to pay for their expenses.

Alternatively, Plaintiffs continue their conjecture that a LAPP is the only other statutorily-authorized means for Defendants to implement the IFM requirement. Pl. Opp. 5-7.[4] This assertion also falls flat because, as previously explained, a LAPP is a multi-faceted management program under which a person receives a federal permit for exclusive use to harvest a certain portion of the total catch allowed for a particular species, i.e., a quota-based system. 16 U.S.C. § 1802(26); *see* Def. Br. 21. When a Council elects to implement a LAPP, it must establish a cost-recovery program

---

[4]   Plaintiffs cite a single sentence from Defendants' voluminous administrative record for the proposition that Defendants approved the Omnibus Amendment and Final Rule because they "wanted to exceed the levels of funding Congress had provided for observers" and "avoid . . . the LAPPs provisions." Pl. Opp. 8, 9 (citing AR16992). The memorandum on which Plaintiffs rely actually states that the "Council is considering ways to increase monitoring in some fisheries above the baseline levels required by the Standardized Bycatch Reporting Methodology (SBRM) to assess the amount and type of catch and to reduce uncertainty around catch estimates." AR16992 (emphasis added). It further stated that "[w]e have limited funding for monitoring, so the Council would like the option to allow the fishing industry to pay its costs for additional monitoring, when federal funding is unavailable to cover industry's costs." *Id.* (emphasis added). The document is not susceptible to Plaintiffs' misinterpretation: it makes no reference whatsoever to LAPPs, much less that Defendants (or anyone else) wanted to "avoid" them. *See id.*

to collect fees, but that is just one component. 16 U.S.C. § 1854(d)(2)(A); *see id.* § 1853a. In other words, although Plaintiffs suggest that a LAPP could have been used in the Atlantic herring fishery, this is a superficial argument because a LAPP is not a stand-alone "cost recovery program." *Cf.* Pl. Opp. 8-9. Plaintiffs offer no explanation for why a LAPP, with its other attendant requirements (including but not limited to a fishing quota), was the only authorized management measure for addressing the issues required in the herring fishery.

Finally, as noted in Defendants' opening brief, Congress has amended the MSA several times since the 1990 amendments but has not acted to curtail Defendants' interpretation of the MSA. Def. Br. 20. Further, Congressional committees have expressly acknowledged that vessels in the Northeast groundfish fishery, for example, are required to bear their direct costs of monitoring through a requirement much like the one at issue here. *Id.* (listing House and Senate reports from 2015-2019, in which Congress discussed the costs to be borne by industry). But Congress has taken no action to override the agency's authority, nor to correct the agency's understanding of its authority, *id.*, even though (as Plaintiffs acknowledge) it knows how to do so. Pl. Opp. 8. Accordingly, Plaintiffs' interpretation of the legislative history cannot stand.

### 2.    NMFS reasonably considered the coverage target and costs associated with the Omnibus Amendment's IFM requirement.

Plaintiffs complain that Defendants lack a "free-standing power to charge all regulated industries fees" that are akin to a tax, and that the IFM requirement is an "intrusive imposition" that "is on dangerous ground constitutionally." Pl. Opp. 16-17. As a threshold matter, at-sea monitors simply gather data on fishing gear, tow-specific information, and biological information on retained and discarded catch, functioning consistent with reporting requirements compliance. AR17735. The *Goethel* court recognized that other statutes, such as the Clean Air Act and Clean Water Act, require industry to fund monitoring equipment. *Goethel*, 2016 WL 4076831, at *5.

There is no distinction between the requirements established pursuant to those statutes and the IFM requirement at issue in this case, thus undermining Plaintiffs' arguments.

