# United States Court of Appeals
## For the First Circuit

———————————————

No. 21-1886

RELENTLESS, INC.; HUNTRESS, INC.; SEAFREEZE FLEET LLC,

Plaintiffs, Appellants,

v.

UNITED STATES DEPARTMENT OF COMMERCE; GINA M. RAIMONDO, in her
official capacity as Secretary of Commerce; NATIONAL OCEANIC AND
ATMOSPHERIC ADMINISTRATION; RICHARD SPINRAD, in his official
capacity as Administrator of NOAA; NATIONAL MARINE FISHERIES
SERVICE, a/k/a NOAA Fisheries; JANET COIT, in her official
capacity as Assistant Administrator for NOAA Fisheries,

Defendants, Appellees.

———————————————

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

Hon. William E. Smith, U.S. District Judge

———————————————

Before

Kayatta, Lipez, and Thompson,
Circuit Judges.

———————————————

John J. Vecchione, with whom New Civil Liberties Alliance was
on brief, for appellants.
Dina B. Mishra, with whom Todd Kim, Assistant Attorney
General, Alison C. Finnegan, Daniel Halanien, Environment &
Natural Resources Division, U.S. Department of Justice, and Mitch
MacDonald, Office of General Counsel, National Oceanic &
Atmospheric Administration, were on brief, for appellees.

---

March 16, 2023

---

**KAYATTA**, **Circuit Judge**.  Charged with promoting the sustainability of the nation's fisheries, the National Marine Fisheries Service requires vessels fishing for herring on certain fishing trips to carry monitors on board.  Although the government trains and certifies these monitors, it does not always pay them for their work.  Instead, the vessel owners must procure and pay for certain monitors by contracting with private entities.  Owners of two fishing vessels that harvest herring -- plaintiffs Relentless Inc., Huntress Inc., and Seafreeze Fleet LLC -- challenge the agency's authority to promulgate this requirement.  The district court granted summary judgment for the government, reasoning that the rule is a permissible exercise of agency authority under the statute governing fishery stocks and conservation, that its promulgation followed proper procedures, and that it does not violate the Constitution.  On appeal, plaintiffs renew their attacks.  Because we agree with the district court that the rule is a permissible exercise of the agency's authority and is otherwise lawful, we affirm.  Our reasoning follows.

**I.**

**A.**

Atlantic herring fishing is regulated under the Magnuson-Stevens Fishery Conservation and Management Act (the "MSA"), which was enacted to respond to the threat of overfishing

and to promote conservation. 16 U.S.C. §§ 1801 et seq. The MSA established eight regional councils that manage the various "fisheries" (defined as "one or more stocks of fish which can be treated as a unit") in their respective regions. Id. §§ 1802(13)(A), 1852(a). The councils accomplish this task primarily by promulgating fishery management plans, which specify the conservation measures "necessary and appropriate" to prevent overfishing, to protect fish stocks, and to promote the sustainability of each fishery. Id. §§ 1852-1853. The MSA sets out elements that fishery management plans shall include, such as a description of the fishery and the optimal yield for the fishery, id. § 1853(a), as well as several elements that plans may include, such as requirements that vessels subject to the plan obtain permits, id. § 1853(b). Fishery management plans must also comply with ten "National Standards" set out in the MSA that identify broad goals and priorities such as minimizing cost, taking communities into account, prioritizing efficiency, and using the best scientific information available. Id. § 1851(a).

    The Secretary of Commerce is tasked with reviewing each fishery management plan or amendment and publishing it along with implementing regulations for notice and comment. Id. § 1854(a)-(b). The Secretary has delegated these responsibilities to the National Marine Fisheries Service (NMFS or the "Agency"), a division of the National Oceanic and Atmospheric Administration

- 4 -

(NOAA).   Regional councils submit plans and amendments to NMFS, which publishes them for notice and comment while undertaking its own review to ensure that the plans are consistent with the MSA, its National Standards, and "any other applicable law."   Id. § 1854(a)(1).   The Agency must then approve, disapprove, or partially approve the plan or amendment.   Id. § 1854(a)(3).   Once a plan or amendment is approved, the Agency works with the regional council and completes a notice and comment procedure to issue implementing regulations.   Id. § 1854(b).

**B.**

The New England Fishery Management Council ("New England Council") regulates fisheries in the Atlantic Ocean seaward of Maine, New Hampshire, Massachusetts, Rhode Island, and Connecticut.   Id. § 1852(a)(1)(A).   This includes the Atlantic herring fishery.   The New England Council implemented the current fishery management plan for Atlantic herring in 2000.   The plan includes an annual catch limit and restrictions on the location and timing of herring fishing.   50 C.F.R. § 648.200.   The Atlantic herring fishery is subject to monitoring, including by government-funded observers using Standardized Bycatch Reporting Methodology

(SBRM) to measure bycatch (fish unintentionally caught) on fishing trips.[1]  Id. § 648.11(m).

In 2013, the New England Council began a process to provide for the use of industry-funded monitoring to reduce uncertainty around catch estimates.  In 2017, the Council approved an Omnibus Amendment, which both provided general guidelines for industry-funded monitoring in all of its fishery management plans and specifically provided for the owners of herring vessels to bear the expense of contracting for some of the monitors engaged on their vessels.  Magnuson-Stevens Fishery Conservation and Management Act Provisions; Fisheries of the Northeastern United States; Industry-Funded Monitoring, 85 Fed. Reg. 7414, 7414 (Feb. 7, 2020).  The Agency approved the amendment in 2018.  It published the final rule implementing the amendment and the

---

[1]  The MSA requires that all fishery management plans "establish a standardized reporting methodology to assess the amount and type of bycatch occurring in the fishery."  16 U.S.C. § 1853(a)(11).  The New England Council, along with the Mid-Atlantic Council, developed an SBRM omnibus amendment in 2015 that implements this requirement.  Magnuson-Stevens Fishery Conservation and Management Act Provisions; Fisheries of the Northeastern United States; Standardized Bycatch Reporting Methodology Omnibus Amendment, 80 Fed. Reg. 37,182 (June 30, 2015); 50 C.F.R. § 648.18.  The methodology in that omnibus amendment, which is primarily implemented through the Northeast Fisheries Observer Program placement of observers on vessels, applies to several fisheries, including the herring fishery.  50 C.F.R. § 648.18.  Although the SBRM has been heavily litigated, see Oceana, Inc. v. Ross, 920 F.3d 855, 859-60 (D.C. Cir. 2019), it is not at issue in this appeal.

industry-funded monitoring program for the herring fishery in 2020. 85 Fed. Reg. at 7414.

