**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND**

| | | |
|---|---|---|
| **RELENTLESS INC., et al.** | : | |
| | : | |
| *Plaintiffs*, | : | |
| | : | |
| v. | : | Case No. 1: 20-cv-00108-WES-PAS |
| | : | |
| | : | |
| **U.S. DEPARTMENT OF COMMERCE,** | : | |
| **et al.** | : | |
| | : | |
| *Defendants*. | : | |

**PLAINTIFFS' SUPPLEMENTAL BRIEF IN SUPPORT OF
MOTION FOR SUMMARY JUDGMENT**

## TABLE OF CONTENTS

TABLE OF CONTENTS ................................................................................................................. ii

TABLE OF AUTHORITIES .......................................................................................................... iii

STATEMENT OF THE CASE ........................................................................................................ 1

FACTS NECESSARY TO DECIDE THE ISSUE .......................................................................... 1

    I.    THE 1990 AMENDMENTS AND THE COST SHIFTING PROVISIONS OF THE MSA ............... 2

    II.   THE OMNIBUS AMENDMENT AND THE FINAL RULE ....................................................... 6

ARGUMENT ..................................................................................................................................... 9

    I.    WITHOUT CHEVRON DEFERENCE, THE BEST READING OF THE STATUTE IS THAT THE OMNIBUS AMENDMENT AND FINAL RULE ARE UNLAWFUL AND UNAUTHORIZED .......... 9

    II.   THE OMNIBUS AMENDMENT AND FINAL RULE ARE NOT "NECESSARY AND APPROPRIATE" AND THOSE WORDS DO NOT SUBSTITUTE FOR CHEVRON DEFERENCE .................................................................................................................. 15

    III.  THE HISTORY OF THE MSA COUNSELS AGAINST THE AGENCY'S HAVING SUCH ASSERTED POWER. .................................................................................................... 17

CONCLUSION ................................................................................................................................ 19

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Ala. Ass'n of Realtors v. Dep't of Health & Hum. Servs.*,
    594 U.S. 758 (2021).................................................................................................. 10

*Ala. Power Co. v. OSHA*,
    89 F.3d 740 (11th Cir. 1996) ................................................................................. 16

*AMG Cap. Mgmt., LLC v. FTC*,
    593 U.S. 67 (2021).................................................................................................. 10

*Chevron, U.S.A., Inc. v. Nat. Res. Def. Council, Inc.*,
    467 U.S. 837 (1984)................................................................................................ 14

*Chisom v. Roemer*,
    501 U.S. 380 (1991)................................................................................................ 19

*Ethyl Corp. v. EPA*,
    51 F.3d 1053 (D.C. Cir. 1995) ............................................................................... 14

*FDA v. Brown & Williamson Tobacco Corp.*,
    529 U.S. 120 (2000)........................................................................................ 13, 18

*Goethel v. Dep't of Com.*,
    854 F.3d 106 (1st Cir. 2017).................................................................................. 12

*Gulf Fishermens Ass'n v. Nat'l Marine Fisheries Serv.*,
    968 F.3d 454 (5th Cir. 2020) ................................................................................. 15

*Haw. Longline Ass'n v. Nat'l Marine Fisheries Serv.*,
    281 F. Supp. 2d 1 (D.D.C. 2003)..................................................................... 15, 16

*In re MCP No. 165, OSHA Admin., Interim Final Rule: Covid-19 Vaccination and Testing*
    *86 Fed Reg. 61402*,
    21 F.4th 357 (6th Cir. 2021) ................................................................................. 16

*La. Pub. Serv. Comm'n v. FCC*,
    476 U.S. 355 (1986)................................................................................................ 13

*Loper Bright Enters., Inc. v. Raimondo* and *Relentless, Inc. v. Dep't of Com.*,
    144 S. Ct. 2244 (2024)........................................................................... 1, 13, 17, 18

*Loper Bright Enters., Inc. v. Raimondo¸*
    544 F. Supp. 3d 82 (D.D.C. 2021)................................................................... 11, 12

*Loper Bright Enters., Inc., v. Raimondo*,
    45 F.4th 359 (D.C. Cir. 2022)......................................................................... 13, 14

*Mexican Gulf Fishing Co. v. Dep't of Com.*,
    60 F.4th 956 (5th Cir. 2023) ................................................................................. 15

*Michigan v. EPA*,
    576 U.S. 743 (2015)................................................................................................ 16

*Nat'l Fed'n of Indep. Bus. v. Dep't of Lab., OSHA*,
    595 U.S. 109 (2022)................................................................................................ 10

*Nat'l Grain & Feed Ass'n v. OSHA*,
   866 F.2d 717 (5th Cir. 1988) ............................................................. 16

*Relentless Inc. v. Dep't of Com.*,
   561 F. Supp. 3d 226 (2021) ........................................................... passim

*Relentless, Inc. v. Dept. of Com.*,
   62 F.4th 621 (1st Cir. 2023) ............................................................. 13

*The Ocean Conservancy v. Gutierrez*,
   394 F. Supp. 2d 147 (D.D.C. 2005) ................................................. 16

