# Exhibit 1

428

TESTIMONY OF

HENRY V.E. MITCHELL, ESQUIRE

ON BEHALF OF

THE BERING SEA FISHERMEN'S ASSOCIATION


BEFORE THE

HOUSE COMMITTEE ON MERCHANT MARINE AND FISHERIES


regarding

REAUTHORIZATION OF

THE

MAGNUSON FISHERY CONSERVATION MANAGEMENT ACT


ANCHORAGE, ALASKA

AUGUST 11, 1989


I am Henry Mitchell, Executive Director of the Bering Sea Fishermen's Association (BSFA), with headquarters located in Anchorage, Alaska. I am also on the Board of Directors and the Executive Committee of the United Fishermen of Alaska (UFA), with headquarters in Juneau, Alaska. For the record, I am a member of the North Pacific Fishery Management Council, the Advisory Panel of the International North Pacific Fisheries Commission, the Advisory Panel of the Yukon Salmon Treaty talks and the US/USSR North Pacific and Bering Sea Fisheries Advisory Panel. I am here to

429

testify today, on behalf of BSFA, on the reauthorization of the Magnuson Act and on related points which continue to be problems where fishery management is concerned.

BSFA is a commercial fishing organization representing some 1,500 Western Alaska residents who traditionally fish for salmon and herring from small boats. The region of Alaska that BSFA represents consists of the coastline starting from the North with Kotzebue and Nome and running south through Bristol Bay. This area includes the fisheries of the Kuskokwim, the Upper Yukon, the Lower Yukon, Norton Sound and Kotzebue--all relatively small and conducted primarily by Alaska Natives--as well as the valuable fisheries of Bristol Bay. Incomes throughout much of this area are among the lowest in the nation. Most of the commercial fishermen of the area also conduct subsistence fisheries for salmon to provide their families with food for the year.

Mr. Chairman, there have been substantial successes achieved under the FCMA since the initiation of the council process. Obviously, the major accomplishment has been the almost total Americanization of the groundfish fishery, bringing about in the EEZ off Alaska (the area served by the North Pacific Fishery Management Council) some $1.52 billion dollars in capitalization-- some 50% of this within the last three years. Now, over 60% of the fish caught in the entire EEZ of the United States comes out of these waters. However, now that Americanization has been realized,

2

430

our Council in particular is faced with some staggering problems that need attention in this year' reauthorization.

Rapid expansion of an Americanized fishery has put extreme pressure on our Council at a time that funding to support the councils nationwide has decreased. Substantial work on management plans and amendments has increased the amount of time the Council, its staff and the affiliated committees of the Council has to spend on managing the fisheries with fewer resources available. That includes less money available to NOAA to perform fundamental resource assessment work. Add to that the fact that with the elimination of the foreign fishing in the EEZ has come the elimination of the observer program, a significant source of scientific information vital to the conservation of the resource. In January, our Council went on record saying that the lack of domestic observer data available to us made it impossible for us to meet our responsibilities to manage the fishery appropriately.

Mr. Chairman, we need a recommitment to the conservation orientation originally intended by Congress. In order to meet our conservation responsibilities under the Act--our primary reason for existence--we need domestic observers and a method of paying for them. BSFA has pressed for some time for 100% domestic observer coverage on the groundfish fisheries as the only realistic method of meeting our conservation mandate, at least initially. Absent a compelling determination by the Council that an alternative to 100% still provides us with a realistic picture of our fisheries stocks,

3

431

true bycatch levels, the amount of "waste'" and the like -- or is otherwise appropriate-- full domestic observer coverage should be provided for in the Act. We had such a requirement with the foreign fleets as a cost of doing business. It should be treated accordingly for the domestic groundfish fleets.

In addition to addressing the observer needs statutorily, we need to address the problem of a funding mechanism statutorily. There is substantial question of how, legally, councils establishing observer programs can assure an equitable and fair method of paying for them. Currently, councils appear to be unable to charge fees to cover such costs, and appear merely to be left now to mandating their existence. What needs to be done is to authorize the creation of a fund and funding mechanism, establish qualitative criteria to set priorities for information, and deal with the continuing problem of observer data confidentiality. Such a conservation orientation on observer programs has been developed by a number of Washington and Alaska fishing groups, and is currently being circulated for wider review. I believe you have heard the Governor and others address this proposal. The proposal has substantial merit and should be included in your package of proposed FCMA amendments.

