# IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF RHODE ISLAND

| | | |
|---|---|---|
| RELENTLESS, INC., et al., | : | |
| | : | |
| Plaintiffs, | : | |
| | : | |
| v. | : | |
| | : | |
| U.S. DEPARTMENT OF COMMERCE, | : | Civil Action No. 1:20-cv-00108-WES-PAS |
| et al., | : | |
| | : | |
| Defendants. | : | |

**DEFENDANTS' SUPPLEMENTAL BRIEF**

# TABLE OF CONTENTS

**PAGE**

I.     INTRODUCTION ......................................................................................................... 1

II.    PERTINENT BACKGROUND ..................................................................................... 1

III.   ARGUMENT ................................................................................................................ 3

   A.    The Court Should Abide By Its Earlier Analysis Of The Magnuson-Stevens Act's Meaning. ................................................................................................................... 3

   B.    The Best Reading Of The Magnuson-Stevens Act Is That Congress Authorized The Service To Require Vessels To Carry At-Sea Monitors At Their Own Expense. ................ 5

     1.    The Magnuson-Stevens Act's text and context establish that Section 1853(b)(8) authorizes observer requirements and the resulting compliance costs. ......................... 6

     2.    Historical practice and legislation confirm that the Service's authority includes cost allocation. .................................................................................................................. 12

     3.    The provisions establishing fee programs are structurally distinct and serve different purposes. ..................................................................................................................... 16

   C.    The Service Properly Exercised Its Authority To Adopt Necessary And Appropriate Measures For Conservation And Management Of The Fishery. ...................................... 19

     1.    Congress conferred a degree of discretion on the Service in implementing Magnuson-Stevens Act measures. ................................................................................................. 19

     2.    The Service reasonably exercised its authority to adopt necessary and appropriate measures. ..................................................................................................................... 22

IV.    CONCLUSION ........................................................................................................... 24

# TABLE OF AUTHORITIES

**CASE**                                                                                        **PAGE**

*Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc.*,
    467 U.S. 837 (1984) ................................................................................... 2, 3

*Conservation L. Found. of New Eng., Inc. v. Franklin*,
    989 F.2d 54 (1st Cir. 1993) ............................................................................ 20

*FDA v. Brown & Williamson Tobacco Corp.*,
    529 U.S. 120 (2000) ..................................................................................... 7, 8

*Goethel v. Pritzker*,
    No. 15-cv-197, 2016 WL 4076831 (D.N.H. July 29, 2016)...................... 16

*Gonzalez v. Justs. of the Mun. Ct. of Bos.*,
    420 F.3d 5 (1st Cir. 2005)............................................................................... 3

*Kotler v. Am. Tobacco Co.*,
    981 F.2d 7 (1st Cir. 1992)............................................................................... 3

*Loper Bright Enters, Inc. v. Raimondo*,
    544 F. Supp. 3d 82 (D.D.C. 2021)................................................................. 2

*Loper Bright Enters., Inc. v. Raimondo*,
    45 F.4th 359 (D.C. Cir. 2022)............................................................... passim

*Loper Bright Enters., Inc. v. Raimondo*,
    144 S. Ct. 2244 (2024) ......................................................................... passim

*Lovgren v. Byrne*,
    787 F.2d 857 (3d Cir. 1986) ......................................................................... 20

*Michigan v. EPA*,
    576 U.S. 743 (2015) ..................................................................................... 19

*Nat'l Ass'n of Home Builders v. Defs. of Wildlife*,
    551 U.S. 644 (2007) ....................................................................................... 7

*N.Y. Stock Exch. LLC v. Sec. & Exch. Comm'n*,
    962 F.3d 541 (D.C. Cir. 2020)..................................................................... 21

*Relentless et al. v. U.S. Dep't of Com.*,
    144 S. Ct. 325 (2023) ..................................................................................... 3

*Relentless, Inc. v. U.S. Dep't of Com.*,
    561 F. Supp. 3d 226 (D.R.I. 2021) ................................................................... passim

*Relentless, Inc. v. U.S. Dep't of Com.*,
    62 F.4th 621 (1st Cir. 2023) ........................................................................... passim

*Solid Waste Agency of N. Cook Cnty. v. U.S. Army Corps of Eng'rs*,
    531 U.S. 159 (2001) ........................................................................................... 15

*United States v. Parks*,
    698 F.3d 1 (1st Cir. 2012) .................................................................................. 16

*Wayman v. Southard*,
    10 Wheat. 1 (1825) ............................................................................................ 19

**Statutes**

5 U.S.C. § 706 ................................................................................................................ 19

5 U.S.C. § 706(2)(A) ................................................................................................. 12, 24

16 U.S.C. § 1801 ............................................................................................................. 1

16 U.S.C. § 1801(a)(8) .................................................................................................. 22

16 U.S.C. § 1801(c)(3) .................................................................................................. 22

16 U.S.C. § 1802(5) ...................................................................................................... 21

16 U.S.C. § 1802(31) ...................................................................................................... 7

16 U.S.C. § 1802(32) ...................................................................................................... 7

16 U.S.C. § 1802(33) .....................................................................................................11

16 U.S.C. § 1802(36) ...................................................................................................... 8

16 U.S.C. § 1821(h)(4) .................................................................................................. 17

16 U.S.C. § 1821(h)(6) .............................................................................................. 16, 17

16 U.S.C. § 1821(h)(6)(C) ............................................................................................. 17

16 U.S.C. § 1827 ............................................................................................................. 5

16 U.S.C. § 1851 ........................................................................................................... 21

16 U.S.C. § 1851(a) .......................................................................................................... 10

16 U.S.C. § 1851(a)(1) ....................................................................................................4, 11

16 U.S.C. § 1851(a)(2) ......................................................................................................... 22

16 U.S.C. § 1851(a)(7) ...................................................................................................11, 23

16 U.S.C. § 1851(a)(8) ...................................................................................................11, 23

16 U.S.C. § 1853 .................................................................................................................. 21

16 U.S.C. § 1853(a)(1)(A) ........................................................................................ 4, 9, 20, 23

16 U.S.C. § 1853(a)(1)(5) ...................................................................................................... 9

16 U.S.C. § 1853(a)(2) .......................................................................................................... 9

16 U.S.C. § 1853(a)(5) ......................................................................................................... 22

16 U.S.C. § 1853(a)(7) .......................................................................................................... 9

16 U.S.C. § 1853(a)(9)(A) ...................................................................................................... 9

16 U.S.C. § 1853(a)(11) ......................................................................................................... 9

16 U.S.C. § 1853(a)(14) ......................................................................................................... 9

16 U.S.C. § 1853(b) ............................................................................................................... 9

16 U.S.C. § 1853(b)(2) .......................................................................................................... 9

16 U.S.C. § 1853(b)(3) .......................................................................................................... 9

16 U.S.C. § 1853(b)(4) ...................................................................................................... 9, 10

