**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF RHODE ISLAND**

| | | |
|---|---|---|
| **RELENTLESS INC., et al.** | : | |
| | : | |
| *Plaintiffs*, | : | |
| | : | |
| v. | : | Case No. 1:20-cv-00108-WES-PAS |
| | : | |
| | : | |
| **U.S. DEPARTMENT OF COMMERCE,** | : | |
| **et al.** | : | |
| | : | |
| *Defendants*. | : | |


**PLAINTIFFS' SUPPLEMENTAL REPLY BRIEF IN SUPPORT OF**
**MOTION FOR SUMMARY JUDGMENT AND RESPONSE TO DEFENDANTS'**
**SUPPLEMENTAL BRIEF**

# TABLE OF CONTENTS

TABLE OF CONTENTS ............................................................................................................. i

TABLE OF AUTHORITIES ................................................................................................... ii

INTRODUCTION ................................................................................................................... 1

FACTS NECESSARY TO DECIDE THE ISSUE ................................................................... 1

    I.    THE PROMULGATION OF THE MSA AND ITS AMENDMENTS ............................................. 1

ARGUMENT ............................................................................................................................ 3

    I.    THE COURT'S TASK IS TO DETERMINE WHETHER CONGRESS PROVIDED THE
            DEFENDANTS WITH THE POWERS THEY CLAIM .............................................................. 3

        A.    The Plain Meaning of the Text Does Not Support the Government's
               Interpretation ................................................................................................... 5

        B.    There Is No "Context" That Can Bootstrap the Word "Carry" Into a
               Requirement to Pay Salaries ........................................................................... 8

        C.    History and Legislation Provide No Power to Require Observer
               Salary Payments. .......................................................................................... 11

        D.    The Other Fee Shifting Provisions Weaken and Do Not Strengthen
               the Government's Position .............................................................................. 12

    II.    "NECESSARY AND APPROPRIATE" DOES NOT GRANT THE AGENCIES THIS POWER ........ 14

CONCLUSION ...................................................................................................................... 16

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Alaska S.S. Co. v. United States*,
290 U.S. 256 (1933)..................................................................................... 7

*Brache v. United States*,
165 F.3d 99 (1st Cir. 1999) .......................................................................... 6

*Compania Di Navigacion La Flecha v. Brauer*,
168 U.S. 104 (1897) ..................................................................................... 7

*Corley v. United States*,
556 U.S. 303 (2009)..................................................................................... 14

*Ethyl Corp. v. EPA*,
51 F.3d 1053 (D.C. Cir. 1995) .................................................................... 15

*Fed. Election Comm'n v. Cruz*,
596 U.S. 289 (2022)....................................................................................... 5

*Gallo Motor Ctr. Corp. v. Mazda Motor of U.S.A.*,
172 F. Supp. 2d 292 (D. Mass. 2001) ........................................................ 13

*Goethel v. Dep't of Com.*,
854 F.3d 106 (1st Cir. 2017).......................................................................... 3

*Harrington v. Purdue Pharma, L.P.*,
144 S. Ct. 2071 (2024)................................................................................. 16

*Loper Bright Enters. v. Raimondo*,
144 S. Ct. 2224 (2024)................................................................... 4, 9, 14, 16

*Loper Bright Enters. v. Raimondo*,
45 F.4th 359 (D.C. Cir. 2022) .............................................................. passim

*Objio-Sarraff v. United States*,
108 F.3d 421 (1st Cir. 1997) ........................................................................ 6

*Objio-Sarraff v. United States*,
927 F. Supp. 30 (D.P.R. 1996)..................................................................... 6

*Parker Drilling Mgmt. Servs., Ltd. v. Newton*,
587 U.S. 601 (2019)...................................................................................... 4

*Relentless v. Dep't of Com.*,
2024 WL 3647769 (1st Cir. July 31, 2024) ................................................. 4

*Relentless v. Dep't of Com.*,
62. F.4th 621 (1st Cir. 2023)......................................................................... 4

*Relentless, Inc. v. U.S. Dep't of Com.*,
561 F. Supp. 3d 226 (D.R.I. 2021) ......................................................... 4, 14

*United States v. Cleveland*,
106 F.3d 1056 (1st Cir. 1997) ...................................................................... 6

*United States v. Ramirez–Ferrer,*
    82 F.3d 1149 (1st Cir. 1996)..................................................................... 6

