# IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF RHODE ISLAND

| | | |
|---|---|---|
| RELENTLESS, INC., et al., | : | |
| | : | |
| Plaintiffs, | : | |
| | : | |
| v. | : | |
| | : | |
| U.S. DEPARTMENT OF COMMERCE, | : | Civil Action No. 1:20-cv-00108-WES-PAS |
| et al., | : | |
| | : | |
| Defendants. | : | |

## DEFENDANTS' SUPPLEMENTAL RESPONSE BRIEF

# TABLE OF CONTENTS

**Page**

I.    INTRODUCTION ........................................................................................................... 1

II.   ARGUMENT ................................................................................................................. 2

   A.    The Best Reading Of The Magnuson-Stevens Act Permits The Service To Require Vessels To Carry Observers At Their Own Expense ............................................................ 2

   B.    The History Of The Magnuson-Stevens Act And Past Practice Confirm The Service's Authority To Require Compliance Costs ............................................................ 6

   C.    The Court Should Reject Plaintiffs' Arguments Regarding The Statute's Fee-Based Provisions ............................................................................................................ 9

   D.    Congress Gave The Service Explicit Authority To Adopt Necessary And Appropriate Measures For Conservation And Management Of The Fishery. ...................................... 13

      1.    The Magnuson Stevens Act confers discretion on the Service in implementing the statute's measures. ....................................................................................................... 13

      2.    The Service reasonably exercised its authority to adopt the measures in the Final Rule. ................................................................................................................. 18

III.  CONCLUSION ............................................................................................................. 21

# TABLE OF AUTHORITIES

**Case**                                                                         **Page**

*Conservation L. Found. of New Eng., Inc. v. Franklin*,
   989 F.2d 54 (1st Cir. 1993) ................................................................ 17

*Goethel v. Pritzker*,
   Civ. No. 15-cv-497-JL, 2016 WL 4076831 (D.N.H. July 29, 2016) ........................................ 9

*Loper Bright Enters. v. Raimondo*,
   45 F.4th 359 (D.C. Cir. 2022) ................................................... 3, 10, 17

*Loper Bright Enters., Inc. v. Raimondo*,
   144 S. Ct. 2244 (2024) ................................................................ passim

*Lovgren v. Byrne*,
   787 F.2d 857 (3d Cir. 1986) ................................................................ 18

*Marsh v. Or. Nat. Res. Council*,
   490 U.S. 360 (1989) ................................................................ 17

*Penobscot Air Servs., Ltd. v. Fed. Aviation Admin.*,
   164 F.3d 713 (1st Cir. 1999) ................................................................ 15

*Relentless, Inc. v. U.S. Dep't of Com.*,
   62 F.4th 621 (1st Cir. 2023) ................................................................ passim

*Relentless, Inc. v. U.S. Dep't of Com.*,
   561 F. Supp. 3d 226 (D.R.I. 2021) ................................................................ passim

**Statutes**

16 U.S.C. § 1801(a)(6) ................................................................ 15, 18

16 U.S.C. § 1801(a)(8) ................................................................ 19

16 U.S.C. § 1801(b)(3) ................................................................ 18

16 U.S.C. § 1801(c)(3) ................................................................ 18, 19

16 U.S.C. § 1802(5) ................................................................ 15, 18

16 U.S.C. § 1802(26) ................................................................ 12

16 U.S.C. § 1821(h)(6) ................................................................ 10, 12

16 U.S.C. § 1851(a)(2) .................................................................................................. 19

16 U.S.C. § 1851(a)(7) ............................................................................................... 4, 18

16 U.S.C. § 1851(a)(8) ............................................................................................... 4, 18

16 U.S.C. § 1853(a) ....................................................................................................... 2

16 U.S.C. § 1853(a)(1) .................................................................................................. 14

16 U.S.C. § 1853(a)(1)(A) ............................................................................................. 20

16 U.S.C. § 1853(a)(2) .................................................................................................... 4

16 U.S.C. § 1853(a)(5) .................................................................................................. 19

16 U.S.C. § 1853(b) ........................................................................................................ 2

16 U.S.C. § 1853(b)(3) .................................................................................................. 14

16 U.S.C. § 1853(b)(4) .................................................................................................... 2

16 U.S.C. § 1853(b)(8) ............................................................................................ passim

16 U.S.C. § 1853(b)(14) ........................................................................................... 13, 14

16 U.S.C. § 1854(d)(2)(A) ............................................................................................. 12

16 U.S.C. § 1858(g)(1)(D) ............................................................................... 5, 10, 11, 12

16 U.S.C. § 1861(b) ........................................................................................................ 4

16 U.S.C. § 1862(a)(2) .................................................................................................... 9

16 U.S.C. § 1862(b)(2)(F) ........................................................................................... 9, 12

16 U.S.C. § 1862(b)(2)(G) ............................................................................................... 9

16 U.S.C. § 1881b(b)(2) ................................................................................................. 20

16 U.S.C. § 1881b(b)(4) ................................................................................................. 20

**Regulations**

50 C.F.R. § 648.9-.10.............................................................................................. 3

50 C.F.R. § 648.11(m)(4)......................................................................................... 20

**Federal Register**

54 Fed. Reg. 50386 (Dec. 6, 1989) ....................................................................... 16

55 Fed. Reg. 4839-02 (Feb. 12, 1990) .................................................................. 16

64 Fed. Reg. 31144 (June 10, 1999) ...................................................................... 16

72 Fed. Reg. 32549 (June 13, 2007) ...................................................................... 16

85 Fed. Reg. 7414 (Feb. 7, 2020) .................................................................. 2, 3, 8

**Other Authorities**

Pub. L. No. 97-453 § 2(a)(5), 96 Stat. 2481 (1983) ............................................. 10

Pub. L. No. 101-627 § 109, 104 Stat. 4436 (1990)................................................. 6

Pub. L. No. 101-627 § 118, 104 Stat. 4436 (1990)................................................. 6

Pub. L. No. 101-627, § 109(b)(2), 104 Stat. 4436 (Nov. 28, 1990).................... 10

