```
                    UNITED STATES DISTRICT COURT
                  FOR THE DISTRICT OF RHODE ISLAND
_____
                                    )
RELENTLESS INC., et al.,            )
                                    )
          Plaintiffs,               )
                                    )
     v.                             )    C.A. No. 20-108 WES
                                    )
U.S. DEPARTMENT OF COMMERCE,        )
et al.,                             )
                                    )
          Defendants.               )
_____)
```

**OPINION AND ORDER**

WILLIAM E. SMITH, Senior District Judge.

The Magnuson-Stevens Act regulates the conservation and management of the United States' fishery resources. Under the Act, the National Marine Fisheries Service enacted a regulation that sometimes requires vessels fishing for Atlantic herring to bear costs associated with carrying aboard a mandated at-sea monitor. Plaintiffs, owners and operators of Atlantic herring fishing vessels, challenge this regulation as unlawful under the Administrative Procedure Act.

Pending before the Court are Plaintiffs' Motion for Summary Judgment, Dkt. No. 37, and Defendants' Cross Motion for Summary Judgment, Dkt. No. 38. For the reasons below, the Court DENIES Plaintiffs' Motion and GRANTS Defendants' Cross Motion.[1]

---

[1] The Court substitutes the Secretary of Commerce, Howard W. Lutnick, for Gina M. Raimondo; Laura Grimm, NOAA Administrator,

1

**I. BACKGROUND**

  **A. The Magnuson-Stevens Act**

To address the "depletion of the nation's fish stocks due to overfishing," Congress passed the 1976 Magnuson-Stevens Fishery Conservation and Management Act ("MSA"), Pub. L. No. 94-265, 90 Stat. 331 (codified as amended at 16 U.S.C. §§ 1801-1884). Goethel v. U.S. Dep't of Com., 854 F.3d 106, 108-09 (1st Cir. 2017) (quoting Associated Fisheries of Me., Inc. v. Daley, 127 F.3d 104, 107 (1st Cir. 1997)). Through the MSA, Congress sought to "take immediate action to conserve and manage the fishery resources found off the coasts of the United States" and "to promote domestic commercial and recreational fishing under sound conservation and management principles." 16 U.S.C. § 1801(b)(1), (3).[2]

Among other things, the MSA (1) requires the "preparation and implementation" of fishery management plans; and (2) establishes "Regional Fishery Management Councils" tasked with "prepar[ing], monitoring, and revisi[ng]" the plans. Id. § 1801(b)(4), (5). The MSA further addresses fishery management plans in two other key places. First, Section 1851(a) provides ten "national

---

for Richard Spinrad; and Eugenio Piñeiro Soler, Assistant Administrator for NOAA Fisheries, for Janet Coit. See Fed. R. Civ. P. 25(d).

  [2] "The term 'fishery' means one or more stocks of fish which can be treated as a unit for purposes of conservation and management . . . and any fishing for such stocks." 16 U.S.C. § 1802(13) (citation modified).

standards for fishery conservation and management" (the "National Standards") with which fishery management plans and implementing regulations "shall be consistent[.]" Second, Section 1853 dictates the plans' specific contents.

As to contents, fishery management plans must include certain provisions. Id. § 1853(a). Relevant to this dispute, a plan "shall contain the conservation and management measures . . . which are necessary and appropriate for the conservation and management of the fishery, to prevent overfishing and rebuild overfished stocks, and to protect, restore, and promote the long-term health and stability of the fishery." Id. § 1853(a)(1)(A).

Fishery management plans may include certain other provisions. Id. § 1853(b). The MSA lists some example discretionary provisions. Id. § 1853(b)(1)-(12). Relevant to this case, Subsection (b)(8) permits plans to "require that one or more observers be carried on board a vessel of the United States engaged in fishing for species that are subject to the plan[.]" But the list is not exclusive; plans may also "prescribe such other measures, requirements, or conditions and restrictions as are determined to be necessary and appropriate for the conservation and management of the fishery." Id. § 1853(b)(14).