Moreover, Plaintiffs miss the fundamental point: participation in the fishery (which allows the harvesting of a public resource) carries all kinds of costs. NMFS regulations require fishing vessels to comply with vessel configuration restrictions and notification requirements; fish with certain gear types or mesh sizes; fish in accordance with catch limits or quota limitations, or in certain areas or limited seasons; ensure the safety of the vessel before an observer may be carried on the vessel, install VMS units for monitoring vessel positions and fishing, and report catch (including bycatch) electronically. AR17739. Defendants never contended that these measures were valid because they had not been challenged: rather, the point is that gear, VMS units, and reporting catch electronically are measures required for participation in the fishery, and have associated costs.[5] Vessels pay third parties for the costs of goods or services needed to comply with these regulatory requirements, which are authorized by the MSA. AR17739. Plaintiffs protest that the IFM requirement is somehow different because at-sea monitors are an "intrusive" presence that is "akin to hiring and paying the salary of the highway patrolman who pulls you over," and

---

[5] Plaintiffs allege that, "in the case of VMS, there are challenges that are in the process of being litigated" and "[i]n many cases when actions were brought, the Government settled by paying some fishers' costs or the challenge to this intrusion has not been fully litigated." Pl. Opp. 10-11. VMS is widely used in many U.S. fisheries and authorized by the plain text of the MSA. *See* 16 U.S.C. § 1853(b)(4) (authorizing FMPs to require, among other things, "devices which may be required to facilitate enforcement"). Furthermore, although Plaintiffs' statement raises an issue that is not relevant in this lawsuit, Defendants are aware of a case (in which Plaintiffs' counsel is counsel of record) pending in the Eastern District of Louisiana that asserts a VMS requirement in two FMPs in the Gulf of Mexico is unconstitutional and seeks class certification. *Rivers End Outfitters, LLC v. U.S. Dep't of Com.*, Case No. 20-cv-2312 (E.D. La.). The parties have not yet briefed the merits, thus the case is irrelevant to the claims here. Years ago, another district court dismissed a challenge to a VMS requirement based on the statute of limitations, but that decision was reversed by the 11th Circuit and later settled. *Gulf Fishermen's Ass'n v. Gutierrez*, 484 F. Supp. 2d 1264 (M.D. Fla. 2007), *rev'd*, 529 F.3d 1321 (11th Cir. 2008). Similarly, the 14 year old law review article that Plaintiffs cite provides nothing more than academic theories about whether VMS units are constitutional. Pl. Opp. 11. Absent more, the Court should disregard Plaintiffs' statement.

accuse Defendants of failing to cite any cases that "equate[] equipment requirements with actual people." Pl. Opp. 10. Yet the IFM requirement is no different: the *Goethel* court, for example, recognized that a vessel's obligation to pay the costs of its observers is analogous to a VMS requirement. *See Goethel*, 2016 WL 4076831, at *5. Here, NMFS has determined that monitoring is necessary in the herring fishery, and industry should bear the cost of that requirement, just as industry bears the costs of these other requirements. *E.g.,* AR17739-40. This is consistent with the maxim that "[g]overnment regulation typically imposes costs on the regulated industry." *Nat'l Fed'n of Indep. Bus. v. Sebelius*, 567 U.S. 519, 652 (2012) (Scalia, J., Kennedy, J., Thomas, J., Alito, J., dissenting). Further, Plaintiffs' "highway patrolman" analogy is misplaced. *See* Pl. Opp. 10. Only persons authorized by the Secretary may carry out enforcement responsibilities. 16 U.S.C. § 1861. The Final Rule, however, explicitly states that the data collected is for the purpose of conservation and management of the fishery, "not for purposes of discovering criminal violations." AR17740. This fully counters Plaintiffs' assertions of intrusions by "actual people . . . who live on the vessel throughout the duration of a fishing trip." Pl. Opp. 10.