The rule implementing industry-funded monitoring for the herring fishery (the "Final Rule" or "Rule") does not require monitors on all vessels. Rather, it sets a target percentage (50%) of herring trips to be monitored. Id. at 7417. Observer coverage required under the SBRM program, which is fully paid for by the government, counts toward this target. Additional monitoring, up to a target of 50%, is covered by industry-funded monitoring (so if SBRM observers are placed on 10% of trips, industry would be asked to pay for monitoring on an additional 40% of trips). Id. The Rule requires the Council to reexamine the monitoring coverage targets after two years to consider the results of increased monitoring, if any, and determine whether to make adjustments. 50 C.F.R. § 648.11(m)(1)(ii)(F). The government bears the administrative expenses associated with the program, including the training and certification of monitors. 85 Fed. Reg. at 7415.

The Rule specifies how industry-funded monitoring will work in practice. Vessels must "declare into" a fishery before beginning a fishing trip, meaning they contact NMFS and announce the species of fish they intend to harvest. 50 C.F.R. § 648.11(m)(2). When a vessel declares into the herring fishery, the Agency then informs it whether a monitor will be required for that trip. Id. § 648.11(m)(3). Trips may receive a waiver of the

monitor requirement under several circumstances: if a monitor is not available, if the vessel is carrying certain fishing gear only and does not intend to carry fish, or if the vessel intends to catch less than 50 metric tons of herring on the trip.  Id. § 648.11(m)(1)(ii)(D)-(E), (4)(ii).  Vessels using certain types of gear are exempt from the requirement to carry a monitor altogether if they use electronic monitoring and portside sampling instead.  Id. § 648.11(m)(1)(iii).

When a nonexempt vessel that does not meet the criteria for a waiver declares into the herring fishery, the Agency will inform the vessel whether it needs to carry a monitor for that trip.  If so, the vessel must contact one of the private entities that provide certified monitors, and pay that entity its resulting fees and expenses.  Id. § 648.11(m)(4).  If the vessel cannot find a monitor after contacting all available providers, it may ask for a waiver.  Id.

The precise cost of the industry-funded monitoring program to vessels participating in the herring fishery is unclear. In its notice publishing the Final Rule, the Agency cautioned that "the economic impact of industry-funded monitoring coverage on the herring fishery is difficult to estimate," because it would vary with "sampling costs, fishing effort, SBRM coverage, price of herring, and participation in other fisheries."  85 Fed. Reg. at 7420.  The agency also noted that the Environmental Assessment

- 8 -

estimated "industry's cost for at-sea monitoring coverage at $710 per day," although this figure would "largely depend on negotiated costs between vessels and monitoring service providers." Id. The Agency further acknowledged that the Rule could reduce vessel returns-to-owner (gross profits minus fixed and operational costs) by around 20%. In total, the New England Council recognized in its amendment adopting the herring plan that "the impacts of [the Rule] on fishery-related businesses and human communities are negative and result from reductions in returns-to-owner."

### C.

Plaintiffs participate in the herring fishery using small-mesh bottom trawl gear. They also participate in the mackerel, butterfish, and squid fisheries. Able to freeze fish at sea, their vessels make longer trips, but also have less processing capacity per day (125,000 pounds of fish per day, they state, which equals approximately 57 metric tons) and higher overhead costs than other herring vessels. Plaintiffs' style of fishing also means that they can choose what to catch at sea, so they often declare into multiple fisheries before leaving the dock in order to catch whatever they encounter on the trip.

Plaintiffs assert that due to their unique fishing style, they are disproportionately burdened by carrying monitors, because they make longer trips (during which they may not even

catch herring) and therefore need to pay a monitor for more days at sea. They also claim that they cannot avail themselves of any of the exceptions to having to carry monitors under the Rule because of their style of fishing. In particular, they focus on the exemption for trips taking less than 50 metric tons of herring. While most herring trips only last 2-4 days, the vessels claim, their trips last 10-14 days. So although they may catch less than 50 metric tons of herring every 2-4 days, they might catch far more herring in a single trip, and thus cannot use the exemption that is available for shorter trips despite having a similar catch per day.

Plaintiffs therefore have a strong incentive to challenge the Rule. They argue that it is not authorized by the MSA, is arbitrary and capricious in violation of the Administrative Procedure Act (APA), violates the National Standards set forth in the MSA, violates the Regulatory Flexibility Act ("RFA"), and violates the Commerce Clause. Defendants (the Agency, along with the Secretary of Commerce, NOAA, and the Administrators of the Agency) disagree on all counts.

The district court granted summary judgment for the Agency. The court found that the MSA is ambiguous regarding authorization for industry-paid monitors, and that under Chevron U.S.A., Inc. v. National Resources Defense Council, Inc., 467 U.S. 837 (1984), the Agency's interpretation is entitled to deference.

It further found that the Rule does not violate any of the National Standards found in the MSA, and also does not violate the RFA because the Agency issued a regulatory flexibility analysis that indicates it considered plaintiffs' concerns, satisfying the statute's procedural requirements.[2]  Finally, the court found that the Rule does not violate the Commerce Clause, because it does not force plaintiffs to enter the market for monitors.