**Statutes**

16 U.S.C. § 1802(31) ............................................................................. 3

16 U.S.C. § 1821(h) ................................................................... 5, 6, 11

16 U.S.C. § 1827 ................................................................................. 17

16 U.S.C. § 1827(b) .............................................................................. 5

16 U.S.C. § 1827(d) .............................................................................. 5

16 U.S.C. § 1827(e) .............................................................................. 5

16 U.S.C. § 1827(f) ............................................................................... 5

16 U.S.C. § 1853(a) ............................................................................ 15

16 U.S.C. § 1853(b)(8) ......................................................... 2, 13, 14, 17

16 U.S.C. § 1854(d) .......................................................................... 4, 5

16 U.S.C. § 1862(a) .............................................................................. 3

16 U.S.C. § 1862(b)(1) ....................................................................... 3, 4

16 U.S.C. § 1862(b)(2) ....................................................................... 3, 4

16 U.S.C. § 1881b .......................................................................... 3, 4, 17

16 U.S.C. §1821 ................................................................................. 17

**Other Authorities**

GARFO,
   *Industry-Funded Monitoring Amendment: Atlantic Herring Fishery* ........................................ 9

NEFMC,
   *Observer Policy Committee (Industry-Funded Monitoring), SBRM* ........................................ 6

NOAA Fisheries,
   *Industry-funded Monitoring in the Atlantic Herring Fishery* .............................................. 9

NOAA Fisheries,
   *Laws & Policies: Magnuson-Stevens Act* ..................................... 17

NOAA,
   *Laws & Policies: Magnuson-Stevens Act* ....................................... 5

*Reauthorization of the Magnuson Fishery Conservation and Management Act of 1976—*
   *Part II, Hearing on H.R. 2061 Before the H. Comm. On Merch. Marine & Fisheries,*
   *Subcomm. On Fisheries & Wildlife Conservation & Env't,* 101st Cong. (1989) (Serial
   No. 101-37) ........................................................................................ 2

**Regulations**

50 C.F.R. § 600.506 ................................................................................................................... 12

## STATEMENT OF THE CASE

This is a Supplemental Memorandum to the materials already submitted and ruled upon by this Court at Summary Judgment. The Supreme Court identified "the question that matters," formerly obscured by *Chevron* deference, "Does the statute authorize the challenged agency action?" *Loper Bright Enters., Inc. v. Raimondo* and *Relentless, Inc. v. Dep't of Com.*, 144 S. Ct. 2244, 2269 (2024). The key question presented to this Court *de novo* and without deference, is whether the Magnuson-Stevens Fishery Conservation and Management Act ("MSA") sanctions the New England Fishery Management Council's Industry-Funded Monitoring Omnibus Amendment ("Omnibus Amendment") and the February 7, 2020 Final Rule ("the Final Rule") implementing it without applying *Chevron* deference which no longer exists. *See id.* at 2273 ("*Chevron* is overruled"); *see also* Dkt. 37-2 (excerpts from Omnibus Amendment) and 37-3 (Final Rule). The MSA does not, the Omnibus Amendment should be declared unlawful, and the Final Rule should be vacated.

## FACTS NECESSARY TO DECIDE THE ISSUE

The record before this Court is extensive. In making its summary judgment ruling in this matter, the Court addressed the contentions of the parties and found that as to the question of whether the MSA allowed the agencies to force regulated fishers to enter contracts with At-Sea Monitors or Observers ("Observers") the statute was, at best, "ambiguous." *Relentless Inc. v. Dep't of Com.*, 561 F. Supp. 3d 226, 236 (D.R.I. 2021) ("*Relentless I*"). The facts of the creation of the MSA and its 1990 amendments and the promulgation of the Final Rule have not changed, but certain facts must be highlighted for the Court's *Chevron-free* new look at the MSA and the challenged regulation.

### I.    THE 1990 AMENDMENTS AND THE COST SHIFTING PROVISIONS OF THE MSA

The 1990 amendments, *inter alia*, allowed Observers to be placed on fishing vessels. 16 U.S.C. § 1853(b)(8) (the "Observer Amendment"). That's it. It did not allow or even intimate those Observers would be paid by the fishers carrying them. The Government often argues this amendment alone granted it power to force permit holders to pay for the cost of Observers. Plaintiffs were in the fishing business at this time and did not oppose this amendment or contact their representatives concerning it. As far as their knowledge and the record shows, there was no opposition to this amendment from either industry or Members of Congress involved with the fishing industry. The power of the agency to place Observers on vessels was in doubt, so Congress acted to make it clear they could be placed. Prior to amending the MSA, the authority to do so was in fact denied by some and certainly without the Northern Pacific amendments there was no fee shifting.[1] The Government has usually relied on the Observer Amendment to bolster its argument. But the contemporaneous original meaning of that amendment was understood to relate to government paid agents, not Observers paid by industry. Indeed, the section itself exempts vessels that cannot bear the regulatory cost of berths and space:

> (8) require that one or more observers be carried on board a vessel of the United States engaged in fishing for species that are subject to the plan, for the purpose of collecting data necessary for the conservation and management of the fishery; *except that such a vessel shall not be required to carry an observer on board if the facilities of the vessel for the quartering of an observer, or for carrying out observer functions, are so inadequate or unsafe that the health or safety of the observer or the safe operation of the vessel would be jeopardized ….*

16 U.S.C. § 1853(b)(8) (emphasis added).

---

[1] *See*, *e.g.*, *Reauthorization of the Magnuson Fishery Conservation and Management Act of 1976—Part II, Hearing on H.R. 2061 Before the H. Comm. On Merch. Marine & Fisheries, Subcomm. On Fisheries & Wildlife Conservation & Env't*, 101st Cong. (1989) (Serial No. 101-37) at 431 (written testimony of Henry Mitchell, Exec. Dir., Bering Sea Fishermen's Ass'n) ("Currently, councils appear to be unable to charge fees to cover such costs, and appear merely to be left now to mandating their existence."). Comments Attached as Exhibit 1.