Further to the FCMA's conservation mandate, we need statutory clarification and acknowledgement that the groundfish fisheries in the US EEZ must not displace fully utilized, historic directed fisheries with bycatches that create conservation concerns. The

4

432

domestic trawl fleet takes as bycatch to their operations traditional species (halibut, crab, salmon, herring) that my fishermen depend on for directed harvest. There needs to be clarification of the national standards that these fisheries are to be protected. This, of course, does not mean elimination of the groundfish fisheries conducted by trawlers. It merely means that as a matter of conservation one species should not be permitted to threaten the health of the stocks of another or unduly burden directed fisheries conducted on those stocks. A domestic observer program will yield essential information on bycatch levels and rates.

The importance of and benefits from such an approach, coupled with a domestic observer program, can best be exemplified by our experience with the foreign fleets in the early 1980's. The Council imposed a five year sliding scale of bycatch for prohibited species on the foreign fleets, supported by 100% domestic observer coverage and fishing closures. Within one year, the fleets met their fifth year objective. BSFA believes that we should expect no less when dealing with the domestic fleets.

It is clear that conservation problems will continue to be the primary focus of the Council. BSFA has serious concerns about the staggering problems of waste evidenced by the roe-stripping issue and the bycatch of our traditional species, and urges the Committee to consider these matters seriously and address them with the appropriate statutory fixes.

433

One further matter deserves exploration. I have briefly described the villages from which the fishermen I represent come. The cash economy is based primarily on salmon and herring. Subsistence depends on these two fisheries as a personal food source. Dependent on migrating ocean resources, our fishermen have borne the conservation burden of foreign salmon interception, foreign longline fishing and foreign and domestic trawl fisheries, each of them creating a major impact on our fisheries.

Not only have the fishermen of our region suffered impacts from other fisheries through directed or indirect catch of our traditional species, we have been unable to participate in the expansion of the groundfish fisheries during the rapid Americanization. For one, my fishermen suffer a substantial capital deficiency. In addition, when these small inshore fisheries have attempted to expand to ocean ventures, they have met opposition. Efforts to develop a small boat cod fishery off Nunivak Island failed when the Council would not protect the fishery from catches by larger boats. The sad thing was that the 9000 ton catch of our local cod resource by the bigger boats was only bycatch to the yellow fin sole fishery. In any case, the cod have essentially disappeared from that area, obviously at the expense of any chance we had to develop a new fishery.

6

434

BSFA believes that a community development quota system needs to be available, on a council by council, basis to address this problem. There should be a set aside of any portion of a shoreside preference as a portion of the TAC for emergent shorebased fisheries which have demonstrated a historic interest in the harvesting but have been unable to demonstrate significant participation in the shoreside processing sector.

Our final critical problem with regard to the FCMA is the continued high seas interception of salmon by the foreign fleets of such nations as Taiwan, Korea, and Japan. Under the FCMA we have exclusive authority within the EEZ and over anadromous species outside of the EEZ. This being the case, we should have all the authority to board, inspect, and arrest vessels on the high seas that are illegally taking salmon. These authorities have been recognized by the nations conducting high seas drift gillnetting in GIFA's entered into under the authority of the FCMA. This should be the same authority that we have over continental shelf species and any fish species within the EEZ. Yet, negotiations with Japan and the Republic of China made under the authority of the Driftnet Act have resulted in generally poor agreements that do not fulfill all the requirements of the Driftnet Act and tend to undermine our authorities and conservation efforts under the FMCA.

Our authorities under the FMCA are quite clear, but exactly how conservation of our anadromous species should be enforced needs to be clarified. We need clarification, and in many instances

7

435

strengthening, of the language in the FCMA asserting U.S. jurisdiction over U.S. origin anadromous species and we must establish the basis for a defensible rebuttable presumption for U.S. salmon and steelhead caught on the high seas. We have all the authority we need to address international fisheries concerns under Magnuson, but this authority has to be fully recognized by State and Commerce. FCMA authority over anadromous species and the applicability of FCMA penalties to violators was not recognized by the State Department in the Japanese and Taiwanese negotiations, and has led, as mention before, to our being bound by poor agreements with sometimes conflicting provisions.