16 U.S.C. § 1853(b)(7) .......................................................................................................... 9

16 U.S.C. § 1853(b)(8) ................................................................................................... passim

16 U.S.C. § 1853(b)(14) ................................................................................................. passim

16 U.S.C. § 1853(c) .............................................................................................................. 4

16 U.S.C. § 1853a ............................................................................................................. 5, 18

16 U.S.C. § 1853a(e)(2) ........................................................................................... 18

16 U.S.C. § 1854(d)(2) ............................................................................................. 18

16 U.S.C. § 1857(1)(L) ............................................................................................. 8

16 U.S.C. § 1858(g)(1)(D) ....................................................................................... 4, 8

16 U.S.C. § 1862 ....................................................................................................... 5, 17

16 U.S.C. § 1862(b)(2)(A) ....................................................................................... 18

16 U.S.C. § 1862(b)(2)(F) ........................................................................................ 18

16 U.S.C. § 1881b ..................................................................................................... 15

31 U.S.C. § 3302 ...................................................................................................... 16

42 U.S.C. § 7412(n)(1)(A) ....................................................................................... 20

**Regulations**

50 C.F.R. § 648.11(g)(4)(i) ...................................................................................... 2

50 C.F.R. § 648.11(g)(4)(iii)(A) .............................................................................. 3

50 C.F.R. § 648.11(k) ............................................................................................... 14

50 C.F.R. § 648.11(*l*) ................................................................................................ 14

50 C.F.R. § 648.11(m) .............................................................................................. 23

**Federal Register**

55 Fed. Reg. 4839 (Feb.12, 1990) ........................................................................... 12

77 Fed. Reg. 23326 (Apr.18, 2012) ......................................................................... 16

85 Fed. Reg. 7414 (Feb. 7, 2020) ............................................................................ 1, 16, 22

**Other Authorities**

H.R. Rep. No. 101-393 (1989) .............................................................................. 12, 13, 15

S. Rep. No. 101-414 (1990) ...................................................................................... 13

S. Rep. No. 116-127 (2019) ...................................................................................... 14

## I.    INTRODUCTION

Plaintiffs challenge the National Marine Fisheries Service's authority under the Magnuson-Stevens Fishery Conservation and Management Act ("Magnuson-Stevens Act") to require at-sea monitoring and associated costs for vessels that participate in the Atlantic herring fishery.  In its earlier decision, the Court examined the statute at *Chevron*'s first step and found that Congress's intent regarding industry-funded monitoring was ambiguous, and that its inquiry could not end there.  Upon examining the statute at *Chevron*'s second step, the Court considered the holdings of other cases concerning industry-funded monitoring and the legislative history and upheld the government's reading as permissible.  The First Circuit affirmed.  *Chevron*'s deference framework is now overruled, and on remand, the Court is tasked with determining the best reading of the statute.

In urging the Court to adopt their position, Plaintiffs rely on their unsubstantiated and self-serving recollections of the debate on the 1990 amendments to the Magnuson-Stevens Act, and pick at random yet another section of the statute that they describe as the linchpin of their theory of the case.  Neither of these provide the "neat" solution that Plaintiffs seek.  Plaintiffs' remaining arguments will be familiar to the Court as it previously rejected them in one form or another and should do so again now.  The Court should now exercise its independent judgment to resolve any remaining ambiguity and hold that the Magnuson-Stevens Act is best read to authorize the rule.

## II.    PERTINENT BACKGROUND

The full background of this case is presented in Defendants' summary judgment briefs.  *See* Dkts. 38, 43.  In short, the Service adopted a rule under the Magnuson-Stevens Act, 16 U.S.C. § 1801 et seq., authorizing an at-sea monitoring program in the Atlantic herring fishery. *See generally* 85 Fed. Reg. 7414 (Feb. 7, 2020) ("Final Rule").  Plaintiffs challenged provisions of the

Final Rule, specifically objecting to industry vessels bearing certain costs of complying with at-sea monitoring coverage requirements.  This Court upheld the Final Rule in September 2021, *Relentless, Inc. v. U.S. Department of Commerce*, 561 F. Supp. 3d 226 (D.R.I. 2021), and the First Circuit affirmed.  *Relentless, Inc. v. U.S. Dep't of Com.*, 62 F.4th 621 (1st Cir. 2023).  The D.C. District Court upheld the Final Rule in June 2021, *Loper Bright Enterprises, Inc. v. Raimondo*, 544 F. Supp. 3d 82 (D.D.C. 2021), and the D.C. Circuit affirmed in 2022.  *Loper Bright Enters., Inc. v. Raimondo*, 45 F.4th 359 (D.C. Cir. 2022).  The Supreme Court then vacated and remanded both courts' judgments in June 2024, based on its decision to overturn the holding in *Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837 (1984), that courts should defer to agency interpretations of ambiguous statutory language in certain circumstances, but without addressing the Magnuson-Stevens Act statutory construction question presented by the *Relentless* and *Loper Bright* cases.  *Loper Bright Enters., Inc. v. Raimondo*, 144 S. Ct. 2244 (2024).

In practice, the at-sea monitoring rule has had no financial impact on vessels in the Atlantic herring fishery.  The Service began operating the program in July 2021 and ceased monitoring coverage in April 2023, when the agency no longer had funds available to cover administrative costs.  NOAA Fisheries, Atlantic Herring Industry-Funded Monitoring Program Suspended Beginning in April 2023 (Nov. 2, 2022), https://www.fisheries.noaa.gov/bulletin/atlantic-herring-industry-funded-monitoring-program-suspended-beginning-april-2023; *see* 50 C.F.R. § 648.11(g)(4)(i).  Although not required to do so, the Service allowed owners of vessels that incurred costs during this period to seek federal reimbursement.  The Service ultimately "reimburse[d] 100 percent of the industry's at-sea monitoring costs" incurred under the rule.  NOAA Fisheries, Status of Industry Cost Reimbursement for Atlantic Herring Industry-Funded Monitoring (Sept. 7, 2023), https://www.fisheries.noaa.gov/bulletin/status-industry-cost-

reimbursement-atlantic-herring-industry-funded-monitoring; *see* 50 C.F.R. § 648.11(g)(4)(iii)(A). Thus, although the Service retains authority under the rule to implement at-sea monitoring prospectively, the Service currently is not exercising that authority.

## III.    ARGUMENT

### A.    The Court Should Abide By Its Earlier Analysis Of The Magnuson-Stevens Act's Meaning.

As an initial matter, there is no basis for the Court to revisit issues that the Supreme Court did not address in its decision.  The "general rule" is that, when the Supreme Court remands in a civil case, the lower court "should confine its ensuing inquiry to matters coming within the specified scope of the remand."  *Kotler v. Am. Tobacco Co.*, 981 F.2d 7, 13 (1st Cir. 1992); *see also Gonzalez v. Justs. of the Mun. Ct. of Bos.*, 420 F.3d 5, 8 (1st Cir. 2005).