**Statutes**

16 U.S.C. § 1821 ........................................................................... 3, 4, 8, 13

16 U.S.C. § 1851 ..................................................................................... 10

16 U.S.C. § 1853a .................................................................................. 13

16 U.S.C. § 1854 ....................................................................................... 2

16 U.S.C. § 1858 ....................................................................................... 4

16 U.S.C. § 1862 ................................................................................. 2, 13

16 U.S.C. § 1881b .............................................................................. 9, 12

16 U.S.C. §1853 ........................................................................................ 5

49 U.S.C. § 44917 .................................................................................... 7

Fishery Conservation and Management Act of 1976,
    Pub. L. No. 94-265, 90 Stat. 331 (1976).................................................. 1

**Regulations**

Groundfish of the Gulf of Alaska, Groundfish Fishery of the Bering Sea and Aleutian
    Islands Area,
    55 Fed. Reg. 4839 (Feb. 12, 1990) ..................................................... 1, 2

Northeast (NE) Multispecies Fishery, Amendment 16,
    75 Fed. Reg. 18262 (Apr. 9, 2010) ......................................................... 3

**Other Authorities**

*Webster's Third New International Dictionary of the English Language Unabridged* 343
    (3d ed. 1971) .......................................................................................... 6

# INTRODUCTION

The Defendants have the burden of demonstrating that the Magnuson Stevens Act ("MSA") allows them to require that a regulated party pays the salaries, by forced contracting, of those individuals monitoring their compliance with regulations. In Defendants' reading, the MSA stands alone among all statutes in the U.S. Code by providing the agencies this power. But they have failed to meet their burden, and it cannot be met based on the MSA's text, structure, and history. The plain meaning of the text does not support the Government's interpretation. The timeline of the promulgation of the MSA and the context of the 1990 amendment that became 16 U.S.C. § 1853(b)(8)[1] does not support it. The structure of the MSA does not support it. Finally, were any recourse to it needed, the legislative history does not support it. Nothing in the Government Defendants' Supplemental Brief changes any of this and indeed it unintentionally strengthens Plaintiffs' argument.

## FACTS NECESSARY TO DECIDE THE ISSUE

### I.   THE PROMULGATION OF THE MSA AND ITS AMENDMENTS

The Defendants note that some months before the MSA's 1990 Amendments—which they rely upon for their sole source of power to create industry-funded observers ("Observers")—they created such a program in the Northern Pacific/Alaska fishery. Defendants' Supplemental Brief at 12 (citing Groundfish of the Gulf of Alaska, Groundfish Fishery of the Bering Sea and Aleutian Islands Area, 55 Fed. Reg. 4839, 4840 (Feb. 12, 1990) 1990 WL 336667 ("Alaska Regulation")). The dates of what happened will be useful to the Court in determining this motion, so they are clarified here. The MSA was promulgated in 1976. Fishery Conservation and Management Act of 1976, Pub. L. No. 94-265, 90 Stat. 331 (1976). Through fourteen years and more than three

---

[1] This statute is the sole portion of the MSA relied upon by the Defendants in promulgating the Omnibus Rule and the Observer Amendment when they were issued.

administrations until the promulgation of the Alaska Regulation, the Defendants did not claim any power under the MSA to force domestic fishers to pay for observers placed on their vessels. When it was promulgated, the Alaska Regulation stated that "Any vessel operator or manager of a shoreside processing facility who is required to accommodate an observer is responsible for obtaining a NMFS-certified observer from any of the certified observer contractors. The vessel operator or manager of a shoreside processing facility will pay the cost of the observer directly to the contractor." 55 Fed. Reg. at 4840.

The Alaska Regulation purported to be founded on the MSA Section 304(d). That section does not provide the power to force regulated fishers into contracts with observers. Instead, it allows fee-based programs. *See* 16 U.S.C. § 1854(d). The Alaska Regulation, the only regulation of its kind in the 14 years from the promulgation of the MSA to the 1990 Amendments, is not based on any grant of power or authority from Congress. Defendants refer to this sole regulation as the "backdrop" of Congress' 1990 Amendments allowing fee shifting in the Alaska fisheries. Plaintiffs have described the fee-shifting provisions of the MSA in detail in prior submissions to the Court and they need not be repeated here. The main fact in reply to the Defendants' Supplemental Brief is that Congress did not bless the Alaska Regulation *even in the sole fishery where they allowed fee shifting of a sort.* What Congress did in 1990 was not to approve of the Defendants' short-lived regulation, but to disapprove it. And it disapproved it in ways that are important to the Omnibus Amendment and the Final Rule's unlawfulness.