Pub. L. No. 104-297, § 114(c), 110 Stat. 3559 (Oct. 11, 1996).......................... 11

H.R. Rep. 101-393 (1990)................................................................................ 6, 16

Sen. Rep. No. 101-414 (1990) ............................................................................... 6

## I.    INTRODUCTION

This Court is now faced with just one task:  to exercise its "independent judgment in deciding whether [the] agency has acted within its statutory authority[.]"  *Loper Bright Enters., Inc. v. Raimondo*, 144 S. Ct. 2244, 2273 (2024).  If the statute is ambiguous, the Court should "use every tool at [its] disposal to determine the best reading of the statute[.]"  *Id*. at 2266.  Here, the tools at the Court's disposal—the text of the statute, the context, historical practice, and other statutory provisions—all lead to the conclusion urged by Defendants:  the best reading of the Magnuson-Stevens Fishery Conservation and Management Act ("Magnuson-Stevens Act") authorizes the National Marine Fisheries Service ("the Service") to require vessels to carry observers and bear the compliance costs of doing so.

Plaintiffs' Supplemental Response Brief, Dkt. 62 ("Pl. Resp. Br."),[1] takes the Court in multiple directions, first arguing that the key term the Court should consider is the word "carry," then claiming that "carry" cannot be interpreted to mean that vessels should pay the observers' "salaries," then stating that the history of the observer provision does not support Defendants' arguments.  Plaintiffs' positions have no merit and, below, Defendants explain why their contentions lack factual and legal support.  The Court should find that Congress granted the Service the authority to require industry-funded monitoring in the Magnuson-Stevens Act and uphold the Omnibus Amendment and Final Rule.

---

[1]   References to page numbers in filings in this Court refer to the page number in the footer.

## II.     ARGUMENT

### A.     The Best Reading Of The Magnuson-Stevens Act Permits The Service To Require Vessels To Carry Observers At Their Own Expense.

As Defendants explained at length in their opening supplemental brief, Dkt. 60 ("Defs. Supp. Br."), Section 1853(b)(8) of the Magnuson-Stevens Act explicitly authorizes the Service to adopt measures implementing the use of "observers" in regulated fisheries. Defs. Supp. Br. 6-12; *see* 16 U.S.C. § 1853(b)(8). Fishery management plans may "require that one or more observers be carried on board a vessel" to collect data "necessary for the conservation and management of the fishery[.]" 16 U.S.C. § 1853(b)(8). This collection of data is consistent with the overall purpose of the Magnuson-Stevens Act and other vessel reporting requirements.

Plaintiffs' narrow focus on the word "carry" creates a sideshow that fails to provide an "apples-to-apples" comparison that is of any use to the Court. Pl. Resp. Br. at 4, 6, 16. The term "carry," which is defined as "to move while supporting," simply states what a vessel is required to do and what physically happens when an observer is on board. *See Carry*, Merriam-Webster, https://www.merriam-webster.com/dictionary/carry (last visited Nov. 25, 2024). As the Service explained in the Final Rule, the "requirement to carry observers, along with many other requirements under the Magnuson-Stevens Act, includes compliance costs on industry participants." 85 Fed. Reg. 7414, 7422 (Feb. 7, 2020). For example, a fishery management plan may "limit, condition, or require the use of specified types and quantities of fishing gear, fishing vessels, or equipment for such vessels, including devices which may be required to facilitate enforcement of the provisions of this chapter[.]" 16 U.S.C. § 1853(b)(4). The Magnuson-Stevens Act confers broad authority on the Service to adopt a wide variety of other conservation and management measures through adoption of fishery management plans. *See generally id.* § 1853(a), (b); *see also* Defs. Supp. Br. at 9 (detailing measures to be included in fishery

management plans).  By regulation, vessels in many fisheries are required to carry (and use) vessel monitoring systems that electronically monitor their fishing activity, 50 C.F.R. §§ 648.9-.10, and vessels "pay costs to third-parties for services or goods in order to comply with these regulatory requirements[.]"  85 Fed. Reg. at 7422.  Plaintiffs do not object to these requirements, purportedly because the equipment "has to be used to fish and is owned by the regulated party."  *See* Pl. Resp. Br. at 9.  But nothing in the word "carry" (or any of the statutorily defined terms at issue in this case, such as "conservation and management") provides that the government will pay for industry's costs.  In fact, nothing in the Magnuson-Stevens Act indicates that such compliance costs, which are traditionally borne by the regulated industry, must instead be paid by the government in this instance.  If Plaintiffs' reading were correct, there would be no obvious basis to distinguish responsibility for the compliance costs for this or any other requirement.  Thus, neither Plaintiffs' discussion of criminal cases construing the word "carry" in the context of a federal drug trafficking statute and nor their citation of maritime cases from the last century is relevant to the statutory interpretation of the Magnuson-Stevens Act, and its governance of the specialized and highly regulated fishing industry.

In arguing that the plain reading of the statute does not support "paying salaries" or "payment of wages," Plaintiffs rely on the dissent from the D.C. Circuit's *Loper Bright* decision in 2022 to contend that no other agency requires an industry to fund its inspection regime.  Pl. Resp. Br. at 6 (citing *Loper Bright Enters. v. Raimondo*, 45 F.4th 359, 375-76 (D.C. Cir. 2022) (Walker, J., dissenting)).  But the First Circuit majority saw it differently, stating that the industry-funded monitoring requirement was "much like an SEC requirement to submit independently audited financials[,]" which itself "imposes on the regulated entity the cost of paying an independent consultant."  *Relentless, Inc. v. U.S. Dep't of Com.*, 62 F.4th 621, 630 (1st Cir. 2023).