Finally, to implement fishery management plans or plan amendments, a regional council may propose regulations that the council "deems necessary or appropriate." Id. § 1853(c).

3

The MSA tasks the Secretary of Commerce ("the Secretary") with reviewing all fishery management plans for consistency with applicable law and publishing them for a sixty-day period of notice and comment. Id. § 1854(a)(1). After considering the comments, the Secretary "shall approve, disapprove, or partially approve" the plans. Id. § 1854(a)(3). The implementing regulations must also be promulgated through notice and comment, with a publication period of fifteen to sixty days. Id. § 1854(b). The Secretary has delegated administrative authority of the MSA to the National Marine Fisheries Service ("NMFS"). Loper Bright Enters. v. Raimondo, 603 U.S. 369, 380 (2024).

**B. Industry-Funded Monitoring**

In 2000, the New England Fishery Management Council (the "Council") implemented the current Atlantic herring fishery management plan (the "Plan"). AR17104.[3] Among other provisions, the Plan has an annual catch limit and restrictions on when and where Atlantic herring may be caught. See 50 C.F.R. § 648.200. Since 2007, the Plan has also included an at-sea monitoring program using the Standardized Bycatch Reporting Methodology ("SBRM"), by which bycatch is monitored by on-board, government-funded observers. See AR17293. The frequency of SBRM coverage varies based on available funding. See MSA Provisions; Fisheries of the

---

[3] The Court cites the Administrative Record, Dkt. Nos. 21-30, 34, using the Bates numbering system utilized by the parties.

4

Northeastern U.S.; Industry-Funded Monitoring ("Final Rule"), 85 Fed. Reg. 7414 (Feb. 7, 2020) (codified at 50 C.F.R. pt. 648) (AR17731).

In 2017, the Council adopted the Industry-Funded Monitoring Omnibus Amendment ("IFM Amendment"). See Final Rule, 85 Fed. Reg. at 7414-19 (AR17731-36). With the IFM Amendment, the Council sought to expand the Plan monitoring program and thus increase the accuracy of catch estimates for Atlantic herring and incidental catch species. Id. at 7417-18 (AR17734-35). Under the IFM Amendment, NMFS pays for some costs - such as training and certifying monitors, processing data, and coordinating with various partners - and industry participants pay for the monitors' travel expenses and daily salaries. Id. at 7415-16 (AR17732-33).

The Plan's overall monitoring program – both SBRM and industry-funded monitoring – aims to cover fifty percent of licensed Atlantic herring fishing vessels on a declared herring fishing trip. Id. at 7417 (AR17734). The two types of monitoring do not co-occur on any one trip. Id. Therefore, industry-funded monitoring only applies to the delta between the percentage of trips with SBRM monitoring (which varies based on available funding) and the fifty-percent target.

For each trip that a vessel declares that it will catch Atlantic herring, NMFS informs the vessel operator whether an at-sea monitor is required. However, the monitoring requirement will

5

be waived if (1) an at-sea monitor is not available, (2) the vessel has midwater trawl gear and intends to operate as a wing vessel (meaning that it will not carry any fish), or (3) the vessel intends to land less than fifty metric tons of herring during the trip. Id. at 7418 (AR17735). Midwater trawl vessels - as opposed to bottom trawlers like Plaintiffs', see Lapp Decl. ¶ 4, Dkt. No. 37-4 – can avoid the at-sea monitoring requirement by using electronic monitoring devices in combination with portside sampling protocols. Id. at 7419-20 (AR17736-37). NMFS estimates that the cost of an at-sea monitor is $710 per day. Id. at 7420 (AR17735).

NMFS approved the IFM Amendment in 2018 and promulgated the implementing rule (the "Final Rule") in 2020. Id. at 7414, 7422, 7424 (AR17731, 17739, 17741).