Plaintiffs seem to suggest that the presence of observers themselves is a constitutional violation, even though they concede elsewhere that it "is undisputed in this litigation" that observers are permissible under the MSA. Pl. Opp. 4; *see also id*. at 16. On this point, Plaintiffs' statements are clearly a sideshow. First, the Complaint contains no claim that either the observer requirement or the IFM requirement violates the Fourth Amendment of the Constitution. *See generally* ECF 1. Second, even if Plaintiffs had asserted such a claim, similar claims have been soundly rejected. Specifically, the *Goethel* court first declined to find that the presence of at-sea monitors amounts to an unconstitutional warrantless search, and then stated that even if it did,

"warrantless administrative searches of closely regulated industries [such as the fishing industry] are valid." *Goethel*, 2016 WL 4076831, at *9; *see also* AR17740.

At bottom, Plaintiffs' argument is that the costs associated with the IFM requirement are too high for them to bear. Pl. Opp. 3-4, 11. Plaintiffs assert that they will lose money when they end up not landing herring on a declared herring trip; they will pay more per trip than other members of the fleet; and they will be forced to bear almost $40,000 in costs for trips that do not land herring. Pl. Opp. 3-4. These positions were expressed during the development of the IFM requirement, *see* AR17713-15, and they were addressed. AR17743. In fact, Defendants explained in the Final Rule that Plaintiffs' cited figure of $40,000 was "highly unlikely," AR17743, and reiterated that explanation in their opening brief. Def. Br. 43. After carefully considering those comments, the Council chose not to carve out an exemption specifically for Plaintiffs' vessels or otherwise afford them special treatment. AR17743. Plaintiffs, therefore, cannot fairly describe the issue as "undisputed" nor can they seriously contend that no response was made. *See* Pl. Opp. 4.

Here, NMFS considered costs throughout its decisionmaking, from its analysis of costs in the Environmental Assessment ("EA"), to its evaluation of public comments regarding the IFM requirement. *E.g.*, AR17241-50 (providing background on economic impacts and estimating industry's cost responsibility at $710/day); AR17734 ("industry's cost responsibilities associated with a 50-percent coverage target are substantially less than those associated with higher coverage targets"); *id.* ("[c]ombined coverage targets are intended to help reduce the cost of industry-funded coverage"); AR17741 (responding to comment asserting that the IFM requirement would impose an economic burden); AR17742 (concluding that the Council's measures minimize costs to maximum extent practicable). NMFS also considered costs in the context of assessing whether the IFM requirement complied with National Standards 7 and 8. AR17315-16; AR17346; *see* Section

II.D.4-5, *infra*. NMFS considered the conservation and management benefits associated with the information that will be gathered through this monitoring requirement and the associated coverage target, and reasonably determined that it would increase the accuracy of catch estimates, including for species with incidental catch caps, thereby reducing uncertainty and leading to better management. AR17312. In doing so, NMFS satisfied its obligation to "ensure that the Council has done its job properly under the MSA and any other applicable law." *Flaherty v. Bryson*, 850 F. Supp. 2d 38, 54 (D.D.C. 2012). Plaintiffs' bald assertion that the monitoring is "not related in any way to a benefit received by the regulated industry" and that there is "no explanation" for the 50% coverage target, Pl. Opp. 17-18, is controverted throughout the administrative record. *See* Def. Br. 31. Nor is their claim that their returns-to-owner ("RTO") will be reduced by 20 percent a foregone conclusion. AR15905 (only 19% of trips by small-mesh bottom trawl vessels land more than 50 metric tons ("mt") of herring); AR17261 (the median potential reduction in RTO for small-mesh bottom trawl vessels is just 2.5%). The administrative record refutes any suggestion that NMFS failed to consider costs, alternative coverage targets, or otherwise acted in an unreasonable manner.