## II.

We review the district court's grant of summary judgment de novo.  Lovgren v. Locke, 701 F.3d 5, 20 (1st Cir. 2012). Judicial review of agency actions under the MSA is governed by the APA.  Id.; 16 U.S.C. § 1855(f).  We may set aside an agency action only if it is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law."  Lovgren, 701 F.3d at 20 (quoting 5 U.S.C. § 706(2)(A)).  Our review is limited to the administrative record.  Id.

At issue here, principally, is the interpretation of the MSA.  Plaintiffs challenge the Agency's authoritative interpretation of the statute as granting it the power to enact the Rule.  In considering such a challenge, we employ "the familiar Chevron two-step analysis."  Bais Yaakov of Spring Valley v. ACT,

---

[2]  The district court also found that the Rule did not violate the APA because the comment periods for an amendment and its implementing rule overlapped.  Plaintiffs do not challenge this finding on appeal.

<u>Inc.</u>, 12 F.4th 81, 86 (1st Cir. 2021). "First, always, is the question whether Congress has directly spoken to the precise question at issue. If the intent of Congress is clear, that is the end of the matter . . . ." <u>Id.</u> (quoting <u>Chevron</u>, 467 U.S. at 842). Second, "[i]f the statute is silent or ambiguous with respect to the specific issue, the question for the court is whether the agency's answer is based on a permissible construction of the statute." <u>Bais Yaakov</u>, 12 F.4th at 86 (quoting <u>Chevron</u>, 467 U.S. at 843).

In determining whether a statute has clearly spoken to the question at issue, we "apply the 'ordinary tools of statutory construction.'" <u>Flock</u> v. <u>U.S. Dep't of Transp.</u>, 840 F.3d 49, 55 (1st Cir. 2016) (quoting <u>City of Arlington</u> v. <u>FCC</u>, 569 U.S. 290, 296 (2013)). Further, "a reviewing court should not confine itself to examining a particular statutory provision in isolation." <u>Nat'l Ass'n of Home Builders</u> v. <u>Defs. of Wildlife</u>, 551 U.S. 644, 666 (2007) (quoting <u>FDA</u> v. <u>Brown & Williamson Tobacco Corp.</u>, 529 U.S. 120, 132 (2000)). Rather, "the words of a statute must be read in their context and with a view to their place in the overall statutory scheme." <u>Id.</u> (quoting <u>Brown & Williamson</u>, 529 U.S. at 132-33). If, after using these tools, we find that there is still relevant ambiguity, "we typically interpret it as granting the agency leeway to enact rules that are reasonable in light of the

text, nature, and purpose of the statute." <u>Cuozzo Speed Techs.</u> v. <u>Lee</u>, 579 U.S. 261, 277 (2016).

With these principles in mind, we turn to plaintiffs' challenges to the Agency's authority under the MSA to promulgate the Rule. Plaintiffs argue generally that the MSA does not authorize the Rule, and specifically that other provisions of the MSA establishing fee programs make clear that the Agency has no authority to require industry-funded monitoring in this instance. They further argue that the legislative history and definitions in the MSA support their position.

### A.

Plaintiffs' primary contention is that the MSA does not authorize industry-funded monitoring and that the Agency therefore exceeded its statutory authority in promulgating the Rule. This argument faces an uphill textual climb. Congress expressly provided that fishery management plans may "require that one or more observers be carried on board a vessel of the United States engaged in fishing for species that are subject to the plan, for the purpose of collecting data necessary for the conservation and management of the fishery." 16 U.S.C. § 1853(b)(8).

But, say plaintiffs, "at-sea monitors" -- as the term is used in the industry-funded monitoring program -- are something entirely different than the "observers" authorized by section 1853(b)(8). We disagree. The statutory definition of

"observers" in the MSA is quite broad and includes "any person required or authorized to be carried on a vessel for conservation and management purposes by regulations or permits under this [Act]." 16 U.S.C. § 1802(31). This certainly includes at-sea monitors, who are authorized by regulation to be carried on a vessel to collect data for conservation purposes. 50 C.F.R. § 648.11(m)(1)(i) (requiring at-sea monitors to be carried on Atlantic herring vessels); id. § 648.2 (defining "observer or monitor" as "any person authorized by NMFS to collect . . . operational fishing data [or] biological data . . . for conservation and management purposes"). The narrow differentiation in the notice promulgating the Final Rule, which at one point notes that at-sea monitors, "in contrast to observers," would not collect whole specimens, 85 Fed. Reg. at 7418, does not mean that at-sea monitors do not form a subset of "observers." Rather, it simply acknowledges that the set of observers is broader than that subset. In short, the MSA explicitly provides for the placement of at-sea monitors on fishing vessels.

Plaintiffs are thus left to argue that Congress somehow conditioned the Agency's right to require monitors on the Agency paying for the cost of the monitors. And this is indeed plaintiffs' most prominently presented argument: Because the statute, they contend, contains no language allowing the Agency to

force plaintiffs to pay for those monitors, the Agency lacks the authority to require any such payments (meaning there will be no monitors on board unless the government pays for the monitors). There are two defects with this argument.

**1.**

First, the "default norm" as "manifest without express statement in literally hundreds of regulations, is that the government does not reimburse regulated entities for the cost of complying with properly enacted regulations, at least short of a taking. If this statute needs clarification on this point, then so too do hundreds of others." Goethel v. U.S. Dep't of Com., 854 F.3d 106, 117–18 (1st Cir. 2017) (Kayatta, J., concurring). When Congress says that an agency may require a business to do "X," and is silent as to who pays for "X," one expects that the regulated parties will cover the cost of "X."

Plaintiffs insist that the requirement to pay for a monitor does not fall into this default norm because it is not a "traditional regulatory cost" and differs from an ordinary instance of requiring a regulated party to bear its own costs. The daily salary of a monitor, they assert, differs from the cost inflicted by other regulatory requirements, such as those mandating permits or particular fishing equipment, in both type (because it pays for a credentialed individual, rather than a thing or a piece of gear) and degree (because it is larger). Moreover,

they argue, the compliance cost the MSA inflicts (and that the Agency should try to reduce per the statute) is represented by the room fishers make available on their vessels to physically host observers -- something far short of paying an at-sea monitor's salary.