Subsequently, in 1996, Congress made this explicit by stating exactly what powers the Secretary has in creating regulations concerning the adequacy of vessels to carry Observers and what the Observers would do on the vessels, as well as how they were to be trained. 16 U.S.C. § 1881b. It also expressly stated that Congress assumed such Observers would be federal employees:

> (c) Observer Status
> An observer on a vessel and under contract to carry out responsibilities under this chapter or the Marine Mammal Protection Act of 1972 (16 U.S.C. 1361 et seq.) shall be deemed to be a Federal employee for the purpose of compensation under the Federal Employee Compensation Act (5 U.S.C. 8101 et seq.).

16 U.S.C. § 1881b(c). Observer is defined as "any person required or authorized to be carried on a vessel for conservation and management purposes by regulations or permits under this chapter." 16 U.S.C. § 1802(31).

Also in the 1990 Amendments, Congress allowed the agencies to charge fees for Observers in the Northern Pacific but did not permit the same in any other fishery. Section 1862(a) states:

> (a) In general
> The North Pacific Council may prepare, in consultation with the Secretary, a fisheries research plan for any fishery under the Council's jurisdiction except a salmon fishery which—
>> (1) requires that observers be stationed on fishing vessels engaged in the catching, taking, or harvesting of fish and on United States fish processors fishing for or processing species under the jurisdiction of the Council, including the Northern Pacific halibut fishery, for the purpose of collecting data necessary for the conservation, management, and scientific understanding of any fisheries under the Council's jurisdiction; and
>> (2) establishes a system, or system, of fees, which may vary by fishery, management area, or observer coverage level, to pay for the cost of implementing the plan.

16 U.S.C. § 1862(a) (footnote omitted). The statute then provides the standards that must be used to provide for this industry funding. *See* 16 U.S.C. §§ 1862(b)(1)(A)–(D), (b)(2)(A)–(J). Those standards include to "be fair and equitable to all vessels and processors[.]" 16 U.S.C.

§ 1862(b)(1)(B). They also severely restrict what the fees can be used for and provide that they not "exceed 2 percent, of the unprocessed ex-vessel value of fish and shellfish harvested…." 16 U.S.C. § 1862(b)(2)(E). Since 1990 the MSA has been amended three times, and while Congress amended it to define "Observers," how they are trained, and what fishing vessels they would be assigned to, Congress never authorized fee shifting in any other domestic fishery. *See* 16 U.S.C. § 1881b (describing placement and training of "observers" but making no provision for them to be paid by the regulated fishers).

The MSA explicitly authorizes the collection of fees for Observers in certain circumstances and for specific purposes. It does not generally allow industry funding of agency wishes. The statute does authorize the Secretary to collect fees to cover actual costs directly related to the management of, data collection for, and enforcement of limited access privilege programs ("LAPPS") and certain community development quota programs. 16 U.S.C. § 1854(d). Such fees are capped at 3 percent of the ex-vessel value of fish harvested under those programs. *Id.* (d)(2)(B). In § 1854(d), Congress laid out the requirement that the level of fees be established by regulation and stated:

> (d) Establishment of fees
> (1) The Secretary shall by regulation establish the level of any fees which are authorized to be charged pursuant to section 1853(b)(1) of this title. The Secretary may enter into a cooperative agreement with the States concerned under which the States administer the permit system and the agreement may provide that all or part of the fees collected under the system shall accrue to the States. The level of fees charged under this subsection shall not exceed the administrative costs incurred in issuing the permits.
> (2)(A) Notwithstanding paragraph (1), the Secretary is authorized and shall collect a fee to recover the actual costs directly related to the management, data collection, and enforcement of any—
>     (i) limited access privilege program; and
>     (ii) community development quota program that allocates a percentage of the total allowable catch of a fishery to such program.

(B) Such fee shall not exceed 3 percent of the ex-vessel value of fish harvested under any such program, and shall be collected at either the time of the landing, filing of a landing report, or sale of such fish during a fishing season or in the last quarter of the calendar year in which the fish is harvested.

*Id*.

Finally, the MSA has allowed Observers on foreign fishing vessels to be charged to them in at least two places. 16 U.S.C. § 1821(h) and § 1827(d). The MSA was created in large part to control foreign fishers from injuring America's fishing resources. NOAA, *Laws & Policies: Magnuson-Stevens Act* (last visited Sept. 25, 2024), https://www.fisheries.noaa.gov/topic/laws-policies. These provisions are specific and allow the Secretary to contract with private Observers and to require foreign fishers to contract with Observers. 16 U.S.C. §§ 1821(h)(3)–(6); 1827(b)(2). They also state that the Secretary shall establish a program that puts an Observer on *every* foreign fishing vessel while it is in American waters. 16 U.S.C. §§ 1821(h)(1)(A); 1827(b)(1). Congress directed that such Observers may be acquired by the Secretary "for such program through contract with qualified private persons." 16 U.S.C. § 1827(b). Congress explicitly stated that "the Secretary" could "impose" fees on such foreign vessels "in an amount sufficient to cover all of the costs of providing an observer aboard that vessel." 16 U.S.C. § 1827(d); *and see* § 1821(h)(4)–(5) (establishing a fund to pay for Observers, that unlike permit fees goes into a fund earmarked within the treasury to be used to pay these observer costs). These fees are placed in a fund that can only be drawn upon as authorized by Congress in appropriations. 16 U.S.C. §§ 1821(h)(4)–(5); 1827(d)–(e). Congress then prohibited any foreign vessel from refusing to pay the fee or refusing to allow an observer aboard. 16 U.S.C. § 1827(f). If Congress does not appropriate the amounts necessary for the Secretary to draw from the "Observer Fund" the Secretary is given full power to force foreign fishers into a contract with private Observers. Section 1821(h)(6). It states:

5

If at any time the requirement set forth in paragraph (1) cannot be met because of insufficient appropriations, the Secretary shall, in implementing a supplementary observer program:

(A) certify as observers, for the purposes of this subsection, individuals who are citizens or nationals of the United States and who have the requisite education or experience to carry out the functions referred to in paragraph (3);

(B) establish standards of conduct for certified observers equivalent to those applicable to Federal personnel;

(C) *establish a reasonable schedule of fees that certified observers or their agents shall be paid by the owners and operators of foreign fishing vessels for observer services; and*

(D) monitor the performance of observers to ensure that it meets the purposes of this chapter.