Clarification and reauthorization of the FMCA will provide us with:

1. Exclusive authority of fishery species within the EEZ and beyond the EEZ for the case of anadromous species. This restatement of our authority must be accompanied by a stronger enforcement presence both in the EEZ and in the areas of anadromous species' migration. The only way to protect and conserve our fish species is to maintain strong enforcement. The primary way to maintain strong enforcement is to assure adequate funding, which is not currently the case. We are very disturbed by reports of major cuts in Coast Gaurd funding proposed through the House appropriations measures.

436

2. The responsiblity to provide funding for more research on the distribution of anadromous species. To conserve our anadromous species we must have more information on where they are at any particular time of the season. That entails additional scientific studies conducted by monitoring vessels near areas of suspected anadromous species distribution, as well as an enhanced foreign observer program of substantial levels of coverage.

3. The suitable negotiating clout that we lacked in the 1989 negotiations with Japan and Taiwan. We have made two agreements which do not satisfy all the requirements of the Driftnet Act--and the Driftnet Act was already deficient in not setting as a priority the rapid phase out of the foreign high seas driftnet fleets. Our negotiating stance did not include what we consider to be a full and complete understanding of our authorities under the FCMA. Frankly, the longer we espouse an inability to board vessels at sea in the face of flagrant violations of our salmon authorities and the foreign fishing nation's own fishing regulations, the less credibility our position retains.

Another major reason these negotiations were unsuccessful is that the certification and sanctions described in the Driftnet Act and the Fishermen's Protective Act have not seemed to pose a credible threat to the other

9

437

nations. The range of products eligible for sanctions under the Pelly Amendment needs to be expanded to include "all" products imported from offending nations.

It is the high seas interception of salmon that is currently causing the most damage to the Alaska fishing industry and creating the most severe policy crisis. BSFA members rely on salmon not only as a means of income, but also as a mainstay in their subsistence way of life. The annual income in the western Alaska regions of the Yukon and Kuskokwim River drainages is little more than $5000 to $6000. These people depend upon sensible fishery management of anadromous species. This management is provided for in the language of the FCMA Act, but if these provisions are not clarified and actively enforced, the economic losses caused by foreign interceptions will continue to have severe impacts upon our members.

High seas interception of salmon is piracy on the high seas, pure and simple. Reauthorization of the FCMA this year provides us with the forum to end this piracy--a forum that was initially created to provide jurisdiction and direction to this end, but has not been recognized by our government at crucial moments.

Reauthorization should include the necessary clarification and ammendments to establish our rights to board foreign vessels fishing for North American salmon (legally or illegally). This should include our rights to board vessels that have traditionally

10

438

harvested salmon in spite of claims to be targeting other species, such as squid. For enforcement purposes, we must establish a rebuttable presumption for enforcement purposes and mandate various enforcement, information-gathering, and observer requirements for the purpose of documenting and minimizing ending high seas interceptions.

Finally, in regards to high seas interception, let me state that BSFA will never be satisfied until foreign high seas driftnet fishing is completely eliminated. That is the position of the United Fishermen of Alaska as well. You have heard from our Governor. In addition the Alaska Legislature is on record to ban foreign high seas drift gillnetting and has asked Congress for a declaration calling for the end of foreign high seas gillnet fishing beyond the Exclusive Economic Zones of all nations by 1992. We are pleased and thankful for the action taken by Congresswoman Jolene Unsoeld, in introducing "The Marine Resources Protection and Driftnet Use Cessation Act" to pursue a complete ban on high seas driftnets. We fully support the concepts embodied in this measure and will work with the Congresswoman and other co-sponsors as the measure moves through Congress

Besides working on a national level through reauthorization of the FCMA and the passing of new legislation, we must pursue the end of high seas driftnets on an international level. The conference of South Pacific nations at Suva, Fiji, issued strong signals that these nations are ready to work on this matter. The Australians

11

**439**

and New Zealanders are strongly on record for achieving this end. We must join together with the Soviets in their efforts to ban this devastating and wasteful means of fishing. By seeking international agreements on the policing of the seas, our enforcement burden will be lessened and we can become more effective in ending high seas interception of salmon as well as protected migratory seabirds and marine mammals. As the Chairman knows well, our western Alaskans are also very concerned about the impact of these foreign activities on the stocks of marine mammals and seabirds of vital importance to our residents.

I thank you for this opportunity to provide these comments on behalf of BSFA. I look forward to working with you and your staff in the furtherance of proper additions to assure the continued success of the FCMA and the health of the fisheries.