The Supreme Court took up only the question whether to overrule the holding of *Chevron U.S.A. Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837 (1984), and declined to review the Magnuson-Stevens Act question.  *Compare Relentless et al. v. U.S. Dep't of Com.*, 144 S. Ct. 325 (2023) (mem.) (granting only *Chevron* question), *with* Pet. for Writ of Cert. at ii, *Relentless*, No. 22-1219 (U.S. June 14, 2023) (seeking certiorari on question whether language in the Magnuson-Stevens Act augments agency authority to require industry-funded monitoring). The Supreme Court's decision overruled the *Chevron* framework but did not apply its holding to the Final Rule itself or otherwise interpret the Magnuson-Stevens Act, which is discussed in the majority opinion only in its recounting of the case background.  *Loper Bright*, 144 S. Ct. at 2254-56.  Thus, the case returns to this Court for review under a different interpretive framework, but without further elaboration on the Magnuson-Stevens Act.  *See id.* at 2273 ("Because the D.C. and

First Circuits relied on *Chevron* in deciding whether to uphold the Rule, their judgments are vacated, and the cases are remanded for further proceedings consistent with this opinion.").[1]

On remand, this Court is charged with exercising its "independent judgment in deciding whether [the] agency has acted within its statutory authority. . . ." *Id.* at 2273. Where the statute is ambiguous, this Court should "use every tool at [its] disposal to determine the best reading of the statute" and may not "defer to an agency interpretation of the law." *Id.* at 2266, 2273. Much of this interpretive work already has been done. On summary judgment and in the appellate proceedings in the First Circuit, the government argued that the most reasonable interpretation of the statute is that the Magnuson-Stevens Act authorizes the Service to adopt rules requiring vessels in regulated fisheries to carry at-sea monitors and bear the costs of complying with those requirements. *See generally* Dkts. 38 & 43; *see also Relentless v. U.S. Dep't of Com.*, Case No. 21-1886 (1st Cir.), Answering Brief at 21-22. Because the government argued that this question of agency authority could be resolved at *Chevron*'s first step, this Court applied the traditional tools of statutory interpretation to determine whether the Magnuson-Stevens Act unambiguously authorized the rule.

The Court's analysis began with the ordinary meaning of the language Congress used in the Magnuson-Stevens Act to authorize the Service to adopt measures requiring vessels to carry observers. *Relentless*, 561 F. Supp. 3d at 234-35 (discussing 16 U.S.C. § 1853(b)(8)). The Court then turned to the broader statutory context and other provisions to inform its understanding of statutory meaning and agency authority. *Id.* (discussing 16 U.S.C. §§ 1851(a)(1), 1853(a)(1)(A), 1853(c), and 1858(g)(1)(D)). The Court then rejected Plaintiffs' arguments that Congress had

---

[1]  The Court need not address questions in this appeal beyond statutory authority. Plaintiffs do not press those arguments in their supplemental brief, and made clear during the August 22, 2024 status conference that they were not raising them at this stage of the litigation.

spoken directly in their favor based on the existence of three fee programs separately authorized in the statute.  *Id.* at 235 (discussing 16 U.S.C. §§ 1827, 1853a, 1862).  But the Court concluded that Congress's intent regarding industry-funded monitoring was ambiguous, thus its inquiry could not end at step one.  Ultimately, the Court resolved the issue at *Chevron*'s second step in favor of the Service.  *Id.* at 235-36.  In contrast, the First Circuit found "clear textual support" for the agency's authority to require vessel owners to pay for at-sea monitors.  *Relentless*, 62 F.4th at 631.  In affirming this Court's decision on summary judgment, the First Circuit ultimately decided that it need not classify the conclusion as a product of *Chevron* step one or step two because it was reasonable for the Service to conclude that its exercise of that authority is not contingent on its payment of the costs of compliance.  *Id.* at 633-34.

There is no cause for the Court to revisit most of this analysis. The Supreme Court's decision forecloses only the final move to *Chevron*'s second step.  The Court therefore should follow the First Circuit's analysis, which credited Defendants' arguments and rejected Plaintiffs'. And for the reasons that follow, the Court should conclude that the statute is best read to authorize the rule.

### B. The Best Reading Of The Magnuson-Stevens Act Is That Congress Authorized The Service To Require Vessels To Carry At-Sea Monitors At Their Own Expense.

The Magnuson-Stevens Act authorizes the Service to adopt "observer" requirements in regulated fisheries, 16 U.S.C. § 1853(b)(8), and that authority encompasses the industry-funded monitoring rule.  Plaintiffs' cost-based objection cannot be squared with the text, context, and history of the statute.  Nothing in Section 1853(b)(8) suggests an exception to the default norm that regulated parties may be required to bear the costs of complying with a rule that Congress has authorized an agency to adopt.  The statute is best read to authorize requiring vessels to carry observers and bear any compliance costs.

This Court previously held that Section 1853(b)(8) did not unambiguously authorize the industry-funded monitoring rule. *Relentless*, 561 F. Supp. 3d at 234-35. The Court concluded that Congress did not directly speak to the question whether the Service may require vessels to bear the costs of complying with an observer requirement under Section 1853(b)(8). But contrary to Plaintiffs' argument, Dkt. 59 ("Pl. Supp. Br.") at 9-10,[2] the Court's conclusion does not resolve the question whether Section 1853(b)(8) is best read to authorize the rule. Applying the *Chevron* framework, the Court concluded only that the "statutory currents flow[] in all directions," thus it was necessary to proceed to the second step of the *Chevron* analysis. *Relentless*, 561 F. Supp. 3d at 236. But without the *Chevron* framework, the Court must exercise its independent judgment to resolve the question.[3]

1.    **The Magnuson-Stevens Act's text and context establish that Section 1853(b)(8) authorizes observer requirements and the resulting compliance costs.**

Section 1853(b)(8) plainly authorizes the Service to adopt measures implementing the use of "observers" in regulated fisheries. Fishery management plans may "require that one or more observers be carried on board a vessel of the United States engaged in fishing for species that are subject to the plan[.]" 16 U.S.C. § 1853(b)(8). Observers are used in programs designed "for the purpose of collecting data necessary for the conservation and management of the fishery[,]" consistent with the overall purpose of the Magnuson-Stevens Act and other vessel reporting requirements. *Id.* There are no further limitations located directly in Section 1853(b)(8). The provision does, however, contain an exception that vessels are not "required to carry an observer"

---

[2]  References to page numbers in filings in this Court refer to the page number in the footer.