As noted in Plaintiffs' Supplemental Brief and not rebutted by the Government, 16 U.S.C. § 1862(a) and (b) provide a fee-based system that caps all fees paid by each fisherman and requires the burden of such observers to be distributed fairly among the fishing fleet. The Observer fee, paid to the Government, cannot be more than 3% of the catch profit and is distributed evenly

through the fleet.  That is nothing like what the Defendants' promulgated in the Alaska Regulation.  It is nothing like the Omnibus Amendment or Final Rule.  Congress did not approve the Defendants' unilateral assertion of power in the Alaska Regulation but rejected it and substituted a different payment scheme that included fees, spreading the costs to each vessel and capping the ultimate fee at levels far below the Final Rule here.  As for forced contracting of Observers with the industry, participants there have had explicit direction for this in foreign fisheries since 1983.  Pub. L. No. 97–453, 96 Stat. 2481 (1983) (codified at 16 U.S.C. § 1821); *and see* 16 U.S.C. § 1821(h)(6)(C) (which requires that the agencies "establish a reasonable schedule of fees that certified observers or their agents shall be paid by the owners and operators of foreign fishing vessels for observer services").

The uninterrupted interpretation of the MSA from 1990 to 2010 was that Observers in domestic fisheries were paid by the Government.  Then, in 2010, the Defendants promulgated Northeast (NE) Multispecies Fishery, Amendment 16, 75 Fed. Reg. 18262 (Apr. 9, 2010).  *See Goethel v. Dep't of Com.*, 854 F.3d 106, 109 (1st Cir. 2017).  The *Goethel* case did not reach the merits of whether that program was lawful.  However, the opinion directed the attention of Congress to the issue.  *Id.* at 116–17.  From that decision to present Congress has never allowed the at-sea monitors in that case to be paid for by the fishermen.  Similarly, since 2021 Congress has prevented—through its funding power—the Final Rule from going into effect.

## ARGUMENT

### I.     THE COURT'S TASK IS TO DETERMINE WHETHER CONGRESS PROVIDED THE DEFENDANTS WITH THE POWERS THEY CLAIM

The Government errs in its assertion that this Court's previous decision or that of the First Circuit in this case, both reversed, bars it from determining whether the Omnibus Amendment and the Final Rule are not authorized by the applicable portions of the MSA.  As noted, this Court has

not cited any portion of the MSA that allows the agencies to do what they claim they can do in this instance. Previously, it was of great import to this Court that existing cost-shifting portions of the MSA were done by fees or some method other than forced contracting with Observers. *Relentless, Inc. v. U.S. Dep't of Com.*, 561 F. Supp. 3d 226, 234–35 (D.R.I. 2021) ("*Relentless I*"), *aff'd by* 62. F.4th 621 (1st Cir. 2023) ("*Relentless App.*"), *vacated and remanded by* 144 S. Ct. 2244 (2024), *vacated and remanded by* 2024 WL 3647769 (1st Cir. July 31, 2024). The Court explicitly noted the "penalty" portion of the MSA used the reference to contracting with Observers by industry which would make no sense in the context of the statutes cited to it at that time. *Id.* But now it is fully explained.

In its Supplemental Brief, the Government now rejects this apples-to-apples cost shifting by requiring direct contracting of observers for foreign fishers as irrelevant despite what this court said in *Relentless I*. *See* 16 U.S.C. § 1821(h)(6)(C) (foreign fishers direct contracting with Observers). But it simultaneously argued to this Court that the different cost-shifting provisions of the MSA were not the same as the Final Rule so that Congress had not prohibited their own invention of this form of cost shifting even though it is explicitly allowed elsewhere by statute. Defs.' Suppl. Br. at 16–19. What this provision really shows is that Congress was quite cognizant of how to allow direct contracting of industry-paid observers when it so desired.

The "penalty" provision that Defendants argue supports their view that Congress approved forced contracting of Observers in this fishery was not added until 1996. *See* 16 U.S.C. § 1858(g)(1)(D); Pub. L. No. 104-297, § 114(c), 110 Stat. 3598, 3599. But by that time, Congress was aware of Section 1821(h)(6)(C) when it drafted and adopted Section 1858(g)(1)(D). *See Parker Drilling Mgmt. Servs., Ltd. v. Newton*, 587 U.S. 601, 611 (2019) (citation omitted) ("It is a commonplace of statutory interpretation that 'Congress legislates against the backdrop of

existing law.'"). The best reading of the statute is that the "penalty" provision relates to the statutorily-identified observer programs existing at the time the 1996 Amendments were adopted, rather than providing an expansive mechanism for the Defendants to create Observer programs in the future at will. The penalty provision did allow *Congress* to amend the kinds of Observer programs in the future without changing this section because it encompassed all known Observer programs extant, including the forced contracting provisions of the foreign fishers program.[2]