Plaintiffs skirt this example, instead comparing observers to air marshals and saying it would be "strange indeed if these government agents were paid by the airlines." Pl. Resp. Br. at 6. Federal air marshals, however, are fundamentally different from fishery observers in function and purpose. Federal air marshals are vested with federal police power and are tasked with maintaining the security of commercial air travel. They have a defined federal law enforcement role on behalf of the federal government and are authorized to carry and use firearms to protect the safety of the American public both in the air and on the ground. Observers, on the other hand, collect data on behalf of the vessel. *See* 16 U.S.C. § 1853(b)(8); AR17735. They are not law enforcement agents and have no enforcement powers. *Contra,* 16 U.S.C. § 1861(b) (describing powers of authorized officers).[2] While Plaintiffs describe observers as "government agent[s] assigned to enforce government rules and regulations[,]" Pl. Resp. Br. at 8, this simply is inaccurate and Plaintiffs fail (as they have throughout this litigation) to back up that assertion with any facts or any legal authority.

As Defendants explained in their opening supplemental brief, the broader context of the Magnuson-Stevens Act and its accompanying provisions further inform the meaning of Section 1853(b)(8). For example, National Standards 7 and 8 include overarching cost-related standards[3] to govern fishery measures implemented under Section 1853, requiring the minimization of conservation and management measures where practicable. 16 U.S.C. § 1851(a)(7), (8). To this,

---

[2] Specifically, the Final Rule states that observers will collect fishing gear information (size of nets, mesh size, gear configuration); tow-specific information; species, weight and disposition of all retained and discarded catch on observed and unobserved hauls; actual catch weights whenever possible; length data, along with whole specimens and photos to verify species identification on retained and discarded catch; information on and biological samples from interactions with protected species, such as sea turtles, marine mammals, and sea birds; and vessel trip costs. AR17735.

[3] A fishery's revenues and management costs must be described in the fishery management plan. 16 U.S.C. § 1853(a)(2).

Plaintiffs can say only that (1) industry-funded monitoring "is not the kind of cost the government can shift onto regulated parties without explicit authorization[,]" and (2) the Final Rule is "far more costly than any analogous cost that Congress actually allowed in the [statute's] cost-shifting provisions." Pl. Resp. Br. at 10. As to the first point, Plaintiffs seem to acknowledge that the Magnuson-Stevens Act authorizes at least some costs, demonstrating (as they do with their second point) that their dispute is more one of degree. But the question of whether the costs associated with the Final Rule have been considered and minimized where practicable has long been resolved.[4] *See Relentless, Inc. v. U.S. Dep't of Com.*, 561 F. Supp. 3d 226, 238-42 (D.R.I. 2021). And, Plaintiffs cite no evidence from the administrative record to support their bald assertion that industry-funded monitoring costs are "far more costly" than any "analogous cost." Pl. Resp. Br. at 10; *see* Section III.C, *infra* (explaining that Plaintiffs' assertion of "capped" costs overlooks other language in the fee-based provisions).

Finally, it bears repeating that Section 1858(g)(1)(D) demonstrates that Congress anticipated industry's use of, and payment for, private observers. Section 1858(g)(1)(D) authorizes the Service to impose permit sanctions on vessels in cases where "any payment required for observer services provided to or contracted by an owner or operator who has been issued a permit" under a marine resource law "has not been paid and is overdue[.]" 16 U.S.C. § 1858(g)(1)(D). As the First Circuit observed, "[t]his penalty would make no sense if Congress did not anticipate that owners and/or operators of the vessels would be paying observers." *Relentless*, 62 F.4th at 630-31. This conclusion is reinforced by the placement of the permit

---

[4] With this argument, Plaintiffs again go beyond the scope of the remand. The Court already rejected Plaintiffs' claims that the industry-funded monitoring requirement violated the standards for costs set forth in National Standards 7 and 8. *See* Defs. Supp. Br. at 11-12. While they may argue that the statute does not authorize the requirement as a general matter, they cannot now argue that the costs are too high.

sanction authorization in Section 1858(g)(1), which is a general provision of the Magnuson-Stevens Act, not one specific to any particular fishery or particular fee program. *See id*. at 631.

In sum, Congress adopted a comprehensive regulatory scheme in the Magnuson-Stevens Act where authorized conservation and management measures may have costs that must be described in fishery management plans, which are considered in light of the benefits of the measures and minimized to the extent practicable. Thus, the context shows that (1) vessels may be required to comply with at-sea monitoring measures that entail procuring observer services, and (2) Congress anticipated that industry would bear the costs of this sort of regulatory requirement, subject to substantive limits in the statute. Thus, it follows that the Service is well within its authority to require the industry to bear such costs.

**B.    The History Of The Magnuson-Stevens Act And Past Practice Confirm The Service's Authority To Require Compliance Costs.**

Defendants previously explained the history of the adoption of Section 1853(b)(8) and Congress's codification of the industry-funded monitoring program that the Service had adopted in Alaska. *See* Defs. Supp. Br. at 12-13. Committee reports explained that regional fishery management councils already were requiring observers to be carried on board domestic fishing vessels and that enactment of Section 1853(b)(8) "makes the authority explicit." H.R Rep. 101-393, at 28 (1990); *see also* S. Rep. No. 101-414 at 8, 20 (1990). The 1990 Amendments also added Section 1862 (the North Pacific Fisheries Research Plan) to the statute. *See* Pub. L. No. 101-627 §§ 109, 118, 104 Stat. 4436 (1990) (respectively, observer provision and North Pacific Fisheries Research Plan). Plaintiffs suggest that the fee-based provisions set forth in Section 1862 were intended to preclude the Service from implementing an industry-funded monitoring requirement such as the one set forth in the Final Rule. Pl. Resp. Br. at 2, 10. To the contrary, the Magnuson-Stevens Act authorizes them both: allowing any fishery management plan and its regulations to

require vessels to carry observers as had occurred for years prior to the 1990 Amendments, and establishing a system of user fees (including administrative and other specified costs) to implement a specific, fisheries research plan, as described in Section 1862.