### C. Procedural History

Plaintiffs filed this four-count lawsuit in 2020, challenging the Final Rule under various legal theories. See Compl. ¶¶ 86-107, Dkt. No. 1. But because challenges to fishery management plans are only reviewable under the Administrative Procedure Act ("APA"), see 16 U.S.C. § 1855(f)(1)(B), the Court re-characterizes Plaintiffs' claims solely in APA terms. Under that framework, Plaintiffs claim that the Final Rule is unlawful and should be set aside because it: (1) is not authorized by the MSA; (2) violates other provisions of the MSA; (3) runs afoul of the Constitution's

6

Commerce Clause; and (4) was adopted without following the procedural requirements of the Regulatory Flexibility Act ("RFA"). See Compl. ¶¶ 86-107; see also 5 U.S.C. § 706(2)(A)-(D).

In late 2020 and early 2021, the parties filed cross-motions for summary judgment. See Pls.' Mot. Summ. J. ("Pls.' Mot."), Dkt. No. 37; Defs.' Cross Mot. Summ. J. ("Defs.' Cross Mot."), Dkt. No. 38. To analyze the cross-motions, the Court relied on so-called Chevron deference to find that the Final Rule was lawful under the MSA. Op. & Order (Sep. 20, 2021) 8-18, Dkt. No. 47 (citing Chevron, U.S.A., Inc. v. Nat. Res. Def. Council, Inc., 467 U.S. 837 (1984). After concluding that Plaintiffs' other challenges also failed, id. at 18-32, the Court denied Plaintiffs' Motion and granted judgment in favor of Defendants. Id. at 32; Judgment (Sep. 20, 2021), Dkt. No. 48.

Plaintiffs appealed. Notice Appeal, Dkt. No. 49. They contested all the Court's rulings, but the First Circuit affirmed across the board. Relentless, Inc. v. U.S. Dep't of Com. ("Relentless I"), 62 F.4th 621, 625 (1st Cir. 2023), vacated, Loper Bright, 603 U.S. 369 (2024).

The Supreme Court then granted review, "limited to the question of whether Chevron should be overruled or clarified." Loper Bright, 603 U.S. at 384. After review, the Court officially overruled Chevron, holding that "[c]ourts must exercise their independent judgment in deciding whether an agency has acted within

7

its statutory authority, as the APA requires." Id. at 412. It therefore vacated the First Circuit's judgment and remanded the case "for proceedings consistent with [its] opinion." Id. at 413.

On remand, the First Circuit vacated its entire earlier opinion and judgment; vacated this Court's earlier judgment; and "remanded to the district court for consideration." Relentless, Inc. v. U.S. Dep't of Com. ("Relentless II"), 2024 WL 3647769 (1st Cir. 2024).

## II. LEGAL STANDARDS

### A. Scope of Remand

"As a general rule, 'when the Supreme Court remands in a civil case, the [lower court] should confine its ensuing inquiry to matters coming within the specified scope of the remand.'" Gonzalez v. Justs. of the Mun. Ct. of Bos., 420 F.3d 5, 8 (1st Cir. 2005) (quoting Kotler v. Am. Tobacco Co., 981 F.2d 7, 13 (1st Cir. 1992)). "To determine the scope of a remand, a district court must 'consider carefully both the letter and the spirit of the mandate, taking into account the appellate court's opinion and the circumstances it embraces.'" United States v. Cheveres-Morales, 83 F.4th 34, 41 (1st Cir. 2023) (quoting United States v. Dávila-Félix, 763 F.3d 105, 109 (1st Cir. 2014) (citation modified)).