Finally, Plaintiffs again argue that the purpose of the IFM requirement was to "avoid the various strictures" they claim are placed on agencies, and that Defendants proceeded "despite the comments of the Plaintiffs and others." Pl. Opp. 11. Plaintiffs made these same arguments in their opening brief, ECF 37-1 ("Pl. Br.") 24, and they offer nothing new for the Court to consider.[6] As Defendants previously explained, casting Defendants' effort to comply with the law as a *de facto*

---

[6] Plaintiffs' attempt to draw an analogy between NMFS's authority to implement the IFM requirement, which plainly is granted by the MSA, and case law interpreting the Federal Trade Commission's authority under the FTC Act, is a stretch. *See* Pl. Opp. 11 n.4. The courts in those cases considered whether the FTC Act's grant of authority to order injunctive relief also impliedly authorizes an award of restitution. *E.g.*, *FTC v. AbbVie Inc*., 976 F.3d 327 (3d Cir. 2020); *FTC v. Credit Bureau Ctr*., 937 F.3d 764 (7th Cir. 2019). Those questions have no application in this case.

legal violation is a meritless argument.[7] *See* Def. Br. 22-23. Similarly, Plaintiffs have failed to identify a single comment that Defendants received but did not consider, or for which they failed to make a response. Rather, their argument appears to rest on the faulty premise that the agency could not proceed if it received comments that disagreed with the proposed decisionmaking. That is not the law. In the administrative setting, agency decisionmaking must derive from the record, possess a rational basis, and evince no mistake of law. *Lovgren v. Locke*, 701 F.3d at 32. Defendants were not required to bend to Plaintiffs' will simply because they submitted comments indicating they disagreed with the proposed decisionmaking. *See Flaherty*, 850 F. Supp. 2d at 63 ("Plaintiffs must do far more than simply show that Defendants did not take their preferred course of action."). To hold otherwise would improperly substitute the Court's judgment for that of the agency, in contravention of the APA. *See Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 42-43 (1983).

**D.      The IFM Requirement Is Consistent With The National Standards.**

Plaintiffs wrongly contend that Defendants ignored the case law on which Plaintiffs relied, and misstate Defendants' arguments regarding the IFM requirement's consistency with National Standards 1, 2, 6, 7, and 8. Pl. Opp. 18. As a threshold matter, Defendants never claimed that the National Standards "do not have the force of law." *Id.* To the contrary, in their opening brief, Defendants stated that the National Standards "constitute statutory requirements upon which legal action can be based," Def. Br. 27, and recognized that the National Standards "provide a

---

[7]   The administrative record is comprised of 17,800 pages. Plaintiffs identify <u>a single page</u> for their assertion that Defendants "simply wanted more observers than Congress authorized." Pl. Opp. 5 (citing AR13509). The only language on that page that references a desire for more monitoring states that "[t]he Councils expressed interest in monitoring above existing requirements[,]" which is an apparent reference to the New England Fishery Management Council and Mid-Atlantic Fishery Management Council, which are entirely separate entities and not parties to this case. AR13509 (emphasis added). Thus, Defendants maintain their position that there is no evidence in the administrative record to support Plaintiffs' assertion, as the statement on the single page they cite cannot be attributed to Defendants. *See* Def. Br. 41-42.

framework for the Council's analysis" through "broadly worded statements of Congressional objectives for all fishery conservation and management measures." *Nat. Res. Def. Council v. NMFS*, 71 F. Supp. 3d 35, 42 (D.D.C. 2014). Plaintiffs appear to be confused about Defendants' statement regarding the <u>advisory guidelines</u> on the National Standards that NMFS has established, which <u>the MSA states </u>"shall not have the force and effect of law." *See* Def. Br. 28 (quoting 16 U.S.C. § 1851(b)).

Further, Defendants expressly addressed the case law cited by Plaintiffs, starting with a thorough explanation of Plaintiffs' improper reliance on *Western Sea Fishing Co. v. Locke*, 722 F. Supp. 2d 126 (D. Mass. 2010). *See* Def. Br. 28-29. And while Plaintiffs allege that they relied on *Hadaja, Inc. v. Evans*, 263 F. Supp. 2d 346 (D.R.I. 2003), in support of their argument that Defendants failed to comply with National Standard 2, their own brief shows <u>no</u> reference to *Hadaja* in their single paragraph National Standard 2 argument. *See* Pl. Br. 31. Defendants, however, spent more than three pages of their brief explaining how the Omnibus Amendment and the Final Rule are based on the best scientific information available, as required by National Standard 2, Def. Br. 30-34, to which Plaintiffs have failed to respond.