To a regulated party, paying the expenses of a credentialed at-sea monitor may well seem different than paying, for example, a vendor who provides fishing gear mandated by a regulation,[3] or for an EPA-required scrubber or monitoring device on a smoke stack.[4] But plaintiffs offer no authority indicating that these differences are material to the question of who pays. To the extent they also argue that the monitors present a different type of costs because they are "federal officers," we disagree. See infra, Section II.B. We therefore see no reason why the default rule does not apply: When Congress expressly authorized

---

[3] See 16 U.S.C. § 1853(b)(4) (allowing fishery management plans to "prohibit, limit, condition, or require the use of specified types and quantities of fishing gear"); 50 C.F.R. § 622.188 (requiring certain types of gear in order to possess South Atlantic snapper-grouper).

[4] See 42 U.S.C. § 7412(d)(2) (requiring EPA to promulgate standards "requir[ing] the maximum degree of reduction in emissions of the hazardous air pollutants subject to this section"); 40 C.F.R. § 61.122 (defining emission standard from kilns at elemental phosphorous plants, and noting that compliance will be shown if certain scrubbers are installed and operated); id. § 61.126 (requiring owner or operator of source "using a wet-scrubbing emission control device" to "install, calibrate, maintain, and operate a monitoring device").

plans promulgated under the MSA to require vessels to carry an observer, it presumed that the vessels' owners would bear the cost of compliance, much like an SEC requirement to submit independently audited financials imposes on the regulated entity the cost of paying an independent accountant.  See 15 U.S.C. § 77aa(25)-(27).

Nor are we persuaded that the cost of an at-sea monitor is different than other compliance costs because it may be greater than fees imposed elsewhere in the statute.  The vessels decry that they may be subject to costs of up to 20% of returns-to-owner, while in other fishery programs, fees for observers are capped at 2% or 3%.  But the fact that costs of complying with one regulatory requirement are greater than the costs of complying with another regulatory requirement does not mean that the former is unlawful.[5]  Nor do we have here any costs that are so great as to cause us to think that Congress without so stating did not presume that they would be borne by the regulated entities.

---

[5]  It is not clear that the plaintiffs will face a 20% reduction in their returns-to-owner.  The Final Rule states that the monitoring program "has the potential to reduce annual [returns-to-owner] . . . up to 20 percent."  But that figure represents an estimate across all types of fishing equipment; the New England Council's Omnibus Amendment shows that for small-mesh bottom trawl vessels, the type of gear Relentless uses, median returns to owner were expected to be reduced only by 5.4%.  Applied only to vessels that take more than 50 metric tons of herring per trip, returns to owner could be reduced even less, by a median of 2.5%.

## 2.

Adding belt to suspenders, the government points out that the statutory support for its position need not rely only on the implication raised by the default norm. Section 1858(g)(1)(D) in the MSA allows the Agency to suspend or revoke the license of any vessel if any "payment required for observer services provided to or contracted by the owner or operator [of the vessel] . . . has not been paid and is overdue." 16 U.S.C. § 1858(g)(1)(D). This penalty would make no sense if Congress did not anticipate that owners and/or operators of the vessels would be paying the observers.

Plaintiffs concede that Congress expected that some vessels would have to pay for monitors, but they argue that that expectation was limited to payments required in a few specific instances elsewhere in the MSA in which Congress expressly authorized the imposition of monitor costs on vessels (more on these instances later). But the provision penalizing the nonpayment of observers appears in a general part of the MSA applicable to all fisheries and fishery management plans, rather than in the specific provisions creating particular fee programs. If Congress had meant to apply this provision only to certain fee programs, it likely would have included it in the sections creating those programs. Or it would have cross-referenced the specific statutes creating fee programs in the penalty provision. See Silva

v. <u>Garland</u>, 27 F.4th 95, 103-04 (1st Cir. 2022) (interpreting statutory language broadly, rather than as limited by other statutes, when potentially limiting statutes were not cross-referenced in the broader statute).

The D.C. Circuit, which recently considered a similar challenge to the very same Rule, relied on just such reasoning in rejecting plaintiffs' position that the penalty provisions apply only to a few statutorily specified fee programs. <u>Loper Bright Enters</u>. V. <u>Raimondo</u>, 45 F.4th 359, 368 (D.C. Cir. 2022) (reasoning that "the penalties in a broadly applicable section of the [MSA] appear to recognize the possibility of industry-contracted and funded observers beyond [a single] context"). That court sensibly observed that "[i]f Congress had intended for penalties associated with industry-funded monitoring to apply only in in the foreign fishing context, the court would expect that Congress in the penalty provisions would have specifically referenced foreign vessels or included a cross-reference to the foreign fishing provision." <u>Id.</u>

**B.**

In an effort to rebut the clear textual support for the Agency's lawful authority to require the vessel owners to pay for at-sea monitors, plaintiffs point to other sections of the MSA that expressly authorize the imposition of fees to be paid to the government to cover certain observer costs. Plaintiffs ask us to

reason that because Congress expressly authorized the imposition of fees in three instances, its failure to do so in the instance of observer costs under section 1853(b)(8) must mean that no such costs can be imposed on plaintiffs. They also suggest that to read the MSA as authorizing industry-funded monitoring would render those other fee provisions superfluous, a result we usually try to avoid.