16 U.S.C. § 1821(h)(6) (emphasis added).

Since 1990, the MSA has been amended at least three times and the ability to charge industry for Observers has never been extended beyond the Northern Pacific, LAPPs and Foreign Fishers. The ability to force fishers into contracts with Observers has never been extended beyond foreign fishers.

## II.    THE OMNIBUS AMENDMENT AND THE FINAL RULE

The Omnibus Amendment and Final Rule are the culmination of almost seven years of design and development. *See* NEFMC, *Observer Policy Committee (Industry-Funded Monitoring), SBRM* (last visited Sept. 25, 2024), https://www.nefmc.org/committees/observer-policy-committee. The Omnibus Amendment and Final Rule allow industry-funded monitoring in NEFMC[2] FMPs, except for those under joint management with MAFMC,[3] *e.g.*, mackerel. *See* AR17731. On or about April 20, 2017, twenty-seven years after the 1990 Amendments, the NEFMC finalized its preferred alternatives and adopted the Omnibus Amendment. *See id*. A year later, on April 19, 2018, the NEFMC "refined" its industry-funded monitoring recommendations. *Id.* On September 19, 2018, the NEFMC published a Notice of Availability for the Omnibus

---

[2] "New England Fishery Management Council"
[3] "Mid-Atlantic Fishery Management Council"

Amendment in the Federal Register. *See* AR17639–40. The Notice of Availability permitted interested parties to submit comments regarding adoption of the Omnibus Amendment for a 61-day period ending on November 19, 2018. *Id*. On November 7, 2018, while the Omnibus Amendment comment period was still open, the proposed rule implementing the Omnibus Amendment was published in the Federal Register. AR16969–91 ("Proposed Rule"). The Proposed Rule permitted interested parties to submit comments regarding the implementing rule for a 47-day period ending on December 24, 2018. *Id*. On February 7, 2020, a full thirty years after the 1990 Amendments, NMFS and NOAA[4] adopted the Final Rule implementing the Omnibus Amendment, which was substantially the same as the Proposed Rule. *See* AR17739.

On December 18, 2018, while the comment period for the Proposed Rule was still open, the Secretary of Commerce notified the NEFMC in an unpublished letter that the Secretary approved the Omnibus Amendment. *See* AR17731; *see also* AR17760–62 ("Pentony Letter"). Plaintiffs, through their sister company, Seafreeze Ltd., as well as other industry stakeholders, submitted comments during the Proposed Rule's comment period. *See* AR17710–15. In contrast to the silence when the 1990 Amendments were proposed, there was an avalanche of opposition. The record reveals that the Omnibus Amendment was contentious and controversial. AR16992–98, AR16994 ("Oliver Mem."). Many of the comments were by fishermen who stated that the proposed regulations were unaffordable, particularly considering other restrictions on herring and mackerel catches. *Id.* at AR16994; and *see*, *e.g.*, AR13491–13494; AR13498; AR16728; AR16735. The comments also noted that the current government-funded observer rate was what *Congress* funded; the new requirement was imposed because the regulators wanted more monitoring than Congress would fund. *See* AR13509.

---

[4] "National Oceanic and Atmospheric Administration"

One agency memorandum complained about the agencies' "limited funding for monitoring," *see* AR16992, and so a scheme was developed to have "the fishing industry [] pay [monitoring] costs for additional monitoring, when Federal funding is unavailable to cover industry's costs." *Id.* While purporting to be consistent with Federal law, the plan was adopted to avoid the problem of spending money Congress had not yet appropriated or the problems of splitting costs between fishers and National Marine Fisheries Service ("NMFS") in ways the violated the law. *Id.* The record is clear that: unlike the 1990 Amendments, the proposed regulation was controversial; and fishers did not believe those amendments had allowed industry funding:

> This action is controversial. Development of this action has been contentious and has taken several years. Some participants in New England fisheries, including those in the Atlantic herring fishery, have expressed concern that they cannot afford industry-funded monitoring or that the Magnuson-Stevens Act does not authorize industry-funded monitoring.

Oliver Mem. at 3.

Despite the controversy and comments Defendants forged ahead and implemented the Final Rule containing all of the objectionable requirements and rejecting all counterproposals.

The $700–800 per day cost of Observers proposed in the Final Rule is far higher than the cost in the high-value Alaskan fishery, which is where the MSA authorizes industry-funded Observers but caps the amount to be charged for Observers. *See* AR17737. The Defendants' response to concerns raised by stakeholders was a near wholesale rejection of the comments submitted. *See* AR17739–44.