[3]  This case does not implicate the major questions doctrine. *Loper Bright*, 45 F.4th at 364-65. The Supreme Court did not suggest otherwise, and Plaintiffs have not raised that argument.

if the facilities for "quartering" an observer or "carrying out observer functions" create health and safety issues. *Id.*

The scope of these provisions is informed by the statute's definitional section. The statute defines "observer" as "any person required or authorized to be carried on a vessel for conservation and management purposes by regulations or permits under this chapter." 16 U.S.C. § 1802(31). There is no definition of "carried," but the definition of the term "observer information" illustrates the type of data observers may collect, including "fish harvest or processing observations, fish sampling or weighing data, vessel logbook data, vessel or processor-specific information . . . and video, audio, photographic, or written documents." *Id.* § 1802(32). Plaintiffs do not dispute that these provisions, collectively, authorize the Service to require vessels permitted to operate in Federal waters to carry observers to collect a wide variety of information used for conservation and management purposes. But they protest that Section 1853(b)(8)'s authority to require that observers "be carried" does not speak directly to costs and point to the "inadequate or safe" vessel exception as prohibiting requiring fishing vessels owners to incur costs. Pl. Supp. Br. at 2 (stating that Section 1853(b)(8) allows observers to be placed on vessels and "[t]hat's it.").

The meaning of Section 1853(b)(8), however, is properly informed by the broader context of the Magnuson-Stevens Act and its accompanying provisions. *Nat'l Ass'n of Home Builders v. Defs. of Wildlife*, 551 U.S. 644, 666 (2007) ("It is a fundamental canon of statutory construction that the words of a statute must be read in their context and with a view to their place in the overall statutory scheme." (cleaned up)). When determining the best meaning of a statutory provision, the "reviewing court should not confine itself to examining a particular statutory provision in isolation." *FDA v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 132 (2000). The "meaning—or ambiguity—of certain words or phrases may only become evident when placed in

context." *Id.* (emphasis added).  The Magnuson-Stevens Act contains two provisions that expressly contemplate the existence of industry-funded monitoring. *See* 16 U.S.C. §§ 1857(1)(L), 1858(g)(1)(D).  First, Section 1858(g)(1)(D) authorizes the Service to impose permit sanctions on vessels in cases where "any payment required for observer services provided to or contracted by an owner or operator who has been issued a permit" under a marine resource law "has not been paid and is overdue."  The reference to observer services "contracted by" the vessel is predicated on authority to require vessels to obtain observer services at their own expense—to "contract" for those services—rather than to simply quarter an observer "provided to" the vessel by the Service. *See id.*  This Court previously held that the use of these words did not indicate that Congress had spoken directly on the issue of industry-funded monitoring. *See Relentless*, 561 F. Supp. 3d at 235 (describing them as "fleeting and unspecific").  Yet they provide context nevertheless:  the First Circuit explained that "[t]his penalty would make no sense if Congress did not anticipate that owners and/or operators of the vessels would be paying the observers." *Relentless*, 62 F.4th at 630-31.  Importantly, as the First Circuit observed, this provision is in a general part of the Magnuson-Stevens Act that applies to all fisheries and fishery management plans, not in any provision specific to a particular fee program. *Id*. at 631.

Second, Section 1857(1)(L) makes it unlawful to commit various offenses against "any observer on a vessel" or "any data collector employed by the National Marine Fisheries Service or under contract to any person to carry out responsibilities" under the Magnuson-Stevens Act. Again, this section presumes observers "under contract" to a "person" other than the Service. *See id.*; *see also* 16 U.S.C. § 1802(36) (defining "person" to include, in part, "any corporation, partnership, association, or other entity").  As the D.C. Circuit previously explained in its

assessment of the Final Rule, the penalties in Sections 1857 and 1858 "indicate that Congress anticipated industry's use of private contractors." *Loper Bright*, 45 F.4th at 366.

More generally, the Magnuson-Stevens Act makes clear that vessels may be required to bear the costs of complying with conservation and management measures. Congress conferred broad authority on the Service to adopt a wide variety of conservation and management measures. In Section 1853(a), Congress provided that fishery management plans must include measures necessary to prevent overfishing and rebuild stocks to protect, restore, and promote the long-term health of the fishery (§ 1853(a)(1)(A)); describe costs likely to be incurred in management (§ 1853(a)(2)); specify data required to be submitted by vessels (§ 1853(a)(1)(5)); minimize adverse effects of fishing on essential fish habitat (§ 1853(a)(7)); include impact statements that assess economic impacts and possible mitigation measures for participants in the fishery (§ 1853(a)(9)(A)); minimize bycatch and bycatch mortality by industry vessels (§ 1853(a)(11)); and consider the economic impact of harvest restrictions on fishery participants (§ 1853(a)(14)). All these measures authorize or are predicated on regulation that imposes compliance costs on vessels. In Section 1853(b)—where the observer programs are found—Congress similarly authorized fishery management plans to include a variety of measures that necessarily implicate industry costs. Specifically, the Service's regulations may limit fishing in particular areas or for particular periods of time (§ 1853(b)(2)); impose limitations on the catch, and sale of fish (§ 1853(b)(3)); require the "use" of specified types and quantities of fishing vessels, fishing gear, and equipment (§ 1853(b)(4)); or require the submission of necessary data (§ 1853(b)(7)).

All these provisions permit the agency to enact measures for which compliance has a financial cost. Yet none explicitly state that the Service may require industry to incur costs.[4] Section 1853(b)(4)—the authority to require the "use" of specified vessels, gear, and equipment— is salient. The most natural reading of "use" does not connote payment of costs. *See, e.g.*, *Use*, Black's Law Dictionary (4th ed. 1968) (first definition as noun: "Act of employing everything, or state of being employed; application; employment, as the use of a pen, or his machines are in use"); *Use*, Webster's Third New Int'l Dictionary (1976 ed.) (first definition as noun: "the act of employing, using, or putting into service").[5] Congress did not use a word like "purchase," "obtain," or "buy." Yet to comply with a requirement to "use" specified vessels, gear, or equipment, a person must first obtain it—and bear the costs of doing so. There is no good reason to assume that, by not explicitly stating that the Service may require industry to incur costs, Congress intended that the Service would provide all vessels, gear, and equipment needed to comply with the regulations it is empowered to enact under these provisions.

The First Circuit recognized as much, explaining "[w]hen Congress says that an agency may require a business to do 'X,' and is silent as to who pays for 'X,' one expects that the regulated parties will cover the cost of 'X.'" *Relentless*, 62 F.4th at 629. The Magnuson-Stevens Act reflects this default norm, not by inserting cost-related language into each of these authorizing provisions, but by adopting overarching cost-related standards to govern fishery measures implemented under Section 1853. All fishery regulations must be consistent with ten "national standards," 16 U.S.C.

---

[4]  The only place in Section 1853 where Congress specified a financial obligation is in subsection (b)(1), which authorizes fees paid to the government for permits. But fees are distinct from compliance costs. *See* Section III.B.3, *infra*. Congress had to specifically authorize fees, which (unlike compliance costs) are paid to the government to cover its administrative costs. *Cf.* Pl. Supp. Br. at 4-5.