All of this was in aide of interpreting 16 U.S.C. §1853(b)(8) the sole support noticed for the Final Rule. . "An agency, after all, 'literally has no power to act' . . . unless and until Congress authorizes it to do so by statute." *Fed. Election Comm'n v. Cruz*, 596 U.S. 289, 301 (2022) (citation omitted). Here there is no explicit grant of such power, and the statute has a clear and available explanation for the penalty section's language.

### A. The Plain Meaning of the Text Does Not Support the Government's Interpretation

The Government argues that the plain text, "carried", when put in context, allows the Final Rule. Defs.' Suppl. Br. at 6–12. There is no plain text that allows "carried" to include "pay the salary of." The MSA requires that "one or more observers be carried on board a vessel[.]" 16 U.S.C. §1853(b)(8). The Government's assertion that there are no limitations on the power granted by "carried" is backwards. Defs.' Suppl. Br. at 6. The Government needs a *grant* of authority or power before it can act. The ability to enforce "carrying" an Observer is not a grant to enforce payment of that Observer and Congress does not have to limit the administrative agencies' ability to enforce payment because it never granted that power. The Government admits the MSA does not define "carried," but courts in this Circuit have considered the term before. One court noted:

---

[2] In other words, Congress could amend the MSA to include more forced contracting as in Section 1821(h)(6) but it would do so by statute as it did there. It was not *carte blanche* for the agencies to invent such programs.

Accordingly, like the Supreme Court in *Bailey,* this Court shall look to Black's Law Dictionary for the ordinary and plain meaning of the term "carry." According to Black's Law Dictionary, "carry" means "to bear, bear about, sustain, transport, remove, or convey. To have or bear upon or about one's person as a watch or weapon." Black's Law Dictionary 214 (6th ed. 1990).

*Objio-Sarraff v. United States*, 927 F. Supp. 30, 34 & n.4 (D.P.R. 1996) (citing *United States v. Ramirez–Ferrer,* 82 F.3d 1149 (1st Cir. 1996)), *reversed on other grounds* 108 F.3d 421 (1st Cir. 1997). None of those definitions denotes payment of wages; they all have to do with carriage. While these cases determine the meaning of carry in the context of "firearms" the legal definition remains the same. In *United States v. Cleveland*, 106 F.3d 1056, 1066 (1st Cir. 1997), *abrogation recognized on other grounds by Brache v. United States*, 165 F.3d 99, 102–03 (1st Cir. 1999), the Court noted that the "ordinary and natural" meaning of the word "carry" is:

> CARRY indicates moving to a location some distance away while supporting or maintaining off the ground. Orig. indicating movement by car or cart, it is a natural word to use in ref. to cargoes and loads on trucks, wagons, planes, ships, or even beasts of burden.

*Id.* (quoting *Webster's Third New International Dictionary of the English Language Unabridged* 343 (3d ed. 1971)). Nothing in that definition connotes paying salaries. There is no "plain" reading of the text in its "ordinary and natural" meaning that supports the Government's interpretation.

Judge Walker, in his dissent in *Loper Bright Enters. v. Raimondo*, 45 F.4th 359 (D.C. Cir. 2022), made this crystal clear. *Id.* at 375–76. (Walker, J., dissenting) (comparing the word "carried" in Section 1853(b)(8) and "use" in the context of fishing gear and equipment in Section 1853(b)(4)). Not only does carrying an Observer not connote paying his salary or wages but there, as here, the Defendants can "identif[y] no other context in which an agency, without express direction from Congress, requires an industry to fund its inspection regime." *Id.* at 376. For instance, Air Marshals are required to be carried by airlines, but it would be strange indeed if these government agents were paid by the airlines. Instead, only a seat is required for them. *See, e.g.*,

49 U.S.C. § 44917(a)(1)–(5) (providing for deployment of Air Marshals on passenger flights, including a seat on such flights).

In no dictionary nor in any context known does the mere word "carry" denote "pay the salary of." Whatever can be said about the meaning of "carry" no transmogrification of its meaning to be "pay the salary of" can be called a "plain reading." "[T]here is no inherent, or even intuitive, connection between paying a monitor's wage and providing him passage." *Loper Bright*, 45 F.4th at 376 (Walker, J., dissenting). The Government's argument that this word can be changed in its meaning by administrative will is ill-taken and it could not under any circumstances be the best reading of that word or the statute.