Rather than tackle this legislative history, Plaintiffs again resort to their "memory" to dispute the common understanding of the meaning of Section 1853(b)(8) and continue to insist that there was "no opposition to the 1990 Observer Amendment." Pl. Resp. Br. at 11. But the Court need not rely on Plaintiffs' unsubstantiated and self-serving memory to assess the positions articulated at that time because the legislative history provides ample evidence. *See* Defs. Supp. Br. at 13-14. Importantly, as Defendants previously explained, industry participants were aware prior to the 1990 amendments that federal funding was unavailable to secure observer coverage. *See id*. The legislative history shows that industry participants expressly recognized that "on-board data gathering can and should be regarded as a cost of doing business." *Id*. at 20 (citing *Magnuson Fishery Conservation and Mgmt. Act of 1976, Reauth.— Part II, Hearing Before the Subcomm. on Fisheries and Wildlife Conservation and the Env't, Comm. on Merch. Marine and Fisheries, House of Representatives*, 101st Cong. 33 (1989) (written statement of A. Thomson)); *see also* Dkt. 38-1 at 18 n.13. Such statements refute Plaintiffs' "memory" and demonstrate unequivocally the commonly held understanding that the observer provision in Section 1853(b)(8) would encompass industry-funded monitoring. Thus, Plaintiffs miss the point when they say Defendants "could find no opposition in the legislative record either." Pl. Resp. Br. at 11.

Nor is there any basis for Plaintiffs' continued assertion that an "uproar" ensued when the Service issued the Final Rule. *See* Pl. Resp. Br. at 11; *see also* Dkt. 59 ("Pl. Supp. Br.") at 17. In their opening supplemental brief, Plaintiffs stated that the Final Rule was met with an "avalanche of opposition." Pl. Supp. Br. at 7. As Defendants explained in response, just twenty comment

letters were submitted on the Proposed Rule.  Defs. Supp. Br. at 14 (citing 85 Fed. Reg. at 7422; AR17647-17718).  Plaintiffs now argue that this modest number of comments is "significant" nonetheless because "there are only about [forty] vessels in the fishery."  Pl. Resp. Br. at 11.  But the comment letters were neither all from industry participants nor uniformly opposed to the Final Rule.  Just three organizations submitted substantive opposition letters:  (1) a group affiliated with Plaintiffs in this case (AR17699-17715); (2) Cause of Action Institute, which is the organization representing the *Loper Bright* plaintiffs (AR17655-67); and (3) Lund's Fisheries, a company affiliated with at least two of the vessels that originally were plaintiffs in the *Loper Bright* case (AR17683-17684).  The remaining comments offered a mix of positions.  Two organizations (including a fishermen's organization) submitted comment letters in support of the Final Rule, urging an even higher 100% coverage target.  *See* AR17653-54 (comment from Cape Cod Commercial Fishermen's Alliance); AR17668-71 (comment from Conservation Law Foundation).  Other comments generally were shorter, stating support for, and opposition to, the Final Rule.  Thus, the number of industry participants has no correlation to the low number of submitted comments.  For this reason and as previously explained, describing the response to the Final Rule as an "uproar" is simply inaccurate.

Plaintiffs next assert without support that Congress has "used its legislative or spending powers" to thwart implementation of industry-funded monitoring.  Pl. Resp. Br. at 11.  Congress has done no such thing.  There is no dispute that Congress is aware that the Service continues to operate observer programs that include industry-funded monitoring components.  *See* Defs. Supp. Br. at 14-15 (citing congressional committee reports that evidence awareness of industry-funded monitoring dating back to 2015).  The Service currently lacks funds to pay its administrative costs for industry-funded monitoring in the herring fishery, *see* Defs. Supp. Br. at 2-3, but Plaintiffs

have identified not a single express statement that supports their characterization of this funding deficit as Congress's effort to block the agency from carrying out the program. The same can be said for Congress's authorization of the industry-funded monitoring program for the New England groundfish fishery that was the subject of litigation in *Goethel v. Pritzker*, Civ. No. 15-cv-497-JL, 2016 WL 4076831, at *6 (D.N.H. July 29, 2016).[5] The Court need not accept Plaintiffs' speculative (and inconsistent) argument that Congress impliedly rejected Defendants' position by providing funding for the New England groundfish fishery on the one hand, but on the other hand, declined to provide funding for the Service's administrative costs as it did here. Surely if Congress disagreed that the Service had authority to implement industry-funded monitoring—or intended to preclude that authority—Congress could and would have made that clear.

### C. The Court Should Reject Plaintiffs' Arguments Regarding The Statute's Fee-Based Provisions.

Plaintiffs continue to argue that the Magnuson-Stevens Act provides "express authorization [of industry-funded monitoring] in three specific contexts." Pl. Resp. Br. at 13. Defendants already have explained at length why those fee provisions are structurally distinct and serve different purposes. *E.g.*, Defs. Supp. Br. at 16-19.[6] This Court and the First Circuit already have rejected their arguments on this point. *Relentless*, 561 F. Supp. 3d at 235-36; *Relentless*, 62 F.4th at 631-33. Plaintiffs' opening supplemental brief offered no reason for the Court to depart from its prior decision, and their response brief fares no better. Defendants briefly address two points.

---

[5] Plaintiffs' statement that the *Goethel* case "did not reach the merits of whether that program was lawful[,]" Pl. Resp. Br. 3, is accurate insofar as they refer to the First Circuit's decision. The district court, however, rendered a fulsome opinion that found the claims were barred by the statute of limitations and, in the alternative, that none of the plaintiffs' challenges to the lawfulness of the program had merit. *Goethel*, 2016 WL 4076831, at *4-11.

[6] For example, fees, unlike compliance costs, are not paid to third parties for services rendered, and they may be required of industry participants who do not even use the funded service. *See, e.g.*, 16 U.S.C. § 1862(a)(2), (b)(2)(F)-(G).