### B. Summary Judgment

"[A] motion for summary judgment is simply a vehicle to tee up a case for judicial review . . . ." Bos. Redev. Auth. v. Nat'l

8

Park Serv., 838 F.3d 42, 47 (1st Cir. 2016) (citing Mass. Dep't of Pub. Welfare v. Sec'y of Agric., 984 F.2d 514, 526 (1st Cir. 1993)). "Because the APA standard affords great deference to agency decisionmaking and because the Secretary's action is presumed valid, judicial review, even at the summary judgment stage, is narrow." Associated Fisheries of Me., 127 F.3d at 109 (citing Citizens to Preserve Overton Park, Inc. v. Volpe, 401 U.S. 402, 415-16 (1971)). The Court will set aside the regulation only if it is "'arbitrary, capricious, an abuse of discretion,' or 'without observance of procedure required by law,' or otherwise contrary to law." Campanale & Sons, Inc. v. Evans, 311 F.3d 109, 116 (1st Cir. 2002) (quoting 5 U.S.C. § 706(2)(A)-(D)).

**III. DISCUSSION**

On remand, Plaintiffs and Defendants agree that the only issue before the Court is whether the MSA authorizes the Final Rule. Pls.' Suppl. Br. Supp. Mot. Summ. J. ("Pls.' Suppl. Br.") 1, Dkt. No. 59; Defs.' Suppl. Br. 3, Dkt. No. 60. The Court concurs and thus does not revisit its earlier rulings on Plaintiffs' other claims.

In interpreting the MSA, the Court "must exercise [its] independent judgment[.]" Loper Bright, 603 U.S. at 412. To the extent that the Act is ambiguous, the Court must "use every tool at [its] disposal to determine the best reading of the statute and resolve the ambiguity." Id. at 400. In doing so, the Court

9

concludes that the Final Rule is consistent with the MSA, specifically Section 1853(b).

The Court starts with Subsection (b)(8), which permits plans to "require that one or more observers be carried on board a vessel of the United States engaged in fishing for species that are subject to the plan, for the purpose of collecting data necessary for the conservation and management of the fishery[.]"  To the extent that the Final Rule does this, Plaintiffs do not contest its legality; they oppose the Final Rule only insofar as it sometimes places the associated costs on them.  See Pls.' Suppl. Br. 2.  But as the First Circuit noted, "[t]his argument faces an uphill textual climb."  Relentless I, 62 F.4th at 629.  That is so because "the 'default norm' as 'manifest without express statement in literally hundreds of regulations, is that the government does not reimburse regulated entities for the cost of complying with properly enacted regulations, at least short of a taking.'"  Id. (quoting Goethel, 854 F.3d at 117-18 (1st Cir. 2017) (Kayatta, J., concurring)).

Next, the Court considers Subsection (b)(14), which allows fishery management plans to "prescribe such other measures, requirements, or conditions and restrictions as are determined to be necessary and appropriate for the conservation and management of the fishery."  This provision, in no uncertain terms, delegates to NMFS a large degree of discretionary authority.  Such a

10

delegation is not uncommon.  See Loper Bright, 603 U.S. at 394, 404 (noting that Congress has "often" done so).  In reviewing NMFS's decisions under this delegated authority, the Court's job is to "effectuate the will of Congress" by "recognizing constitutional delegations, fixing the boundaries of the delegated authority, and ensuring the agency has engaged in reasoned decisionmaking within those boundaries."  Id. at 395 (citation modified) (first quoting H. Monaghan, Marbury and the Administrative State, 83 Colum. L. Rev. 1, 27 (1983); then quoting Michigan v. EPA, 576 U.S. 743, 750 (2015); and then citing Motor Vehicle Mfrs. Assn. of United States, Inc. v. State Farm Mut. Automobile Ins., 463 U.S. 29 (1983)).  This Court and the Relentless I court have already reviewed the Final Rule and found it reflects reasoned decisionmaking and does not cross the boundaries specified by the MSA (namely, the National Standards), the RFA, or the Constitution.  See Op. & Order 18-32; Relentless I, 62 F.4th at 634-39.  This Court now reaffirms that conclusion.