Plaintiffs' remaining arguments in support of their National Standards claims are equally deficient. Plaintiffs cite no new case law, make no new arguments, refer to the same portions of the administrative record, and otherwise fail to meaningfully address Defendants' points. Pl. Opp. 19-22. Defendants fulsomely addressed Plaintiffs' claims in their opening brief, and briefly reiterate several key issues as set forth below.

### 1.    National Standard 1

Plaintiffs' entire argument rests on their assertion that the herring stock was not overfished when the Omnibus Amendment and Final Rule were approved and, therefore, the monitoring

program that they implemented was not necessary to prevent overfishing. As Defendants explained in their opening brief, the then not-overfished status of the Atlantic herring fishery is not a prerequisite to whether the IFM requirement is consistent with National Standard 1. AR17210, AR17251; *see* Def. Br. 28-30. Rather, National Standard 1 is directed at preventing <u>and</u> ending overfishing. 16 U.S.C. § 1851(a)(1).[8]

To rebut this, Plaintiffs argue that it is "undisputed" that their "method of fishing takes in less of the herring stock than other vessels[.]" Pl. Opp. 19. But when Plaintiffs made these same comments during the notice and comment period on the Final Rule, NMFS noted the Council's concern that Plaintiffs' vessels had "the potential for a relatively high herring catches per trip" which "warranted additional monitoring." AR17743. Similarly, Plaintiffs' contention that they will bear "a disproportionate share of the at-sea monitors' costs," Pl. Opp. 19, is based on the faulty premise that National Standard 1 demands elimination of vessel costs. There is no legal support for such an interpretation: National Standard 1 requires only "balancing the various interests that comprise the greatest overall benefits to the Nation." 50 C.F.R. § 600.310(b)(2)(ii). Here, the "various interests" were balanced in favor of additional monitoring as outlined in the Omnibus Amendment and Final Rule. AR17734; AR17742; AR17747; *see* AR17257-58. Nor can Plaintiffs' outdated and cherry-picked statistics from a six-month period in 2014-2015 serve to undercut

---

[8]    Plaintiffs make a number of incorrect factual statements, not all of which are relevant to this Court's decisionmaking, For example, Plaintiffs repeatedly state that "Atlantic herring stocks <u>are</u> neither endangered nor overfished." Pl. Opp. 2 (emphasis added); *see id*. 19. The herring stock was not overfished at the time of the decisionmaking challenged in this case and Defendants acknowledge, as they must, that the Court should evaluate whether the agency's decisionmaking was arbitrary and capricious based on the facts before it at that time. *Vt. Yankee Nuclear Power Corp. v. Nat. Res. Def. Council*, 435 U.S. 519, 549 (1978). Yet to the extent that Plaintiffs' statement is meant to imply that the herring stock enjoys the same status as when the Omnibus Amendment and Final Rule were finalized, that is no longer the case. According to a June 2020 stock assessment, Atlantic herring are now overfished. *See* https://www.fisheries.noaa.gov/species/atlantic-herring#industry-fundedmonitoring (last visited Feb. 11, 2021).

Defendants' conclusions.[9] Their narrowly-selected figures provide no predictive insight for future assignments, a fact that Plaintiffs do not refute.

### 2.    National Standard 2

Defendants already have addressed Plaintiffs' allegations that they will bear a disproportionate share of costs associated with the IFM requirement, *see* Section II.D.1, *supra*, and do not address it further here. Furthermore, the administrative record disproves Plaintiffs' statement that "no other proposal was made except a per day herring catch that was proposed and rejected." Pl. Opp. 20. The Final Rule expressly states that alternative coverage waivers were considered "for trips when landings would be less than 20-percent herring or less than 50 mt of herring per day." AR17743 (emphasis added). Plaintiffs' own proposal to grant their vessels a special exemption because of their unique fishing style also was considered, but rejected by the Council, as explained for the reasons stated in the Final Rule. *Id.*; *see also* Section II.D.1, *supra*.