The instances to which plaintiffs point in which the MSA expressly provides for payments of a cost by the vessels are as follows: First, section 1853a authorizes and sets requirements for Limited Access Privilege Programs (LAPPs) to be created in certain fisheries. To support a LAPP, a Council may "provide . . . for a program of fees paid by limited access privilege holders that will cover the costs of management, data collection and analysis, and enforcement activities." 16 U.S.C. § 1853a(e)(2). Second, section 1862(a) allows the North Pacific Council to prepare a "fisheries research plan" for any fishery within its jurisdiction except a salmon fishery. Such plans may require that observers be stationed on vessels, and "establish[] a system . . . of fees." Id. § 1862(a)(1)-(2). Third, section 1827(d) imposes fees "in an amount sufficient to cover all of the costs of providing an observer aboard that vessel" on foreign fishing vessels in certain circumstances which may result in the incidental taking of billfish. Id. § 1827(d). Plaintiffs contend that these

are the only instances in which industry vessels may be required to pay for observers.

This argument falters at the threshold because this is not a case in which the agency need rely only on the default presumption that a regulated party presumably bears its own costs. To the contrary, as we have described in Part II.A.2 of this opinion, the statutory text provides affirmative confirmation that Congress presumed that vessel owners would bear the cost of complying with monitoring requirements. So plaintiffs' effort to use these examples to negate reliance on statutory silence is inapt, or at least insufficient. In any event, the three instances to which plaintiffs point do not present apples-to-apples comparators from which one can infer that anything mentioned in those instances but not in the general observer provision was intentionally omitted from the latter.

First and foremost, no money is paid into government coffers under the industry-funded monitoring program. Instead, vessels are required to obtain and pay for a service from a non-governmental source, just as they would have to pay for a certain type of fishing gear. As the Loper Bright court explained, the fact that Congress instituted a "different funding mechanism" in the North Pacific fishery and for LAPPs, where funds are collected by the Agency and deposited into the Treasury, does not indicate

that Congress intended to preclude the entirely different mechanism of industry-funded monitoring. 45 F.4th at 367–68.

Moreover, the North Pacific and LAPP programs are further distinguishable because the fees fund agency programs that include more than direct observer costs. See, e.g., 16 U.S.C. § 1854(d)(2)(A) (allowing fee "to recover the actual costs directly related to the management, data collection, and enforcement of any limited access privilege program," without limiting fee to payment for observers); Fisheries of the Northeastern United States; Amendment 17 to the Atlantic Surfclam and Ocean Quahog Fishery Management Plan, 81 Fed. Reg. 38,969, 38971 (June 15, 2016) (in responding to comment regarding cost recovery program for LAPP, noting that recoverable costs through fee "would include the costs of issuing and renewing ITQ permits, processing cage tag transfers, and tracking cage tag usage"); 16 U.S.C. § 1862(b)(2)(A) (providing that fees not exceed "the combined cost" of stationing observers, "inputting collected data," and assessing the necessity of a risk-sharing pool); Groundfish Fisheries of the Exclusive Economic Zone off Alaska and Pacific Halibut Fisheries; Observer Program, 77 Fed. Reg. 23,326, 23,339 (April 18, 2012) (explaining that in North Pacific fee program which was eventually adopted, "[o]bserver fees would not be linked to the actual level of observer coverage for individual vessels and plants," but rather "each participant" would pay the

same percentage regardless of when they carried observers).  In
the industry-funded monitoring program at issue here, by contrast,
the Agency must pay its own administrative costs and vessels only
pay for observers they actually carry.  As for the third instance
-- fees imposed on foreign vessels for observer costs -- the
placement of observers is authorized under a different provision
than the one relied on by the Agency, because section 1853(b)(8)
authorizes observers only on board "vessel[s] of the United
States."  But even putting that aside, one can easily see why
Congress might opt for a direct fee rather than relying on foreign
owners to arrange for observers themselves.  With treaties,
international agreements, and foreign relations at stake, it makes
sense that Congress would have opted for extra specificity.[6]

---

[6] In their reply brief, plaintiffs also point to
section 1821(h)(6), which provides that if there are insufficient
appropriations to station an observer on each foreign vessel, the
Secretary shall "establish a reasonable schedule of fees that
certified observers or their agents shall be paid" by foreign
fishing vessel operators.  16 U.S.C. § 1821(h)(6).  As an initial
matter, this argument was raised for the first time on reply, and
absent exceptional circumstances we consider it waived.  See
Gottlieb v. Amica Mut. Ins., 57 F.4th 1, 11 (1st Cir. 2022).  Even
if we were to consider this argument, we would not find that this
provision renders the Agency's interpretation unreasonable.  It
makes sense that Congress would provide more detail in a sensitive
area (foreign relations) where it wanted to ensure observer
coverage, rather than leaving such coverage to the discretion of
the Agency or a regional Council.  Such a provision does not
suggest that Congress did not delegate authority to the Agency to
require industry-funded monitoring in other instances.  See Loper
Bright, 45 F.4th at 367-68.

Plaintiffs also contend that the costs under the Final Rule are actually fees paid to the Agency.  To build this argument, they claim that privately contracted monitors are government employees or agents.  To that end, plaintiffs describe the monitors engaged by private companies as "federal officers."  To justify this relabeling, the plaintiffs point to a penalty provision which provides that interfering with an "observer" or "data collector" is prohibited by federal law, 16 U.S.C. § 1857(1)(L), as well as a decision upholding a conviction for sexually harassing an at-sea monitor in violation of this law.  See United States v. Cusick, No. 11-cr-10066, 2012 WL 442005, at *6 (D. Mass. Feb. 9, 2012).  But, establishing that Congress intended to deter the harassment of monitors falls well short of establishing that Congress intended to turn those monitors into "federal officers."  And the MSA expressly distinguishes the provision that prohibits assaulting "any observer" or "data collector," 16 U.S.C. § 1857(1)(L), from a provision prohibiting similar actions against "officer[s]," id. § 1857(1)(D)-(F).