The Omnibus Amendment and the Final Rule establish a 50 percent monitoring coverage target for Observers. *See* AR17739, AR17742. This target is achieved by combining Standardized Bycatch Reduction Methodology ("SBRM") of the Northeast Fishers Observer Program

("NEFOP") plus IFM[5] coverage. *See* AR17734, AR17735. The Atlantic herring vessel owners pay for the IFM sampling cost—approximately $710 per day—and NOAA Fisheries purportedly pays for IFM administrative costs. *See* AR17732, 17735. SBRM NEFOP is funded by NOAA Fisheries. *See* NOAA Fisheries, *Industry-funded Monitoring in the Atlantic Herring Fishery* (last updated Feb. 22, 2024), https://www.fisheries.noaa.gov/infographic/industry-funded-monitoring-atlantic-herring-fishery. The Final Rule forces many Atlantic herring vessel owners, including Plaintiffs, to enter forced negotiations with private Observer who are approved and trained by NOAA. *See* GARFO, *Industry-Funded Monitoring Amendment: Atlantic Herring Fishery* at 4 (last visited Sept. 25, 2024), https://s3.amazonaws.com/nefmc.org/14_200130-IFM-Amendment-Presentation.pdf.

The information and data that Observers collect is directed by NOAA Fisheries and the NEFMC. *See* AR17735. As small-mesh bottom trawls, Plaintiffs' F/Vs *Relentless* and *Persistence* are not eligible for the Observer alternative—electronic monitoring with portside sampling—thus, they can only comply with the Final Rule by carrying and bearing the cost of an Observer. *See* AR17735. The Omnibus Amendment and the Final Rule project that, for vessels like F/Vs *Relentless* and *Persistence* that cannot use electronic monitoring, implementing the Omnibus Amendment will reduce Returns to Owners by almost ***20 percent***. *See* AR17735, AR17742.

## ARGUMENT

## I.    WITHOUT CHEVRON DEFERENCE, THE BEST READING OF THE STATUTE IS THAT THE OMNIBUS AMENDMENT AND FINAL RULE ARE UNLAWFUL AND UNAUTHORIZED

This Court was correct that there was no clear statement by Congress in the MSA that industry-funded monitoring in the instant fishery is allowed. *Relentless I,* 561 F. Supp. 3d at 236.

---

[5] IFM stands for "industry-funded monitoring." In previous submissions, the parties have used either "IFM Amendment" or "Omnibus Amendment." This brief adopts "Omnibus Amendment," but refers to IFM when necessary.

The Court stated that "[w]ith statutory currents flowing in all directions, the Court concludes that Congress's intent regarding industry-funded monitoring is ambiguous, and the inquiry cannot end at step one." *Id.* at 236. With *Chevron* deference gone, this Court's analysis should end there. Congress did not provide the extraordinary power to impose Observer costs on private fishers and so it should not be invented from vague language. There is no natural reading of the text and structure of the MSA that allows such a power in the Secretary.

The Supreme Court has thoroughly rejected claims of broad authority by agencies to create their own power to impose new and novel regulations based on vague and ambiguous language in a statute. *Nat'l Fed'n of Indep. Bus. v. Dep't of Lab., OSHA*, 595 U.S. 109 (2022) (statutory authority to regulate workplace safety was not authority to regulate general health); *Ala. Ass'n of Realtors v. Dep't of Health & Hum. Servs.*, 594 U.S. 758 (2021) (statutory authority to prevent spread of communicable diseases did not include power to place a moratorium on evictions); *AMG Cap. Mgmt., LLC v. FTC*, 593 U.S. 67 (2021) (rejecting FTC's 40-year claim of disgorgement remedy based on the statutory grant of ability to obtain injunctions). Again and again, in recent years the Supreme Court has admonished the agencies (and some lower courts) not to infer power when none is given.

However, if this Court goes beyond its prior reasoning, it (and Plaintiffs) must correct a critical absence in *Relentless I*, which is the absence of any citation to 16 U.S.C. § 1821(h)(6). That section provides an apples to apples, oranges to oranges comparison between the Final Rule and a section of the MSA that actually granted the Secretary the power to force vessels (foreign) to contract and pay Observers directly. *Relentless I* is based largely on the misapprehension that Congress had not directly allowed this power elsewhere. In its Step One determination, this Court distinguished the other cost-shifting portions of the MSA from the Final Rule because they were

not a one-to-one analogies between fees and forcing Plaintiffs' vessels into a contract with an Observer. 561 F. Supp. 3d at 235. This Court cited the district court in *Loper Bright Enters., Inc. v. Raimondo¸* 544 F. Supp. 3d 82, 106 (D.D.C. 2021) ("*Loper Bright I*"), for the proposition that all the statues cited as analogous to the Final Rule were fee based and did not force a vessel into a contract with an Observer. *Relentless I*, 561 F. Supp. 3d at 235. This Court stated that those fee-based programs "are distinguishable 'from the industry-funded observer measures at issue here, in which the fishing vessels contract with and make payments directly to third-party monitoring service providers.'" *Id.* (citing *Loper Bright I*).

Section 1821(h)(6) is not so distinguishable. It is clear. It is exact and it contains the power in plain English that the agencies conjure here out of thin air. It states that, as to foreign vessels fishing in American waters, the Secretary can:

> (C) establish a reasonable schedule of fees that certified observers or their agents shall be paid by the owners and operators of foreign fishing vessels for observer services ….