[5]  Section 1853(b)(4) was adopted in 1976. Pub. L. No. 94-265, § 303(b)(4), 90 Stat. 331, 352.

§ 1851(a), and two of these standards expressly require the Service to consider industry costs. National Standard 7 directs the Service to "minimize costs" of conservation and management measures "where practicable," and National Standard 8 directs the Service, "to the extent practicable, minimize adverse economic impacts on [fishing] communities." *Id.* § 1851(a)(7), (8). These two provisions demonstrate that Congress plainly understood that the Service's exercise of regulatory authority conferred in Section 1853 frequently requires industry participants to incur compliance costs as a necessary part of achieving optimum yield from a fishery.[6] In adopting these standards, however, Congress also provided a substantive limit on those costs. *See id*.

In sum, the broader context of the comprehensive regulatory scheme Congress adopted in the Magnuson-Stevens Act illustrates that (1) vessels may be required to comply with at-sea monitoring measures that entail contracting for observer services and (2) Congress authorized the costs of this kind of regulatory requirement to be borne by industry, subject to substantive limits in the statute. Plaintiffs do not appear to dispute that observer programs may properly require vessels to pay some costs, like lodging and feeding an observer. *See* Pl. Supp. Br. at 2. Rather, Plaintiffs contend that the costs of complying with the Atlantic herring fishery's industry-funded monitoring rule are too significant to be authorized by Section 1853(b)(8). *See id.* at 3-4. But that argument mistakes authority for policy.

If the Magnuson-Stevens Act authorizes at least *some* costs, then the question of cost is one of degree, not statutory interpretation. The Court reviews whether the cost of conservation and

---

[6] National Standard 1 provides that the Service's rules "shall prevent overfishing while achieving, on a continuing basis, the optimum yield from each fishery for the United States fishing industry." 16 U.S.C. § 1851(a)(1). "Optimum" yield is "prescribed on the basis of the maximum sustainable yield from the fishery, as reduced by any relevant economic, social, or ecological factor[.]" *Id.* § 1802(33). This overarching mandate also implicates cost considerations throughout the national standards.

management measures has been taken into account and minimized where practicable consistent with the Magnuson-Stevens Act's national standards and for reasonableness under the deferential arbitrary-and-capricious standard in the Administrative Procedure Act ("APA").  5 U.S.C. § 706(2)(A).  Plaintiffs brought such a challenge to the Final Rule: they argued on summary judgment that the Service did not comply with National Standards 1, 2, 6, 7 and 8, but this Court rejected those claims. *Relentless*, 561 F. Supp. 3d at 238-42.  The First Circuit affirmed this Court's decision, holding that Plaintiffs' challenges "boil down to arguments that the Rule burdens them more heavily than it burdens others without a clear enough justification, or without adopting an alternative they suggested.  But they have not proffered the types of evidence or argument under which courts have found that agency actions violate the National Standards." *Relentless*, 62 F.4th at 637.  Plaintiffs did not seek certiorari on that issue and further expressly disclaimed any attempt to relitigate those claims on remand.

**2.    Historical practice and legislation confirm that the Service's authority includes cost allocation.**

In addition to the text and context of the statute, the legislative backdrop and the agency's past practice both support the conclusion that Congress authorized the Service to implement observer programs that require industry to bear its compliance costs.  Both bolster the Service's interpretation as the best reading of the statute.

As previously explained, *see* Dkt. 38-1 at 17-19, the modern Magnuson-Stevens Act originates with a statute enacted in 1976, but Congress added the provision codified as Section 1853(b)(8) in 1990. Fishery Conservation Amendments of 1990, Pub. L. No. 101-627, § 109(b)(2), 104 Stat. 4436, 4448.  By that time, the Service already had adopted an industry-funded monitoring program in Alaska, 55 Fed. Reg. 4839, 4840 (Feb. 12, 1990), and Congress legislated against that backdrop. *See, e.g.*, H.R. Rep. No. 101-393, at 28 (1989).  During hearings on the statute that year,

witnesses discussed these existing industry-funded observers in the North Pacific fishery and testified to the observer requirements, where "[i]n all cases" industry "pays the cost of the observer." *Oversight of Marine Fisheries Management: Hearings Before the National Ocean Policy Study of the Committee on Commerce, Science, and Transportation, U.S. Senate*, 101st Cong. 464 (1989) (written testimony of Chris Blackburn); *see also Magnuson Fishery Conservation and Management Act of 1976, Reauth.—Part II, Hearing Before the Subcommittee on Fisheries and Wildlife Conservation and the Environment, Committee on Merchant Marine and Fisheries, House of Representatives*, 101st Cong. 33 (1989) (testimony of John Peterson). A committee report accompanying the bill explained that this provision "allows the Councils to require that observers be carried on board domestic fishing [vessels] for data collection purposes," noting that "the Councils already have—and have used—such authority." H.R. Rep. No. 101-393, at 28 (1990). Enactment of the observer provision simply "makes the authority explicit." *Id.* Another committee report similarly confirmed that the amendment "clarif[ies] the existing authority." S. Rep. No. 101-414, at 8, 20 (1990). As the First Circuit recognized, the existing observer practices that Congress sought to expressly authorize included the use of industry-funded monitoring. *See Relentless*, 62 F.4th at 633.

Against this backdrop, Plaintiffs' version of the public's response to adoption of Section 1853(b)(8) falls flat. Pl. Supp. Br. at 17-18. Citing nothing, Plaintiffs repeatedly contend that "there was no opposition by anyone to the amendments, and no one articulated opposition to them on the idea that they might allow charging vessels for such Observers." *Id*. at 18-19; *see also id*. at 2, 17. Plaintiffs' self-serving descriptions of their "understanding" of the changes imposed by the 1990 amendments are irrelevant to the Court's statutory interpretation task here and lack evidentiary support. *Magnuson Fishery Conservation and Management Act of 1976, Reauth.—*

13

*Part II, Hearing Before the Subcommittee on Fisheries and Wildlife Conservation and the Environment, Committee on Merchant Marine and Fisheries, House of Representatives*, 101st Cong. 33 (1989) (testimony of John Peterson); *see also id.* (written statement of A. Thomson) ("Recent attempts by the National Marine Fisheries Service to secure federal matching funds for observers aboard trawl vessels have obscured the fact that on-board data gathering can and should be regarded as a cost of doing business."). The legislative history demonstrates that hearings were held in Alaska, Massachusetts, and in Washington, D.C., and that written and in-person testimony was submitted. *E.g.*, *Oversight of Marine Fisheries Management: Hearings Before the National Ocean Policy Study of the Committee on Commerce, Science, and Transportation, U.S. Senate*, 101st Cong. 464 (1989). Any implication that that the 1990 amendments simply were accepted in silence and without robust debate is flatly wrong. Plaintiffs' contentions, on the other hand, that the Final Rule caused an "uproar" and was met with an "avalanche of opposition" are gross overstatements. *See* Pl. Supp. Br. at 7, 17. Although the Service characterized the rule as controversial, AR16994, Plaintiffs overstate the nature and degree of the public response. The administrative record shows that just twenty comment letters were submitted. *See* 85 Fed. Reg. at 7422; AR17647-17718. While some comment letters (including from a group affiliated with Plaintiffs in this case (AR17699-17715)) expressed concerns about affordability, others demonstrated support for additional monitoring in the herring fishery. *See id*.