It should also be noted that the MSA addresses men and vessels at sea. The term "carry" is used often in maritime and admiralty law, typically for goods. "Carrying" in the maritime sense means what it means here, to take on the voyage—not to pay for the goods or people. *See*, *e.g.*, *Compania Di Navigacion La Flecha v. Brauer*, 168 U.S. 104, 118 (1897) ("By the laws of both countries, the ordinary contract of a common carrier by sea involves an obligation on his part to use due care and skill in navigating the vessel and in carrying the goods"). That does not mean "to pay for the goods." Similarly, in deciding what a provision meant, the Court held:

> That section imposes on masters of United States vessels homeward bound the duty, upon request of consular officers, to receive and carry destitute seamen to the port of destination at such compensation [to the "carrying" vessel] not exceeding a specified amount as may be agreed upon by the master with a consular officer, and authorizes the consular officer to issue certificates for such transportation ….

*Alaska S.S. Co. v. United States*, 290 U.S. 256, 258 (1933). "Carry" did not mean "pay the salary of such seamen." Neither does it mean that for Observers here.

With the end of *Chevron* deference, the complete statutory silence concerning industry paying the Observers does not allow a plain reading that "carry" means "pay salaries." There is no

plain reading of "carry" that means pay the salary. In the dictionaries and in traditional maritime law, "carry" did not mean "pay" unless the seamen were doing work for the vessel. Observers are government servants and answer to the government. They provide no work for the functioning of the regulated vessel. Carry does not mean pay on a plain reading of the statute and the analysis should end there.

**B. There Is No "Context" That Can Bootstrap the Word "Carry" Into a Requirement to Pay Salaries**

The Government, left with no straws to grasp in the plain text of Section 1853(b)(8), attempts to manufacture "context" to save its unlawful assertion of power. The "context" straw grasped at has already been addressed—the sanctions or penalty provisions of Section 1858(g)(1)(D). The Government acknowledges that this Court did not find that section a clear grant of such power in *Relentless I*, but it now claims it is found in "context." Defs.' Suppl. Br. at 7. As demonstrated by the foreign fishing provisions already addressed, the only context the penalty provision supplies is to explain that Congress knew how to provide the agencies with the claimed forced contracting power because it did so explicitly. 16 U.S.C. § 1821(h)(6). The D.C. Circuit stated that the penalty provision indicated that "Congress anticipated industry's use of private contractors." *Loper Bright*, 45 F.4th at 366. Of course it did, it had already provided it by explicit statutory language. It also knew that it might by statute add more such provisions and would not have to amend this section if it did so (it never has).

The Governments' second attempt at "context" is to equate paying salaries of a government agent assigned to enforce government rules and regulations to having to buy equipment that meets the specifications laid down by the agencies. Such a claim is, as already noted, made nowhere in any other statute or by any other agency. Paying costs "incidental" to complying with a regulation and paying of the salary of the person one's regulated status allows on one's property are

completely different things.  As noted, Judge Walker explained why equipment and berths are different from salaries of government enforcers.  *Loper Bright*, 45 F.4th at 375–76 (Walker, J., dissenting).  It should also be noted that equipment, like nets, gaffes, and the like, has to be used to fish and is owned by the regulated party.  The agencies are only regulating the type of equipment the vessel would use anyway and that equipment becomes an effect of the vessel to be transferred with it.  The Observers are not owned by the vessel, are not directed by the vessel owner, and do nothing for the vessel except report violations of law.  *See e.g.*. 16 U.S.C. § 1881b(b)(4).  They are deemed to be federal employees:

> **(c) Observer status** An observer on a vessel and under contract to carry out responsibilities under this chapter or the Marine Mammal Protection Act of 1972 (16 U.S.C. 1361 et seq.) shall be deemed to be a Federal employee for the purpose of compensation under the Federal Employee Compensation Act (5 U.S.C. 8101 et seq.).

16 U.S.C. § 1881b(c).

A contrary ruling would allow every agency in the Government to fund its functionaries by saying the salaries of its inspectors, checkers, agents, and enforcers can all be put in the "costs" section of the regulatory ledger.  The Supreme Court overruled and remanded this case and the First Circuit's opinion, *Relentless App.*, creating a "default norm" is no longer good law.  The Chief Justice described what the First Circuit did but did not approve it.   *See Loper Bright Enters. v. Raimondo*, 144 S. Ct. 2244, 2256 (2024).  The Supreme Court did not endorse such a "default norm" which only ever existed in the overruled First Circuit case, *Relentless App.*, and nowhere else.  In any event, even a "default norm" is countered by statutory language and structure as we have here demonstrating Congress did not approve this power.