First, in their opening brief, Plaintiffs described Section 1821(h)(6) as the missing piece needed to solve the statutory interpretation question before the Court. Pl. Supp. Br. at 10-11. But as Defendants explained, Section 1821(h)(6) provides the Service with residual authority to require foreign vessels to pay the fee described in Section 1821(h)(4) directly to the service provider in the event the Service does not have funds to cover administrative overhead. *See* 16 U.S.C. § 1821(h)(6). As the D.C. Circuit explained in its *Loper Bright* decision, Section 1821(h)(6) serves as a "contingency plan" for monitoring in the foreign fishing context. *Loper Bright*, 45 F.4th at 367-68. Plaintiffs failed to respond to these points in their supplemental response brief, choosing instead to weave Section 1821(h)(6) into their convoluted chronology regarding the permit sanction provision in Section 1858(g)(1)(D). According to Plaintiffs, Congress was "well aware" of Section 1821(h)(6), and thus drafted Section 1858(g)(1)(D) to account for it. *See* Pl. Resp. Br. at 4-5; *see also id.* at 8, 13-14. But the plain language of Section 1858(g)(1)(D) is not specific to foreign fishing: it refers broadly to "<u>any</u> payment required for observer services provided to or <u>contracted by an owner or operator</u> who has been issued a permit or applied for a permit under <u>any</u> marine resource law administered by the Secretary[.]" 16 U.S.C. § 1858(g)(1)(D) (emphasis added).

Moreover, legislative history does not support Plaintiff's chronology. Congress enacted Section 1821(h)(6) in 1983 as part of amendments to the statutory provisions regarding foreign fishing. Act of January 12, 1983, Pub. L. No. 97-453 § 2(a)(5), 96 Stat. 2481, 2483 (1983). Congress then amended the statute in 1990, adding the observer provision that is set forth in Section 1853(b)(8) to the section on Contents of Fishery Management Plans - Discretionary Provisions. Pub. L. No. 101-627, § 109(b)(2), 104 Stat. 4436 (Nov. 28, 1990). The last directed fishing by foreign vessels in the U.S. exclusive economic zone ("EEZ") occurred in 1991, except

for a small amount of activity in 2001. NAT'L MARINE FISHERIES SERV., FISHERIES OF THE UNITED STATES 2015 at 118 (Sept. 2016) (stating that displacement of foreign fishing effort in the U.S. EEZ "marked the achievement of one of the objectives of the [Magnuson-Stevens Act]: the development of the U.S. fishing industry," and noting a small quantity of Atlantic herring harvest by foreign vessels in 2001), *available at* https://www.st.nmfs.noaa.gov/Assets/commercial/fus/fus15/documents/FUS2015.pdf;[7] *see also Fisheries Monitoring and Analysis Division History: A history of fisheries monitoring and management in the North Pacific*, NOAA Fisheries, https://www.fisheries.noaa.gov/alaska/fisheries-observers/fisheries-monitoring-and-analysis-division-history (noting that, by 1991, foreign fishing within the 200-mile EEZ of the Bering Sea and Gulf of Alaska was ended) (last visited Nov. 25, 2024). The North Pacific "pay as you go" industry-funded monitoring program continued during this time, contrary to the Plaintiffs' unsupported and incorrect assertion of a "gap" between 1990 and 2010. Pl. Resp. Br. at 3; *see* Dkt. 38-1 at 18 (citing N. Pac. Fishery Mgmt. Council, Envtl. Assessment, Restructuring the Program for Observer Procurement & Deployment in the N. Pac. (March 2011), at 3 (later description of the observer program)).[8] Congress then enacted the permit sanction provision in Section 1858(g)(1)(D) in 1996. Pub. L. No. 104–297, § 114(c), 110 Stat. 3559 (Oct. 11, 1996). Given that foreign fishing was not occurring at that time, Plaintiffs' assertion that Congress intended for Section 1858(g)(1)(D) to apply only to observers referred to in the foreign fishing

---

[7] FISHERIES OF THE UNITED STATES 2019 at 124 (May 2021) also notes the small amount of harvest in 2001, but the 2020 and 2022 reports – issued in May 2022 and November 2024, respectively – do not continue to include information on foreign fishing. All reports are available at *Fisheries of the United States*, NOAA Fisheries, https://www.fisheries.noaa.gov/national/sustainable-fisheries/fisheries-united-states (last visited Nov. 25, 2024).

[8] This source is available at https://repository.library.noaa.gov/view/noaa/4291 (last visited Nov. 25, 2024).

provisions of Section 1821(h)(6) falls flat. The more plausible explanation—supported by the plain language of the statute and its focus on a national fishery management program—is that Congress intended Section 1858(g)(1)(D) to address the potential lack of payment for observer services by domestic vessels, as authorized by the enactment of Section 1853(b)(8) in the 1990 amendments.

Second, Plaintiffs argue that when Congress "shift[s] fees," it "caps the costs shifted[.]" Pl. Resp. Br. at 12-13; *see also id*. at 10. But this argument is wrong for two reasons. First, industry-funded monitoring does not "shift" costs: the Final Rule delineates between industry costs and government costs, and makes each entity responsible for its own. AR17732-33. Second, in asserting that Congress only allowed compliance costs that were subject to a "cap," Plaintiffs invoke the fee provision in Section 1854(d)(2)(A), which applies to limited access privilege programs (i.e., programs that issue permits to harvest a specified portion of the total allowable catch of a fishery for a person's exclusive use). 16 U.S.C. §§ 1854(d)(2)(A), 1802(26) (defining "limited access privilege"). That section of the statute authorizes the Secretary to recover the actual costs related to management, data collection, and enforcement of a limited access privilege program. *See id*. While the Magnuson-Stevens Act also states that the cost recovery fee in Section 1854 shall not exceed 3 percent of the value of the fish harvested under any such program, imposing a fee in this manner is different in kind from requiring an individual vessel to use observer services and pay for the costs of those services. *See also* 16 U.S.C. § 1862(b)(2)(F) (describing fee system for the North Pacific fishery plan, which "shall. . . be assessed against some or all fishing vessels and U.S. fish processors, including those not required to carry an observer or an electronic monitoring system under the plan. . .").

In sum, the fee-based provisions in the Magnuson-Stevens Act do not support the reading of the statute urged by Plaintiffs. Their arguments about the fee-based provisions already have been rejected by this Court and the First Circuit, and Plaintiffs have given this Court no basis to change course now.