A broader view of the surrounding statutory context strengthens the Court's conclusion that Section 1853(b) authorizes the Final Rule.  Of note, Section 1858(g)(1)(D) allows NMFS to sanction any vessel owner who has not made "any payment required for observer services provided to or contracted by an owner or operator."  The Court agrees with the Relentless I court's assessment that "[t]his penalty would make no sense if Congress

11

did not anticipate that owners and/or operators of the vessels would be paying the observers." 62 F.4th at 630-31.

Section 1801 lends further contextual support. There, Congress spelled out the legislative factfinding, purpose, and policy undergirding the MSA. Congress specifically documented the irreversible effects of overfishing and the "essential" nature of reliable data collection. See 16 U.S.C. § 1801(a)(2)-(6), (8). And Congress translated those findings into a clear directive that "the national fishery conservation and management program utilize[], and [be] based upon, the best scientific information available." Id. § 1801(c)(3). To the extent that associated costs or financial burdens on commercial fishing industry participants were addressed, Section 1801(b)(5) expressly observes that industry participants – along with other relevant actors - would be able to "participate in, and advise on," fishery management plans affecting them.

In their effort to persuade the Court to reach a different result, Plaintiffs advance three principal counterarguments. None is persuasive.

First, Plaintiffs renew their earlier argument that the language of Section 1853(b)(8) does not authorize the Final Rule because it does not directly address industry-funded monitoring. Pls.' Suppl. Br. 9-14; see Op. & Order 11-13. This time, they point to Section 1821(h)(6) to argue that because Congress knew

12

how to provide for Industry-Funded Monitoring in the context of foreign vessels, its decision not to do so in Section 1853(b)(8) constitutes a withholding of authority. Pls.' Suppl. Br. 9-14. They argue that Section 1858(g)(1)(D), which authorizes sanctions for nonpayment, refers only to the observers referenced in Section 1821(h)(6). But Section 1858(g)(1)(D), by its very terms, does not so limit its application. And in any event, Plaintiffs' argument does not account for Section 1853(b)(14), which provides NMFS a residual and broad delegation to "prescribe such other measures, requirements, or conditions and restrictions" that it deems "necessary and appropriate for the conservation and management of the fishery."

This leads to Plaintiffs' second argument: that the Final Rule cannot be deemed "necessary and appropriate." Pls.' Suppl. Br. 15-16. In making this claim, they canvass case law to urge that the broad "language does not allow the Government to do whatever it wants at sea." Id. at 15 (collecting cases). True enough. But Plaintiffs' interpretation, in effect, asks the Court to read Subsection (b)(14) out of the statute. That directly conflicts with the Court's job, which is to "effectuate the will of Congress." Loper Bright, 603 U.S. at 395. Here, Congress explicitly delegated discretionary authority to NMFS, cabined by the National Standards (and, as Plaintiff previously argued, the RFA and the Constitution). As noted above, this Court and the

13

Relentless I court have already explained that the Final Rule sits within those boundaries.

Finally, Plaintiffs cite to legislative history.  Pls.' Suppl. Br. 17-19.  "But that does not move the needle.  When it comes to interpreting the law, speculation about what Congress may have intended matters far less than what Congress actually enacted."  Medina v. Planned Parenthood S. Atl., No. 23-1275, 2025 WL 1758505, at *12 (U.S. June 26, 2025) (citing Epic Sys. Corp. v. Lewis, 584 U.S. 497, 523 (2018) ("[L]egislative history is not the law.")).

## IV. CONCLUSION

To interpret the MSA, the Court "must exercise [its] independent judgment in deciding whether an agency has acted within its statutory authority, as the APA requires."  Loper Bright, 603 U.S. at 412.  In doing so, the Court concludes that the MSA authorizes the Final Rule.  For this reason, the Court DENIES Plaintiffs' Motion for Summary Judgment, Dkt. No. 37, and GRANTS Defendants' Cross Motion for Summary Judgment, Dkt. No. 38.

IT IS SO ORDERED.

/s/ William E. Smith
―――――――――――――――
William E. Smith
Senior District Judge
Date: July 15, 2025

14