The Omnibus Amendment and Final Rule were "diligently researched and based on sound science," as required by National Standard 2. *Massachusetts v. Pritzker*, 10 F. Supp. 3d 208, 217 (D. Mass. 2014) (quoting *Flaherty*, 850 F. Supp. 2d at 61). Plaintiffs fail to identify any scientific or economic information that Defendants did not consider. For the reasons stated here and in Defendants' opening brief, the Court should reject Plaintiffs' claim that the Omnibus Amendment and Final Rule are inconsistent with National Standard 2. *See* Def. Br. 30-34.

### 3.    National Standard 6

As stated in Defendants' opening brief, the Omnibus Amendment and Final Rule comply

---

[9]    Plaintiffs alternatively allege that they "currently bear disproportionate regulatory cost of observers[,]" Pl. Opp. 20 (emphasis added), but there is no record support for this assertion, nor do Plaintiffs cite any. The only data that is in the administrative record is the data that Plaintiffs' "sister company" submitted from a six-month period in 2014-15.

with the mandate in National Standard 6 that conservation and management "take into account and allow for variations among, and contingencies in, fisheries, fishery resources, and catches." 16 U.S.C. § 1851(a)(6); *see* Def. Br. 34-35. Participating vessels have multiple options to comply with the IFM requirement in a flexible manner, and the Final Rule explains the built-in review process scheduled for two years after implementation. AR17734-37. Compliance with National Standard 6 does not require Defendants to "finely attune [their] regulations to each and every fishing vessel in [a] fishery," *Ace Lobster v. Evans*, 165 F. Supp. 2d 148, 182 (D.R.I. 2001), as Plaintiffs seemingly now acknowledge. *See* Pl. Opp. 21 ("under the national standards Defendants may not have to account for individual fishing methods…"). The Court should reject this claim.

### 4.    National Standard 7

National Standard 7 requires conservation and management measures to minimize costs and avoid unnecessary duplication, where practicable. 16 U.S.C. § 1851(a)(7). The plain language of National Standard 7 makes clear that measures that impose costs are permissible, and requires only that they be minimized to the extent practicable. *See id*. As Defendants explained at length in their opening brief, the Omnibus Amendment and Final Rule comply with this mandate through the 50% coverage target and multiple options for reducing IFM costs through exemptions for trips that land less than 50 mt of herring,[10] and the EFP requirement. *See* Def. Br. 35-37. Plaintiffs' statement that they are burdened "for no good regulatory reason" is specious. Pl. Opp. 21. Plaintiffs have failed to address any of Defendants' arguments, thus the Court should reject Plaintiffs' claim.

---

[10]   Plaintiffs also repeatedly state that they are unlikely to be able to take advantage of the waiver of the IFM requirement for vessels "taking less than 50,000 pounds of herring per day." Pl. Opp. 3 (emphasis added). Plaintiffs' stated figures are wrong. The waiver to which Plaintiffs refer is for vessels taking less than 50 metric tons of herring, AR17735, which is more than 110,000 pounds.

### 5.     National Standard 8

There is no merit to Plaintiffs' argument that the Omnibus Amendment and Final Rule do not comply with National Standard 8. As set forth at length in Defendants' opening brief, NMFS fully explained the conservation value associated with additional monitoring, which is expected to reduce uncertainty around catch estimates in the herring fishery, and help improve the tracking of catch against catch limits. Def. Br. 37-39; AR17316. This, in turn, will help improve management of the fishery. *Id.*; *see also* AR17742; AR17789-90. NMFS acknowledged that the IFM requirement may have a substantial impact on participants in the herring fishery, and outlined in the Final Rule the measures that minimize the adverse impacts. AR17742. Plaintiffs make no rejoinder to these points. *See* Pl. Opp. 22.