## C.

Finally, plaintiffs argue that the legislative history confirms their preferred interpretation of the statute.  They note that amendments to the MSA enacted in 1990, which added the fee provisions for observers in the North Pacific, indicated that "nothing in [that] section should be construed as affecting the

- 24 -

rights and responsibilities of other Regional Fishery Management Councils." H.R. Rep. No. 101-393, at 31 (1989). We have already explained why the industry-funded monitoring program at issue here does not impose a fee. And in rejecting plaintiffs' challenge to the observer rule, we do not (nor did the Agency) rely on any contention that anything in that section altered another Council's rights and responsibilities by granting new authority to require plaintiffs to carry observers on board. To the contrary, the Councils already had that authority, as acknowledged in the very legislative history on which plaintiffs rely. See H.R. Rep. No. 101-393, at 28 (1989) (stating that "the Councils already have -- and have used -- such authority" to require that observers be carried on board).[7]

* * *

In sum, we have no trouble finding that the Agency's interpretation of its authority to require at-sea monitors who are paid for by owners of regulated vessels does not "exceed[] the bounds of the permissible." Barnhardt v. Walton, 535 U.S. 212, 218 (2002). We need not decide whether we classify this conclusion as a product of Chevron step one or step two. Congress expressly authorized NMFS to require vessels to carry monitors. And at the

---

[7] The Agency also points to regulations that implement industry-funded monitoring in other fisheries. See, e.g., 50 C.F.R. § 648.11(k)(4)-(5) (sea scallop vessels required to carry observers must arrange and pay for those observers).

very least, it is certainly reasonable for the agency to conclude that its exercise of that authority is not contingent on its payment of the costs of compliance.

## III.

Having found that the MSA authorizes the adoption of a rule requiring vessels to procure at their expense the services of an at-sea monitor, we now consider plaintiffs' other challenges to the Agency's decision process and procedure in adopting the Rule.

## A.

Plaintiffs argue that the Rule is arbitrary and capricious because it allows for waivers for trips on which a vessel plans to catch less than 50 metric tons of herring. This exemption benefits mostly small mesh bottom trawlers and single midwater trawlers that make short trips and plan on catches of less than 50 metric tons of herring. Plaintiffs point out that their larger scale operation, having the capacity to freeze and hold more fish, catches around 50 metric tons per day but may harvest many more tons than that on a per-trip basis. Hence, the waiver is practically unavailable to them. The result, they argue, is that plaintiffs would have to pay for an at-sea monitor on a single 14-day trip in which they catch 343 metric tons of herring, but a hypothetical smaller boat catching 49 metric tons on each of seven back-to-back 2-day trips (for a total of the same 343 metric tons) would not have to pay for a monitor at all. Additionally,

the flexibility to stay at sea for longer means that plaintiffs declare into multiple fisheries before leaving the dock, which means they may declare that they will catch herring but not actually take any herring.  Thus, not only can they not use the exemption, but they may be forced to pay for a herring monitor on a trip where no herring is caught.  Plaintiffs argue that these features render the Rule and the exemptions arbitrary and capricious.

"The scope of review under the 'arbitrary and capricious' standard is narrow and a court is not to substitute its judgment for that of the agency." Sorreda Transp., LLC v. DOT, 980 F.3d 1, 3 (1st Cir. 2020) (quoting Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co., 463 U.S. 29, 43 (1983)). Under this deferential standard, "[a]n agency rule is arbitrary and capricious if the agency lacks a rational basis for adopting it -- for example, if the agency relied on improper factors, failed to consider pertinent aspects of the problem, offered a rationale contradicting the evidence before it, or reached a conclusion so implausible that it cannot be attributed to a difference of opinion

or the application of agency expertise." <u>Associated Fisheries of Me., Inc.</u> v. <u>Daley</u>, 127 F.3d 104, 109 (1st Cir. 1997).

Here, the Agency expressly considered plaintiffs' objections and rejected them. It stated:

> In an effort to minimize the economic impact of industry-funded monitoring, the Council explicitly considered measures to address Seafreeze's concern about disproportional impacts on its vessels, including considering alternatives for coverage waivers for trips when landings would be less than 20-percent herring or less than 50 mt of herring per day. Ultimately, the Council determined that the potential for a relatively high herring catches per trip aboard those vessels warranted additional monitoring and chose the 50 mt per trip threshold.

85 Fed. Reg. at 7426. The Agency also found it highly unlikely that plaintiffs would be paying as much as they claimed for trips that did not take herring, based on cost estimates contained in the Environmental Assessment. <u>Id.</u> So plaintiffs cannot argue that the Agency failed to consider their objections.[8] Nor do they develop any contention that the explanation given by the agency relied on any factors prohibited by Congress or ran counter to the available evidence.

And the rationale given by the Agency -- "that the potential for a relatively high herring catches per trip aboard those vessels warranted additional monitoring" -- does not strike

---

[8] Plaintiffs presented no evidence that their hypothetical scenarios actually occur.

us as "so implausible that it cannot be attributed to a difference
in view or the applicable agency expertise." Associated Fisheries
of Me., 127 F.3d at 109.  To the contrary, determinations as to
whether monitoring will be more effective on a per-trip basis or
per-day basis seem squarely within the expertise of the Agency.
Although we agree that the Agency could have provided a more
thorough explanation than it did, we do not find the per-trip
waiver to be arbitrary and capricious on its face.  Certainly, one
can see why monitoring per trip rather than per day may be easier
to administer, and why plaintiffs' uncertainty about how much
herring they will decide to catch might counsel for including a
monitor rather than not.  See id. at 111 ("Whether or not we, if
writing on a pristine page, would have reached the same set of
conclusions is not the issue.  What matters is that the
administrative judgment, right or wrong, derives from the record,
possesses a rational basis, and evinces no mistake of law.")

**B.**

Plaintiffs further contend that the Rule violates
several National Standards contained in the MSA.  All fishery
management plans must be consistent with ten National Standards,
which "are broadly worded statements of the MSA's objectives for
all fishery conservation and management measures." Lovgren, 701
F.3d at 32.  "The purposes of the national standards are many, and
can be in tension with one another." Id.  As such, "we will uphold

a regulation against a claim of inconsistency with a 'national standard' under § 1851 if the [Agency] had a 'rational basis' for it." Id. (quoting Or. Trollers Ass'n v. Gutierrez, 452 F.3d 1104, 1119 (9th Cir. 2006)).