16 U.S.C. § 1821(h)(6)(C).

That section of the MSA was not cited by the Court (or to it by the Plaintiffs) in *Relentless I*. However, it appears it was cited to the Court in *Loper Bright I* but was not discussed or distinguished in that now-overruled case. With this information now before this Court many of the "ambiguities" identified in *Relentless I* are cleared up, and as *Chevron* deference has fallen, so should the Omnibus Amendment and Final Rule. This Court found an ambiguity and distinguished Plaintiffs' arguments concerning § 1858(g)(1)(D) that allows sanctions to be issued "for failure to pay for services 'contracted by an owner or operator.'" *Relentless I*, 561 F. Supp. 3d at 234 (citing Section 1858(g)(1)(D)). This Court noted that "[i]n the three provisions that explicitly allow the Secretary to charge fees for monitoring, *there are no contracts between vessel owners and*

*observers.*" *Id.* at 234–235(emphasis added). The Court only knew of fees. *Id.* at 235. It therefore reasoned, as courts before it had, that because of the "fleeting and unspecific" mention of contracts in § 1858(g)(1)(D), the MSA was not "directly" speaking to the issue. *Id.* All the perceived ambiguity of those words, relied upon so heavily by the Government, evaporates in the face of § 1821(h)(6) of the MSA. It provides for the exact contracts that this Court expected to find somewhere in the MSA because of that "fleeting and unspecific" mention of contracting in Section 1858(g)(1)(D).[6] The agencies are certainly aware of this as they have issued a regulation regarding it. 50 C.F.R. § 600.506(f)–(h). That regulation could not be clearer that not only does the MSA allow such direct contracting by foreign fishing vessels, but that NMFS has provided all the specifications and requirements for the payments and contracting by the foreign vessels.

This Court's and *Relentless I*'s logic in its Step One analysis should, with the addition of the fully statutory picture, now find no ambiguity. The MSA is clear and unambiguous. The statute fits together neatly. Section 1853(b)(8) requires domestic fishers to "carry" Observers. Section 1827(h)(6) allows the Secretary to require certain fishers (but not Plaintiffs or those in the Atlantic fishery) to be forced into contracts with providers of Observer services. Section 1858(g)(1)(D) allows sanctions for those vessels required to contract with Observers under statute if they do not pay such Observers. The statute is neatly wrapped together and none of it provides the power the agencies assert in the Omnibus Amendment and the Final Rule. The D.C. Circuit found this language did not prohibit the agencies from requiring fishers to contract in other areas, but that was before the demise of *Chevron* and makes little sense given the apples-to-apples demonstration that Congress knew how to impart such a power to the agency. *See Loper Bright Enters., Inc., v.*

---

[6] Neither *Goethel v. Dep't of Com.*, 854 F.3d 106 (1st Cir. 2017) nor *Loper Bright I* mentions this section of the MSA. Neither they nor this Court has ever cited it, and it removes any ambiguity at all the Court might find concerning the meaning of the MSA.

*Raimondo*, 45 F.4th 359, 367–68 (D.C. Cir. 2022) (discussing the section). That court erred, in any event, because the question is not whether Congress *prevented* the agency from doing something but whether it *gave* it the power to do so. It did not.

The bedrock foundation of administrative law is that an agency is without power to act "unless and until Congress confers power upon it." *La. Pub. Serv. Comm'n v. FCC*, 476 U.S. 355, 374 (1986). "An agency may not confer power upon itself." *Id*. To do that would permit an agency to override Congress, which is something the Supreme Court is "both unwilling and unable to do." *Id*. at 374–75. Nothing in the MSA confers this power on any Defendant. "[A]n administrative agency's power to regulate … must always be grounded in a valid grant of authority from Congress." *FDA v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 161 (2000). The MSA explicitly allows "observers" to be placed on vessels "for the purpose of collecting data." 16 U.S.C. § 1853(b)(8). It is silent as to forcing fishers into contracts with such Observers. *Loper Bright*, 45 F.4th at 368 ('construe [a statute's] silence as exactly that: silence.") (citing *EEOC v. Abercrombie & Fitch Stores, Inc*, 575 U.S. 768, 774 (2015)). Such silence then does not indicate a Congressional intent to force domestic fishers, like Plaintiffs, to enter into contracts and pay for such collections.

Other than the district court in *Loper I*, all the courts to look at this Rule have only upheld it using *Chevron* deference. *See Loper Bright*, 144 S. Ct. at 2273 ("Because the D.C. and First Circuits relied on *Chevron* in deciding whether to uphold the Rule, their judgments are vacated …."); *Relentless, Inc. v. Dept. of Com.*, 62 F.4th 621, 634 (1st Cir. 2023) (citing reasonableness of agency's interpretation of statute); *Relentless I*, 561 F. Supp. 3d at 236–37 (ambiguous statutory commands allow court to simply assess reasonableness of agency interpretation). The only outlier to the view that the MSA does not expressly provide such power to the agencies was reversed by the D.C. Circuit, noting that the "necessary and appropriate"

language of the statute does not unambiguously provide the agencies such power. *Loper Bright*, 45 F.4th at 366; *see id.* at 368 ("Congress has thus provided no wholly unambiguous answer[.]").

The near unanimity of Courts on the failure of the MSA to provide this power to the agencies absent *Chevron* deference should make the statute's meaning clear. That power was not provided. All that happened in 1990 was that a clarifying amendment was included empowering the agencies to require properly outfitted vessels (but not others) to carry Observers. 16 U.S.C. § 1853(b)(8). *Chevron* notoriously allowed agencies to provide reasonable interpretations of "silence." *Chevron, U.S.A., Inc. v. Nat. Res. Def. Council, Inc.*, 467 U.S. 837, 843 (1984) ("Rather, if the statute is silent or ambiguous with respect to the specific issue, the question for the court is whether the agency's answer is based on a permissible construction of the statute."). That has been overruled. The better interpretation of the MSA is that it does not provide the power to the agencies to force fishers into contracts with Observers. This is so because other portions of the statute allow fee shifting and even the power to force foreign fishers into such contracts, but it is nowhere in the Observer Amendment or any others. S*ee also Ethyl Corp. v. EPA*, 51 F.3d 1053, 1060 (D.C. Cir. 1995) (*Chevron* deference not created by congressional silence on an issue). Congress must implicitly or explicitly assign the power. *Id.* Here it did neither. In fact, the D.C. Circuit's holding in *Ethyl Corp.* also notes that silence does not get an agency to *Chevron* step two by creating an ambiguity. *Id*. (allowing agency power "absent an express withholding of such power" would give agencies "virtually limitless hegemony."). That is what the Government is attempting here post-*Chevron*, and this Court should forbid it.