The Service has consistently, over multiple decades, maintained the view that the Magnuson-Stevens Act authorizes industry-funded monitoring programs and has adopted regulations to that effect. *See, e.g.*, 50 C.F.R. §§ 648.11(k), 648.11(*l*). Congress also is plainly aware that the Service continues to operate observer programs that include industry-funded monitoring components. *See, e.g.*, S. Rep. No. 116-127, at 42 (2019); *see also* Dkt. 38-1 at 20

14

(listing congressional committee reports that evidenced awareness of industry-funded monitoring dating back to 2015).[7]  Just last year, Congress directed the Service to use certain appropriated funds to pay for industry vessels' costs under the industry-funded monitoring program for the northeast multispecies fishery.  Explanatory Statement, Division B, at 263, Consolidated Appropriations Act of 2023, Pub. L. No. 117-328, 136 Stat. 4459, *available at* https://www.congress.gov/117/cprt/HPRT50347/CPRT-117HPRT50347.pdf.  That direction is incongruous with Plaintiffs' premise that the statute does not authorize industry to incur these costs in the first instance.  If Congress disagreed that the Service had authority to implement industry-funded monitoring—or intended to preclude that authority—Congress could have made that clear.

Plaintiffs briefly cite Section 1881b, which directed the Secretary to promulgate regulations regarding adequate and safe facilities for fishing vessels that carry observers and training for observers.  Pl. Supp. Br. at 17.  The fact that this later-enacted section of the statute did not explicitly address the Service's authority to require industry to bear its compliance costs offers no guidance on this issue, particularly when the legislative history of the 1990 amendments shows that Congress intended to make existing authority explicit.  *See supra*.

---

[7]  Plaintiffs state that the Magnuson-Stevens Act "has been reauthorized three times since 1989, and Congress has rejected the authority asserted here by the agencies each time."  Pl. Supp. Br. at 18.  "A bill can be proposed for any number of reasons, and it can be rejected for just as many others."  *Solid Waste Agency of N. Cook Cnty. v. U.S. Army Corps of Eng'rs*, 531 U.S. 159, 170 (2001).  If Plaintiffs mean to say that Congress did not explicitly authorize industry-funded monitoring in amendments to the statute since 1990, the better explanation is that Congress did not because it believed Section 1853(b)(8) already provided such authority.  Moreover, even if Congress proposed to essentially codify the provisions in the Omnibus Amendment, that would not mean the Service lacked authority already.  For example, the legislative history to the 1990 amendments makes clear that Congress was simply codifying existing authority.  *See* H.R. Rep. No. 101-393, at 28 (1990).

### 3. The provisions establishing fee programs are structurally distinct and serve different purposes.

This Court and the First Circuit have already rejected most of Plaintiffs arguments that Section 1853(b)(8) should not be construed to authorize the industry-funded monitoring rule because the Magnuson-Stevens Act separately authorizes three fee-based programs, thereby implicitly depriving the Service of authority to impose regulations with compliance costs.  Pl. Supp. Br. at 4-6; *Relentless*, 561 F. Supp. 3d at 235-36; *Relentless*, 62 F.4th at 631-33.  The Court should not revisit its conclusions on this issue, which the Supreme Court did not disturb.  *United States v. Parks*, 698 F.3d 1, 7 (1st Cir. 2012).

Throughout this litigation, Plaintiffs have misunderstood the nature of the fee authorities in the Magnuson-Stevens Act and the important distinctions—substantive, structural, and administrative—between fees and compliance costs.  *E.g.*, Pl. Supp. Br. at 14, 18.  A "fee is a form of 'funding' where the industry is assessed a payment by the agency, authorized by statute, to be deposited in the U.S. Treasury and disbursed for administrative costs otherwise borne by the agency."  85 Fed. Reg. at 7422.  Fee programs may implicate specific rules and restrictions that govern the government's receipt of funds.  *See, e.g.*, 31 U.S.C. § 3302; *Relentless*, 62 F.4th at 632-33; *Goethel v. Pritzker*, No. 15-cv-197, 2016 WL 4076831, at *7 (D.N.H. July 29, 2016), *aff'd sub nom. Goethel v. U.S. Dep't of Com.*, 854 F.3d 106 (1st Cir. 2017), *cert. denied*, 138 S. Ct. 221 (2017).  And fee programs may assess fees on regulated industry participants generally rather than based on the amount of participation in a regulated activity.  *See, e.g.*, 77 Fed. Reg. 23326, 23339 (Apr. 18, 2012) (describing program where fees "would not be linked to the actual level of observer coverage for individual vessels" and participants would instead "pay an equal percentage").

Plaintiffs contend that this Court's September 2021 decision resulted from a "critical absence" of any citation to provisions regarding the foreign fishing program in 16 U.S.C. §

1821(h)(6).  Pl. Supp. Br. at 10.  According to Plaintiffs, Section 1821(h)(6) "actually granted the Secretary the power to force vessels (foreign) to contract and pay observers directly," and this Court's earlier decision "is based largely on the misapprehension that Congress had not directly allowed this power elsewhere."  *Id*.  To be clear, the foreign-fishing program requires foreign vessels to pay "a surcharge in an amount sufficient to cover all the costs of providing a United States observer aboard that vessel[,]" a system that is yet again structured differently from industry-funded monitoring.  16 U.S.C. § 1821(h)(4).  The section on which Plaintiffs rely provides the Service with residual authority to require foreign vessels to pay their fee directly to the observer service provider in the event the Service does not have funds to cover administrative overhead.  *Id.* § 1821(h)(6).  In relying on this statutory provision, Plaintiffs omit altogether any acknowledgement of the D.C. Circuit's discussion of Section 1821(h)(6).  As that court explained, Section 1821(h)(6) serves as a "contingency plan" for monitoring in the foreign fishing context. *Loper Bright*, 45 F.4th at 367-68.  The D.C. Circuit further stated that "it appears doubtful that Congress intended implicitly to preclude the Service from requiring industry-funded monitoring in all other circumstances" simply because it "provid[ed] for industry-funded observers as part of a contingency in the foreign-fishing provisions of the Act[.]" *Id*. at 368.  Moreover, payment under Section 1821(h)(6) is still a "fee" pursuant to a schedule set by the government rather than a compliance obligation.  16 U.S.C. § 1821(h)(6)(C).  Section 1821(h)(6), therefore, is hardly a "neat" solution to resolving the issue before the Court.