The Government attempts to disregard the actual context of the MSA that demonstrates that there is no such power as its claims.  The National Standards were cited by Plaintiffs not to

relitigate whether they were traduced by the Government with the Final Rule but to show that the MSA does not allow this type of regulation. The Government asserts Standards 7 and 8 help it. *See* Defs.' Suppl. Br. at 11–12. Although these Standards require regulators to "minimize costs" and "adverse economic impacts," 16 U.S.C. § 1851(a)(7), (8), they do not cabin the meaning of a compliance cost. A management measure might cost very little, and comply with the National Standards, while still being unlawful. Industry-funded monitoring is not the kind of cost the government can shift onto regulated parties without explicit authorization. The Final Rule is far more costly than any analogous cost that Congress actually allowed in the MSA's cost-shifting provisions. It is important, as the plain text is so strongly against the asserted power, that the Standards and the fees provisions of the MSA all direct the agency to (1) take great care with imposing costs on fishermen, and, (2) cap every analogous Observer cost shifting for domestic carriers. There is no cap in the Omnibus Amendment or the Final Rule. That is the "context" the Court should assess, and all of it urges rejection of the Government's asserted power.

It is also instructive that in the three cases we know of, where the Defendants tried to impose a contracting of Observers regulation on fishermen, Congress stopped the Government from doing so. As explained, *infra.*, the Alaska Regulation appeared in 1990 after 14 years of the MSA, and was statutorily abrogated with a capped, fairly-distributed fee scheme by Congress within months. The second attempt by the agencies in 2010, which was the subject of the *Goethel* litigation, has been stopped every year for almost a decade by Congress funding the program to stop any forced contracting for that fishery. Now, this regulation has been stopped by Congress because it won't fund the portions of the Final Rule that the agencies admit must be funded by them.

That is the real "context" of this regulation. Like the "plain reading" of the statute, a proper review of "context" redounds to the benefit of Plaintiffs.

### C. History and Legislation Provide No Power to Require Observer Salary Payments.

The Government challenges Plaintiffs' assertion that there was no opposition to the 1990 Observer Amendment. That is the memory of the Plaintiffs who were fishing commercially at the time, but the real import is that the Government could find no opposition in the legislative record either. More to the point, as demonstrated, Congress legislated a different cost-shifting scheme than Defendants promulgated that very year. And no such program was ever anywhere but Alaska, which is why all the legislative history cited by both sides only applies to that fishery.

Moreover, history and legislative history should only be used when the plain text is not sufficient. Here, it is. The Court need not even look at this. But again, the Government attempts to run away from the record by forcing Plaintiffs to prove a negative. Plaintiffs believe there was no opposition to the 1990 Observer Amendment and the Government responds by saying there was debate but cites no opposition at all. The absence of something is challenged by showing its presence, and that the Government has not done.

The Government also takes issue with the extent of the opposition to the Final Rule when it was promulgated, saying there were only about 20 letters. Defs' Suppl. Br. at 14. But there are only about 40 vessels in the fishery. Relatively speaking, that is a significant number of complaints, and the Government cannot walk away from its own recorded description of the opposition to it. Similarly, as demonstrated, Congress may know of these asserted powers, but in every instance, it has used its legislative or spending powers to avert it. It takes a bill passing both houses of Congress and being signed by the President to make explicit that the agencies do not have this power. Congress did so in 1990 with the amendments that changed the agencies' asserted

Alaska Regulation. Courts cannot require the political branches to keep passing clarifying laws when administrative agencies assert unbounded power never granted by Congress in the first place.

Finally, the assertion that Congress, in providing detailed statutory requirements for Observers but not providing for industry-funded salaries, makes no sense. *See* 16 U.S.C. § 1881b (empowering the Secretary to create Guidelines for carrying observers on ships currently unable to carry them). That statue empowers the agencies to determine when a vessel is unsafe for an observer and what actions a vessel owner can "reasonably be required" to do to address them. *Id.* § 1881b(a)(1)(2). It lays out careful points on how Observers are to be trained and empowers the Secretary to do so. It would be strange indeed for Congress to lay out in detail what must be provided to an Observer but never mention who is paying the salary of the Observer. At most, Congress knew that the agencies had attempted an Observer program in the Alaska Regulation that it had quickly overridden in 1990. The fishermen would have been able to oppose it, but the agencies never asserted that power in New England in 1976 when the MSA was promulgated, or until 34 years after the MSA was implemented and 20 years after the 1990 Amendments.