### D.     Congress Gave The Service Explicit Authority To Adopt Necessary And Appropriate Measures For Conservation And Management Of The Fishery.

Plaintiffs urge the Court to decline to find that the Magnuson-Stevens Act granted the Service any more authority than "the explicit grants of power the Congress made in [the statute.]" Pl. Resp. Br. 15. Their arguments, however, rest on mischaracterizations of Defendants' positions and ignore the plain language of the statute. As explained below, the Service properly exercised its discretionary authority to adopt the cost-allocation provisions in the Final Rule as a measure "necessary and appropriate" to implement the at-sea monitoring program. 16 U.S.C. § 1853(b)(14).

### 1.     The Magnuson Stevens Act confers discretion on the Service in implementing the statute's measures.

The Supreme Court explained that courts evaluating an agency's authority must exercise their independent judgment to determine a statute's meaning, but "in a case involving an agency," the "statute's meaning may well be that the agency is authorized to exercise a degree of discretion." *Loper Bright Enters., Inc. v. Raimondo*, 144 S. Ct. 2244, 2263 (2024). This discretion is evidenced by laws that "empower an agency to prescribe rules to 'fill up the details' of a statutory scheme," or "to regulate subject to the limits imposed by a term or phrase that 'leaves agencies with flexibility,' such as 'appropriate' or 'reasonable.'" *Id*. (internal citations omitted). Congress used such language in the Magnuson-Stevens Act when it authorized the Service to prescribe "measures, requirements, or conditions and restrictions as are determined to be necessary and

appropriate for the conservation and management of the fishery." 16 U.S.C. § 1853(b)(14); *see also Relentless*, 561 F. Supp. 3d at 237 (citing 16 U.S.C. § 1853(a)(1)).[9]

Notwithstanding the Supreme Court's instructions, Plaintiffs insist that Defendants' reliance on the Magnuson-Stevens Act's "necessary and appropriate" language is indicative of "an agency unable to find any textual statutory support for its position." Pl. Resp. Br. at 14. Not so. As explained above, there is ample support in the text of the Magnuson-Stevens Act for the industry-funded monitoring required in the Final Rule. *See* Section III.A, *supra*. Moreover, recognition of the Service's discretion to require industry-funded monitoring is consistent with Section 1853(b)(14), which authorizes the Service to prescribe such "measures, requirements, or conditions and restrictions as are determined to be <u>necessary and appropriate</u> for the conservation and management of the fishery." 16 U.S.C. § 1853(b)(14) (emphasis added). The Supreme Court itself explained that when assessing laws that "delegate[] discretionary authority" with words like "appropriate," courts should "independently identify and respect such delegations of authority, police the outer statutory boundaries of those delegations, and ensure that agencies exercise their discretion consistent with" the APA.[10] *Loper Bright*, 144 S. Ct. at 2263, 2268. Thus, Plaintiffs' assertion that Congress did not delegate authority to require conservation and management measures that are "necessary and appropriate" is plainly wrong, as is their argument that Defendants are advocating for "unbounded power." Pl. Resp. Br. at 15-16.

---

[9]   Indeed, Congress used the term "necessary and appropriate" three times in providing direction about the contents of fishery management plans. 16 U.S.C. §§ 1853(a)(1), 1853(b)(3), 1853(b)(14).

[10]   Plaintiffs say that Defendants have asserted it is this Court's responsibility to "police the outer statutory boundaries" of Section 1853(b)(14). *See* Pl. Resp. Br. at 16. This, however, is the language that the Supreme Court used in remanding this case for further consideration.

Plaintiffs next describe "conservation" as an "[a]bstract" and "vague policy goal." *Id.* at 15. Here, too, Plaintiffs overlook the text of the statute. The words "conservation" and "management" are repeated throughout the findings, purposes, and policy of the Magnuson-Stevens Act. *See* 16 U.S.C. § 1801(a)(6). Among other things, Congress found that "[a] national program for the conservation and management of the fishery resources of the United States is necessary to prevent overfishing, to rebuild overfished stocks, to insure conservation, to facilitate long-term protection of essential fish habitats, and to realize the full potential of the Nation's fishery resources." *Id*. Elsewhere, the Magnuson-Stevens Act expressly defines the phrase "conservation and management" as referring to "rebuilding, restoring, or maintaining fishery resources and the marine environment;" assuring a supply of food and other products and recreational benefits; avoiding "irreversible or long-term adverse effects on fishery resources and the marine environment[;]" and assuring "a multiplicity of options available with respect to future uses of these resources." 16 U.S.C. § 1802(5); *see* Defs. Supp. Br. at 21 n.8. These specifically defined terms are not "abstract," nor do they represent "vague policy goal[s]."[11]

Plaintiffs' other efforts to discount the Final Rule as imposing measures that are not "necessary and appropriate" ask the Court to look beyond the administrative record, Pl. Resp. Br. at 15, which is inappropriate in this case. *Penobscot Air Servs., Ltd. v. Fed. Aviation Admin.,* 164 F.3d 713, 719 (1st Cir. 1999). According to Plaintiffs, industry-funded monitoring is not necessary because "forced Observer contracts. . . are not being used now." Pl. Resp. Br. at 15. But even if this argument were proper (which it is not), Plaintiffs know this assertion lacks a factual basis:

---

[11]  Plaintiffs' contention that requiring industry to pay its monitoring costs "impinges on Congress' ability. . .to control the agency by controlling its budget[,]" asks the Court to presume that Congress intended to exercise control through its budgeting choices. Pl. Resp. Br. at 15. The proper approach is for the Court to rely on the text of the statute, the context, historical practice, and other statutory provisions to assess whether Congress intended to grant such authority.

industry-funded monitoring is not being implemented now because the Final Rule specifically provided that industry-funded monitoring coverage (that is, coverage in addition to that associated with Standard Bycatch Reporting Methodology) was contingent on the Service having appropriated funds to pay for its administrative costs. AR17737. Accordingly, the Service ceased requiring monitoring coverage when it no longer had funds available to cover administrative costs. *See* Defs. Supp. Br. at 2-3. This outcome has nothing to do with whether the Service determined that the coverage was "necessary" at the time it issued the Final Rule.