Instead, Plaintiffs make a local appeal by characterizing themselves as "Rhode Island fishers" and "two vessels out of Rhode Island." Pl. Opp. 6, 22. But there is no support in the administrative record for Plaintiffs' innuendo that the IFM requirement is directed in any way toward favoring vessels with a home port in one state over another. First, the issues presented in this case have a broad scope and a regional impact that extend beyond Rhode Island as evidenced by pending litigation brought by vessel owners with their home port in New Jersey. *See generally* ECF 10-1; AR17161-62 (explaining numbers of vessels with Category A or B permits and listing their home ports). Second, National Standard 4 states that conservation and management measures shall not discriminate between residents of different States. 16 U.S.C. § 1851(a)(4). The Complaint, however, contains no claim by Plaintiffs that the IFM requirement operates to disadvantage them based on their state of residence.

The statutory text and implementing regulations of National Standard 8 make clear that Congress intended that "conservation efforts remain the Secretary's priority, and that a focus on

the economic consequences of regulations not subordinate this principal goal of the MSA." *N.C. Fisheries Ass'n v. Gutierrez*, 518 F. Supp. 2d 62, 91-92 (D.D.C. 2007). The IFM requirement is consistent with this principal goal and, therefore, National Standard 8.

### E. Defendants Complied With The Regulatory Flexibility Act.

The Regulatory Flexibility Act ("RFA") requires an agency to make a "reasonable, good-faith effort," prior to the issuance of a final rule, to inform the public about potential adverse effects of an agency's proposals and less harmful alternatives. *Associated Fisheries*, 127 F.3d at 114. Sections 603 and 604 of the statute establish the explanations and considerations that an initial regulatory flexibility analysis ("IRFA") and a final regulatory flexibility analysis ("FRFA") "shall contain." 5 U.S.C. §§ 603(b), 604(a). Here, NMFS's analyses addressed the economic impact from the omnibus measures and the herring measures, leaving no doubt that Defendants complied with these requirements and satisfied their statutory obligations. AR17339, AR17341-46; AR17744-47. As to the herring measures, the IRFA and FRFA track, subsection by subsection, what Congress by statute required an agency to provide in each, 5 U.S.C. §§ 603(a), 604(a), a fact that Plaintiffs do not (and cannot) dispute. Pl. Opp. 22-23. This is fatal to Plaintiffs' RFA claim. *N.C. Fisheries*, 518 F. Supp. 2d at 96.

Plaintiffs continue to argue that the alternatives they proposed were not addressed, including not adopting any monitoring at all and exempting their vessels so as to accommodate their unique style of fishing. Pl. Opp. 22. This assertion cannot be squared with the administrative record. Throughout the EA, the possibility of not implementing any IFM requirement was considered. *E.g.*, AR17008, AR17012, AR17047-49, AR17075-78, AR17177-78. Further, as previously explained, Defendants specifically addressed Plaintiffs' requests for a special exemption for their vessels. AR17743.

Defendants' RFA analyses considered the economic impacts on small entities that could result from the herring measures and described the steps taken to minimize those impacts on small entities as required by the statute. AR17341-46; AR17744-45. The FRFA also addressed the potential impacts associated with other considered alternatives. AR17746-47. Defendants gave attention to the impacts the proposed actions would have on small entities; disclosed the alternatives that were considered to lessen those impacts; considered public comments; and stated the basis for the final decision. *Associated Fisheries*, 127 F.3d at 116. Nothing more was required to comply with the RFA, and judgment should be entered for Defendants on this claim.

**F.      The IFM Requirement Does Not Force Plaintiffs Into A Market.**

As previously explained, Plaintiffs' argument that the IFM requirement forces them into a market they do not wish to join has no factual or legal support. Def. Br. 39-41. In response, Plaintiffs continue their refrain that the IFM requirement is not statutorily authorized, citing *National Federation of Independent Businesses*. Pl. Opp. 23-24. Their arguments are unpersuasive. The Omnibus Amendment and Final Rule do not compel Plaintiffs to engage in commerce: participation in the fishery is voluntary. AR17740. Conversely, neither the Omnibus Amendment nor the Final Rule prevent Plaintiffs from participating in the herring fishery. *Cf.* Pl. Opp. 2. Rather, they set conditions on vessels' participation, and if Plaintiffs choose to participate, then they are obliged to carry an at-sea monitor on board their vessels when an IFM monitor is assigned on a declared herring trip, if they choose to attempt to catch 50 mt or more of herring. *See* Def. Br. 40.