First, plaintiffs allege that the Rule violates National Standard One (which requires plans to "prevent overfishing while achieving, on a continuing basis, the optimum yield from each fishery," 16 U.S.C. § 1851(a)(1)) because it disproportionately burdens them although they take less bycatch and herring than other types of trawlers, and because it allows boats taking more herring to harvest without monitors. The government counters that the purpose of the industry-funded monitoring requirement -- more accurately tracking catch -- will allow better calibration of regulation, and thus furthers the goals of National Standard One. We agree that the rule implementing industry-funded monitoring is consistent with the standard for this reason. The district court also pointed out that plaintiffs' argument here relates to the distribution of herring catch between vessels, not the optimum yield for the fishery as a whole. This mismatch between plaintiffs' complaint and the actual subject of the Standard further renders their challenge under National Standard One unavailing.

Second, plaintiffs allege that the Rule violates National Standard Two, which requires that plans "be based upon

the best scientific information available," 16 U.S.C.
§ 1851(a)(2), because it burdens them without "scientific evidence
of clear increase in Atlantic herring stocks" as a result of the
Rule.  But they do not actually allege that the Agency ignored
specific scientific data or point to better data available.  "If
no one proposed anything better, then what is available is the
best."  Massachusetts ex rel. Div. of Marine Fisheries v. Daley,
170 F.3d 23, 30 (1st Cir. 1999).  National Standard Two does not
require the Agency to wait to regulate because it does not have
certain data.  See 50 C.F.R. § 600.315(e)(2) ("The fact that
scientific information concerning a fishery is incomplete does not
prevent the preparation or implementation of an FMP.").  Nor does
it prohibit an agency from regulating in the face of some
uncertainty about the effects of its chosen rule.  See Coastal
Conservation Ass'n v. U.S. Dep't of Com., 846 F.3d 99, 109 (5th
Cir. 2017) (explaining that where economic impacts of rule were
uncertain because they depended on the choices of several parties,
"[t]he National Standards [did] not require analysis of
unpredictable, and thus unavailable, data").  Where, as here,
plaintiffs point to no data they say should have been considered
or relied upon -- and where the very purpose of the rule is to
gather better data to be used in future fishery management -- we
find that the regulation complies with National Standard Two.  See
Massachusetts ex rel. Div. of Marine Fisheries, 170 F.3d at 30;

see also Coastal Conservation Ass'n, 846 F.3d at 109 (finding that National Standard Two was not violated where no one pointed to data that Secretary had ignored, and citing cases doing the same).

The Rule also does not violate National Standard Six (which requires the Agency to account for "variations among, and contingencies in, fisheries, fishery resources, and catches," 16 U.S.C. § 1851(a)(6)).  The regulations implementing this National Standard focus on maintaining flexibility to adjust to uncertainty or changed circumstances.  50 C.F.R. § 600.335; see J.H. Miles & Co. v. Brown, 910 F. Supp. 1138, 1155 (E.D. Va. 1995) ("National Standard Six, on its face, dictates flexibility on the part of fishery managers.  It suggests that the Secretary and his designees must be prepared to address uncertainties or changes that might arise.").  Plaintiffs' challenge has nothing to do with flexibility to adjust to changing circumstances, but rather protests that the Rule does not adequately take their unique style of fishing or community into account.  As with their challenge based on National Standard One, this mismatch between what the Standard requires and the nature of Plaintiffs' challenge renders their complaints unavailing.  We do not see anything in the National Standard that requires the Agency to change its regulations to eliminate all differential impacts on all of the varied types of vessels.  See Ace Lobster Co. v. Evans, 165 F. Supp. 2d 148, 182 (D.R.I. 2001) ("There is no requirement in national standard 6 or anywhere else

in the statute that defendant finely attune its regulations to each and every fishing vessel in the offshore fishery.").

Finally, the Rule does not violate National Standards Seven and Eight, which require the Agency to consider fishery resources and cost burdens.  See 16 U.S.C. § 1851(a)(7) (plans "shall, where practicable, minimize costs and avoid unnecessary duplication"); id. § 1851(a)(8)) (plans shall "utiliz[e] economic and social data . . . to (A) provide for the sustained participation of such communities, and (B) to the extent practicable, minimize adverse economic impacts on such communities").  Plaintiffs argue that the Rule violates these standards because their boats bear heavier regulatory burdens than other boats.  As a result, they claim, National Standard Seven "has been completely ignored," and National Standard Eight "has been violated in the same way" because "Appellants are not more damaging" to the fishery, but their community bears the brunt of severe impacts.

Our precedent suggests that "the required analysis of alternatives and impacts [under National Standard 8] is subject to a rule of reason, for study could go on forever."  Little Bay Lobster Co. v. Evans, 352 F.3d 462, 470 (1st Cir. 2003).  "About the best a court can do is ask whether the [Agency] has examined the impacts of, and alternatives to, the plan [it] ultimately adopts and whether a challenged failure to carry the analysis

further is clearly unreasonable, taking account of the usual considerations . . . ." Id. Moreover, we are mindful that "the plain language of [National Standard] 8 and its advisory guidelines make clear that these obligations are subordinate to the MSA's overarching conservation goals." Lovgren, 701 F.3d at 35.

Here, the Agency has done what is required under National Standards Seven and Eight. The National Standards require consideration, not adoption, of alternatives; they also require the Agency to minimize costs "where practicable," not to eliminate cost burdens entirely. The Agency considered various coverage targets to meet its goal of gathering additional data, balanced those targets with costs, and selected a 50% monitoring target. Similarly, it adopted a waiver for boats taking less than 50 metric tons of herring per trip, after considering and rejecting Relentless' proposed alternative waiver. 85 Fed. Reg. at 7425-26. The New England Council's Omnibus Amendment also considered in detail the economic impacts to industry participants using various gear types. The Agency explained how exemptions for vessels catching below a certain weight threshold per trip would minimize cost impacts. 85 Fed. Reg. at 7430. Nothing in our prior opinions suggests that the National Standards require that cost and community impacts, even those disproportionately borne by some regulated parties, must be eliminated or distributed exactly

evenly under National Standards Seven and Eight among those who employ different methods of fishing.