The MSA does not generally allow the Government to charge fishermen for the cost of their own Observers and, when the law does, it says so. The statute is clear and its deafening silence on any power to force domestic fishers to pay for Observers should end the matter.

## II.  THE OMNIBUS AMENDMENT AND FINAL RULE ARE NOT "NECESSARY AND APPROPRIATE" AND THOSE WORDS DO NOT SUBSTITUTE FOR CHEVRON DEFERENCE

The Government in *Relentless I* tried to use 16 U.S.C. § 1853(a)'s language, governing requirements of fishery management plans, to support its actions. That section, as this Court recognized, requires fishery management plans to contain "conservation and management measures" that are "necessary and appropriate" to stop overfishing and maintain and rebuild fish stocks. *Relentless I*, 561 F. Supp. 3d at 234. Such plans also had to have regulations that were "'necessary or appropriate' to implement the plan." *Id.* (citing 16 U.S.C. § 1853(c)). But those words do not give the agencies powers they were not given elsewhere. As noted, § 1853 requires that all fishery management plans contain "conservation and management measures …" "necessary and appropriate for the conservation and management of the fishery" and that they be consistent with the National Standards, "the other provisions of this chapter," and "any other applicable law." 16 U.S.C. § 1853(a)(1)(A)–(C).

But courts have held that that language does not allow the Government to do whatever it wants at sea. *Gulf Fishermens Ass'n v. Nat'l Marine Fisheries Serv.*, 968 F.3d 454, 468 (5th Cir. 2020) ("necessary and appropriate" language did not grant NMFS authority over aquaculture); *see also Mexican Gulf Fishing Co. v. Dep't of Com.*, 60 F.4th 956, 965 (5th Cir. 2023) ("As an initial matter, we stress that the adjectives *necessary* and *appropriate* limit the authorization contained in this provision." (emphasis in the original)). The attempt to wrest authority from a limiting provision is even less lawful given *Chevron'*s demise.

Courts in other Circuits have likewise concluded that the "necessary and appropriate" adjectives have meaning other than "the agency gets to do whatever it wishes." *See, e.g., Haw. Longline Ass'n v. Nat'l Marine Fisheries Serv.*, 281 F. Supp. 2d 1, 3 (D.D.C. 2003) (rule struck as NMFS did not properly determine whether regulation was "necessary and appropriate" despite

15

argument adopted rule was consistent with "other applicable law[.]"); *id.* at 37 ("To reach a contrary holding would be to allow Defendants to flout the procedural rights of Plaintiff, circumvent judicial review, and ignore some of the most basic tenets of administrative law."). The adjectives "necessary" and "appropriate" have been held to "temper"—not expand—agency power. *The Ocean Conservancy v. Gutierrez*, 394 F. Supp. 2d 147, 156 (D.D.C. 2005) ("This broad discretion is tempered by substantive elements of the [MSA] that require all regulations to be 'necessary and appropriate for the conservation and management of the fishery,' and consistent with ten National Standards defined by the statute." (quoting 16 U.S.C. § 1851(a)(1)–(10)).

In *Michigan v. EPA*, 576 U.S. 743 (2015), the Supreme Court held that a requirement under the Clean Air Act for regulations to be "appropriate" required the agency to ensure a reasonable relationship between costs imposed on the industry and air quality benefits before promulgating such a regulation. *Id.* at 752 ("One would not say that it is even rational, never mind 'appropriate,' to impose [exorbitant] economic costs in return for [marginal] health or environmental benefits."). Courts likewise have concluded that "necessary or appropriate" language "encompasses a specie of cost-benefit justification[.]" *Nat'l Grain & Feed Ass'n v. OSHA*, 866 F.2d 717, 733 (5th Cir. 1988); s*ee also Ala. Power Co. v. OSHA*, 89 F.3d 740, 746 (11th Cir. 1996) (interpreting "necessary or appropriate" language). The *National Grain* and *Alabama Power* statutes had language that allowed a regulation to be "necessary or appropriate," that is *either* of those two alternatives. The MSA requires that all FMP's be *both*. The "necessary and appropriate" language thus cabins rather than expands Defendants' power. *See In re MCP No. 165, OSHA Admin., Interim Final Rule: Covid-19 Vaccination and Testing 86 Fed Reg. 61402*, 21 F.4th 357, 391–97 (6th Cir. 2021) (Larsen, J., dissenting) (distinguishing "necessary" from "necessary or appropriate").

### III. THE HISTORY OF THE MSA COUNSELS AGAINST THE AGENCY'S HAVING SUCH ASSERTED POWER.

The MSA was passed to address the depredations by foreign fishers of American fish stocks. NOAA Fisheries, *Laws & Policies: Magnuson-Stevens Act* (last visited Sept. 25, 2024), https://www.fisheries.noaa.gov/topic/laws-policies. Congress passed the MSA with provisions both for 100% Observer coverage of foreign fishers in American waters and with a provision allowing the Secretary to force such fishers to contract Observer services. 16 U.S.C. §§1821, 1827. Congress knew what Observers were. It specifically added a requirement that allowed the Secretary to require permitted fishers to carry them in 1990. 16 U.S.C. § 1853(b)(8). In doing so, it did not say permitted fisherman had to pay for such Observers. Congress amended the MSA again in 1996 to better define what vessels had to cover Observers, what they were and how they were to be trained. 16 U.S.C. § 1881b. At no time did Congress say that such Observers were to be contracted to the vessels except for foreign fishers.