The other fee programs set forth in the Magnuson-Stevens Act also are distinct from the program the Final Rule implements.  The statutory authority for the North Pacific Council—one of the regional councils that prepares fishery management plans for the Service's review— provides for development of a fee-based research program to fund observers.  16 U.S.C. § 1862.

As the Court already recognized, this provision authorizes a monitoring program that involves a fee-based program distinguishable from the industry-funded monitoring program here, where vessels contract with and make payment directly to third-party monitoring service providers. *Relentless*, 561 F. Supp. 3d at 235-36.  The pool of activities covered by the fee program is broader. *See, e.g.*, 16 U.S.C. § 1862(b)(2)(A); *see Relentless*, 561 F. Supp. 3d at 235 (noting that the North Pacific program, among others, allows the Service to use fees to pay for any or all aspects of the observer program, including the agency's administrative costs).  Thus, it is well settled that Section 1862 grants the Service broader and different authority than Section 1853(b)(8)'s regulatory requirement.  *See, e.g.*, 16 U.S.C. § 1862(b)(2)(F) (authorizing collection of fees from vessels and fish processors that do not carry an observer).

The Magnuson-Stevens Act also contains a provision authorizing the Service to establish limited-access-privilege programs, a special type of market-based fishery management not implicated by this case.  16 U.S.C. § 1853a.  The statute authorizes cost recovery for these programs through the collection of fees from privilege holders.  *Id.* § 1853a(e)(2).  These fees help recover the Service's actual costs directly related to "management, data collection and analysis, and enforcement activities" *generally*, or in other words, the statutory provision authorizes a funding scheme for recovering those costs for the entire management program, subject to a cap on fees.  *Id.* (citing § 1854(d)(2)).  Such programs may include observers but are structurally and substantively distinct for the reasons the Court previously recognized.  *See Relentless*, 561 F. Supp. 3d at 235.

In sum, Plaintiffs' arguments about the best meaning of the Magnuson-Stevens Act already have been considered and rejected.  Although the Court did not conclusively resolve the best meaning without deferring to the government's interpretation, its September 2021 decision points

squarely in the direction of that interpretation and the First Circuit affirmed. The Court should now hold that the best meaning of Section 1853(b)(8) is that the Magnuson-Stevens Act authorized the industry-funded monitoring rule.

### C.  The Service Properly Exercised Its Authority To Adopt Necessary And Appropriate Measures For Conservation And Management Of The Fishery.

Even if Section 1853(b)(8) alone were not enough to authorize the Final Rule, the Service properly exercised its discretionary authority to adopt the cost-allocation provisions of the rule as a measure "necessary and appropriate" to implement the at-sea monitoring program. 16 U.S.C. § 1853(b)(14). The Supreme Court's decision makes clear that Congress may properly assign the Service this kind of discretion to adopt measures in furtherance of its statutory authority.

### 1.  Congress conferred a degree of discretion on the Service in implementing Magnuson-Stevens Act measures.

Courts evaluating an agency's authority must exercise their independent judgment to determine a statute's meaning, but in "a case involving an agency," the "statute's meaning may well be that the agency is authorized to exercise a degree of discretion." *Loper Bright*, 144 S. Ct. at 2263. For example, a statute may be best read to "empower an agency to prescribe rules to 'fill up the details' of a statutory scheme[.]" *Id.* (quoting *Wayman v. Southard*, 10 Wheat. 1, 43 (1825)). Congress may authorize the agency to "regulate subject to the limits imposed by a term or phrase that 'leaves the agencies with flexibility[.]'" *Id.* (quoting *Michigan v. EPA*, 576 U.S. 743, 752 (2015)). When Congress "delegates discretionary authority" in this fashion, the reviewing court should "stay out of discretionary policymaking left to the political branches" and "need only . . . independently identify and respect such delegations of authority, police the statutory boundaries of those delegations, and ensure that agencies exercise their discretion consistent with" the APA, 5 U.S.C. § 706. *Id.* at 2263, 2268.

Congress authorized the Service to prescribe "measures, requirements, or conditions and restrictions as are determined to be necessary and appropriate for the conservation and management of the fishery." 16 U.S.C. § 1853(b)(14); *see also Relentless*, 561 F. Supp. 3d at 237 (citing 16 U.S.C. § 1853(a)(1)(A). The Magnuson-Stevens Act's "necessary and appropriate" authority fits comfortably within the category of statutes that authorize agencies to regulate subject to the limits of a term or phrase that leaves the agency with flexibility. *Loper Bright*, 144 S. Ct. at 2263. In discussing this type of statutory delegation, the Supreme Court cited as an example a provision of the Clean Air Act authorizing "appropriate and necessary" regulation, 42 U.S.C. § 7412(n)(1)(A), along with the Supreme Court's decision in *Michigan v. EPA* interpreting that provision. *Id*. Although the statutory schemes are distinct, the delegatory language is plainly a close match.

Courts generally have recognized that Section 1853(b)(14) confers discretion and flexibility on the agency to "achieve the Act's conservation and management goals." *Loper Bright*, 45 F.4th at 366 (describing the language "necessary and appropriate" as "a 'capacious[]' grant of power that 'leaves agencies with flexibility'"); *see also, e.g.*, *Conservation L. Found. of New Eng., Inc. v. Franklin*, 989 F.2d 54, 61 (1st Cir. 1993) (describing "broad discretion" under identically phrased provision); *Lovgren v. Byrne*, 787 F.2d 857, 864 (3d Cir. 1986) (similarly describing "broad authority" under Section 1853(b)(14)).

Although the policy delegation in Section 1853(b)(14) is flexible, the Service's authority is not limitless. The courts determine the outer bounds of the terms "necessary" and "appropriate," and that inquiry is informed not only by the ordinary meaning of those terms, but also by the statutory context. As the D.C. Circuit previously explained, "an agency may not rely on a 'necessary and appropriate' clause to claim implicitly delegated authority beyond its regulatory

lane or inconsistent with statutory limitations or directives." *Loper Bright*, 45 F.4th at 368; *see also N.Y. Stock Exch. LLC v. Sec. & Exch. Comm'n*, 962 F.3d 541, 554 (D.C. Cir. 2020). The Magnuson-Stevens Act provides substantive standards to guide and circumscribe the exercise of that discretion, including a detailed definition of the phrase "conservation and management" that identifies specific policy goals focused on sustaining fishery resources and the marine environment. 16 U.S.C. § 1802(5).[8] Conservation and management measures also must be consistent with the national-standard mandates that provide substantive limits on the agency's rulemaking authority, including the cost-related standards. *Id.* § 1851. Congress placed Section 1853(b)(14)'s necessary-and-appropriate authority within a list of enumerated provisions authorizing specific conservation and management measures, including the authority to require vessels to carry observers. *See generally id.* § 1853. The concerns about unchecked power in this regard, Pl. Supp. Br. at 17-19, are unfounded.