Congress knows exactly how to grant the power that the agencies want here, as it did so for foreign fishers explicitly. There is no reason, and the Government asserts none, why they would not have done so in 1990 if that was what was intended.

### D. The Other Fee Shifting Provisions Weaken and Do Not Strengthen the Government's Position

The Government asserts that the fee programs created by Congress are structurally distinct from the forced contracting power it manufactures, *contra* text, from Section 1853(b)(8). Defs.' Suppl. Br. at 16. The other fee shifting provisions are important because (1) the Alaska provision was put in precisely to alter the Alaska Regulation within months of the agencies asserting it; (2) they demonstrate that Congress, when it does shift fees, caps the costs shifted; and (3) Congress

knows how to impose Observer costs on industry when it wants to. The Government cites the now overruled *Loper Bright* for what is explicitly a *Chevron* grant of power. Defs.' Suppl. Br. at 17 (citing *Loper Bright*, 45 F.4th at 368). The D.C. Circuit said, "it appears doubtful that Congress intended implicitly to preclude the Service from requiring industry-funded monitoring in all other circumstances." *Id*. at 368. Under *Chevron*, silences and ambiguities gave the agencies unwonted power. But now it is clear that Congress does not have to "preclude" agencies from doing anything. It has to grant power, and power will not be conjured from the vasty deep by the courts at agencies' behest. Congress did not have to "preclude" the agency from doing something it did not give it the power to do.

Congress's decision not to grant the agencies a general power to require industry funding is evident from its express authorization in three specific contexts. None of them include the Atlantic herring fishery And, as discussed previously, one of them explicitly allows forced contracting with Observers by the regulated party. *See* 16 U.S.C. §§ 1821(h)(4), (6) (foreign fishing); 1853a(c)(1)(H), (e)(2) (limited access privilege programs); 1862(a) (North Pacific). The Government's assertion that all of these are "distinct" from what it is trying to do here is an effort to reject the negative implication of these provisions and to avoid the "*expressio unius est exclusio alterius*" canon which infers that if Congress put a term in one portion of a statute and not another it did not grant that power in the statute not containing it. *See Gallo Motor Ctr. Corp. v. Mazda Motor of U.S.A.*, 172 F. Supp. 2d 292, 294 (D. Mass. 2001) (applying the canon to interpret a statute). In this case it is crystal clear that Congress knew how to force industry into contracts with Observers. *See* 16 U.S.C. § 1821(h)(6). It is also clear Congress knew other ways to transfer such costs to industry. That it expressed that intention in section 1821(h)(6) but did not do so in the 1990 Observer Amendment is powerful constructive evidence of its intent not to do so in the

Observer Amendment. It also expressed its intent by never allowing any of these agency plans to go into effect for very long without stopping them.

When this Court was determining the meaning of the statute and noted there were no apple-to-apple comparisons it did not have Section 1821(h)(6) before it. But the other fee-shifting provisions, at minimum, demonstrate that Congress knew how to shift fees to industry. And Section 1821(h)(6) provides another problem for the Government. If the agencies' view of their inherent power was correct, placing this ability to force foreign fisheries to contract with Observers is a superfluous provision. To agree with the Defendants here is to make that provision superfluous which is disfavored in statutory interpretation. *Corley v. United States*, 556 U.S. 303, 314 (2009) (internal quotation marks and citation omitted) ("The Government's reading is thus at odds with one of the most basic interpretive canons, that '[a] statute should be construed [so that] effect [is given] to all its provisions, so that no part will be inoperative or superfluous, void or insignificant.")

## II. "NECESSARY AND APPROPRIATE" DOES NOT GRANT THE AGENCIES THIS POWER

"Necessary and Appropriate" is the final redoubt of an agency unable to find any textual statutory support for its position. The Government believes that Section 1853(b)(14), which provides "a plan may 'prescribe such other measures, requirements, or conditions and restrictions as are determined to be necessary and appropriate for the conservation and management of the fishery'" saves the Final Rule. *Relentless I*, 561 F. Supp. 3d at 231. Even in the *Chevron*-era neither this Court nor any other determined that provision alone gave the agency such power as here claimed without applying deference. While *Loper Bright* allowed agency discretion in the first instance, the Supreme Court insisted that under the APA the reviewing court's duty is to fix "the boundaries of [the] delegated authority." *Loper Bright*, 144 S. Ct. at 2263 (cleaned up).