Without providing any citation, Plaintiffs seem to state that "the Government admit[ted]" that observers "have mostly never been used[.]" Pl. Resp. Br. at 15. Defendants have never "admit[ted]" any such thing, nor is there any factual basis for that assertion. To the contrary, industry-funded monitoring has been a mainstay in other fisheries in the United States for decades. This includes the industry-funded monitoring in fisheries in the North Pacific that was implemented in 1989 and which Section 1853(b)(8) was intended to codify. *See* 54 Fed. Reg. 50386, 50391 (Dec. 6, 1989), *see*, *e.g*., Comm. Merch. Marine & Fisheries, H.R. Rep. No. 101-393, at 28 (1989) ("[T]his subsection allows the Councils to require that observers be carried on board domestic fishing [vessels] for data collection purposes. The Committee notes that the Councils already have—*and have used*—such authority; the amendment makes the authority explicit."); 55 Fed. Reg. 4839-02, 4840 (Feb. 12, 1990) (observer program approved by the North Pacific Council, providing that vessel operators "will pay the cost of the observer directly to the contractor"). The Atlantic sea scallop fishery also implemented an industry-funded observer program in 1999, which was reactivated in 2007 after a brief period of inactivity. *See* 64 Fed. Reg. 31144, 31145 (June 10, 1999); 72 Fed. Reg. 32549, 32550 (June 13, 2007). To the extent Plaintiffs intended to refer to the industry-funded monitoring in the Atlantic herring fishery, Defendants

explained the chronology in their opening supplemental brief and incorporate that discussion here by reference.  Defs. Supp. Br. at 2-3.  In short, Plaintiffs' assertion that observers only have been "paid by the Government" from 1990 to 2010, Pl. Resp. Br. at 3, is wrong.

Nor is there any factual basis for Plaintiffs' assertion that "the conservation of the fishery has continued on while Congress refused to fund the program[.]"  *Id.* at 15.  After many years of litigation, it remains undisputed that the Final Rule established industry-funded monitoring to assess the amount and type of catch, monitor annual catch limits more precisely, and provide other information for management, with the purpose of providing increased accuracy in catch estimates.  AR17027.  Whether or not industry-funded monitoring is "necessary and appropriate" for the "conservation and management" of the fishery must be assessed on the reasons stated by the Service in the Final Rule and the other documents in the administrative record that provide the basis for the agency's reasoning.  *Marsh v. Or. Nat. Res. Council*, 490 U.S. 360, 378 (1989).

Plaintiffs also argue that Defendants fail to articulate a "principled limit" to the phrase "necessary and appropriate."  Pl. Resp. Br. at 16.  Again, not so.  At the threshold, as explained in Defendants' opening supplemental brief, courts have recognized that Section 1853(b)(14) confers discretion and flexibility to "achieve the [Magnuson-Stevens] Act's conservation and management goals."  Defs. Supp. Br. at 20 (citing *Loper Bright*, 45 F.4th at 366 (describing the language "necessary and appropriate" as "a 'capacious[]' grant of power that 'leaves agencies with flexibility.'"))  The D.C. Circuit's recognition that the Magnuson-Stevens Act utilized broad language in employing this phrase is the most recent such acknowledgment.  Other cases dating back to the 1980s and 1990s are in accord.  *E.g.*, *Conservation L. Found. of New Eng., Inc. v. Franklin*, 989 F.2d 54, 61 (1st Cir. 1993) (describing "broad discretion" under identically phrased

17

provision); *Lovgren v. Byrne*, 787 F.2d 857, 864 (3d Cir. 1986) (similarly describing "broad authority" under Section 1853(b)(14)).

As for the "outer bounds" of the term "necessary and appropriate," the Supreme Court has made clear that this is a matter for the courts to determine, as informed by the ordinary meaning of the terms and statutory context. Accordingly, the Court should consider the substantive standards in the Magnuson-Stevens Act, which guide and circumscribe the exercise of the Service's discretion. As outlined above, these include the definition of the phrase "conservation and management" and the multiple detailed, specific policy goals set forth in the statute. 16 U.S.C. § 1801(a)(6), (b)(3), (c)(3); *id*. at § 1802(5). The National Standards play an integral role in ensuring that conservation and management measures are consistent with the substantive limits on the Service's rulemaking authority, particularly the cost-related standards. 16 U.S.C. § 1851(a)(7)-(8). And, in exercising its discretion, the Service must choose among reasonable options, subjecting its choices to the arbitrary-and-capricious standard of review set forth in the APA. *Loper Bright*, 144 S. Ct. at 2263, 2268.

Thus, Defendants have identified here and in their opening supplemental brief multiple "principled limits" that Plaintiffs simply overlook and avoid. *See* Defs. Supp. Br. at 20-21. The Service's interpretation of Section 1853(b)(8) is not a bid for "unbounded power." Pl. Resp. Br. at 15, 16. Rather, Defendants' position relies on the discretion and flexibility granted to the Service in the Magnuson-Stevens Act, which was appropriately exercised in crafting the Final Rule.

### 2.    The Service reasonably exercised its authority to adopt the measures in the Final Rule.

In arguing that the Final Rule "is novel and unknown in all federal law or other agencies," Plaintiffs try valiantly to cast this dispute as one that is about the "salary of an[] inspector or enforcement agent[.]" Pl. Resp. Br. at 15. But observers are not inspectors or enforcement agents,

and the proper focus is whether the Service reasonably exercised its authority in determining that the data obtained through industry-funded monitoring is necessary for the conservation and management of the fishery, thereby implementing the Final Rule. Plaintiffs fail to make any serious argument against the Service's authority to implement observer programs for conservation and management as authorized in Section 1853(b)(8), and to adopt reasonable policies necessary and appropriate for implementation of those programs as permitted in Section 1853(b)(14).