For the first time, Plaintiffs seem to argue that the IFM requirement constitutes a tax. Pl. Opp. 24. This half-hearted, single-sentence, belated argument has no merit. The "essential feature of any tax: [is that] [i]t produces at least some revenue for the [g]overnment." *Nat'l Fed'n of Indep. Bus.*, 567 U.S. at 564 (citation omitted); *see* Black's Law Dictionary (11th ed. 2019) ("tax" is "a

charge, usu[ally] monetary, imposed by the government on persons, entities, transactions, or property to yield public revenue") (emphasis added). The IFM requirement bears none of these hallmarks: it generates no revenue for NMFS. AR17740; AR17772. Monitors are employed by private companies who apply to NMFS to participate as service providers and are paid directly by participating vessels. *Id*. NMFS receives no payment from the vessels related to IFM, thus any payments are not "for the use" of NMFS or any other federal agency.

Plaintiffs also misstate Defendants' response to their reliance on *Anglers Conservation Network v. Pritzker*, 139 F. Supp. 3d 102 (D.D.C. 2015). This case is plainly distinguishable for the reasons stated in Defendants' opening brief. Def. Br. 41-42. Further, as Defendants noted, Plaintiffs vaguely referred to estoppel in their opening brief, but continue to fail to cite any case law or the relevant legal standard they would seek to have the Court apply. *See* Def. Br. 41 n.18. Based on these fundamental failures, the Court should disregard their argument.

Finally, Plaintiffs previously suggested that there were procedural irregularities in Defendants' review process for the Omnibus Amendment and Final Rule. Pl. Br. 28. In their opening brief, Defendants explained at length that the Omnibus Amendment and implementing regulations were approved pursuant to the procedures established by the MSA, demonstrating that there is no merit to these allegations. Def. Br. 24-27. Plaintiffs' opposition brief neither responded to nor refuted Defendants' points. In the absence of any pertinent legal authority, the Court should reject Plaintiffs' argument that there were procedural infirmities.

## III.    CONCLUSION

Plaintiffs have failed to carry their burden in challenging the Omnibus Amendment and Final Rule. The Court should deny their motion for summary judgment and enter judgment for Defendants.

Dated: February 12, 2021            Respectfully submitted,

JEAN E. WILLIAMS,
Acting Assistant Attorney General
SETH M. BARSKY, Chief
MEREDITH L. FLAX, Assistant Chief

/s/ Alison C. Finnegan
Alison C. Finnegan, Senior Trial Attorney
(Pennsylvania Bar No. 88519)
U.S. Department of Justice
Environment & Natural Resources Division
Wildlife & Marine Resources Section
Ben Franklin Station, P.O. Box 7611
Washington, D.C. 20044-7611
Tel: (202) 305-0500; Fax: (202) 305-0275
alison.c.finnegan@usdoj.gov

/s/ Kristine S. Tardiff
Kristine S. Tardiff
(New Hampshire Bar No. 10058)
United States Department of Justice
Environment & Natural Resources Division
Natural Resources Section
53 Pleasant Street, 4th Floor
Concord, NH 03301
Tel: (603) 230-2583; Fax (603) 225-1577
kristine.tardiff@usdoj.gov

Attorneys for Defendants

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on February 12, 2021, I electronically filed the foregoing Reply Memorandum of Law in Support of Defendants' Cross-Motion for Summary Judgment with the Clerk of Court using the CM/ECF system, which will send electronic notification of such filing to all counsel of record.

   /s/ Alison C. Finnegan     