Plaintiffs' challenges under each of the National Standards boil down to arguments that the Rule burdens them more heavily than it burdens others without a clear enough justification, or without adopting an alternative they suggested. But they have not proffered the types of evidence or argument under which courts have found that agency actions violate the National Standards. For example, they do not argue that the differential treatment of different fishers under the Rule was based not on scientific data, but on political compromise. See Hadaja, Inc. v. Evans, 263 F. Supp. 2d 346, 354 (D.R.I. 2003); Hall v. Evans, 165 F. Supp. 2d 114, 136 (D.R.I. 2001). They also cannot show that no reason was given either for the Rule itself or for the scope of the exceptions. See Massachusetts ex rel Div. of Marine Fisheries, 170 F.3d at 31-32; Hall, 165 F. Supp. 2d at 137-38. The Agency gave reasons for adopting the Rule and the waivers; the fact that those reasons were unsatisfactory to these plaintiffs does not mean that the Rule violates the National Standards.

This is not to say that the Rule, or the Agency's explanation for it, is a model of clarity. Plaintiffs point out several features of the Rule (for example, the hypothetical ability of a boat to take more overall herring with no monitoring under the structure of the exemptions) that might cause one to wonder if

- 35 -

the Agency could have tailored the rule more precisely or chosen a different alternative. But adoption of the Rule, and consideration of alternatives, was the Agency's prerogative; it met its obligations to respond to comments and explain the reason for the Rule's adoption and structure. Plaintiffs' criticisms that the Rule does not account for peculiarities of their specific businesses under all hypothetical scenarios do not convince us that the Rule violates the National Standards.

### c.

Plaintiffs also contend that the Rule violates the RFA, which requires agencies to consider the effects of their actions on small businesses. Associated Fisheries of Me., 127 F.3d at 110, 116. Agencies must publish interim and final regulatory flexibility analyses in the Federal Register along with Notices of Proposed Rulemaking, and make them available for comment in the same way. 5 U.S.C. §§ 603-04. These analyses are reviewable under the APA in a similar manner to final agency actions. Id. § 611.

Here, the Final Rule states that the Agency considered the impact of the Rule on small businesses, and, to address that impact, set the monitoring target at 50% of trips (rather than 75% or 100%) and allowed waivers on certain types of trips. 85 Fed. Reg. at 7429-30. Plaintiffs argue that the Agency nonetheless violated the RFA because it did not consider the effect of its actions on, or include recommendations to assist, businesses who

- 36 -

freeze catch at sea like themselves. They also argue that the
Agency did not adequately respond to comments in response to the
RFA, did not consider data regarding a drop in fishermen, and did
not make a plan to ensure monitors are allocated fairly across the
fleet.

The RFA "does not alter the substantive mission of the
agencies" but creates "procedural obligations." <u>Little Bay
Lobster</u>, 352 F.3d at 470-71. The Agency met those here. The
Agency explained potential impacts on small businesses and
accordingly described how it mitigated those impacts, largely by
setting the monitoring coverage target at 50% and by setting a
weight threshold for monitored trips that would exempt many small
businesses from the requirement to carry a monitor. 85 Fed. Reg.
at 7429-30. The Agency also explained why it disagreed that small
businesses would be forced out of fishing. Finally, as discussed
above, it explained why it did not adopt alternative measures that
Relentless suggested. 75 Fed. Reg. at 7426. Plaintiffs'
suggestion that the Agency could have done more to respond to their
specific concerns is not without some appeal. But the RFA only
required the Agency to consider and respond to comments and to
evaluate the impact of its action on small businesses. It did so
here. <u>See</u> <u>Little Bay Lobster</u>, 352 F.3d at 471 (noting that "there
is no requirement as to the amount of detail with which specific
comments need to be discussed," and that "[t]he agency's obligation

is simply to make a reasonable good faith effort to address comments and alternatives.")

**D.**

Finally, plaintiffs claim that, by forcing them "to participate in the market" for at-sea monitors, the Rule is an unconstitutional exercise of Congress's commerce power under the Supreme Court's decision in <u>NFIB</u> v. <u>Sebelius</u>, 567 U.S. 519 (2012). That case, plaintiffs argue, held that Congress cannot force individuals to become active in a market in which they do not already participate. They argue that because Congress has forced them to become unwilling participants in the market for at-sea monitors, the Rule is unconstitutional since it is beyond the power of the Commerce Clause.

We reject this contention. Plaintiffs harvest a national resource for economic gain. But no one is forcing plaintiffs to participate in any market. Rather, they choose to engage in an activity that has long been subject to regulation. In so doing, they can hardly complain about complying with the otherwise lawful regulations that govern the manner in which they engage in that activity merely because compliance requires some

- 38 -

payment to another person, whether a seller of nets or life preservers, or a seller of monitoring services.[9]

## IV.

For the foregoing reasons, we hold that the rule requiring plaintiffs to bear the costs of complying with on-board monitor regulation is authorized by Congress and is otherwise immune to plaintiffs' assorted procedural and substantive challenges. We therefore <u>affirm</u> the judgment of the district court.

---

[9] To the extent plaintiffs challenge the Rule as violating constitutional controls on taxing, appropriations, and spending, U.S. Const. art. I, §§ 1, 7, 8, those challenges are referenced only in passing, are undeveloped, and are therefore waived. <u>See</u> <u>United States</u> v. <u>Zannino</u>, 895 F.2 1, 17 (1st Cir. 1990). Similarly, any potential Fourth Amendment argument was not raised in the briefing on appeal, and is therefore waived.