More than forty years of consistent Congressional direction exist on this matter, and not until 2018 when the Omnibus Amendment was proposed did the agencies assert the power to force herring fishers to contract with Observers.[7] When the agencies did so it created an uproar. AR16994–95 (Oliver Mem.). This contrasts with the utter silence when Congress determined Observers should go on fishing vessels. This is evidence of contemporaneous understanding that Observers were believed by everyone reading the 1990 statutes to be Government paid employees. The MSA explicitly says they are such employees for certain purposes. *See, e.g.,* 16 U.S.C. § 1881b(c). *Loper Bright* noted that courts still may respect "contemporaneous construction" of ambiguous laws by the executive (though not to defer to them). *See* 144 S. Ct. at 2257 (quoting

---

[7] Even if the Court looks to *Goethel* in a different fishery, two decades went by from the 1990 Amendments to this assertion of non-textual power.

*Edwards' Lessee v. Darby*, 12 Wheat. 206, 210 (1827)). But such respect was only "especially warranted when an Executive Branch interpretation was issued roughly contemporaneously with enactment of the statute and remained consistent over time." *Id.* at 2258. Here, the contemporaneous interpretation of the MSA, as commentators noted, was that the Government paid for the Observers allowed by the Observer amendments. This was the case for more than 20 years after Congress amended the statute in 1990.

Congress added the Observer Amendment to make clear that Observers could be placed on vessels in all the fisheries when the Secretary so determined. But Congress permitted *industry*-funded Observers only in the Northern Pacific, just as Plaintiffs have argued. Congress did not approve cost shifting of Observers in other fisheries, unless they were foreign vessels or approved LAPPs. If Congress does grant such power, it says so in statutes, not interstices or penumbras. The MSA has been reauthorized three times since 1989, and Congress has rejected the authority asserted here by the agencies each time. When an agency asserts broad power, courts "are obliged to defer not to the agency's expansive construction of the statute, but to Congress' consistent judgment to deny the [agency] this power." *Brown & Williamson Tobacco*, 529 U.S. at 160. The fact that, in every other domestic cost shifting portion of the MSA, Congress caps costs to the permitted fishing vessels is further evidence that they did not willy-nilly grant the agencies powers to shift costs with no caps at all and to impose costs greatly in excess of anything Congress allowed by statute. The agencies cannot have more power to impose costs when Congress does not speak to the issue directly, than when Congress does.

As noted, Plaintiffs were in the fishing industry when the Observer Amendments were adopted. As far as their knowledge and the contemporaneous record demonstrates, there was no opposition by anyone to the amendments, and no one articulated opposition to them on the idea

that they might allow charging vessels for such Observers. Congress's silence—and that of the fishing industry as a whole—is the "dog that didn't bark," and that silence provides strong evidence that the understanding at the time was that no charging danger lurked. The Supreme Court has noted what such silence means:

> Congress' silence in this regard can be likened to the dog that did not bark. See A. Doyle, Silver Blaze, in The Complete Sherlock Holmes 335 (1927). Cf. *Harrison v. PPG Industries, Inc.,* 446 U.S. 578, 602, 100 S.Ct. 1889, 1902, 64 L.Ed.2d 525 (1980) (REHNQUIST, J., dissenting) ("In a case where the construction of legislative language such as this makes so sweeping and so relatively unorthodox a change as that made here, I think judges as well as detectives may take into consideration the fact that a watchdog did not bark in the night").

*Chisom v. Roemer*, 501 U.S. 380, 396 n.23 (1991).

The contemporaneous understanding of the MSA is powerfully bolstered by the fact that the agency did not begin to plan the Omnibus Amendment until more than 20 years had passed from the Observer Amendment. And when the agency proposed the Omnibus Amendment requiring industry funded monitoring, the immediate outpouring of negative commentary and resistance from the fishing community was overwhelming, as the record reveals.

To hold the Government's interpretation of its power lawful would also strike at democratic accountability. Plaintiffs never had an opportunity to oppose proposed legislation concerning industry-paid Observers in the New England fisheries. The agencies presented the idea to them as a *fait accompli* decades after the Observer Amendment passed. The Court should reject this novel interpretation of the MSA, asserted two decades after passage of the amendment relied upon to support it and completely at odds with the history and structure of the MSA statute itself.

## CONCLUSION

The Omnibus Amendment and the Final Rule do not comport with powers granted to the Defendant agencies by Congress in the MSA. This Court should declare the Omnibus Amendment unlawful and vacate the Final Rule.

Dated: September 26, 2024                    Respectfully submitted,

                                             /s/ John J. Vecchione
                                             John J. Vecchione (admitted *pro hac vice*)
                                             Kara Rollins (admitted *pro hac vice*)
                                             New Civil Liberties Alliance
                                             4250 N. Fairfax Drive, Ste. 300
                                             Arlington, VA 22203
                                             Phone: (202) 869-5210
                                             john.vecchione@ncla.legal
                                             kara.rollins@ncla.legal

                                             Timothy J. Robenhymer, #4419
                                             303 Jefferson Boulevard, 2nd Floor
                                             Warwick, RI 02888
                                             Phone: (401) 921-4800
                                             Facsimile: (401) 526-0302
                                             tjr@lawofficesri.com

                                             *Counsel for Plaintiffs*

**CERTIFICATE OF SERVICE**

I hereby certify that on September 26, 2024, I electronically filed the foregoing Plaintiffs' Supplemental Brief in Support of Motion for Summary Judgment using the CM/ECF system, which will send electronic notification of such filing to all counsel of record.


_/s/ John J. Vecchione_