Thus, in reviewing the Service's exercise of its authority under Section 1853(b)(14) to adopt necessary and appropriate measures, the Court's interpretive task is to "police the outer statutory boundaries" of this statutory delegation in the context of the broader statutory scheme and the substantive standards that govern the Service's policy discretion. *Loper Bright*, 144 S. Ct. at 2268. Within that zone of discretion, the Service is empowered to choose among reasonable options, and the Court reviews that choice under the familiar arbitrary-and-capricious standard of the APA. *Id.* at 2263, 2268.

---

[8]     The definition of "conservation and management" refers to "rebuilding, restoring, or maintaining fishery resources and the marine environment;" assuring a supply of food and other products and recreational benefits; avoiding "irreversible or long-term adverse effects on fishery resources and the marine environment[;]" and assuring "a multiplicity of options available with respect to future uses of these resources." *Id*. § 1802(5).

### 2. The Service reasonably exercised its authority to adopt necessary and appropriate measures.

The Service reasonably exercised its policy discretion under Section 1853(b)(14) to adopt the industry-funded monitoring rule as necessary and appropriate to implement the at-sea monitoring program in the Atlantic herring fishery. Section 1853(b)(8) authorizes the Service to implement observer programs generally for conservation and management purposes, and Section 1853(b)(14) works in tandem with that authority to permit the Service to adopt reasonable policies that are necessary and appropriate to the implementation of those programs. In the Final Rule, the Service explained the importance of fishery data to the conservation and management of the Atlantic herring fishery and the benefits to fishery participants from increased accuracy of catch data. 85 Fed. Reg. at 7423, 7425. The Service concluded that the rule's cost-allocation structure was thus necessary and appropriate to implementing an at-sea monitoring program that serves these purposes.

The Magnuson-Stevens Act makes clear that the collection of data about the fishery is critical to conservation and management of the fishery. Section 1853(b)(8) provides for the implementation of an observer program "for the purpose of collecting data necessary for the conservation and management of the fishery[,]" 16 U.S.C. § 1853(b)(8), and the premise of this authority is that some data is in fact *necessary* to meeting the statute's conservation and management purposes. Indeed, Congress specifically found that the "collection of reliable data is *essential* to the effective conservation, management, and scientific understanding" of fishery resources. *Id.* § 1801(a)(8) (emphasis added); *see also id.* §§ 1801(c)(3), 1851(a)(2). Fishery management plans are required to specify data and "information" about commercial fishing that must be submitted to the Service. *Id.* § 1853(a)(5).

Section 1853(b)(14), in turn, authorizes the Service to adopt measures "necessary and appropriate" for the conservation and management of the fishery. Sections 1853(b)(8) and (b)(14) thus work in tandem. Section 1853(b)(8) authorizes observers to obtain data about the fishery, and Section 1853(b)(14) authorizes additional measures that are necessary and appropriate to collecting that data. Of course, those measures must be consistent with the statute's requirements for conservation and management measures, including the two national standards expressly requiring the Service to consider industry costs. 16 U.S.C. § 1851(a)(7)-(8). But the Service's adoption of industry-funded monitoring programs like the Atlantic herring rule falls well within the outer statutory boundaries of the necessary-and-appropriate authority under Section 1853(b)(14). The Atlantic herring measures, in particular, expressly provide for the kind of data collection discussed in the statute. *See* 50 C.F.R. § 648.11(m).

Plaintiffs nonetheless contend that the Service's necessary-and-appropriate authority operates as a "limiting provision" that "cabins rather than expands" the agency's power. Pl. Supp. Br. at 15-16. The Court already decided otherwise, albeit under a different section of the statute. The Court explained (correctly) that Congress gave the Secretary the power to take any measures that are "necessary and appropriate" to achieve the Magnuson-Stevens Act's conservation goals. *See Relentless*, 561 F. Supp. 3d at 237 (citing 16 U.S.C. § 1853(a)(1)(A)). Given the "integral nature of catch estimates" to the statute's goals, along with the agency's financial incapacity to fully fund a monitoring program and the statute's legislative history (namely, the historical operation of the North Pacific monitoring program), the Court endorsed an interpretation of the statute that permits requiring industry to pay for their observer costs. *Id*. at 237-38; *accord Loper Bright*, 45 F.4th at 368 (the exercise of "necessary and appropriate" authority under Section 1853(b)(14) "encompass[es] industry-funded monitoring" and does not "exceed statutory limits").

The same authority exists in Section 1853(b)(14).  Indeed, the Service's authority to adopt regulatory measures that entail compliance costs is evident in the cost-related provisions of the Magnuson-Stevens Act.  *See* Section III.B.1, *supra*.  Plaintiffs' suggestion that the Service is asserting limitless authority to impose costs simply ignores these express limitations—along with the limitation that agency action not be arbitrary or capricious.  5 U.S.C. § 706(2)(A).

For these reasons, the Final Rule is well within the "outer statutory bounds" of the Service's authority under Section 1853(b)(14) to adopt necessary and appropriate measures.  *Loper Bright*, 144 S. Ct. at 2268.  The Court's role in reviewing this "discretionary policymaking" is thus to ensure that the Service exercises its discretion reasonably, consistent with arbitrary-and capricious review under the APA.  *Id.* at 2263, 2268.  The Court already rejected Plaintiffs' arguments that the Final Rule is arbitrary and capricious, or otherwise failed to comply with the law.  *Relentless*, 561 F. Supp. 3d at 237.

## IV.    CONCLUSION

The Magnuson-Stevens Act is best read to authorize the Final Rule.  For all the foregoing reasons, the Court should reject Plaintiffs' arguments and uphold the Omnibus Amendment and the Final Rule as wholly consistent with the authority granted by Congress in the Magnuson-Stevens Act.

Dated: October 25, 2024                              Respectfully submitted,

                                                     TODD KIM,
                                                     Assistant Attorney General
                                                     S. JAY GOVINDAN, Chief
                                                     MEREDITH L. FLAX, Deputy Chief

                                                     /s/ Alison C. Finnegan
                                                     Alison C. Finnegan, Senior Trial Attorney
                                                     (Pennsylvania Bar No. 88519)
                                                     U.S. Department of Justice
                                                     Environment & Natural Resources Division

Wildlife & Marine Resources Section
Ben Franklin Station, P.O. Box 7611
Washington, D.C. 20044-7611
Tel: (202) 305-0500; Fax: (202) 305-0275
alison.c.finnegan@usdoj.gov

Attorneys for Defendants

Of Counsel:

Mitch MacDonald
U.S. Department of Commerce
National Oceanic and Atmospheric Administration
Office of General Counsel, Northeast Section
Gloucester, Massachusetts

## **CERTIFICATE OF SERVICE**

I hereby certify that on October 25, 2024, I electronically filed the foregoing with the Clerk of Court using the CM/ECF system, which will send electronic notification of such filing to all counsel of record.

    /s/ Alison C. Finnegan