In their opening brief, Plaintiffs laid out the meaning of "necessary and appropriate" and cited cases demonstrating that their use in the MSA does not grant the agencies unbounded power. Pls.' Suppl. Brief at 15–16. Those terms are legal text for the Court to interpret. They cannot undermine the explicit grants of power the Congress made in the MSA discussed already. More to the point, in no way can the Omnibus Amendment and the Final Rule be described as "necessary and appropriate." As the Government admits, forced Observer contracts have mostly never been used and are not being used now. The entire history of their implementation and use demonstrates they are neither "necessary" because the conservation of the fishery has continued on while Congress refused to fund the program, and they are not "appropriate" because they are not a power that has been delegated to the agency by Congress which demonstrated in many cases that it knew how to delegate such power to the agencies.

The other boundary that is smashed through and must be reset by the Court is that this supposedly "necessary and appropriate" regulation is novel and unknown in all federal law or other agencies. The agency power proposed impinges on Congress's ability to exercise its Article I powers to control the agency by controlling its budget. If the salary of any inspector or enforcement agent of a regulated party in an agency with a "necessary and appropriate" clause in its operational statute can be shifted to the regulated, then an enormous power inherent in Congress has been shifted to the Executive Branch. This was exactly what abandoning *Chevron* was meant to prevent; the leakage of Congressional authority to legislate.

The agency's arguments about the purpose of the statute are ill-taken. Abstract goals like "conservation" cannot override statutory text. *See, e.g., Ethyl Corp. v. EPA*, 51 F.3d 1053, 1060 n.9 (D.C. Cir. 1995). Nor can vague policy goals defy the specific design of the Act's funding schemes. *See id.* Plaintiffs are not in a dispute with the Defendants over the presence of Observers

on their vessels. As noted, they never opposed the 1990 Observer amendment. Nor do they dispute that Observers collect information useful to the Government. But that does not provide the agencies with *carte blanche* to foist the salaries of Observers on small businesses without congressional authorization.

The Government asserts without real argument the Court's responsibility to "police the outer statutory boundaries" of Section 1853(b)(14). *Loper Bright*, 144 S. Ct. at 2268. None of its authorities meaningfully engages with the scope of Section 1853(b)(14)'s delegation. The Government continues to avoid articulating any principled limit to what it can require as a "necessary and appropriate" measure. And it fails to recognize how that phrase must be construed narrowly under Supreme Court precedent far more recent than the First Circuit cases it cites to this Court. *See Harrington v. Purdue Pharma, L.P.*, 144 S. Ct. 2071, 2082 (2024) (citations omitted) ("When faced with a catchall phrase like [appropriate], courts do not necessarily afford it the broadest possible construction … . Instead, we generally appreciate that the catchall must be interpreted in light of its surrounding context and read to embrace 'only objects similar in nature' to the specific examples preceding it.'").

In short, the entire text, structure, context and history of the MSA reveal no congressional intent to provide this unbounded power upon the agencies. They instead reveal a Congress that at every turn, statutorily and in its exercise of its spending power, limited the costs that the agencies could shift to regulated fishermen. That consistent 40-year effort by Congress to not allow these agency schemes undermines the assertions of power made by the Defendants here.

## CONCLUSION

For the foregoing reasons the Court should strike and vacate the Omnibus Amendment and Final Rule.

Dated: November 12, 2024                    Respectfully submitted,

/s/ John J. Vecchione
John J. Vecchione (admitted *pro hac vice*)
Kara Rollins (admitted *pro hac vice*)
New Civil Liberties Alliance
4250 N. Fairfax Drive, Ste. 300
Arlington, VA 22203
Phone: (202) 869-5210
john.vecchione@ncla.legal
kara.rollins@ncla.legal

Timothy J. Robenhymer, #4419
303 Jefferson Boulevard, 2nd Floor
Warwick, RI 02888
Phone: (401) 921-4800
Facsimile: (401) 526-0302
tjr@lawofficesri.com

*Counsel for Plaintiffs*

**CERTIFICATE OF SERVICE**

I hereby certify that on November 12, 2024, I electronically filed the foregoing Plaintiffs' Supplemental Reply Brief in Support of Motion for Summary Judgment and Response to Defendants' Supplemental Brief using the CM/ECF system, which will send electronic notification of such filing to all counsel of record.


/s/ John J. Vecchione