As explained in Defendants' opening supplemental brief, the Magnuson-Stevens Act makes clear that the collection of data about the fishery is critical to conservation and management of this public resource. Accordingly, the purpose of the observer provision is to "collect[] data necessary for the conservation and management of the fishery[.]" 16 U.S.C. § 1853(b)(8). The importance of reliable data is evident throughout the statute. *See*, *e.g.*, 16 U.S.C. § 1801(a)(8) (collection of reliable data is "essential" to conservation, management, and scientific understanding of the fishery resource); *see also id.* at §§ 1801(c)(3), 1851(a)(2), 1853(a)(5).

Plaintiffs argue throughout their brief that observers "collect information useful to the Government[,]" Pl. Resp. Br. at 16, as though to imply that the data gathered by observers is not useful to the fishery. But, as explained in the Final Rule, the information that observers collect is beneficial to the entire fishery and, in fact, essential for the accurate monitoring of fishery harvests.[12] AR17735; AR17740-42. Plaintiffs' description of industry-funded monitors as "government enforcers[,]" Pl. Resp. Br. at 7, is contradicted by the biological nature of the information that observers collect and the lack of any enforcement powers authorized in the

---

[12] For example, other provisions of the Final Rule allow midwater trawl vessels to fish for herring in closed areas if the vessel voluntarily chooses to procure an observer. AR17735-36. In other words, it allows fishing opportunities in a restricted area where there otherwise would be none, absent an industry-funded monitor. *Id.* The data collected in these closed areas has the potential to allow others a similar fishing opportunity.

19

statute.[13]  AR17735; *see* n.2, *supra*.  Plaintiffs also cite Section 1881b(b)(4) for the proposition that observers "do nothing for the vessel except report violations of law[,]" Pl. Resp. Br. at 7, but that section of the Magnuson-Stevens Act has nothing to do with "violations of law."  To the contrary, Section 1881b(b)(4) is just one of several directions to the Secretary regarding the training of observers, requiring the use of "university and any appropriate private nonprofit organization training facilities and resources, where possible, in carrying out this subsection."  16 U.S.C. § 1881b(b)(4).[14]  Nor is there any basis for Plaintiffs' statement that observers "are not directed by the vessel owner[.]" Pl. Resp. Br. at 9.  While the Final Rule identifies the information that observers should gather, AR17735, vessels are required to procure monitoring services.  50 C.F.R. § 648.11(m)(4).  Thus, vessels have the choice to seek a contract or not with any approved service provider and can decide the terms of that contract or seek to purchase services on a trip-by-trip basis if a service provider can feasibly provide such services.  AR17737.  While the Final Rule explains what information is to be collected, this hardly serves to bar the vessel owner from providing other direction.

As Defendants explained in their opening supplemental brief, this Court already determined that Congress gave the Secretary the power to take measures that are necessary and appropriate to achieve the Magnuson-Stevens Act's conservation goals.  *See Relentless*, 561 F. Supp. 3d at 237 (citing 16 U.S.C. § 1853(a)(1)(A)).  Plaintiffs fail to provide any reason why this

---

[13]   Observers are available for debriefing by authorized officers, but any witness to a potential fishery violation may be subject to an interview by an authorized officer.

[14]   Nor is there any other text in Section 1881b to support Plaintiffs' contention that industry-funded monitors serve a law enforcement purpose.  To the contrary, Section 1881b(b) explains that observers must have a sufficient level of competence in "fisheries science and statistical analysis[,]" thus underscoring the biological nature of the position.  16 U.S.C. § 1881b(b)(2).

Court should depart from its earlier holding on this point, nor have they disputed the "integral nature of catch estimates" to the statute's conservation goals. *See id*. at 237-38.

When reviewing "discretionary policymaking," the Court's role is to ensure that the Service has exercised its discretion reasonably, consistent with the arbitrary-and-capricious review set forth in the APA. *See Loper Bright*, 144 S. Ct. at 2263, 2268. The Court should adhere to its earlier holding and again reject Plaintiffs' arguments.

## III. CONCLUSION

Congress authorized the Service to require vessels to carry observers for the purposes of collecting data necessary for the conservation and management of the fishery. Congress also authorized the Service to prescribe other measures, requirements, conditions, and restrictions that are deemed necessary and appropriate for the conservation and management of the fishery. Here, the Service determined that observers were necessary for the conservation and management of the herring fishery, and required industry to pay its costs for observer services. Requiring industry participants to bear their compliance costs is not a novel proposition. As the First Circuit explained, "[w]hen Congress says that an agency may require a business to do 'X,' and is silent as to who pays for 'X,' one expects that the regulated parties will cover the cost of 'X.'" *Relentless*, 62 F.4th at 629. Nothing in the Supreme Court's decision displaced this practical, common-sense rule, and none of Plaintiffs' arguments offer the Court any reason to depart from it. For all the foregoing reasons, the Court should reject Plaintiffs' arguments and uphold the Omnibus Amendment and the Final Rule as wholly consistent with the authority granted by Congress in the Magnuson-Stevens Act.

Dated: November 26, 2024                              Respectfully submitted,

                                                     TODD KIM,
                                                     Assistant Attorney General

S. JAY GOVINDAN, Chief
MEREDITH L. FLAX, Deputy Chief

/s/ Alison C. Finnegan
Alison C. Finnegan, Senior Trial Attorney
(Pennsylvania Bar No. 88519)
U.S. Department of Justice
Environment & Natural Resources Division
Wildlife & Marine Resources Section
Ben Franklin Station, P.O. Box 7611
Washington, D.C. 20044-7611
Tel: (202) 305-0500; Fax: (202) 305-0275
alison.c.finnegan@usdoj.gov

Attorneys for Defendants

Of Counsel:

Mitch MacDonald
U.S. Department of Commerce
National Oceanic and Atmospheric Administration
Office of General Counsel, Northeast Section
Gloucester, Massachusetts

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on November 26, 2024, I electronically filed the foregoing with the

Clerk of Court using the CM/ECF system, which will send electronic notification of such filing

to all counsel of record.

                                                     /s/ Alison C. Finnegan